UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

CHANEL MOODY, AYANDA CARMICHAEL,
AND RONNIE CLARK

               Plaintiffs,

   vs.

THE RELATED COMPANIES, L.P., AND
ERY SOUTH RESIDENTIAL TOWER LLC,

               Defendants.

Case No. 1:21-cv-6238 (VEC)

**Oral Argument Requested**

---

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF <u>THEIR MOTION TO DISMISS PLAINTIFFS' COMPLAINT</u>

GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
Telephone:  212.351.4000

*Attorneys for Defendants The Related Companies,
L.P., and ERY South Residential Tower LLC*

Dated:  New York, New York
         September 10, 2021

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ......................................................................................... 1

FACTUAL BACKGROUND .............................................................................................. 6

      I.      The Defendants and the Residential Properties at Issue in this Action ................. 6

      II.     Plaintiffs and Their Allegations ................................................................. 9

APPLICABLE LEGAL STANDARDS ............................................................................. 12

ARGUMENT .................................................................................................................... 12

      I.      Plaintiffs Fail to State a Claim Under the Fair Housing Act ............................. 12

            A.     Plaintiffs Fail to Plead an Actionable Disparate-Treatment Claim ......... 13

            B.     Plaintiffs Fail to Plead an Actionable Disparate-Impact Claim .............. 17

            C.     Plaintiffs Fail to Plead Actionable Claims under FHA Sections
                   3604(c) or 3605 ....................................................................................... 23

      II.     Plaintiffs' State- and Local-Law Claims Should Be Dismissed ........................ 24

            A.     Plaintiffs Fail To State a Claim Under State and Local Law .................. 24

            B.     Alternatively, this Court May Decline to Exercise Supplemental
                   Jurisdiction ............................................................................................. 25

CONCLUSION .................................................................................................................. 25

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*30 Clinton Place Owners Inc. v. City of New Rochelle*,
2014 WL 890482 (S.D.N.Y. Feb. 27, 2014) ..................................................................4, 13, 15

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ....................................................................................................................12

*Blair v. N.Y. City Transit Auth.*,
2016 WL 6405900 (E.D.N.Y. Oct. 27, 2016) ............................................................................15

*Boyd v. Lefrak Org.*,
509 F.2d 1110 (2d Cir. 1975) .............................................................................................2, 4, 18

*Byrd v. Rochester Hous. Auth.*,
2018 WL 2739790 (W.D.N.Y. June 7, 2018) ............................................................................24

*Carnegie-Mellon Univ. v. Cohill*,
484 U.S. 353 (1988) ....................................................................................................................25

*DeVore v. Neighborhood Housing Srvs. of Jamaica Inc.*,
2017 WL 1034787 (E.D.N.Y. Mar. 16, 2017) ...........................................................................16

*Fair Hous. in Huntington Comm. Inc. v. Town of Huntington, N.Y.*,
316 F.3d 357 (2d Cir. 2003) .......................................................................................................12

*Felder v. Madison Square Garden*,
2017 WL 9538169 (S.D.N.Y. Jan. 25, 2017),
*report and recommendation adopted*,
2017 WL 1011493 (S.D.N.Y. Mar. 15, 2017) .............................................................................6

*Francis v. Kings Park Manor, Inc.*,
992 F.3d 67 (2d Cir. 2021) .............................................................................................12, 13, 25

*Francois v. N.Y.C. Dep't of Educ.*,
2021 WL 603226 (S.D.N.Y. Mar. 2, 2021) ...............................................................................25

*Garcia v. Marc Tetro, Inc.*,
2020 WL 996481 (S.D.N.Y. Mar. 2, 2020) ...............................................................................25

*Graham v. Long Island R.R.*,
230 F.3d 34 (2d Cir. 2000) .........................................................................................................13

*Grimes v. Fremont Gen. Corp.*,
785 F. Supp. 2d 269 (S.D.N.Y. 2011) ........................................................................................14

## TABLE OF AUTHORITIES
(continued)

Page(s)

*Hack v. President & Fellows of Yale Coll.*,
    237 F.3d 81 (2d Cir. 2000).................................................................21, 22

*Harris v. Dep't of Hous. Pres. & Dev.*,
    2011 WL 13299800 (E.D.N.Y. Apr. 5, 2011) ....................................17

*Hous. Opportunities Made Equal, Inc. v.*
    *Cincinnati Enquirer, a Div. of Gannett Co.*,
    943 F.2d 644 (6th Cir. 1991) .............................................................24

*Jackson v. Cnty. of Rockland*,
    450 F. App'x 15 (2d Cir. 2011) ..........................................................15

*Jernigan v. NYCERS*,
    2010 WL 1049585 (E.D.N.Y. Mar. 18, 2010)....................................9

*Jimenez v. Chase Bank*,
    2019 WL 919626 (S.D.N.Y. Jan. 28, 2019),
    *report and recommendation adopted*,
    2019 WL 917210 (S.D.N.Y. Feb. 25, 2019).......................................24

*Kolari v. New York-Presbyterian Hosp.*,
    455 F.3d 118 (2d Cir. 2006)...............................................................25

*Logan v. Matveevskii*,
    175 F. Supp. 3d 209 (S.D.N.Y. 2016)................................................16

*Louis v. N.Y.C. Hous. Auth.*,
    152 F. Supp. 3d 143 (S.D.N.Y. 2016)................................................12

*Mandala v. NTT Data, Inc.*,
    975 F.3d 202 (2d Cir. 2020)..........................................................20, 21, 22

*Marzullo v. Beekman Campanile, Inc.*,
    2010 WL 11506402 (S.D.N.Y. July 27, 2010) ...................................7

*Mhany Mgmt., Inc. v. Cty. of Nassau*,
    819 F.3d 581 (2d Cir. 2016)...............................................................19

*Moultrie v. Carver Foundation*,
    669 Fed. App'x 25 (2d Cir. 2016).......................................................13

*Ng v. HSBC Mortg. Corp.*,
    2010 WL 889256 (E.D.N.Y. Mar. 10, 2010).......................................15

# TABLE OF AUTHORITIES
(continued)

Page(s)

*Nieblas-Love v. N.Y.C. Hous. Auth.*,
    165 F. Supp. 3d 51 (S.D.N.Y. 2016).........................................................................25

*Ohio House, LLC v. City of Costa Mesa*,
    2020 WL 4187765 (C.D. Cal. Mar. 16, 2020).........................................................23

*Opoku v. Brega*,
    2016 WL 5720807 (S.D.N.Y. Sept. 30, 2016).........................................................14

*Pandozy v. Segan*,
    340 F. App'x 723 (2d Cir. 2009) .............................................................................24

*Rowe v. N.Y.S. Dep't of Tax & Finance*,
    2018 WL 3384429 (N.D.N.Y. July 10, 2018),
    *aff'd* 786 Fed. App'x 302 (2d Cir. 2019) ...............................................................16

*Salute v. Stratford Greens Garden Apts.*,
    136 F.3d 293 (2d Cir. 1998).......................................................................2, 4, 19

*Sanders v. Grenadier Realty, Inc.*,
    2009 WL 1270226 (S.D.N.Y. May 6, 2009),
    *aff'd*, 367 F. App'x 173 (2d Cir. 2010)...............................................................14, 25

*Short v. Manhattan Apartments, Inc.*,
    916 F. Supp. 2d 375 (S.D.N.Y. 2012)......................................................................25

*Smith v. City of New York*,
    385 F. Supp. 3d 323 (S.D.N.Y. 2019) ....................................................................25

*Soloviev v. Goldstein*,
    104 F. Supp. 3d 232 (E.D.N.Y. 2015) ....................................................................25

*Sosa v. N.Y. City Dep't of Educ.*,
    368 F. Supp. 3d 489 (E.D.N.Y. 2019) ....................................................................15

*Stewart v. Loring Ests. LLC*,
    2020 WL 3002363 (E.D.N.Y. Feb. 26, 2020),
    *report and recommendation adopted sub nom.*,
    *Parsaram v. Chicago Title Ins. Co.*,
    2020 WL 1231783 (E.D.N.Y. Mar. 13, 2020).............................................................7

*Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*,
    576 U.S. 519 (2015)........................................................................5, 12, 18, 22, 23

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Thompson v. ABVI Goodwill Servs.*,
    531 F. App'x 160 (2d Cir. 2013) ...........................................................................12

*Tsombanidis v. W. Haven Fire Dep't*,
    352 F.3d 565 (2d Cir. 2003),
    *superseded by regulation on other grounds*..............................................5, 20, 22

*Ungar v. NYCHA*,
    2009 WL 125236 (S.D.N.Y. Jan. 14, 2009) ...........................................................22

*Watson v. New York Pressman's Union No. 2*,
    444 F. App'x 500 (2d Cir. 2011) ...........................................................................21

*Williams v. 2000 Homes Inc.*,
    2009 WL 2252528 (E.D.N.Y. July 29, 2009) .........................................................13

*Williams v. 5300 Columbia Pike Corp.*,
    1996 WL 690064 (4th Cir. 1996) ....................................................................4, 5, 18

*Wiltz v. New York University*,
    2019 WL 8437456 (S.D.N.Y. Dec. 23, 2019),
    *report and recommendation adopted*,
    2020 WL 614658 (S.D.N.Y. Feb. 10, 2020)...........................................................15

*Wood v. Mut. Redevelopment Houses, Inc.*,
    2016 WL 11720460 (S.D.N.Y. Mar. 31, 2016) ......................................................23

*Xia v. 65 W. 87th St. Hous. Dev. Fund Corp.*,
    2020 WL 7230961 (S.D.N.Y. Dec. 8, 2020) .........................................................13

*Yak v. Bank Brussels Lambert*,
    252 F.3d 127 (2d Cir. 2001)....................................................................................7

**Statutes**

28 U.S.C. § 1367 ..........................................................................................................25

42 U.S.C. § 3604..................................................................................................*passim*

42 U.S.C. § 3605..................................................................................................*passim*

**Regulations**

24 C.F.R. § 100.500 ..........................................................................................19, 20, 21

## PRELIMINARY STATEMENT

This is a case that never should have been brought.  It makes incendiary, unwarranted allegations of race discrimination against the respected developer of this highly-acclaimed mixed-use project in the recently-revitalized Hudson Yards area of Manhattan—one that, as Plaintiffs themselves allege, "provide[s] a predominantly minority community with a form of social assistance."  Compl. ¶ 87.  Defendants have contributed substantially to the development of affordable housing in New York, including through this project, which was specifically structured to have the owners of luxury condominiums on this site subsidize the operational costs of affordable rental apartments.  Yet Plaintiffs complain that, because, unsurprisingly, there are differences between the amenities afforded to luxury condominium owners and affordable apartment renters in this mixed-used development, that somehow constitutes "racial discrimination."  But disparity relating to the economics of what individuals of different financial means can afford is not race discrimination.  Because, in sum and substance, Plaintiffs allege nothing more than such a disparity, that should end the inquiry.

The mixed-use development at issue here is comprised of multiple properties on the same site—one consisting of for-sale "luxury condominiums," and another offering below-market affordable rental apartments subject to federal and state affordable-housing regulations.  *Id.* ¶ 67.  These two residential components share common entrances and lobby space, but each has dedicated amenity spaces that are not shared with the other.[1]  Plaintiffs acknowledge that there are "differences in wealth" between the residents of these two housing components; from there, they allege that the affordable rental tenants, mostly minorities, do "not hav[e] access" to the "posh

---

[1]   Plaintiffs try to give the false impression that each housing component—one containing luxury condominiums and the other affordable rentals—has a "separate entrance," but then concede that that is not so today.  Compl. ¶¶ 13, 69 (alleging "separate" entrances "at one point").  In fact, the two components have always shared common lobby space accessible from either of two entrances, each open to all and staffed with 24-hour concierge.

amenities," such as a pool and roof terrace, that are appurtenant to the purchased "luxury" condominium residences. *Id.* ¶¶ 14, 67.

Of course, there are differences in economic means between those who can afford to purchase luxury condominiums and pay high monthly fees for the amenities that go with them, and those who qualify for subsidized affordable rental housing and the different amenities accompanying those rental apartments. But economic disparity is not racial discrimination, and this Complaint's "apples to oranges" comparison does not make it so. As the Second Circuit has explained, the fair-housing laws were not intended to create liability "every time a neutral policy imposes an adverse impact on individuals who are poor," and "differential treatment of different economic groups" does not become "racial discrimination" simply because "minorities are statistically overrepresented in the poorer economic groups." *Salute v. Stratford Greens Garden Apts.*, 136 F.3d 293, 302 (2d Cir. 1998); *Boyd v. Lefrak Org.*, 509 F.2d 1110, 1113 (2d Cir. 1975). In short, Plaintiffs fail to state any viable claim of race discrimination under the federal Fair Housing Act, or under state or local anti-discrimination laws. Hence, this Court should dismiss this action with prejudice, pursuant to Federal Rule of Civil Procedure 12(b)(6), or, alternatively, dismiss Plaintiffs' federal claims with prejudice and decline to exercise supplemental jurisdiction over Plaintiffs' state- and local-law claims.

At bottom, this Complaint is all rhetoric, no substance. In a transparent attempt to generate adverse press to try to shake down the Defendants, Plaintiffs' counsel have peppered their pleading with racially-charged references to "segregation" and "financial apartheid" (Compl. at 2, ¶¶ 1-3, 14, 73, 77), but they state no actual claim of race discrimination. Nor could they, because the Defendants never discriminated here against anyone at any time in any way. Indeed, they have created what commentators have hailed as a "grand vision of the mixed-use neighborhood of the

future" that is "not just for the wealthy," but also includes apartments "reserved for affordable housing."[2] But this is a motion to dismiss to be decided on the face of the pleading, and stripped of its rhetoric, this pleading is fatally flawed, which compels its immediate dismissal.

The fundamental premise of Plaintiffs' case is that unlawful race discrimination somehow results from the mere fact that individuals of greater economic means can obtain more luxurious housing accommodations than individuals of lesser means. Plaintiffs admit they applied for affordable rental housing in this development and won a government-supervised "housing lottery" for the opportunity to rent these below-market apartments, but allege they declined because of differences in the configuration and amenities associated with the affordable rentals, as compared with the luxury condominiums. *Id.* ¶¶ 57, 73. They accuse Defendants of "racial discrimination," claiming that, "[b]ecause of well-known racial disparities regarding low-income tenants and high-income tenants in New York City," Defendants' alleged differential treatment of these two differently situated economic groups—"low-income" renters of "affordable rental units," on the one hand, and purchasers of "luxury condominiums," on the other—has a "disproportionately adverse impact on minorities." *Id.* ¶¶ 1, 67, 78, 84. But that is a product of economics, not race, and it is not actionable under anti-discrimination laws for several reasons.

To begin with, Plaintiffs purport to assert claims under the federal Fair Housing Act ("FHA"), 42 U.S.C. §§ 3604, 3605, alleging both "disparate treatment" and "disparate impact" theories of discrimination. But upon closer scrutiny, their allegations cannot plausibly be read as asserting a claim premised on disparate treatment of any racial group. A claim of race-based disparate treatment requires allegations that Plaintiffs "were treated differently from similarly

---

[2] Yasmin Gagne, *Manhattan's Hudson Yards is the neighborhood of the future*, Fast Company, Jan. 23, 2019, https://www.fastcompany.com/90285733/manhattans-hudson-yards-is-the-neighborhood-of-the-future (reporting below-market rents "starting at $858 a month for a studio").

situated persons or groups because of race." *30 Clinton Place Owners Inc. v. City of New Rochelle*, 2014 WL 890482, at *3 (S.D.N.Y. Feb. 27, 2014). Plaintiffs make no such allegation here. They do not claim that qualified members of any racial group were excluded from obtaining housing either in the affordable rental apartments they sought or in the luxury condominiums that are offered for sale in this mixed-use development. Nor do they claim that any of the affordable rental tenants were treated differently from other affordable rental tenants—or that any of the condominium residents were treated differently from one another—based on race. And they conflate and compare fundamentally different groups, calling both "tenants," when, in reality, those who purchased condominiums are owners, not "tenant" renters.

Rather, Plaintiffs admit what they really challenge is an alleged "facially neutral housing practice" that supposedly has "a disproportionately adverse impact on minorities" who, because of demographic wealth "disparities," are on average less likely than non-minorities to be able to afford "luxury condominiums," and more likely to qualify for below-market "affordable" rentals. Compl. ¶¶ 14, 78, 84. Such allegations do not state a claim for disparate *treatment* based on race.

More importantly, though, the core premise of Plaintiffs' case—that the existence of wealth disparities between different racial groups should render it unlawful to engage in "economic discrimination of a kind that is practiced without regard to" protected classifications such as race— contravenes settled legal principles that have repeatedly been upheld in this Circuit. *Salute*, 136 F.3d at 302; *accord*, *Boyd*, 509 F.2d at 1113. Federal courts have long held that, "[a]lthough it is no doubt true that the 'neutral criterion' of price may disparately impact [minorities], because they may, on average, be poorer than whites . . . , this type of injury extends beyond the reach of the Fair Housing Act." *Williams v. 5300 Columbia Pike Corp.*, 1996 WL 690064, at *3 (4th Cir. 1996) (unpublished decision). To hold otherwise would undermine the very policies underlying

the fair-housing laws and related government programs that incentivize developers to build affordable housing precisely because, as here, they want to help those most in need of it.[3]  Thus, the Supreme Court has explained that "[i]t would be paradoxical to construe the FHA to impose onerous costs on actors who encourage revitalizing dilapidated housing in our Nation's cities merely because some other priority might seem preferable," and that "[e]ntrepreneurs" who develop affordable housing "must be given latitude to consider market factors," so as not to "subject [them] to suit" whenever they "choose to rejuvenate a city core."  *Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 541-42 (2015).

Federal courts have long held that, "when the alleged injury to a claimant is solely the product of a facially neutral price (e.g., a price that does not vary depending on one's race . . . or other status protected by the [FHA]), no claim based on disparate impact can be brought . . . ."  *Williams*, 1996 WL 690064, at *3.  That is exactly what Plaintiffs seek to do here, and they therefore fail to state an actionable disparate-impact claim.

But Plaintiffs' disparate-impact claim also fails for independent reasons.  For example, Plaintiffs' allegations fail to show a "disproportionate impact" on a protected group, as compared to similarly-situated others, and fail to show a "robust" "causal connection between the facially neutral policy and the alleged discriminatory effect" of which they claim—both prerequisites for a viable disparate-impact claim.  *Inclusive Cmtys.*, 576 U.S. at 542; *Tsombanidis v. W. Haven Fire Dep't*, 352 F.3d 565, 575 (2d Cir. 2003), *superseded by regulation on other grounds*.

---

[3]  Of note, New York State and City housing officials were heavily involved in reviewing and approving the plans for this multi-use development, and City officials ran the lottery application process for the affordable housing rental tenants.  For example, as reflected in the Regulatory Agreement with the New York State Housing Finance Agency, that State agency reviewed the building's plans and found that the project's "marketing and tenant selection plan" complied with agency requirements.  Herrmann Decl. Ex. 2 § 4.5.

The balance of the Complaint fares no better.  Plaintiffs mention, in passing, Sections 3604(c) and 3605 of the FHA, which concern practices relating to advertising and certain real estate-related transactions.  But they fail to plead facts sufficient to support either of those far-fetched claims.  And Plaintiffs' state- and local-law claims should be dismissed as a matter of law for the same reasons that compel dismissal of their FHA claims.  In any event, though, in the alternative to addressing those claims on the merits, this Court could properly decline to exercise supplemental jurisdiction over them after dismissing Plaintiffs' FHA claims.

Accordingly, for the reasons explained here, this Court should dismiss the Complaint in its entirety with prejudice, or, alternatively, dismiss Plaintiffs' federal claims with prejudice and decline to exercise supplemental jurisdiction over Plaintiffs' state- and local-law claims.

## FACTUAL BACKGROUND[4]

### I.     The Defendants and the Residential Properties at Issue in this Action

Defendant The Related Companies, L.P. ("Related") is a "privately-owned real estate firm" based in New York, "with offices and major developments" around the world, that "has developed mixed-use projects" in New York and elsewhere, including the historic Hudson Yards redevelopment project that includes the properties at issue here.  Compl. ¶¶ 29-31.  Defendant ERY South Residential Tower LLC ("ERY") is alleged, paradoxically, to be a "foreign limited liability company" organized and existing "under and by virtue of the laws of the State of New York."  *Id.* ¶ 25.  Plaintiffs allege that the Defendants "have developed a mixed-use project [known] as 553 West 30th Street, a/k/a 15 Hudson Yards."  *Id.* ¶ 31.  They further allege (again, paradoxically) that both Related and ERY were "prospective landlords" of the Plaintiffs, and that

---

[4]   Except as otherwise stated, the factual recitation set forth here is drawn from the allegations of Plaintiffs' Complaint.  Defendants do not concede the accuracy of any such allegations and hereby reserve all of their rights to contest, at the appropriate time, any factual matter pleaded in Plaintiffs' Complaint.  Capitalized terms not otherwise defined herein are used as defined in the Condominium Documents.  *See infra* note 5.

each of them "owned," "maintained," "controlled," or "operated the premises known as 15 Hudson Yards and 553 West 30th Street," as well as each being both the "lessor" and "lessee" of such premises. *Id.* ¶¶ 37-51.

The "mixed-use project" at issue here comprises both "luxury condominiums on the upper floors" of the tower constructed on this site, and "affordable rental units on the lower floors," the latter of which are operated "[p]ursuant to" a "Regulatory Agreement between the New York State Housing Finance Agency ("HFA") and the Defendants" (the "Regulatory Agreement"). *Id.* ¶¶ 31, 52, 67; *see* Ex. 2.[5]  The Regulatory Agreement, as Amended and Restated, recites that the affordable rental component "consists of a single condominium unit"—referred to as the "Base Unit"—"located in a larger residential and commercial condominium development . . . established pursuant to the terms of a Declaration of Condominium."[6]  Ex. 2 at 7, *id.* Schedule A at 46.

The Condominium Declaration and supporting Condominium By-Laws and Tower Section By-Laws (collectively, the "Condominium Documents") establish the legal ownership structure for this mixed-use development—which is divided into a number of separately owned

---

[5]  Citations in the form "Ex. __" refer to the exhibits to the Declaration of Gabriel Herrmann filed with this memorandum (Plaintiffs' Complaint is attached thereto as Exhibit 1).  The Regulatory Agreement may be considered for purposes of this motion both because it is incorporated by reference into the Complaint and because it is recorded as a matter of public record accessible via New York City's Automated City Register Information System ("ACRIS") website at https://a836-acris.nyc.gov/DS/DocumentSearch/DocumentImageView?doc_id=2020080300635009.  *See Yak v. Bank Brussels Lambert*, 252 F.3d 127, 130 (2d Cir. 2001) (court may consider "statements or documents incorporated in [the complaint] by reference"); *Stewart v. Loring Ests. LLC*, 2020 WL 3002363, at *9 (E.D.N.Y. Feb. 26, 2020), *report and recommendation adopted sub nom.*, *Parsaram v. Chicago Title Ins. Co.*, 2020 WL 1231783 (E.D.N.Y. Mar. 13, 2020) (in cases concerning real property, court "may take judicial notice of and consider public documents relating to the real property at issue, such as those available at the . . . ACRIS[] website").  Similarly, the Condominium Documents for this development, *see infra* at 6, may be considered now both because they are referenced and relied upon in the Regulatory Agreement, which in turn is incorporated into the Complaint, *see Marzullo v. Beekman Campanile, Inc.*, 2010 WL 11506402, at *1 (S.D.N.Y. July 27, 2010), and because they were publicly filed and are available via ACRIS at https://a836-acris.nyc.gov/DS/DocumentSearch/DocumentImageView?doc_id=2018120700109001.

[6]  The Regulatory Agreement was initially entered into by HFA and ERY as of November 23, 2015.  *See* Ex. 2 at 7.  An Amended and Restated version of the Regulatory Agreement was subsequently executed by HFA and non-parties 15 HY Base Unit Owner LLC and South Residential Tower Affordable, L.P. in July 2020, after 15 HY Base Unit Owner LLC "acquired from ERY . . . a fee interest in a residential condominium unit containing [the] residential rental apartments . . . located within [this] 73-story mixed use tower." *Id.*

condominium units—and define the legal rights and obligations attributable to the owners and occupants of the various condominium units.  As detailed in the Condominium Documents, this development consists of three components, together with various "Common Elements" that are owned and maintained for the benefit of some or all of the condominium unit owners:  (1) a cultural center known as the "Shed," comprising three related condominium units owned by non-profit entities affiliated with the City of New York, which is located on the ground floor and lower levels of the site, together with certain supporting structures and facilities; (2) the "Base Unit," a single condominium unit comprising a bloc of 107 affordable rental apartments, together with certain dedicated amenity spaces for the exclusive use of its residents; and (3) 285 "Tower Units," which are individual for-sale condominium residences collectively that (together with certain Tower Limited Common Elements, discussed below, that are appurtenant to the Tower Units) are referred to in the Condominium Documents as the "Tower Section."  Ex. 3, Condominium Declaration § 3.1.1(a)-(e).  Pursuant to the Regulatory Agreement, all 107 affordable rental apartments are reserved exclusively for low-income tenants at subsidized, below-market rates, and the process for selecting tenants was conducted pursuant to a lottery system overseen by the New York City Department of Housing Preservation and Development and conducted in accordance with the HFA's Fair Housing and Tenant Selection Guidelines.  *See* Ex. 2 §§ 3.2(d), 4.2, 4.3, 4.5.

The Condominium Documents also define the condominium unit owners' respective property rights in several categories of "Common Elements" appurtenant to the site, which are defined by reference to the portions of the property they benefit or serve.  Ex. 3, Condominium Declaration § 7.1.  The "Residential Limited Common Elements," for example, "exclusively serve or exclusively benefit the Base Unit and some or all of the Tower Units or the Tower Section."  *Id.* § 7.1; *see id.* § 7.4.  They expressly include, among other things, the "residential building entrances

and lobbies." *Id.* § 7.4(b).  A separate category of Common Elements, the "Tower Limited Common Elements," are owned in common by the owners of residential condominium units and "exclusively serve or exclusively benefit some or all of" those units.  *Id.* §§ 7.1, 7.5.  These elements include "[t]he Tower amenities spaces located on the First Floor, Eleventh Floor, Thirty Eighth, Thirty Ninth and Sixty Seventh Floors" of the Residential Tower Building and the "Tower Section elevators."  *Id.* §§ 7.5(b), (g).  The expenses of maintaining the Tower Limited Common Elements are "borne solely by the Tower Unit Owners."  Ex. 3, Tower Section By-Laws § 6.1.2(a).

## II.   Plaintiffs and Their Allegations

Plaintiffs Chanel Moody ("Moody"), Ayanda Carmichael ("Carmichael"), and Ronnie Clark ("Clark") (collectively "Plaintiffs") allege that they are "African American" residents of "New York County" who, "[a]t all relevant times," were "prospective low-income tenant[s]" of the "affordable housing" offered for rent at this site.  Compl. ¶¶ 18-20, 32-34.

Plaintiffs allegedly "were selected from a housing lottery through 'NYC Housing Connect' for low-income housing tenancy that Plaintiffs initially thought were located at '15 Hudson Yards' but in actuality were located at 553 West 30th."  *Id.* ¶ 57.[7]  They claim they only "later became aware that the units offered by Defendants were located at 553 West 30th Street," which "sits on the same grounds as 15 Hudson Yards, but in an entirely separate part of the building and with a different address."  *Id.* ¶ 58.  They also allege that a Related employee "told Plaintiff Moody that," as an affordable rental tenant, she would be "prohibited from entering the 15 Hudson Yards entrance."  *Id.* ¶ 64.  "Upon realizing" these purportedly "discriminatory" circumstances, Plaintiffs allegedly "collectively declined the Defendants' offer of low-income units."  *Id.* ¶ 73.

---

[7]   Plaintiffs do not dispute, however, that the official NYC Housing Connect notice announcing this lottery process exclusively refers to "553 West 30th St." and makes no reference to "15 Hudson Yards."  Ex. 4, 553 West 30th Street, NYC Housing Connect Flyer, *available at* https://a806-housingconnect.nyc.gov/nyclottery/AdvertisementPdf/602.pdf.

Plaintiffs further allege that:

- the affordable rental apartments "did not share the same playrooms or laundry rooms as the market-rate tenants of the adjacent building entrance at 15 Hudson Yards";

- the affordable rental apartments "were isolated and segregated to specific lower floors or areas, away and separate from the market-rate units";

- there are "separate elevators" servicing the affordable rental apartments and the for-sale condominium residences, and that affordable rental tenants have "limited access to certain upper floors" of the tower structure;

- "the lobby of 553 West 30th Street is smaller in comparison to the lobby of 15 Hudson Yards, and at one point was sealed off from 15 Hudson Yards and has its own separate mailboxes and elevators from 15 Hudson Yards"; and

- the affordable rental apartments "do not have a washer and dryer within the unit, as compared to the market-rate units at 15 Hudson Yards."

*Id.* ¶¶ 65-71. Plaintiffs claim that "[s]uch accommodations are necessary" to afford them "an equal opportunity to use and enjoy the dwelling and its amenities." *Id.* ¶ 72.[8]

Based on these allegations, Plaintiffs claim that:

Defendants . . . illegally segregated and discriminated against Plaintiffs and other prospective and current tenants of 553 West 30th Street by segregating the low-income units from market-rate units by placing low-income units on lower floors, and, at one point, excluding the low-income tenants from the same entrance and exit, amenities, rules and regulations, and limiting access to the overall building structure and address of 15 Hudson Yards, among other violations.

*Id.* ¶ 62. They assert claims of unlawful racial discrimination by the Defendants under the FHA, the New York State Human Rights Law, New York Executive Law § 296(5) ("NYSHRL"), and the New York City Human Rights Law, N.Y.C. Admin. Code § 8-107(5) ("NYCHRL").

---

[8]  The Complaint also cites recent amendments to New York's "421-a" tax-incentive program, which encourages development of affordable housing by offering tax exemptions to projects that comply with specified criteria—including, as amended, criteria calling for affordable rental apartments to share "common entrances and common areas" with other apartments, and not to be "isolated to a specific floor or area of a building." Compl. ¶ 9. Such allegations are irrelevant. Plaintiffs do not, and could not, allege that Defendants failed to comply with the requirements of any tax-incentive program applicable to this project. *See id.* ¶ 14. Moreover, development of this project—which was approved in advance by State and City regulators—began *before* the cited amendments took effect. In any event, a developer does not violate anti-discrimination laws simply by building housing that does not conform to the qualification criteria for a *voluntary* tax-incentive program.

But notably, although their claims are premised entirely upon allegations of supposed "racial discrimination" or "discrimination based on race," *e.g.*, Compl. ¶¶ 1, 101, 107, 115, 122, Plaintiffs do not (and in good faith credibly could not) propound any allegation accusing the Defendants of engaging in any differential treatment of any individual or group based on race. They do not claim that any applicant was denied the opportunity to reside in either the affordable rental apartments, or the for-sale condominium residences, because of that person's race. Defendants are not (and could not be) accused, for example, of refusing to rent or sell to minority applicants.  Nor do Plaintiffs claim that any resident of the affordable rental apartments at this site was denied access, on the basis of his or her race, to any of the amenities available to other affordable rental tenants—or that any condominium resident, because of his or her race, was ever denied access to any of the amenities available to other condominium residents.

Rather, Plaintiffs admit that the Defendants' alleged practices at issue here are "facially neutral" with regard to race.  *Id.* ¶¶ 82-84.  They nevertheless claim, however, that, "[b]ecause of well-known racial disparities regarding low-income tenants and high-income tenants in New York City," in which affordable housing is "disproportionately occupied by racial minorities," the Defendants' alleged "housing practices" have a "disproportionately adverse impact on minorities" and "are consistent with a discriminatory policy of limiting the minority tenants into one specific building address and lower floors segregated away from the high-income tenants."  *Id.* ¶¶ 75, 78, 84-85.  Accordingly, Plaintiffs claim, Defendants' alleged practices "violate[] the Fair Housing Act, New York City and State Human Rights Laws, by impeding integration by restricting low-income housing needed by minorities exclusively to an area of a building mostly inhabited by minorities."  *Id.* ¶ 75.  Plaintiffs' Complaint prays for damages and civil penalties, as well as declaratory and injunctive relief, on the basis of these claims.  *Id.* at 29-30.

## APPLICABLE LEGAL STANDARDS

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). "'[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements,' . . . are not entitled to the presumption of truth." *Thompson v. ABVI Goodwill Servs.*, 531 F. App'x 160, 161 (2d Cir. 2013) (quoting *Iqbal*, 556 U.S. at 678). Where, as here, the plaintiffs' non-conclusory factual allegations fail to plausibly support a claim for entitlement to relief under the fair-housing laws, courts do not hesitate to dismiss complaints at the pleading stage. *See, e.g.*, *Francis v. Kings Park Manor, Inc.*, 992 F.3d 67, 82 (2d Cir. 2021); *Louis v. N.Y.C. Hous. Auth.*, 152 F. Supp. 3d 143, 159 (S.D.N.Y. 2016).

## ARGUMENT

### I.       Plaintiffs Fail to State a Claim Under the Fair Housing Act

Plaintiffs assert two causes of action under the FHA. *See* Compl. ¶¶ 93–107. They cite multiple FHA provisions—42 U.S.C. § 3604(a), (b), and (c), as well as § 3605—but the substance of their claims relates principally to Section 3604(a) (discrimination in the offering of, or in refusal to offer, a dwelling) and Section 3604(b) (discrimination in the "terms, conditions, or privileges" of a sale or rental). A plaintiff may assert claims under those provisions premised either on a theory of disparate treatment or a theory of disparate impact. *See, e.g.*, *Inclusive Cmtys.*, 576 U.S. at 533-39; *Fair Hous. in Huntington Comm. Inc. v. Town of Huntington, N.Y.*, 316 F.3d 357, 366 (2d Cir. 2003). Plaintiffs' claims fail, however, because they do not adequately plead either.[9]

---

[9]   Plaintiffs themselves seem unclear about whether their claims are premised on disparate impact or disparate treatment. While they reference "disparate treatment" in the first paragraph of their Complaint, they never explicitly use the word "treatment" or any derivation thereof throughout the rest of the Complaint. Moreover, they allege that Defendants' practices are "facially neutral," Compl. ¶ 84, a concession that damns their disparate-treatment claim and can be squared only with a disparate-impact theory. Defendants assume for purposes of this motion that Plaintiffs are attempting to assert both disparate-treatment and disparate-impact claims.

In passing, Plaintiffs also reference Sections 3604(c) (concerning advertising) and 3605 (concerning "residential real estate-related transactions").  As explained below, Plaintiffs likewise fail to plead any actionable claim under those either of these provisions.

### A.      Plaintiffs Fail to Plead an Actionable Disparate-Treatment Claim

To plead a viable disparate-treatment claim, Plaintiffs "must allege they were treated differently from similarly situated persons or groups because of race, color, religion, sex, familial status, or national origin."  *30 Clinton Place Owners Inc. v. City of New Rochelle*, 2014 WL 890482, at *3 (S.D.N.Y. Feb. 27, 2014).  Plaintiffs fail to meet this standard for two independent reasons:  (1) they fail to identify any similarly situated persons of other races who were treated differently from Plaintiffs, and (2) they fail to allege plausibly that they were treated differently "because of" their race.  Plaintiffs' disparate-treatment claim must therefore be dismissed.

*First*, the Complaint fails to allege that Defendants treated similarly situated individuals differently on the basis of race (or any other protected classification).  A complaint must provide "factual allegations . . . as to how [other individuals who received different treatment] were similarly situated" to the plaintiff, and "how [the plaintiff] experienced disparate treatment." *Moultrie v. Carver Foundation*, 669 Fed. App'x 25, 26 (2d Cir. 2016);[10] *Williams v. 2000 Homes Inc.*, 2009 WL 2252528, at *5 (E.D.N.Y. July 29, 2009) ("[T]reating individuals of different races differently constitutes disparate treatment only if those individuals are otherwise similarly situated.").  Plaintiffs must show they are "similarly situated in all material respects" to the individuals with whom they compare themselves.  *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000).  Thus, for example, plaintiffs who allege that they were excluded from accessing

---

[10]   Courts have recognized that the legal standards applicable to employment-discrimination claims under Title VII are generally applicable to FHA claims as well.  *See Francis v. Kings Park Manor, Inc.*, 992 F.3d 67, 73 (2d Cir. 2021); *Xia v. 65 W. 87th St. Hous. Dev. Fund Corp.*, 2020 WL 7230961, at *7 n.8 (S.D.N.Y. Dec. 8, 2020).

housing accommodations that were made available to similarly-situated others must allege that they "were qualified to rent or purchase the housing" in question.  *Sanders v. Grenadier Realty, Inc.*, 2009 WL 1270226, at *3 (S.D.N.Y. May 6, 2009), *aff'd*, 367 F. App'x 173 (2d Cir. 2010).

Plaintiffs' allegations focus on the wrong comparator group and, therefore, fail to identify any "similarly situated" members of other racial groups who were treated differently from them. Plaintiffs allege that tenants of the affordable rental apartments located in a portion of this development were treated differently from residents of privately owned condominium residences located in another portion of the development because the two groups were not provided access to the same residential amenities and services.  *See, e.g.*, Compl. ¶¶ 62-64.  But this is an "apples-to-oranges" comparison:  residents of privately owned "luxury condominiums," *id.* ¶ 67, are not similarly situated to tenants residing in affordable rental apartments reserved exclusively for people of limited economic means.  In other words, Plaintiffs do not—and plausibly could not—allege that they or any of the other residents of the affordable rental housing in this development were "qualified to . . . purchase" the condominium residences separately offered for sale there. *Sanders*, 2009 WL 1270226, at *3.  Nor do they allege any disparity in treatment as between different racial groups residing within the affordable rental apartments, or between different racial groups residing in the "luxury condominiums."  As such, any disparity in the amenities appurtenant to those two different categories of housing cannot be a predicate for a disparate-treatment claim.

Indeed, courts routinely dismiss disparate-treatment claims when a plaintiff "has not adequately pleaded allegations from which it is plausible to conclude that the comparators are similarly situated, and, therefore, has not adequately alleged disparate treatment that could plausibly support even a minimal inference of discrimination."  *Opoku v. Brega*, 2016 WL 5720807, at *9 (S.D.N.Y. Sept. 30, 2016) (quotation omitted); *see Grimes v. Fremont Gen. Corp.*,

785 F. Supp. 2d 269, 292 n.33 (S.D.N.Y. 2011) (noting "serious deficiencies" in an FHA claim where plaintiffs "fail to plead that any specific similarly-situated non-African American" person received more favorable treatment); *Sosa v. N.Y. City Dep't of Educ.*, 368 F. Supp. 3d 489, 499 (E.D.N.Y. 2019) ("Plaintiff must do more than make conclusory legal allegations that she is substantially similar to her colleagues in order to adequately plead this claim.").

The Complaint is devoid of allegations that Plaintiffs (or any other members of a minority racial group) ever received treatment that differed from any similarly situated individuals who were not members of the same protected group. That is fatal to their disparate-treatment claims. *See, e.g.*, *30 Clinton Place*, 2014 WL 890482, at *3 ("With respect to the disparate treatment theory, plaintiffs have not alleged the City Defendants treated similarly situated persons or groups differently."); *Ng v. HSBC Mortg. Corp.*, 2010 WL 889256, at *11 (E.D.N.Y. Mar. 10, 2010) (dismissing FHA disparate treatment claim where Complaint contained no "specific factual allegations that tend to show how [Plaintiff] was treated any differently from similarly situated" individual). Plaintiffs' "bald assertions of discrimination" must be rejected because they are unsupported by any examples of similarly-situated individuals being treated differently. *Jackson v. Cnty. of Rockland*, 450 F. App'x 15, 19 (2d Cir. 2011); *see Wiltz v. New York Univ.*, 2019 WL 8437456, at *11 (S.D.N.Y. Dec. 23, 2019), *report and recommendation adopted*, 2020 WL 614658 (S.D.N.Y. Feb. 10, 2020). Because Plaintiffs "fail[] to plausibly allege sufficient facts to show that defendant[s] treated a similarly situated [individual] more favorable, [they have] failed to plausibly state a claim for race discrimination." *Blair*, 2016 WL 6405900, at *4.

*Second*, even if tenants of affordable rental housing could be characterized as "similarly situated" to the purchasers of "luxury condominiums" with regard to their respective financial means, dismissal of Plaintiffs' disparate-treatment claim would still be warranted because

Plaintiffs fail to allege that any differences in access to amenities arise "because of" their race.  In fact, the only action that Plaintiffs allege Defendants took was to implement a policy that the Complaint describes as a "facially neutral housing practice."   Compl. ¶ 84.[11]   Plaintiffs nevertheless claim this neutral practice demonstrates an "intent to discriminate." *Id.*  But this effort to bootstrap a disparate-impact claim into an allegation of racial animus to support a disparate-treatment claim fails as a matter of law.  Plaintiffs do "not plausibly allege that similarly situated applicants outside [their] protected class were treated more favorably" vis-à-vis access to amenities and services "in a manner that is even minimally likely to be attributable to racially discriminatory motives." *Rowe v. N.Y.S. Dep't of Tax & Fin.*, 2018 WL 3384429, at *6 (N.D.N.Y. July 10, 2018), *aff'd* 786 Fed. App'x 302 (2d Cir. 2019); *see also DeVore v. Neighborhood Hous. Srvs. of Jamaica Inc.*, 2017 WL 1034787, at *7 (E.D.N.Y. Mar. 16, 2017).  Plaintiffs' claim "is appropriately dismissed" because the "factual allegations do not permit the conclusion that the complained-of conduct occurred because of discriminatory animus." *Logan v. Matveevskii*, 175 F. Supp. 3d 209, 226 (S.D.N.Y. 2016).

In short, Plaintiffs' Complaint fails to allege how the provision of different services and amenities to the residents of two different categories of housing accommodations—which merely reflects the materially different economic terms upon which those two categories of housing are offered (on a race-neutral basis) to prospective residents—"support[s] a non-conclusory and hence plausible, claim of disparate treatment . . . motivated by Plaintiff[s'] protected characteristic." *Felder v. Madison Square Garden*, 2017 WL 9538169, at *12 (S.D.N.Y. Jan. 25, 2017), *report*

---

[11]   The Complaint asserts that a Related employee made certain statements to Plaintiff Moody regarding the "rules and regulations and what was prohibited as a prospective tenant of 553 West 30th Street," Compl. ¶ 64, but there is no allegation that the employee made those statements to Plaintiff Moody because of Plaintiff Moody's race, or that the employee described the rules differently to prospective rental tenants of different races.  Nor is there any allegation that Plaintiff Moody or any other person was ever actually denied access to the entrances and lobby spaces shared by the affordable rental and residential condominium components of this development.

*and recommendation adopted*, 2017 WL 1011493 (S.D.N.Y. Mar. 15, 2017).  Instead, Plaintiffs purport to advance claims based on nothing more than the fact that they are part of a protected class, coupled with conclusory allegations of discriminatory intent.  These conclusory allegations are insufficient to plead disparate treatment.  *See Harris v. Dep't of Hous. Pres. & Dev.*, 2011 WL 13299800, at *3 (E.D.N.Y. Apr. 5, 2011) ("[C]onclusory statements that defendants discriminated against the plaintiff on account of a protected status" do not state a claim).

### B.     Plaintiffs Fail to Plead an Actionable Disparate-Impact Claim

#### 1.     Mere Differential Treatment of Different Economic Groups Is Not Actionable Race-Based "Disparate-Impact" Discrimination

The Complaint focuses more centrally on a theory of disparate-impact discrimination, but it fares no better in its effort to state a valid disparate-impact claim than it does in pleading disparate treatment.  Plaintiffs' principal theory is that, because certain minority groups in New York City allegedly rely "disproportionately" on low-income affordable housing, as compared to other racial groups, disparate-impact discrimination *based on race* arises from the fact the affordable rental apartments situated in this mixed-use development allegedly constitute "subpar units"—as compared to the for-sale "luxury condominiums" also developed there—that are "isolated to lower floors" and lack access to the same "posh amenities" associated with those "luxury condominium[]" residences.  *E.g.*, Compl. ¶¶ 14, 56, 67.  In other words, Plaintiffs claim that race-based disparate-impact "discrimination" somehow arises simply because individuals with greater financial means are able to obtain different and more luxurious housing accommodations than are individuals of lesser economic means—or, as Plaintiffs put it, whenever low-income tenants are "segregated" from so-called "market-rate units."  That is not the law.

Disparate-impact liability does not, and was never intended to, remedy the market-based reality that people of greater economic means are able to procure more luxurious housing

accommodations than those of lesser means—even accepting the premise that certain groups are, on average, less affluent than others.  As the Supreme Court has noted, "disparate-impact liability has always been properly limited in key respects that avoid the serious constitutional questions that might arise under the FHA, for instance, if such liability were imposed based solely on a showing of a statistical disparity."  *Inclusive Cmtys.*, 576 U.S. at 540.  Indeed, "[e]ntrepreneurs must be given latitude to consider market factors" in developing housing accommodations because "[t]he FHA does not decree a particular vision of urban development" and "does not put . . . private developers in a double bind of liability, subject to suit whether they choose to rejuvenate a city core or to promote new low-income housing in suburban communities."  *Id.* at 541-42.

For precisely these reasons, the Fourth Circuit recognized 25 years ago that:

> Although it is no doubt true that the "neutral criterion" of price may disparately impact blacks and the handicapped, because they may, on average, be poorer than whites or nondisabled persons, *this type of injury extends beyond the reach of the Fair Housing Act*.  This is because the Fair Housing Act is not so expansive that it would require sales or rentals of residences to those who concede that they are unable to pay the price faced by all other buyers or leasers.  *The Fair Housing Act does not purport to grapple with the truism that, all things being equal, those with money are better off than those without it.*  To conclude otherwise would be to effect a radical alteration in the status quo, neither permitted by the plain language of the Fair Housing Act nor its legislative history.  Therefore, we hold that *when the alleged injury to a claimant is solely the product of a facially neutral price (e.g., a price that does not vary depending on one's race, handicap, or other status protected by the Fair Housing Act), no claim based on disparate impact can be brought under the Fair Housing Act.*

*Williams*, 1996 WL 690064, at *3 (emphasis added).

The law in the Second Circuit is no different.  "A businessman's differential treatment of different economic groups is not necessarily racial discrimination and is not made so because minorities are statistically overrepresented in the poorer economic groups."  *Boyd*, 509 F.2d at 1113.  And the Second Circuit has similarly rejected efforts to use differential treatment of different economic groups as a proxy for claims of discrimination based on disability, citing the

"fundamental" premise that "the law addresses the accommodation of handicaps, *not the alleviation of economic disadvantages that may be correlated with having handicaps*." *Salute*, 136 F.3d at 301 (emphasis added). In that case, the Second Circuit rejected a group of disabled plaintiffs' reasonable-accommodation and disparate-impact claims where the plaintiffs sought to "use th[e Fair Housing Act] to remedy economic discrimination of a kind that is practiced without regard to handicap," finding that "[w]hat stands between these plaintiffs and the apartments [they seek] is a shortage of money, and nothing else," and that, "[i]n this respect, impecunious people with disabilities stand on the same footing as everyone else." *Id.* at 302. In other words, the Fair Housing Act "does not elevate the rights of the handicapped poor over the rights of the non-handicapped poor" and was not intended to create liability "every time a neutral policy imposes an adverse impact on individuals who are poor." *Id.* That principle applies with equal force to Plaintiffs' claims alleging race-based "disparate impact" discrimination here.

### 2. Plaintiffs' Disparate-Impact Claim Suffers from Independent Pleading Deficiencies

Even if Circuit precedent did not bar Plaintiffs' attempt to conflate economic and racial disparities as the basis of a disparate-impact claim, Plaintiffs' failure to satisfy the requirements for pleading and proving actionable disparate-impact discrimination requires dismissal.

The framework for analyzing disparate-impact claims is set forth in a Department of Housing and Urban Development regulation, *see* 24 C.F.R. § 100.500, which the Second Circuit has adopted, *see Mhany Mgmt., Inc. v. Cnty. of Nassau*, 819 F.3d 581, 617 (2d Cir. 2016). "At the pleading stage," a plaintiff asserting a disparate-impact claim "must sufficiently plead facts to support" the required "elements" of the claim, including that: (1) "the challenged policy or practice is arbitrary, artificial, and unnecessary to achieve a valid interest or legitimate objective such as a practical business, profit, policy consideration, or requirement of law"; (2) "the challenged policy

or practice has a disproportionately adverse effect on members of a protected class"; (3) "there is a robust causal link between the challenged policy or practice and the adverse effect on members of a protected class, meaning that the specific policy or practice is the direct cause of the discriminatory effect"; (4) "the alleged disparity caused by the policy or practice is significant"; and (5) "there is a direct relation between the injury asserted and the injurious conduct alleged." 24 C.F.R. § 100.500(b); *accord, e.g.*, *Mandala v. NTT Data, Inc.*, 975 F.3d 202, 209 (2d Cir. 2020) (disparate-impact complaint "must at least set forth enough factual allegations to plausibly support each of the three basic elements of a disparate impact claim"); *Tsombanidis*, 352 F.3d at 574-75.

Here, Plaintiffs fail to meet their pleading burden for at least two independent reasons: (1) they fail to allege facts demonstrating the existence of a "disproportionate impact" on a protected group, as compared to the impact on a similarly situated, non-protected group, *Tsombanidis*, 352 F.3d at 575; and (2) they fail to allege facts demonstrating the existence of a "causal connection between the facially neutral policy and the alleged discriminatory effect," *id*.

*First,* to establish "a significantly adverse or disproportionate impact" on a protected group, "plaintiffs must . . . utilize the appropriate comparison groups," by "first identify[ing] members of a protected group that are affected by the neutral policy and then identify[ing] similarly situated persons who are unaffected by the policy." *Id.* at 575-77. Plaintiffs allege, in conclusory fashion, that Defendants' "acts, policies, and practices have an adverse and disproportionate impact on African Americans and Hispanics in New York City as compared to similarly situated whites." Compl. ¶¶ 97, 105, 113, 120. But that allegation fails to account for the fact that "prospective low-income tenants"—regardless of their race—are not "similarly situated" to the purchasers of "luxury condominiums." *Id.* ¶¶ 15, 21-23, 67. Plaintiffs admit that purchasers of luxury condominiums—regardless of their race—are by definition "more economically advantaged" than

those who qualify for low-income affordable housing, and that there are "differences in wealth" between "lower-income residents" and so-called "market-rate tenants." *Id.* ¶¶ 14, 80.  Comparing the demographics of affordable housing tenants to those of luxury-condominium buyers is "like relying on apples to study oranges": the two are not "appropriate comparator groups." *Mandala*, 975 F.3d at 209-11; *accord, e.g.*, *Watson v. New York Pressman's Union No. 2*, 444 F. App'x 500, 501-01 (2d Cir. 2011) (holding that plaintiffs had not compared similarly-situated groups because their allegations failed to account for "the pre-existing demographics of the workplace").  Absent a comparison of similarly situated groups, Plaintiffs cannot state a disparate-impact claim.

Plaintiffs do not allege that it is more difficult for members of any minority group—as compared to similarly situated non-minority applicants—to gain access to housing either in the affordable rental apartments for which Plaintiffs applied, or in the "luxury condominiums." *See, e.g.*, *Hack v. President & Fellows of Yale Coll.*, 237 F.3d 81, 91 (2d Cir. 2000), *abrogated on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002).  Nor do they identify any "similarly situated" non-minority persons who are impacted less harshly by any policy concerning access to amenities than the minority groups they claim are disparately impacted. *See Watson*, 444 F. App'x at 501.  All affordable-rental tenants are afforded the same access to amenities, regardless of race. The same is true for owners of condominium residences.  Because Plaintiffs admit that differences other than race—notably, "differences in wealth," Compl. ¶14—distinguish the affordable-rental tenants from the owners of the condominium residences, the two groups are not "similarly situated," and Plaintiffs fail to state a disparate-impact claim.  And for similar reasons, Plaintiffs fail to allege that any challenged policy is "arbitrary" or "artificial."  24 C.F.R. § 100.500(b)(1).

*Second*, Plaintiffs fail to plausibly allege a "causal connection between the facially neutral policy and the alleged discriminatory effect," because they do not—and cannot—identify any

challenged policy that "has resulted in or predictably will result in underrepresentation" of African-Americans or Hispanics in either of the categories of housing accommodations that exist in this mixed-use development.  *Tsombanidis*, 352 F.3d at 575-76 (rejecting disparate-impact claim where plaintiff failed to show that challenged policy "actually or predictably created a shortage of housing" for a protected group); *Hack*, 237 F.3d at 90-91; *Ungar v. NYCHA*, 2009 WL 125236, at *15 (S.D.N.Y. Jan. 14, 2009) (rejecting disparate-impact claim in light of plaintiff's failure to demonstrate that "the [defendant]'s policy has resulted or will result in under-representation of [a protected group] in [defendant's] housing" (citing *Hack*, 237 F.3d at 91)).  "[A] disparate-impact claim that relies on a statistical disparity must fail if the plaintiff cannot point to a defendant's policy or policies *causing* that disparity."  *Inclusive Cmtys.*, 576 U.S. at 542 (2015).

Plaintiffs have not alleged any facts to show that any alleged policy challenged here has had the effect of hindering minorities from securing housing either in the affordable rental apartments for which Plaintiffs applied or in the "luxury condominiums" that are offered for sale. Indeed, Plaintiffs cite no statistics whatsoever about the racial make-up of the residents of either the affordable rental apartments or the condominium residences.  *See Mandala*, 975 F.3d at 210 (holding that "even at th[e] early juncture" of the pleading stage, "statistics must plausibly suggest that the challenged practice actually has a disparate impact").  Instead, they merely reference the "well-known" existing "racial disparities" in income among New York residents and claim that, because some racial groups are more likely to be able to afford "luxury condominiums" than others, unlawful "racial segregation" results whenever residents of those "luxury" residences receive more luxurious amenities than residents of affordable rentals.  *Compl.* ¶¶ 67, 84, 95.

Put differently, Plaintiffs' allegations fail to demonstrate that any alleged disparity between racial groups was caused by any policy or practice attributable to Defendants.  Courts must apply

a "robust causality requirement" to disparate-impact claims in order to (1) "ensure[] that [r]acial imbalance . . . does not, without more, establish a prima facie case of disparate impact," and (2) "protect[] defendants from being held liable for racial disparities they did not create." *Inclusive Cmtys.*, 576 U.S. at 542 (internal quotation omitted).   As the Supreme Court has explained, "[c]ourts should avoid interpreting disparate-impact liability to be so expansive as to inject racial considerations into every housing decision," because "serious constitutional questions . . . might arise under the FHA . . . if such liability were imposed based solely on a showing of a statistical disparity." *Id.* at 540, 543 (internal quotation omitted).   Defendants are not guilty of "racial discrimination"—as a matter of disparate-impact liability or otherwise—simply because they transact with market participants on race-neutral terms in a world where there are pre-existing demographic wealth disparities between different racial groups.

### C.   Plaintiffs Fail to Plead Actionable Claims under FHA Sections 3604(c) or 3605

In passing, Plaintiffs also invoke claims under FHA Sections 3604(c) and 3605, but they likewise fail to plead essential elements required to state a claim under either of those provisions.

Section 3604(c) makes it unlawful "[t]o make, print, or publish, or cause to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on" a protected characteristic.   Plaintiffs' only allegation relating to such a claim is a single paragraph claiming that Defendants' "advertising . . . prominently and predominately feature[s] mostly young, white men and women." Compl. ¶ 86.   That fails to state a claim for at least two independent reasons.

*First*, it fails to identify any specific advertising statement that allegedly runs afoul of the proscriptions in Section 3604(c).   *See, e.g., Wood v. Mut. Redevelopment Houses, Inc.*, 2016 WL 11720460, at *12 (S.D.N.Y. Mar. 31, 2016); *Ohio House, LLC v. City of Costa Mesa*, 2020 WL 4187765, at *6–7 (C.D. Cal. Mar. 16, 2020).   Such vague references to "advertising" do not suffice.

23

*Second*, Plaintiffs' allegation falls short because a lack of "inclusive advertising and marketing," without more, does not indicate a "preference, limitation, or discrimination based on race." *Jimenez v. Chase Bank*, 2019 WL 919626, at *4 (S.D.N.Y. Jan. 28, 2019), *report and recommendation adopted*, 2019 WL 917210 (S.D.N.Y. Feb. 25, 2019); *see also Hous. Opportunities Made Equal, Inc. v. Cincinnati Enquirer, a Div. of Gannett Co.*, 943 F.2d 644, 648 (6th Cir. 1991) ("[A] complaint . . . based on the single publication of an advertisement which uses a small number of all-white models does not, without more, state a cognizable claim . . . .").

Similarly, Plaintiffs' cite Section 3605—which concerns discrimination in connection with certain defined categories of "residential real estate transactions"—but their allegations in respect of that claim are even more lacking.  At the outset, Plaintiffs' purported recitation of the provisions of this section appears to be a duplication of the provisions of Section 3604, *compare* Compl. ¶ 107, *with id.* ¶ 100, and has no bearing on the actual text of Section 3605, which prohibits discrimination in "residential real estate-related transactions."  Moreover, the Complaint fails to plead the existence of such a transaction, as defined by statute.  *See* 42 U.S.C. § 3605(b)(2).  As such, Plaintiffs' claim under Section 3605 must be dismissed.  *See, e.g.*, *Pandozy v. Segan*, 340 F. App'x 723, 725 (2d Cir. 2009) (dismissing claim that "did not allege that Defendants–Appellees had been engaged in 'residential real-estate related transactions' or in providing brokerage services"); *Byrd v. Rochester Hous. Auth.*, 2018 WL 2739790, at *2 (W.D.N.Y. June 7, 2018) (Section 3605 "inapplicable" where Plaintiff's claim arose out of attempt to rent public housing).

## II.      Plaintiffs' State- and Local-Law Claims Should Be Dismissed

### A.      Plaintiffs Fail To State a Claim Under State and Local Law

Plaintiffs' claims under the NYSHRL and NYCHRL—which are essentially identical the allegations of their federal claims, *compare* Compl. ¶¶ 108-23, *with id.* ¶¶ 93-107, and thus may appropriately be dismissed by this Court on the merits, in the interest of judicial efficiency—

likewise suffer from fatal pleading deficiencies.  Claims under the NYSHRL are evaluated under the same framework as the FHA, and Plaintiffs' NYSHRL claim therefore fails for all of the reasons explained previously.  *See, e.g.*, *Francis*, 992 F.3d at 80.  Similarly, although NYCHRL claims are construed under a somewhat "more lenient" standard, that standard is "not boundless" and "a complaint will not always pass muster" under it.  *Nieblas-Love v. N.Y.C. Hous. Auth.*, 165 F. Supp. 3d 51, 74 (S.D.N.Y. 2016); *Soloviev v. Goldstein*, 104 F. Supp. 3d 232, 250 (E.D.N.Y. 2015).  Where, as here, "even a broad reading of the NYCHRL cannot save Plaintiffs' claim[]," an NYCHRL claim should be dismissed "for [the] same reasons" compelling dismissal of their FHA claims.  *Short v. Manhattan Apartments, Inc.*, 916 F. Supp. 2d 375, 396 (S.D.N.Y. 2012).

### B.    Alternatively, this Court May Decline to Exercise Supplemental Jurisdiction

If the Court is not inclined to dismiss the state and local law claims for failure to state a claim, it should decline to exercise supplemental jurisdiction over those claims after ordering dismissal of Plaintiffs' FHA claims.  *See Sanders v. Grenadier Realty, Inc.*, 2009 WL 1270226, at *3 (S.D.N.Y. May 6, 2009) (quoting 28 U.S.C. § 1367 (c)(3)); *accord, e.g.*, *Francois v. N.Y.C. Dep't of Educ.*, 2021 WL 603226, at *3 (S.D.N.Y. Mar. 2, 2021).  Doing so is appropriate when "the only federal law claims have been eliminated before trial"—and particularly so "when the federal-law claims have dropped out of the lawsuit in its early stages."  *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 353, 350 (1988); *Francois*, 2021 WL 603226, at *6 (citing *Kolari v. New York-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006)); *see also, e.g.*, *Garcia v. Marc Tetro, Inc.*, 2020 WL 996481, at *3 (S.D.N.Y. Mar. 2, 2020) (Caproni, J.); *Smith v. City of New York*, 385 F. Supp. 3d 323, 345 (S.D.N.Y. 2019) (Caproni, J.).

### CONCLUSION

For the foregoing reasons, Plaintiffs' Complaint should be dismissed.

Dated: New York, New York
      September 10, 2021

GIBSON, DUNN & CRUTCHER LLP


By: /s/    *Randy M. Mastro*
    Randy M. Mastro
    (rmastro@gibsondunn.com)
    Gabriel Herrmann
    (gherrmann@gibsondunn.com)

Of counsel:
    Akiva Shapiro
    (ashapiro@gibsondunn.com)

Alexandra Perloff-Giles
    Nathan C. Strauss
Lauren Myers
    (nstrauss@gibsondunn.com)

200 Park Avenue
New York, NY 10166-0193
(212) 351-4000

*Attorneys for Defendants The Related Companies,*
*L.P., and ERY South Residential Tower LLC*