# EXHIBIT 2

**NYC DEPARTMENT OF FINANCE**
**OFFICE OF THE CITY REGISTER**

This page is part of the instrument. The City Register will rely on the information provided by you on this page for purposes of indexing this instrument. The information on this page will control for indexing purposes in the event of any conflict with the rest of the document.



2020080300635009001E4F3F

| RECORDING AND ENDORSEMENT COVER PAGE | PAGE 1 OF 57 |
|---|---|

| Document ID: **2020080300635009** | Document Date: 07-29-2020 | Preparation Date: 08-17-2020 |
|---|---|---|

Document Type:  AGREEMENT
Document Page Count: 55

| PRESENTER: | RETURN TO: |
|---|---|
| ROYAL ABSTRACT OF NEW YORK LLC(913123)<br>125 PARK AVENUE, SUITE 1610<br>NEW YORK, NY 10017<br>212-376-0900<br>MBASALATAN@ROYALABSTRACT.COM | ROYAL ABSTRACT OF NEW YORK LLC(913123)<br>125 PARK AVENUE, SUITE 1610<br>NEW YORK, NY 10017<br>212-376-0900<br>MBASALATAN@ROYALABSTRACT.COM |

## PROPERTY DATA

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1004 | Entire Lot   IRU | 553 WEST 30TH STREET |

**Property Type:**   COMMERCIAL CONDO UNIT(S)

## CROSS REFERENCE DATA

CRFN_____   or   DocumentID_____   or   _____ Year_____ Reel____ Page_____   or   File Number_____

## PARTIES

| PARTY 1: | PARTY 2: |
|---|---|
| 15 HY BASE UNIT OWNER LLC<br>C/O THE RELATED COMPANIES, L.P., 60 COLUMBUS CIRLCE<br>NEW YORK, NY 10023 | NEW YORK STATE HOUSING FINANCE AGENCY<br>641 LEXINGTON AVENUE<br>NEW YORK, NY 10022 |

☒  Additional  Parties Listed on Continuation  Page

## FEES AND TAXES

| Mortgage : | | | Filing Fee: | | |
|---|---|---|---|---|---|
| Mortgage Amount: | $ | 0.00 | | $ | 0.00 |
| Taxable Mortgage Amount: | $ | 0.00 | NYC Real Property Transfer Tax: | | |
| Exemption: | | | | $ | 0.00 |
| TAXES:   County (Basic): | $ | 0.00 | NYS Real Estate Transfer Tax: | | |
| City (Additional): | $ | 0.00 | | $ | 0.00 |
| Spec (Additional): | $ | 0.00 | | | |
| TASF: | $ | 0.00 | | | |
| MTA: | $ | 0.00 | | | |
| NYCTA: | $ | 0.00 | | | |
| Additional MRT: | $ | 0.00 | | | |
| TOTAL: | $ | 0.00 | | | |
| Recording Fee: | $ | 312.00 | | | |
| Affidavit Fee: | $ | 0.00 | | | |

**RECORDED OR FILED IN THE OFFICE**
**OF THE CITY REGISTER OF THE**
**CITY OF NEW YORK**
Recorded/Filed          08-27-2020 09:26
City Register File No.(CRFN):
**2020000240775**

*Annette M. Hill*

*City Register Official Signature*

**NYC DEPARTMENT OF FINANCE**
**OFFICE OF THE CITY REGISTER**



2020080300635009001C4DBF

| RECORDING AND ENDORSEMENT COVER PAGE  (CONTINUATION) | PAGE 2 OF 57 |
|---|---|

Document ID: 2020080300635009          Document Date: 07-29-2020          Preparation Date: 08-17-2020
Document Type: AGREEMENT

**PARTIES**

**PARTY 1:**
SOUTH RESIDENTIAL TOWER AFFORDABLE, L.P.
C/O THE RELATED COMPANIES, L.P., 60 COLUMBUS
CIRLCE
NEW YORK, NY 10023

9/2/23

**EXECUTION COPY**

---

# AMENDED AND RESTATED
# REGULATORY AGREEMENT

### among

## NEW YORK STATE HOUSING FINANCE AGENCY,
## 15 HY BASE UNIT OWNER LLC

### and

## SOUTH RESIDENTIAL TOWER AFFORDABLE, L.P.

### for the

## 15 HUDSON YARDS APARTMENTS PROJECT

---

### (Low Income Housing Tax Credit
### Requirements Included)

---

Record and Return to:
Joan Bocina, Associate Counsel
New York State Housing Finance Agency
641 Lexington Avenue
New York, New York 10022
212-688-4000

| | |
|---|---|
| Premises: | 553 West 30th Street (a/k/a 15 Hudson Yards) |
| County: | New York |
| Block: | 702 |
| Lot: | 1004 |

.

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................ i

APPENDICES AND EXHIBITS ..................................................... ii

RECITALS ............................................................................. 1

1.0   DEFINITIONS ................................................................. 3

2.0   ENFORCEMENT ............................................................. 6
    2.1   Incorporation in Mortgage and Termination of Agreement ............ 6
    2.2   Recording ................................................................. 7
    2.3   Remedies ................................................................. 7
    2.4   Indemnification .......................................................... 9

3.0   TERM ......................................................................... 10
    3.1   Term of Agreement and Restrictions .................................. 10
    3.2   Special Rules for Tax Credits ......................................... 10

4.0   TENANTS AND LEASES .................................................... 12
    4.1   Rental Restrictions ..................................................... 12
    4.2   Low Income Occupancy Requirements ................................ 12
    4.3   Low Income Unit Rents, Fees & Charges ............................. 13
    4.4   Lease Provisions for Low Income Units ............................... 14
    4.5   Fair Market Housing Guidelines ...................................... 14

5.0   OPERATING RULES ........................................................ 14
    5.1   Project Restrictions ..................................................... 14
    5.2   Low Income Unit Requirements ....................................... 15
    5.3   Replacement Reserve Account ......................................... 15
    5.4   Project Management .................................................... 17
    5.5   Change of Principals and Transfer Restrictions ..................... 19
    5.6   Prohibited Persons ...................................................... 21
    5.7   Changes to Structure of Owner Entity ................................ 22
    5.8   General Tax Covenants; Use of Mortgage Proceeds;
          Other Restrictions ....................................................... 22
    5.9   Intentionally deleted .................................................... 23
    5.10  Allocation of Operating Expenses ..................................... 23

6.0   REPORTING .................................................................. 23
    6.1   Information and Project Reports ....................................... 24
    6.2   Monitoring and Recordkeeping Requirements for Low Income Units ...... 25
    6.3   Late Filing Penalties .................................................... 28

7.0   OBLIGATIONS RELATING TO THE PROJECT AND LESSEE ........ 29
    7.1   Lessee to be Bound ..................................................... 29
    7.2   Lessee Restrictions on Transfer ....................................... 29
    7.3   Subordination of Master Lease ........................................ 30

| | 7.4 | Indemnities ....................................................................... | 31 |
| | 7.5 | Limitation on Term ......................................................... | 31 |
| | 7.6 | Cure Rights ...................................................................... | 31 |
| 8.0 | **GENERAL PROVSIONS** ................................................... | | 31 |
| | 8.1 | Interpretation and Section Headings............................. | 31 |
| | 8.2 | Parties Bound.................................................................... | 31 |
| | 8.3 | Compliance with Equal Opportunity Laws and Regulations...................... | 32 |
| | 8.4 | Governing Law ................................................................. | 32 |
| | 8.5 | Notices.............................................................................. | 32 |
| | 8.6 | Waiver............................................................................... | 34 |
| | 8.7 | Severability ...................................................................... | 35 |
| | 8.8 | Counterparts ..................................................................... | 35 |
| | 8.9 | Intentionally deleted......................................................... | 35 |
| | 8.10 | Intentionally deleted........................................................ | 35 |
| | 8.11 | Green Building Guidelines .............................................. | 35 |
| | 8.12 | Modification and Waiver ................................................. | 35 |
| | 8.13 | Fannie Mae a Third Party Beneficiary ........................... | 35 |

## APPENDICES AND EXHIBITS

Schedule A - Legal Description of the Premises.............................................................

Exhibit A  - Mortgagee's Assignment Certificate ................................................ A-1

Exhibit B  - Intentionally deleted............................................................................. B-1

Exhibit C  - Adjustments for Smaller and Larger
Families to the Area Median Income Figure........................................ C-1

Exhibit D  - Services and Amenities ......................................................................... D-1

.

# NEW YORK STATE HOUSING FINANCE AGENCY
# AMENDED AND RESTATED
# REGULATORY AGREEMENT

## (Low Income Housing Tax Credit Requirements Included)

This Amended and Restated Regulatory Agreement ("Agreement") is entered into as of the 29th day of July, 2020, among **15 HY BASE UNIT OWNER LLC** ("Owner"), a New York limited liability company, **SOUTH RESIDENTIAL TOWER AFFORDABLE, L.P.** ("Lessee"), a New York limited partnership, each having an office c/o The Related Companies, L.P., 60 Columbus Circle, New York, New York 10023, and the **NEW YORK STATE HOUSING FINANCE AGENCY** ("Agency"), a corporate governmental agency established pursuant to Article III of the New York State Private Housing Finance Law (the "PHFL"), constituting a public benefit corporation, having its principal place of business at 641 Lexington Avenue, New York, New York 10022.

## W I T N E S S E T H:

**WHEREAS**, the Owner has acquired from ERY South Residential Tower LLC (the "Original Owner"), through a deed from the New York Metropolitan Transportation Authority (the "MTA") to the Owner, as directed by the Original Owner pursuant to certain agreements between the MTA and the Original Owner (the "Deed Transfer"), a fee interest in certain real property located at 553 West 30th Street (a/k/a 15 Hudson Yards), City, County and State of New York upon which has been developed a residential condominium unit containing 107 residential rental apartments (the "Project") all located within a 73-story mixed use tower; and

**WHEREAS**, the construction of the Project was originally financed by a mortgage loan made by HFA to the Original Owner in an aggregate principal amount of $80,000,000 (the "Original Mortgage Loan") which was funded by the proceeds of a tax-exempt funding loan made by Citibank, N.A. to HFA, which funding loan was evidenced by tax-exempt Housing Revenue Debt Obligations (the "Agency Obligations") in the principal amount of $80,000,000 issued pursuant to certain resolution of the Agency; and

**WHEREAS**, the Project consists of a single condominium unit located in a larger residential and commercial condominium development (the "Condominium"), established pursuant to the terms of a Declaration of Condominium (as amended, the "Declaration"); and

**WHEREAS**, Lessee obtained a master leasehold interest in the Project pursuant to the Master Lease between Original Owner and Lessee dated as of December 24, 2019 (the "Master Lease"); and

**WHEREAS**, in connection with the Original Mortgage Loan, the Agency and the Original Owner executed a Regulatory Agreement dated as of November 23, 2015 which was recorded in the New York County Office of the Register of The City of New York (the "City Register's Office") as CRFN

2015000428831, which agreement was amended by a First Amendment to Regulatory Agreement dated as of September 11, 2017 which was recorded in the City Register's Office as CRFN 2017000345008, as further amended by a Second Amendment to Regulatory Agreement (pursuant to which the Lessee became a party to the Original Regulatory Agreement) dated as of December __, 2019 [*sic*] and recorded in the City Register's Office at CRFN 2020000013777 and that certain Partial Release of Regulatory Agreement dated as of December 23, 2019 and recorded in the City Register's Office at CRFN 2020000013776 (as collectively amended, the "Original Regulatory Agreement"); and

      **WHEREAS**, in accordance with the terms of the Original Regulatory Agreement, all of the 107 apartments in the Project ("Low Income Units") are reserved for occupancy by tenants having household incomes are at or below 60% of AMI (as hereinafter defined), and five (5) of those Low Income Units will be made available to tenants whose household incomes are at or below 50% of AMI adjusted for family size ("50% AMI Units"); and

      **WHEREAS**, the Original Owner has completed construction of the Project and has caused the Original Mortgage Loan to be repaid by Owner in consideration for the Deed Transfer; and

      **WHEREAS**, the Agency Obligations have been redeemed and are no longer outstanding; and

      **WHEREAS**, as of the date hereof, Original Owner's interest in the Master Lease has been assigned to, and assumed by, the Owner, and the Original Owner has no further interest in the Master Lease or the Project; and

      **WHEREAS**, pursuant to the Agency's 15 Hudson Yards Housing Revenue Bond Resolution (the "General Resolution") and its 15 Hudson Yards Housing Revenue Bonds 2020 Series A Resolution (together with the General Resolution, the "Resolution"), each adopted by the Agency on June 11, 2020, the Agency shall issue its 15 Hudson Yards Housing Revenue Bonds, 2020 Series A (the "Bonds") the interest on which is qualified for exclusion from gross income for federal income tax purposes pursuant to §103 of the Code (as defined herein); and:

      **WHEREAS**, The Bank of New York Mellon is trustee for the holders of the Bonds (said trustee or any substitute or successor trustee under the Resolution, is hereinafter referred to as the "Trustee"); and

      **WHEREAS**, the Bonds will be secured by a certain direct pay irrevocable credit enhancement instrument (the "Credit Enhancement Instrument") issued by Fannie Mae ("Fannie Mae", or the "Credit Facility Provider") and held by the Trustee that will provide for credit enhancement for payments required to be made in connection with the Mortgage Loan and for a liquidity facility with respect to the Bonds; and

      **WHEREAS**, the proceeds of the Bonds will be used to fund a loan to the Owner (the "Mortgage Loan") for the acquisition of the Project, and will be evidenced by a multifamily note (as may be amended from time to time, collectively, the "Note") made by the Owner to the Agency, and secured by a Multifamily Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing made by

the Owner and the Lessee (together with all amendments, addenda, joinders, supplements and riders thereto, the "Mortgage", and together with the Note, the "Loan Documents"), each of which shall be dated as of the date hereof; and

**WHEREAS,** the Loan Documents will be assigned to the Trustee and to Fannie Mae, as their interests may appear, pursuant to an Assignment and Intercreditor Agreement by and among the Agency, Fannie Mae and the Trustee, acknowledged, accepted and agreed to by the Owner and Wells Fargo Bank, National Association, as loan servicer of Fannie Mae with respect to the Project, dated as of July 1, 2020 as the same may be amended, restated or modified from time to time (the "Intercreditor Agreement"); and

**WHEREAS,** in connection with the Transfer and the Mortgage Loan, the parties hereto wish to amend and restate the Original Regulatory Agreement in its entirety; and

**WHEREAS,** the Agency has found and determined that the Project is to be occupied by persons or families of low income pursuant to the restrictions set forth in this Agreement; and

**WHEREAS,** the Agency is a credit administering agency under §42 of the Code, and the Agency has made or will make an allocation to the Lessee of low income housing tax credits ("LIHTC") pursuant to §42(h)(4) of the Code; and

**WHEREAS,** pursuant to §421-a of the New York Real Property Tax Law, §11-243 of the Administrative Code of the City of New York, and the rules promulgated thereunder, it is anticipated that the Project will qualify for an exemption from New York City real property taxes; and

**WHEREAS,** the Agency requires, as a condition of the issuance of the Bonds, its financing of the Mortgage Loan and the allocation of LIHTC to the Lessee, that the Owner agree to the restrictions running with the land and binding on the Owner's successors, assigns, heirs, grantees or lessees for the term of this Agreement as set forth herein, and that the Owner and Lessee each consents to be regulated by the Agency, as set forth herein, to: (i) preserve the tax-exempt status of the Bonds under the Code; (ii) meet the requirements of §44.29-a of the PHFL; (iii) meet the requirements of §42 of the Code with regard to LIHTC; and (iv) ensure that other public benefit requirements are met.

**NOW THEREFORE,** the parties do hereby agree as follows:

**1.0    DEFINITIONS** - Except as otherwise defined herein, all capitalized words and phrases herein shall have the meanings assigned to such terms in the Mortgage and the Code. For general rules of interpretation, see Section 8.1. In addition, the following words and phrases as used in this Agreement shall have the following meanings:

"Act" shall mean the New York State Housing Finance Agency Act, Article III of the PHFL

"Agency" shall mean the New York State Housing Finance Agency.

"Agreement" shall mean this Amended and Restated Regulatory Agreement.

.

"Area Median Income" or "AMI" shall mean the area median gross income for New York City Area Metropolitan Statistical Area as determined from time to time by the Secretary of the United States Department of Housing and Urban Development ("HUD") as applicable to this Project and pursuant to the Code. References to 60% of AMI shall mean amounts established by HUD constituting 120% of the Very Low Income Limit for HUD's Section 8 programs, and references to 50% of AMI shall mean amounts established by HUD constituting the Very Low Income Limit for HUD's Section 8 programs. in each case adjusted for family size.

"Assumption Fee" shall have the meaning assigned in section 5.5(e).

"Bonds" shall have the meaning assigned in the recitals to this Agreement.

"Code" shall mean the Internal Revenue Code of 1986, as amended. the Treasury Regulations, and published administrative positions of the Internal Revenue Service set forth in Revenue Procedures, Revenue Rulings, and other Internal Revenue Service publications with binding authority applicable thereunder.

"Compliance Period" shall have the meaning assigned in section 3.1(a).

"Condominium" shall have the meaning assigned in the recitals to this Agreement.

"Credit Enhancement Instrument" shall have the meaning assigned in the recitals to this Agreement.

"Credit Period" shall have the meaning assigned in section 3.1(a).

"Declaration" shall have the meanings assigned in the recitals to this Agreement.

"Deed Transfer" shall have the meanings assigned in the recitals to this Agreement.

"Early Termination" shall have the meaning assigned in section 3.2(b).

"Eligible Basis" shall have the meaning assigned in section 6.2(a)(7).

"ELIHC" shall have the meaning assigned in section 3.2(a).

"Event of Default" shall have the meaning assigned in section 2.1.

"Extended Use Period" shall have the meaning assigned in section 3.2(b).

"Fannie Mae" shall mean that certain corporation duly organized and existing under Federal National Mortgage Association Charter Act, as amended, 12 U.S.C. §1716 et seq. and duly organized and existing under the laws of the United States and its successors.

"Federal Section 8" shall have the meaning assigned in section 3.1(a).

"General Public" shall have the meaning given in § 1.42-9 of the Treasury Regulations, as clarified by § 42(g) of the Code.

"General Resolution" shall have the meaning assigned in the recitals to this Agreement.

"Governmental Entity" shall have the meaning assigned in section 5.6(a).

"Individuals of Low Income" shall mean individuals and families: (i) whose income is 50% or less of Area Median Income for purposes of §§142(d)(2)(B) and 142(d)(3) of the Code and §1.103-8(b)(8)(v) of the Tax Regulations (except that "50 percent" shall be substituted for "80 percent" therein), and (ii) who are individuals of low and moderate income within the meaning of the Act.

"Intercreditor Agreement" shall have the meaning assigned in the recitals to this Agreement.

"Lessee GP" and "Lessee LP" shall have the meaning assigned in Section 7.2 hereof.

"LIHTC" shall have the meaning assigned in the recitals to this Agreement.

"Loan Documents" shall refer collectively to the Mortgage, the Note and the other documents (other than this Agreement) entered into by Owner or Lessee in connection with the making of the Mortgage Loan.

"Long Term Holding Period" shall have the meaning assigned in section 5.5(e).

"Low Income Units" shall have the meaning assigned in the recitals to this Agreement.

"Master Lease" shall have the meaning assigned in the recitals to this Agreement.

"Mortgage" and "Mortgage Loan" shall have the meanings assigned in the recitals to this Agreement.

"Note" shall have the meaning assigned in the recitals to this Agreement.

"Operating Agreement" shall mean the operating agreement of the Owner, as the same may be amended from time to time.

"Original Owner" shall have the meaning assigned in the recitals to this Agreement.

"Owner" shall mean 15 HY Base Unit Owner LLC, and any transferees or successors.

"PHFL" shall have the meaning assigned in the recitals to this Agreement.

"Principal(s)" shall mean (i) The Related Companies, L.P., Stephen M. Ross, Jeff Blau, Bruce A. Beal, Jr. and (ii) Oxford Hudson Yards LLC.

"Prohibited Person" shall have the meaning assigned in section 5.6(a).

"Project" shall have the meaning assigned in the recitals to this Agreement.

"Qualified Project Period" shall have the meaning assigned in section 3.1(a).

"Reimbursement Agreement" shall mean the Reimbursement Agreement between Borrower and Fannie Mae dated as of July 1, 2020, as it may be amended.

"Related Party" shall have the meaning assigned in section 5.5(d)(1).

"Related Person" shall have the meaning given thereto in section 144(a)(3) of the Code.

"Replacements" shall have the meaning assigned in section 5.3(c).

"Replacement Reserve Account" shall have the meaning assigned in section 5.3(b).

"Transfer Fee" shall have the meaning assigned in section 5.5(c).

"Wrongful Dishonor" shall mean an uncured failure by Fannie Mae to make an advance to the Trustee upon proper presentation of documents which conform to the terms and conditions of the Credit Enhancement Instrument.

## 2.0   ENFORCEMENT

2.1   Incorporation in Mortgage and Termination of Agreement.  This Agreement and the restrictions hereunder are to be incorporated by reference in the Mortgage so that an Event of Default hereunder shall constitute an "Event of Default" under and as defined in the Mortgage.  For purposes of this Agreement, an Event of Default shall be deemed to have occurred if (i) the Owner shall fail to observe any requirement or perform any obligation imposed on the Owner by this Agreement (including any obligation with respect to the Low Income Units or the allocation of LIHTC) or (ii) the Owner fails to pay any amount due hereunder (subject to any notice and cure period), and in either case the Owner shall fail to cure, or shall fail to cause the Lessee to cure, such default within thirty (30) days after the Owner, the Lessee and the Credit Facility Provider receive written notice of such default from the Agency, unless such default shall not be a willful default and can be cured but cannot by its nature be cured within such thirty (30) day period, in which case an Event of Default shall not be deemed to have occurred so long as the Owner or the Lessee commences such cure as soon as reasonably possible and shall proceed with all due diligence to cure such default; provided, however, that in any case an Event of Default shall be deemed to have occurred (i) when and if interest on the Bonds shall become includable in gross income for federal income tax purposes or (ii) thirty (30) days before the Agency shall be required to commence foreclosure of the Mortgage in order to prevent interest on the Bonds from becoming includable in gross income for such purposes.

Except as limited in section 3.2 hereof in regard to LIHTC, in the event of foreclosure or deed-in-lieu of foreclosure, this Agreement and the restrictions hereunder shall automatically terminate with respect to the Mortgage Loans, provided the Bonds are redeemed at the first available call date.  However, if the obligor on the Mortgage Loan or a Related Person thereafter obtains, during the term of this Agreement (as determined by section 3.1), an ownership interest in the Project for tax purposes, this Agreement shall be revived in full force and effect to the extent of the restrictions hereunder which affect the exclusion from federal income taxation of interest on the Bonds.

In addition, this Agreement and the restrictions hereunder shall cease to apply partially or entirely in accordance with the provisions of Treasury Regulations §1.103-8(b)(6)(iii) in the event of involuntary

noncompliance as determined by the Agency in its sole discretion in consultation with Fannie Mae, caused by a material unforeseen event such as fire, seizure, requisition, condemnation, change in federal law, or action of a federal agency after the date of issue, which prevents the Agency from enforcing any restriction hereunder, provided the Bonds are repaid or refunded, as applicable, in full at the first available date thereafter.

2.2     Recording.   The benefits and burdens of this Agreement shall run with the land and bind the interest of the Owner in the Project. The Owner, at its cost and expense, shall cause this Agreement to be duly recorded, filed, re-recorded, and refiled in such places as may be required, and shall pay or cause to be paid all recording, filing, or other taxes, fees and charges, and shall comply with all such statutes and regulations as may be required by law in order to establish, preserve and protect the ability of the Agency to enforce this Agreement. At the request of the Owner or Fannie Mae, the Agency shall provide an instrument executed in recordable form at such time as the term of this Agreement has expired and the obligations under this Agreement have been satisfied, releasing the Owner and the Project from this Agreement.

2.3     Remedies.   The injury to the Agency arising from noncompliance with any of the terms of this Agreement would be great, and the effect of misrepresentations of material fact and any violations by the Owner of its warranties and covenants under this Agreement, would be irreparable, and the amount of damage would be difficult to ascertain and may not be compensable by money alone. Therefore, upon the occurrence of an Event of Default, the misrepresentation of material fact, or violation of any warranty or covenant under this Agreement by the Owner, the Agency, at its option, may apply to any state or federal court, (i) for specific performance of this Agreement, (ii) for an injunction against any noncompliance causing such Event of Default or misrepresentation of material fact under this Agreement, or (iii) with the prior written consent of Fannie Mae, for such other relief as may be appropriate in addition to its right to request Fannie Mae to foreclose on the Mortgage, entirely or partially, pursuant to the terms of the Intercreditor Agreement.

Non-compliance with any of the terms of this Agreement relating to the Project may jeopardize the tax exempt status of the Bonds. The Agency is obligated to notify the Internal Revenue Service of non-compliance with this Agreement that results in noncompliance under the Code with respect to the LIHTC.

In the event the Mortgage and the Bonds are no longer outstanding or, in the case of the Mortgage, has been assigned to a third party without retention of any interest therein by the Agency, then, in addition to (and not to the exclusion of) any remedies set forth in the preceding paragraph or elsewhere in this Agreement, upon noncompliance with any of the provisions hereof, misrepresentation of any material fact, or violation of any warranty or covenant under this Agreement by Owner, the Agency, at its option, may avail itself any or all of the following remedies by written notice to the Owner at any time after the Agency becomes aware of such violation:

.

(X)     In connection with a violation of the provisions of this Agreement arising out of the rental of any unit in the Project at a rental rate in excess of that which the Owner is permitted to receive for such unit under this Agreement or applicable laws or regulations (such excess shall be referred to as the "Overage"). then in addition to any restitution or other remedies available to the respective tenant and other penalties that may be assessed in accordance with any applicable rent regulations, the Owner shall pay the Agency damages in an amount equal to three times the Overage for such unit, calculated from the date Owner receives written notice of such Overage or if senior management of Owner otherwise has actual knowledge of such Overage for the remaining period during which the Owner receives the Overage, provided that amounts hereunder shall only be payable to the Agency if the Owner has failed to remedy the Overage (including reimbursement to the respective tenant of the amount of the Overage) within 30 days, or if remediation does not occur within 30 days, the Owner has been and continues to diligently and in good faith pursue such remediation.  In any event, the Owner shall promptly upon written notice from the Agency, after reasonable opportunity to discuss with the Agency, reduce the then current rent charged to any tenant in any unit in the Project to the amount allowed hereunder so as to eliminate the Overage.

(Y)     In connection with an Event of Default by the Owner of any other material provision of this Agreement. the Owner shall pay the Agency as liquidated damages, and not as a penalty, the amount of $3,000 for each day that such Event of Default exists, to and including the date such Event of Default is cured to the reasonable satisfaction of the Agency, provided that no amounts hereunder shall be payable if the Owner commences and diligently pursues such cure. The parties agree the amount of damages that would be suffered by the Agency in the event of such a violation would be difficult and impractical to ascertain, and that the above amount represents a reasonable determination of the damages that would be suffered by the Agency in connection with such violation.

At such time that either (i) the Credit Enhancement Instrument is no longer in effect and all amounts owed to Fannie Mae have been paid, or (ii) the Credit Enhancement Instrument is in effect but there has been a Wrongful Dishonor caused by Fannie Mae's disavowal of the obligation to honor a properly submitted Advance request from the Trustee, then any amounts payable by the Owner to the Agency pursuant to clauses (X) and/or (Y) above shall be secured by a lien on the Project which shall be subordinate in priority to any mortgage encumbering the Project. At such time as the Mortgage and the Bonds are no longer outstanding and the Mortgage has been assigned to a third party without retention of any interest therein by the Agency, the Owner shall cause a Principal or other person or entity affiliated with the Owner and reasonably acceptable to the Agency to deliver a guaranty of such amounts in a form reasonably acceptable to the Agency. Neither (i) Fannie Mae nor its designee in possession of the Project as a result of a foreclosure or deed-in lieu of foreclosure, nor (ii) a third party (not affiliated with the Owner) acquiring possession of the Project from the lender or its designee as a direct result of a foreclosure

or deed in lieu of foreclosure, shall be liable for penalties pursuant to clauses (X) and/or (Y) that accrued prior to the date such entity or person shall have assumed possession of the Project, however the Owner shall remain liable to the Agency for payment of such amounts.

For purposes of this Agreement, the date of such Event of Default or misrepresentation shall be the date the noncompliance causing such Event of Default or misrepresentation was first discovered by the Agency, the Owner or the Lessee, or would have been first discovered by the Owner or the Lessee by the exercise of reasonable diligence.

2.4     Indemnification. (a) The Owner shall indemnify and hold the Agency harmless from and against any and all claims, demands, liability, loss, cost or expense (including but not limited to attorney fees and other costs of litigation) actually incurred by the Agency arising out of or in any way related to the Owner's breach of any of its obligations or performance under this Agreement or any action taken by the Agency (other than willful misconduct on the part of the Agency) to enforce or exercise its rights under this Agreement as a result of such breach, provided, however, with the sole and exclusive exception, that if the Owner is the prevailing party in its defense or pursuit of a suit, complaint, claim or arbitration initiated as the result of the Owner's breach of this Agreement, after all appeals to the highest court or judicial authority having jurisdiction over this matter have been exhausted, the Owner shall not be liable to the Agency for such damages, attorneys' fees, expenses and costs arising from such suit, claim, complaint or arbitration. The obligations under this section shall survive the termination or expiration of this Agreement as necessary to effectuate its provisions. This indemnity is not a guarantee of any portion of the Mortgage Loan. For so long as the Mortgage is held by Fannie Mae pursuant to the terms of the Intercreditor Agreement, any monetary obligations arising under this Agreement and all claims or judgments for monetary damages against the Owner occasioned by breach or alleged breach by the Owner of its obligations hereunder shall be subordinated in priority and right to payment and in all other respects to the obligations, liens, rights (including without limitation the right to payment) and interests arising or created under the Loan Documents.

(b) The Owner and any subsequent owner of the Project shall be liable or obligated for the breach or default of any obligation of any prior owner under this Agreement, including, but not limited to, payment of any indemnification obligation. Notwithstanding the prior sentence, during any period that Fannie Mae or its designee owns the Project or if any subsequent owner acquires the Project from Fannie Mae or its designee, neither Fannie Mae, such designee nor such subsequent owner shall be liable or obligated for the breach or default of any obligation of any prior owner (including the Owner) under this Agreement, including but not limited to any payment or indemnification obligation, in which case the owner of the Project at the time the default or breach occurred shall remain liable for any and all damages occasioned thereby even after such entity ceases to be the owner (and, in such event, any party seeking to collect such damages shall have no recourse and shall have no right to levy against or otherwise collect on any judgment from the Project).

3.0 **TERM**

3.1 Term of Agreement and Restrictions.

(a)    The term of this Agreement shall, subject to the provisions of Section 2.1, extend through a period (the "Qualified Project Period") ending on the latest of the following:

(i)    the date which is fifteen (15) years after March 1, 2020, being the date on which 50% of the residential units in the Project were first occupied;

(ii)    the first date on which no Bonds (and no other private activity bonds relating to the Project) are outstanding;

(iii)    the date on which any assistance provided with respect to the Project under Section 8 of the United States Housing Act of 1937, as amended ("Federal Section 8") terminates;

(iv)    the date on which the Mortgage Loan is no longer outstanding or has been assigned to a third party without retention of any interest therein by the Agency; or

(v)    the end of a period (the "Compliance Period") consisting of fifteen (15) taxable years of the Owner commencing with the first taxable year of the credit period ("Credit Period") as defined in §42(f)(1) of the Code with respect to the Project; or

(vi)    November 23, 2045.

Additionally, as provided in Sections 3.2, 6.1(b) and 6.2(b) hereof, certain provisions of this Agreement with respect to the Project may continue in effect beyond the end of the Qualified Project Period notwithstanding any foreclosure or transfer in lieu of foreclosure of any mortgage on the Project (including, without limitation, the Mortgage). The Owner acknowledges that the Qualified Project Period and other periods required by this Agreement may represent a longer period than that which would otherwise be required by the Code to ensure the tax exempt status of the Bonds, the allowance of LIHTC or any property tax exemption applicable to the Project.

(b)    In the event that the Bonds are no longer outstanding and the Agency no longer retains an interest in the Mortgage, then, in lieu of the regularly scheduled monthly fee payable to the Agency (as provided in Section 4.3(a) of the Financing Agreement between the Owner and the Agency dated as of the date hereof), the Owner shall pay to the Agency until such time as this Agreement has expired or been terminated in accordance with its terms an annual monitoring fee of $100,000 per year.

3.2    Special Rules for Tax Credits.

(a)    This Section 3.2, together with such other provisions of this Agreement as are necessary to give effect to and enforce the provisions hereof, constitute an "extended low income housing commitment" ("ELIHC") in accordance with the requirements of §42(h)(6)(B) of the Code, arising from an election by the Owner to accept the benefits of LIHTC and the Agency financing in relation to the Project. Failure to comply with the provisions of the ELIHC shall be an Event of Default under this

Agreement and thereby the Mortgage, and, subject to Section 8.2 of the Intercreditor Agreement, the Agency or its successors may exercise any of the remedies available to it, including specific performance of the ELIHC by the Owner or any successor in interest thereto, without declaring an Event of Default pursuant to the Mortgage and without waiving any other available remedies or actions. Any existing, past or prospective tenant of the Project who qualifies, qualified or would qualify as a low income occupant pursuant to §42(g) of the Code is hereby expressly agreed to be a beneficiary of this ELIHC and may apply to any court of competent jurisdiction in the State of New York for specific performance of any provisions of the ELIHC, notwithstanding any action that may or may not be taken by the Agency.

(b)       The ELIHC shall begin on the first day of the Compliance Period and remain in effect until fifteen (15) years after the end of the Compliance Period (the "Extended Use Period"), except that the Extended Use Period will terminate ("Early Termination") in the event of a foreclosure of the Mortgage or deed-in-lieu of foreclosure (unless such events are part of an arrangement with the Owner to cause an early termination as determined by the Internal Revenue Service).

(c)       Notwithstanding anything herein to the contrary, the terms of this Agreement necessary to effectuate the terms and conditions of this Section 3.2 shall continue through the expiration or Early Termination of the Extended Use Period.

(d)       During the Extended Use Period:

(1)       except as provided in Section 4.2 of this Agreement, the Low Income Units, constituting not less than 100% of the units in the Project, shall be occupied or available for occupancy by qualified families or individuals earning not more than 60% of the Area Median Income (with respect to the 50% AMI Units, 50% of the Area Median Income), adjusted for family size;

(2)       except as provided in Section 4.3 of this Agreement, the rents for Low Income Units, as adjusted by utility allowances and any rental subsidies approved by the Agency in accordance with the Code, shall not be more than 30% of 60% of Area Median Income (with respect to the 50% AMI Units, 50% of Area Median Income), adjusted for family size as follows: (i) for studio or efficiency apartments having no separate bedrooms, the designated family size shall be a 1-person family; and (ii) for apartments containing at least one bedroom, the designated family size shall be equal to 1.5 times the number of bedrooms;

(3)       no portion of any building in the Project shall be disposed of to any person unless all of such building in the Project is disposed of to such person;

(4)       the Owner shall not refuse to lease a unit in the Project to a holder of a voucher or certificate of eligibility under Federal Section 8 because of the status of the prospective tenant as such a holder;

(5)       during the Extended Use Period and for the three (3) year period following an Early Termination:

(A)   no existing tenant (i.e., the tenant occupying the respective Low Income Unit on the last day of the Extended Use Period, or upon the occurrence of an Early Termination of the Extended Use Period) may be removed whether by eviction, expiration of lease, or for any reason other than good cause; and

(B)   no rent for any Low Income Unit occupied by such existing tenant may be increased, except as permitted under §42 of the Code; and

(6)   the "applicable fraction" (as defined in §42(c)(1) of the Code) for the Project shall be 100%.

## 4.0   TENANTS AND LEASES

4.1   Rental Restrictions.  Once available for occupancy, each residential unit in the Project (other than any unit approved by the Agency for occupancy as a superintendent or employee unit) must be rented or available for rental on a continuous basis and occupied by individuals or families as their residence and must be rented or available for rental on a continuous basis to members of the General Public.  No portion of the Project and none of the units in the Project may, at any time during the term of this Agreement, be used on a transient basis or as a hotel, motel, dormitory, fraternity house, sorority house, rooming house, hospital, nursing home, sanitarium, rest home or retirement home.  Use on a transient basis shall mean the rental of units for an initial lease term of less than twelve months.

4.2   Low Income Occupancy Requirements.

(a)   During the Qualified Project Period, all of the Project's revenue-generating units (i.e., 107 units) will be occupied or held available for occupancy by Individuals of Low Income.  In accordance with Treasury Regulation §1.103-8(b)(8) and, for LIHTC purposes, in accordance with Treasury Regulation §1.42-5(b)(1)(vii) and Internal Revenue Notice 88-80, families of low or moderate income shall be determined in a manner consistent with determinations of "lower income families" under Federal Section 8 (or if such program is terminated, under such program as was in effect immediately before such termination).  Determinations under the preceding sentence shall include adjustments for family size. Adjustments for smaller and larger families in effect on the date hereof are set forth in Exhibit C. In accordance with procedures established by the Agency, the Owner shall take reasonable steps to verify the low or moderate income status of all families or individuals who occupy Low Income Units.

(b)   A Low Income Unit shall continue to be treated as such, notwithstanding any increase in the income of the occupant of such Low Income Unit, provided that any newly vacated unit is rented to Individuals of Low Income in accordance with this Agreement.  Occupancy of a unit shall refer to the date that the tenant has possession of the unit and the right to occupy such unit pursuant to a fully executed lease.

4.3   Low Income Unit Rents, Fees & Charges.

(a)   The annual rents for the units in the Project shall not exceed 30% of 60% of Area Median Income (with respect to the 50% AMI Units, 30% of 50% of Area Median Income), adjusted for the presumed average number of individuals occupying the unit as follows: for units not having a separate bedroom, one individual; and for units having one or more separate bedrooms, 1.5 individuals for each separate bedroom. The term "rent" for purposes of this section does not include any payment under Federal Section 8 or any comparable rental assistance program, but does include: (i) any utility allowance determined by the Secretary of Housing and Urban Development as may be adjusted by the Agency, or (ii) the cost of any utilities that would be covered by such utility allowance, as determined by the Agency, if the units were receiving Federal Section 8 assistance.

(b)   Pursuant to the Code, the rents for the Low Income Units shall be based on the Area Median Income and shall be trended upward for inflation annually pursuant to the calculations of AMI made by HUD in accordance with the Code, but in no case shall rents for Low Income Units be adjusted downward. For example, if the AMI calculations in effect on the date hereof were to form the basis for setting maximum permitted rents, then such maximum rents for the Low Income Units would be set as follows:

### MAXIMUM PERMITTED MONTHLY RENTS

|  | STUDIO | ONE BEDROOM | TWO BEDROOM |
|---|---|---|---|
| 60% AMI Units | $1,194 | $1,279 | $1,536 |
| 50% AMI Units | $995 | $1,066 | $1,280 |

Further, the maximum rents for the Low Income Units will be reduced by a utility allowance, if applicable, that may be revised annually.   The Owner shall review the utility allowance annually for the Low Income Units pursuant to the provisions of Treasury Regulation Section 1.42-10(c)(2). Accordingly, each January, the Owner shall submit to the Agency documentation satisfactory to the Agency of any utility usage estimates, cost projections and proposed utility allowance with respect to the Low Income Units for the upcoming year. Based thereon, in accordance with the Code, the Agency shall approve the proposed utility allowance or determine the appropriate utility allowance applicable to the Low Income Units for such period. The Owner's failure to provide such information on a timely, annual basis, to the satisfaction of the Agency, may result in the Agency delaying or denying a change in the rents for the Low Income Units, and may constitute noncompliance with applicable requirements of the Code.

(c)   No fees or charges may be imposed upon the tenants of Low Income Units without the prior written consent of the Agency, except for the following: (1) a late payment charge not to exceed $25.00 if rent is received after the 10th day past the due date; and (2) a bounced check fee not to exceed the actual

fee charged by the bank, which may be adjusted from time to time upon request of the Owner, and approved by the Agency at its sole discretion.

4.4    Lease Provisions for Low Income Units.  Tenant leases for units in the Project shall be for terms of at least one year and shall be expressly subordinate to the Mortgage.  In a separate rider acceptable to the Agency the lease for the Low Income Units shall state that: (i) the lease shall be terminated and the tenant may be evicted for failure to qualify pursuant to the income standards for that unit if a tenant has falsely certified family income or family composition;  (ii)  false certification constitutes material noncompliance under the lease; (iii) tenants shall be obligated to provide annual income certification, and any additional recertifications of income as the Agency and/or the Owner shall require; (iv) in the event the unit is not receiving a Federal Section 8 subsidy, the Owner's right to increase rent for an existing tenant over the amounts provided in Section 4.3(b) hereof upon the conclusion of the Qualified Project Period shall be conditioned upon the Owner meeting the requirements of §42 of the Code as referenced in Section 3.2 hereof and the Owner furnishing such tenant with a notice at least six months prior to such increase in a form reasonably acceptable to the Agency, and that if such notice is not given, such tenant shall be entitled to lease renewals at the rents provided for in Section 4.3(b) until such notice has been given and six months has elapsed; (v) subletting and the tenant's assignment of the lease shall be prohibited; and (vi) the Agency and its representatives or agents shall have the right to inspect such unit for the purpose of fulfilling the Agency's responsibilities under the Code.  The form of lease to be utilized by the Owner in renting the units in the Project shall be subject to the Agency's prior written approval. Failure to utilize an approved form of lease for the units in the Project shall subject the Owner to a penalty equal to one month's rent for each affected unit.

4.5    Fair Market Housing Guidelines.  The Owner has submitted to the Agency a marketing and tenant selection plan that is in compliance with the Agency's Fair Housing and Tenant Selection Guidelines,  as the same may be amended from time to time (the "Guidelines")  accompanied by a certification in a form satisfactory to the Agency.  Additionally, a certification as to compliance with the Guidelines  and applicable rules, as defined therein, must be submitted to the Agency on an annual basis for the term of this Agreement. The marketing plan shall specifically describe the method of marketing to and selection of tenants for the Low Income Units. No marketing or selection of tenants for any of the Low Income Units shall be commenced without the submission of the plan to the Agency with the accompanying certification.  The Owner will notify the Agency in writing of the date on which it intends to commence marketing and shall have such pre-occupancy meetings with the Agency as the Agency shall require. In addition, prior to the initial marketing of any units in the Project, the Owner shall submit to the Agency for its records a copy of any proposed advertisement or other form of marketing of such units.

### 5.0   OPERATING RULES

5.1    Project Restrictions.  The Project shall constitute a qualified multi-family residential rental project within the meaning of §142(d) of the Code and will be used for such purposes during the term of

.

this Agreement. The Owner warrants that the Project has been completed substantially in accordance with building plans and specifications as submitted to and approved by the Agency, subject to such changes as have been approved by the Agency where applicable.

The Project consists of a building or structure located on a single tract of land or contiguous tracts of land with or without facilities directly related and essential thereto. The term "tract" means any parcels of land that are contiguous except for the interposition of a road, street, stream or similar property. Parcels are contiguous if their boundaries meet at one or more points. Owner represents that all of the residential units in the Project have been similarly constructed.

The Owner (or a Related Person to the Owner) shall not occupy a unit in a building or structure in the Project unless such building or structure contains more than four units. All of the residential units in the Project will contain within the unit complete living, sleeping, eating, cooking and sanitation facilities, all of which are separate and distinct from other units.

The Project shall include such other services and amenities as described in Exhibit D hereto, which Owner shall complete and certify to the Agency no later than the time the certifications are made pursuant to section 6.1(e) hereof. All facilities used in connection with the Project are located in the Condominium and of a character and size commensurate with the needs of such tenants.

5.2     Low Income Unit Requirements.  The Low Income Units shall constitute 100% of the revenue generating units in the Project (i.e., 107 units). This requirement shall continue throughout the Qualified Project Period. To ensure that Low Income Units are occupied by households of an appropriate number of individuals, the Owner shall comply with the following standards for occupancy upon initial rental or re-rental of such units:

| Number of Bedrooms | Number of Persons | % Low Income Units |
| --- | --- | --- |
| 0 | 1-2 | 100% |
| 1 | 1-2 | 100% |
| 2 | 2-4 | 100% |
| 3 | 3-6 | N/A |

*Excluding non-revenue units.

5.3     Replacement Reserve Account.  (a)  The Reimbursement Agreement establishes a replacement reserve account (the "Replacement Reserve Account"), which shall be funded in accordance with the terms set forth therein. In the event there is a Wrongful Dishonor by Fannie Mae of its obligations under the Credit Enhancement Instrument, or Fannie Mae is replaced by another entity as issuer or provider of a similar credit enhancement for the Bonds subject to the approval of the Agency ("Credit

Enhancer"), and only in such events, the Replacement Reserve Account and all funds in accounts maintained thereunder shall revert to the Agency and the provisions in subparagraphs (b) through (e) of this section 5.3 shall be applicable in lieu thereof. The parties agree that (i) absent a Wrongful Dishonor by Fannie Mae, or (ii) prior to the replacement of Fannie Mae as the Credit Enhancer, the provisions set forth in subsections (b) through (e) of this Section 5.3 shall not be applicable.

(b)   The Owner shall establish the following reserve account that shall be held in an account controlled by the Agency, at a financial institution reasonably acceptable to the Agency, to be known as the "Replacement Reserve Account". This account shall be funded by the Owner with monthly payments of Two Thousand Two Twenty Nine Dollars ($2,229) (i.e. $250 per residential unit in the Project per year), commencing on the first business day of the month after a Wrongful Dishonor by Fannie Mae or any successor thereto. All interest earned on funds in the Replacement Reserve Account shall remain on deposit in the Replacement Reserve Account. The Agency shall not be responsible for any losses resulting from the investment of the Replacement Reserve Account or obtaining any specific level or percentage of earnings on such investment.

(c)   The amount of monthly payments to the Replacement Reserve Account shall remain constant, until and unless revised in the reasonable discretion of the Agency based on (i) the results of the physical needs assessment report as described in subsection (c) below, (ii) the Project's history of repairs, (iii) the existing physical condition of the Project, or (iv) other factors deemed reasonably relevant by the Agency. Upon Owner's written request, the Agency shall disburse to the Owner within a reasonable period of time, in a manner reasonably determined by the Agency, such amounts from the Replacement Reserve Account as may be necessary to reimburse or pay the Owner for the actual approved cost of repairing and/or replacing building systems or any parts thereof, equipment and other items of a capital nature, including, without limitation, the repair or refurbishing of common areas, required for the proper operation and marketing of the Project, or to remedy a situation deemed to be of an emergency nature ("Replacements"). No such disbursements shall be made, however, for costs incurred prior to the fifth (5th) anniversary of the date deposits into the Replacement Reserve Account actually commence.

In no event shall the Agency approve or make any payment of funds from the Replacement Reserve Account unless such work and or materials have been performed or installed, as applicable and same has been approved by the Agency, which approval shall not be unreasonably withheld or delayed, and which disbursements shall be made on a periodic basis as work is completed in cases where periodic draws are reasonably requested by Owner. If at any time the funds deposited in the Replacement Reserve Account are or will be insufficient to maintain the Replacement Reserve Account at a satisfactory level, as reasonably determined by the Agency, the Owner, upon notification, shall, at such times as may be designated by the Agency, deposit into the Replacement Reserve Account an amount determined by the Agency in its reasonable judgment as a prudent lender necessary to restore the account to a sufficient level. In no event shall the Agency be obligated to approve the disbursement of funds from the Replacement Reserve Account if an Event of Default has occurred and is continuing under this Agreement

or the Loan Documents, or if an act, event or condition shall have occurred and then be existing as of that date, which solely with notice or lapse of time, would constitute an Event of Default under this Agreement or the Loan Documents.

(d)     No earlier than the first day of the first month following the tenth anniversary of the date of the Mortgage and on each tenth anniversary thereafter during the term of the Mortgage Loan, the Agency may engage a licensed independent engineer or architect to perform a physical needs assessment of the Project. The physical needs assessment shall be performed at the expense of the Owner, which expense shall be reimbursable from the Replacement Reserve Account. At the discretion of the Agency, after review of the physical needs assessment report, the Owner's required monthly payment to the Replacement Reserve Account may be adjusted within 90 days following the Agency's receipt of the physical needs assessment report so that the amount in the Replacement Reserve Account will, in the Agency's reasonable determination, be sufficient to pay for required Replacements as identified in said assessment. The Agency agrees that it shall exercise reasonable judgment as a prudent lender in determining such increases for required Replacements.

(e)     After payment in full of all sums secured by the Mortgage and the expiration of the Qualified Project Period, the Agency shall disburse to the Owner all amounts remaining in the Replacement Reserve Account.

5.4     Project Management.

(a)     The Owner shall not employ or otherwise use or retain a management entity for the Project other than Related Management Company, L.P., or an affiliate thereof which is reasonably acceptable to the Agency, without the Agency's and Fannie Mae's prior written approval of such management entity and the terms of its engagement, including, without limitation, compensation and fees, which approval shall not be unreasonably withheld or delayed. Any termination of the managing agent's engagement or any renewal of such engagement, other than a renewal in which the terms of engagement are identical to those previously approved by the Agency, shall be subject to the Agency's and Fannie Mae's prior written approval, which approval shall not be unreasonably withheld or delayed. The Owner may also retain a leasing/rental agent for the Project, subject to the Agency's and Fannie Mae's approval, which shall not be unreasonably withheld or delayed, which may be the managing agent and may not be replaced without the Agency's prior approval in accordance with the terms of this subsection (a).

(b)     The Agency reserves the right to review the performance of any management entity used or retained by the Owner. If the Agency notifies the Owner and Fannie Mae of reasons for which it is not satisfied with such performance of the management entity by reason of any Event of Default or persistent failure (despite notice from the Agency) to comply with the requirements of this Agreement, and the Owner fails to cure such condition in a period of time not to exceed 30 days, provided that said time period may be extended for a reasonable period of time if Owner is diligently and expeditiously seeking to cure such condition so long as such condition is curable in the Agency's reasonable judgment, the Owner shall

engage a replacement managing agent subject to approval by the Agency and Fannie Mae, at their reasonable discretion, respectively. The Owner shall not thereafter employ or otherwise use or retain any managing agent for the property or any part thereof, without having first obtained the Agency's written approval, not to be unreasonably withheld, of such managing agent and the agreement setting forth all the terms of such employment or retainer including compensation. If Owner retains a managing agent without having first received the approval of the Agency, Owner shall be obligated to pay to the Agency a monetary penalty equal to the lesser of (i) the amount of the monthly management fee paid to the unapproved agent or (ii) $20,000, which amount shall be assessed initially and for each month such agent is in place without Agency approval.

(c)     Every management agreement shall contain a provision that the management entity shall be bound by the terms of this Agreement and that such management agreement is subject to termination upon written request by the Agency in accordance with the provisions hereof, or Fannie Mae, however, in no event shall the Agency terminate the managing agent's employment without the prior written approval of Fannie Mae. The Owner shall submit to the Agency such information as the Agency and Fannie Mae reasonably requires in order to review the background and qualifications of any proposed new management entity, including proof of a valid New York State real estate broker's license, in a form acceptable to the Agency. If the Owner has not submitted a management entity acceptable to the Agency and Fannie Mae within 30 days after notice from the Agency as provided herein, or if there has been non-compliance hereunder that remains uncured for more than the time period permitted under Section 2.1 to cure a default, Fannie Mae or, with Fannie Mae's prior written consent, the Agency, may act as the managing agent or may unilaterally appoint a replacement management entity, in which case Owner shall be obligated to pay a management fee to Fannie Mae, the Agency or to the Agency-appointed entity, respectively, in the amount equal to the fee paid, including accrued incentive payments, if any, to the preceding managing agent, and shall additionally reimburse the Agency and Fannie Mae for any expenses incurred in connection therewith.

(d)     In the event there is a need to replace the management entity due to premature termination or otherwise, which requires immediate temporary replacement of the management entity before approval can be obtained from the Agency, Owner may employ a replacement management entity, provided the agreement for such employment is terminable upon receipt by Owner of written notice that said management entity is not acceptable to the Agency.

(e)     The Agency reserves the right to review the performance of the leasing agent for the Low Income Units and may require, with the prior written approval of Fannie Mae, the removal and replacement of such agent in a manner similar to, and subject to the terms of, the provisions set forth in subsections (b) through (d) above, except that the Agency shall not act in the capacity of leasing agent.

(f)     In the event there is a Wrongful Dishonor by Fannie Mae or Fannie Mae is replaced as Credit Enhancer, any reference to Fannie Mae in this Section 5.4, including all consents of or notice to. Fannie Mae, shall be of no further force and effect.

5.5     Change of Principals and Transfer Restrictions.

(a)     As used in this Section 5.5, the term "transfer" shall include any sale, transfer, assignment or other conveyance, provided, however. that the meaning of the term "transfer" shall not include a mort-gaging of the Project.

(b)     In addition to the restrictions on conveyance of the Project as set forth in the Mortgage, except as otherwise provided for herein, the Owner shall not transfer the Project, or any part thereof, without the prior written consent of the Agency which consent shall not be unreasonably withheld or delayed. Any transfer or attempted transfer of the Project, or any part thereof, made without any required consent of the Agency shall be null and void *ab initio*.

(c)     No consent of the Agency shall be required for the transfer of any direct or indirect own-ership interest in the Owner or the Project, provided that after giving effect to such transfer: (i) there shall not be a change of more than an aggregate amount of 10% of the interests in the Owner, (ii) one or more of the Principals and/or Related Parties (defined below) will directly or indirectly retain not less than a 90% ownership interest in the direct or indirect managing member of the Owner, and (iii) one or more of the Principals (or, with respect to Principals that are individuals, if all of them are deceased, one or more Related Parties who have significant experience in owning and operating comparable multi-family prop-erties) shall retain the day to day management and control of the Owner. The provisions of this Section 5.5(c) shall not be construed as to require the Agency's consent to any pledge of any direct or indirect interest in the Owner to another party, however, any resulting transfer in connection with such a pledge shall be subject to the Agency's consent hereunder.

(d)     Notwithstanding anything herein to the contrary, the following additional transfers of direct and indirect interests in the Owner shall be permitted without the prior written consent of the Agency, provided that, one or more of the Principals (or, with respect to Principals that are individuals, if all of them are deceased, one or more Related Parties who have significant experience in owning and operating comparable multi-family properties) maintain all operational and managerial control of the Owner, and, in each case, the Owner shall give the Agency prompt written notice thereof:

(1)     transfers to any one or more of the Principals or to any spouse, child, grandchild, sib-lings, children of siblings of any Principal (or spouse of any of the foregoing), trust for the benefit of same (each, a "Related Party"), or any entity directly or indirectly wholly owned and controlled by one or more of the Principals and/or a Related Party;

(2)  transfers by the direct and indirect individual members of the Owner to any spouse, child, grandchild, siblings, children of siblings (or spouse of any of the foregoing), or trust for the benefit of same;

(3)  transfers by operation of law or, in the case of any member who is a natural person, transfers resulting from the death or permanent incapacity or disability of such member; or

(4)  any transfer between the existing individuals or entities with a direct or indirect ownership interest in the Owner.

(e)  The Owner represents and warrants that as of the date of this Agreement, except as expressly set forth herein, (i) it intends to own the Project for a period ("Long Term Holding Period") ending on the date which is a minimum of eight years after December 1, 2019 (being the date when at least 50% percent of the units in the Project have received a temporary certificate of occupancy and at least one unit is actually occupied) and (ii) it has no present intent to transfer ownership or control of the Project or any portion thereof other than as set forth herein. In connection with its consent to any transfer for which the Agency's consent is required pursuant to this Section 5.5, the Agency will charge the Owner a fee of one-half of one percent (0.5%) of the then outstanding principal amount of the Bonds ("Transfer Fee"); provided, however, that if the proposed transfer occurs during the Long Term Holding Period, then in lieu of a Transfer Fee the Agency will charge an assumption fee ("Assumption Fee") based on the outstanding principal amount of the Bonds as follows:

Year 1. - 5.0%

Year 2. - 4.0%

Year 3. - 3.0%

Year 4. - 2.0%

Year 5. -2.0%

Year 6. -2.0%

Year 7 and Year 8. -1.0%

and further provided, that any and each transfer in which the cumulative direct or indirect ownership interests being transferred, when combined with any previous transfers of any ownership interest for which the Agency's consent hereunder is required, represents less than a 50% direct or indirect interest in the Owner shall be subject to a separate Transfer or Assumption Fee, as applicable, however, the respective Transfer or Assumption Fee shall be reduced by 50% of the amount otherwise applicable.

(f)  In the event a transfer which requires Agency consent has occurred without the prior consent of the Agency, then in addition to the applicable Assumption Fee or Transfer Fee, the Owner will be subject to a penalty of the greater of (i) an additional one half of one percent (0.5%) of the then outstanding principal balance of the Bonds, or (ii) $5,000. The Agency agrees that it will not charge the

Owner the Transfer Fee or Assumption Fee in connection with any transfers that do not require the Agency's consent under sections 5.5(c) and (d), above, however, the Agency reserves the right to charge Owner for any reasonable related out-of-pocket expenses and such other fees as the Agency, in its reasonable discretion, may deem appropriate for such transfers.

(g)     If at any time after the expiration of the Compliance Period the Agency no longer holds any interest in the Mortgage and the Bonds are no longer outstanding, then neither the Transfer Fee nor the Assumption Fee shall be applicable for any transfers requiring Agency consent hereunder.  To the extent the Agency's consent is required under this Section 5.5 with respect to any transfer it shall continue to be so required for the term of this Agreement, but in no event shall such consent be unreasonably withheld.

(h)     The Owner shall, within five business days after request of the Agency, furnish to the Agency the names of the officers, directors, managers, members, partners and/or shareholders of the Owner, together with such other information as the Agency shall reasonably request with respect to such persons.

(i)     Notwithstanding any of the foregoing provisions, in no event shall any conveyance of the Project or transfer of any direct or indirect interest of the Owner be permitted if such conveyance or addition or substitution shall cause the Owner to become a Prohibited Person, as defined below.

(j)     No consent of the Agency to any transfer of the Project or interest in the Owner or the Lessee shall be effective without the prior written consent of Fannie Mae to such transfer if such consent is required under the Mortgage or Reimbursement Agreement. No consent of the Agency to any transfer of the Project or change in Owner shall be required in connection with a transfer, assignment or conveyance to (i) Fannie Mae or an entity wholly owned by Fannie Mae, or (ii) Fannie Mae's designee or wholly owned subsidiary of Fannie Mae's designee, or (iii) to a person or entity assuming ownership on a long-term basis from any party described in the immediately preceding subsections (i) or (ii).  Any written consent to the sale, transfer or other disposition of the Project given by the Agency shall constitute conclusive evidence that such sale, transfer or other disposition is not a violation of the disposition provisions of this Agreement.

5.6     Prohibited Persons.  A "Prohibited Person" shall mean:

(a)     A "Prohibited Person" shall mean: (i) any individual who has ever been convicted of a felony or any other crime involving moral turpitude, or is an Organized Crime Figure, as defined in Section 5.6(b) hereof, or is reputed to have substantial business or other affiliations with an Organized Crime Figure; (ii) any individual or entity against whom any action or proceeding is pending to enforce rights of any municipal, city, state or federal government, or any agency, department, public authority, public benefit corporation or local development corporation thereof ("Governmental Entity") arising out of a contractual obligation to any such Governmental Entity; (iii) any individual or entity with respect to whom

any notice of monetary default that remains uncured and has otherwise not been waived, has been given by any Governmental Entity; (iv) any individual who is an officer, director, or otherwise exercises managerial discretion or has an ownership interest in excess of 25% in: (A) any property other than the Project against which three or more Immediately Hazardous Violations (as defined in the N.Y.C. Housing Maintenance Code) have been placed for failure to comply with local building, housing maintenance and/or construction codes, the N.Y. Multiple Dwelling Law or the N.Y. Multiple Residence Law, or (B) any entity which has ever been, or whose principals have ever been, suspended, debarred, disqualified, found non-responsible, had its and/or their pre-qualification revoked or otherwise has been declared ineligible to do business with any Governmental Entity or that could be deemed non-responsible under New York law; (v) any entity with respect to which managerial discretion is directly or indirectly exercised by an individual or entity described in any of the preceding clauses of this paragraph; or (vi) any entity, other than a publicly-traded entity with more than 35 members, shareholders or other beneficiaries, 25% or more of the ownership interest of which is owned, directly or indirectly, by one or more individuals or entities described in the preceding clauses of this paragraph.

(b)     An individual shall be deemed to be an "Organized Crime Figure" if he or she is alleged to be such in writing by Bishop's Investigation Service, or any other similar private investigation agency, and such allegation has been confirmed by any state or federal prosecutorial, investigative or regulatory agency or authority.

(c)     Provided that Owner shall provide to the Agency such information concerning a proposed transaction and the parties thereto as the Agency shall reasonably require, the Agency shall upon request promptly endeavor to determine whether, in the Agency's reasonable judgment, based on such information, the consummation of such proposed transaction would violate any of Sections 5.5(i), 5.6, or 5.9 of this Agreement. The Agency shall endeavor to give notice of its determination to the party requesting such determination within 30 days after the Agency shall have received such information.

5.7     Changes to Structure of Owner Entity. The Owner may not modify, amend or otherwise change the terms of its organizational documents, except (i) to effect a transaction permitted under Section 5.5 or (ii) to correct any formal defect, omission or ambiguity in a manner that will not prejudice the rights of the Agency or affect the ability of the Owner to perform its obligations under this Agreement, in either case without the prior written approval of the Agency, which approval shall not be unreasonably withheld or delayed. Owner shall provide Agency with any such documents, with revisions clearly indicated, within 30 days of the execution thereof.

5.8     General Tax Covenants; Use of Mortgage Proceeds; Other Restrictions. The Owner covenants that it will not take any action, or fail to take any action, or make any use of the Project or the proceeds of the Bonds (including investment earnings), in a way that would adversely affect the exclusion of interest on the Bonds from federal income taxation under the Code. The Owner further covenants and agrees that:

(a)     Intentionally deleted.

(b)     No more than 5% of the portion of the Mortgage Loan attributable to the Bonds shall be used to provide any facilities other than the multi-family housing units in the Project and the portion of the Project that is functionally related and subordinate to such units.

(c)     In no event shall the Owner or a Related Person become the registered or beneficial owner of any of the Bonds.

(d)     All certifications, representations and warranties made by the Original Owner in the "Owner's Tax Certification" executed by the Original Owner in connection herewith, as the same may have been amended and approved by the Agency, together with all supplements thereto and all Disbursement Certifications, except as so amended and approved by the Agency, are and will be as amended true and correct. All such certifications, representations and warranties are hereby incorporated and repeated herein with full force and effect. Specifically and not by way of limitation, the Owner warrants the accuracy of the schedules of costs in all material respects included therein as such schedules may be amended. The Owner agrees to execute and deliver such amendments and supplements to this Agreement as are necessary to preserve the tax-exempt status of interest on the Bonds.

(e)     The Owner covenants that it will comply with any use or occupancy requirement then in effect of any governmental entity providing any subsidy, tax abatement or regulatory approval for the Project as the same may be amended, to the extent such requirements apply as a matter of law or other regulatory or contractual agreement do not irreconcilably conflict with the requirements of this Agreement, the Mortgage or any rule, regulation or policy of any state or federal entity.

5.9     Intentionally deleted

5.10    Allocation of Operating Expenses.    If at any time the revenue generated from the Low Income Units is less than the associated operating expenses including (a) any common area expenses, or capital or special assessments payable by the Lessee under the by-laws or other governing document of the Condominium as the same may be amended from time to time (the "Condo Documents") during any time which the Lessee has any obligations thereunder by virtue of the Master Lease, and (b) rents payable by the Lessee under the Master Lease during the time such lease is in effect, then any such shortfall shall be paid by the Owner, notwithstanding any contrary provision contained in the Master Lease or Condo Documents, as applicable. Owner may, at its option, provide for the payment of such shortfall in the form of a loan, provided that such loan may in no event be secured by or give rise to a lien or encumbrance against the Project or the Lessee's interest therein.

6.0  **REPORTING**

6.1     Information and Project Reports. (a)   The Owner shall submit to the Secretary of the Treasury, at such time and in such manner as the Secretary shall require, an annual certification as to

whether the Project continues to meet the requirements of §142(d) of the Code. The Owner is on notice that the Code provides that failure to comply will subject the Owner to penalty as provided in §6652(j) of the Code.

(b)     The Owner covenants and agrees to submit to the Agency annually, or more frequently if reasonably required in writing by the Agency, reports detailing such facts as the Agency reasonably determines are sufficient to establish compliance with the restrictions contained hereunder including, subject to Section 6.2(5) below, annual certifications of low income tenant incomes. The Owner covenants and agrees to secure and maintain on file for inspection and copying by the Agency, for at least six (6) years after the later of (i) the due date (including any extensions) for any filings required to be made by the Owner with the Internal Revenue Service or its successor agency for that year or (ii) the end of the Qualified Project Period, such information, reports and certifications as the Agency may from time to time require in writing. The Owner further covenants and agrees promptly to notify the Agency if the Owner discovers noncompliance with any restriction or covenant hereunder. The Agency agrees to notify the Owner if the Agency discovers noncompliance with any restriction or covenant hereunder, but the Agency's failure to do so shall not affect the Owner's obligations hereunder.

(c)     Intentionally deleted.

(d)     Intentionally deleted.

(e)     From the date of the first rental of any unit in the Project and monthly throughout the term hereof, the Owner shall submit to the Agency certifications (including a copy of the certification for any Federal Section 8 eligible tenant) and reports of the Owner's compliance with the requirements of this Agreement in such detail as may be required by the Agency. The Project was issued a temporary certificate of occupancy as of December 1, 2019, and was at least 50% occupied as of March 1, 2020 and at least 80% occupied as of April 30, 2020.

(f)     The Owner shall submit to the Agency within 90 days of the end of its fiscal year three copies of the Project's annual audited financial statements. Prior to the expiration of the 90-day period, Owner may request an additional thirty (30) day extension, which request shall not be unreasonably denied by the Agency. The financial statements must (i) include a balance sheet, a statement of operations (income and expenses), a statement of cash flows and all related notes; (ii) be prepared in accordance with generally accepted accounting principles (GAAP) or income tax basis of accounting, consistently applied; (iii) be presented in a two-year comparative format; and (iv) be accompanied by an opinion of an independent certified public accountant reasonably acceptable to the Agency stating that the financial statements were audited in accordance with GAAP or income tax basis of accounting, as applicable. The Agency may require that the financial statements be prepared in a specific format and may require that certain subjects be included in the notes to the financial statements. The Agency reserves the right to require interim period financial statements certified by the Owner. If required by the Agency, these

statements are to be submitted within 60 days of the date of request, which time period may be extended at the reasonable discretion of the Agency.

(g)  The Owner shall submit to the Agency, on or before the 20th day of each month, an occupancy report, a cash flow statement and a schedule of accounts payable for the preceding month certified by an authorized representative of the Owner. The cash flow statement must be prepared on a monthly basis as well as a cumulative basis (for all months which preceded it in the current fiscal year) for both budgeted and actual results and presented in a format reasonably acceptable to the Agency.

6.2   Monitoring and Recordkeeping Requirements.  (a) The Owner shall keep records for the Project showing for each year in the Qualified Project Period:

(1)  The total number of residential rental units in the Project (including the number of bedrooms and the size in square feet of each residential rental unit);

(2)  The percentage of residential rental units in the Project that are Low Income Units;

(3)  The rent charged on each residential rental unit in the Project (including any utility allowance);

(4)  The Low Income Unit vacancies in the Project and information that shows when, and to whom the next available Low Income Units were rented;

(5)  The annual income certification of each tenant of a Low Income Unit, provided, however, that the Agency shall grant a waiver of this requirement upon a satisfactory initial compliance review, as reasonably determined by the Agency, which shall take place no more than two (2) years after lease-up of the Project, provided that the Agency is authorized under the Code to grant such waivers;

(6)  Documentation to support the initial income certification made by each tenant of a Low Income Unit (for example, a copy of the tenant's federal income tax return, Form W-2, or verifications of income from third parties such as employers or state agencies paying unemployment compensation), in accordance with Treasury Regulation §1.42-5(b)(1)(vii);

(7)  The eligible basis as defined in §42(d) of the Code (the "Eligible Basis") and the qualified basis as defined in §42(c) of the Code of the Project at the end of the first year of the Credit Period;

(8)  The character and use of the nonresidential portion of the Project, if any, included in the Project's Eligible Basis (e.g., tenant facilities that are available on a comparable basis to all tenants and for which no separate fee is charged for use of the facilities, or facilities reasonably required by the Project); and

(9)  Such other information as the Agency may reasonably request from time to time.

(b)     The Owner shall retain the foregoing records for the Project for at least six (6) years after the due date (including any extensions) for any filings required to be made by the Owner with the Internal Revenue Service or its successor agency for that year, except that the records for the first year of the Credit Period shall be retained for at least six (6) years after the due date (including any extensions) of any filings required to be made by the Owner or Lessee, as applicable, with the Internal Revenue Service or its successor agency for the last year of the Compliance Period.

(c)     The Owner and the Lessee shall certify in a sworn statement to the Agency, as of the last business day of December of each year during the Qualified Project Period through and including the end of the Qualified Project Period, that, for the preceding 12-month period:

(1)     The Project met the requirements of the 20-50 test under §42(g) (1) (A) of the Code, or the 40-60 test under §42(g)(1)(B) of the Code;

(2)     There was no change in the "applicable fraction" (as defined in §42(c)(1)(B) of the Code) of the Project, or if there was a change, a description of such change;

(3)     The Owner or the Lessee has received an annual income certification from each tenant of a Low Income Unit and documentation to support that certification, or a substitute permitted under Treasury Regulation §1.42-5(c)(1)(iii), unless such requirement has been waived by the Agency in accordance with Section 6.2(5), above;

(4)     Each Low Income Unit in the Project was rent-restricted under §42(g)(2) of the Code;

(5)     All units in the Project were for use by the General Public and are used on a non-transient basis; and there has been no finding of discrimination (as defined in Treasury Regulation §1.42-5(c)(1)(v)) with respect to the Project. (The Owner should forward a copy of any such finding to the Agency and retain the original or a copy thereof for review by the Agency during the next inspection of the Project.)

(6)     The Project was suitable for occupancy, taking into account local health, safety, and building codes; or if there is or has been any major or minor violation(s) of any health, safety, or building code applicable to the Project (or portion thereof), a copy of any notice or summons related thereto has been forwarded to the Agency with a description of the violation and remedial action plan of the Owner. The Owner shall further indicate whether the violation has been corrected as of the time of certification or the Owner's estimate of the time frame necessary for correction. The Owner shall forward a copy of the violation to the Agency and retain the original violation report for review by the Agency during the inspection of the Project. Such reports must be retained until the completion of the Agency's inspection of the Project following the correction of the violation;

(7) There was no change in the Eligible Basis of the Project or, if there was a change, the nature of the change;

(8) Except as specified in Section 5.2, all tenant facilities included in the Eligible Basis of the Project, such as recreational facilities, are provided on a comparable basis without charge to all tenants in the Project;

(9) If a Low Income Unit in the Project became vacant during the year, reasonable attempts were or are being made to rent that unit to tenants having a qualifying income;

(10) An extended low-income housing commitment as defined in §42(h)(6)(B) of the Code was in effect with respect to the Project;

(11) The Project complies with the requirements of the Code applicable to the Bonds;

(12) There were no findings of discrimination under the Fair Housing Act or, if there · have been such findings, an explanation of such findings;

(13) The Owner and Lessee has complied with all requirements of the LIHTC program, as they may be amended or supplemented, and any additional reporting requirements the Agency has reasonably deemed to be necessary in order to monitor compliance with the LIHTC requirements of the Code; and

(14) Such other matters as the Agency may reasonably request from time to time.

(d) During the Qualified Project Period, the Owner shall retain for inspection and review by the Agency a copy of the required income certification from each tenant of a Low Income Unit and a copy of the documentation the Owner has received to support that certification and the rent record of such tenant.

(e) The Agency shall have the right to perform audits of the Project through the end of the Compliance Period. For this purpose, an audit includes an inspection of the Project, an inspection of any Low Income Unit in the Project and a review of the records described in paragraph (a) of this section. The costs and expenses of any audit or inspection performed by Agency personnel shall be borne by the Agency. The Owner shall be solely responsible for any costs incurred by Owner or Owner's consultants in connection with any such audit or inspection. However, in the event the Agency determines in its sole discretion that it is necessary to engage a third party to conduct such audit or inspection as a result of Owner's failure to perform its obligations hereunder, then the reasonable expense of such audit or inspection shall be borne by Owner. The Owner shall use reasonable efforts to assist the Agency with obtaining access to the Low Income Units and shall include a provision in the lease rider to the effect that the tenant of each Low Income Unit shall give the Agency and its representatives or agents the right to enter and physically inspect such Low Income Unit, as provided in Section 4.4 hereof. If the Agency cannot obtain access to the Low Income Units in a sufficient number required to fulfill its obligations under the Code, notwithstanding the good faith efforts of the Owner to assist the Agency in obtaining such

access, the Agency will be obligated to report such lack of access to the Internal Revenue Service as an incident of involuntary non-compliance with LIHTC regulations.

(f)     The Agency shall provide prompt written notice to the Owner if the Agency does not receive the certifications described in paragraph (c) of this section or discovers on audit, inspection or review (or in some other manner) that the Project is not in compliance with the provisions of §42 of the Code. Additionally the Agency shall file Form 8823, Low-Income Housing Credit Agencies Report of Noncompliance, with the Internal Revenue Service no later than 45 days after the end of the correction period (which period shall commence on the date that the Agency notifies the Owner of noncompliance pursuant to the preceding sentence and shall extend for 60 days thereafter, unless the Agency determines that there is good cause for granting an extension of the correction period, in which case the period may be extended by the Agency for up to six months).

(g)     The Agency shall retain records of noncompliance or failure to certify for six years after the Agency's filing of the respective Form 8823. The Agency shall retain the certifications described in paragraph (c) of this section for three years from the end of the calendar year the Agency receives such certifications.

(h)     It is expressly understood by the Owner and the Lessee that the Agency's monitoring of the Owner's compliance with the requirements of §42 of the Code does not and will not make the Agency liable in any manner whatsoever for any noncompliance with such requirements.

6.3     Late Filing Penalties. Unless otherwise specified herein, all reports, certifications or information required under this Article 6 shall be submitted to the Agency by the twentieth (20th) day of the month following the month to which each relates, and shall be in a format reasonably acceptable to the Agency. The Agency shall notify the Owner in the event it has not received any report required hereunder within fifteen (15) days of the date due (including all extensions approved by the Agency). If Owner fails to submit such delinquent report within five business (5) days after the date of such notice, the Owner shall be subject to a late filing fee equal to the lesser of (i) five percent (5%) of the then current monthly mortgage debt service obligation or (ii) $5,000, which amount shall be assessed initially and for each succeeding month until such report is submitted. Notwithstanding the above, and with respect only to reports required pursuant to Section 6.1(g) above with respect to which the Agency has granted a 30 day filing extension, failure to file such reports upon the expiration of such 30 day period shall immediately, and without any notice required from the Agency, subject the Owner to a late filing penalty equal to the lesser of (i) five percent (5%) of the then current monthly mortgage debt service obligation or (ii) $20,000, which amount shall be assessed initially and for each succeeding month until such report is submitted.

## 7.0   OBLIGATIONS RELATING TO THE PROJECT AND LESSEE

7.1.   Lessee to be Bound. (a) Lessee is and shall be subject to this Agreement, in all cases to the same extent as the Owner is hereby bound, with respect to (i) all restrictions and requirements on the use, operation, rental, maintenance and monitoring of the Low Income Units and the Project, including without limitation, restrictions in relation to the Bonds and all restrictions and requirements with respect to the LIHTC and ELIHC, (ii) all restrictions on transfers of ownership interests as more fully set forth in Section 7.2 below, and (iii) such other restrictions and requirements as set forth in this Article 7. Lessee shall also comply with all reporting and record-keeping requirements of this Agreement to the extent not undertaken by the Owner, and shall make all certifications required under Section 6.2 hereof, however the Owner maintains the obligation to ensure that all such requirements have been satisfied. The Agency agrees to accept from Lessee and/or the Lessee LP performance of any obligation under this Agreement to the same extent as if performed by Owner, and may be substituted for "Owner" with respect to lease provisions contained in Section 4.4, above, however, Owner maintains the obligation to ensure that all such requirements have been satisfied.

(b)   The Owner and Lessee acknowledge that any rights of Early Termination in accordance with Section 3.2(b) of this Agreement may be exercised only by Owner, and any "qualified contract" requested thereunder must be for the acquisition of the Project in its entirety.

7.2   Lessee Restrictions on Transfer. (a) Except as otherwise provided in this Section 7.2, the Lessee shall not convey all or part of its leasehold interest in the Project without obtaining the Agency's prior written consent, which consent shall not be unreasonably withheld or delayed. As of the date hereof and at all times hereafter, the general partner of the Lessee ("Lessee GP") shall be wholly owned and controlled by (1) one or more of the Principals, either directly or indirectly through another entity wholly owned and controlled by such Principal(s), or (2) the Owner or an entity to which the ownership interests in the Owner have been transferred in accordance with Section 5.5, of this Agreement. As of the date hereof, the limited partner of the Lessee is RAH Investor 225 LLC ("RAH"), and the special limited partner of the Lessee is Sterling Corporate Services, LLC (together with RAH, the "Lessee LP"). Lessee shall not permit the admission of additional partners or members to the Lessee or the Lessee GP, as applicable, without the prior consent of the Agency, which consent shall not be unreasonably withheld or delayed.

(b)   Notwithstanding anything else herein to the contrary, the Agency's consent shall not be required for a direct or indirect transfer of:

(i) the Lessee's interest in the Project to the Owner (whether upon termination of the Lease or otherwise), or to any entity or person identified in section (i) of the definition of Principals;

(ii) all or a portion of the Lessee GP's interest in the Lessee to the Owner;

(iii) the Lessee LP's interest in Lessee to either the Lessee GP or the Owner, including without

limitation a transfer in connection with the end of the ten-year LIHTC credit period and/or fifteen-year LIHTC recapture period or upon the withdrawal of Lessee LP as a member of Lessee upon the occurrence of a withdrawal event under the partnership agreement of the Lessee;

(iv) the Lessee LP's interest in Lessee to an affiliate of RAH or another institutional tax credit investor or entity regularly engaged in the investment in and/or syndication of low income housing tax credits, provided that in any case such transferee is not a Prohibited Person and does not have the right to control, manage or direct day to day operations of the Lessee;

(v) by operation of law or, in the case of any partner who is a natural person, the death of such partner.

(c)     The Lessee shall notify the Agency in writing, within 30 days after the occurrence thereof, of any transfer of any interest in the Lessee, the Lessee GP or the Lessee LP notwithstanding whether Agency consent is required for such transfer, provided that failure to provide such notice shall not affect the validity of any transfer which does not hereunder require the consent of the Agency. The Lessee shall, within five days after request of the Agency, furnish to the Agency the names of the officers, directors, managers, members, partners and shareholders of the Lessee or the Lessee GP, together with such other information as the Agency shall reasonably request with respect to such persons or entities. The notice requirements under this Section 7.2(c) shall not apply to ownership interests held in the Lessee LP.

(d)     The Agency will charge the Owner, and the Owner shall be obligated to pay, a transfer fee of one-tenth of one percent (0.1%) of the then outstanding principal amount of the Bonds ("Lessee Transfer Fee"): (i) in connection with any consent required by this Section 7.2, or (ii) if at any time the Lessee GP is no longer an entity solely owned (directly or indirectly) by the Principals, whether by operation of the partnership agreement of the Lessee or otherwise, provided, however, that such Lessee Transfer Fee shall not apply to (x) any transfers for which the Agency consent is not required under Section 7.2(b)(i)-(v), or (y) any transfers for which a Transfer Fee under Section 5.5 is otherwise payable, however, the Agency reserves the right to charge Owner for any reasonable related out-of-pocket expenses. In the event a transfer of interest which requires Agency consent under this Section 7.2 has occurred without the prior consent of the Agency, the Owner will be subject to, in addition to the Lessee Transfer Fee, a penalty of the greater of an additional one half of one percent (0.5%) of the then outstanding principal balance of the Mortgage Loan, or $5,000.

(e)     To the extent not modified by this Section 7.2 all other exceptions to restrictions on transfer set forth in Section 5.5 of this Agreement shall remain in effect.

7.3.    Subordination of Master Lease. The Owner and Lessee acknowledge and agree that the Master Lease and all terms and conditions contained therein and all rights, options, loans, liens and charges created thereby, is and shall be subject and subordinate in all respects to this Agreement, as each may be amended, renewed, extended, or otherwise altered. In the event of any conflict between the terms of the Master Lease and the terms hereof, the terms of this Agreement shall apply. The Agency shall not be

bound by any amendment or modification of the Master Lease made without the written consent of the Agency.

7.4. <u>Indemnities</u>.    The Owner and the Lessee shall each jointly and severally indemnify and hold the Agency harmless from and against any and all actual claims, demands, liabilities, and losses, and actual and reasonable out-of-pocket costs or expenses (including but not limited to attorneys' fees and other costs of litigation)(the "Claims"), from any party whatsoever, arising out of or in any way related to the syndication of the LIHTC, the operation of the Project, the Master Lease or the application or enforcement of any provisions thereunder, in all cases including but not limited to any Claim brought by either the Owner or the Lessee against the other party. The obligations under this section shall survive the termination or expiration of this Agreement as necessary to effectuate its provisions. This indemnity is not a guarantee of any portion of the Mortgage Loan.

7.5. <u>Limitation on Term</u>. The terms and provisions of this Section 8 shall be in effect until the earlier of such time as: (a) this Agreement no longer remains in effect; and (b) the Master Lease terminates.

7.6. <u>Cure Rights</u>. To the extent that the Regulatory Agreement affords Owner any cure rights following a default or event of default, each of Lessee and Lessee LP shall have the right, but not the obligation, to cure any such default or event of default and any cure so made by the Lessee and Lessee LP will be recognized by the Agency on the same basis as if made or tendered by the Owner or Lessee.

**8.0  GENERAL PROVISIONS**

8.1  <u>Interpretation and Section Headings</u>. In this Agreement:

(a)    The terms "hereby," "hereof," "hereto," "herein," "hereunder" and any similar terms as used in this Agreement refer to this Agreement, and the term "hereafter" means after, and the term "heretofore" means before the date of this Agreement.

(b)    Unless the context otherwise requires, words of the masculine gender mean and include correlative words of the feminine and neuter genders, and words defined in the singular have the same meaning when used in the plural and vice versa.

(c)    Words importing persons include firms, associations, partnerships, trusts, corporations, limited liability companies and other legal entities including public bodies, as well as natural persons.

(d)    Any headings preceding the texts of any section, paragraph or subparagraph of this Agreement and table of contents appended to the copies hereof shall be solely for convenience of reference and shall not constitute a part of this Agreement, nor shall they affect its meaning, construction or effect.

(e)    All certifications, documents and instructions, including those regarding approvals, consents and acceptances, required to be given or made by any person or party hereunder shall be made in writing.

8.2    <u>Parties Bound</u>. Prior to any sale, transfer or other disposition of the Project (or portion thereof), the Owner and/or Lessee, as applicable, shall require the subsequent purchaser or transferee to

assume in writing the Owner's and Lessee's respective obligations and duties under this Agreement and shall provide the Agency with a copy of such assumption. Such obligations and duties shall extend to the provisions that all partners, members or principals of the new owner shall also be bound hereby. Any sale, transfer or other disposition without such written assumption is null and void *ab initio* and not effective to result in sale, transfer or other disposition or to relieve the Owner of its obligations under this Agreement. The Agency shall, upon request, provide such transferor with documentation in a form reasonably acceptable to the Owner evidencing that pursuant to said assumption the Agency shall release the Owner from all future obligations hereunder.

   8.3 <u>Compliance with Equal Opportunity Laws and Regulations</u>. The Owner shall comply with all applicable state and federal laws and regulations regarding affirmative action, equal opportunity in employment and fair housing laws.

   8.4 <u>Governing Law</u>. This Agreement has been executed and delivered in, and shall be construed and enforced in accordance with and governed by the laws of the State of New York as applicable to contracts made and performed entirely within such state by residents of such state. In the event of conflict between the provisions of this Agreement and federal laws, regulations and requirements, the latter shall prevail.

   8.5 <u>Notices</u>. All notices to be given pursuant to this Agreement shall be in writing and shall be deemed given when delivered by hand or by Federal Express, United Parcel Service or equivalent package delivery service, or when mailed by certified or registered mail, return receipt requested, or by such other means as may be prescribed in writing by any party (including any temporary means of notification due to disruptions in normal business operations) to the parties hereto at the addresses first set forth herein, or to such other place as the Agency or the Owner from time to time designate in writing. Additional notices should be sent as follows:

If to Owner:

> 15 HY Base Unit Owner LLC
> c/o The Related Companies, L.P.
> 60 Columbus Circle
> New York, New York 10023
> Attention: Michael Iannacone

> with a copy to:

> Levitt & Boccio, LLP
> 423 West 55th Street, 8th Floor
> New York, New York 10023
> Attention: David S. Boccio, Esq.

and to:

Oxford Hudson Yards LLC
c/o Oxford Properties Group
450 Park Avenue, Suite 900
New York, New York 10022
Attention: Dean J. Shapiro

and to:

Oxford Hudson Yards LLC
c/o Oxford Properties Group
100 Adelaide Street W
Toronto, Ontario ON M5H 0E2, Canada
Attention: Chief Legal Counsel

If to Lessee:

South Residential Tower Affordable, L.P.
c/o Related Companies
60 Columbus Circle, 19th Floor
New York, NY 10023
Attn: Michael Iannacone

With copies to:

Levitt & Boccio, LLP
423 West 55th Street, 8th Floor
New York, NY 10019
Attn: David S. Boccio, Esq.

and to:

Oxford Hudson Yards LLC
c/o Oxford Properties Group
320 Park Avenue, 17th Floor
New York, New York 10022
Attention: Dean J. Shapiro

and to:

Oxford Hudson Yards LLC
c/o Oxford Properties Group
Royal Bank Plaza, North Tower
200 Bay Street, Suite 900
Toronto, Ontario M5J 2J2
Attention: Chief Legal Counsel

and, if different from the address set forth above, to the address posted from time to time
as the corporate head office of Oxford Properties Group on the website
www.oxfordproperties.com, to the attention of Chief Legal Counsel

and to:

RAH Investor 225 LLC
c/o Regions Affordable Housing
111 Great Neck Road, Suite 500
Great Neck, NY 11021

If to Fannie Mae:

Fannie Mae
1100 15th Street, NW
Multifamily Servicing
Washington, DC 20005
Attention:      Director, Multifamily Operations
Telephone:      (202) 752-4937
Facsimile:      (202) 752-8369
Re:    $80,000,000 Bond Credit Enhancement – New York State Housing Finance
Agency 15 Hudson Yards/Wells Fargo Bank, National Association

and to:

Fannie Mae
1100 15th Street, NW
Drawer AM
Washington, DC 20005
Attention:      Director, Multifamily Asset Management
Telephone:      (301) 204-8008
Facsimile:      (301) 280-2065
Re:    $80,000,000 Bond Credit Enhancement – New York State Housing Finance
Agency 15 Hudson Yards/Wells Fargo Bank, National Association

8.6    Waiver. No omission by the Agency or act of the Agency other than a writing signed by
it waiving a breach by the Owner, shall constitute a waiver thereof. No such waiver of any breach shall

be deemed a waiver of any other or subsequent breach or affect or alter this Agreement, which shall continue in full force and effect with respect to any other then-existing or subsequent breach.

8.7     Severability.   All rights, powers and remedies provided herein may be exercised only to the extent that exercise thereof does not violate any applicable law, and are intended to be limited to the extent necessary so that they will not render this Agreement invalid, unenforceable or not entitled to be recorded, registered, or filed under applicable law.  If any provision shall be held to be invalid, illegal or unenforceable, only such provision or part thereof shall be affected by such holding and the validity of other provisions of this Agreement and of the balance of any provision held to be invalid, illegal or unenforceable in part only, shall in no way be affected thereby, and this Agreement shall be construed as if such invalid, illegal, or unenforceable provision or part thereof had not been contained therein.

8.8     Counterparts. This Agreement may be executed in any number of counterparts, and each such counterpart shall be deemed to be a duplicate original.  All such counterparts shall constitute but one and the same instrument.

8.9     Intentionally deleted.

8.10    Intentionally deleted.

8.11    Green Building Guidelines.  The Project shall comply with the Agency's Green Building Guidelines in effect as of the date of the Original Regulatory Agreement.

8.12.   Modification and Waiver - This Agreement may not be amended, supplemented, or modified except by written agreement of the parties hereto, and, so long as the Credit Enhancement Instrument shall continue to provide credit enhancement for this transaction and no Wrongful Dishonor by Fannie Mae shall have occurred with respect thereto, with the written consent of Fannie Mae.

8.13.   Fannie Mae a Third Party Beneficiary.  For so long as the Credit Enhancement Instrument shall provide credit enhancement for this transaction, and provided that there shall not have been a Wrongful Dishonor by Fannie Mae under such Credit Enhancement Instrument, Fannie Mae is intended to be and shall be the sole third-party beneficiary of this Agreement. Fannie Mae shall have the right (but not the obligation) to enforce the terms of this Agreement, insofar as this Agreement sets forth the obligations of the Owner hereunder.  In the event that Fannie Mae is no longer providing the Credit Enhancement Instrument or a Wrongful Dishonor has occurred and is continuing, all rights to enforce the Owner's obligations under this Agreement shall be exercised solely by the Agency.

[Remainder of page intentionally left blank.  Signature pages follow.]

**IN WITNESS WHEREOF**, the parties have caused this Agreement to be executed and delivered by their respective duly authorized representatives, as of the day and year first written above.

Approved by Counsel
to the Agency

**NEW YORK STATE HOUSING FINANCE AGENCY**

By:    //ss JOAN S. Bocina
        Joan S. Bocina
        Associate Counsel

By:
        Nicole Ferreira
        Senior Vice President


STATE OF NEW YORK    )
                         ) ss.:
COUNTY OF _____)


On the _____ day of July in the year 2020, before me, the undersigned, a notary public in and for said state, personally appeared Nicole Ferreira personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose names is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person on behalf of which the individual acted, executed the instrument.


_____
Notary Public
Commission expires:

**IN WITNESS WHEREOF**, the parties have caused this Agreement to be executed and delivered by their respective duly authorized representatives, as of the day and year first written above.

Approved by Counsel
to the Agency

**NEW YORK STATE HOUSING FINANCE AGENCY**

By:      //ss JOAN S. Bocina
         Joan S. Bocina
         Associate Counsel

By:      _____  __  .  __

         Nicole Ferreira
         Senior Vice President


STATE OF NEW YORK       )
                         ) ss.:
COUNTY OF  Suffolk      )


On the 16ᵗʰ day of July in the year 2020, before me, the undersigned, a notary public in and for said state, personally appeared Nicole Ferreira personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose names is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person on behalf of which the individual acted, executed the instrument.


Nancy Georgiou
Notary Public
Commission expires:

NANCY GEORGIOU
Notary Public, State of New York
Reg. No. 01GE6256421
Qualified in Suffolk County
Commission Expires February 27, 2024

SIGNATURE AND ACKNOWLEDGEMENT PAGE - REGULATORY AGREEMENT

**OWNER:**

**15 HY BASE UNIT OWNER LLC,** a
New York limited liability company

By: _____
Name: Michael Iannacone
Title: Vice President

STATE OF NEW YORK      )
                       ) ss.:
COUNTY OF NEW YORK   )

On the 24ᵗʰ day of July in the year 2020, before me, the undersigned, a notary public in and for said state, personally appeared Michael Iannacone personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose names is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person on behalf of which the individual acted, executed the instrument.

_____
Notary Public
Commission expires:

ALLISON BUKHTULOV
NOTARY PUBLIC-STATE OF NEW YORK
No. 01BU6103706
Qualified in New York County
My Commission Expires 01-05-2024

SIGNATURE AND ACKNOWLEDGEMENT PAGE - REGULATORY AGREEMENT

**LESSSEE:**

**SOUTH RESIDENTIAL TOWER AFFORDABLE, L.P.**, a New York limited partnership

By:   **SOUTH RESIDENTIAL TOWER AFFORDABLE GP, LLC**, a New York limited partnership, its general partner

By: _____
Name: Michael Iannacone
Title: Vice President

STATE OF NEW YORK   )
                      ) ss.:
COUNTY OF NEW YORK  )

On the 24th day of July in the year 2020, before me, the undersigned, a notary public in and for said state, personally appeared Michael Iannacone personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose names is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person on behalf of which the individual acted, executed the instrument.

_____
Notary Public
Commission expires:

ALLISON BUKHTULOV
NOTARY PUBLIC-STATE OF NEW YORK
No. 01BU6103706
Qualified in New York County
My Commission Expires 01-05-2024

SIGNATURE AND ACKNOWLEDGEMENT PAGE - REGULATORY AGREEMENT

## SCHEDULE A
## LEGAL DESCRIPTION OF THE PREMISES

The condominium unit (the "Unit") in the building known as 15 HUDSON YARDS CONDOMINIUM (the "Building"), located at and known as and by street number 15 Hudson Yards (f/k/a 545 and 553 West 30th Street), New York, New York designated and described as the Base Unit in the Declaration, as amended, establishing a plan for condominium ownership of said Building and the land upon which it is situate (the "Land") under Article 9-B of the Real Property Law of the State of New York, dated August 5, 2015 and recorded on November 18, 2015 in the Office of the Register of the City of New York, County of New York (the "Register's Office") under CRFN 2015000410388, as amended and restated pursuant to that certain Amended and Restated Declaration, dated December 6, 2018 and recorded on December 7, 2018 in the Register's Office under CRFN 2018000404416, said Base Unit also being designated as Tax Lot 1004, in Block 702 of the Borough of Manhattan on the Tax Map of the Real Property Assessment Department of the City of New York (the "Assessment Department") and on the Floor Plans of said Building filed in the Assessment Department as Condominium Plan No. 2638 and also filed in the Register's Office on November 18, 2015 as Condominium Map filed under CRFN 2015000410389, as amended on the Floor Plans of said Building filed in the Assessment Department as Condominium Plan No. 2638-A and also filed in the Register's Office on December 7, 2018 as Condominium Map filed under CRFN 2018000404417.

**TOGETHER** with an undivided 11.3759% interest in the Common Elements (as such term is defined in the Declaration),

**TOGETHER** with the benefits of those certain easements appurtenant to the Building, granted by the Declaration, the Condominium By-Laws and the Tower Section By-Laws (each as defined in the Declaration).

The Land on which the Building containing the Unit is situate is bounded and described as follows:

**Basement Level and Below:**

All of the lands at or below an upper limiting plane of elevation 12.00 feet (Manhattan Borough Datum) within the following horizontal boundary:

Beginning at a point formed by the intersection of the easterly line of Eleventh Avenue (100' R.O.W.), and the northerly line of West 30th Street (60' R.O.W.); running thence

1.   Along said easterly line of Eleventh Avenue, North 00°03'07" East, a distance of 182.50 feet to a point; thence

2.   Leaving Eleventh Avenue, South 89°56'53" East, a distance of 98.58 feet to a point; thence

3.   South 00°03'07" West, a distance of 104.83 feet to a point; thence

4.   South 89°56'53" East, a distance of 112.00 feet to a point; thence

5.  South 00°03'07" West, a distance of 77.67 feet to a point on the aforementioned northerly line of West 30th Street; thence

6.  Along said northerly line of West 30th Street, North 89°56'53" West, a distance of 210.58 feet to the Point of Beginning.

**Street Level I:**

All of the lands above a lower limiting plane of elevation 12.00 feet and at or below an upper limiting plane of elevation 26.67 feet (Manhattan Borough Datum) within the following horizontal boundary:

Beginning at a point formed by the intersection of the easterly line of Eleventh Avenue (100' R.O.W.), and the northerly line of West 30th Street (60' R.O.W.); running thence

1.  Along said easterly line of Eleventh Avenue, North 00°03'07" East, a distance of 182.50 feet to a point; thence

2.  Leaving Eleventh Avenue, South 89°56'53" East, a distance of 119.54 feet to a point; thence

3.  South 00°03'07" West, a distance of 34.75 feet to a point; thence

4.  South 89°56'53" East, a distance of 37.04 feet to a point; thence

5.  South 00°03'07" West, a distance of 12.90 feet to a point; thence

6.  South 89°56'53" East, a distance of 45.42 feet to a point; thence

7.  South 00°03'07" West, a distance of 31.86 feet to a point; thence

8.  South 89°56'53" East, a distance of 10.32 feet to a point; thence

9.  South 36°42'17" East, a distance of 27.85 feet to a point; thence

10. South 00°03'07" West, a distance of 18.31 feet to a point; thence

11. North 89°56'53" West, a distance of 2.33 feet to a point; thence

12. South 00°03'07" West, a distance of 6.60 feet to a point; thence

13. South 89°56'53" East, a distance of 0.50 feet to a point; thence

14. South 00°03'07" West, a distance of 5.03 feet to a point; thence

15. South 89°56'53" East, a distance of 1.80 feet to a point; thence

16. South 00°03'07" West, a distance of 30.67 feet to a point; thence

Schedules and Exhibits to
Regulatory Agreement

17.  North 89°56'53" West, a distance of 8.37 feet to a point; thence

18.  South 00°03'07" West, a distance of 20.06 feet to a point on the aforementioned northerly line of West 30th Street; thence

19.  Along said northerly line of West 30th Street, North 89°56'53" West, a distance of 220.58 feet to the Point of Beginning.

## Street Level II:

All of the lands above a lower limiting plane of elevation 26.67 feet and at or below an upper limiting plane of elevation 28.83 feet (Manhattan Borough Datum) within the following horizontal boundary:

Beginning at a point formed by the intersection of the easterly line of Eleventh Avenue (100' R.O.W.), and the northerly line of West 30th Street (60' R.O.W.); running thence

1.  Along said easterly line of Eleventh Avenue, North 00°03'07" East, a distance of 212.00 feet to a point; thence

2.  Leaving Eleventh Avenue, South 89°56'53" East, a distance of 92.17 feet to a point; thence

3.  South 00°03'07" West, a distance of 29.50 feet to a point; thence

4.  South 89°56'53" East, a distance of 27.37 feet to a point; thence

5.  South 00°03'07" West, a distance of 34.75 feet to a point; thence

6.  South 89°56'53" East, a distance of 37.04 feet to a point; thence

7.  South 00°03'07" West, a distance of 12.90 feet to a point; thence

8.  South 89°56'53" East, a distance of 45.42 feet to a point; thence

9.  South 00°03'07" West, a distance of 31.86 feet to a point; thence

10.  South 89°56'53" East, a distance of 10.32 feet to a point; thence

11.  South 36°42'17" East, a distance of 27.85 feet to a point; thence

12.  South 00°03'07" West, a distance of 18.31 feet to a point; thence

13.  North 89°56'53" West, a distance of 2.33 feet to a point; thence

14.  South 00°03'07" West, a distance of 6.60 feet to a point; thence

15.  South 89°56'53" East, a distance of 0.50 feet to a point; thence

Schedules and Exhibits to
Regulatory Agreement

16.    South 00°03'07" West, a distance of 5.03 feet to a point; thence

17.    South 89°56'53" East, a distance of 1.80 feet to a point; thence

18.    South 00°03'07" West, a distance of 30.67 feet to a point; thence

19.    North 89°56'53" West, a distance of 8.37 feet to a point; thence

20.    South 00°03'07" West, a distance of 20.06 feet to a point on the aforementioned northerly
       line of West 30th Street; thence

21.    Along said northerly line of West 30th Street, North 89°56'53" West, a distance of 220.58
       feet to the Point of Beginning.

## Street Level III:

All of the lands above a lower limiting plane of elevation 28.83 feet and at or below an upper
limiting plane of elevation 29.00 feet (Manhattan Borough Datum) within the following horizontal
boundary:

Beginning at a point formed by the intersection of the easterly line of Eleventh Avenue (100'
R.O.W.), and the northerly line of West 30th Street (60' R.O.W.); running thence

1.     Along said easterly line of Eleventh Avenue, North 00°03'07" East, a distance of 212.00
       feet to a point; thence

2.     Leaving Eleventh Avenue, South 89°56'53" East, a distance of 232.17 feet to a point;
       thence

3.     South 00°03'07" West, a distance of 19.83 feet to a point; thence

4.     North 89°56'53" West, a distance of 62.81 feet to a point; thence

5.     South 78°45'38" West, a distance of 49.37 feet to a point; thence

6.     North 89°56'53" West, a distance of 1.41 feet to a point; thence

7.     South 00°03'07" West, a distance of 34.75 feet to a point; thence

8.     South 89°56'53" East, a distance of 37.04 feet to a point; thence

9.     South 00°03'07" West, a distance of 12.90 feet to a point; thence

10.    South 89°56'53" East, a distance of 45.42 feet to a point; thence

11.    South 00°03'07" West, a distance of 31.86 feet to a point; thence

12.    South 89°56'53" East, a distance of 10.32 feet to a point; thence

13.    South 36°42'17" East, a distance of 27.85 feet to a point; thence

14.    South 00°03'07" West, a distance of 18.31 feet to a point; thence

15.    North 89°56'53" West, a distance of 2.33 feet to a point; thence

16.    South 00°03'07" West, a distance of 6.60 feet to a point; thence

17.    South 89°56'53" East, a distance of 0.50 feet to a point; thence

18.    South 00°03'07" West, a distance of 5.03 feet to a point; thence

19.    South 89°56'53" East, a distance of 1.80 feet to a point; thence

20.    South 00°03'07" West, a distance of 30.67 feet to a point; thence

21.    North 89°56'53" West, a distance of 8.37 feet to a point; thence

22.    South 00°03'07" West, a distance of 20.06 feet to a point on the aforementioned northerly line of West 30th Street; thence

23.    Along said northerly line of West 30th Street, North 89°56'53" West, a distance of 220.58 feet to the Point of Beginning.

## Mezzanine Level I:

All of the lands above a lower limiting plane of elevation 29.00 feet and at or below an upper limiting plane of elevation 38.00 feet (Manhattan Borough Datum) within the following horizontal boundary:

Beginning at a point formed by the intersection of the easterly line of Eleventh Avenue (100' R.O.W.), and the northerly line of West 30th Street (60' R.O.W.); running thence

1.    Along said easterly line of Eleventh Avenue, North 00°03'07" East, a distance of 212.00 feet to a point; thence

2.    Leaving Eleventh Avenue, South 89°56'53" East, a distance of 232.17 feet to a point; thence

3.    South 00°03'07" West, a distance of 156.24 feet to a point; thence

4.    North 89°56'53" West, a distance of 3.21 feet to a point; thence

5.    South 00°03'07" West, a distance of 35.70 feet to a point; thence

6.    North 89°56'53" West, a distance of 8.37 feet to a point; thence

7.     South 00°03'07" West, a distance of 20.06 feet to a point on the aforementioned northerly line of West 30th Street; thence

8.     Along said northerly line of West 30th Street, North 89°56'53" West, a distance of 220.58 feet to the Point of Beginning.

## Mezzanine Level II:

All of the lands above a lower limiting plane of elevation 38.00 feet and at or below an upper limiting plane of elevation 40.55 feet (Manhattan Borough Datum) within the following horizontal boundary:

Beginning at a point formed by the intersection of the easterly line of Eleventh Avenue (100' R.O.W.), and the northerly line of West 30th Street (60' R.O.W.); running thence

1.     Along said easterly line of Eleventh Avenue, North 00°03'07" East, a distance of 212.00 feet to a point; thence

2.     Leaving Eleventh Avenue, South 89°56'53" East, a distance of 384.00 feet to a point; thence

3.     South 00°03'07" West, a distance of 19.83 feet to a point; thence

4.     North 89°56'53" West, a distance of 151.83 feet to a point; thence

5.     South 00°03'07" West, a distance of 136.41 feet to a point; thence

6.     North 89°56'53" West, a distance of 3.21 feet to a point; thence

7.     South 00°03'07" West, a distance of 35.70 feet to a point; thence

8.     North 89°56'53" West, a distance of 8.37 feet to a point; thence

9.     South 00°03'07" West, a distance of 20.06 feet to a point on the aforementioned northerly line of West 30th Street; thence

10.     Along said northerly line of West 30th Street, North 89°56'53" West, a distance of 220.58 feet to the Point of Beginning.

## Plaza Level and Above:

All of the lands above a lower limiting plane of elevation 40.55 feet (Manhattan Borough Datum) within the following horizontal boundary:

Beginning at a point formed by the intersection of the easterly line of Eleventh Avenue (100' R.O.W.), and the northerly line of West 30th Street (60' R.O.W.); running thence

1.    Along said easterly line of Eleventh Avenue, North 00°03'07" East, a distance of 212.00 feet to a point; thence

2.    Leaving Eleventh Avenue, South 89°56'53" East, a distance of 384.00 feet to a point; thence

3.    South 00°03'07" West, a distance of 212.00 feet to a point on the aforementioned northerly line of West 30th Street; thence

4.    Along said northerly line of West 30th Street, North 89°56'53" West, a distance of 384.00 feet to the Point of Beginning.

## APPURTENANT EASEMENTS

A.    TOGETHER WITH THE BENEFITS OF THOSE CERTAIN EASEMENTS appurtenant to the Building contained in that certain Amended and Restated Declaration Establishing the ERY Facility Airspace Parcel Owners' Association and of Covenants, Conditions, Easements and Restrictions Relating to the Premises known as the Eastern Rail Yard Section of the John D. Caemmerer West Side Yard made by Metropolitan Transportation Authority, dated as of December 7, 2015 and recorded in the Register's Office on December 8, 2015 as CRFN 2015000434131, as amended and supplemented by that certain First Amendment and Supplement to Amended and Restated Declaration Establishing the ERY Facility Airspace Parcel Owners' Association and of Covenants, Conditions, Easements and Restrictions made by Metropolitan Transportation Authority and Legacy Yards Tenant LP, and consented and agreed to by ERY Retail Podium LLC, ERY Tenant LLC, the Board of Managers of 20-30 Hudson Yards Condominium and the Board of Managers of 15 Hudson Yards Condominium, dated as of 4/15/2019 and recorded in the Register's Office on 5/9/2019 as CRFN 2019000148843, as amended by that certain Second Amendment to Amended and Restated Declaration Establishing the ERY Facility Airspace Parcel Owners' Association and of Covenants, Conditions, Easements and Restrictions made by Metropolitan Transportation Authority, Legacy Yards Tenant LP and the Board of Managers of 20-30 Hudson Yards Condominium, and consented and agreed to by ERY Retail Podium LLC, ERY Retail Pavilion LLC and ERY Tenant LLC, dated as of 5/22/2020 and recorded in the Register's Office on 6/4/2020 as CRFN 2020000163961.

B.    TOGETHER WITH THE BENEFITS OF THOSE CERTAIN EASEMENTS appurtenant to the Building contained in that certain Declaration of Easements (Eastern Rail Yard Section of the John D. Caemmerer West Side Yard) made by Metropolitan Transportation Authority, and consented to by The Long Island Rail Road Company, dated as of May 26, 2010 and recorded in the Register's Office on June 10, 2010 as CRFN 2010000194078, as amended by that certain First Amendment to Declaration of Easements (Eastern Rail Yard Section of the John D. Caemmerer West Side Yard) made by Metropolitan Transportation Authority, and consented to by The Long Island Rail Road Company, dated as of April 10, 2013 and recorded in the Register's Office on July 12, 2013 as CRFN 2013000276090, as supplemented by that certain Supplement to Declaration of Easements (Eastern Rail Yard Section of the John D. Caemmerer West Side Yard) by and between Metropolitan Transportation Authority and ERY Tenant LLC, and consented to by The Long Island Rail Road Company, dated as of November 16, 2015 and

recorded in the Register's Office on November 18, 2015 as CRFN 2015000410387, as further supplemented pursuant to that certain Second Supplement to Declaration of Easements (Eastern Rail Yard Section of the John D. Caemmerer West Side Yard) by and among Metropolitan Transportation Authority, Hudson Yards North Tower Tenant LLC and ERY Retail Podium LLC, consented to by The Long Island Rail Road Company, and consented and agreed to by the Board of Managers of 20-30 Hudson Yards Condominium, dated as of April 15, 2019 and recorded in the Register's Office on 5/9/2019 as CRFN 2019000148842.

**EXHIBIT A**

AGREEMENT BETWEEN AGENCY AND SUCCESSOR MORTGAGEE
IN THE EVENT OF ASSIGNMENT OF THE MORTGAGE

After the Mortgage has been assigned to **[insert name of successor mortgagee]**, the Agency's right to enforce the Mortgage, in its own right, shall be on the condition that the Agency may only cause an acceleration of the amounts due under the Mortgage Note and/or commencement of foreclosure of the Mortgage if the Agency has received the written consent of **[insert name of successor mortgagee]** or an opinion of a nationally recognized bond counsel acceptable to the Agency to the effect that such noncompliance under the Regulatory Agreement, the failure to accelerate the amount due under the Mortgage Note and/or commence foreclosure of the Mortgage, would adversely affect the exclusion from gross income for purposes of federal income taxation of interest on the Agency's obligations issued with respect to such Mortgage Loan. The Agency hereby agrees that it will only exercise its rights under the Loan Agreement, Mortgage and Regulatory Agreement to declare the outstanding balance of the Mortgage Loan to be due and payable and/or to foreclosure on the Mortgage as herein provided. This provision shall affect only the rights of **[insert name of successor]** and the Agency and it is not intended that the Owner shall be a third party beneficiary hereof.

**EXHIBIT B**

Intentionally Deleted

**EXHIBIT C**

## ADJUSTMENTS FOR SMALLER AND LARGER FAMILIES
## TO THE AREA MEDIAN INCOME FIGURE

Number of Persons in Family

### 60% LOW INCOME UNITS

| 1 | 2 | 3 | 4 | 5 | 6 |
|---|---|---|---|---|---|
| 42% | 48% | 54% | 60% | 64.8% | 69.6% |

### 50% LOW INCOME UNITS

| 1 | 2 | 3 | 4 | 5 | 6 |
|---|---|---|---|---|---|
| 35% | 40% | 45% | 50% | 54% | 58% |

THE PERCENTAGES SET FORTH ABOVE ARE PERCENTAGES TO BE APPLIED TO
AREA MEDIAN INCOME TO DETERMINE APPROPRIATE INCOME LEVELS

HOWEVER, THE ACTUAL APPLICABLE INCOME LIMITS ADJUSTED FOR FAMILY
SIZE ARE THOSE PUBLISHED BY HUD FROM TIME TO TIME

**EXHIBIT D**

## PROJECT SERVICES AND AMENITIES

**Project:**

1. The project includes commercial space, either financed by the Agency or included in the total development cost of the project:      ___ Yes      _X_ No

2. There will be 1 unit reserved for resident managers, superintendents and/or employees:

| Unit # (If Known) | Unit Type | Residential or Commercial Use | Revenue- or Non-Revenue-Generating |
|---|---|---|---|
| 23F (RMU)* | 3BR Condo | Residential | Revenue (paid by condo purchasers) |

*23F (RMU) is a residential condominium unit (i.e. in the Tower Section), and was not financed by the Agency.*

3. The following services and amenities are offered by the project for a fee which is NOT included in the monthly base rent for all tenants (both affordable and market rate):

Parking spaces:

N/A        All spaces
N/A        Indoor parking or garages only
N/A        Additional space(s) after one
N/A        Other:

N/A      Storage space

_____  Recreational facilities

Individual utilities:

X      Electric                               X      Heat

X      Gas                                      X      A/C

X      Water

X      Cable service

Laundry facilities:

N/A      Washer/Dryer hook-up

N/A      Washer/Dryer in unit

X      Laundry room

Structural or architectural features:

N/A      Bay windows                   N/A      Den in apartment

N/A      Balconies                          N/A      Vaulted ceilings

N/A      Fireplaces

N/A      Other:

Other services and/or amenities for which a fee will be charged:

N/A

If applicable, the service package for senior/congregate/assisted projects includes:

N/A

Certification:   I, 15 HV 2nSe Un4 Owner LLC   , Owner, hereby certify that the information contained herein is accurate and correct.

Signed: _____   Dated: 7/29/2020

Title:   c/

**Ex. D**