# EXHIBIT 3

**NYC DEPARTMENT OF FINANCE**
**OFFICE OF THE CITY REGISTER**

This page is part of the instrument. The City Register will rely on the information provided by you on this page for purposes of indexing this instrument. The information on this page will control for indexing purposes in the event of any conflict with the rest of the document.



2018120700109001002E9449

| RECORDING AND ENDORSEMENT COVER PAGE | PAGE 1 OF 317 |
|---|---|

| **Document ID:** 2018120700109001 | Document Date: 12-06-2018 | Preparation Date: 12-07-2018 |
|---|---|---|

Document Type: AMENDED CONDO DECLARATION
Document Page Count: 295

**PRESENTER:**

ROYAL REGISTERED PROPERTY REPORTS
(182445)BL/MB
125 PARK AVENUE, SUITE 1610
NEW YORK, NY 10017
212-376-0900
MBASALATAN@ROYALABSTRACT.COM

**RETURN TO:**

ROYAL REGISTERED PROPERTY REPORTS
(182445)BL/MB
125 PARK AVENUE, SUITE 1610
NEW YORK, NY 10017
212-376-0900
MBASALATAN@ROYALABSTRACT.COM

## PROPERTY DATA

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1001  Entire Lot | CSU | 553 WEST 30TH STREET |

Property Type: COMMERCIAL CONDO UNIT(S)

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1002  Entire Lot | CSLL | 553 WEST 30TH STREET |

Property Type: COMMERCIAL CONDO UNIT(S)

☒ Additional Properties on Continuation Page

## CROSS REFERENCE DATA

CRFN: 2015000410388

## PARTIES

**PARTY ONE:**
15 HUDSON YARDS CONDOMINIUM
15 HUDSON YARDS
NEW YORK, NY 10001

## FEES AND TAXES

| **Mortgage :** | | | Filing Fee: | |
|---|---|---|---|---|
| Mortgage Amount: | $ | 0.00 | | $ | 0.00 |
| Taxable Mortgage Amount: | $ | 0.00 | NYC Real Property Transfer Tax: | |
| Exemption: | | | | $ | 0.00 |
| TAXES:  County (Basic): | $ | 0.00 | NYS Real Estate Transfer Tax: | |
| City (Additional): | $ | 0.00 | | $ | 0.00 |
| Spec (Additional): | $ | 0.00 | | |
| TASF: | $ | 0.00 | | |
| MTA: | $ | 0.00 | | |
| NYCTA: | $ | 0.00 | | |
| Additional MRT: | $ | 0.00 | | |
| TOTAL: | $ | 0.00 | | |
| Recording Fee: | $ | 2,376.00 | | |
| Affidavit Fee: | $ | 0.00 | | |

**RECORDED OR FILED IN THE OFFICE**
**OF THE CITY REGISTER OF THE**
**CITY OF NEW YORK**

Recorded/Filed         12-07-2018 14:22
City Register File No.(CRFN):
**2018000404416**

*Annette M. Hill*

*City Register Official Signature*



**NYC DEPARTMENT OF FINANCE**
**OFFICE OF THE CITY REGISTER**

2018120700109001002C96C9

| RECORDING AND ENDORSEMENT COVER PAGE  (CONTINUATION) | PAGE 2 OF 317 |
|---|---|

Document ID: 2018120700109001        Document Date: 12-06-2018        Preparation Date: 12-07-2018
Document  Type: AMENDED CONDO DECLARATION

---

**PROPERTY DATA**

| Borough | Block | Lot | | Unit | Address |
|---|---|---|---|---|---|
| MANHATTAN | 702 | 1003 | Entire Lot | CSMS | 553 WEST 30TH STREET |

Property Type: COMMERCIAL CONDO UNIT(S)

| Borough | Block | Lot | | Unit | Address |
|---|---|---|---|---|---|
| MANHATTAN | 702 | 1004 | Entire Lot | IRU | 553 WEST 30TH STREET |

Property Type: COMMERCIAL CONDO UNIT(S)

| Borough | Block | Lot | | Unit | Address |
|---|---|---|---|---|---|
| MANHATTAN | 702 | 1001 | Entire Lot | CSU | 553 WEST 30TH STREET |

Property Type: COMMERCIAL CONDO UNIT(S)

| Borough | Block | Lot | | Unit | Address |
|---|---|---|---|---|---|
| MANHATTAN | 702 | 1002 | Entire Lot | CSLL | 553 WEST 30TH STREET |

Property Type: COMMERCIAL CONDO UNIT(S)

| Borough | Block | Lot | | Unit | Address |
|---|---|---|---|---|---|
| MANHATTAN | 702 | 1003 | Entire Lot | CSMS | 553 WEST 30TH STREET |

Property Type: COMMERCIAL CONDO UNIT(S)

| Borough | Block | Lot | | Unit | Address |
|---|---|---|---|---|---|
| MANHATTAN | 702 | 1004 | Entire Lot | IRU | 553 WEST 30TH STREET |

Property Type: COMMERCIAL CONDO UNIT(S)

| Borough | Block | Lot | | Unit | Address |
|---|---|---|---|---|---|
| MANHATTAN | 702 | 1005 | Entire Lot | 23F | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | | Unit | Address |
|---|---|---|---|---|---|
| MANHATTAN | 702 | 1006 | Entire Lot | 23G | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | | Unit | Address |
|---|---|---|---|---|---|
| MANHATTAN | 702 | 1007 | Entire Lot | 23H | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | | Unit | Address |
|---|---|---|---|---|---|
| MANHATTAN | 702 | 1008 | Entire Lot | 24A | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | | Unit | Address |
|---|---|---|---|---|---|
| MANHATTAN | 702 | 1009 | Entire Lot | 24B | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | | Unit | Address |
|---|---|---|---|---|---|
| MANHATTAN | 702 | 1010 | Entire Lot | 24C | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | | Unit | Address |
|---|---|---|---|---|---|
| MANHATTAN | 702 | 1011 | Entire Lot | 24D | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | | Unit | Address |
|---|---|---|---|---|---|
| MANHATTAN | 702 | 1012 | Entire Lot | 24E | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

**NYC DEPARTMENT OF FINANCE**
**OFFICE OF THE CITY REGISTER**



2018120700109001002C96C9

| RECORDING AND ENDORSEMENT COVER PAGE (CONTINUATION) | PAGE 3 OF 317 |
|---|---|

Document ID: 2018120700109001          Document Date: 12-06-2018          Preparation Date: 12-07-2018
Document Type: AMENDED CONDO DECLARATION

---

**PROPERTY DATA**

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1013 Entire Lot | 24F | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1014 Entire Lot | 24G | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1015 Entire Lot | 24H | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1016 Entire Lot | 24J | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1017 Entire Lot | 25A | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1018 Entire Lot | 25B | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1019 Entire Lot | 25C | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1020 Entire Lot | 25D | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1021 Entire Lot | 25E | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1022 Entire Lot | 25F | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1023 Entire Lot | 25G | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1024 Entire Lot | 25H | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1025 Entire Lot | 25J | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1026 Entire Lot | 26A | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

**NYC DEPARTMENT OF FINANCE**
**OFFICE OF THE CITY REGISTER**



2018120700109001002C96C9

| RECORDING AND ENDORSEMENT COVER PAGE  (CONTINUATION) | PAGE 4 OF 317 |
|---|---|

Document ID: 2018120700109001          Document Date: 12-06-2018          Preparation Date: 12-07-2018
Document  Type: AMENDED CONDO DECLARATION

**PROPERTY DATA**

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1027 Entire Lot | 26B | 553 WEST 30TH STREET |
| Property Type: SINGLE RESIDENTIAL CONDO UNIT | | | | |
| Borough | Block | Lot | Unit | Address |
| MANHATTAN | 702 | 1028 Entire Lot | 26C | 553 WEST 30TH STREET |
| Property Type: SINGLE RESIDENTIAL CONDO UNIT | | | | |
| Borough | Block | Lot | Unit | Address |
| MANHATTAN | 702 | 1029 Entire Lot | 26D | 553 WEST 30TH STREET |
| Property Type: SINGLE RESIDENTIAL CONDO UNIT | | | | |
| Borough | Block | Lot | Unit | Address |
| MANHATTAN | 702 | 1030 Entire Lot | 26E | 553 WEST 30TH STREET |
| Property Type: SINGLE RESIDENTIAL CONDO UNIT | | | | |
| Borough | Block | Lot | Unit | Address |
| MANHATTAN | 702 | 1031 Entire Lot | 26F | 553 WEST 30TH STREET |
| Property Type: SINGLE RESIDENTIAL CONDO UNIT | | | | |
| Borough | Block | Lot | Unit | Address |
| MANHATTAN | 702 | 1032 Entire Lot | 26G | 553 WEST 30TH STREET |
| Property Type: SINGLE RESIDENTIAL CONDO UNIT | | | | |
| Borough | Block | Lot | Unit | Address |
| MANHATTAN | 702 | 1033 Entire Lot | 26H | 553 WEST 30TH STREET |
| Property Type: SINGLE RESIDENTIAL CONDO UNIT | | | | |
| Borough | Block | Lot | Unit | Address |
| MANHATTAN | 702 | 1034 Entire Lot | 26J | 553 WEST 30TH STREET |
| Property Type: SINGLE RESIDENTIAL CONDO UNIT | | | | |
| Borough | Block | Lot | Unit | Address |
| MANHATTAN | 702 | 1035 Entire Lot | 27A | 553 WEST 30TH STREET |
| Property Type: SINGLE RESIDENTIAL CONDO UNIT | | | | |
| Borough | Block | Lot | Unit | Address |
| MANHATTAN | 702 | 1036 Entire Lot | 27B | 553 WEST 30TH STREET |
| Property Type: SINGLE RESIDENTIAL CONDO UNIT | | | | |
| Borough | Block | Lot | Unit | Address |
| MANHATTAN | 702 | 1037 Entire Lot | 27C | 553 WEST 30TH STREET |
| Property Type: SINGLE RESIDENTIAL CONDO UNIT | | | | |
| Borough | Block | Lot | Unit | Address |
| MANHATTAN | 702 | 1038 Entire Lot | 27D | 553 WEST 30TH STREET |
| Property Type: SINGLE RESIDENTIAL CONDO UNIT | | | | |
| Borough | Block | Lot | Unit | Address |
| MANHATTAN | 702 | 1039 Entire Lot | 27E | 553 WEST 30TH STREET |
| Property Type: SINGLE RESIDENTIAL CONDO UNIT | | | | |
| Borough | Block | Lot | Unit | Address |
| MANHATTAN | 702 | 1040 Entire Lot | 27F | 553 WEST 30TH STREET |
| Property Type: SINGLE RESIDENTIAL CONDO UNIT | | | | |

**NYC DEPARTMENT OF FINANCE**
**OFFICE OF THE CITY REGISTER**



2018120700109001002C96C9

| RECORDING AND ENDORSEMENT COVER PAGE  (CONTINUATION) | PAGE 5 OF 317 |
|---|---|

Document ID: 2018120700109001          Document Date: 12-06-2018          Preparation Date: 12-07-2018
Document  Type: AMENDED CONDO DECLARATION

---

**PROPERTY DATA**

| Borough | Block | Lot | | Unit | Address |
|---|---|---|---|---|---|
| MANHATTAN | 702 | 1041 | Entire Lot | 27G | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | | Unit | Address |
|---|---|---|---|---|---|
| MANHATTAN | 702 | 1042 | Entire Lot | 27H | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | | Unit | Address |
|---|---|---|---|---|---|
| MANHATTAN | 702 | 1043 | Entire Lot | 27J | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | | Unit | Address |
|---|---|---|---|---|---|
| MANHATTAN | 702 | 1044 | Entire Lot | 28A | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | | Unit | Address |
|---|---|---|---|---|---|
| MANHATTAN | 702 | 1045 | Entire Lot | 28B | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | | Unit | Address |
|---|---|---|---|---|---|
| MANHATTAN | 702 | 1046 | Entire Lot | 28C | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | | Unit | Address |
|---|---|---|---|---|---|
| MANHATTAN | 702 | 1047 | Entire Lot | 28D | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | | Unit | Address |
|---|---|---|---|---|---|
| MANHATTAN | 702 | 1048 | Entire Lot | 28E | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | | Unit | Address |
|---|---|---|---|---|---|
| MANHATTAN | 702 | 1049 | Entire Lot | 28F | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | | Unit | Address |
|---|---|---|---|---|---|
| MANHATTAN | 702 | 1050 | Entire Lot | 28G | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | | Unit | Address |
|---|---|---|---|---|---|
| MANHATTAN | 702 | 1051 | Entire Lot | 28H | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | | Unit | Address |
|---|---|---|---|---|---|
| MANHATTAN | 702 | 1052 | Entire Lot | 28J | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | | Unit | Address |
|---|---|---|---|---|---|
| MANHATTAN | 702 | 1053 | Entire Lot | 29A | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | | Unit | Address |
|---|---|---|---|---|---|
| MANHATTAN | 702 | 1054 | Entire Lot | 29B | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

**NYC DEPARTMENT OF FINANCE**
**OFFICE OF THE CITY REGISTER**



2018120700109001002C96C9

| RECORDING AND ENDORSEMENT COVER PAGE  (CONTINUATION) | PAGE 6 OF 317 |
|---|---|

Document ID: 2018120700109001    Document Date: 12-06-2018    Preparation Date: 12-07-2018
Document Type: AMENDED CONDO DECLARATION

---

**PROPERTY DATA**

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1055 Entire Lot | 29C | 553 WEST 30TH STREET |

**Property Type:** SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1056 Entire Lot | 29D | 553 WEST 30TH STREET |

**Property Type:** SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1057 Entire Lot | 29E | 553 WEST 30TH STREET |

**Property Type:** SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1058 Entire Lot | 29F | 553 WEST 30TH STREET |

**Property Type:** SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1059 Entire Lot | 29G | 553 WEST 30TH STREET |

**Property Type:** SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1060 Entire Lot | 29H | 553 WEST 30TH STREET |

**Property Type:** SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1061 Entire Lot | 29J | 553 WEST 30TH STREET |

**Property Type:** SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1062 Entire Lot | 30A | 553 WEST 30TH STREET |

**Property Type:** SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1063 Entire Lot | 30B | 553 WEST 30TH STREET |

**Property Type:** SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1064 Entire Lot | 30C | 553 WEST 30TH STREET |

**Property Type:** SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1065 Entire Lot | 30D | 553 WEST 30TH STREET |

**Property Type:** SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1066 Entire Lot | 30E | 553 WEST 30TH STREET |

**Property Type:** SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1067 Entire Lot | 30F | 553 WEST 30TH STREET |

**Property Type:** SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1068 Entire Lot | 30G | 553 WEST 30TH STREET |

**Property Type:** SINGLE RESIDENTIAL CONDO UNIT

**NYC DEPARTMENT OF FINANCE**
**OFFICE OF THE CITY REGISTER**



2018120700109001002C96C9

| RECORDING AND ENDORSEMENT COVER PAGE (CONTINUATION) | PAGE 7 OF 317 |
|---|---|

Document ID: 2018120700109001   Document Date: 12-06-2018   Preparation Date: 12-07-2018
Document Type: AMENDED CONDO DECLARATION

---

**PROPERTY DATA**

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1069 Entire Lot | 30H | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1070 Entire Lot | 30J | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1071 Entire Lot | 31A | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1072 Entire Lot | 31B | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1073 Entire Lot | 31C | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1074 Entire Lot | 31D | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1075 Entire Lot | 31E | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1076 Entire Lot | 31F | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1077 Entire Lot | 31G | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1078 Entire Lot | 31H | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1079 Entire Lot | 31J | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1080 Entire Lot | 32A | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1081 Entire Lot | 32B | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1082 Entire Lot | 32C | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

**NYC DEPARTMENT OF FINANCE**
**OFFICE OF THE CITY REGISTER**



2018120700109001002C96C9

| RECORDING AND ENDORSEMENT COVER PAGE (CONTINUATION) | PAGE 8 OF 317 |
|---|---|

Document ID: 2018120700109001          Document Date: 12-06-2018          Preparation Date: 12-07-2018
Document Type: AMENDED CONDO DECLARATION

**PROPERTY DATA**

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1083 Entire Lot | 32D | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1084 Entire Lot | 32E | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1085 Entire Lot | 32F | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1086 Entire Lot | 32G | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1087 Entire Lot | 32H | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1088 Entire Lot | 32J | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1089 Entire Lot | 33A | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1090 Entire Lot | 33B | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1091 Entire Lot | 33C | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1092 Entire Lot | 33D | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1093 Entire Lot | 33E | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1094 Entire Lot | 33F | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1095 Entire Lot | 33G | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1096 Entire Lot | 33H | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

**NYC DEPARTMENT OF FINANCE**
**OFFICE OF THE CITY REGISTER**



2018120700109001002C96C9

| RECORDING AND ENDORSEMENT COVER PAGE  (CONTINUATION) | PAGE 9 OF 317 |
|---|---|

Document ID: 2018120700109001     Document Date: 12-06-2018     Preparation Date: 12-07-2018
Document  Type: AMENDED CONDO DECLARATION

**PROPERTY DATA**

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1097 Entire Lot | 33J | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1098 Entire Lot | 34A | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1099 Entire Lot | 34B | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1100 Entire Lot | 34C | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1101 Entire Lot | 34D | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1102 Entire Lot | 34E | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1103 Entire Lot | 34F | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1104 Entire Lot | 34G | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1105 Entire Lot | 34H | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1106 Entire Lot | 34J | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1107 Entire Lot | 35A | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1108 Entire Lot | 35B | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1109 Entire Lot | 35C | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1110 Entire Lot | 35D | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

**NYC DEPARTMENT OF FINANCE**
**OFFICE OF THE CITY REGISTER**



2018120700109001002C96C9

| RECORDING AND ENDORSEMENT COVER PAGE  (CONTINUATION) | PAGE 10 OF 317 |
|---|---|

| Document ID: 2018120700109001 | Document Date: 12-06-2018 | Preparation Date: 12-07-2018 |
|---|---|---|

Document Type: AMENDED CONDO DECLARATION

---

**PROPERTY DATA**

| Borough | Block | Lot | | Unit | Address |
|---|---|---|---|---|---|
| MANHATTAN | 702 | 1111 | Entire Lot | 35E | 553 WEST 30TH STREET |

**Property Type:** SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | | Unit | Address |
|---|---|---|---|---|---|
| MANHATTAN | 702 | 1112 | Entire Lot | 35F | 553 WEST 30TH STREET |

**Property Type:** SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | | Unit | Address |
|---|---|---|---|---|---|
| MANHATTAN | 702 | 1113 | Entire Lot | 35G | 553 WEST 30TH STREET |

**Property Type:** SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | | Unit | Address |
|---|---|---|---|---|---|
| MANHATTAN | 702 | 1114 | Entire Lot | 35H | 553 WEST 30TH STREET |

**Property Type:** SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | | Unit | Address |
|---|---|---|---|---|---|
| MANHATTAN | 702 | 1115 | Entire Lot | 35J | 553 WEST 30TH STREET |

**Property Type:** SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | | Unit | Address |
|---|---|---|---|---|---|
| MANHATTAN | 702 | 1116 | Entire Lot | 36A | 553 WEST 30TH STREET |

**Property Type:** SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | | Unit | Address |
|---|---|---|---|---|---|
| MANHATTAN | 702 | 1117 | Entire Lot | 36B | 553 WEST 30TH STREET |

**Property Type:** SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | | Unit | Address |
|---|---|---|---|---|---|
| MANHATTAN | 702 | 1118 | Entire Lot | 36C | 553 WEST 30TH STREET |

**Property Type:** SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | | Unit | Address |
|---|---|---|---|---|---|
| MANHATTAN | 702 | 1119 | Entire Lot | 36D | 553 WEST 30TH STREET |

**Property Type:** SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | | Unit | Address |
|---|---|---|---|---|---|
| MANHATTAN | 702 | 1120 | Entire Lot | 36E | 553 WEST 30TH STREET |

**Property Type:** SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | | Unit | Address |
|---|---|---|---|---|---|
| MANHATTAN | 702 | 1121 | Entire Lot | 36F | 553 WEST 30TH STREET |

**Property Type:** SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | | Unit | Address |
|---|---|---|---|---|---|
| MANHATTAN | 702 | 1122 | Entire Lot | 36G | 553 WEST 30TH STREET |

**Property Type:** SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | | Unit | Address |
|---|---|---|---|---|---|
| MANHATTAN | 702 | 1123 | Entire Lot | 36H | 553 WEST 30TH STREET |

**Property Type:** SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | | Unit | Address |
|---|---|---|---|---|---|
| MANHATTAN | 702 | 1124 | Entire Lot | 36J | 553 WEST 30TH STREET |

**Property Type:** SINGLE RESIDENTIAL CONDO UNIT

**NYC DEPARTMENT OF FINANCE**
**OFFICE OF THE CITY REGISTER**



2018120700109001002C96C9

| RECORDING AND ENDORSEMENT COVER PAGE  (CONTINUATION) | PAGE 11 OF 317 |
|---|---|

**Document ID:** 2018120700109001   Document Date: 12-06-2018   Preparation Date: 12-07-2018
Document  Type: AMENDED CONDO DECLARATION

---

**PROPERTY DATA**

| Borough | Block Lot | | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1125 Entire Lot | 37A | 553 WEST 30TH STREET |

**Property Type:** SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block Lot | | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1126 Entire Lot | 37B | 553 WEST 30TH STREET |

**Property Type:** SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block Lot | | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1127 Entire Lot | 37C | 553 WEST 30TH STREET |

**Property Type:** SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block Lot | | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1128 Entire Lot | 37D | 553 WEST 30TH STREET |

**Property Type:** SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block Lot | | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1129 Entire Lot | 37E | 553 WEST 30TH STREET |

**Property Type:** SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block Lot | | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1130 Entire Lot | 37F | 553 WEST 30TH STREET |

**Property Type:** SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block Lot | | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1131 Entire Lot | 37G | 553 WEST 30TH STREET |

**Property Type:** SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block Lot | | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1132 Entire Lot | 37H | 553 WEST 30TH STREET |

**Property Type:** SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block Lot | | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1133 Entire Lot | 37J | 553 WEST 30TH STREET |

**Property Type:** SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block Lot | | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1134 Entire Lot | 38A | 553 WEST 30TH STREET |

**Property Type:** SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block Lot | | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1135 Entire Lot | 38B | 553 WEST 30TH STREET |

**Property Type:** SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block Lot | | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1136 Entire Lot | 38C | 553 WEST 30TH STREET |

**Property Type:** SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block Lot | | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1137 Entire Lot | 38D | 553 WEST 30TH STREET |

**Property Type:** SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block Lot | | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1138 Entire Lot | 38E | 553 WEST 30TH STREET |

**Property Type:** SINGLE RESIDENTIAL CONDO UNIT

**NYC DEPARTMENT OF FINANCE**
**OFFICE OF THE CITY REGISTER**



2018120700109001002C96C9

| RECORDING AND ENDORSEMENT COVER PAGE  (CONTINUATION) | PAGE 12 OF 317 |
|---|---|

Document ID: 2018120700109001          Document Date: 12-06-2018          Preparation Date: 12-07-2018
Document  Type: AMENDED CONDO DECLARATION

---

**PROPERTY DATA**

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1139 Entire Lot | 38F | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1140 Entire Lot | 38G | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1141 Entire Lot | 38H | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1142 Entire Lot | 38J | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1143 Entire Lot | 39A | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1144 Entire Lot | 39B | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1145 Entire Lot | 39C | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1146 Entire Lot | 39D | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1147 Entire Lot | 39E | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1148 Entire Lot | 39F | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1149 Entire Lot | 39G | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1150 Entire Lot | 39H | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1151 Entire Lot | 39J | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1152 Entire Lot | 63A | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT



**NYC DEPARTMENT OF FINANCE**
**OFFICE OF THE CITY REGISTER**

2018120700109001002C96C9

| RECORDING AND ENDORSEMENT COVER PAGE  (CONTINUATION) | PAGE 13 OF 317 |
|---|---|

| Document ID: 2018120700109001 | Document Date: 12-06-2018 | Preparation Date: 12-07-2018 |
|---|---|---|

Document Type: AMENDED CONDO DECLARATION

---

**PROPERTY DATA**

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1153 Entire Lot | 63B | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1154 Entire Lot | 63C | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1155 Entire Lot | 63D | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1156 Entire Lot | 63E | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1157 Entire Lot | 63F | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1158 Entire Lot | 64A | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1159 Entire Lot | 64B | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1160 Entire Lot | 64C | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1161 Entire Lot | 64D | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1162 Entire Lot | 64E | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1163 Entire Lot | 64F | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1164 Entire Lot | 65A | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1165 Entire Lot | 65B | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1166 Entire Lot | 65C | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

**NYC DEPARTMENT OF FINANCE**
**OFFICE OF THE CITY REGISTER**



2018120700109001002C96C9

| RECORDING AND ENDORSEMENT COVER PAGE  (CONTINUATION) | PAGE 14 OF 317 |
|---|---|

Document ID: 2018120700109001          Document Date: 12-06-2018          Preparation Date: 12-07-2018
Document Type: AMENDED CONDO DECLARATION

**PROPERTY DATA**

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1167 Entire Lot | 65D | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1168 Entire Lot | 65E | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1169 Entire Lot | 65F | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1170 Entire Lot | 66A | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1171 Entire Lot | 66B | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1172 Entire Lot | 66C | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1173 Entire Lot | 66D | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1174 Entire Lot | 66E | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1175 Entire Lot | 66F | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1176 Entire Lot | 67A | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1177 Entire Lot | 67B | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1178 Entire Lot | 67C | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1179 Entire Lot | 67D | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1180 Entire Lot | 67E | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

**NYC DEPARTMENT OF FINANCE**
**OFFICE OF THE CITY REGISTER**



2018120700109001002C96C9

| RECORDING AND ENDORSEMENT COVER PAGE  (CONTINUATION) | PAGE 15 OF 317 |
|---|---|

Document ID: 2018120700109001          Document Date: 12-06-2018          Preparation Date: 12-07-2018
Document  Type: AMENDED CONDO DECLARATION

**PROPERTY DATA**

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1181 Entire Lot | 67F | 553 WEST 30TH STREET |

**Property Type:** SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1182 Entire Lot | 68A | 553 WEST 30TH STREET |

**Property Type:** SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1183 Entire Lot | 68B | 553 WEST 30TH STREET |

**Property Type:** SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1184 Entire Lot | 68C | 553 WEST 30TH STREET |

**Property Type:** SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1185 Entire Lot | 68D | 553 WEST 30TH STREET |

**Property Type:** SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1186 Entire Lot | 68E | 553 WEST 30TH STREET |

**Property Type:** SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1187 Entire Lot | 68F | 553 WEST 30TH STREET |

**Property Type:** SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1188 Entire Lot | 69A | 553 WEST 30TH STREET |

**Property Type:** SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1189 Entire Lot | 69B | 553 WEST 30TH STREET |

**Property Type:** SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1190 Entire Lot | 69C | 553 WEST 30TH STREET |

**Property Type:** SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1191 Entire Lot | 69D | 553 WEST 30TH STREET |

**Property Type:** SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1192 Entire Lot | 69E | 553 WEST 30TH STREET |

**Property Type:** SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1193 Entire Lot | 69F | 553 WEST 30TH STREET |

**Property Type:** SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1194 Entire Lot | 70A | 553 WEST 30TH STREET |

**Property Type:** SINGLE RESIDENTIAL CONDO UNIT

**NYC DEPARTMENT OF FINANCE**
**OFFICE OF THE CITY REGISTER**



2018120700109001002C96C9

| RECORDING AND ENDORSEMENT COVER PAGE  (CONTINUATION) | PAGE 16 OF 317 |
|---|---|

Document ID: 2018120700109001          Document Date: 12-06-2018          Preparation Date: 12-07-2018
Document  Type: AMENDED CONDO DECLARATION

---

**PROPERTY DATA**

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1195 Entire Lot | 70B | 553 WEST 30TH STREET |

**Property Type:** SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1196 Entire Lot | 70C | 553 WEST 30TH STREET |

**Property Type:** SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1197 Entire Lot | 70D | 553 WEST 30TH STREET |

**Property Type:** SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1198 Entire Lot | 70E | 553 WEST 30TH STREET |

**Property Type:** SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1199 Entire Lot | 70F | 553 WEST 30TH STREET |

**Property Type:** SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1200 Entire Lot | 71A | 553 WEST 30TH STREET |

**Property Type:** SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1201 Entire Lot | 71B | 553 WEST 30TH STREET |

**Property Type:** SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1202 Entire Lot | 71C | 553 WEST 30TH STREET |

**Property Type:** SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1203 Entire Lot | 71D | 553 WEST 30TH STREET |

**Property Type:** SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1204 Entire Lot | 71E | 553 WEST 30TH STREET |

**Property Type:** SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1205 Entire Lot | 71F | 553 WEST 30TH STREET |

**Property Type:** SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1206 Entire Lot | 72A | 553 WEST 30TH STREET |

**Property Type:** SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1207 Entire Lot | 72B | 553 WEST 30TH STREET |

**Property Type:** SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1208 Entire Lot | 72C | 553 WEST 30TH STREET |

**Property Type:** SINGLE RESIDENTIAL CONDO UNIT

**NYC DEPARTMENT OF FINANCE**
**OFFICE OF THE CITY REGISTER**



2018120700109001002C96C9

| RECORDING AND ENDORSEMENT COVER PAGE  (CONTINUATION) | PAGE 17 OF 317 |
|---|---|

Document ID: 2018120700109001          Document Date: 12-06-2018          Preparation Date: 12-07-2018
Document  Type: AMENDED CONDO DECLARATION

---

**PROPERTY DATA**

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1209 Entire Lot | 72D | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1210 Entire Lot | 72E | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1211 Entire Lot | 72F | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1212 Entire Lot | 73A | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1213 Entire Lot | 73B | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1214 Entire Lot | 73C | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1215 Entire Lot | 73D | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1216 Entire Lot | 73E | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1217 Entire Lot | 73F | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1218 Entire Lot | 74A | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1219 Entire Lot | 74B | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1220 Entire Lot | 74C | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1221 Entire Lot | 74D | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1222 Entire Lot | 74E | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

**NYC DEPARTMENT OF FINANCE**
**OFFICE OF THE CITY REGISTER**



2018120700109001002C96C9

| RECORDING AND ENDORSEMENT COVER PAGE  (CONTINUATION) | PAGE 18 OF 317 |
|---|---|

Document ID: 2018120700109001          Document Date: 12-06-2018          Preparation Date: 12-07-2018
Document  Type: AMENDED CONDO DECLARATION

**PROPERTY DATA**

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1223 Entire Lot | 74F | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1224 Entire Lot | 75A | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1225 Entire Lot | 75B | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1226 Entire Lot | 75C | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1227 Entire Lot | 75D | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1228 Entire Lot | 75E | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1229 Entire Lot | 75F | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1230 Entire Lot | 76A | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1231 Entire Lot | 76B | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1232 Entire Lot | 76C | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1233 Entire Lot | 76D | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1234 Entire Lot | 76E | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1235 Entire Lot | 76F | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1236 Entire Lot | 77A | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

**NYC DEPARTMENT OF FINANCE**
**OFFICE OF THE CITY REGISTER**



2018120700109001002C96C9

| RECORDING AND ENDORSEMENT COVER PAGE  (CONTINUATION) | PAGE 19 OF 317 |
|---|---|

Document ID: 2018120700109001          Document Date: 12-06-2018          Preparation Date: 12-07-2018
Document  Type: AMENDED CONDO DECLARATION

---

**PROPERTY DATA**

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1237 Entire Lot | 77B | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1238 Entire Lot | 77C | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1239 Entire Lot | 77D | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1240 Entire Lot | 77E | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1241 Entire Lot | 77F | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1242 Entire Lot | 78A | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1243 Entire Lot | 78B | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1244 Entire Lot | 78C | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1245 Entire Lot | 78D | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1246 Entire Lot | 78E | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1247 Entire Lot | 78F | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1248 Entire Lot | 79A | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1249 Entire Lot | 79B | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1250 Entire Lot | 79D | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

**NYC DEPARTMENT OF FINANCE**
**OFFICE OF THE CITY REGISTER**



2018120700109001002C96C9

| RECORDING AND ENDORSEMENT COVER PAGE  (CONTINUATION) | PAGE 20 OF 317 |
|---|---|

Document ID: 2018120700109001          Document Date: 12-06-2018          Preparation Date: 12-07-2018
Document  Type: AMENDED CONDO DECLARATION

---

**PROPERTY DATA**

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1251 Entire Lot | 79E | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1252 Entire Lot | 79F | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1253 Entire Lot | 80A | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1254 Entire Lot | 80B | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1255 Entire Lot | 80D | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1256 Entire Lot | 80E | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1257 Entire Lot | 80F | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1258 Entire Lot | PH81A | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1259 Entire Lot | PH81B | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1260 Entire Lot | PH81C | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1261 Entire Lot | PH81D | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1262 Entire Lot | PH82A | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1263 Entire Lot | PH82B | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1264 Entire Lot | PH82C | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT



**NYC DEPARTMENT OF FINANCE**
**OFFICE OF THE CITY REGISTER**

2018120700109001002C96C9

| RECORDING AND ENDORSEMENT COVER PAGE  (CONTINUATION) | PAGE 21 OF 317 |
|---|---|

Document ID: 2018120700109001          Document Date: 12-06-2018          Preparation Date: 12-07-2018
Document  Type: AMENDED CONDO DECLARATION

---

**PROPERTY DATA**

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1265 Entire Lot | PH82D | 553 WEST 30TH STREET |

**Property Type:** SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1266 Entire Lot | PH83A | 553 WEST 30TH STREET |

**Property Type:** SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1267 Entire Lot | PH83B | 553 WEST 30TH STREET |

**Property Type:** SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1268 Entire Lot | PH83C | 553 WEST 30TH STREET |

**Property Type:** SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1269 Entire Lot | PH83D | 553 WEST 30TH STREET |

**Property Type:** SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1270 Entire Lot | PH84A | 553 WEST 30TH STREET |

**Property Type:** SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1271 Entire Lot | PH84B | 553 WEST 30TH STREET |

**Property Type:** SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1272 Entire Lot | PH84C | 553 WEST 30TH STREET |

**Property Type:** SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1273 Entire Lot | PH84D | 553 WEST 30TH STREET |

**Property Type:** SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1274 Entire Lot | PH85A | 553 WEST 30TH STREET |

**Property Type:** SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1275 Entire Lot | PH85B | 553 WEST 30TH STREET |

**Property Type:** SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1276 Entire Lot | PH85C | 553 WEST 30TH STREET |

**Property Type:** SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1277 Entire Lot | PH85D | 553 WEST 30TH STREET |

**Property Type:** SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1278 Entire Lot | PH86A | 553 WEST 30TH STREET |

**Property Type:** SINGLE RESIDENTIAL CONDO UNIT

**NYC DEPARTMENT OF FINANCE**
**OFFICE OF THE CITY REGISTER**



2018120700109001002C96C9

| **RECORDING AND ENDORSEMENT COVER PAGE (CONTINUATION)** | **PAGE 22 OF 317** |
|---|---|

Document ID: 2018120700109001          Document Date: 12-06-2018          Preparation Date: 12-07-2018
Document Type: AMENDED CONDO DECLARATION

**PROPERTY DATA**

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1279 Entire Lot | PH86B | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1280 Entire Lot | PH86C | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1281 Entire Lot | PH86D | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1282 Entire Lot | PH87A | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1283 Entire Lot | PH87B | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1284 Entire Lot | PH87C | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1285 Entire Lot | PH88A | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1286 Entire Lot | PH88B | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1287 Entire Lot | PH88C | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1288 Entire Lot | PH88D | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 702 | 1289 Entire Lot | SKYA | 553 WEST 30TH STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT





## STATE OF NEW YORK
### OFFICE OF THE ATTORNEY GENERAL

ERIC T. SCHNEIDERMAN
ATTORNEY GENERAL                    (212) 416-8246

DIVISION OF ECONOMIC JUSTICE
REAL ESTATE FINANCE BUREAU

Ery South Residential Tower Llc                    June 8, 2016
c/o Kramer Levin Naftalis & Frankel Llp
Attention: Meigan Serle, Esq.
1177 Avenue Of The Americas
New York, NY 10036

RE:  15 Hudson Yards Condominium
File Number:    CD150325     Amount Offering    $1,739,835,000.00
Filing Fee:     $30,000.00   Receipt Number: 133578
Acceptance Date:  06/02/2016

Dear Sponsor:

    The offering literature submitted for the subject premises is hereby accepted and
filed. Unless extended by duly filed amendment, the effectiveness of the filing shall
expire twelve months from this date. All advertising and solicitation material must be
consistent with the contents of the filed offering literature. Any material change of
facts or circumstances affecting theproperty or the offering requires an immediate
amendment.

    Any misstatement or concealment of material fact in the literature filed renders
this filing void ab initio. This office has relied on the truth of the certification of
sponsor, sponsor's principals and sponsor's experts, as well as the transmittal letter
of sponsor's attorney.

    The issuance of this letter is conditioned upon the faithful performance of all of the
obligations of the sponsor, its agents and instrumentalities, which are required by law or
set forth in the offering literature. If there is a failure or neglect to perform any such
obligations when required, the effectiveness of this letter shall be suspended, and all
offering and sales shall cease, pending further action by this office. Issuance of this
letter is further conditioned on the collection of all fees imposed by law. This letter
is your receipt for the above filing fee.

    The filing of the offering literature shall not in any way be construed as approval
of the contents or terms thereof by the Attorney General of the State of New York. Nor
does it waive or limit the Attorney General's authority to take enforcement action for
violation of Article 23-A of the General Business Law or other applicable provisions of law.

                                        Very truly yours,

                                        RYAN RIDINGS
                                        Assistant Attorney General





### STATE OF NEW YORK
### OFFICE OF THE ATTORNEY GENERAL

BARBARA D. UNDERWOOD
ATTORNEY GENERAL

DIVISION OF ECONOMIC JUSTICE
REAL ESTATE FINANCE BUREAU

August 27, 2018

(212)416-8128

Ery South Residential Tower LLC
c/o Kramer Levin Naftalis & Frankel LLP
Attention: Meigan Serle, Esq.
1177 Avenue Of The Americas
New York, NY 10036

RE:   15 Hudson Yards Condominium
      File Number: CD150325                     Amendment No: 6
      Date Amendment Filed: 08/21/2018          Filing Fee: $225.00
      Receipt Number: 147136

Dear Sponsor:

      The referenced amendment to the offering plan for the subject premises is hereby
accepted and filed. This filing is effective for the greater of six months from the date
of filing this amendment or twelve months from the acceptance of the original offering
literature. However, any material change of fact or circumstance affecting the property or
offering requires an immediate amendment, including amending the plan to disclose the most
recent certified financial statement and budget, which should be done as soon as either of
these documents is available.

      Any misstatement or concealment of material fact in the material submitted as part
of this amendment renders this filing void ab initio. This office has relied on the truth of
the certifications of sponsor, sponsor's principals, and sponsor's experts, as well as the
transmittal letter of sponsor's attorney.

      Filing this amendment shall not be construed as approval of the contents or terms
thereof by the Attorney General of the State of New York, or any waiver of or limitation
on the Attorney General's authority to take enforcement action for violation of Article 23-A
of the General Business Law or other applicable law. The issuance of this letter is
conditioned upon the collection of all fees imposed by law. This letter is your receipt for
the filing fee.

                                        Very truly yours,

                                        *Tiffani Simmons*

                                        TIFFANI SIMMONS
                                        Assistant Attorney General

CONDOMINIUM NO. 2638-A



CONDOMINIUM NO. 2638A

## AMENDED AND RESTATED DECLARATION

Establishing a Plan for Condominium Ownership
of the Premises known as
15 Hudson Yards
(f/k/a 545 and 553 West 30th Street)
New York, New York 10001
Pursuant to Article 9-B of the Real Property
Law of the State of New York

Name

15 HUDSON YARDS CONDOMINIUM
15 Hudson Yards
New York, New York 10001

Declarant

METROPOLITAN TRANSPORTATION AUTHORITY
347 Madison Avenue
New York, New York 10017

Date of Original Declaration

As of August 5, 2015

Date of Amended
and Restated Declaration

As of December 6, 2018

Block 702
Lots 1001-1289
(f/k/a Lots 1001-1004; also f/k/a Lot 4)
Borough of Manhattan

When Recorded, Return to:
Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, New York 10036
Attention: Jonathan H. Canter, Esq.

182445
Royal Registered Property Reports, Inc.
125 Park Avenue, Suite 1610
New York, N.Y 10017
(212) 376-0900

**INDEX TO AMENDED AND
RESTATED DECLARATION**

<u>Page</u>

ARTICLE 1 SUBMISSION OF THE PROPERTY; BY-LAWS ...................................................1
ARTICLE 2 THE LAND .............................................................................................................4
ARTICLE 3 THE PROPERTY ...................................................................................................4
ARTICLE 4 THE BUILDING .....................................................................................................6
ARTICLE 5 THE UNITS ............................................................................................................7
ARTICLE 6 DIMENSIONS OF UNITS .....................................................................................8
ARTICLE 7 COMMON ELEMENTS .......................................................................................10
ARTICLE 8 UNDERLYING AGREEMENTS;  USE OF UNITS AND COMMON
          ELEMENTS...........................................................................................................20
ARTICLE 9 CHANGES IN TOWER SECTION, BASE UNIT AND CS GROUP .................27
ARTICLE 10 RESIDENTIAL LOADING DOCK .....................................................................30
ARTICLE 11 PERSON TO RECEIVE SERVICE .....................................................................31
ARTICLE 12 DETERMINATION OF PERCENTAGE INTERESTS IN COMMON
          ELEMENTS...........................................................................................................31
ARTICLE 13 ENCROACHMENTS ............................................................................................31
ARTICLE 14 FACILITIES AND ALL OTHER COMMON ELEMENTS;
          SCAFFOLDING ...................................................................................................32
ARTICLE 15 EASEMENTS; RIGHTS OF ACCESS ...............................................................33
ARTICLE 16 POWER OF ATTORNEY TO THE BOARDS.....................................................42
ARTICLE 17 ACQUISITIONS OF UNITS BY THE BOARDS ..............................................44
ARTICLE 18 COVENANTS RUNNING WITH THE LAND....................................................45
ARTICLE 19 AMENDMENTS OF DECLARATION ...............................................................46
ARTICLE 20 TERMINATION OF CONDOMINIUM ..............................................................46
ARTICLE 21 WAIVER................................................................................................................47
ARTICLE 22 CAPTIONS ...........................................................................................................48
ARTICLE 23 CERTAIN REFERENCES ...................................................................................48
ARTICLE 24 SEVERABILITY...................................................................................................48
ARTICLE 25 COVENANT OF FURTHER ASSURANCES .....................................................48
ARTICLE 26 NAME OF CONDOMINIUM AND BUILDING.................................................50
ARTICLE 27 INITIAL CONSTRUCTION OF THE UNITS AND THE COMMON
          ELEMENTS...........................................................................................................50
ARTICLE 28 INTELLECTUAL PROPERTY ...........................................................................51
ARTICLE 29 SUCCESSORS AND ASSIGNS ..........................................................................51
ARTICLE 30 REGULATORY AGREEMENTS.........................................................................52
ARTICLE 31 REAL PROPERTY LAW SECTION 339-M.......................................................52
ARTICLE 32 EXCULPATION OF DECLARANT; RIGHTS AND OBLIGATIONS OF
          DECLARANT NET LESSEES; EXCULPATION .............................................52

<u>Schedules</u>
Schedule A   —   The Land
Schedule B-1 —   Description of Units
Schedule B-2 —   Description of Tower Units

Schedule C   —   Description of Building
Schedule D   —   Construction and Marketing Floor Designations
Schedule E   —   CS Building Signage Restrictions
Schedule F   —   Intentionally Omitted
Schedule G   —   Coach Competitors

<u>Exhibits</u>
Exhibit A —    Condominium By-Laws
Exhibit B —    Tower Section By-Laws

# AMENDED AND RESTATED DECLARATION

## OF

## 15 HUDSON YARDS CONDOMINIUM

### (Pursuant to Article 9-B of the Real Property Law of the State of New York)

This AMENDED AND RESTATED DECLARATION (this "Declaration") is made as of the date set forth below by METROPOLITAN TRANSPORTATION AUTHORITY, a body corporate and politic constituting a public benefit corporation of the State of New York (hereinafter referred to as the "Declarant"):

## W I T N E S S E T H:

WHEREAS, a Declaration (the "Original Declaration"), dated as of August 5, 2015, was made by Declarant under the provisions of the New York Condominium Act (hereinafter defined) establishing a plan for condominium ownership of the premises then known as 545 and 553 West 30th Street (now known as 15 Hudson Yards), New York, New York 10001, which Original Declaration was recorded in the City Register's Office (hereinafter defined) on November 18, 2015 as CRFN 2015000410388 (Condominium No. 2638) together with the original floor plans of the Condominium (the "Original Floor Plans") recorded with the City Register's Office on November 18, 2015 as CRFN 2015000410389;

WHEREAS, Declarant continues to own all of the Units (hereinafter defined) in the Condominium (hereinafter defined) and desires to amend and restate said Original Declaration in its entirety; and

WHEREAS, each of the Declarant Net Lessees of the Units, as applicable, and their respective mortgagees, have consented to said amendment and restatement of the Original Declaration.

NOW, THEREFORE, Declarant (with the consent of such consenting parties) hereby amends and restates the Original Declaration in its entirety and declares as follows:

## ARTICLE 1

## SUBMISSION OF THE PROPERTY; BY-LAWS

1.1     Submission of Property.  Declarant hereby submits the Land and Building (each as hereinafter defined), all other improvements erected and to be erected thereon, all easements, rights and appurtenances belonging thereto and all other property, real, personal or mixed, intended for use in connection therewith (collectively, the "Property"), to the provisions of Article 9-B of the Real Property Law of the State of New York (as the same may be amended from time to time, the "New York Condominium Act") and pursuant thereto does hereby establish a condominium to be known (subject to the provisions of this Declaration) as "15

Hudson Yards Condominium" (the "Condominium"). This Declaration is subject to the Underlying Agreements (as defined in Section 8.1 hereof) and to any other matter of record.

1.2     Condominium By-Laws. Annexed to this Declaration as Exhibit A and made a part hereof are the overall by-laws of the Condominium which shall govern the general affairs, operation, use and occupancy of the Condominium generally (said by-laws, as the same have been amended and restated, and may further be amended (and/or amended and restated) from time to time in accordance with the provisions hereof and thereof, the "Condominium By-Laws").

1.3     Tower Section By-Laws. Annexed to this Declaration as Exhibit B and made a part hereof are the by-laws of the Tower Section (as hereinafter defined) (said by-laws, as the same may be amended (and/or amended and restated) from time to time in accordance with the provisions hereof and thereof, and of the Condominium By-Laws governing amendment, the "Tower Section By-Laws") and the same shall (together with, but subject and subordinate to, this Declaration and the Condominium By-Laws) govern the exclusive affairs, operation, use and occupancy of the Tower Section. The Tower Section By-Laws shall be effective from and after the creation of the Tower Section pursuant to Section 3.2 hereof and the first conveyance (the "First Tower Unit Closing") of title to a Tower Unit by or at the direction of Tower Sponsor. Until the First Tower Unit Closing, the owner or Declarant Net Lessee of all the Tower Units, if any, shall have all rights and obligations of the Tower Board.

1.4     [Intentionally omitted.]

1.5     Development Rights. (a) Any unused floor area development rights appurtenant to the Property that are now owned, subsequently acquired or that may become available under the Zoning Resolution, as hereinafter defined (the "Development Rights") are reserved by and to ERY Tenant LLC.

(b)     The Development Rights may be utilized by the owner or lessee thereof (together with any successor owner or lessee of all or a portion of the Development Rights, the "Development Rights Owner") or transferred or leased: (i) to a Board or another Unit Owner, or (ii) to a third party, pursuant to a Declaration of Zoning Lot Restrictions (a "Zoning Lot Declaration"), merging the Property into a single zoning lot, and a zoning lot development agreement or similar agreement or instrument (each, a "ZLDA"). (Any such transferee or lessee is referred to herein as a "Development Rights Purchaser").

(c)     Each Board and each Unit Owner shall be required, within ten (10) Business Days following the request of the Development Rights Owner or a Development Rights Purchaser, to execute and deliver any documents or applications reasonably required in connection with any Merger (as hereinafter defined), Zoning Lot Declaration and ZLDA.

(d)     Without limiting the foregoing, the Unit Owners hereby irrevocably nominate, constitute and appoint the Development Rights Owner or its designee as such Unit Owner's attorney-in-fact, coupled with an interest and with power of substitution to: (i) effectuate the acquisition, sale, lease, transfer, assignment, sublease, pledge, hypothecation or encumbrance of, or other action by the Development Rights Owner with respect to the

- 2 -

Development Rights; (ii) effectuate the use of the Development Rights for any purpose, including, without limitation, to effect an increase in the size of a Unit (subject, however, to the provisions of Section 1.5(f) hereof); (iii) effectuate a merger or division of the zoning lot in which the Property is located, with any other zoning lots to form a single zoning lot (the "Merger") for the purpose of transferring all or any portion of the Development Rights (including, without limitation, the execution of a Zoning Lot Declaration and ZLDA), or (iv) permit the Development Rights Purchaser, once the Merger has occurred, to acquire and utilize development rights from other zoning lots, including, without limitation, development rights attributable to landmark parcels (as that term is used in the Zoning Resolution) located in blocks neighboring the block in which the Property is located, all in accordance with applicable provisions of the Zoning Resolution.

(e)     Any mortgagee and other Party in Interest (as hereinafter defined) holding a mortgage secured by a Unit or having another interest in a Unit, upon the making of said mortgage or acquiring such interest is deemed to have consented to and subordinated to the foregoing rights of the Development Rights Owner or its designee with respect to the Development Rights. Notwithstanding the foregoing, such mortgagee or other Party in Interest shall be required, upon the request of the Development Rights Owner or a Development Rights Purchaser, to execute and deliver any waivers, consents and subordinations with respect to the Zoning Lot Declaration (or any future declarations of zoning lot restrictions), the ZLDA or the transfer of the Development Rights to the Development Rights Purchaser.

(f)     Notwithstanding anything to the contrary contained herein, neither the Development Rights Owner nor its designee nor any Development Rights Purchaser shall be permitted to utilize the Development Rights in such a manner that would increase the height or expand the exterior dimensions of a Unit or the Residential Tower Building, the CS Building or the LL Structure, once constructed.

1.6     Inclusionary Rights. (a) All inclusionary zoning rights now or hereafter related to the Property under Section 23 – 90 through 23-962 of the Zoning Resolution, (the "Inclusionary Rights") shall be initially allocated to the Base Unit (and if the Base Unit is subject to a Declarant Net Lease, the Development Rights shall be leased to the Declarant Net Lessee thereunder). The Inclusionary Rights may be utilized by the owner or lessee thereof (together with any successor owner or lessee of all or a portion of the Inclusionary Rights, the "Inclusionary Rights Owner") or transferred or leased to a Board, another Unit Owner, or a third party purchaser (an "Inclusionary Rights Purchaser").

(b)     Each Board and each Unit Owner shall be required, within ten (10) Business Days following the request of the Inclusionary Rights Owner or an Inclusionary Rights Purchaser, to execute and deliver any documents or applications reasonably required in connection with the transfer of the Inclusionary Rights.

(c)     Without limiting the foregoing, the Unit Owners hereby irrevocably nominate, constitute and appoint the Inclusionary Rights Owner or its designee as such Unit Owner's attorney-in-fact, coupled with an interest and with power of substitution to (i) effectuate the acquisition, sale, lease, transfer, assignment, sublease, pledge, hypothecation or encumbrance of, or other action by the Inclusionary Rights Owner with respect to the Inclusionary Rights; (ii)

- 3 -

effectuate the use of the Inclusionary Rights for any purpose, including, without limitation, to effect an increase in the size of its Unit (subject, however, to the provisions of Section 1.6(e) hereof); (iii) permit the use of the Building footprint by an Inclusionary Rights Purchaser for purposes of utilizing the Inclusionary Rights.

   (d) Any mortgagee and other Party in Interest holding a mortgage secured by a Unit or having another interest in a Unit, upon the making of said mortgage or acquiring such interest is deemed to have consented to and subordinated to the foregoing rights of the Inclusionary Rights Owner or its designee with respect to the Inclusionary Rights. Notwithstanding the foregoing, such mortgagee or other Party in Interest shall be required, upon the request of the Inclusionary Rights Owner or an Inclusionary Rights Purchaser, to execute and deliver any waivers, consents and subordinations to evidence such consent and subordination.

   (e) Notwithstanding anything to the contrary contained herein, neither the Inclusionary Rights Owner nor its designee nor any Inclusionary Rights Purchaser shall be permitted to utilize the Inclusionary Rights in such a manner that would increase the height or expand the exterior dimensions of a Unit or the Residential Tower Building, the CS Building or the LL Structure.

   1.7 <u>Defined Terms: Conflicting Provisions</u>. All capitalized terms used but which are not separately defined in this Declaration shall have the meanings given to such terms in the Condominium By-Laws (including the Table of Definitions annexed as <u>Exhibit 1</u> thereto). In the event of a conflict between: (i) the terms and provisions of this Declaration, on the one hand, and the terms and provisions of either of the Condominium By-Laws or the Tower Section By-Laws, on the other hand, the terms of this Declaration shall in all events govern; and (ii) the terms and provisions of the Condominium By-Laws, on the one hand, and the terms and provisions of the Tower Section By-Laws, on the other hand, the terms of the Condominium By-Laws shall in all events govern.

## ARTICLE 2

## THE LAND

   Included in the Property described in Article 1 is all that certain tract, plot, piece and parcel of land described in <u>Schedule A</u> annexed hereto and made a part hereof (the "<u>Land</u>"), situate, lying and being in the City, County and State of New York. The Land (and Property and each Unit) is owned, as of the date hereof, by Declarant in fee simple absolute.

## ARTICLE 3

## THE PROPERTY

   3.1 <u>General</u>. Included in the Property described in Article 1 are (i) a building (the "<u>CS Building</u>") constructed by the CS Unit Owner in accordance with the DCA (as defined in Section 8.1(f)) on a portion of the Property described as "Permanent Structure" on the Floor Plans (the "<u>Permanent Structure</u>") which Permanent Structure includes a moveable shed (the "<u>Moveable Shed</u>"), (ii) a building (the "<u>Residential Tower Building</u>") constructed in accordance

- 4 -

with the DCA, as applicable, on a portion of the Property and (iii) a structure (the "LL Structure") constructed in accordance with the DCA and located beneath the CS Building and adjacent to a portion of the Residential Tower Building.  The CS Building, the Residential Tower Building, and the LL Structure are referred to herein collectively as the "Building".

        3.1.1    The Building contains, in addition to the Common Elements (as hereinafter described):

        (a)    a Unit (the "CS Unit") as shown on the Floor Plans consisting of (i) the CS Building, and (ii) the portion of the Plaza level adjacent to the Permanent Structure and designated as the "CS Unit Plaza Area" on the Floor Plans (the "CS Unit Plaza Area").  The CS Unit Owner shall at all times be responsible for compliance, at its sole cost and expense, with the requirements of the Zoning Resolution with respect to the CS Unit;

        (b)    a Unit (the "CS LL Unit") as shown on the Floor Plans, located in the LL Structure;

        (c)    a Unit (the "CS MS Unit") as shown on the Floor Plans, located in the Residential Tower Building consisting of portions of the Cellar through Eleventh Floors and Floor Thirty-Six of the Residential Tower Building;

        (d)    a Unit (the "Base Unit") containing residential apartments (each, a "Base Apartment" and collectively the "Base Apartments") and associated common areas, as shown on the Floor Plans, located in the Residential Tower Building consisting of portions of the Fourth, Tenth, Twelfth through Nineteenth Floors; and

        (e)    two hundred eighty-five (285) individual residential condominium units (each, a "Tower Unit" and collectively, the "Tower Units"), as shown on the Floor Plans, located in the Residential Tower Building consisting of portions of the Nineteenth Floor through Thirty-Fifth Floor and Fortieth Floor through Sixty-Seventh Floor.  (The Tower Units, together with the Tower Limited Common Elements are referred to herein as the "Tower Section", and the Base Unit and the Tower Units are referred to herein collectively as the "Residential Units").

        3.2    [Intentionally Omitted.]

        3.3    [Intentionally Omitted.]

        3.4    Units and Unit Owners.  The CS Unit, the CS LL Unit, the CS MS Unit, the Base Unit and the Tower Units, are herein called the "Units" and individually a "Unit".  The Unit Owner (as such term is defined in Exhibit 1 to the Condominium By-Laws) of the CS Unit is herein called the "CS Unit Owner"; the Unit Owner of the CS LL Unit is herein called the "CS LL Unit Owner", the Unit Owner of the CS MS Unit is herein called the "CS MS Unit Owner", the Unit Owner of the Base Unit is herein called the "Base Unit Owner", and the Unit Owner of a Tower Unit is herein called a "Tower Unit Owner", subject to Section 13.7(e) of the Condominium By-Laws.

3.5     Street Addresses.  The overall street address of the Property is 545 West 30th Street, New York, New York 10001 (CS Building and LL Structure) and 15 Hudson Yards, New York, New York 10001 (Residential Tower Building).

3.6     Special Provisions Regarding the CS Group.  To the extent the CS Group is leased, subject to the provisions of Section 13.6 of the Condominium By-Laws, to a third party, such lease shall be subject to all provisions of the Condominium Documents and all applicable Laws (including, without limitation, the requirements of the Zoning Resolution relating to the CS Group), and the lessee shall be entitled to all rights, and required to observe and perform, all obligations of the CS Unit Owner, the CS MS Unit Owner and/or the CS LL Unit Owner, whether under this Declaration, the Condominium By-Laws or otherwise, to the extent provided in the applicable lease and the CS Unit Owner and the lessee and any mortgagee of the CS Group shall confirm in writing that this is the case.  For the avoidance of doubt, notwithstanding any such lease, the CS Unit Owner, CS MS Unit Owner and the CS LL Unit Owner shall remain liable in all respects for the payment and performance of all obligations in respect of such Units under the Condominium Documents.

## ARTICLE 4

## THE BUILDING

4.1     A description of the Building (including the CS Building, the Residential Tower Building and the LL Structure), including the number of stories, cellars, and subcellars, the number of units,  and the principal materials of which it is constructed, is set forth in Schedule C annexed hereto and made a part hereof.  All references in the Condominium Documents to a particular "Floor" or "Floors" or "Level" or "Levels" of the Residential Tower Building, the CS Building or the LL Structure shall mean the construction floor(s) or level(s) so designated on the Floor Plans.  Such designations shall be subject to change in an Amendment to the Declaration (and/or the Condominium By-Laws or the Tower Section By-Laws, as the case may be, and the Floor Plans, as may be appropriate) made in accordance with Article 16 of the Condominium By-Laws, provided that such changed designation(s): (i) comply at all times with all applicable Laws; and (ii) shall not conflict or overlap with any other designations then in effect.

4.2     The CS Building, as constructed, shall at all times remain in compliance with the requirements of the Zoning Resolution and with the following:

(a)     the eastern boundary of the Permanent Structure shall be no more than 232 feet 10 inches from the westerly property line of the Land;

(b)     the eastern boundary of the Moveable Shed, when deployed (including, without limitation, the wheel mechanism used to deploy the Moveable Shed), shall be no more than 356 feet from the westerly property line of the Land, except to the extent any encroachment over the Public Access Area shall be expressly permitted by Section 93-71(f) of the Zoning Resolution, but in no event shall such encroachment be at a height below 60 feet beyond 14 feet 7 inches from the eastern boundary of the Moveable Shed; and

(c)     the elevation of the roof of the CS Building (of both the Permanent Structure and the Moveable Shed, when deployed) shall not be higher than the upper elevations shown on the Floor Plans.

## ARTICLE 5

## THE UNITS

5.1     Floor Plans.  The location of each Unit is shown on and is governed by the Original Floor Plans certified by Ismael Leyva Architects P.C. on October 16, 2015, filed with the New York City Real Property Assessment Bureau on November 9, 2015, as Condominium Plan No. 2638 and submitted for recording in the New York County office of the Register of the City of New York (the "City Register's Office") on November 18, 2015, CRFN 2015000410389, as amended and restated by the Floor Plans certified by Ismael Leyva Architects P.C., filed with the New York City Real Property Assessment Bureau as Condominium Plan No. 2638 -A and submitted for recording in the City Register's Office simultaneously herewith (as the same may be further amended from time to time, the "Floor Plans").

5.2     Schedule B Descriptions.  Schedule B-1 annexed hereto and made a part hereof sets forth the following supplementary data with respect to the CS Unit, the CS LL Unit, the CS MS Unit, and the Base Unit necessary for the proper identification thereof: Unit designation; tax lot number; statement of location; approximate square foot area; and the Common Interest appurtenant to such Unit.  Schedule B-2 annexed hereto and made a part hereof sets forth, with respect to each of the Tower Units, the following additional categories: "direction faced"; "number of bedrooms and bathrooms" and "the portions of the Common Elements to which each Tower Unit has immediate access".

5.3     Each Unit includes, and each Unit Owner shall be responsible for, all fixtures, equipment and other items of personalty, including, without limitation, all plumbing and heating fixtures and equipment, and other appliances as may be contained in, affixed, attached or appurtenant to such Unit, other than as may constitute part of the Common Elements.  Plumbing and heating fixtures and equipment as used in the preceding sentence shall include exposed gas and water pipes attached to fixtures, appliances and equipment and the fixtures, appliances and equipment to which they are attached, and any special pipes or equipment which a Unit Owner may install within a wall or ceiling, or under the floor, but shall not include water or other pipes, conduits, wiring or ductwork within the walls, ceiling or floors.  Except as otherwise expressly set forth herein, each Unit shall also include all lighting and electrical fixtures and appliances within the Unit and any special equipment, fixtures or facilities affixed, attached or appurtenant to the Unit to the extent located within such Unit and serving or benefiting only that Unit.

5.3.1     Additionally, each Tower Unit includes, and each Tower Unit Owner shall be responsible for, all fixtures, equipment and other items of personalty, including, without limitation, front entrance door and any other entrance doors to such Tower Unit (including all locks, peep holes and hardware), interior doors and hardware, hallways serving a Tower Unit exclusively, the interior walls, partitions, wallcoverings, wood or other floors (including all underlayerments above the concrete slab) and floor coverings and ceilings affixed, attached or appurtenant to such Tower Unit, smoke and carbon monoxide detectors, all window

- 7 -

blinds or draperies and associated hardware, all plumbing, gas and heating fixtures, equipment and appliances such as refrigerators, microwaves, dishwashers, washers and dryers, heating, ventilating and air-conditioning units (including the fans inside the units), heating equipment, ranges and other appliances, electrical panel boxes, lighting and electrical fixtures and switches and any special equipment, fixtures or facilities affixed, attached or appurtenant to the Tower Unit, to the extent located within such Tower Unit from the electrical panel box (including electrical branch wiring but excluding electrical service risers) and serving or benefiting only that Tower Unit, sinks, bathtubs, waterclosets, medicine cabinets and vanities, built-in cabinetry of any type, backsplashes in kitchen and bathrooms, kitchen cabinets, countertops in kitchens and bathrooms, wall accessories, trim and moldings and all other facilities as may be contained in, affixed, attached or appurtenant to such Tower Unit, other than as may constitute part of the Common Elements. Additionally, each Tower Unit includes the Private Elevators contained therein, subject to the rights of the Tower Board to service and repair the same as more particularly set forth in the Tower Section By-Laws. Plumbing, gas and heating fixtures and equipment as used in this paragraph shall include fireplace, fireboxes and dampers, exposed gas and water pipes from branch or fixture shut-off valves attached to fixtures, appliances and equipment and the fixtures, appliances and equipment to which they are attached, and any special pipes or equipment which a Tower Unit Owner may install within a wall or ceiling, or under the floor, but shall not include gas, water or other pipes, conduits, wiring, flues or ductwork within the walls, ceilings or floors. Notwithstanding anything contained in this Declaration to the contrary, each Tower Unit Owner will have the right, subject to such rules as may be imposed by the Condominium Board or the Tower Board, to install, at such Tower Unit Owner's sole cost and expense, decorations, fixtures and coverings (including, without limitation, painting, finishing, wall to wall carpeting, pictures, mirrors, shelving and lighting fixtures) on the surfaces of the walls, ceilings and floors that face the interior of such Tower Unit Owner's Unit and to a depth of one inch behind such surfaces for the purposes of installing nails, screws, bolts and the like, provided that no such installation shall impair the structural integrity and mechanical and electrical systems of such Tower Unit or of the Residential Tower Building.

## ARTICLE 6

### DIMENSIONS OF UNITS

6.1     The CS Unit comprises (a) the entire CS Building, including, without limitation, the exterior walls, floors and roof (including, without limitation the Moveable Shed which, when deployed, must be located within the boundaries described in the Floor Plans, and must meet the requirements set forth in Section 4.2(a) hereof), and all exterior windows and glass and all canopies and attached fixtures and (b) the surface of the CS Unit Plaza Area.

6.2     The CS LL Unit comprises a portion of the LL Structure, as shown on the Floor Plans, including, without limitation, all exterior windows and glass and all canopies and attached fixtures.

6.3     The CS MS Unit comprises a portion of the Residential Tower Building, as shown on the Floor Plans, including the elevator depicted as #P.E.F.1 on the Floor Plans (the "CS MS Exclusive Elevator") which is located exclusively within the CS MS Unit and which exclusively services the CS MS Unit.

- 8 -

6.4     The passenger elevators designated as # B.PE1 and B.PE2 on the Floor Plans, including the shafts, elevator equipment, elevator pits and entrances and appurtenant facilities (the "Low Rise Passenger Elevators") are part of the Base Unit, the passenger elevators designated as # T.PE1, T.PE2, T.PE/SE3 and T.PE/SE4 on the Floor Plans, including the shafts, elevator equipment, elevator pits and entrances and appurtenant facilities (the "High Rise Passenger Elevators") are Tower Limited Common Elements, the combined passenger/service elevator designated as # SE1 on the Floor Plans, including the shafts, elevator equipment, elevator pits and entrances and appurtenant facilities (the "Service Elevator") are a Residential Limited Common Element, each of the Private Elevators designated as # RL1, RL2, RL3 and RL4 on the Floor Plans, including its appurtenant shafts, elevator equipment, elevator pits and entrances and appurtenant facilities are deemed a part of the Tower Unit exclusively serviced by such Private Elevator, and the passenger elevator designated as # LE1 on the Floor Plans, including the shafts, elevator equipment, elevator pits and entrances and appurtenant facilities (the "Lobby Elevator") are a Residential Limited Common Element.

6.5     Except as set forth in Section 8.15 hereof, the CS MS Unit shall have no access to any elevators in the Residential Tower Building (other than the CS MS Exclusive Elevator), and all other access to the CS MS Unit or its equipment (except in the case of Emergency egress through the fire stairs in the Residential Tower Building) shall be solely through the CS Building.

6.6     The approximate square foot area of each Unit, other than the CS Unit and CS LL Unit, consists of the area measured horizontally from the exterior side of the exterior wall and or window system (columns, mechanical pipe shafts, shaft ways, chases, chase ways and conduits are not deducted) to the centerline of the partition separating one Unit from another Unit, or the centerline of a shear-wall separating one Unit from another Unit to the corridor face of common corridors, to the outer face of shear-walls of stairs, elevators and to the centerline of walls of other mechanical equipment spaces or any Common Elements not within a Unit or to the exterior side of the opposite exterior wall. Each Unit, other than the CS Unit, consists of the area measured vertically from the top of the concrete floor to the underside of the concrete ceiling slab. All stated terrace dimensions (if any) are measured from the face of the Residential Tower Building to outside face of parapet wall. The approximate square foot area of each Storage Locker, Wine Locker and Wine Cellar is measured from the interior face of wall to the interior face of opposite wall. The CS LL Unit consists of the area measured horizontally from the exterior face of exterior wall or tax lot line wall or midpoint separating the Unit from Common Elements to west side of Tower D/Culture Shed Construction Limited Line or exterior face of exterior wall and measured vertically from Cellar Floor top of structural slab to Level 02 top of structural slab. The Permanent Structure consists of the area measured horizontally from the exterior face of the exterior wall to the exterior face of the exterior wall, and exterior face of exterior wall to west side of Tower D/Culture Shed Construction Limit Line, and vertically from Level 02 top of structural slab to the roof. The Moveable Shed consists of the area measured horizontally from the exterior face of the exterior wall to the exterior face of the exterior wall, and from the exterior face of the exterior wall to the exterior face of the Permanent Structure or exterior wall where the Moveable Shed overlaps the Permanent Structure, and vertically from the CS Unit Plaza Area top of structural slab to the roof.

6.7     The Condominium Board has an easement to install and maintain pipes, conduits, wires, ducts and other facilities in the space between the underside of each such floor slab and the top surface of each Unit's (other than the CS Unit's) finished ceiling, without any need to obtain the consent of any Unit Owner with respect to the same; provided, however, that in the event the underside of any such floor slab does not include a finished ceiling surface below it, the party exercising such easement rights shall coordinate such installations with the Unit Owner's existing installations in order to minimize disruption of such Unit Owner's existing installations, provided, further that the maintenance and installation work is performed at such times and in such a manner so as to minimize the interference as much as practicable with the use of such Unit.  The Condominium Board may delegate its rights under this Section 6.7 to the Developer (as hereinafter defined) until completion of the Initial Construction Work.

## ARTICLE 7

## COMMON ELEMENTS

7.1     General.  The common elements of the Condominium (the "Common Elements") consist of the entire Property including the Land and all parts of the Building and improvements thereon other than the Units.  The Common Elements include, among other things, the foundations, roofs and supports of the Building (except to the extent the same are exclusive to the CS Building or part of the CS Unit) and all areas, equipment or facilities[1] for the common use of all or some of the Units or all or some of the Unit Owners or which are necessary or convenient for the existence, maintenance, operation or safety of the Property.  The Common Elements include the General Common Elements and the Limited Common Elements.  The general Common Elements (the "General Common Elements") consist of those Common Elements the common use of which is necessary or convenient for the existence, maintenance, operation or safety of the Property and which generally serve or benefit all of the Units and/or Unit Owners, as more particularly described in Section 7.2 below.  The limited Common Elements of the Condominium (the "Limited Common Elements") consist of (a) those Common

---

[1]     As used herein, the words "facility" and "facilities" include, but are not limited to, the following fixtures, apparatus, equipment, personalty, appurtenances, installations, systems and other items (grouped more or less functionally) which are set forth only for the purpose of illustrating the broad scope of those terms:  convector, radiator, heater, convertor, heat exchanger, mechanism, device, machinery, induction unit, fan coil unit, motor, pump, control, tank or tank assembly, condenser, compressor, fan, damper, blower, thermostat, thermometer, coil, vent, sensor, shut-off valve or other valve, gong, panel, receptacle, outlet, relay, alarm, sprinkler head, electric distribution facility, wiring, wireway, switch, switchboard, circuit breaker, transformer, fitting, siamese connection, hose, plumbing fixture, lighting fixture, other fixture, bulb, sign, telephone, meter, meter assembly, scaffolding, piping, line duct, conduit, cable, riser, main, shaft, pit, flue, lock or other hardware, rack, screen, strainer, trap, drain, catch basin, leader, filter, incinerator, canopy, closet, cabinet, door, railing, coping, step, furniture, mirror, furnishing, appurtenance, urn, carpeting, tile, marble or other floor covering, drapery, shade or other window covering, wallpaper or other wall covering, tree, shrubbery, flower or other plantings.

Elements (the "Residential Tower Limited Common Elements") that exclusively serve or exclusively benefit one or more of the Residential Units and the CS LL Unit and/or the CS MS Unit, (b) those Common Elements (the "Residential Limited Common Elements") that exclusively serve or exclusively benefit the Base Unit and some or all of the Tower Units or the Tower Section, (c) those Common Elements (the "Tower Limited Common Elements") that exclusively serve or exclusively benefit some or all of the Tower Units, and (d) such other Limited Common Elements as may hereafter be created pursuant to the Condominium Documents. All of the foregoing are more particularly described in Sections 7.2 through 7.5 of this Article 7, respectively, subject in all events however to any specific designation for any portion of the Property as may be reflected on the Floor Plans (whether or not consistent with the general descriptions contained in this Article).

       7.2    General Common Elements. The General Common Elements include those portions of the Building that are designated as "General Common Elements" on the Floor Plans and, to the extent not specifically identified as part of the General Common Elements on the Floor Plans, all other parts of the Property (other than those areas and items specifically identified as part of a Unit or Limited Common Element) the common use of which is necessary or convenient for the existence, maintenance, operation or safety of the overall Property. More specifically, the General Common Elements consist of the following (whether or not covered by the preceding sentence):

       (a)    the Land, together with and subject to all easements, rights and privileges appurtenant thereto (except as otherwise expressly provided in this Declaration);

       (b)    the airspace located above the roof of the CS Building, including, without limitation, the airspace above either the CS Unit Plaza Area when the Moveable Shed is not deployed or the top of the Moveable Shed when it is deployed;

       (c)    the Public Access Area, as shown on the Floor Plans. For the avoidance of doubt, the Public Access Area is not part of the CS Unit Plaza Area and is at all times part of the publicly accessible connection between the High Line and Plaza level (shown as the Second Floor on the Floor Plans) under the Zoning Resolution and shall be subject to the Zoning Resolution;

       (d)    all foundations, foundation walls, footings, columns, girders, beams, supports, interior load bearing walls, party walls to the extent located on the Property, floor slabs and ceilings relating thereto (other than those that are exclusive to the CS Building or are part of the CS Unit) (collectively "Foundations") including, without limitation, rights to the use of any Foundations that comprise a portion of Parcel C (as hereinafter defined) and are located beneath, or provide support for, the Building or any portion thereof, pursuant to a Site Specific Easement (as hereinafter defined);

       (e)    all storm and sanitary sewer equipment and pipes (including vent lines, ejections, interceptions, filters and valves) to the extent serving or benefitting any portion(s) of two or more of the Residential Tower Building, the CS Building and the LL Structure;

       (f)    The following Building systems and facilities:

(i)     The Generator (the "Generator"), located on the Tenth Floor of the Residential Tower Building, the generator flue from the Tenth Floor through the Roof of the Residential Tower Building, and utility lines connecting the Generator to the point of entry to each Unit;

(ii)    The fuel oil tank and the room in which it is located, on the Sub-Cellar Floor of the Residential Tower Building, as shown on the Floor Plans;

(iii)   The electrical distribution room(s) (including the Con Ed vault) located on the Ninth through Eleventh Floors of the Residential Tower Building, as shown on the Floor Plans;

(iv)    The gas meters located on the Basement Floor of the Residential Tower Building that serve the Residential Tower Building and all or a portion of the CS MS Unit and CS LL Unit but excluding any such meters that exclusively service the CS Unit;

(v)     The fire reserve tanks, and points of entry and risers for the fire protection system on the Thirty Sixth and Thirty Seventh Floors of the Residential Tower Building;

(vi)    The storm water detention tanks located on the Cellar and Thirty Seventh Floors of the Residential Tower Building and associated storm water infrastructure systems;

(vii)   The shared cooling tower cells located on the Sixty Ninth Floor of the Residential Tower Building including the cooling tower cells and respective water treatment and filtration systems associated therewith;

(viii)  The portions of the Auxiliary System located in the Building, including without limitation, pipes, conduits and equipment, all of which shall be subject to an exclusive easement to be granted by the Condominium Board to the owner of Parcel A/B pursuant to the Annex;

(ix)    The plumbing equipment room located on the Cellar Floor of the Residential Tower Building;

(x)     The Main Condenser Water Loop;

(xi)    [Intentionally omitted]; and

(xii)   The fire pump room located on the Basement Floor of the Residential Tower Building.

(g)     Shared Egress Doors with the CS LL Unit, as shown on the Floor Plans as "Door C".

- 12 -

(h)     Those portions of the Building ENVAC (if any) which serve all Units and excluding those portions located within a Unit exclusively serving that Unit.

(i)     Those portions of the Building Digital Antenna System which serve all Units (excluding those portions located within a Unit exclusively serving that Unit).

(j)     The dedicated technology, pipes, conduits and equipment (the "Dedicated Technology Equipment") which Dedicated Technology Equipment shall be part of the Technology System and shall be subject to an exclusive easement to be granted by the Condominium Board to the Plaza Owner pursuant to the Annex.

(k)     The shared technology, pipes, conduits, vertical risers and equipment (the "Shared Technology Equipment") which Shared Technology Equipment shall be part of the Technology System and shall be subject to an exclusive easement to be granted by the Condominium Board to the Plaza Owner pursuant to the Annex.

(l)     The shared fire service elements (the "Fire Service Elements") which Fire Service Elements shall be subject to an exclusive easement to be granted by the Condominium Board to the owner of Parcel E and the owner of Plaza Parcel pursuant to the Annex.

(m)     Any and all easements set forth in the Annex benefiting Parcel D, unless otherwise specifically set forth in Section 15.6 herein or benefitting solely the CS Unit, CS MS Unit or CS LL Unit.

(n)     whether or not specifically identified as part of the General Common Elements (or identified at all) on the Floor Plans, all other parts of the Property and all other Facilities (including shafts, pipes, wires, ducts, vents, flues, cables, conduits and lines, and pipes and conduits providing heated or chilled water to more than one Unit) and Equipment in the Building or on the Property (other than those areas and/or items specifically identified on the Floor Plans or in the Declaration as part of a Unit and/or the Limited Common Elements), to the extent the same serve or benefit or are necessary or convenient for the existence, maintenance, operation or safety of any portion(s) of two or more of the Residential Tower Building, the CS Building and the LL Structure.

7.3     Residential Tower Limited Common Elements.  The Residential Tower Limited Common Elements consist of those portions of the Property designated on the Floor Plans as Residential Tower Limited Common Elements and also those Common Elements which exclusively serve or exclusively benefit all or a combination of one or more of the Residential Units and the CS LL Unit and/or the CS MS Unit, whether or not designated as Residential Tower Limited Common Elements on the Floor Plans.  The Residential Tower Limited Common Elements include, without limitation, the following:

(a)     The airspace over the roof of the Residential Tower Building;

(b)     all of the roofs (including without limitation, the main roof and all setback roofs) of the Residential Tower Building, except to the extent designated on the Floor Plans or in this Declaration as a Residential Limited Common Element, a Tower Limited Common Element, or a part of a Unit; further provided, however, Tower Sponsor (and after Tower Sponsor no

- 13 -

longer owns any Tower Units, the Tower Board) may designate, in its/their sole discretion, certain areas, but not the CS MS Unit or the CS LL Unit, as exclusive use for some or all Residential Unit Owners and reflect the same in an amendment to the Declaration and/or on revised Floor Plans;

(c)     all columns, girders, beams, supports, interior load-bearing walls, floor slabs and ceilings of the Residential Tower Building; and those portions of the exterior walls beyond the Unit side of the glass or concealed block work or other structural members of those walls (except those of the above items which are expressly described in this Declaration as General Common Elements or are included in any Unit);

(d)     all exterior windows, louver fins, and other façade elements of the Residential Tower Building, and those portions of the exterior walls of the Residential Tower Building and attached fixtures beyond the Unit side of the glass or concealed block work or concealed structural members of those walls, to the extent the same form a perimeter to, and are adjacent to, a Residential Tower Limited Common Element (except those of the above items which are expressly described in this Declaration as Residential Limited Common Elements or are included in any Unit);

(e)     the slosh/tuned mass damper located on the Sixty Eighth through Seventieth Floors of the Residential Tower Building;

(f)     Building maintenance unit on the Seventieth Floor of the Residential Tower Building;

(g)     all passages and corridors, mechanical and other utility rooms, all fire staircases, landings and stairs, areas and spaces located in the Building, to the extent serving or benefiting any portion(s) of one or more of the Residential Units and the CS LL Unit and/or the CS MS Unit (except those of the above which are expressly described in this Declaration as Residential Limited Common Elements or are included in any Unit);

(h)     any central smoke and/or carbon monoxide alarm system for the Residential Tower Building;

(i)     any central ventilation supply and/or exhaust system consisting of motors, ductwork, fans and controls, supply and return piping to the extent serving or benefiting any portion(s) of one or more of the Residential Units and the CS LL Unit and/or the CS MS Unit (except those of the above items which are expressly described in this Declaration as Residential Limited Common Elements or are included in any Unit);

(j)     heated water, condenser water and chilled water systems to the extent serving or benefiting any portion(s) of one or more of the Residential Units and the CS LL Unit and/or the CS MS Unit (except those of the above items which are expressly described in this Declaration as Residential Limited Common Elements or are included in any Unit);

(k)     all mechanical equipment and associated piping and controls to the extent serving or benefiting any portion(s) of one or more of the Residential Units and the CS LL Unit

- 14 -

and/or the CS MS Unit (except those of the above items which are expressly described in this Declaration as Residential Limited Common Elements or are included in any Unit);

(l)     all electrical risers, feeders, lines and equipment, including incoming service, emergency generator main switchgear and distribution panelboards, conduits, wires, meters, transformers and panelboards to the extent serving or benefiting any portion(s) of one or more of the Residential Units and the CS LL Unit and/or the CS MS Unit (except those of the above items which are expressly described in this Declaration as Residential Limited Common Elements or are included in any Unit);

(m)     all plumbing fixtures, equipment for distribution of cold water and equipment for producing and distributing domestic heated water, including pumps, valves, heat exchangers, pressure reducers, meters and water heaters and chillers for the Building to the extent serving or benefiting any portion(s) of one or more of the Residential Units and the CS LL Unit and/or the CS MS Unit (except those of the above items which are expressly described in this Declaration as Residential Limited Common Elements or are included in any Unit);

(n)     all fire protection equipment for distribution of sprinkler and standpipe systems, including the water storage tank and the structure(s) provided for such tank to the extent serving or benefiting any portion(s) of one or more of the Residential Units and the CS LL Unit and/or the CS MS Unit (except those of the above items which are expressly described in this Declaration as Residential Limited Common Elements or are included in any Unit);

(o)     all storm and sanitary sewer equipment and pipes (including vent lines, ejectors, interceptors, filters and valves) to the extent serving or benefiting any portion(s) of one or more of the Residential Units and the CS LL Unit and/or the CS MS Unit (except those of the above items which are expressly described in this Declaration as Residential Limited Common Elements or General Common Elements are included in any Unit);

(p)     all electric service rooms, gas, steam and water meter rooms, storage rooms, workrooms, locker rooms, telephone rooms and other service, mechanical and utility rooms to the extent serving or benefiting any portion(s) of one or more of the Residential Units and the CS LL Unit and/or the CS MS Unit (except those of the above items which are expressly described in this Declaration as Residential Limited Common Elements or are included in any Unit);

(q)     heated water pipes from the Auxiliary System to the Base Unit and heated water pipes to the applicable portions of the Tower Section and to the CS LL Unit and CS MS Unit (if applicable) and all meters and exchangers installed pursuant to the Thermal Energy Supply Agreement (excluding, for the avoidance of doubt, any such meters and exchangers installed in a Unit pursuant to any separate thermal energy supply or other similar agreement entered into by a Unit Owner, if any);

(r)     the Shared Ingress Door from the parking garage in Parcel C, as shown on the Floor Plans as "Door B".

(s)     the Egress Door from the CS LL Unit into the Garage Access Hallway, as shown on the Floor Plans as "Door D".

- 15 -

(t)     the Garage Access Hallway and staircase from the Cellar Floor to the Basement Floor, as shown on the Floor Plans;

(u)     all meters and submeters installed pursuant to the Electric Energy Supply Agreement, if any;

(v)     whether or not specifically identified as part of the Residential Tower Limited Common Elements (or identified at all) on the Floor Plans, all other parts of the Residential Tower Building and all other facilities (including shafts, pipes, wires, ducts, vents, flues, cables, conduits and lines) and Equipment in the Residential Tower Building or on the Property (other than those areas and/or items specifically identified on the Floor Plans or in this Declaration as part of a Unit and/or the General Common Elements), to the extent the same serve or benefit or are necessary or convenient for the existence, maintenance, operation or safety of any portion(s) of one or more of the Residential Units and the CS LL Unit and/or the CS MS Unit.

7.4     <u>Residential Limited Common Elements</u>.  The Residential Limited Common Elements consist of those portions of the Residential Tower Building and the LL Structure (other than the CS LL Unit) designated on the Floor Plans as Residential Limited Common Elements; and also those Common Elements which exclusively serve or exclusively benefit the Base Unit and all or a combination of the Tower Units or Tower Section whether or not designated as Residential Limited Common Elements (or designated at all) on the Floor Plans (but excluding any items therein or in the Residential Tower Building which are not part of the Property, including, without limitation, any equipment, wiring and devices owned by telecom providers).  The Residential Limited Common Elements include, without limitation, the following:

(a)     the "LIRR Vents", as the same are shown on the Floor Plans;

(b)     the residential building entrances and lobbies and related areas shown on the Floor Plans as Residential Limited Common Elements;

(c)     any canopies appurtenant to the residential building entrances;

(d)     all passages, corridors, storage rooms, housekeeping areas, all fire staircases, landings and stairs, mechanical and other rooms, areas and spaces (including their respective floors, ceilings and enclosing walls) located in the Building to the extent serving or benefiting solely the Base Unit and the Tower Section and not forming a part of any Unit;

(e)     the Service Elevator and the Lobby Elevator, including their respective shafts, elevator equipment, elevator pits and entrances and appurtenant facilities;

(f)     The Residential Loading Dock;

(g)     smoke and carbon monoxide alarm system, telephone system and cable television system exclusively to the extent serving the Base Unit and the Tower Section and not forming a part of any Unit;

- 16 -

(h)      any ventilation supply and/or exhaust system consisting of motors, ductwork, fans and controls, supply and return piping, and the heated water and condenser water systems to the extent serving or benefiting solely the Base Unit and the Tower Section and not forming a part of any Unit;

(i)      all mechanical equipment and associated piping and controls to the extent serving or benefiting solely the Base Unit and the Tower Section and not forming a part of any Unit;

(j)      all electrical risers, feeders, lines and equipment, including incoming service, main switchgear and distribution panelboards, conduits, wires, meters, transformers and panelboards to the extent serving or benefiting solely the Base Unit and the Tower Section and not forming a part of any Unit;

(k)      all plumbing fixtures, equipment for distribution of cold water and equipment for producing and distributing domestic heated water, including pumps, valves, heat exchangers, pressure reducers, meters and water heaters, to the extent serving or benefiting solely the Base Unit and the Tower Section and not forming a part of any Unit;

(l)      all storm and sanitary sewer equipment and pipes (including vent lines, ejectors, interceptors, filters and valves), to the extent serving or benefiting solely the Base Unit and the Tower Section and not forming a part of any Unit or any Residential Tower Limited Common Element or General Common Element;

(m)      all fire protection equipment for distribution of sprinkler and standpipe systems to the extent serving or benefiting solely the Base Unit and the Tower Section and not forming a part of any Unit;

(n)      all electric service rooms, gas, steam and water meter rooms, workrooms, locker rooms, telephone rooms and other service, mechanical and utility rooms to the extent serving or benefiting solely the Base Unit and the Tower Section and not forming a part of any Unit;

(o)      all storage rooms, mail rooms, locker rooms, telephone rooms and other service, mechanical and utility rooms to the extent serving or benefiting solely the Base Unit and the Tower Section and not forming a part of any Unit;

(p)      all security monitors and equipment and other security facilities to the extent serving or benefiting solely the Base Unit and the Tower Section and not forming a part of any Unit;

(q)      all portions of the LL Structure not included in the CS LL Unit, including, without limitation, the Residential Loading Dock;

(r)      the Residential Tower Building roof areas, if any, shown on the Floor Plans as a Residential Limited Common Element;

- 17 -

(s)      The secondary condenser water loop (for air conditioning) servicing the Base Unit and the Common Elements located below and on the Nineteenth Floor;

(t)      The egress door and hallway from the Garage Access Hallway on the Cellar Floor, as shown on the Floor Plans as "Door A"; and

(u)      whether or not specifically identified as part of the Residential Limited Common Elements (or identified at all) on the Floor Plans, all other parts of the Residential Tower Building and all other facilities (including shafts, pipes, wires, ducts, vents, flues, cables, conduits and lines) and Equipment in the Residential Tower Building or on the Property (other than those areas and/or items specifically identified on the Floor Plans (as the same may be revised) or in this Declaration as part of a Unit, the General Common Elements or a classification of Limited Common Element other than Residential Limited Common Element), to the extent the same serve or benefit or are necessary or convenient or existing for the common use, existence, maintenance, operation or safety solely of the Base Unit and the Tower Section or the Base Unit Owner and the Tower Unit Owners thereof.

7.5      <u>Tower Limited Common Elements</u>.  The Tower Limited Common Elements consist of those portions of the Residential Tower Building designated on the Floor Plans as Tower Limited Common Elements; and also those Common Elements which exclusively serve or exclusively benefit some or all of the Tower Units (including, without limitation, the High Rise Passenger Elevators and their shafts, elevator equipment, elevator pits and entrances and appurtenant facilities, and common hallways) whether or not designated as Tower Limited Common Elements (or designated at all) on the Floor Plans, (but excluding any items therein or in the Residential Tower Building, which are not part of the Property, including, without limitation, any equipment, wiring and devices owned by telecom providers).  The Tower Limited Common Elements include, without limitation:

(a)      A common terrace (the "<u>Tower Terrace</u>") for the use of the Tower Unit Owners located on the Sixty Seventh Floor of the Residential Tower Building, in a location shown on the Floor Plans.

(b)      The tower amenities spaces located on the First Floor, Eleventh Floor, Thirty Eighth, Thirty Ninth and Sixty Seventh Floors of the Residential Tower Building, as designated on the Floor Plans.

(c)      The mechanical rooms in the Residential Tower Building as designated on the Floor Plans but expressly excluding any mechanical rooms located within the CS MS Unit and servicing only the CS MS Unit.

(d)      The storage areas located in the Residential Tower Building as designated on the Floor Plans.

(e)      The secondary condenser water loop (for air conditioning) servicing the Tower Limited Common Elements.

(f)      The secondary chilled water loop (for air conditioning) servicing the Tower Units.

- 18 -

(g)     All Tower Section elevators (including both passenger elevators, but specifically excluding any Private Elevator exclusively serving any Tower Unit, with each such elevator, together with its appurtenant shafts, elevator equipment, elevator pits and entrances and appurtenant facilities, deemed a part of the Tower Unit exclusively serviced by such elevator), in each case including the shafts, elevator equipment, elevator pits and entrances and appurtenant facilities.

(h)     A portion of the Basement Floor of the Residential Tower Building shown on the Floor Plans as the "Pet Facility Area", licensed or to be licensed to the Tower Sponsor or its designee  in perpetuity as set forth in Section 8.16 hereof, which may be used for the purposes set forth in Section 8.16 hereof.

(i)     whether or not specifically identified as part of the Tower Limited Common Elements (or identified at all) on the Floor Plans (as revised), all other parts of the Residential Tower Building and all other facilities (including shafts, pipes, wires, ducts, vents, flues, cables, conduits and lines) and Equipment in the Residential Tower Building or on the Property (other than those areas and/or items specifically identified on the Floor Plans or in this Declaration as part of a Unit, the General Common Elements or a classification of Limited Common Element other than Tower Limited Common Element), to the extent the same serve or benefit or are necessary or convenient or existing for the common use, existence, maintenance, operation or safety solely of the Tower Units or the Tower Unit Owners thereof.

7.6     Leases of Common Elements.  (a)  The Condominium Board shall have the right from time to time to lease or license portions of the Common Elements to internet, telecommunications, utility and other similar providers, provided that the same does not adversely affect the use of the same by Unit Owners (to the extent that a Unit Owner has specifically enumerated as opposed to general rights therein) by more than a de minimis extent.

(b)     In addition, the Tower Board shall have the right from time to time to lease or license portions of the Residential Limited Common Elements and Tower Limited Common Elements to third parties (including, without limitation, to the Association and to the Plaza Owner and its Affiliates and in connection with the license of the Pet Facility Area referred to in Section 8.16 hereof) provided that the same does not adversely affect the use of the same by Unit Owners (to the extent that a Unit Owner has specifically enumerated as opposed to general rights therein) by more than a de minimis extent.

(c)     Without limiting any of the provisions set forth in the Condominium Documents (including, without limitation, Section 2.16 of the Condominium By-Laws), the Condominium Board shall have the right from time to time to lease or license portions of the General Common Elements (other than the General Common Elements identified in Section 7.2(b) and 7.2(g) of this Declaration) to the Association, the Plaza Owner or its Affiliates, on such terms and conditions as the Condominium Board may elect, provided that the same does not adversely affect the use of the same by Unit Owners (to the extent that a Unit Owner has specifically enumerated as opposed to general rights therein) by more than a de minimis extent.

- 19 -

## ARTICLE 8

### UNDERLYING AGREEMENTS;
### USE OF UNITS AND COMMON ELEMENTS

8.1     Definitions: As used in the Condominium Documents:

(a)     "Affiliate" means, with respect to any person or entity (except as may be provided more specifically in any instance in the Condominium Documents) a person or entity which directly or indirectly (through one or more intermediaries) controls, is controlled by, or is under common control with, such person or entity.  For purposes hereof, the term "control" (including the related terms "controlled by" and "under common control with") mean the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such person or entity (whether through the ownership of voting securities or other ownership interest, by contract or otherwise); provided, that the fact that such power may be subject to certain approval or veto rights in favor of one or more Persons shall not ipso facto be deemed to mean that the person possessing such power lacks control of the Person in question for purposes hereof.

(b)     "Association" means the ERY Facility Airspace Parcel Owners' Association and it successors in interest.

(c)     "Coach" means Coach, Inc., a Maryland corporation, and its successors whether by way of merger, sale of assets, reincorporation, consolidation, recapitalization, liquidation, amalgamation, business combination or similar transaction, however structured or effectuated.

(d)     "Coach Affiliate" means Coach or any Affiliate of Coach.

(e)     "Coach Competitors" means (i) the entities set forth on the list annexed hereto as Schedule G (the "Coach Competitor List"), and (ii) which Coach Competitor List may be updated by Coach from time to time but no earlier than the third (3rd) anniversary of the date Coach occupies all or a portion of space at 10 Hudson Yards (Tower C),  and thereafter at no time more frequently than once every three years, provided that (A) the Coach Competitor List shall at no time include more than twenty one (21) named competitors in the aggregate, (B) any update of the entities listed as a Coach Competitor shall not apply (1) to any prospective party with respect to Designated Signage with which the CS Unit Owner is in active negotiation at the time of such update and who was not set forth on the Coach Competitor List prior to such update, or (2) to any existing party with respect to Designated Signage at the time of such update (provided, that such party was not on the Coach Competitor List at the time the CS Unit Owner first entered into an agreement with such party with respect to Designated Signage), and (C) any update of the Coach Competitor List shall only include retailers comparable in reputation to Coach or to the competitors then listed on the Coach Competitor List.  For the avoidance of doubt, L'Oreal and its Affiliates shall not be deemed to be a Coach Competitor.

(f)     "DCA" means that certain Design and Construction Agreement, dated as of December 30, 2013 (as amended), by and between Developer and Culture Shed Lessee LLC.

- 20 -

All references in these Condominium Documents to DCA shall mean DCA, to the extent still applicable at the time in question pursuant to its terms.

(g)    "Designated Signage" means Signage temporarily installed or permanently affixed by the CS Unit Owner on the eastern facing side of the CS Building or on the CS Unit Plaza Area, subject to the restrictions set forth in the Condominium Documents and applicable Laws.

(h)    "Developer" means the developer under the DCA.

(i)    "Eastern Rail Yard" means the Eastern Rail Yard Section of the John D. Caemmerer West Side Yard, as defined as the "ERY" in the Master Declaration.

(j)    "ERY FAPOA Declaration" means that certain Amended and Restated Declaration Establishing the ERY Facility Airspace Parcel Owners' Association and of Covenants, Conditions, Easements and Restrictions by MTA, as declarant, dated as of December 7, 2015, and recorded on December 8, 2015 with the City Register's Office at CRFN 2015000434131, as the same may be further amended, restated, supplemented or otherwise modified from time to time.

(k)    "Fashion Week" means the bi-annual week long city-wide fashion productions in New York City, currently (as of the date of recording of this Declaration) occurring in February and September of each calendar year, during which international fashion collections are shown to buyers, press and the general public consisting of branded events by one or more sponsors and/or producers.

(l)    "FAS Parcel" has the meaning set forth in the ERY FAPOA Declaration.

(m)    "Master Declaration" means that certain Declaration of Easements (Eastern Rail Yard Section of the John D. Caemmerer West Side Yard), by MTA, as declarant, dated May 26, 2010 and recorded on June 10, 2010 with the City Register's Office at CRFN 2010000194078, as amended by that certain First Amendment to Declaration of Easements (Eastern Rail Yard Section of the John D. Caemmerer West Side Yard), dated as of April 10, 2013 and recorded on July 12, 2013 in the City Register's Office at CRFN 2013000276090, as supplemented by that certain Supplement to Declaration of Easements (Eastern Rail Yard Section of the John D. Caemmerer West Side Yard), dated as of November 16, 2015, and recorded on November 18, 2015 in the City Register's Office as CRFN 2015000410387, as the same has or may be further amended, restated, supplemented or otherwise modified from time to time.

(n)    "Parcel A/B" means the FAS Parcel A/B, as such term is defined in the ERY FAPOA Declaration.

(o)    "Parcel C" means the FAS Parcel C, as such term is defined in the ERY FAPOA Declaration. Parcel C is not part of the Condominium.

(p)    "Parcel C Condominium" means the Condominium regime created or to be created, as the case may be, comprising Parcel C, if any.

- 21 -

(q)    "Parcel C Loading Dock" means the loading dock facility to be located in Tower C and which may comprise a general common element in the Parcel C Condominium, if created, and which will be operated by or on behalf of the owner of Tower C or the condominium board of the Parcel C Condominium, if any.

(r)    "Parcel C Parking Garage" means the parking garage to be located in Tower C and which may comprise a separate condominium unit in the Parcel C Condominium, if created, and which will be operated by or on behalf of the owner of Tower C or the owner of such separate condominium unit, if any.

(s)    "Parcel D" means the FAS Parcel D, as such term is defined in the ERY FAPOA Declaration.

(t)    "Party in Interest" has the meaning set forth in the Zoning Resolution.

(u)    "Tower A/B Condominium" means the condominium formed on Parcel A/B by that certain Declaration Establishing the Plan for Condominium Ownership for the Premises Known as 500 West 33rd Street New York, New York 10001 executed by Metropolitan Transportation Authority, dated as of September 10, 2015, and recorded on December 9, 2015 with City Register's Office at CRFN 2015000436062, as the same may be further amended, restated, supplemented or otherwise modified from time to time.

(v)    [Intentionally omitted.]

(w)    "Tower C" means the building located or to be located on Parcel C.

(x)    "Underlying Agreements" means collectively, the Master Declaration and the ERY FAPOA Declaration.

(y)    "Zoning Resolution" means the Zoning Resolution of the City of New York, effective December 15, 1961, as amended or restated from time to time.

8.2    Master Declaration. The Condominium Board shall have sole authority to act as Owner (as such term is defined in the Master Declaration), party-in-interest and beneficiary for all purposes under the Master Declaration with respect to the Property, and the Unit Owner of any Unit, the holder of any lien encumbering any Unit, and the holder of any other occupancy or other interest in a Unit shall not be deemed to be an Owner, party-in-interest, or third party beneficiary under the Master Declaration, but Unit Owners shall have liability to the extent set forth in Article 13 of the ERY FAPOA Declaration, Section 3.4 of the Master Declaration, Article 11 and Sections 6.3.2(m) and 12.9 of the Condominium By-Laws.

8.3    Compliance with Laws and Underlying Documents. The use of all Units and the Common Elements (and the use and exercise of any easements granted hereunder) shall be subject in all instances to all applicable Laws (including, without limitation, the Zoning Resolution) and the applicable provisions of the Underlying Agreements.

8.4    Use of the Residential Units. The Tower Units, the Base Unit and Base Apartments may be used and occupied for any legally permitted purpose including, without

- 22 -

limitation, for residential purposes and for a lawful home occupation as defined in the Zoning Resolution, and subject to Section 8.5 hereof, the Tower Units shall be subject to such other use and other restrictions as may be set forth in the Tower Section By-Laws, and the Base Unit and Base Apartments shall be subject to such other use restrictions as may be set forth in any Regulatory Agreement or as otherwise determined by the Base Unit Owner from time to time and/or set forth in rules and regulations for the Base Apartments promulgated by the Base Unit Owner. The use of the Tower Units and the Base Apartments shall further be subject to the following:

(a)     At all times, noises, odors and vibrations shall be in compliance with the New York City Noise Control Code and other applicable Laws; and

(b)     The same shall be kept free of rodents (other than household pets) and insects.

8.5     Unsold Tower Units. Notwithstanding the foregoing or anything to the contrary contained herein, in the Condominium By-Laws, the Tower Section By-Laws or any Rules and Regulations, subject only to compliance with all applicable Laws, Tower Sponsor (and its respective designees) may, without the permission of the Condominium Board or the Tower Board or any other Person use or grant permission for the use of any Unsold Tower Unit (as hereinafter defined) for any lawful purpose, including, but not limited to, the use of any Unsold Tower Units or (subject to any Regulatory Agreement) Base Apartments as models and sales and/or promotion offices in connection with the sale or rental of the Tower Units or for any other purpose. As used in the Condominium Documents, "Unsold Tower Unit" refers to (i) any Tower Unit held pursuant to a Declarant Net Lease or owned or retained, by way of lease or any other arrangement by which management and/or financial responsibility is retained, by Tower Sponsor or its designees as the holder of one or more Unsold Tower Unit(s); (ii) any Tower Unit that is acquired, individually or collectively, by a principal of Tower Sponsor or a group of which the Tower Sponsor or one or more of its principals is a member; or (iii) a Tower Unit that is acquired, individually or collectively, by either the holder of a Permitted Mortgage given by Tower Sponsor or the designee of a holder of such a Permitted Mortgage.

8.6     Base Unit. Neither the Condominium Board, the Tower Board, nor any Unit Owner other than the Base Unit Owner (except as may be expressly provided in the Condominium Documents to the contrary or pursuant to separate written agreement by or among the applicable parties), shall have any right to the income derived from any use of the Base Unit.

8.7     Use of the CS Unit. (a) The CS Unit may be used solely as an ERY Culture, Festival and Exhibit Facility, as defined in Section 93-01 of the Zoning Resolution, subject to the restrictions on use set forth herein and in the DCA (provided that in the event of a conflict between the DCA and these Condominium Documents, the DCA shall govern).

(b)     The CS Unit Owner will control the scheduling of events at the CS Group, whether or not the Moveable Shed is deployed, subject to compliance with applicable Laws including, without limitation, the provisions of Section 93-71(j) of the Zoning Resolution. In no event may the CS Unit Owner use or schedule any event in any portion of the Public Access Area (whether or not any portion of the Moveable Shed is deployed over it) or any other portion

- 23 -

of the General Common Elements or the Plaza level (shown as the Second Floor on the Floor Plans).

(c)     Neither Declarant, any Declarant Net Lessee (other than the Declarant Net Lessee of the CS Unit), any Unit Owner other than the CS Unit Owner, nor the Tower Board shall have the right to book events in the CS Group (with or without the Moveable Shed being deployed) without the consent of the CS Unit Owner.

(d)     Except during Fashion Week, neither the CS Unit Owner nor any Declarant Net Lessee of the CS Unit shall erect Signage on the eastern facing side of the CS Building (i.e., either the Permanent Structure or the Moveable Shed, when deployed) or in, on or about the CS Unit Plaza Area which benefits or advertises a Coach Competitor.

(e)     Any deployment and/or retraction of the Moveable Shed shall be in compliance with applicable Laws, and CS Unit Owner shall use commercially reasonable efforts to provide written notice of any deployment and/or retraction to the Condominium Managing Agent at least four (4) hours prior thereto, and in no event less than two (2) hours prior thereto, except in the case of an Emergency, in which case the CS Unit Owner will provide notice as soon as reasonably practicable.

(f)     The CS Unit Owner shall, at its sole cost and expense, implement and adhere to appropriate safety measures to ensure the safety and security of the Occupants and Permittees of the Building and CS Unit Plaza Area in connection with any deployment and/or retraction of the Moveable Shed.

(g)     The CS Unit Owner shall provide the Condominium Managing Agent, at least (x) thirty (30) days prior to the commencement of each calendar month, a schedule of events then scheduled to be held at the CS Unit for the immediately succeeding calendar month, and (y) not less than two (2) Business Days' prior notice of any particular event scheduled within the thirty (30) day calendar month which may not have been included in the schedule provided pursuant to clause (x), in each case, together with reasonably detailed information regarding each event, including an approximate number of attendees and whether or not any high-profile guests are expected to be in attendance; it being acknowledged and agreed that the CS Unit Owner shall at all times be required to, and shall, at its sole cost and expense, implement and maintain security measures and procedures (including crowd control) commensurate with a first-class cultural, festival and exhibit facility or similar facility located in Manhattan, New York offering comparable exhibitions, cultural events and/or performances. Further, CS Unit Owner and the Condominium Board shall meet at least on a quarterly basis to discuss CS Unit Owner's current security protocol and to discuss in good faith any additional security measures and procedures reasonably required to adhere to the first-class standard described above and necessary to ensure the safety and security of residents and other Occupants and to prevent unreasonable interference with Building operations.

8.8     Use of the CS LL Unit.  Until such time as the CS LL Unit is conveyed to the CS Unit Owner or leased under a Declarant Net Lease to the CS Unit Owner (or to the Declarant Net Lessee of the CS Unit), it may be used for any legally permitted purpose. Thereafter, the CS LL Unit may be used solely for the ERY Culture, Festival and Exhibit

- 24 -

Facility, and further subject to the restrictions on use set forth herein and in the DCA (provided that in the event of a conflict between the DCA and these Condominium Documents, the DCA shall govern). At no time may the CS LL Unit be used in a manner that would constitute Floor Area, as such term is defined in the Zoning Resolution.

        8.9    Use of the CS MS Unit. Until such time as the CS MS Unit is conveyed to the CS Unit Owner or leased under a Declarant Net Lease to the CS Unit Owner (or to the Declarant Net Lessee of the CS Unit), it may be used for any legally permitted purpose. Thereafter, the CS MS Unit may be used solely for the ERY Culture, Festival and Exhibit Facility, and further subject to the restrictions on use set forth herein and in the DCA (provided that in the event of a conflict between the DCA and these Condominium Documents, the DCA shall govern), provided that the Thirty Sixth Floor of the CS MS Unit shall only be used as storage space ancillary to the other uses permitted herein. At no time may the CS MS Unit be used in a manner that would constitute Floor Area, as such term is defined in the Zoning Resolution.

        8.10    Use of the Common Elements.

        (a)    Except as otherwise provided herein, in the Condominium By-Laws, or the Tower Section By-Laws, as applicable: (i) the Common Elements may be used only for the furnishing of the services and facilities and for the other uses for which they are reasonably suited; and (ii) balconies and terraces may be used only for purposes commensurate with the uses permitted of the Units to which they are appurtenant.

        (b)    Subject to any easements (exclusive or otherwise) and/or rights of access or as otherwise provided in the Condominium Documents with respect to the Common Elements, neither the Condominium Board, the Tower Board nor any Unit Owner shall impede the exercise of or encroach upon the rights of the others of such parties or anyone claiming, by, through or under them, including, but not limited to, the occupants of the Units and their respective invitees, to use the same.

        8.11    Special Use Provisions. With respect to the operation of any facility/ies within any portion of (i) the CS Unit including, without limitation, the CS Unit Plaza Area, and (ii) the CS LL Unit, after it is acquired or leased by the CS Unit Owner (or Declarant Net Lessee of the CS Unit), the CS Unit Owner and/or the CS LL Unit Owner shall comply with the following at its sole cost and expense:

        (a)    At all times, noises, odors and vibrations shall be in compliance with the New York City Noise Control Code and other applicable Laws;

        (b)    Patrons may not congregate outside of the CS Unit or the CS LL Unit so as to result in disturbance of other Building occupants. CS Unit Owner and CS LL Unit Owner, as applicable, shall cause all queues or lines of patrons awaiting entrance to events at the CS Group to be formed to the east of the doors to the CS Group along West 30th Street and West 31st Street. At no time shall the CS Unit Owner or the CS LL Unit Owner, as applicable, allow any queue or line to block or impede access to, or form in front of, the entrances to the Base Unit or the Tower Units;

(c)     All rubbish, garbage and waste from such operations shall be stored in air tight containers in a self-contained and drained area within the premises set aside for the storage of garbage and refuse so as to prevent such containers from leaking and to prevent any fumes, odors or fluids from emanating from the premises; and no garbage or refuse shall be permitted to accumulate or otherwise become a nuisance or otherwise interfere with the safety, comfort or enjoyment of any occupant of the Building, or their Permittees.

(d)     The Condominium Board may elect, in its sole discretion, to install and maintain an ENVAC System and all (or certain, as applicable) Unit Owners, including CS Unit Owner, CS LL Unit Owner and CS MS Unit Owner will be required to use such ENVAC System for waste disposal, provided, however, that the CS Group, as a whole, shall have a one (1) time right to elect by written notice to the Condominium Board to opt out of the ENVAC System which election must be made within thirty (30) calendar days of receipt of notice of such election by the Condominium Board.

(e)     Exhaust ducts and filter systems shall be installed, as necessary, and kept and maintained in a clean and operational condition as required by their manufacturers, so that no fumes or odors will emanate from the CS Unit directly or indirectly into any portion of the Residential Tower Building, and so that no fumes or odors will emanate from the CS LL Unit directly or indirectly into any portion of the Residential Tower Building.

(f)     All such areas shall at all times be kept free of rodents and insects except to the extent such rodents and/or insects are contained and used in a controlled manner as part of the artistic and/or cultural exhibits maintained in the CS Group.

8.12     Condominium 421-a Eligibility and Low Income Housing Tax Credits. Notwithstanding anything contained herein or in the Condominium By-Laws, for so long as all or any portion of the Condominium is eligible to receive tax benefits, credits, reductions or abatements from HPD, if applicable, or other Governmental Authority pursuant to New York Real Property Tax Law Section 421-a or under Section 42 of the Internal Revenue Code of 1986 or any Regulatory Agreement, neither the Unit Owners nor the Condominium Board nor the Tower Board shall be permitted to use or alter a Unit or the Property, or any portion(s) thereof, or sell or dispose of its interest in a Unit in any way that would interfere with or diminish either Declarant's (or its designees'), the Condominium Board's, any Unit Owner's, or any Declarant Net Lessee's, as applicable, ability to obtain and maintain such tax benefits, credits, reductions or abatements, as the case may be. The foregoing shall not apply to the CS Group.

8.13     Standard of Care. Each Unit Owner (other than the owner(s) of the CS Group) shall at all times construct, use, maintain and operate its Unit in accordance with standards appropriate for a first-class mixed use property of the size, location and composition of the Building. The CS Unit Owner, CS MS Unit Owner and CS LL Unit Owner will use, maintain and operate the CS Group in accordance with standards appropriate for a first-class cultural, festival and exhibit facility.

8.14     Nuisance. No nuisance shall be allowed in the Property nor shall any use or practice be allowed in the Property which interferes with the peaceful possession or proper use thereof by the Unit Owners or the Occupants of their respective Units. No improper, offensive

or unlawful use shall be made of the Property or any portion thereof. All applicable Laws relating to any portion of the Property shall be complied with at the sole expense of whichever of the Unit Owner(s) or Board(s) shall have the obligation pursuant to the Declaration, the Condominium By-Laws and, as applicable, the Tower Section By-Laws, to maintain or repair such portion of the Property.

8.15    Service Elevator. The use of the Service Elevator by the CS MS Unit Owner shall be for access to the portions of the CS MS Unit located on the Thirty Sixth Floor of the Residential Tower Building and shall be subject to (x) scheduling usage with the Tower Managing Agent, and (y) the reasonable rules and regulations relating to its use imposed by the Tower Board. The CS MS Unit Owner shall not have the right to use the Service Elevator for access to the balance of the CS MS Unit, and shall not have the right to use any other elevator in the Residential Tower Building.

8.16    Pet Facility Area. The Pet Facility Area may be used for the provision of pet services, pet amenities and uses ancillary thereto or otherwise, as more particularly set forth in Section 6.12.4 of the Tower Section By-Laws. The Pet Facility Area shall be a Tower Limited Common Element and shall be irrevocably licensed by the Tower Board in perpetuity to Tower Sponsor or its designee for an annual license fee of $1. The Pet Facility Area may be outfitted and operated by a third-party operator, and the third-party operator may elect to charge Tower Unit Owners and their Occupants or others a fee for its pet services.

## ARTICLE 9

## CHANGES IN TOWER SECTION, BASE UNIT AND CS GROUP

9.1    Tower Section.

9.1.1    Unsold Tower Units. Notwithstanding anything to the contrary in Article 8 of the Condominium By-Laws or in the Tower Section By-Laws, except to the extent prohibited by, or to the extent that the same will cause the Property or any portion thereof not to comply with, any applicable Laws, Tower Sponsor, its respective designees and any other owner of an Unsold Tower Unit shall have the right, at any time and from time to time, without the vote or consent of the Condominium Board, the Tower Board, any Unit Owner, Declarant Net Lessor or Declarant Net Lessee or any other Person, to: (a) make Alterations and/or Repairs whether structural or non-structural, interior or exterior, ordinary or extraordinary, in, to and upon its Unsold Tower Unit(s); (b) change the use (subject to compliance with all applicable Laws and the applicable Underlying Agreements), or layout of, or number of rooms in, any Unsold Tower Unit(s) from time to time; (c) change the size and/or number of Unsold Tower Unit(s) by subdividing one or more Unsold Tower Units into two or more separate Tower Units, combining separate Unsold Tower Units (including those resulting from such subdivision or combination or otherwise) into one or more Tower Units, converting an Unsold Tower Unit or any portion thereof to a Tower Limited Common Element or Residential Limited Common Element, reclassifying a Tower Limited Common Element or Residential Limited Common Element as a Unit and vice versa, altering the boundary walls between any Unsold Tower Units, or otherwise, including incorporating the use of any portion of the Tower Limited Common Elements or Residential Limited Common Elements adjacent or appurtenant thereto (but only to the extent

- 27 -

that such Tower Limited Common Elements or Residential Limited Common Element are not required to be maintained as such prior to and/or following such alterations); (d) whether in respect of subdivisions or combinations of the Unsold Tower Units or otherwise, designate all or any part of an Unsold Tower Unit or Tower Limited Common Element or Residential Limited Common Element as part of a newly created or expanded Unsold Tower Unit or Tower Limited Common Element or Residential Limited Common Element; (e) create new Residential Limited Common Elements; (f) increase the number of Tower Units within the Residential Tower Building; and (g) if appropriate, reapportion among the Units affected by such change in size, use or number pursuant to the preceding clauses (b), (c), (d), (e) and (f) their percentage interests in the Common Elements; provided, however, that: (i) such changes are in compliance with Section 339 of the New York Condominium Act; (ii) the Common Interest of any other Units (other than the Unsold Tower Units (or other Units) owned by such person) shall not be changed by reason thereof unless the owners of such other Units shall consent thereto; and (iii) Tower Sponsor, such designee or such other owner of an Unsold Tower Unit, as the case may be, shall comply with all applicable Laws and shall agree to defend and hold the Condominium Board and the Tower Board and all other Unit Owners harmless from any liability arising therefrom. Tower Sponsor, its designee(s), and any other such other owner of an Unsold Tower Unit, as the case may be, shall have the right, without the consent of the Condominium Board, the Tower Board, any Unit Owner, any Declarant Net Lessor or Declarant Net Lessee or any other Person to amend (and/or cause the Condominium Board and/or Tower Board to amend) the Declaration, the Condominium By-Laws, the Tower Section By-Laws and the Floor Plans and any other documentation to reflect the foregoing changes; and the Condominium Board and Tower Board, as applicable, shall upon request by Tower Sponsor or its designee, or the holder of such Unsold Tower Unit at the sole cost and expense of such requesting party, reasonably cooperate as needed to effect the same.

9.1.2   Storage Area and Wine Room.  Tower Sponsor reserves the right to reconfigure, change, combine, relocate and/or modify the Storage Area, Wine Room or any portion thereof, and the number and size of the Storage Lockers, Wine Cellars and/or Wine Lockers by, among other things, reconfiguring the Storage Area and/or Wine Room, in connection therewith, re-designating in an amendment to the Declaration a portion of any Tower Limited Common Element space (other than such Tower Limited Common Element spaces which are used for ingress or egress to the Residential Tower Building or otherwise similarly used at the time for Building operations), as part of the Storage Area or Wine Room.  Tower Sponsor expressly reserves the right to effect such changes and to amend the Plan so as to reflect the same.  Tower Sponsor will maintain the necessary permits and approvals required by the New York City Department of Buildings in connection with the foregoing work.

9.2   Tower Units Generally.  Subject to this Declaration and the Condominium By-Laws and compliance with all applicable Laws, the Unit Owner(s) of one or more Tower Units (other than Unsold Tower Unit(s)), with the consent of the Tower Board and (for so long as there remain any Unsold Tower Units) Tower Sponsor, shall have such rights with respect to changing, combining and/or subdividing such Tower Unit(s) as are provided in the Tower Section By-Laws.

9.3   Base Unit.  Notwithstanding anything to the contrary in Article 8 of the Condominium By-Laws, except to the extent prohibited by, or to the extent that the same will

- 28 -

cause the Property or any portion thereof not to comply with, any applicable Laws and/or any Regulatory Agreements (including, without limitation, any Alterations that would adversely affect any Base Apartment that is subject to a Regulatory Agreement in violation of such Regulatory Agreement unless the prior written consent of the applicable agency is obtained), the Base Unit Owner and/or its designee shall have the right, at any time and from time to time, without the vote or consent of any Board, Unit Owner, Declarant Net Lessee of a Unit, or other Person, to: (a) make Alterations and/or Repairs whether structural or non-structural, interior or exterior, ordinary or extraordinary, in, to and upon the Base Unit; (b) change the use of all or a portion of the Base Unit (subject to compliance with all applicable Laws); (c) change the size and/or number of the Base Apartments, (d) subdivide the Base Unit into two or more separate Base Units, or combine such separate Base Units into one or more Base Units, convert a Base Unit or any portion thereof to a common element for the exclusive use of the subdivided Base Units (a "Base Common Element"), altering the boundary walls between any Base Unit(s), or otherwise, including incorporating the use of any portion of the Base Common Elements adjacent or appurtenant thereto (but only to the extent that such Base Common Elements are not required to be maintained as Base Common Elements prior to and/or following such alterations), and creating a sub-board to govern the separate Base Units and promulgating rules and regulations pertaining thereto; (e) whether in respect of subdivisions or combinations of the Base Units or otherwise, designate all or any part of a Base Unit or a Base Common Element as part of a newly created or expanded Base Unit or Base Common Element; and (f) if appropriate, reapportion among the Units affected by such change in size, use or number pursuant to the preceding clauses (c), (d) and (e) their percentage interests in the Common Elements; provided, however, that: (i) such changes are in compliance with Section 339 of the New York Condominium Act; (ii) the Common Interest of any other Units (other than the Base Units (or other Units) owned by such person) shall not be changed by reason thereof unless the owners of such other Units shall consent thereto; and (iii) the Base Unit Owner and/or designee, as the case may be, shall comply with all applicable Laws and shall agree to defend and hold each Board and all other Unit Owners harmless from any liability arising therefrom. The Base Unit Owner and/or its designee, as the case may be, shall have the right, without the consent of any Board, Unit Owner or other Person to amend the Declaration, the Condominium By-Laws and the Floor Plans and any other documentation to reflect the foregoing changes; and the Condominium Board, Tower Board, and any other Unit Owner shall, upon request by the Base Unit Owner, at the sole cost and expense of the Base Unit Owner, reasonably cooperate as needed to effect the same.

       9.4    Consents. (a) Subject to the immediately succeeding sentence, the provisions of Sections 9.1 and 9.2 of this Declaration may not be added to, amended, modified or deleted without the prior written consent of Tower Sponsor or the owner of any Unsold Tower Unit(s), as the case may be, or the designee of any of the foregoing. Wherever the consent, approval or satisfaction of Tower Sponsor, solely in its capacity as the owner or the Declarant Net Lessee of any Unsold Tower Units, is required under this Declaration, the Condominium By-Laws or the Tower Section By-Laws, such consent, approval or satisfaction of such party shall not be required (unless otherwise required under the Condominium Documents) when such party no longer owns or is the Declarant Net Lessee of any Unsold Tower Units.

      (b)    The provisions of Section 9.3 of this Declaration may not be added to, amended, modified or deleted without the prior written consent of the Base Unit Owner.

9.5     The CS Unit, CS LL Unit and/or CS MS Unit shall not be combined at any time.

9.6     Certification Regarding Common Interest Reallocation.

9.6.1   Base Unit and Tower Units.  Notwithstanding the other provisions of this Article 9, no reapportionment of the interests in the Common Elements appurtenant to any Tower Unit or Base Unit shall be made unless there is first delivered to the Tower Board or to the Condominium Board, as applicable a written certification stating, in each case with respect to the Unit(s) in question that the percentage interests of the affected Unit(s) in the Common Elements, immediately after such reapportionment, are consistent with the terms of this Declaration and in compliance with the terms of Section 339-i(1) of the Condominium Act.  The certification referred to herein shall be delivered: (a) in the case of any Unsold Tower Unit(s), at the election of Tower Sponsor, by Tower Sponsor, the managing agent of the Tower Section, or any other Person reasonably acceptable to the applicable Boards; and (b) in the case of any other Tower Unit(s), by the managing agent of the Tower Section, or any other person reasonably acceptable to the applicable Board(s).

9.6.2   CS Group.  Notwithstanding the other provisions of this Article 9, no reapportionment of the interests in the Common Elements appurtenant to any of the CS Unit, the CS MS Unit and/or the CS LL Unit shall be made unless there is first delivered to the CS Unit Owner a written certification stating, in each case with respect to the Unit(s) in question that the percentage interests of the affected Unit(s) in the Common Elements, immediately after such reapportionment, are consistent with the terms of this Declaration and in compliance with the terms of Section 339-i(1) of the Condominium Act.  Any reapportionment of the interests in the Common Elements which will result in an increase of the General Common Charges and/or General Common Expenses to the CS Unit Owner shall be subject to the prior written consent of the CS Unit Owner.  The aggregate interests in the Common Elements of the CS Group shall not be changed by the CS Unit Owner, the CS MS Unit Owner or the CS LL Unit Owner at any time.

# ARTICLE 10

# RESIDENTIAL LOADING DOCK

The Base Unit Owner and the Tower Board (on behalf of the Tower Unit Owners) shall have the exclusive use of the Residential Loading Dock, as more particularly shown on the Floor Plans, together with (a) a non-exclusive right of access through the easement described in Section A-3(b) of the Annex, and (b) a non-exclusive right of access from the Residential Loading Dock to the doorway designated on the Floor Plans as the "Residential Loading Dock". Notwithstanding the foregoing, the CS Unit Owner may request that the Tower Board permit the CS Unit Owner to make temporary use of the Residential Loading Dock and bays.  Such temporary use may be granted in the Tower Board's sole discretion; to the extent temporary use is agreed to, such temporary use shall be subject to (i) availability; (ii) payment by the CS Unit

- 30 -

Owner on a per use basis in such amount as may reasonably be set by the Tower Board; and (iii) any rules and regulations promulgated by the Tower Board.

## ARTICLE 11
### PERSON TO RECEIVE SERVICE

The Secretary of State of the State of New York (the "Secretary of State") is hereby designated to receive service of process in any action which may be brought against the Condominium Board or the Tower Board. As of the date of this Declaration, any process received by the Secretary of State on behalf of the Condominium Board or the Tower Board should be mailed to: c/o Related Hudson Yards Manager LLC, 423 West 55th Street, 9th Floor, New York, New York 10019.

## ARTICLE 12

### DETERMINATION OF PERCENTAGE
### INTERESTS IN COMMON ELEMENTS

The Common Interest of each Unit has been determined, pursuant to Section 339-i(1)(iv) of the Condominium Act. In accordance with such method of calculation, the Common Interests have been determined based primarily upon a comparison of the floor areas of the Units, subject to the location of such space and the additional factors of relative value to other space in the Condominium, the uniqueness of the Unit, the availability of the Common Elements for exclusive or shared use and the overall dimensions of the particular Unit, with certain discounts for below grade areas. The aggregate Common Interests of all of the Units equals 100%.

## ARTICLE 13

### ENCROACHMENTS

If: (a) any portion of the Common Elements encroaches upon any Unit or upon any other Common Element; (b) any Unit encroaches upon any other Unit or upon any portion of the Common Elements; or (c) any encroachment shall hereafter occur as a result of: (i) settling or shifting of the Building; (ii) any Alteration or Repair made to the Common Elements in accordance with the applicable terms of this Declaration, the Condominium By-Laws and/or the Tower Section By-Laws by, or with the consent (when required by the applicable by-laws), of the Condominium Board and/or the Tower Board, as the case may be; or (iii) any Alteration or Repair of the Building (or any portion thereof) or of any Unit or Common Element after damage by fire or other casualty or any taking by condemnation or eminent domain proceedings of all or any portion of any Unit or the Common Elements, that is, in the case of this clause (iii) made in accordance with the Condominium Documents, then, in any such event, a valid easement shall exist for such encroachment and for the maintenance of the same as long as the Building shall stand (or during any period in which it is being rebuilt or restored, in accordance with the Condominium By-Laws, following any such fire or other casualty, taking or eminent domain proceeding); provided that in the case of any such encroachment described in subparagraph (c)(ii) or (iii) above, such encroachment does not unreasonably interfere with the use of any of

the Units for their permitted purposes and/or the use of the Common Elements for their intended purposes.

## ARTICLE 14

## FACILITIES AND ALL OTHER COMMON ELEMENTS; SCAFFOLDING

14.1     Except as otherwise expressly set forth in this Declaration or the Condominium By-Laws (or with respect to the Tower Units and the Base Unit, if applicable, the Tower Section By-Laws): (i) each Unit Owner will have, in common with all other Unit Owners and each Unit will be subject to, an easement for the use of the General Common Elements located anywhere on the Property without hindering the exercise of or encroaching upon the rights of the other Unit Owners in respect of such easement, including, but not limited to, such easement as will be necessary to maintain, such Unit Owner's Unit; (ii) (1) the Base Unit Owner, each Tower Unit Owner, and the Tower Board will have, in common with the Base Unit Owner and all Tower Unit Owners, and the Base Unit and each Tower Unit will be subject to, (A) an easement for the use of the Residential Limited Common Elements and any Facilities located therein, and (B) such easements as may be necessary to maintain such Unit Owner's Unit (and, in the case of the Tower Board, the Tower Limited Common Elements), provided that such easements shall not impair the use of any other Unit, and (2) the Tower Board, on behalf of the Base Unit Owner and all Tower Unit Owners, shall have an easement to maintain, and to make repairs and alterations to, the Residential Limited Common Elements; (iii) each Tower Unit Owner will have, in common with all other Tower Unit Owners, and each Tower Unit will be subject to, an easement for the use of the Tower Limited Common Elements and any facilities located therein, without hindering the exercise of or encroaching upon the rights of the other Tower Unit Owners in respect of such easement, including, but not limited to, such easement as will be necessary to operate and maintain, as necessary, such Tower Unit Owner's Unit, and the Tower Board, on behalf of all Tower Unit Owners, shall have an easement to maintain, and to make Repairs and Alterations to, the Tower Limited Common Elements; and (iv) each Unit Owner (other than the CS Unit Owner) and the Tower Board (on behalf of the Tower Unit Owners and the Base Unit Owner) will have, in common with all Unit Owners (other than the CS Unit Owner), an easement for the use of the Residential Tower Limited Common Elements and any facilities located therein, including, but not limited to, such easement as will be necessary to operate and maintain, as necessary, such Unit Owner's Unit.  Each Unit and the Common Elements shall be subject to an easement in favor of the Condominium Board, on behalf of all Unit Owners, to use, operate, maintain, Repair, Alter and rebuild all General Common Elements located in such Unit or elsewhere on the Property.  The foregoing easements shall be exercised in such a manner so as not to interfere with the use of any of the Units for their permitted purposes and/or the use of the Common Elements for their intended purposes.

14.2     <u>Scaffolding</u>.

14.2.1  <u>By Condominium Board or Tower Board</u>.  The Condominium Board or the Tower Board, as applicable, shall have the right to erect scaffolding on or adjacent to the Property or the roof of the CS Building for a temporary period of time in connection with maintenance and repairs of the Building and its Common Elements.  The CS Unit Owner and Condominium Board or Tower Board will reasonably cooperate to erect such scaffolding in the

- 32 -

least obstructive manner, provided that if such scaffolding blocks visibility of the CS Unit from the outside, the CS Unit Owner shall have the right, at the sole cost and expense of the CS Unit Owner and to the extent the same complies with applicable Laws, the Underlying Agreements, and Sections 8.7 and 15.14(a) hereof, to place reasonable temporary signage identifying the CS Unit on the scaffolding. In the event the Condominium Board and/or Tower Board need to erect any such scaffolding which would impair the ability to use or mobilize the Moveable Shed, except in the event of an Emergency or as required by applicable Laws, the Condominium Board or the Tower Board, as applicable, and the CS Unit Owner shall reasonably cooperate to ensure that such scaffolding will not be erected (but, for the avoidance of doubt, may nevertheless be maintained) at times when an event is scheduled in the CS Unit, provided at all times the parties comply with Law.

14.2.2    By CS Unit Owner.  The CS Unit Owner shall have the right to erect scaffolding on or adjacent to the CS Building or the roof of the CS Building for a temporary period of time in connection with maintenance and repairs of the CS Building.  The CS Unit Owner and Condominium Board or Tower Board will reasonably cooperate to erect such scaffolding in the least obstructive manner, provided that if such scaffolding blocks visibility of the Residential Tower from the outside, the Condominium Board or Tower Board, as applicable, shall have the right, at its sole cost and expense and to the extent the same complies with applicable Laws, the Underlying Agreements, and Sections 8.7 and 15.14(a) hereof, to place reasonable temporary signage identifying the Residential Tower on the scaffolding.

## ARTICLE 15

## EASEMENTS; RIGHTS OF ACCESS

15.1    Operation and Maintenance of Common Elements.  Each Unit Owner shall have, in common with all other Unit Owners, to be exercised by the Condominium Board (as to the General Common Elements and the Residential Tower Limited Common Elements) and the Tower Board (as to the Residential Limited Common Elements and the Tower Limited Common Elements), and each Unit shall be subject to, an easement: (a) to install, use, operate, maintain, Repair, Alter and rebuild the Common Elements located in, over, under, through or upon any Unit, or any other Common Elements or elsewhere on the Property; and (b) to maintain any encroachment on any Unit, the General Common Elements or any Limited Common Element resulting from the Repair, Alteration or rebuilding of the Units or the Common Elements; provided that access to any Unit or the Common Elements in furtherance of such easement shall be exercised in such a manner as will not unreasonably interfere with the use and method of use of the Units for their permitted purposes.  Such entry shall be permitted on not less than fifteen days prior written notice, except that no written notice will be necessary in the case of an Emergency and in such case such entry shall be permitted following telephonic notice as soon as reasonably practicable.

15.2    Residential Tower Building Heated Water.  The Tower Board and/or the Base Unit Owner, shall have an easement to install, maintain, repair and replace utility lines connecting the Base Unit, the CS MS Unit, the CS LL Unit, the Tower Units or the Common Elements below the Nineteenth or Thirty Fifth Floor of the Residential Tower Building, as

- 33 -

applicable, to the Auxiliary System, for the purposes of providing heated water to such Units or Common Elements, including the heat pump loop located in the Base Unit.

      15.3   <u>Ingress and Egress</u>.  Each Unit Owner shall have, to the extent reasonably necessary, in common with all other Unit Owners, an easement for ingress to and egress from its Unit and its appurtenant (shared or exclusive) Limited Common Elements.  Each Unit and the Common Elements shall be subject to such easement.

      15.4   <u>Subjacency, Support and Necessity</u>.  Each Unit and the Common Elements shall have easements of subjacency, support and necessity, and the same shall be subject to such easements in favor of all the other Units and the Common Elements.

      15.5   <u>Miscellaneous</u>.  Each Unit Owner (except as otherwise set forth below) grants an easement over its Unit and the Common Elements (including, without limitation, its appurtenant Limited Common Elements), which right may be exercised by the Condominium Board or the Tower Board, as necessary, and the Condominium Board and the Tower Board grants an easement over and through the General Common Elements and its Limited Common Elements, respectively: (a) to the Condominium Board and the Tower Board, in common with the other Board, for the purpose of (and to the extent reasonably necessary for) maintaining, Repairing, Altering, preventing or minimizing damage to and causing to be in compliance with applicable Laws, Insurance Requirements and the Underlying Agreements, such granting Unit Owner's Unit, the Limited Common Elements, if any, appurtenant to its Unit and the Limited Common Elements of such Board; (b) to each Unit Owner, in common with each other Unit Owner, for the purpose of (but only in the absence of a commercially practicable alternative and only to the extent necessary for) maintaining, Repairing, Altering, preventing or minimizing damage to and causing to be in compliance with applicable Laws, Insurance Requirements and the Underlying Agreements any portions of the grantee Unit Owner's Unit and its appurtenant Limited Common Elements; (c) to each Unit Owner, and to each Board, in common with each other, for the purpose of (but only in the absence of a commercially practicable alternative and only to the extent necessary for) installing, allowing to remain (and using for their respective intended purposes), maintaining, Repairing, Altering, preventing or minimizing damage to and causing to be in compliance with applicable Laws, Insurance Requirements and the Underlying Agreements, any Common Elements or other facilities located in or only readily accessible through such granting Unit Owner's Unit, Limited Common Elements, if any, which serve other Units (including, without limitation, reading, maintaining or replacing utility meters relating to the Common Elements, such Unit or any other Unit in the Building); (d) to each Board (only to the extent permitted under the other provisions of the Condominium Documents), in common with each other, for the purpose of (and to the extent reasonably necessary for) preventing or minimizing damage to such Unit or to any other portion of the Property; (e) to each Board (in each case, only to the extent permitted under the other provisions of the Condominium Documents), in common with each other, for the purpose of (and only to the extent reasonably necessary for) making inspections of, or removing violations noted or issued by any Governmental Authority against, the Common Elements or any other part of the Property; and/or (f) to each Unit Owner and to each Board (in each case, only to the extent permitted under the other provisions of the Condominium Documents), in common with each other, for the purpose of (and only to the extent reasonably necessary for) curing defaults hereunder or under the Condominium By-Laws or the Tower Section By-Laws, as applicable, or correcting any

conditions originating in such Unit Owner's Unit, Limited Common Elements and threatening the health, safety and welfare of the occupants of, or the property located within, another Unit or all or any part of the Common Elements.

    15.6   Site Specific Easements.  (a)  The following Site Specific Easements (the "Site Specific Easements") as set forth in the Annex (the "Annex") to the ERY FAPOA Declaration, shall be for the exclusive or non-exclusive, as indicated below, benefit of the Condominium Board, Unit Owners (or their respective Declarant Net Lessees) or the Tower Section, as follows:

        (i)    The easements set forth in the Annex which are for the benefit of Parcel D shall be General Common Elements for the benefit of all Units, and the rights and obligations thereunder shall be exercised and complied with solely by the Condominium Board, and the cost of such compliance shall be a Common Charge allocated to the Unit Owners based on percentage Common Interest, except as otherwise set forth in this Section 15.6.

        (ii)    The easement set forth in Section A-3(c) of the Annex shall be a General Common Element for the benefit of all Units, and the rights and obligations thereunder shall be exercised and complied with solely by the Condominium Board in accordance with Section A-3(a) of the Annex.

        (iii)    The easement set forth in Section A-11(e) of the Annex shall be a General Common Element for the benefit of all Units, provided that if the CS Group opts out of the ENVAC System as provided in Section 8.11(d) hereof, it shall be for the benefit of the Base Unit and the Tower Section, and the rights and obligations thereunder shall be exercised and complied with solely by the Condominium Board and the costs thereof shall be allocated among the benefitted Unit Owners.

        (iv)    The easement set forth in Section A-3(g) of the Annex shall be a General Common Element for the benefit of all Units, and the rights and obligations thereunder shall be exercised and complied with solely by the Condominium Board and the costs thereof shall be allocated among the Unit Owners on a usage basis.

        (v)    [Intentionally omitted.]

        (vi)    The easements set forth in Sections A-2(d) and A-3(b) of the Annex shall be Residential Limited Common Elements for the sole benefit of the Base Unit and the Tower Units, and the rights and obligations thereunder shall be exercised and complied with solely by the Tower Board, and the cost of such compliance shall be allocated to the Residential Unit Owners in accordance with their percentage Residential Common Interest.

        (vii)    The easements set forth in Sections A-3(d) and A-3(f) of the Annex shall be for the sole benefit of the CS Unit (as among any Unit Owners or Boards in the Condominium), and the rights and obligations of

- 35 -

the Condominium thereunder shall be exercised and complied with solely by the CS Unit Owner in accordance with Section A-3(a) of the Annex.

(viii)   The easements set forth in Sections A-13(a) and A-13(b)(i)(A) of the Annex shall be General Common Elements enforced solely by the Condominium Board on behalf of all Unit Owners, and any costs related thereto shall be allocated to all Unit Owners in accordance with their respective Common Interest, except that any costs relating to a breach by a Unit Owner of the easement set forth in Section A-13(b)(i)(A) of the Annex shall be allocated 100% to the Unit Owner causing such breach.

(ix)   The rights set forth in Section A-6 of the Annex shall be exercised by the Condominium Board on behalf of any Unit Owner that requests the heated water service described in Section A-6 thereof. The cost thereof shall be paid by the Unit Owner using such hot water and chilled water directly to the operator of the Auxiliary System or to a Board, in accordance with any Thermal Energy Supply Agreement (as defined in the Condominium By-Laws) or similar agreement and Section 6.4 of the Condominium By-Laws. The cost of maintaining any common distribution lines in Parcel D shall be allocated among the Unit Owners on a usage basis, and in absence of any usage, to all Unit Owners in accordance with their respective Common Interest.

(x)   The easement set forth in Section A-2(g) of the Annex shall be for the sole benefit of the CS LL Unit to provide for Emergency access from the CS LL Unit through the Parcel C Parking Garage.

(xi)   The easement set forth in Section A-2(f) and A-2(i) of the Annex shall be for the sole benefit of the CS LL Unit for the exclusive use of certain space located in the Parcel C Parking Garage, and the rights and obligations thereunder shall be exercised and complied with solely by the CS LL Unit Owner.

(xii)   The easement set forth in Section A-2(n) of the Annex shall be for the sole benefit of the CS LL Unit for the exclusive use of certain roof space on the First Floor, and the rights and obligations thereunder shall be exercised and complied with solely by the CS LL Unit Owner.

(b)   The Condominium Board shall have the sole right and authority to enter into modifications of the Site Specific Easements, as provided for in the Annex; provided, however, that the amendment or modification of any Site Specific Easement which is for the sole or exclusive benefit of a particular Unit Owner shall require the consent of such Unit Owner. The cost to the Condominium Board in connection therewith shall be allocated (as to each Site Specific Easement) to the Unit Owner(s) responsible for the payments referred to in the applicable subsections of Section 15.6(a) hereof, to be allocated as set forth in such subsections.

15.7   Common Elements. The Condominium Board and/or Declarant shall have the sole right and authority to grant such easements as it determines through the General Common Elements and Residential Tower Limited Common Elements for any purpose

- 36 -

(including, without limitation, as necessary for the Auxiliary System (including any thermal loops), Shared Technology Equipment and ENVAC System), including through, over and upon shaft space for the installation, maintenance and repair of conduits and equipment by the holder of an easement. The Condominium Board shall have the authority to cause the Tower Board to grant such easements to the extent the same are necessary to implement the purposes of the Electric Service Supply Agreement and/or the Thermal Energy Supply Agreement in order to provide services thereunder to the Residential Section. These easements will not (i) prevent or unreasonably interfere with the use of any Unit for its permitted purposes, (ii) adversely affect or interfere with the use of any Common Elements by more than a de minimis extent, and (iii) will not be located in the CS Building without the consent of the CS Unit Owner, unless otherwise expressly permitted by other provisions of the Condominium Documents.

    15.8   <u>Utilities</u>. Subject to the restrictions set forth in Section 6.4 of the Condominium By-Laws, the Condominium Board, with respect to the General Common Elements, the Tower Board with respect to the Tower Section (and the Residential Limited Common Elements and Residential Tower Limited Common Elements), and each Unit Owner (or Declarant Net Lessee) but not an individual Tower Unit Owner other than Tower Sponsor with respect to its Unit(s), shall each have the right to grant such additional electric, gas, steam or other utility easements or relocate any existing utility easements in any portion of the General Common Elements, the Tower Section, or it respective Unit(s), as the case may be, as the Condominium Board, the Tower Board, or such Unit Owner, as the case may be, shall deem necessary or desirable for the proper operation and maintenance of the Building, or any portion thereof, or for the general health or welfare of the owners, tenants and occupants of the applicable Units, provided that such additional utilities or the relocation of existing utilities: (x) will not prevent or unreasonably interfere with the use of any of the Units for their permitted purposes, (y) do not adversely affect or interfere with, to more than a de minimis extent, the use by any Unit Owner or Board, or any of such Person's Occupants and Permittees, of the General Common Elements or Limited Common Elements and (z) do not adversely affect or interfere with, to more than a de minimis extent, the use, occupancy, business or aesthetics of or at any of the Units. For purposes of the preceding sentence, any adverse effect on or interference with any visible space that is part of a Limited Common Element or Unit (other than any temporary adverse effect or interference during the creation and installation of the applicable utility lines and pipes) shall be deemed to be a more than de minimis adverse effect on, or interference with, the use of such Limited Common Element or Unit. In furtherance of such easement, the Unit Owner or Board, as applicable, shall provide notice to the affected Unit Owner and schedule a mutually convenient time for such access, except in the event of an Emergency, in which case the applicable Unit Owner or Board will endeavor to provide notice as soon as reasonably practicable given the circumstances. Any utility company and/or any supplier of utility services and their respective employees and agents, including, but not limited to, Electric Service Supplier and Thermal Energy Supplier, shall have the right of access to any Unit or the Common Elements in furtherance of such easement, provided such right of access shall be exercised in such a manner as shall not unreasonably interfere with the use of any of the Units for their permitted purposes.

    15.9   <u>Sidewalks</u>. All Unit Owners shall have a non-exclusive easement to use the sidewalks surrounding all portions of the Building for all purposes permitted by applicable

Laws.  The obligation to maintain sidewalks shall be as set forth in Section 6.3.2(f) of the Condominium By-Laws.

      15.10   <u>Contractors and Agents</u>.  Each easement and other right granted under this Article 15 shall be deemed to permit the benefited party's/ies' contractors, subcontractors, agents, representatives, occupants, employees and other designees (and, in the case of a grant to the Condominium Board or the Tower Board, such Board's managing agent), to use such easement or other right, as applicable, if such Unit Owner or such Board so elects.

      15.11   <u>Miscellaneous Terms</u>.  Any grant of an easement "on", "over", "across" or "through" a given area shall be deemed to mean "on, over, across, through, and upon" such area, unless the context otherwise requires.

      15.12   <u>Roof Telecom Installations</u>.  The Developer, the Plaza Owner and/or its/their designee (and their respective successors and assigns) but not any Unit Owner except to the extent a Unit Owner is Developer's or Plaza Owner's designee, shall have an easement for so long as the Condominium shall remain in existence: (i) to erect, use, lease, license, maintain, repair, replace, and operate a platform and other facilities for the purpose of erecting, using, leasing, licensing, maintaining, repairing, replacing and operating antennae, satellite dishes and other communications equipment on the roof of the Residential Tower Building; and (ii) to erect, use, lease, maintain, repair, replace and operate related electronic and other communications equipment in any portion of any mechanical equipment room, and the right to erect partitions separating such portion from the balance of such equipment room; in each case, without the consent of, or charge by any Board, Unit Owner or other Person; provided, however, that the Developer and Plaza Owner (or its/their designee) shall give at least fifteen (15) days prior written notice to the Boards and the CS LL Unit Owner, to the extent such installation is inside the CS LL Unit, of the type and location of any such equipment before installation.  Any obligations of any lease, license or other right of use granted by the Developer with respect to the roof or the aforesaid mechanical equipment room under this Section 15.12 shall be the obligation solely of the Developer and not of the Condominium and any rights of the Developer, including, without limitation, the right to receive rent or other consideration for such lease, license or other right of use, shall be the right solely of the Developer and not of the Condominium.  In connection with such easements and related rights, the Developer and its designee (and their respective successors and assigns) and its respective tenants and licensees shall each have, to the extent necessary or advisable for such erection, use, lease, maintenance, repair, replacement and operation, an easement in common with all Unit Owners for ingress, egress and the use of any Common Elements.  The Units and the Common Elements shall each be subject to such easement.  The word "utility" or "utilities" as used in this Section shall be deemed to include fiber optic cable and other communications liens, wires, cables and conduits.

      15.13   <u>Perpetual and Irrevocable</u>.  Except as may otherwise be set forth in this Declaration, any easement created or granted hereunder shall be perpetual and irrevocable for so long as the Condominium shall remain in existence.

15.14   Signage.

(a)   Each Unit Owner (other than the CS MS Owner) shall have the right to install and maintain Signage on the exterior façade of its Unit in accordance with applicable Laws (including, without limitation, zoning requirements), the Underlying Agreements, and Insurance Requirements, and (x) in the case of the eastern facing side of the CS Building (i.e. either the Permanent Structure or the Moveable Shed, when deployed) or in, on or about the CS Unit Plaza Area, subject to the restrictions set forth in Section 8.7(d) and subject to the restrictions as to type, location and specifications set forth in Schedule E annexed hereto and made a part hereof, and (y) on the remainder of the CS Building (i.e., other than the eastern facing side of the CS Building), the restrictions as to type, location and specifications set forth in Schedule E annexed hereto and made a part hereof.  Any permitted Signage during the construction of the Residential Tower Building, the CS Building and the LL Structure shall be governed by the terms of the DCA and subject to the restrictions set forth in Section 8.7(d) hereof.  There shall be no Signage restrictions on the Base Unit or the Tower Section. Notwithstanding the foregoing, no individual Tower Unit Owner other than Tower Sponsor shall have the right to place Signage on the exterior of the Residential Tower Building.  No Unit Owner, other than Tower Sponsor, shall have the right to place Signage on any of the General Common Elements.

(b)   In addition to the right set forth in Section 15.14(a) hereof, (i) the Base Unit Owner (or the Declarant Net Lessee) and the Tower Board, or the designees of any of them)), shall, to the extent permitted by applicable Laws, have an easement to place, erect, maintain, repair and replace, from time to time, Signage, lighting, lighting elements or awnings or other protrusions, devices or decorative elements on or within the Property in those areas on, adjacent to or adjoining the Residential Tower Building (but not within a Unit or on the exterior of another Unit (to the extent such exterior is part of such Unit) without the consent of the applicable Unit Owner thereof), including, without limitation, on the exterior of the Property (including any balconies), or as otherwise approved by the Condominium Board, for the purposes of advertising or promoting or enhancing the operation of the Property, or the sale or lease of all or any portion of the Property owned by such Unit Owner (or leased to such Declarant Net Lessee) or an Affiliate thereof, and/or the operation of any business of a tenant or occupant of all or any portion of the Property owned by such Unit Owner (or Declarant Net Lessee) or an Affiliate thereof, or otherwise; and (ii) Tower Sponsor, shall, to the extent permitted by applicable Laws, have an easement to erect, maintain, repair and replace, from time to time, Signage, lighting, lighting elements or awnings or other protrusions, devices or decorative elements on the Property in those areas adjacent to or adjoining the Residential Tower Building (or as otherwise approved by the Condominium Board) (but not within a Unit or on the exterior of another Unit (to the extent such exterior is part of such Unit) without the consent of the Unit Owner thereof), including without limitation, on the exterior of the walls (including any balconies) of the Building, for the purposes of advertising the sale or lease of any Unsold Tower Unit, or otherwise, provided, however, that no such Signage, lighting, lighting elements or awnings or other protrusions, devices or decorative elements shall be placed in any manner that (x) impedes or obstructs, other than to a de minimis extent, the sightlines from the street to, or the views from, the entrances(s) to the CS Building, (y) covers the windows and/or louvers within the CS MS Unit, and/or (z) blocks, impedes, covers or obstructs any portion of the CS Building façade and/or the roof of the CS Building.  In addition, Tower Sponsor (or its

designee(s)) as the owner(s) of any Unsold Tower Units, until the earlier to occur of the tenth anniversary of the First Tower Unit Closing or upon completion of sales for all Tower Units by Tower Sponsor and its designee(s), to use without charge the Residential Limited Common Elements, Residential Tower Limited Common Elements, and Tower Limited Common Elements and other public or common areas of the Residential Tower Building for exhibitions, events, and promotional functions with respect to any sales programs for Unsold Tower Units.

15.15    Pet Facility Area. The Tower Board and the licensee and users of the Pet Facility Area shall have such easements (including, without limitation, easements of ingress and egress) through the Residential Limited Common Elements and Tower Limited Common Elements as may be reasonably necessary for the operation and use of the pet amenity facility in the Pet Facility Area.

15.16    Right of Access for Operation, Emergency Repairs, Damage Prevention. Each Unit Owner hereby grants to each other Unit Owner, the Boards and to the Developer for the exercise by Developer of its right under the DCA and the Condominium Documents, an irrevocable right of access (to be exercised in the case of the Base Unit Owner or any Tower Unit Owner, by the Tower Board or the managing agent thereof (and for the avoidance of doubt, not by an individual Tower Unit Owner)), to the granting Unit Owner's Unit, its appurtenant Limited Common Elements and any General Common Elements which such granting Unit Owner (either by itself or jointly with some (but not all) of the other Unit Owner(s)) has the exclusive right to use pursuant to an easement granted under this Article, from time to time to the extent necessary for the operation of the Property for making Emergency repairs therein necessary to prevent damage to the Common Elements or to another Unit or Units. In the case of the CS LL Unit and the CS MS Unit such entry shall be permitted on not less than three (3) day's prior notice, except that no notice will be necessary in the case of an Emergency; provided, however, that in the case of the lobby located in the CS LL Unit, except in the case of an Emergency, all entry shall be coordinated with the CS LL Unit Owner so as not to interfere with the use of the CS LL Unit for its intended use as part of the CS Building and any events which may be scheduled therein. In the case of the CS Unit, except in the event of an Emergency, all entry shall be coordinated with the CS Unit Owner so as not to interfere with scheduled events in the CS Unit; in the event of an Emergency, commercially reasonable efforts shall be made to minimize disruption with scheduled events in the CS Unit.

15.17    Initial Construction Work. Each of Declarant, the Condominium Board, the Tower Board and each Unit Owner grants to the Developer a right of access over, as applicable, the General Common Elements, its Unit and its appurtenant Limited Common Elements for the purposes of exercising Developer's rights and obligations under the DCA for purposes of performing the Initial Construction Work (as hereinafter defined). The provisions of Section 15.18 and 15.19(b) hereof shall not apply to this Section 15.17.

15.18    Notice. Except for access provided for in Section 15.17 hereof, all access under this Article shall, except in the case of Emergency or as otherwise expressly provided, be on at least ten (10) days prior written notice, which written notice shall specify in reasonable detail, the purpose and contemplated extent, location and duration of such exercise. In the case of Emergency, only such notice shall be required as may be practicable under the circumstances.

15.19  Equipment.  (a)  Each Unit Owner and the Tower Board shall have the right to maintain equipment and facilities on General Common Elements if necessary and as would be reasonably required in connection with the operation of the applicable Unit or the Tower Section.

(b)     In exercising its rights under Section 15.19(a) and 15.19(c) hereof, each Unit Owner or the Tower Board, as applicable, shall use commercially reasonable efforts to ensure that equipment and facilities are located and operated in such manner so as not to unreasonably interfere with the operation or marketability of any other Unit or with the General Common Elements or Limited Common Elements.

(c)     The CS Unit Owner shall have the right, with the consent of the Condominium Board, such consent not to be unreasonably withheld, to install "non-noisy" mechanical equipment on the roof of the Permanent Structure and the Moveable Shed at an elevation not to exceed six (6) feet above the roof, provided further that the same complies with the Zoning Resolution and all other applicable Laws.

15.20  Moveable Shed Encroachment.  The Moveable Shed may encroach over the Public Access Area only as expressly permitted by Section 93-71(f) of the Zoning Resolution and in no event may encroach at a height below sixty feet beyond 14 feet 7 inches from the easterly edge of the CS Unit Plaza Area.

15.21  ERY Easements.  The Units and the Common Elements are intended to be benefitted and burdened by the provisions of the ERY FAPOA Declaration and easements in the Master Declaration (including, but not limited to, Section 5.1(l) of the Master Declaration) and the Annex that benefit and burden the Property, subject to the limitations on Site Specific Easements set forth in Section 15.6.  These include certain easements granted by the Condominium for the benefit of the Association and other FAS Parcel Owners and occupants of FAS Parcels (the "HY Easements").  Without limiting the generality of the foregoing, the Condominium Board shall have the right to grant any HY Easements to the General Common Elements and Residential Tower Limited Common Elements as more particularly provided in the ERY FAPOA Declaration (subject to the provisions of Section 2.2.2 of the Condominium By-Laws), certain Unit Owners will assume specific obligations under the ERY FAPOA Declaration to the extent specifically provided therein, and all Unit Owners shall have liability to the extent set forth in Article 13 of the ERY FAPOA Declaration and Section 3.4 of the Master Declaration (provided that no Unit Owner shall be liable for the use of an easement granted to the Property pursuant to the ERY FAPOA Declaration which is for the exclusive benefit of a different Unit Owner).

15.22  Plaza Parcel Easements.  In connection with events, activities and the general use of the Plaza Parcel, the Condominium Board and the Tower Board grant to Plaza Owner and/or its Affiliates, together with their Affiliates, successors, assigns and designees, the right to construct, install, use, operate, maintain, Alter and Repair from time to time sponsored art, exterior signage, digital marquees, digital media, screens, media walls, other advertising or artistic installations, kiosks, way-finding technology and/or other similar installations, in or upon the exterior General Common Elements (other than the airspace described in Section 7.2(b) hereof) and/or exterior Residential Limited Common Elements, including, but not limited to, the

- 41 -

exterior of the Residential Tower Building, sidewalks and landscaped areas of the Residential Tower Building, provided the same (w) are in compliance with applicable Laws, (x) do not impede ingress and egress through such General Common Elements, Residential Limited Common Elements and/or the CS Building, (y) are not placed in or upon the CS Building or CS Unit Plaza Area, and (z) are in keeping with the Project Standards.

15.23    Additional General Provisions Relating to Easements.

15.23.1    Each easement (including all Exclusive Easements and Other Easements (each as defined below) and other right granted under this Article 15 (as well as any other easements granted in the Condominium Documents) shall be deemed to permit the grantee's Occupants and Permittees to use such easement or other right, as applicable, if such grantee so elects, but only to the extent, and with respect to particular Persons that are, appropriate in the context of the applicable easement or other right.

15.23.2    With respect to any provision that provides for the holder of an Exclusive Easement (as defined below) to grant an "easement" (an "Other Easement") with respect to the area or Equipment that is the subject of such Exclusive Easement, to the extent that the holder of such Exclusive Easement cannot grant such an "easement" because it is the holder of only an easement interest, it shall be deemed that such Exclusive Easement was granted to such holder subject to a further easement in favor of the intended grantee of the Other Easement for the purpose for which such Other Easement was intended to be granted.  As used herein, the term "Exclusive Easement" shall mean an easement that was granted to a given Unit Owner or Board, or to a given Unit Owner or Board and one or more (but not all) other Unit Owner(s)), for its or their, as applicable, exclusive use.

15.23.3    Any grant of an easement or right of access "on", "over", "across" or "through" a given area shall be deemed to mean "on, over, across, through, and upon" such area, unless the context otherwise requires.

15.23.4    Except as may otherwise be set forth in this Declaration or the Condominium By-Laws, any easement or other right created or granted hereunder or under the Condominium By-Laws shall be perpetual and irrevocable for so long as the Condominium shall remain in existence.

**ARTICLE 16**

**POWER OF ATTORNEY TO THE BOARDS**

16.1    From Tower Unit Owners.

16.1.1 Each Tower Unit Owner shall grant to the persons who shall from time to time constitute the Tower Board, an irrevocable power of attorney, coupled with an interest (in such form and with such content as the Tower Board shall determine) to: (i) acquire or lease on behalf of all Tower Unit Owners any Tower Unit, together with its Appurtenant Interests, whose Tower Unit Owner desires to sell, convey, transfer, assign or lease the same; (ii) acquire on behalf of all Tower Unit Owners any Tower Unit, together with its Appurtenant Interests, whose Tower Unit Owner elects to surrender the same pursuant to the terms of the

Tower Section By-Laws; (iii) purchase or otherwise acquire any Tower Unit, together with its Appurtenant Interests, which becomes the subject of a foreclosure or other similar sale, or with respect to which liens for real estate taxes are being sold, in each case on such terms and at such price or rental, as the case may be, as the attorneys-in-fact deem proper, in the name of the Tower Board or its designee (corporate or otherwise), on behalf of all Tower Unit Owners, and after any such acquisition or leasing, to manage, convey, sell, lease, sublease, mortgage or otherwise deal with (but not vote the Common Interests appurtenant to) any such Tower Unit so acquired by them, or to sublease any such Tower Unit so leased by them without the necessity of further authorization by the Tower Unit Owners or any other Person, on such terms as the attorneys-in-fact may determine; and (iv) execute, acknowledge and deliver: (A) any declaration or other instrument affecting the Tower Section or Residential Limited Common Elements which the Tower Board deems necessary or appropriate to comply with any applicable Laws or the Underlying Agreements applicable to the maintenance, demolition, construction, alteration, repair, or restoration of the Tower Section or Residential Limited Common Elements, or (B) any consent, covenant, restriction, easement or declaration, or any amendment thereto, affecting only the Tower Section or Residential Limited Common Elements which the Tower Board, in its reasonable discretion, deems necessary or appropriate; and

16.1.2  Each Tower Unit Owner shall grant to Tower Sponsor, an irrevocable power of attorney, coupled with an interest (in such form and content as the Tower Sponsor or the Tower Board shall determine) to execute an amendment to any of the Condominium Documents or acquire any permits, applications or documents required to undertake, perform or complete work to the Unsold Tower Units or Common Elements by Tower Sponsor or obtain an amended certificate of occupancy therefor, or any of said documents when such amendment: (i) shall be required to reflect any changes in Unsold Tower Units and/or the reapportionment of the Common Interests of the aforesaid Tower Units resulting therefrom made by Tower Sponsor in accordance with this Declaration or (ii) shall be required by: (1) a mortgagee designated by Tower Sponsor to make a mortgage loan secured by a mortgage on any Tower Unit, (2) any governmental agency having regulatory jurisdiction over the Condominium, or (3) any title insurance company selected by Tower Sponsor to insure title to any Tower Unit. Additionally, each Tower Unit Owner shall grant to Tower Sponsor a power of attorney to amend this Declaration and to effectuate the rights granted to Tower Sponsor under this Declaration, the Condominium By-Laws, the Tower Section By-Laws and the Offering Plan.

16.2    From All Unit Owners.  Each Unit Owner and/or each Declarant Net Lessee shall grant to the persons who from time to time constitute the Condominium Board, an irrevocable power of attorney, coupled with an interest (in such form and content as the Condominium Board shall determine) to: (i) purchase or otherwise acquire in the name of the Condominium Board or its designee, corporate or otherwise, on behalf of all Unit Owners, title to any Unit, together with its Appurtenant Interests: (A) in connection with the enforcement of the Condominium Board's lien for unpaid General Common Charges; or (B) that becomes the subject of a foreclosure or other similar sale; on such terms, including, without limitation, price (with respect to clause (B) immediately above) as said attorneys-in-fact shall deem proper; and (ii) convey, sell, lease, mortgage, or otherwise deal with (but not to vote the Common Interest appurtenant to) any Unit so acquired or to sublease any Unit so leased by them, without the necessity of any authorization by the Unit Owners or any other Person, on such terms as said attorneys-in-fact may determine, granting to said attorneys-in-fact the power to do all things in

- 43 -

and to said Unit which the undersigned could do if personally present; (iii) execute, acknowledge, deliver and (if determined to be necessary or desirable by said attorneys-in-fact) cause to be recorded in the City Register's Office: (A) any declaration or other instrument affecting the Condominium that the Condominium Board reasonably deems necessary or appropriate to comply with any applicable Laws or the Underlying Agreements applicable to the maintenance, demolition, construction, Alteration or Repair of the Condominium; or (B) any consent, covenant, restriction, easement or declaration, or amendment thereto, affecting the Condominium or any of the Common Elements, that the Condominium Board deems necessary or appropriate, provided that in no event shall the Condominium Board execute, acknowledge and deliver any document pursuant to clause (iii)(B) of this sentence prior to the approval thereof by any Unit Owner(s) whose Unit is adversely affected, unless such approval is expressly not required under any of the provisions hereof or of the Condominium By-Laws or Tower Section By-Laws.

16.3    Power of Attorney.  Each Unit Owner and each Declarant Net Lessee shall grant to each Development Rights Owner and Inclusionary Rights Owner (in its capacity as a Unit Owner or otherwise) a power of attorney on behalf of itself, any Permitted Mortgagees of the granting party's Unit, and any other Party in Interest with respect to the granting party's Unit, (a) to amend this Declaration and the Condominium By-Laws to effectuate the rights granted to a Development Rights Owner (or a Development Rights Purchaser) and an Inclusionary Rights Owner (or an Inclusionary Rights Purchaser), as the case may be, and (b) to sign (or waive its rights to sign) on behalf of each Unit Owner, its Permitted Mortgagees, and any other Party in Interest with respect to its Unit, as a Party in Interest, any Declaration of Zoning Lot Restrictions, ZLDA, or other agreement and any future amendments of any of the same (and/or a subordination of its rights to such Declaration of Zoning Lot Restrictions, ZLDA or other agreement or amendment thereto) effecting a Merger or subdivision of the zoning lot (as such term is defined in the Zoning Resolution) in which the Property is located with any other tax lots to form a single zoning lot for the purpose of transferring to or from a Development Rights Owner, a Development Rights Purchaser, an Inclusionary Rights Owner, or an Inclusionary Rights Purchaser all or a portion of the Development Rights or the Inclusionary Rights, as the case may be.

## ARTICLE 17

## ACQUISITIONS OF UNITS BY THE BOARDS

17.1    If: (a) any Unit Owner surrenders its Unit to the Condominium Board to the extent permitted and provided herein and the Condominium By-Laws, together with its Appurtenant Interests pursuant to the provisions of Section 339-x of the New York Condominium Act; or (b) the Condominium Board purchases, at a foreclosure or other similar sale, a Unit, together with its Appurtenant Interests, then, in any such event, title to any such Unit, together with its Appurtenant Interests, shall be held by the Condominium Board or its designee, on behalf of all Unit Owners, in proportion to their respective Common Interests.

17.2    If: (a) any Tower Unit Owner surrenders its Unit to the Tower Board, together with its Appurtenant Interests pursuant to the provisions of Section 339-x of the New York Condominium Act; (b) the Tower Board, pursuant to the Tower Section By-Laws, acquires

or leases a Unit, together with its Appurtenant Interests; or (c) the Tower Board purchases, at a foreclosure or other similar sale, a Tower Unit, together with its Appurtenant Interests, then, in any such event, title to any such Tower Unit, together with its Appurtenant Interests, shall be held by the Tower Board or its designee, on behalf of all Tower Unit Owners, in proportion to their respective Common Interests. The lease or sublease covering any Tower Unit leased or subleased by the Tower Board or its designee shall be held by the Tower Board or its designee, corporate or otherwise, on behalf of all Tower Unit Owners in proportion to their respective Common Interests.

17.3    As used in the Condominium Documents, "Appurtenant Interests" means with respect to each Unit other than a Tower Unit, (i) the undivided interest in the Common Elements appurtenant thereto; (ii) the interest of the Unit Owner of such Unit in any other Units owned at the time in question by the Condominium Board or its designee on behalf of all Unit Owners, or the proceeds of the sale or lease of any such Units theretofore acquired; and (iii) the interest of the Unit Owner of such Unit in all other assets of the Condominium Board or the Condominium, and with respect to a Tower Unit: (A) the undivided interest in the Common Elements appurtenant thereto; (B) the interest of the Unit Owner of such Unit in any other Units owned at the time in question by the Tower Board, or such Board's designee on behalf of all Tower Unit Owners, or in any other Units then owned by the Condominium Board or its designee on behalf of all Unit Owners, or in each case the proceeds of the sale or lease of any such Units theretofore acquired; and (C) the interest of the Unit Owner of such Unit in any other assets of the Tower Board, and of the Condominium Board or the Condominium.

## ARTICLE 18

## COVENANTS RUNNING WITH THE LAND

18.1    Applicability.  All provisions of this Declaration, the Condominium By-Laws and the General Rules and Regulations (if any) (and in the case of a Tower Unit (and, if applicable, the Base Unit, the Tower Section By-Laws and Tower Rules and Regulations)), as may be adopted and amended from time to time, shall, to the extent applicable and unless otherwise expressly herein or therein provided to the contrary, be perpetual and be construed to be covenants running with the Land and with every part thereof and interest therein, and all of the provisions hereof and thereof shall be binding upon and inure to the benefit of the Unit Owners and all the occupants, and their heirs, executors, administrators, legal representatives, successors and assigns, but the same are not intended to create nor shall they be construed as creating any rights in or for the benefit of the general public.  All present and future Owners, tenants and occupants of Units shall be subject to and shall comply with the provisions of this Declaration, the Condominium By-Laws and the General Rules and Regulations, if any, as they may be amended from time to time (and in the case of a Tower Unit (and, if applicable, the Base Unit)), the Tower Section By-Laws and Tower Rules and Regulations.

18.2    Deemed Acceptance of Condominium Documents.  The acceptance of a deed or conveyance, or the succeeding to title to, or the acquisition of any interest in, or the entering into a lease, sublease or license for, or the act of occupancy of, all or any portion of any Unit by any person shall constitute an agreement that the provisions of this Declaration, the Condominium By-Laws, the General Rules and Regulations (if any), (and in the case of a Tower

- 45 -

Unit and the Base Unit, if applicable, the Tower Section By-Laws and Tower Rules and Regulations), as any of the same may be adopted and amended from time to time, are accepted, ratified and will be complied with by such Owner, tenant, or occupant or other party, and all of such provisions shall be deemed and taken to be covenants running with the Land and shall bind any person having at any time any interest or estate in such Unit or Common Element, as though such provisions were recited and stipulated at length in each and every deed or conveyance or lease or license thereof.

        18.3   <u>Unenforceability</u>. If any provision of this Declaration or the other Condominium Documents is invalid under, or would cause this Declaration and the other Condominium Documents to be insufficient to submit the Property to the provisions of, the New York Condominium Act, such provision shall be deemed deleted from this Declaration or the other Condominium Documents, as applicable, for the purpose of submitting the Property to the provisions of the New York Condominium Act but shall nevertheless be valid and binding upon and inure to the benefit of the Unit Owners and their heirs, executors, administrators, legal representatives, successors and assigns, as covenants running with the Land and with every part thereof and interest therein under other applicable Laws to the extent permitted under such applicable Laws with the same force and effect as if, immediately after the recording of this Declaration, all Unit Owners had signed and recorded an instrument agreeing to each such provision as a covenant running with the Land. If any provision which is necessary to cause this Declaration and the other Condominium Documents to be sufficient to submit the Property to the provisions of the New York Condominium Act is missing herefrom or therefrom, then such provision shall be deemed included as part hereof or thereof, as the case may be, for the purposes of submitting the Property to the provisions of the New York Condominium Act.

## ARTICLE 19

## AMENDMENTS OF DECLARATION

        Article 16 of the Condominium By-Laws is incorporated herein in its entirety; and, except as otherwise expressly set forth herein, the provisions thereof shall govern the amendment and/or modification of, addition to and/or deletion of any of the provisions of this Declaration.

## ARTICLE 20

## TERMINATION OF CONDOMINIUM

        20.1   <u>Termination</u>. The Condominium shall continue and the Property shall not be subject to an action for partition until: (a) terminated by casualty loss, condemnation or eminent domain, as more particularly provided in the Condominium By-Laws; or (b) such time as withdrawal of the Property from the provisions of the New York Condominium Act is authorized by a vote of at least 80.01% in aggregate Common Interests of all Unit Owners but in all events including the affirmative vote of the CS Unit Owner. No such vote shall be effective, however: (i) without the written consent (which consent shall not be unreasonably withheld or delayed) of at least 51% of the Tower Mortgagee Representatives, if any; (ii) without the written consent of Tower Sponsor (or any other owner of Unsold Tower Units for so long as any such

- 46 -

Person owns any Unsold Tower Unit(s)), provided that in no event shall any such consents with respect to Unsold Tower Units in this clause (ii) be required more than five years after the First Tower Unit Closing; and (c) as to any Unit which is then subject to a Declarant Net Lease, the consent of the Declarant Net Lessee and the Declarant Net Lessor, provided that (1) Declarant Net Lessor will not unreasonably withhold its consent if (A) the Declarant Net Lease requires that the landlord thereunder not unreasonably withhold consent to the matter in question, and (B) the proposed amendment is not inconsistent with and will not result in a default under such Declarant Net Lease, and (2) as to all other amendments, the provisions of such Declarant Net Lease regarding consent will apply.

        20.2   <u>Waiver</u>.     To the fullest extent permissible under applicable Laws, each Unit Owner shall be deemed to have waived any right to seek partition of the Property. In the event said withdrawal is authorized as aforesaid in Section 20.1 above, and only to the extent the waiver contained in the preceding sentence shall be inapplicable or unenforceable, the Property shall be subject to an action for partition by any Unit Owner or lienor as if owned in common, in which event the net proceeds of sale, together with the net proceeds of any applicable insurance policies, shall be divided among all Unit Owners: (i) first, by apportioning such proceeds among the classes of Units (in the aggregate) pursuant to an appraisal of fair market values to be performed by a panel of three independent appraisers (one of whom shall be selected by the Tower Board representing the Tower Unit Owners, one of whom shall be selected by Base Unit Owner, and the third selected by the CS Unit Owner); and (ii) then, among the Tower Unit Owners in proportion to their respective Common Interests, provided, however, that no payment shall be made to a Unit Owner until there has first been paid out of its share of such funds, such amounts as may be necessary to discharge all unpaid liens on its Unit (other than mortgages which are not Permitted Mortgages or Registered Mortgages, as applicable) in the order of the priority of such liens.

        20.3    To the extent permitted by applicable Laws, in the event the Condominium is terminated pursuant to Section 20.1 of this Declaration, Unit Owners shall reasonably cooperate to effect partition in kind as between the CS Unit and all other Units consistent with this Declaration, the By-Laws and with applicable Laws, which partition in kind would ensure that each Unit Owner continues to benefit from such easements, benefits, rights and/or privileges as may be necessary for such Unit Owner to continue to maintain and operate its respective Unit, including, without limitation, making that portion of the Land upon which the CS Building shall initially be constructed available to the CS Unit Owner for the CS Unit Owner's reconstruction of the same.

## ARTICLE 21

### WAIVER

        No provision contained in this Declaration shall be deemed to have been abrogated or waived by reason of any failure to enforce the same, irrespective of the number of violations or breaches which may occur.

## ARTICLE 22

## CAPTIONS

The captions herein are inserted only as a matter of convenience and for reference, and in no way define, limit or describe the scope of this Declaration nor the intent of any provision hereof.

## ARTICLE 23

## CERTAIN REFERENCES

23.1   Gender, etc.   A reference in this Declaration to any one gender, masculine, feminine or neuter, includes the other two, and the singular includes the plural, and vice versa, unless the context otherwise requires.

23.2   Herein; Hereof; Hereunder.   The terms "herein," "hereof" or "hereunder" or similar terms used in this Declaration refer to this entire Declaration and not to the particular provision in which the terms are used.

23.3   Sections; Articles.   Unless otherwise stated, all references herein to Articles, Sections or other provisions are references to Articles, Sections or other provisions of this Declaration.

23.4   Schedules; Exhibits.   All references herein to Schedules and Exhibits shall be (unless otherwise stated) to the Schedules and Exhibits attached hereto, which shall all be made a part hereof and incorporated herein.

## ARTICLE 24

## SEVERABILITY

Subject to the provisions of Section 18.3, if any provision of this Declaration is invalid or unenforceable as against any person or under certain circumstances, the remainder of this Declaration and the applicability of such provision to other persons or circumstances shall not be affected thereby.  Each provision of this Declaration shall, except as otherwise herein provided, be valid and enforceable to the fullest extent permitted by applicable Laws.

## ARTICLE 25

## COVENANT OF FURTHER ASSURANCES

25.1   Further Assurances.   Any party which is subject to the terms of this Declaration, whether such party is a Unit Owner, a lessee or sublessee of a Unit Owner, an occupant of a Unit, a member or officer of a Board, or otherwise, shall, at the expense of any such other party (or the holder of a lien on its Unit) requesting the same, execute, acknowledge and deliver, within twenty (20) days after request, to such other party (or the holder of a lien on its Unit) such instruments, in addition to those specifically provided for herein, and take such

- 48 -

other action, as such other party (or the holder of a lien on its Unit) may reasonably request to effectuate the provisions of this Declaration or of any transaction contemplated herein or to confirm or perfect any right to be created or transferred hereunder or pursuant to any such transaction.  Without intending to limit the generality of the foregoing, each Board, and each Unit Owner and Declarant Net Lessee (on behalf of itself and its Permitting Mortgagees and any other Party in Interest with respect to its Unit) shall be required, upon the request of a Development Rights Owner, Development Rights Purchaser, Inclusionary Rights Owner or Inclusionary Rights Purchaser, to execute and deliver any documents or applications reasonably required in connection with any Merger, any Declaration of Zoning Lot Restrictions,  ZLDA or other agreement (and any future amendments thereto) effecting a Merger or the transfer of all or a portion of the Development Rights to a Development Rights Purchaser or transfer of all or a portion of the Inclusionary Rights to an Inclusionary Rights Purchaser.

       25.2    <u>Attorney in Fact</u>.

       25.2.1  If any Unit Owner, Board or other Person which is subject to the terms of this Declaration fails to execute, acknowledge or deliver any instrument which such Unit Owner, Board or other Person is required to execute, acknowledge or deliver pursuant to this Declaration and/or the Condominium By-Laws, or fails or refuses, within twenty (20) days after receipt of a written request therefor, to take any action which such Unit Owner, Board or other Person is required to take pursuant to this Declaration and/or the Condominium By-Laws, and such failure continues for an additional ten (10) day period following receipt of a second written request therefor (together with written advice that the requesting party shall be entitled to take specified action upon the recipient's failure or refusal to perform) then the Condominium Board is hereby authorized as attorney-in-fact for such Unit Owner, other Board or other Person, coupled with an interest, to execute, acknowledge and deliver such instrument, or to take such action, in the name of such Unit Owner, Board or other Person and such document or action shall be binding on such Unit Owner, Board or other Person.

       25.2.2  If any Unit Owner, Board or other Person which is subject to the terms of this Declaration fails to execute, acknowledge or deliver any instrument which such Unit Owner, Board or other Person is required to execute, acknowledge or deliver pursuant to this Declaration and/or the Condominium By-Laws, or fails or refuses, within ten (10) days after receipt of a written request therefor, to take any action which such Unit Owner, Board or other Person is required to take pursuant to this Declaration, the Condominium By-Laws, or the Tower Section By-Laws, as the case may be, at the request of Declarant or Tower Sponsor (or its designee), and such failure continues for an additional ten (10) day period following receipt of a second written request therefor (together with written advice that Declarant (or its designee) or Tower Sponsor shall be entitled to take specified action upon the recipient's failure or refusal to perform), then Declarant (or its designee) or Tower Sponsor is hereby authorized as attorney-in-fact for such Unit Owner, Board or other Person, coupled with an interest, to execute, acknowledge and deliver such instrument, or to take such action, in the name of such Unit Owner, Board or other Person and such document or action of Declarant (or its designee) or Tower Sponsor shall be binding on such Unit Owner, Board or other Person.

## ARTICLE 26

### NAME OF CONDOMINIUM AND BUILDING

26.1    The Condominium shall be designated and known as the "15 Hudson Yards Condominium".  The Developer shall own and control all rights and interests, and shall be responsible for all obligations and liabilities, appurtenant to the name of the Condominium and/or the Residential Tower Building, and it (and only it) shall have the right to change or assign the name of the Condominium and/or the Residential Tower Building.  In addition, the Developer shall have the right and all necessary easements, for so long as the Property is a condominium, to maintain one or more plaque(s) identifying it (or its Affiliate(s)) as the developer of the Property, together with such other information as the Developer (or its designee) determines in its sole discretion.

### ARTICLE 27

### INITIAL CONSTRUCTION OF
### THE UNITS AND THE COMMON ELEMENTS

27.1    Initial Construction of the Property; Construction Loan Documents. Notwithstanding anything to the contrary in Article 8 of the Condominium By-Laws, Developer, on behalf of each of Declarant (or the Declarant Net Lessee of the Initial Residential Unit), the Condominium Board, the Tower Board, the Tower Sponsor, and each Unit Owner, shall have the right, without the vote or consent of any Board or any other Unit Owner, Declarant Net Lessor, Declarant Net Lessee or any other Person, but subject in each case to all applicable Laws, the applicable provisions of the DCA, and the Construction Loan Documents, to perform (which term, for the purposes of this Section, shall also include permit, cause and suffer) the development, renovation, design, construction and making of all initial installations, finishes, Alterations and Repairs in or to, and equipping and fitting-out of, the Residential Tower Building to the extent provided for in the DCA (including, without limitation, performing structural or non-structural, interior or exterior, ordinary or extraordinary work) which Developer may be permitted or required to make or do pursuant to the above-described documents and in accordance with the approved construction plans and specifications therefor as filed with applicable Governmental Authorities having jurisdiction or otherwise in furtherance of its/their respective obligations under the DCA and the Construction Loan Documents (such work, as the scope of which may be modified from time to time, the "Initial Construction Work").  The CS Unit Owner shall be solely responsible for the construction of the CS Unit and the fit-out of the CS Group, as set forth in the DCA.

27.2    Construction Warranties.  Upon completion of the Residential Tower Building, Developer will, pursuant to the DCA, assign all warranties with respect to Developer's Work (as defined in the DCA) with respect to the Residential Tower Building and the General Common Elements to the Condominium Board without representation, warranty or recourse. The Condominium Board will endeavor to enforce such warranties on behalf of the applicable Unit Owner (or Tower Board) without representation, warranty or recourse.  In the event that the Condominium Board fails to timely exercise any remedies on behalf of and at the request of any Unit Owner owning a Unit in the Residential Tower Building it will have the non-exclusive right

- 50 -

to pursue remedies against the contractors issuing such warranties. Upon conveyance of the CS LL Unit to the CS Unit Owner, Developer will, pursuant to the DCA, assign all warranties with respect to Developer's Work to the extent required by the DCA to the CS Unit Owner without representation, warranty, or recourse.

## ARTICLE 28

## INTELLECTUAL PROPERTY

Each of the Condominium Board, Unit Owners, Tower Sponsor and Tower Board and any other Person subject to this Declaration may, from time to time either own or obtain licenses to rights in certain trademarks, trade names, copyrights and/or other intellectual property, or successor corporate identifiers or images of the CS Building (as to the CS Unit Owner), the LL Structure (as to the CS Unit Owner once the CS LL Unit has been conveyed to the CS Unit Owner) or the Residential Tower Building (as to the Base Unit Owner, Tower Sponsor or Tower Board) (collectively, "Intellectual Property"). Nothing in this Declaration shall allow any Person to use any other Persons' Intellectual Property and all such uses are prohibited unless expressly permitted herein or by a separate controlling agreement, except that Tower Sponsor and the Base Unit Owner may use the name of the 15 Hudson Yards Building or any other name or the name "15 Hudson Yards Condominium" (i.e., excluding any logos, images or likenesses or other proprietary elements of the Intellectual Property other than the Intellectual Property owned by the Tower Sponsor and/or the Base Unit Owner, as applicable) in a descriptive manner in conjunction with the sale or rental of the Tower Units or the Base Apartments, as applicable, or the provision of any services or conduct of any business therein or therefrom. Without limiting any other right or remedy available at law or in equity, the foregoing may be enforced by an action for specific performance and/or injunctive relief, unless otherwise expressly prohibited by a separate controlling agreement. Under no circumstances shall the Intellectual Property be deemed part of the Property or an appurtenance of any Unit or any Person subject to the foregoing. Each Person's Intellectual Property shall at all times remain the sole and exclusive property of such Person (i.e., the applicable Board, Unit Owner, Tower Sponsor or other Person, or their licensors who own the same).

## ARTICLE 29

## SUCCESSORS AND ASSIGNS

Except as set forth herein or in the Condominium By-Laws to the contrary, and subject specifically to the provisions of Article 32 hereof, the rights and obligations of: (i) Declarant or its designee, as set forth in the Condominium Documents, shall inure to the benefit of and be binding upon any successor or assign of Declarant, its designee or, with the consent of Declarant or its designee, any transferee of some or all of the then Unsold Units then owned by Declarant or its designee; and (ii) Tower Sponsor or its designee, as set forth herein, shall inure to the benefit of and be binding upon any successor or assign of Tower Sponsor, its designee or, with the consent of Tower Sponsor or its designee, any transferee of some or all of the then Unsold Tower Units then owned by Tower Sponsor or its designee. For purposes hereof, references to Declarant or its designee, or Tower Sponsor or its designee, as the case may be, shall also include any mortgagee (or its nominee or designee) or other Person taking title from

- 51 -

such party/ies upon a foreclosure or by deed-in-lieu of foreclosure.  The rights and/or obligations of the Unit Owners as set forth in the Condominium Documents shall inure to the benefit of and be binding upon any successors or assigns of the respective Unit Owners.

## ARTICLE 30

### REGULATORY AGREEMENTS

All rights, powers, duties and obligations of the Base Unit Owner under this Declaration, the Condominium By-Laws and the Tower Section By-Laws shall be subject to, and the Base Unit Owner shall be bound by, the covenants, and restrictions with respect to the Base Apartments, as are set forth in any Regulatory Agreement, as long as such agreement is in full force and effect.

## ARTICLE 31

### REAL PROPERTY LAW SECTION 339-M

As set forth in the Tower Section By-Laws:  (a) in the event the Base Unit Owner has a Base Unit Operating Shortfall (as defined in the Tower Section By-Laws), the Common Charges or Special Assessments payable by it shall be accordingly reduced to the maximum amount payable by such Base Unit Owner in accordance with Section 339-m of the New York Real Property Law (pursuant to the procedures set forth in the Tower Section By-Laws) and the Base Unit Owner shall have no obligation for the payment of Common Charges or Special Assessments in excess of such amount and (b) the Common Charges or Special Assessments, as the case may be, payable by the Tower Unit Owners (but no other Unit Owners or other General Common Charge Obligors) shall be increased by the amount of such reduction in the Common Charges and Special Assessments (pursuant to the procedures set forth in the Tower Section By-Laws) otherwise payable by the Base Unit Owner on a pro rata basis in accordance with their relative proportional Common Interest.

## ARTICLE 32
### EXCULPATION OF DECLARANT; RIGHTS AND OBLIGATIONS OF DECLARANT NET LESSEES; EXCULPATION

32.1    Notwithstanding anything in this Declaration to the contrary, neither Declarant nor its Affiliates shall have any liability under or with respect to this Declaration, and all obligations of Declarant arising under this Declaration shall be performed by the Condominium Board and/or the Unit Owners, as the case may be, at their sole cost and expense. None of the members, directors, officers, employees, agents or servants of Declarant or its Affiliates shall have any liability (personal or otherwise) hereunder, and no property or assets of Declarant or its Affiliates or the members, directors, officers, employees, agents or servants of Declarant or its Affiliates shall be subject to levy, execution or other enforcement procedure hereunder.  Notwithstanding the foregoing, if Declarant is a Unit Owner of any Units upon recordation of the Declaration (other than a Unit that is subject to a Declarant Net Lease, in which case the provisions regarding Declarant Net Leases shall apply), then Declarant shall be

liable under the Declaration solely in its capacity as Unit Owner of such Unit(s), and solely to the extent of liability of such Unit Owner hereunder.

32.2  Notwithstanding anything in this Declaration to the contrary, none of the members, directors, officers, donors, employees, agents or servants of any Unit Owner or any Declarant Net Lessee shall have any liability (personal or otherwise) hereunder, and no property or assets of the members, directors, officers, donors, employees, agents or servants of any Unit Owner or any Declarant Net Lessee shall be subject to levy, execution or other enforcement procedure hereunder.

32.3  Notwithstanding the foregoing, for so long as a Declarant Net Lease is in effect with respect to a Unit or Units, the Declarant Net Lessee (and not the Declarant Net Lessor) (i) shall be deemed to be the sole Unit Owner of such Unit or Units, and such Declarant Net Lessee shall be deemed to have assumed, and to be solely responsible for, all of the obligations of such Unit Owner, (ii) shall have the sole right, if any, under Section 2.1 of the Condominium By-Laws to be the Designator for the purposes of designating a member or members of the Condominium Board with respect to such Unit, and (iii) shall have the sole right to act as the Unit Owner of such Unit for the purpose of casting any vote as a Unit Owner under the Condominium Documents, proposing or consenting to any amendment to the Condominium Documents, or giving any consents required under the Condominium Documents, except as otherwise specifically provided in Article 16 of the Condominium By-Laws and Section 20.1(c) hereof, and the provisions of the Condominium By-Laws respecting the rights of a Declarant Net Lessor following the occurrence of an Event of Default under a Declarant Net Lease.  Declarant hereby grants to each Declarant Net Lessee a power of attorney, coupled with an interest, to take any of the actions described in this Section 32.3 in the name of Declarant Net Lessor.

[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK]

IN WITNESS WHEREOF, Declarant has caused this Declaration to be executed as of the date first set forth above.

METROPOLITAN TRANSPORTATION AUTHORITY

By: _____

Name: Robert Paley

Title: Dir. Transit Oriented Development, Real Estate

STATE OF NEW YORK    )
                           ) ss.:
COUNTY OF NEW YORK  )

        On the 16 day of August in the year 2018, before me, the undersigned, personally appeared Robert Pala, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
Notary Public

**JANUARY ANN DREVNAK**
Notary Public, State of New York
No. 01DR6338371
Qualified in Queens County
Commission Expires March 7, 2020

**SCHEDULE A**
**TO AMENDED AND RESTATED DECLARATION ESTABLISHING**
**CONDOMINIUM OWNERSHIP OF**
**15 HUDSON YARDS CONDOMINIUM**

**DESCRIPTION OF THE LAND**

ALL THAT CERTAIN plot, piece or parcel of land, situate, lying and being in the Borough of Manhattan, County, City, and State of New York, bounded and described as follows:

**Basement Level and Below:**

All of the lands at or below an upper limiting plane of elevation 12.00 feet (Manhattan Borough Datum) within the following horizontal boundary:

Beginning at a point formed by the intersection of the easterly line of Eleventh Avenue (100' R.O.W.), and the northerly line of West 30th Street (60' R.O.W.); running thence

1. Along said easterly line of Eleventh Avenue, North 00°03'07" East, a distance of 182.50 feet to a point; thence

2. Leaving Eleventh Avenue, South 89°56'53" East, a distance of 98.58 feet to a point; thence

3. South 00°03'07" West, a distance of 104.83 feet to a point; thence

4. South 89°56'53" East, a distance of 112.00 feet to a point; thence

5. South 00°03'07" West, a distance of 77.67 feet to a point on the aforementioned northerly line of West 30th Street; thence

6. Along said northerly line of West 30th Street, North 89°56'53" West, a distance of 210.58 feet to the Point of Beginning.

**Street Level I:**

All of the lands above a lower limiting plane of elevation 12.00 feet and at or below an upper limiting plane of elevation 26.67 feet (Manhattan Borough Datum) within the following horizontal boundary:

Beginning at a point formed by the intersection of the easterly line of Eleventh Avenue (100' R.O.W.), and the northerly line of West 30th Street (60' R.O.W.); running thence

1. Along said easterly line of Eleventh Avenue, North 00°03'07" East, a distance of 182.50 feet to a point; thence

2. Leaving Eleventh Avenue, South 89°56'53" East, a distance of 119.54 feet to a point; thence

3.  South 00°03'07" West, a distance of 34.75 feet to a point; thence

4.  South 89°56'53" East, a distance of 37.04 feet to a point; thence

5.  South 00°03'07" West, a distance of 12.90 feet to a point; thence

6.  South 89°56'53" East, a distance of 45.42 feet to a point; thence

7.  South 00°03'07" West, a distance of 31.86 feet to a point; thence

8.  South 89°56'53" East, a distance of 10.32 feet to a point; thence

9.  South 36°42'17" East, a distance of 27.85 feet to a point; thence

10. South 00°03'07" West, a distance of 18.31 feet to a point; thence

11. North 89°56'53" West, a distance of 2.33 feet to a point; thence

12. South 00°03'07" West, a distance of 6.60 feet to a point; thence

13. South 89°56'53" East, a distance of 0.50 feet to a point; thence

14. South 00°03'07" West, a distance of 5.03 feet to a point; thence

15. South 89°56'53" East, a distance of 1.80 feet to a point; thence

16. South 00°03'07" West, a distance of 30.67 feet to a point; thence

17. North 89°56'53" West, a distance of 8.37 feet to a point; thence

18. South 00°03'07" West, a distance of 20.06 feet to a point on the aforementioned northerly line of West 30th Street; thence

19. Along said northerly line of West 30th Street, North 89°56'53" West, a distance of 220.58 feet to the Point of Beginning.

**Street Level II:**

All of the lands above a lower limiting plane of elevation 26.67 feet and at or below an upper limiting plane of elevation 28.83 feet (Manhattan Borough Datum) within the following horizontal boundary:

Beginning at a point formed by the intersection of the easterly line of Eleventh Avenue (100' R.O.W.), and the northerly line of West 30th Street (60' R.O.W.); running thence

Schedule A-2

1. Along said easterly line of Eleventh Avenue, North 00°03'07" East, a distance of 212.00 feet to a point; thence

2. Leaving Eleventh Avenue, South 89°56'53" East, a distance of 92.17 feet to a point; thence

3. South 00°03'07" West, a distance of 29.50 feet to a point; thence

4. South 89°56'53" East, a distance of 27.37 feet to a point; thence

5. South 00°03'07" West, a distance of 34.75 feet to a point; thence

6. South 89°56'53" East, a distance of 37.04 feet to a point; thence

7. South 00°03'07" West, a distance of 12.90 feet to a point; thence

8. South 89°56'53" East, a distance of 45.42 feet to a point; thence

9. South 00°03'07" West, a distance of 31.86 feet to a point; thence

10. South 89°56'53" East, a distance of 10.32 feet to a point; thence

11. South 36°42'17" East, a distance of 27.85 feet to a point; thence

12. South 00°03'07" West, a distance of 18.31 feet to a point; thence

13. North 89°56'53" West, a distance of 2.33 feet to a point; thence

14. South 00°03'07" West, a distance of 6.60 feet to a point; thence

15. South 89°56'53" East, a distance of 0.50 feet to a point; thence

16. South 00°03'07" West, a distance of 5.03 feet to a point; thence

17. South 89°56'53" East, a distance of 1.80 feet to a point; thence

18. South 00°03'07" West, a distance of 30.67 feet to a point; thence

19. North 89°56'53" West, a distance of 8.37 feet to a point; thence

20. South 00°03'07" West, a distance of 20.06 feet to a point on the aforementioned northerly line of West 30th Street; thence

21. Along said northerly line of West 30th Street, North 89°56'53" West, a distance of 220.58 feet to the Point of Beginning.

**Street Level III:**

Schedule A-3

All of the lands above a lower limiting plane of elevation 28.83 feet and at or below an upper limiting plane of elevation 29.00 feet (Manhattan Borough Datum) within the following horizontal boundary:

Beginning at a point formed by the intersection of the easterly line of Eleventh Avenue (100' R.O.W.), and the northerly line of West 30th Street (60' R.O.W.); running thence

1. Along said easterly line of Eleventh Avenue, North 00°03'07" East, a distance of 212.00 feet to a point; thence

2. Leaving Eleventh Avenue, South 89°56'53" East, a distance of 232.17 feet to a point; thence

3. South 00°03'07" West, a distance of 19.83 feet to a point; thence

4. North 89°56'53" West, a distance of 62.81 feet to a point; thence

5. South 78°45'38" West, a distance of 49.37 feet to a point; thence

6. North 89°56'53" West, a distance of 1.41 feet to a point; thence

7. South 00°03'07" West, a distance of 34.75 feet to a point; thence

8. South 89°56'53" East, a distance of 37.04 feet to a point; thence

9. South 00°03'07" West, a distance of 12.90 feet to a point; thence

10. South 89°56'53" East, a distance of 45.42 feet to a point; thence

11. South 00°03'07" West, a distance of 31.86 feet to a point; thence

12. South 89°56'53" East, a distance of 10.32 feet to a point; thence

13. South 36°42'17" East, a distance of 27.85 feet to a point; thence

14. South 00°03'07" West, a distance of 18.31 feet to a point; thence

15. North 89°56'53" West, a distance of 2.33 feet to a point; thence

16. South 00°03'07" West, a distance of 6.60 feet to a point; thence

17. South 89°56'53" East, a distance of 0.50 feet to a point; thence

18. South 00°03'07" West, a distance of 5.03 feet to a point; thence

19. South 89°56'53" East, a distance of 1.80 feet to a point; thence

Schedule A-4

20. South 00°03'07" West, a distance of 30.67 feet to a point; thence

21. North 89°56'53" West, a distance of 8.37 feet to a point; thence

22. South 00°03'07" West, a distance of 20.06 feet to a point on the aforementioned northerly line of West 30th Street; thence

23. Along said northerly line of West 30th Street, North 89°56'53" West, a distance of 220.58 feet to the Point of Beginning.

**Mezzanine Level I:**

All of the lands above a lower limiting plane of elevation 29.00 feet and at or below an upper limiting plane of elevation 38.00 feet (Manhattan Borough Datum) within the following horizontal boundary:

Beginning at a point formed by the intersection of the easterly line of Eleventh Avenue (100' R.O.W.), and the northerly line of West 30th Street (60' R.O.W.); running thence

1. Along said easterly line of Eleventh Avenue, North 00°03'07" East, a distance of 212.00 feet to a point; thence

2. Leaving Eleventh Avenue, South 89°56'53" East, a distance of 232.17 feet to a point; thence

3. South 00°03'07" West, a distance of 156.24 feet to a point; thence

4. North 89°56'53" West, a distance of 3.21 feet to a point; thence

5. South 00°03'07" West, a distance of 35.70 feet to a point; thence

6. North 89°56'53" West, a distance of 8.37 feet to a point; thence

7. South 00°03'07" West, a distance of 20.06 feet to a point on the aforementioned northerly line of West 30th Street; thence

8. Along said northerly line of West 30th Street, North 89°56'53" West, a distance of 220.58 feet to the Point of Beginning.

**Mezzanine Level II:**

All of the lands above a lower limiting plane of elevation 38.00 feet and at or below an upper limiting plane of elevation 40.55 feet (Manhattan Borough Datum) within the following horizontal boundary:

Beginning at a point formed by the intersection of the easterly line of Eleventh Avenue (100' R.O.W.), and the northerly line of West 30th Street (60' R.O.W.); running thence

1. Along said easterly line of Eleventh Avenue, North 00°03'07" East, a distance of 212.00 feet to a point; thence

2. Leaving Eleventh Avenue, South 89°56'53" East, a distance of 384.00 feet to a point; thence

3. South 00°03'07" West, a distance of 19.83 feet to a point; thence

4. North 89°56'53" West, a distance of 151.83 feet to a point; thence

5. South 00°03'07" West, a distance of 136.41 feet to a point; thence

6. North 89°56'53" West, a distance of 3.21 feet to a point; thence

7. South 00°03'07" West, a distance of 35.70 feet to a point; thence

8. North 89°56'53" West, a distance of 8.37 feet to a point; thence

9. South 00°03'07" West, a distance of 20.06 feet to a point on the aforementioned northerly line of West 30th Street; thence

10. Along said northerly line of West 30th Street, North 89°56'53" West, a distance of 220.58 feet to the Point of Beginning.

**Plaza Level and Above:**

All of the lands above a lower limiting plane of elevation 40.55 feet (Manhattan Borough Datum) within the following horizontal boundary:

Beginning at a point formed by the intersection of the easterly line of Eleventh Avenue (100' R.O.W.), and the northerly line of West 30th Street (60' R.O.W.); running thence

1. Along said easterly line of Eleventh Avenue, North 00°03'07" East, a distance of 212.00 feet to a point; thence

2. Leaving Eleventh Avenue, South 89°56'53" East, a distance of 384.00 feet to a point; thence

3. South 00°03'07" West, a distance of 212.00 feet to a point on the aforementioned northerly line of West 30th Street; thence

4. Along said northerly line of West 30th Street, North 89°56'53" West, a distance of 384.00 feet to the Point of Beginning.

Schedule A-6

15 HUDSON YARDS CONDOMINIUM
15 HUDSON YARDS
(A/K/A 545 AND 553 WEST 30TH STREET)
NEW YORK, NEW YORK
BLOCK: 702

SCHEDULE B-1
DESCRIPTION OF UNITS

| Unit Designation | Tax Lot Number | Location | Approx. Unit Area in Sq. Ft. | Exclusive Limited Common Element Square Footage | Common Elements to which the Unit has Access | Percent of Interest in the Common Elements |
|---|---|---|---|---|---|---|
| Base Unit | 1004 | * | 106,692 | 0 | ** | 11.3759% |
| CS MS Unit | 1003 | * | 67,886 | 0 | ** | 6.4005% |
| CS LL Unit | 1002 | * | 49,233 | 0 | ** | 4.6952% |
| CS Unit | 1001 | * | 82,131*** | 0 | ** | 7.5360% |
| TOTAL: | | | 305,942 SF***** | | | 30.0076% |

* As shown on the Floor Plans and described in Article 4 of this Declaration.

** As described in Article 6.

*** Excludes 19,055 square feet of building area enclosed when the Moveable Shed is deployed.

**** For the avoidance of doubt, the "Approx. Unit Area in Sq. Ft." on Schedules B-1 and B-2 in this Declaration reflect the as-built square footages, which differ slightly from the "to be built" square footages on Schedule B in the Original Declaration.

Schedule B

15 HUDSON YARDS CONDOMINIUM
15 HUDSON YARDS
(A/K/A 545 AND 553 WEST 30TH STREET)
NEW YORK, NEW YORK
BLOCK: 702
SCHEDULE B-2

THE TOWER UNITS

| Unit Designation | Tax Lot Number | Location (and direction faced) | Number of Bedrooms and Bathrooms | Approx. Unit Area in Sq. Ft. | Proportionate Share of Aggregate Common Interest | Proportionate Share of Aggregate Tower Limited Common Interest | Common Elements to which the Unit has Access |
|---|---|---|---|---|---|---|---|
| 23F | 1005 | W | 3BR/2BA | 1,623 | 0.1809% | 0.2585% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 23G | 1006 | NW | 2BR/2.5BA | 1,157 | 0.1495% | 0.2136% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 23H | 1007 | NE | 3BR/3BA | 1,481 | 0.1823% | 0.2604% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 24A | 1008 | SE | 2BR/2.5BA | 1,777 | 0.2231% | 0.3188% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 24B | 1009 | S | 1BR/1BA | 851 | 0.1052% | 0.1503% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 24C | 1010 | SW | 2BR/2.5BA | 1,665 | 0.2096% | 0.2994% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 24D | 1011 | W | 2BR/2.5BA | 1,571 | 0.1910% | 0.2728% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 24E | 1012 | W | 1BR/1.5BA | 991 | 0.1218% | 0.1740% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 24F | 1013 | W | 1BR/1BA | 1,044 | 0.1261% | 0.1801% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 24G | 1014 | NW | 2BR/2.5BA | 1,464 | 0.1900% | 0.2714% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 24H | 1015 | NE | 3BR/3BA | 2,221 | 0.2800% | 0.4001% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 24J | 1016 | E | 1BR/1.5BA | 1,166 | 0.1421% | 0.2031% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 25A | 1017 | SE | 2BR/2.5BA | 1,777 | 0.2235% | 0.3193% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 25B | 1018 | S | 1BR/1BA | 851 | 0.1053% | 0.1504% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 25C | 1019 | SW | 2BR/2.5BA | 1,665 | 0.2099% | 0.2999% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 25D | 1020 | W | 2BR/2.5BA | 1,571 | 0.1906% | 0.2723% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 25E | 1021 | W | 1BR/1.5BA | 991 | 0.1216% | 0.1738% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 25F | 1022 | W | 1BR/1BA | 1,044 | 0.1263% | 0.1805% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |

Schedule B

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 25G | 1023 | NW | 2BR/2.5BA | 1,464 | 0.1902% | 0.2717% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 25H | 1024 | NE | 3BR/3BA | 2,221 | 0.2803% | 0.4004% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 25J | 1025 | E | 1BR/1.5BA | 1,166 | 0.1419% | 0.2028% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 26A | 1026 | SE | 2BR/2.5BA | 1,777 | 0.2238% | 0.3198% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 26B | 1027 | S | 1BR/1BA | 851 | 0.1060% | 0.1514% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 26C | 1028 | SW | 2BR/2.5BA | 1,665 | 0.2096% | 0.2995% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 26D | 1029 | W | 2BR/2.5BA | 1,571 | 0.1908% | 0.2726% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 26E | 1030 | W | 1BR/1.5BA | 991 | 0.1222% | 0.1746% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 26F | 1031 | W | 1BR/1BA | 1,044 | 0.1262% | 0.1803% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 26G | 1032 | NW | 2BR/2.5BA | 1,464 | 0.1904% | 0.2720% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 26H | 1033 | NE | 3BR/3BA | 2,221 | 0.2805% | 0.4008% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 26J | 1034 | E | 1BR/1.5BA | 1,166 | 0.1422% | 0.2031% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 27A | 1035 | SE | 2BR/2.5BA | 1,782 | 0.2246% | 0.3209% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 27B | 1036 | S | 1BR/1BA | 851 | 0.1060% | 0.1515% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 27C | 1037 | SW | 2BR/2.5BA | 1,661 | 0.2103% | 0.3005% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 27D | 1038 | W | 2BR/2.5BA | 1,571 | 0.1910% | 0.2729% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 27E | 1039 | W | 1BR/1.5BA | 991 | 0.1221% | 0.1744% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 27F | 1040 | W | 1BR/1BA | 1,044 | 0.1264% | 0.1806% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 27G | 1041 | NW | 2BR/2.5BA | 1,464 | 0.1906% | 0.2723% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 27H | 1042 | NE | 3BR/3BA | 2,221 | 0.2808% | 0.4012% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 27J | 1043 | E | 1BR/1.5BA | 1,161 | 0.1420% | 0.2029% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 28A | 1044 | SE | 2BR/2.5BA | 1,782 | 0.2249% | 0.3214% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 28B | 1045 | S | 1BR/1BA | 851 | 0.1064% | 0.1521% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 28C | 1046 | SW | 2BR/2.5BA | 1,661 | 0.2106% | 0.3009% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 28D | 1047 | W | 2BR/2.5BA | 1,571 | 0.1918% | 0.2741% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 28E | 1048 | W | 1BR/1.5BA | 991 | 0.1223% | 0.1748% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 28F | 1049 | W | 1BR/1BA | 1,044 | 0.1270% | 0.1815% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 28G | 1050 | NW | 2BR/2.5BA | 1,464 | 0.1908% | 0.2726% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 28H | 1051 | NE | 3BR/3BA | 2,221 | 0.2811% | 0.4016% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 28J | 1052 | E | 1BR/1.5BA | 1,161 | 0.1422% | 0.2032% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 29A | 1053 | SE | 2BR/2.5BA | 1,782 | 0.2253% | 0.3219% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 29B | 1054 | S | 1BR/1BA | 851 | 0.1068% | 0.1526% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 29C | 1055 | SW | 2BR/2.5BA | 1,661 | 0.2110% | 0.3014% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 29D | 1056 | W | 2BR/2.5BA | 1,571 | 0.1920% | 0.2744% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |

Schedule B

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 29E | 1057 | W | 1BR/1.5BA | 991 | 0.1225% | 0.1751% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 29F | 1058 | W | 1BR/1BA | 1,044 | 0.1272% | 0.1818% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 29G | 1059 | NW | 2BR/2.5BA | 1,464 | 0.1910% | 0.2729% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 29H | 1060 | NE | 3BR/3BA | 2,221 | 0.2813% | 0.4019% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 29J | 1061 | E | 1BR/1.5BA | 1,161 | 0.1424% | 0.2035% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 30A | 1062 | SE | 2BR/2.5BA | 1,782 | 0.2256% | 0.3223% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 30B | 1063 | S | 1BR/1BA | 851 | 0.1072% | 0.1532% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 30C | 1064 | SW | 2BR/2.5BA | 1,661 | 0.2107% | 0.3010% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 30D | 1065 | W | 2BR/2.5BA | 1,571 | 0.1922% | 0.2747% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 30E | 1066 | W | 1BR/1.5BA | 991 | 0.1228% | 0.1754% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 30F | 1067 | W | 1BR/1BA | 1,044 | 0.1271% | 0.1816% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 30G | 1068 | NW | 2BR/2.5BA | 1,464 | 0.1912% | 0.2732% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 30H | 1069 | NE | 3BR/3BA | 2,220 | 0.2815% | 0.4022% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 30J | 1070 | E | 1BR/1.5BA | 1,161 | 0.1427% | 0.2038% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 31A | 1071 | SE | 2BR/2.5BA | 1,780 | 0.2251% | 0.3216% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 31B | 1072 | S | 1BR/1BA | 850 | 0.1075% | 0.1536% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 31C | 1073 | SW | 2BR/2.5BA | 1,659 | 0.2109% | 0.3013% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 31D | 1074 | W | 2BR/2.5BA | 1,567 | 0.1916% | 0.2737% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 31E | 1075 | W | 1BR/1.5BA | 988 | 0.1228% | 0.1754% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 31F | 1076 | W | 1BR/1BA | 1,044 | 0.1277% | 0.1824% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 31G | 1077 | NW | 2BR/2.5BA | 1,463 | 0.1914% | 0.2734% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 31H | 1078 | NE | 3BR/3BA | 2,218 | 0.2816% | 0.4024% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 31J | 1079 | E | 1BR/1.5BA | 1,157 | 0.1426% | 0.2037% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 32A | 1080 | SE | 2BR/2.5BA | 1,780 | 0.2261% | 0.3231% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 32B | 1081 | S | 1BR/1BA | 850 | 0.1079% | 0.1542% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 32C | 1082 | SW | 2BR/2.5BA | 1,659 | 0.2112% | 0.3018% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 32D | 1083 | W | 2BR/2.5BA | 1,567 | 0.1924% | 0.2748% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 32E | 1084 | W | 1BR/1.5BA | 988 | 0.1230% | 0.1757% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 32F | 1085 | W | 1BR/1BA | 1,044 | 0.1279% | 0.1828% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 32G | 1086 | NW | 2BR/2.5BA | 1,462 | 0.1915% | 0.2736% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 32H | 1087 | NE | 3BR/3BA | 2,218 | 0.2819% | 0.4027% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 32J | 1088 | E | 1BR/1.5BA | 1,157 | 0.1432% | 0.2046% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 33A | 1089 | SE | 2BR/2.5BA | 1,779 | 0.2264% | 0.3235% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 33B | 1090 | S | 1BR/1BA | 850 | 0.1083% | 0.1547% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |

Schedule B

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 33C | 1091 | SW | 2BR/2.5BA | 1,659 | 0.2116% | 0.3023% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 33D | 1092 | W | 2BR/2.5BA | 1,566 | 0.1925% | 0.2750% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 33E | 1093 | W | 1BR/1.5BA | 986 | 0.1231% | 0.1758% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 33F | 1094 | W | 1BR/1BA | 1,044 | 0.1282% | 0.1831% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 33G | 1095 | NW | 2BR/2.5BA | 1,461 | 0.1916% | 0.2738% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 33H | 1096 | NE | 3BR/3BA | 2,218 | 0.2821% | 0.4031% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 33J | 1097 | E | 1BR/1.5BA | 1,155 | 0.1433% | 0.2047% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 34A | 1098 | SE | 2BR/2.5BA | 1,778 | 0.2267% | 0.3238% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 34B | 1099 | S | 1BR/1BA | 849 | 0.1086% | 0.1552% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 34C | 1100 | SW | 2BR/2.5BA | 1,658 | 0.2118% | 0.3027% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 34D | 1101 | W | 2BR/2.5BA | 1,564 | 0.1925% | 0.2751% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 34E | 1102 | W | 1BR/1.5BA | 986 | 0.1233% | 0.1761% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 34F | 1103 | W | 1BR/1BA | 1,044 | 0.1284% | 0.1834% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 34G | 1104 | NW | 2BR/2.5BA | 1,460 | 0.1917% | 0.2739% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 34H | 1105 | NE | 3BR/3BA | 2,217 | 0.2823% | 0.4034% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 34J | 1106 | E | 1BR/1.5BA | 1,153 | 0.1433% | 0.2048% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 35A | 1107 | SE | 2BR/2.5BA | 1,777 | 0.2269% | 0.3242% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 35B | 1108 | S | 1BR/1BA | 849 | 0.1090% | 0.1557% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 35C | 1109 | SW | 2BR/2.5BA | 1,657 | 0.2121% | 0.3030% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 35D | 1110 | W | 2BR/2.5BA | 1,563 | 0.1927% | 0.2753% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 35E | 1111 | W | 1BR/1.5BA | 984 | 0.1234% | 0.1762% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 35F | 1112 | W | 1BR/1BA | 1,043 | 0.1282% | 0.1831% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 35G | 1113 | NW | 2BR/2.5BA | 1,459 | 0.1919% | 0.2741% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 35H | 1114 | NE | 3BR/3BA | 2,215 | 0.2824% | 0.4035% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 35J | 1115 | E | 1BR/1.5BA | 1,151 | 0.1434% | 0.2049% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 36A | 1116 | SE | 2BR/2.5BA | 1,776 | 0.2265% | 0.3236% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 36B | 1117 | S | 1BR/1BA | 849 | 0.1094% | 0.1563% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 36C | 1118 | SW | 2BR/2.5BA | 1,656 | 0.2124% | 0.3034% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 36D | 1119 | W | 2BR/2.5BA | 1,561 | 0.1927% | 0.2753% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 36E | 1120 | W | 1BR/1.5BA | 983 | 0.1235% | 0.1764% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 36F | 1121 | W | 1BR/1BA | 1,043 | 0.1288% | 0.1840% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 36G | 1122 | NW | 2BR/2.5BA | 1,458 | 0.1920% | 0.2743% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 36H | 1123 | NE | 3BR/3BA | 2,215 | 0.2827% | 0.4039% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 36J | 1124 | E | 1BR/1.5BA | 1,149 | 0.1435% | 0.2050% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |

Schedule B

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 37A | 1125 | SE | 2BR/2.5BA | 1,774 | 0.2274% | 0.3248% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 37B | 1126 | S | 1BR/1BA | 848 | 0.1100% | 0.1572% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 37C | 1127 | SW | 2BR/2.5BA | 1,655 | 0.2126% | 0.3038% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 37D | 1128 | W | 2BR/2.5BA | 1,559 | 0.1928% | 0.2754% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 37E | 1129 | W | 1BR/1.5BA | 982 | 0.1236% | 0.1767% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 37F | 1130 | W | 1BR/1BA | 1,043 | 0.1290% | 0.1843% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 37G | 1131 | NW | 2BR/2.5BA | 1,457 | 0.1921% | 0.2745% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 37H | 1132 | NE | 3BR/3BA | 2,213 | 0.2828% | 0.4040% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 37J | 1133 | E | 1BR/1.5BA | 1,147 | 0.1431% | 0.2044% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 38A | 1134 | SE | 2BR/2.5BA | 1,772 | 0.2275% | 0.3251% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 38B | 1135 | S | 1BR/1BA | 848 | 0.1101% | 0.1573% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 38C | 1136 | SW | 2BR/2.5BA | 1,654 | 0.2129% | 0.3042% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 38D | 1137 | W | 2BR/2.5BA | 1,557 | 0.1928% | 0.2755% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 38E | 1138 | W | 1BR/1.5BA | 979 | 0.1240% | 0.1772% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 38F | 1139 | W | 1BR/1BA | 1,043 | 0.1292% | 0.1846% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 38G | 1140 | NW | 2BR/2.5BA | 1,455 | 0.1922% | 0.2746% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 38H | 1141 | NE | 3BR/3BA | 2,211 | 0.2829% | 0.4042% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 38J | 1142 | E | 1BR/1.5BA | 1,145 | 0.1436% | 0.2051% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 39A | 1143 | SE | 2BR/2.5BA | 1,770 | 0.2270% | 0.3244% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 39B | 1144 | S | 1BR/1BA | 847 | 0.1104% | 0.1577% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 39C | 1145 | SW | 2BR/2.5BA | 1,652 | 0.2131% | 0.3044% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 39D | 1146 | W | 2BR/2.5BA | 1,555 | 0.1929% | 0.2756% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 39E | 1147 | W | 1BR/1.5BA | 978 | 0.1242% | 0.1774% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 39F | 1148 | W | 1BR/1BA | 1,043 | 0.1291% | 0.1844% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 39G | 1149 | NW | 2BR/2.5BA | 1,453 | 0.1922% | 0.2746% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 39H | 1150 | NE | 3BR/3BA | 2,209 | 0.2830% | 0.4043% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 39J | 1151 | E | 1BR/1.5BA | 1,142 | 0.1431% | 0.2045% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 63A | 1152 | SE | 2BR/2.5BA | 2,087 | 0.2752% | 0.3931% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 63B | 1153 | SW | 2BR/2.5BA | 2,334 | 0.3091% | 0.4416% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 63C | 1154 | W | 2BR/2.5BA | 1,907 | 0.2334% | 0.3335% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 63D | 1155 | NW | 2BR/2.5BA | 2,020 | 0.2573% | 0.3676% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 63E | 1156 | NE | 2BR/2.5BA | 2,517 | 0.3191% | 0.4559% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 63F | 1157 | E | 2BR/2.5BA | 1,839 | 0.2279% | 0.3257% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 64A | 1158 | SE | 2BR/2.5BA | 2,083 | 0.2759% | 0.3942% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |

Schedule B

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 64B | 1159 | SW | 2BR/2.5BA | 2,330 | 0.3081% | 0.4402% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 64C | 1160 | W | 2BR/2.5BA | 1,900 | 0.2331% | 0.3331% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 64D | 1161 | NW | 2BR/2.5BA | 2,017 | 0.2573% | 0.3676% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 64E | 1162 | NE | 2BR/2.5BA | 2,512 | 0.3190% | 0.4557% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 64F | 1163 | E | 2BR/2.5BA | 1,833 | 0.2284% | 0.3263% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 65A | 1164 | SE | 2BR/2.5BA | 2,080 | 0.2759% | 0.3942% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 65B | 1165 | SW | 2BR/2.5BA | 2,324 | 0.3088% | 0.4411% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 65C | 1166 | W | 2BR/2.5BA | 1,893 | 0.2321% | 0.3316% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 65D | 1167 | NW | 2BR/2.5BA | 2,014 | 0.2573% | 0.3677% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 65E | 1168 | NE | 2BR/2.5BA | 2,507 | 0.3188% | 0.4555% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 65F | 1169 | E | 2BR/2.5BA | 1,825 | 0.2273% | 0.3248% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 66A | 1170 | SE | 2BR/2.5BA | 2,076 | 0.2750% | 0.3930% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 66B | 1171 | SW | 2BR/2.5BA | 2,320 | 0.3087% | 0.4410% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 66C | 1172 | W | 2BR/2.5BA | 1,885 | 0.2324% | 0.3321% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 66D | 1173 | NW | 2BR/2.5BA | 2,010 | 0.2573% | 0.3676% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 66E | 1174 | NE | 2BR/2.5BA | 2,502 | 0.3187% | 0.4553% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 66F | 1175 | E | 2BR/2.5BA | 1,818 | 0.2270% | 0.3244% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 67A | 1176 | SE | 2BR/2.5BA | 2,072 | 0.2758% | 0.3941% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 67B | 1177 | SW | 2BR/2.5BA | 2,314 | 0.3075% | 0.4394% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 67C | 1178 | W | 2BR/2.5BA | 1,877 | 0.2321% | 0.3316% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 67D | 1179 | NW | 2BR/2.5BA | 2,006 | 0.2572% | 0.3675% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 67E | 1180 | NE | 2BR/2.5BA | 2,497 | 0.3185% | 0.4551% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 67F | 1181 | E | 2BR/2.5BA | 1,810 | 0.2267% | 0.3239% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 68A | 1182 | SE | 2BR/2.5BA | 2,068 | 0.2749% | 0.3928% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 68B | 1183 | SW | 2BR/2.5BA | 2,309 | 0.3074% | 0.4392% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 68C | 1184 | W | 2BR/2.5BA | 1,869 | 0.2310% | 0.3300% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 68D | 1185 | NW | 2BR/2.5BA | 2,002 | 0.2572% | 0.3674% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 68E | 1186 | NE | 2BR/2.5BA | 2,491 | 0.3183% | 0.4547% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 68F | 1187 | E | 2BR/2.5BA | 1,801 | 0.2262% | 0.3232% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 69A | 1188 | SE | 3BR/3.5BA | 2,420 | 0.3360% | 0.4801% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 69B | 1189 | SW | 4BR/4.5BA | 3,058 | 0.4171% | 0.5959% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 69C | 1190 | W | 1BR/1.5BA | 1,174 | 0.1522% | 0.2174% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 69D | 1191 | NW | 2BR/2.5BA | 1,783 | 0.2322% | 0.3317% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 69E | 1192 | NE | 3BR/3.5BA | 2,304 | 0.3022% | 0.4317% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |

Schedule B

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 69F | 1193 | E | 2BR/2.5BA | 1,747 | 0.2222% | 0.3175% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 70A | 1194 | SE | 3BR/3.5BA | 2,413 | 0.3347% | 0.4782% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 70B | 1195 | SW | 4BR/4.5BA | 3,049 | 0.4167% | 0.5953% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 70C | 1196 | W | 1BR/1.5BA | 1,169 | 0.1525% | 0.2178% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 70D | 1197 | NW | 2BR/2.5BA | 1,779 | 0.2321% | 0.3316% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 70E | 1198 | NE | 3BR/3.5BA | 2,298 | 0.3020% | 0.4314% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 70F | 1199 | E | 2BR/2.5BA | 1,738 | 0.2211% | 0.3159% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 71A | 1200 | SE | 3BR/3.5BA | 2,407 | 0.3345% | 0.4779% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 71B | 1201 | SW | 4BR/4.5BA | 3,039 | 0.4162% | 0.5947% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 71C | 1202 | W | 1BR/1.5BA | 1,164 | 0.1518% | 0.2169% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 71D | 1203 | NW | 2BR/2.5BA | 1,774 | 0.2327% | 0.3324% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 71E | 1204 | NE | 3BR/3.5BA | 2,292 | 0.3017% | 0.4311% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 71F | 1205 | E | 2BR/2.5BA | 1,729 | 0.2213% | 0.3162% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 72A | 1206 | SE | 3BR/3.5BA | 2,400 | 0.3352% | 0.4789% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 72B | 1207 | SW | 4BR/4.5BA | 3,029 | 0.4158% | 0.5940% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 72C | 1208 | W | 1BR/1.5BA | 1,159 | 0.1521% | 0.2173% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 72D | 1209 | NW | 2BR/2.5BA | 1,769 | 0.2318% | 0.3312% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 72E | 1210 | NE | 3BR/3.5BA | 2,285 | 0.3014% | 0.4306% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 72F | 1211 | E | 2BR/2.5BA | 1,720 | 0.2202% | 0.3146% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 73A | 1212 | SE | 3BR/3.5BA | 2,393 | 0.3348% | 0.4784% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 73B | 1213 | SW | 4BR/4.5BA | 3,019 | 0.4153% | 0.5934% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 73C | 1214 | W | 1BR/1.5BA | 1,154 | 0.1519% | 0.2170% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 73D | 1215 | NW | 2BR/2.5BA | 1,764 | 0.2324% | 0.3320% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 73E | 1216 | NE | 3BR/3.5BA | 2,278 | 0.3011% | 0.4302% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 73F | 1217 | E | 2BR/2.5BA | 1,710 | 0.2203% | 0.3147% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 74A | 1218 | SE | 3BR/3.5BA | 2,385 | 0.3334% | 0.4764% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 74B | 1219 | SW | 4BR/4.5BA | 3,009 | 0.4149% | 0.5927% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 74C | 1220 | W | 1BR/1.5BA | 1,148 | 0.1516% | 0.2166% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 74D | 1221 | NW | 2BR/2.5BA | 1,759 | 0.2322% | 0.3318% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 74E | 1222 | NE | 3BR/3.5BA | 2,271 | 0.3008% | 0.4297% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 74F | 1223 | E | 2BR/2.5BA | 1,700 | 0.2198% | 0.3140% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 75A | 1224 | SE | 3BR/3.5BA | 2,378 | 0.3331% | 0.4759% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 75B | 1225 | SW | 4BR/4.5BA | 2,997 | 0.4143% | 0.5918% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 75C | 1226 | W | 1BR/1.5BA | 1,142 | 0.1509% | 0.2156% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |

Schedule B

| Unit | No. | Dir | Type | SqFt | Pct1 | Pct2 | Description |
|---|---|---|---|---|---|---|---|
| 75D | 1227 | NW | 2BR2.5BA | 1,753 | 0.2320% | 0.3315% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 75E | 1228 | NE | 3BR3.5BA | 2,264 | 0.3005% | 0.4293% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 75F | 1229 | E | 2BR2.5BA | 1,690 | 0.2192% | 0.3132% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 76A | 1230 | SE | 3BR3.5BA | 2,370 | 0.3327% | 0.4754% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 76B | 1231 | SW | 4BR4.5BA | 2,986 | 0.4137% | 0.5911% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 76C | 1232 | W | 1BR1.5BA | 1,136 | 0.1511% | 0.2158% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 76D | 1233 | NW | 2BR2.5BA | 1,747 | 0.2318% | 0.3312% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 76E | 1234 | NE | 3BR3.5BA | 2,257 | 0.3002% | 0.4288% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 76F | 1235 | E | 2BR2.5BA | 1,679 | 0.2186% | 0.3123% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 77A | 1236 | SE | 3BR3.5BA | 2,362 | 0.3323% | 0.4748% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 77B | 1237 | SW | 4BR4.5BA | 2,974 | 0.4131% | 0.5902% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 77C | 1238 | W | 1BR1.5BA | 1,130 | 0.1508% | 0.2155% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 77D | 1239 | NW | 2BR2.5BA | 1,741 | 0.2316% | 0.3309% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 77E | 1240 | NE | 3BR3.5BA | 2,249 | 0.2998% | 0.4283% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 77F | 1241 | E | 2BR2.5BA | 1,668 | 0.2180% | 0.3114% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 78A | 1242 | SE | 3BR3.5BA | 2,353 | 0.3318% | 0.4741% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 78B | 1243 | SW | 4BR4.5BA | 2,961 | 0.4124% | 0.5892% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 78C | 1244 | W | 1BR1.5BA | 1,124 | 0.1501% | 0.2144% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 78D | 1245 | NW | 2BR2.5BA | 1,735 | 0.2307% | 0.3296% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 78E | 1246 | NE | 3BR3.5BA | 2,241 | 0.2994% | 0.4277% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 78F | 1247 | E | 2BR2.5BA | 1,657 | 0.2173% | 0.3105% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 79A | 1248 | SE | 3BR3.5BA | 2,344 | 0.3313% | 0.4734% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 79B | 1249 | SW | 4BR4.5BA | 3,058 | 0.4207% | 0.6010% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 79D | 1250 | NW | 2BR2.5BA | 1,802 | 0.2393% | 0.3419% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 79E | 1251 | NE | 3BR3.5BA | 2,232 | 0.2989% | 0.4270% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 79F | 1252 | E | 2BR2.5BA | 1,646 | 0.2167% | 0.3096% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 80A | 1253 | SE | 3BR3.5BA | 2,335 | 0.3309% | 0.4727% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 80B | 1254 | SW | 4BR4.5BA | 3,137 | 0.4275% | 0.6107% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 80D | 1255 | NW | 3BR3.5BA | 2,175 | 0.2898% | 0.4140% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 80E | 1256 | NE | 3BR3.5BA | 2,224 | 0.2985% | 0.4265% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| 80F | 1257 | E | 2BR2.5BA | 1,634 | 0.2154% | 0.3077% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| PH81A | 1258 | SE | 4BR4.5BA | 3,444 | 0.4700% | 0.6715% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| PH81B | 1259 | SW | 4BR4.5BA | 3,238 | 0.4414% | 0.6307% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| PH81C | 1260 | NW | 3BR3.5BA | 2,628 | 0.3482% | 0.4975% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |

Schedule B

| Unit | Dir | Type | SF | % | % | Description |
|---|---|---|---|---|---|---|
| PH81D | 1261 | NE | 3BR/3.5BA | 2,572 | 0.3349% | 0.4784% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| PH82A | 1262 | SE | 4BR/4.5BA | 3,425 | 0.4703% | 0.6719% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| PH82B | 1263 | SW | 4BR/4.5BA | 3,220 | 0.4417% | 0.6311% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| PH82C | 1264 | NW | 3BR/3.5BA | 2,617 | 0.3486% | 0.4981% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| PH82D | 1265 | NE | 3BR/3.5BA | 2,561 | 0.3342% | 0.4775% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| PH83A | 1266 | SE | 4BR/4.5BA | 3,405 | 0.4691% | 0.6702% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| PH83B | 1267 | SW | 4BR/4.5BA | 3,203 | 0.4407% | 0.6297% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| PH83C | 1268 | NW | 3BR/3.5BA | 2,604 | 0.3468% | 0.4954% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| PH83D | 1269 | NE | 3BR/3.5BA | 2,550 | 0.3336% | 0.4769% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| PH84A | 1270 | SE | 4BR/4.5BA | 3,385 | 0.4678% | 0.6684% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| PH84B | 1271 | SW | 4BR/4.5BA | 3,185 | 0.4397% | 0.6282% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| PH84C | 1272 | NW | 3BR/3.5BA | 2,592 | 0.3471% | 0.4959% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| PH84D | 1273 | NE | 3BR/3.5BA | 2,538 | 0.3329% | 0.4756% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| PH85A | 1274 | SE | 4BR/4.5BA | 3,364 | 0.4665% | 0.6666% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| PH85B | 1275 | SW | 4BR/4.5BA | 3,166 | 0.4386% | 0.6266% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| PH85C | 1276 | NW | 3BR/3.5BA | 2,579 | 0.3452% | 0.4932% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| PH85D | 1277 | NE | 3BR/3.5BA | 2,527 | 0.3312% | 0.4732% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| PH86A | 1278 | SE | 4BR/4.5BA | 3,343 | 0.4652% | 0.6647% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| PH86B | 1279 | SW | 4BR/4.5BA | 3,147 | 0.4374% | 0.6250% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| PH86C | 1280 | NW | 3BR/3.5BA | 2,566 | 0.3455% | 0.4936% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| PH86D | 1281 | NE | 3BR/3.5BA | 2,515 | 0.3315% | 0.4736% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| PH87A | 1282 | SE | 4BR/4.5BA | 3,323 | 0.4640% | 0.6630% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| PH87B | 1283 | SW | 4BR/4.5BA | 3,128 | 0.4363% | 0.6233% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| PH87C | 1284 | NW | 3BR/3.5BA | 5,118 | 0.6735% | 0.9622% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| PH88A | 1285 | SE | 4BR/6.5BA | 5,211 | 0.8118% | 1.1598% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| PH88B | 1286 | SW | 4BR/6.5BA | 5,211 | 0.8118% | 1.1598% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| PH88C | 1287 | NW | 4BR/7.5BA | 5,139 | 0.7890% | 1.1272% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| PH88D | 1288 | NE | 4BR/7.5BA | 5,139 | 0.7890% | 1.1272% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| Sky A (a/k/a Skytop A) | 1289 | E | 1BR/2.5BA | 1,682 | 0.2130% | 0.3048% | Refuse chute, Elevators, Public Corridor, and Fire Stairs |
| **TOTAL** | | | | 533,295 SF | 69.9924% | 100.0000% | |

Schedule B

|  | Shared General Common Element Square Footage | Shared Residential Tower Limited Common Element Square Footage | Shared Residential Limited Common Element Square Footage | Shared Tower Limited Common Element Square Footage |
|---|---|---|---|---|
| CS UNIT | Share of GCE* | 0 | 0 | 0 |
| CS MS UNIT | Share of GCE* | Share of RTLCE** | 0 | 0 |
| CS LL UNIT | Share of GCE* | Share of RTLCE** | 0 | 0 |
| BASE UNIT | Share of GCE* | Share of RTLCE** | Share of RLCE*** | 0 |
| TOWER UNITS (in the aggregate) | Share of GCE* | Share of RTLCE** | Share of RLCE*** | Share of TLCE**** |
| **TOTAL** | **27,109 SF** | **24,034 SF** | **87,849 SF** | **139,369 SF** |

* Total shared pro rata by all Units.

** Total shared pro rata by all Units other than the CS Unit.

*** Total shared pro rata by the Residential Units.

**** Total shared pro rata by the Tower Units.

Schedule B

**SCHEDULE C**

**BUILDING DESCRIPTION**

The Building will include a 73 story (including below grade stories) residential tower (the "Residential Tower Building") at 553 West 30th Street, a free standing building above grade (the "CS Building") at 545 West 30th Street, and a lower level structure (the "LL Structure") also at 545 West 30th Street, located beneath the CS Building and adjacent to a portion of the Residential Tower Building located on the Cellar, Basement and 1st floors. The CS Building, the Residential Tower Building, and the LL Structure are referred to collectively as the "Building".

The Residential Tower Building will be a concrete structure with a primary building envelope that is an aluminum and glass curtain wall, consisting of vision glazing, glazed spandrel panels, louver panels and aluminum panels. The base of the building will be comprised of a stone cavity wall and an aluminum and glass storefront system. The Residential Tower Building includes 285 Tower Units and approximately 107 Base Apartments and the separately contained CS MS Unit and portion of the CS LL Unit.

The CS Building will contain 6 stories, including occupiable space in the Cellar. The principal materials are concrete, steel, glass and ETFE. The LL Structure will consist of 3 levels and will house CS Building support programs like mechanical spaces, loading docks, back-of-house functions, flex spaces and a street level lobby for the CS Building. The primary construction of the LL Structure will be out of steel and concrete.

Schedule C

# SCHEDULE D

## DECLARATION ESTABLISHING CONDOMINIUM OWNERSHIP OF
## 15 HUDSON YARDS CONDOMINIUM

### Construction and Marketing Floor Designations

| Residential Floor # Construction | Residential Floor # Marketing | | Residential Floor # Construction | Residential Floor # Marketing |
|---|---|---|---|---|
| Sub-Cellar | Sub-Cellar | | 35 | 39 |
| Cellar | Cellar | | 36 | 48 |
| Basement / 30th St. Lvl. | Lower Lobby | | 37 | 49 |
| 1st Fl. / 31st Street Lobby Lvl. | Lobby | | 38 | 50 / Wellness |
| 2 | 2 | | 39 | 51 / Leisure |
| 3 | 3 | | 40 | 63 |
| 4 | 4 | | 41 | 64 |
| 5 | 5 | | 42 | 65 |
| 6 | 6 | | 43 | 66 |
| 7 | 7 | | 44 | 67 |
| 8 | 8 | | 45 | 68 |
| 9 | 9 | | 46 | 69 |
| 10 | 10 | | 47 | 70 |
| 11 | 11 | | 48 | 71 |
| 12 | 16 | | 49 | 72 |
| 13 | 17 | | 50 | 73 |
| 14 | 18 | | 51 | 74 |
| 15 | 19 | | 52 | 75 |
| 16 | 20 | | 53 | 76 |
| 17 | 21 | | 54 | 77 |
| 18 | 22 | | 55 | 78 |
| 19 | 23 | | 56 | 79 |
| 20 | 24 | | 57 | 80 |
| 21 | 25 | | 58 | PH 81 |
| 22 | 26 | | 59 | PH 82 |
| 23 | 27 | | 60 | PH 83 |
| 24 | 28 | | 61 | PH 84 |
| 25 | 29 | | 62 | PH 85 |
| 26 | 30 | | 63 | PH 86 |
| 27 | 31 | | 64 | PH 87 |
| 28 | 32 | | 65 | PH 88 |
| 29 | 33 | | 66 | PH 89 |
| 30 | 34 | | 67 | Skytop Level |
| 31 | 35 | | 68 | 91 |
| 32 | 36 | | 69 | 92 |
| 33 | 37 | | 70 | 93 |
| 34 | 38 | | Main Roof | Main Roof |

Schedule D

# SCHEDULE E

## CS BUILDING SIGNAGE RESTRICTIONS

CULTURE SHED

CULTURE SHED

FACING CONNECTION TO MAIN LINE

FACING WEST 30TH STREET

FACING OUTDOOR PLAZA

DSK-588

Schedule E-1A

## SCHEDULE F

**[Intentionally Omitted]**

## SCHEDULE G

### COACH COMPETITORS

American Eagle Outfitters, Inc.
Burberry Group PLC
Diane Von Furstenberg
GAP, Inc.
Gucci Group/PPR
J. Crew Group, Inc.
Jones Apparel Group, Inc.
Kenneth Cole Productions, Inc.
Li & Fung
Limited Brands, Inc.
Liz Claiborne, Inc.
LVMH Moet Hennessy Louis Vuitton SA
Michael Kors (USA), Inc.
Nike, Inc.
Phillips-Van Heusen Corp.
Polo Ralph Lauren Corp.
Prada, S.p.A.
Tory Burch LLC
Tumi, Inc.
VF Corp.

This list includes affiliates of the foregoing to the extent that the same engage in a similar luxury retail goods lines of business.

# EXHIBIT A

CONDOMINIUM BY-LAWS

# AMENDED AND RESTATED CONDOMINIUM BY-LAWS

## OF

## 15 HUDSON YARDS CONDOMINIUM

# TABLE OF CONTENTS

Page

ARTICLE 1 GENERAL ........................................................................................1

ARTICLE 2 CONDOMINIUM BOARD ............................................................1

ARTICLE 3 UNIT OWNERS.............................................................................17

ARTICLE 4 OFFICERS .....................................................................................20

ARTICLE 5 NOTICES .......................................................................................22

ARTICLE 6 GENERAL COMMON EXPENSES AND CHARGES; BUDGETS;
MAINTENANCE OBLIGATIONS AND COSTS; UTILITIES.........................24

ARTICLE 7 REAL ESTATE TAXES AND PILOT; TAX CERTIORARI
PROCEEDINGS .................................................................................................40

ARTICLE 8 ALTERATIONS..............................................................................41

ARTICLE 9 MECHANIC'S LIENS, VIOLATIONS; COMPLIANCE WITH LAWS
AND INSURANCE REQUIREMENTS; HAZARDOUS
MATERIALS ......................................................................................................46

ARTICLE 10 RECORDS AND AUDITS ...........................................................49

ARTICLE 11 INSURANCE; CASUALTY; CONDEMNATION ........................51

ARTICLE 12 EVENTS OF DEFAULT; RIGHTS OF CURE; CONDOMINIUM
BOARD'S LIEN; GRANTEES LIABLE FOR UNPAID GENERAL
COMMON CHARGES ......................................................................................77

ARTICLE 13 SALES, LEASES AND MORTGAGES OF UNITS.....................89

ARTICLE 14 ARBITRATION ............................................................................94

ARTICLE 15 GENERAL RULES AND REGULATIONS .................................95

ARTICLE 16 AMENDMENTS TO DECLARATION AND/OR BY-LAWS.......95

ARTICLE 17 INSURANCE TRUSTEE..............................................................99

ARTICLE 18 MISCELLANEOUS....................................................................102

i

<u>Exhibits</u>

1 – Table of Definitions
2 – Expense Allocation Schedule

# AMENDED AND RESTATED CONDOMINIUM BY-LAWS

## OF

## 15 HUDSON YARDS CONDOMINIUM

## ARTICLE 1

### GENERAL

1.1    Defined Terms.  All capitalized terms used but which are not separately defined in these Amended and Restated Condominium By-Laws (herein these, "Condominium By-Laws") shall have the meanings given to such terms in the Declaration or Tower Section By-Laws or, if not defined in the Declaration or Tower Section By-Laws, in the Table of Definitions annexed hereto as Exhibit 1 and made a part hereof.

1.2    Purpose.  The purpose of these Condominium By-Laws is to set forth the rules and procedures concerning the conduct of the affairs of the Condominium.

1.3    Principal Office of Condominium.  The principal office of the Condominium shall be located either within the Property or at such other place in the Borough of Manhattan as may be designated from time to time by the Condominium Board.

## ARTICLE 2

### CONDOMINIUM BOARD

2.1    General Description of Condominium Board.

2.1.1    The affairs of the Condominium shall be governed by a board of managers of the Condominium (the "Condominium Board").  The Condominium Board shall consist initially of five (5) members (each, a "Board Member" or "Condominium Board Member") as follows: (a) one (1) Board Member designated by the CS Unit Owner, (b) one (1) Board Member designated by the Base Unit Owner, and (c) three (3) Board Members designated by the Tower Board representing and on behalf of all the individual Tower Unit Owners.  No other Unit Owners or Boards shall have the right to designate a Board Member.  It is understood that the CS LL Unit Owner and the CS MS Unit Owner shall not have any right at any time to designate a Board Member, and that the CS Unit Owner shall not at any time have the right to designate a majority or controlling interest on the Condominium Board, its representation therein being limited at all times to such one (1) Board Member as aforesaid, subject to the further terms of these Condominium By-Laws.  If any Unit is owned by Declarant but subject to a Declarant Net Lease, the Declarant Net Lessee thereunder, and not the Declarant or a Declarant Net Lessor, shall have the right to vote the Common Interest of such Unit and to make the designations set forth in this Section 2.1.1.  Following notice by Declarant or the Declarant Net Lessor to the Condominium Board that an Event of Default (as therein defined) has occurred under a Declarant Net Lease, (a) the Declarant Net Lessee under such Declarant Net Lease may not thereafter exercise any voting rights as a member of the Condominium Board until further written notice is provided from Declarant or the Declarant Net Lessor to the Condominium

Board that such voting rights have been reinstated, and (b) Declarant may replace the member of the Condominium Board designated by the applicable Declarant Net Lessee, subject to the right of such Declarant Net Lessee to redesignate a member to the Condominium Board after a further notice to such effect from Declarant.

   2.1.2 With respect to the Condominium Board Members: (i) any requirements set forth in the Tower Section By-Laws as to members of the Tower Board shall apply to the Condominium Board Member[(s)] designated by the Tower Board, as applicable; and (ii) no restrictions shall apply as to which persons the Base Unit Owner and the CS Unit Owner (or, except as set forth in the Tower Section By-Laws, the Tower Board) may designate from time to time to the Condominium Board except that each Board Member (and any proxy) must be a natural person and not an entity, and may include, without limitation, a representative of such Unit Owner's mortgagee.

   2.2 <u>Powers and Duties of Condominium Board</u>.

   2.2.1 <u>General</u>.  The Condominium Board shall have the powers and duties necessary for or incidental to the administration of the affairs of the Condominium (except such powers and duties which by applicable Laws or the Condominium Documents may not be delegated to the Condominium Board by the Unit Owners).  Subject to the terms of the Condominium Documents, (i) all determinations which affect the CS Unit and do not (to more than an immaterial extent) relate to or affect or involve the Condominium generally or any portion of the Residential Tower Building, shall be made exclusively by the CS Unit Owner, (ii) all determinations which affect the CS LL Unit or the CS MS Unit and do not (to more than an immaterial extent) relate to or affect or involve the Condominium generally or any other portion of the Residential Tower Building, shall, (following the conveyance of the CS LL Unit and the CS MS Unit to the CS Unit Owner) be made exclusively by the CS LL Unit Owner and the CS MS Unit Owner, respectively, (iii) [intentionally deleted], (iv) all determinations which affect the Base Unit and do not (to more than an immaterial extent) relate to or affect or involve (1) the Condominium generally, (2) any portion of the Residential Tower Building other than the Base Unit, (3) any portion of the CS LL Unit or CS MS Unit, or (4) any portion of the CS Building, shall be made by the Base Unit Owner, and (v) all determinations which affect the Tower Section, the Base Unit and/or the Residential Limited Common Elements, and/or the Tower Limited Common Elements, and do not (to more than an immaterial extent) relate to or affect or involve (1) the Condominium generally, (2) any portion of the Residential Tower Building other than the Base Unit and/or the Tower Section, (3) any portion of the CS LL Unit or CS MS Unit, or (4) any portion of the CS Building, shall be made by the Tower Board.

   2.2.2 <u>Condominium Board</u>.  Subject to, and in accordance with, the provisions of Section 2.2.1, the further provisions of this Section 2.2.2, Sections 2.2.3 through 2.2.10 and Article 6 of these Condominium By-Laws and such other provisions, if any, of the Declaration and these Condominium By-Laws as may grant to one or more Unit Owner(s), the Tower Board or certain Board Member(s), as the case may be, rights of approval with respect to certain matters, the Condominium Board shall be entitled to make determinations and take actions with respect to all matters relating to the operation and the administration of the affairs of the Condominium, including, without limitation, the following:

      (a)     (i) Operation, care, upkeep and maintenance of; (ii) the making of alterations, additions and improvements (collectively, "Alterations") to; and (iii) the making of repairs, restorations and replacements (collectively, "Repairs") of, the General Common Elements and the Residential Tower Limited Common Elements, and to the extent provided in the Condominium Documents, any other Limited Common Elements.

      (b)     Determination and imposition of General Common Charges, preparation and adoption of Budgets as hereinafter provided, and determination and imposition of Special Assessments.

      (c)     Methods of, and procedures with respect to, collection of General Common Charges and Special Assessments from the General Common Charge Obligors, and the implementation of such methods and procedures.

      (d)     Employment and dismissal of the personnel necessary for the maintenance and operation of the General Common Elements and Residential Tower Limited Common Elements (and, as and to the extent provided in the Condominium Documents, the other Limited Common Elements).

      (e)     Promulgation (and amendment) of General Rules and Regulations from time to time, in accordance with Article 15 hereof.

      (f)     In the name of the Condominium Board or its designee: (1) on behalf of all Unit Owners: (i) acquiring one or more of the Units (other than Tower Units) to the extent such Unit(s) is/are surrendered to the Condominium Board (to the extent the waiver contained in the Condominium Documents with respect to the right to surrender is inapplicable or unenforceable); (ii) purchasing or otherwise acquiring those Units (subject to any prior right of the Tower Board with respect to the Tower Units) with respect to which liens for real estate taxes or any lien to which the Condominium Board's Lien is subordinate, may be and are being sold in accordance with the Condominium Documents; and (2) on behalf of all Unit Owners, purchasing or otherwise acquiring Units at foreclosure or other similar sales (subject to any prior right of the Tower Board with respect to the Tower Units). In the event of any purchase or acquisition of a Unit pursuant to clause 1(ii) of this subparagraph effected by means of a Special Assessment against the General Common Charge Obligors (other than, in the case of a purchase or acquisition of a Tower Unit, the CS Unit Owner, CS MS Unit Owner and CS LL Unit Owner), upon the disposition of such Unit, the proceeds thereof shall be disbursed to the General Common Charge Obligors (other than, in the case of a purchase or acquisition of a Tower Unit, the CS Unit Owner, CS MS Unit Owner and CS LL Unit Owner) in proportion to any Special Assessment made against or other funds contributed by such parties to the Condominium Board for such purpose (reduced in each case by amounts owed by any such Person to the Condominium Board at the time of such disbursement).

      (g)     Selling, leasing, licensing, mortgaging and otherwise dealing with Units acquired by the Condominium Board or its designee on behalf of all Unit Owners (but not voting the Common Interest appurtenant thereto).

(h)     Making Alterations to, and Repairs of, the General Common Elements and the Residential Tower Limited Common Elements (and, as and to the extent provided in the Condominium Documents, the other Limited Common Elements) or parts thereof damaged or destroyed by fire or other casualty or necessitated as a result of condemnation or eminent domain proceedings.

(i)     Enforcing obligations hereunder and under the Declaration and the General Rules and Regulations of any Unit Owner and the Tower Board, including, without limitation, commencing, prosecuting and settling litigation in connection therewith.

(j)     Maintaining bank accounts on behalf of the Condominium and designating the signatories required therefor.

(k)     Adjusting and settling insurance claims (and executing and delivering releases in connection therewith) if the loss is to be adjusted and settled by the Condominium Board in accordance with Article 11 hereof.

(l)     Subject to the provisions of Section 2.2.9 below, borrowing money on behalf of the Condominium.

(m)     Organizing (and owning shares of or membership interests in, as the case may be) corporations, limited liability companies and/or other entities to act as designees of the Condominium Board with respect to such matters as the Condominium Board may determine, including, without limitation, in connection with the acquisition of title to, or the leasing of, any Unit acquired by the Condominium Board on behalf of all Unit Owners.

(n)     Subject to the provisions of Section 2.2.7 below, execution, acknowledgment and delivery of, without limitation: (i) any consent, agreement, document, covenant, restriction, easement, declaration or other instrument, or any amendment thereto, affecting the overall Property or Condominium, or the General Common Elements or the Residential Tower Limited Common Elements which the Condominium Board deems necessary or appropriate to comply with any applicable Laws applicable to the maintenance, demolition, construction, Alteration, Repair or restoration of the Property or the Condominium; or (ii) any consent, agreement, document, covenant, restriction, easement, declaration or other instrument, or any amendment thereto, affecting: (x) the Property or the Condominium which the Condominium Board deems necessary or appropriate (provided that if any such consent, agreement, document, covenant, restriction, easement, declaration or other instrument, or any amendment thereto materially, adversely and disproportionately affects a particular Unit Owner, the same shall require such Unit Owner's consent); or (y) a Unit, if the owner of such Unit (or the Tower Board on behalf of a Tower Unit Owner), requests, or under the Condominium Documents is required to request, that the Condominium Board take such action, and/or (except as otherwise provided in the Condominium Documents) the Condominium Board determines that taking such action is appropriate.

(o)     Execution, acknowledgment and delivery of any documents or other instruments necessary to commence, pursue, compromise or settle certiorari proceedings to obtain reduced real estate tax assessments, or in connection with any real estate tax

- 4 -

exemption or abatement, with respect to any or all of the Units, for the benefit and on behalf of the respective Unit Owners thereof, but only to the extent requested and authorized to do so, in writing, by the respective Unit Owners thereof and provided such Unit Owners indemnify the Condominium Board and all other Unit Owners from and against all Costs resulting from or incurred in connection with such proceedings.

(p)     Preparation, execution and recording, on behalf of all Unit Owners, as their attorney-in-fact, coupled with an interest, of a restatement of the Declaration and/or these Condominium By-Laws whenever, in the Condominium Board's estimation, it is advisable to consolidate and restate all amendments, modifications, additions and deletions theretofore made to the Declaration and/or these Condominium By-Laws; provided, however, that such power of attorney shall be subject to Section 16.2 of the Declaration and shall only be effective to consummate a consolidation and restatement with no modifications, supplements and/or revisions to the Declaration and/or these Condominium By-Laws or otherwise to effect amendments or modifications otherwise expressly permitted by the Declaration and/or these Condominium By-Laws; upon request by the Tower Board, preparation, execution and recording, on behalf of the Tower Board and at the Tower Board's expense, as the Tower Board's attorney-in-fact, coupled with an interest, a restatement of the Tower Section By-Laws, as applicable, whenever, in the Tower Board's estimation, it is advisable to consolidate and restate all amendments, modifications, additions and deletions theretofore made to the Tower Section By-Laws.

(q)     Commencing, prosecuting and settling litigation and arbitration proceedings against third parties, and defending and settling litigation and arbitration proceedings against the Condominium and/or the Condominium Board.

(r)     Obtaining and reviewing insurance in respect of the General Common Elements and Residential Tower Limited Common Elements in accordance with the requirements of Article 11 hereof.

(s)     Making all determinations with respect to matters affecting multiple Units (except in the case of those matter and Limited Common Elements delegated to the control of particular Unit Owners or the Tower Board pursuant to the terms of the Condominium Documents).

(t)     To the extent required to effectuate the rights granted to a Development Rights Owner or an Inclusionary Rights Owner, entering into, in its capacity as the Condominium Board, the following documents: a Zoning Lot Declaration merging the Property with other property to form a merged zoning lot and/or any declaration or other instruments necessary to acquire, purchase, allocate, sell or dispose of any Development Rights or Inclusionary Rights by the Development Rights Owner or Inclusionary Rights Owner; provided that copies of all such executed documents are provided to CS Unit Owner.

(u)     Acting on behalf of the Condominium as a director or member of the Association, and appointing a designee to act as the Condominium's member of the Association board of directors or managers.

(v)    Acting as "FAS Parcel D Owner" under the ERY FAPOA Declaration.

(w)    Leasing of portions of the Common Elements as provided in Section 7.6 of the Declaration.

(x)    Providing utility services to the Plaza Owner for use at the Plaza Parcel and to the Pavilion Owner for use at the Pavilion Parcel, as more particularly described herein, entering into separate agreements for such provision, and collecting the associated costs for any and all electricity and/or gas usage measured by sub-meters and paid by the Plaza Owner or the Pavilion Owner, as applicable.

(y)    Providing, upon request of a Unit Owner or Board, an estoppel letter in accordance with and as set forth in Section 18.9 of these Condominium By-Laws.

2.2.3    <u>Major Decisions</u>.  Notwithstanding any other provision in the Condominium Documents, the following items shall constitute "<u>Major Decisions</u>" and shall require in each instance, as part of any affirmative vote otherwise required hereunder, the affirmative vote of the Board Member designated by the CS Unit Owner or by the Declarant Net Lessee of the CS Unit, as applicable.

(a)    Any changes to the Expense Allocation Schedule that affect the CS Unit, the CS LL Unit or the CS MS Unit, including, without limitation, imposition on the CS Group of any new or additional General Common Expenses and/or General Common Charges.

(b)    Imposition of Common Charges and/or Special Assessments in a discriminatory manner so as to materially adversely (and without justification) affect one General Common Charge Obligor and not the others.

(c)    The imposition of Property-wide security measures for open portions of the Property, including those that impact the CS Unit Plaza Area and the allocation of costs thereof to the respective Unit Owners.

(d)    Alterations to General Common Elements and/or Limited Common Elements which materially adversely affect the CS Group.

(e)    Any casualty insurance policies obtained by the Condominium Board insuring the General Common Elements and/or Limited Common Elements (including the levels of deductibles applicable thereto) not otherwise required by the Declaration, these Condominium By-Laws or the Tower Section By-Laws.

(f)    Any amendment, modification and/or supplement of Section 8.15 of the Declaration.

(g)    Amendments to the Condominium Documents to the extent the CS Unit Owner's consent is required pursuant to Article 16 hereof.

(h)     As may be required pursuant to Section 2.2.9 of these Condominium By-Laws.

(i)     Adoption of, and any supplement, modification and/or amendment to the General Rules and Regulations (and/or Tower Section Rules and Regulations) to the extent the same purport to adversely impact the use of the CS Group in any manner other than to a de minimis extent.

(j)     Any other provision of these Condominium By-Laws and/or the Declaration which require the affirmative vote of the CS Unit Owner.

(k)     Amendments to this definition of "Major Decisions".

In addition, the Condominium Board shall not adopt or apply any policy or General Rule or Regulation in a discriminatory manner so as to thereby materially adversely (and without justification) affect one General Common Charge Obligor and not the others.

2.2.4     Discretionary Approval Rights.  Approval rights with respect to Discretionary Approval Items shall be (in whole or in part) retained by Developer (or an Affiliate of Developer) except as (i) otherwise agreed by Developer and the CS Unit Owner, or (ii) as otherwise provided in the Condominium Documents.

2.2.5     Tower Board.  The Tower Section and Residential Limited Common Elements will be governed by the Tower Section By-Laws subject to the Declaration and the applicable provisions of these Condominium By-Laws; and subject to, and in accordance with, the provisions of Sections 2.2.1, 2.2.2 and 2.2.3 hereof (and without limiting the generality thereof), the Tower Board shall be entitled to make determinations with respect to matters relating exclusively to the Tower Section and to the operation, care, upkeep, maintenance and administration of the affairs thereof, including, without limitation, the making of Repairs of, and performance of Alterations to, the Tower Limited Common Elements, and shall have the powers and duties described in the Tower Section By-Laws, subject, however, to the rights of the Tower Unit Owners as may be provided in the Tower Section By-Laws and to those provisions in the Declaration and these Condominium By-Laws that provide otherwise and/or that set forth restrictions on the right to make such determinations.  In addition, except as may otherwise be provided in (and subject to) the Condominium Documents, each of the Tower Unit Owners shall have such powers as are permitted by applicable Laws, and shall be entitled to make determinations, with respect to all matters relating exclusively to their respective Tower Units. Neither the CS Unit Owner, the CS LL Unit Owner, nor the CS MS Unit Owner shall have any representation on or review or control over the Tower Board.

2.2.5.1  The Tower Board shall have the right in the name of the Condominium Board to assess the Base Unit for the Base Unit's Residential Common Interest of the cost of the operating, care, upkeep, maintenance and administration of the Residential Limited Common Elements, including, without limitation, the making of Repairs and Alterations thereto.  The amount so assessed to the Base Unit shall be included for purposes of calculating the Base Unit Operating Shortfall and shall be subject to the limitations set forth in Article 31 of the Declaration.

2.2.6    Agents for the Condominium Board and Tower Board.  (a)  Any action required or permitted to be taken by the Condominium Board pursuant to the provisions of the Declaration and/or these Condominium By-Laws shall be done or performed by the Condominium Board or on behalf of the Condominium Board and at its direction by the agents, officers, employees or designees of the Condominium Board, and the Condominium Board may employ one or more managing agents and/or managers, at a reasonable compensation, in accordance with market rates, established by the Condominium Board, to perform such duties and services as the Condominium Board shall authorize, except (unless in specific instances provided in the Declaration and/or these Condominium By-Laws or as otherwise authorized by a Unanimous vote of the Condominium Board) in connection with the actions set forth in subparagraphs 2.2.2(a), (b), (d), (e), (h), (i), (j), (k), (o), (p) and (q) hereof.

(b)    Any action required or permitted to be taken by the Tower Board pursuant to the provisions of these Condominium By-Laws, the Declaration or the Tower Section By-Laws, shall be done or performed by the Tower Board or on behalf of the Tower Board and at its direction by the agents, officers, employees or designees of the Tower Board, and the Tower Board may employ one or more managing agents and/or managers, at a compensation established by the Tower Board, to perform such duties and services as the Tower Board shall authorize in accordance with the Tower Section By-Laws.  Any costs associated with the employment of such managing agents shall be borne exclusively by the Tower Unit Owners.

(c)    Any managing agent designated and/or employed by the Condominium Board, the Tower Board or any Unit Owner, may be an affiliate of any of the Tower Sponsor or the Base Unit Owner.  The terms of employment of any such managing agent shall be commercially reasonable at the time entered into.

2.2.7    Certain Actions by Tower Board. Any action required or permitted to be taken pursuant to the provisions of the Condominium Documents by the Tower Board, shall, if required by applicable Laws, be taken by the Tower Board, in the name of the Condominium Board which shall, upon request (at the sole expense of the Tower Board), execute, acknowledge and deliver any and all instruments, documents or applications in connection therewith; provided, however, that: (i) no such action shall be taken in the name of the Condominium Board except upon at least fifteen (15) Business Days' advance notice delivered to the Condominium Board (unless such action is required in connection with an Emergency, in which event only such prior notice as is practicable under the circumstances (which may be, but shall not be presumed to be, none) shall apply and if no prior notice is given, notice shall be given promptly thereafter), which notice shall specify the action proposed to be taken, the grounds upon which the Tower Board is entitled to take such action, and shall include complete and accurate copies of all documents proposed to be executed or filed in connection with the exercise of the rights provided in this Section; and (ii) the Tower Board shall, subject to the provisions of Section 2.11, indemnify and hold harmless the Unit Owners and the Condominium Board from and against all Costs resulting therefrom or incurred in connection therewith.

2.2.8    Additional Limitations; Tower Board as Agent.  Except as otherwise expressly set forth in the Declaration or these Condominium By-Laws, no Unit Owner, acting alone, shall have any authority to act for, or to create, undertake or assume any liabilities,

obligations or responsibilities on behalf of any other Unit Owner.  Notwithstanding the immediately preceding sentence, the Unit Owners agree that the Tower Board, as agent for the Condominium Board and the Base Unit Owner, shall have the exclusive control, and decision-making authority, over and with respect to operation, management, insurance, maintenance, Alteration and Repair of the Residential Limited Common Elements.  The Tower Board, in exercise of such authority, will assess Residential Common Charges (as such term is defined hereinafter) to the Tower Section and/or the Tower Unit Owners and to the Base Unit Owner on behalf of and in the name of the Condominium Board, and shall be entitled to include in such Residential Common Charges a reasonable compensation for its administration of such responsibilities, and the same will be payable by the Base Unit Owner and Tower Unit Owners in the same manner and subject to the same requirements as General Common Charges.

2.2.9    Borrowing by the Condominium Board.

(a)    The Condominium Board shall have the power to borrow money on behalf of the Condominium when required in connection with the operation, care, upkeep and maintenance of, or the making of Repairs or Alterations of, the General Common Elements or otherwise in connection with any permitted action or activity of the Condominium Board, provided, however, that any borrowing in excess of $5,000,000 (as such amount is increased from time to time by the CPI Increase Factor) shall require the affirmative vote of the Board Member designated by the CS Unit Owner; provided that neither the CS Unit Owner, the CS LL Unit Owner, nor the CS LL Unit Owner shall have any liability for debt service on any borrowing in excess of $1,000,000 (as such amount is increased from time to time by the CPI Increase Factor) unless such borrowing has been approved by the CS Unit Owner not to be unreasonably withheld, conditioned or delayed; and (ii) no lien to secure repayment of any sum borrowed may be created on the General Common Elements unless permitted by applicable Laws and approved by the affirmative vote of the Board Member designated by the CS Unit Owner.  The powers and rights of the Tower Board to borrow money (including, without limitation, for the purchase of a Unit to be occupied by a resident manager) pursuant to the provisions of the Tower Section By-Laws is not limited or impaired by the foregoing provided that any debt service and/or repayment of money borrowed by the Tower Board shall be borne exclusively by the Tower Unit and/or Tower Unit Owners and/or Base Unit Owner.

(b)    All such borrowing by the Condominium Board shall be by and in the name of the Condominium, and shall expressly provide that no individual Unit Owner (or shareholder, member, director or officer thereof) or Board Member shall be liable (primarily or otherwise) therefor in any respect (including, without limitation, for any fees, expenses, or other liabilities or obligations accruing or to be performed thereunder) unless specifically agreed to in writing by such Unit Owner or Board Member.

2.2.10    Insurance Requirements.  Subject to Section 2.2.3(e), the Condominium Board shall make all determinations and take all actions necessary to cause the insurance requirements set forth in Article 11 hereof with respect to the Condominium and Condominium Board to be complied with.

2.2.11   Miscellaneous.

(a)   Any act with respect to a matter determinable by the Condominium Board and deemed necessary or desirable by the Condominium Board, shall be done or performed by the Condominium Board or shall be done on its behalf and at its direction by the agents, employees or designees of the Condominium Board.

(b)   Any dispute under Section 2.2 of the Condominium By-Laws as to the authority of the Condominium Board to take an action without the consent of one or more of the Unit Owners shall be resolved by Arbitration in accordance with the provisions of Article 14 of these Condominium By-Laws.

(c)   To the extent that the Condominium has the right, under the ERY FAPOA Declaration, to call a special meeting of the Association, the Condominium Board, either on its own initiative or at the request of the Tower Board, the Base Unit Owner or the CS Unit Owner, shall request that the Association call such special meeting.

(d)   There will be *de minimis* administrative expenses incurred by the Condominium Board in connection with the operation of the Condominium (e.g., yearly accounting and management fees), which will be billed to the Unit Owners as a General Common Expense.

2.2.12   Declarant Net Lessees.   The rights and obligations of Declarant as a Unit Owner under this Article 2 shall be deemed to have been assigned to its Declarant Net Lessee, and such assignment shall be binding upon and recognized by the Condominium Board and the Unit Owners and the Declarant Net Lessee shall be fully responsible to comply with the obligations of the Unit Owner. Such assignment shall no longer be effective following notice by Declarant Net Lessor to the Condominium Board that an Event of Default has occurred under a Declarant Net Lease, until further notice from the Declarant Net Lessor to the Condominium Board that such assignment has been reinstated. A copy of each such assignment shall be delivered by the applicable Declarant Net Lessee to the Condominium Board.

2.3   Terms of Office of Board Members.

2.3.1   Each Condominium Board Member shall vote the entire undivided Common Interest of such Board Member's Designator and all votes shall be determined by the applicable Common Interest. Except as otherwise provided in the Condominium Documents, all designations (and substitute and further designations) which are provided for in the Declaration or these Condominium By-Laws shall be in writing and shall include an address specified for notice to such designated Board Member. Subject in all events to the provisions of Section 2.4 below, and, as applicable, the provisions of the Tower Section By-Laws with respect to Condominium Board Members designated by the Tower Board, the term of each Board Member designated from time to time shall expire annually on the anniversary of such Board Member's designation; and, subject to the other provisions of this Section 2.3, the replacement for each such Board Member, which may be the same person, shall be made by such Board Member's Designator. There shall be no limit on the number of terms of office, successive or otherwise, that a Board Member may serve. Notwithstanding the expiration of the term of office of a

member of the Condominium Board, such member shall serve until a successor has been elected and qualified.

2.3.2      If more than one (1) Person owns a Unit entitled to designate a Board Member hereunder, then such Persons shall jointly designate the Board Member hereinabove provided to be designated by the owner of such Unit. Failing any such joint designation, the concurrence of such Persons shall be conclusively presumed if any one of them purports to make such designation, unless and until a protest of such designation is made by any other such Persons to the Condominium Board. From and after the day such protest is made until the dispute with respect thereto is resolved (which dispute shall be resolved in Arbitration), no such Board Member shall be deemed to have been appointed by the Designator in question; provided, however, that (i) for the limited purpose of determining whether a quorum exists at any meeting of the Condominium Board, such Board Member shall be deemed to have been appointed and Present In Person at any meeting of the Condominium Board and (ii) such protest shall not nullify any vote or action taken by such Board Member prior to such protest being made.

2.4     Resignation and Removal.

2.4.1      Any Board Member may resign at any time by notice given to the President or Secretary of the Condominium Board and to such Board Member's Designator. Any such resignation shall take effect at the time specified in such notice and, unless specifically requested, acceptance of such resignation shall not be necessary for the effectiveness thereof.

2.4.2      Any Board Member may be removed from office: (i) for cause, either (x) by the Designator of such Board Member or (y) notwithstanding any protest of such Designator, by a 66 2/3% vote of the Condominium Board; and (ii) without cause, only by the Designator of such Board Member. In the event of any removal described in the immediately preceding sentence, whether with or without cause, the Designator of such Board Member shall have the sole right to designate the replacement of such member.

2.4.3      Any Board Member whose removal for cause has been proposed shall (and its Designator shall) be given an opportunity to be heard at the meeting of the Condominium Board at which such removal is to be considered; except that no opportunity to be heard shall be required if the removal is proposed or caused by such Board Member's Designator.

2.5     Vacancies on Condominium Board.  The vacancy of a Board Member's seat on the Condominium Board shall be filled only by designation of the Designator of such member.

2.6     Initial Meeting of Condominium Board; Regular and Special Meetings.

2.6.1      Within ten (10) days following the initial recording of the Original Declaration in the City Register's Office, each Designator designated its Board Member(s) by notice given to each other Designator and the first meeting of the Condominium Board took place. Promptly after the recording of the amended and restated Declaration in the City Register's Office, the Tower Board and the Base Unit Owner shall each designate its Board Member(s) by notice given to the Condominium Board and each Unit Owner, and such Board

Members, when so designated, shall replace the Board Members designated by the Initial Residential Unit Owner.

2.6.2    Following the first meeting of the Condominium Board, regular meetings of the Condominium Board may be held at such time and place in the Borough of Manhattan as shall be determined by the Condominium Board from time to time but at least quarterly. Notice of regular meetings shall be given to each Board Member by the President, Vice President or Secretary of the Condominium Board or by the Condominium's managing agent, at least thirty (30) days prior to the day fixed for such meeting which notice shall state the date, time and place (in the Borough of Manhattan) and shall include an agenda therefor.

2.6.3    Special meetings of the Condominium Board may be called (x) by the President or Vice President of the Condominium or (y) by any two (2) Board Members in Good Standing and having different Designators or (z) by the CS Unit Owner, in each case by giving at least ten (10) Business Days' prior notice to each Board Member, which notice shall state the date, time, place (in the Borough of Manhattan) and purpose (including the agenda) for the meeting. In addition, the President of the Condominium Board shall, by written notice given in accordance with Section 2.6.2 above, call a meeting of the Condominium Board upon the written request of any five (5) Board Members.

2.7    <u>Principal Offices of Condominium Board</u>. The principal office of the Condominium Board shall be located either within the Property or at such other place in the Borough of Manhattan as may be designated from time to time by the Condominium Board.

2.8    <u>Waiver of Notice</u>. Any Board Member (or his or her respective proxy) may at any time waive notice of any Condominium Board meeting in writing and such waiver shall be deemed equivalent to the giving of such notice. Attendance by a Board Member (or his or her respective proxy) at any meeting thereof shall constitute a waiver by such member of notice of the time and place thereof. If all the Board Members (or their proxies) are present at any meeting of the Condominium Board, no notice shall be required and any business may be transacted at such meeting.

2.9    <u>Determinations by Condominium Board; Quorum</u>.

2.9.1    Except as otherwise set forth in Section 2.9.3, all determinations of the Condominium Board shall be made at a meeting of the Condominium Board at which a quorum thereof is Present In Person. Only Board Members in Good Standing shall have the right to vote at meetings of the Condominium Board and only such Board Members shall count for purposes of determining whether a quorum is present. Subject to the preceding sentence, the Presence in Person, at any meeting of the Condominium Board, of Board Members sufficient to cast a Majority Member Vote shall constitute a quorum. Except as may otherwise be required by any applicable Laws, these Condominium By-Laws and/or the Declaration, a Majority Member Vote shall constitute the decision of the Condominium Board.

2.9.2    If at any Condominium Board meeting a quorum (as defined in Section 2.9.1 hereof) does not exist, a majority of those present may adjourn the meeting from time to time to a time, in each case specified on at least ten (10) Business Days' notice to the

Board Members not Present in Person, until a quorum shall exist. At any such adjourned meeting at which a quorum (determined as aforesaid) exists, any business which might have been transacted at the meeting originally called may be transacted without further notice.

2.9.3    A Board Member or Members shall be deemed "Present in Person" at a meeting of the Condominium Board if such Board Member(s) or its/their proxy (as described in this Section 2.9) is/are: (i) physically present; or (ii) participating by means of a conference telephone call or similar communications equipment by means of which all persons participating in such meeting can hear one another's voice. Notwithstanding anything to the contrary contained herein, any action permitted or required to be taken at a meeting of the Condominium Board, may be taken without a meeting if all Board Members consent thereto in writing.

2.9.4    In the event the Condominium Board or its designee shall own any Unit which the Owner of which on its own is otherwise entitled to designate a Condominium Board Member, then the Condominium Board shall not designate a Board Member to vote on behalf of (or otherwise in connection with) such Unit.

2.9.5    Board Members shall be entitled to vote by proxy at any meeting of the Condominium Board, and all references herein and in the Declaration and/or these Condominium By-Laws to votes by Board Members shall be deemed to be references to votes by Board Members or their properly designated proxies. The designation of any such proxy shall be made in a signed and dated writing to the Secretary of the Condominium and shall be revocable at any time as provided at law or by notice actually delivered to such Secretary by the Unit Owner or Board which had made the designation; provided, however, that no designation to act as a proxy shall be effective for a period in excess of twelve (12) months (except that the designation of a Board Member by a Registered Mortgagee pursuant to clause (i) of the first sentence of Section 13.4(f) hereof shall be effective until the Secretary of the Condominium shall have received written notice from such Registered Mortgagee of the first of the following events to occur: (i) the revocation of such designation by such Registered Mortgagee; (ii) the satisfaction or assignment of record of such mortgage; and (iii) the release of the encumbered Unit from the lien of such mortgage).

2.10    Compensation. No Board Member shall receive any compensation from the Condominium or the Condominium Board for acting in the capacity of a Condominium Board Member.

2.11    Liability of Condominium Board and Unit Owners.

2.11.1    (a) To the extent permitted by applicable Laws, no Board Member shall have any personal liability with respect to any contract, act or omission of the Condominium, the Condominium Board or its members, or of any managing agent or manager, building engineer, superintendent or employee in connection with the affairs or operation of the Condominium (except to the extent arising from such Board Member's own bad faith, gross negligence or willful misconduct).

(b)    Every contract made by the Condominium Board or by any managing agent or manager thereof shall state that it is made by the Condominium Board or the

- 13 -

managing agent or manager only as agent for the Condominium, and that the Board Members or managing agent or manager shall have no personal liability thereon and may also state the applicable limitations of liability of Unit Owners provided for in Section 2.11.2 below; and the absence of such statement or statements in any such contract shall not be deemed to imply any personal liability on the part of the Condominium Board, its members, managing agent or manager, or any Unit Owner.

(c)     The Condominium shall indemnify each Board Member against all Costs arising out of such Board Member's serving in such capacity except those matters arising out of such Board Member's own bad faith, gross negligence or willful misconduct.

(d)     The Condominium Board may contract or effect any other transaction with any Board Member, any member of the Tower Board, any Unit Owner or Declarant Net Lessee, Declarant, Tower Sponsor and/or Affiliates of any of the foregoing without incurring any liability for self-dealing or otherwise (except in the case of bad faith, gross negligence or willful misconduct which shall not be deemed presumed or established by the relationship between or among any such parties), but all such contracts or transactions shall be made only in accordance with the provisions of Section 2.16 hereof.

2.11.2     No Unit Owner, in its capacity as a Unit Owner, shall be personally liable for any contract, act or omission of the Condominium.  Nothing in the preceding sentence shall limit a Unit Owner's liability for the payment of Common Charges or Special Assessments, as set forth in Article 6 hereof.

2.12     Committees.  The Condominium Board may, subject to such limitations and exceptions as the Condominium Board may prescribe, appoint such committees as the Condominium Board may deem appropriate, each to consist of two or more members of the Condominium Board.  Each such committee, to the extent provided in the resolution which creates it, shall have and may exercise all the powers designated to it by the Condominium Board during the intervals between Condominium Board meetings insofar as may be permitted by applicable Laws.

2.13     Status of Boards.  In addition to the status conferred upon each of the Boards under or pursuant to the provisions of the New York Condominium Act, each independently shall, to the extent permitted by applicable Laws, be deemed to constitute a separate unincorporated association for all purposes under and pursuant to the provisions of the General Associations Law of the State of New York, as the same may be amended from time to time.  In the event of the incorporation or organization of any such Board pursuant to the applicable provisions of Section 2.14, the provisions of this Section 2.13 shall no longer be applicable to such Board.

2.14     Incorporation and Organization of Boards.  To the extent and in the manner provided in the New York Condominium Act (or as may otherwise be permitted by applicable Laws), each of the Condominium Board and the Tower Board may, by action of such Board as provided in Article 2 of the Condominium By-Laws and the Tower Section By-Laws, respectively, be organized as a limited liability company or incorporated under the applicable statutes of the State of New York.  In the event that any such Board so organizes or incorporates,

- 14 -

it shall have, to the extent permitted by applicable Laws, the status conferred upon it under such statutes in addition to the status conferred upon it under or pursuant to the provisions of the New York Condominium Act. The certificate of incorporation and by-laws of any such resulting corporation or the articles of organization and operating agreement of such resulting limited liability company, as the case may be, shall conform as closely as practicable to the provisions of the Declaration and the applicable set of By-Laws (*i.e.*, for such purpose, the Condominium By-Laws with respect to the Condominium Board and the Tower Section By-Laws with respect to the Tower Board) and the provisions of the Declaration and the applicable set of By-Laws shall control in the event of any inconsistency or conflict between the provisions thereof and the provisions of such certificate of incorporation and by-laws or articles of organization and operating agreement, as applicable, and any such certificate, by-laws, articles and agreement shall in all events be subject and subordinate in all respects to the Declaration, the Condominium By-Laws and, with respect to the Tower Board, the Tower Section By-Laws.

    2.15   <u>Condominium Board as Agent of Unit Owners</u>. In exercising its powers and performing its duties under the Declaration and these Condominium By-Laws (and, to the extent applicable, the Tower Section By-Laws), the Condominium Board shall act as, and shall be, the agent of each Unit Owner and the Tower Board (with the Tower Board itself being the agent of the Tower Unit Owners and to the extent provided in these Condominium By-Laws, the Base Unit Owner), subject to and in accordance with the provisions of the Declaration and these Condominium By-Laws (and, to the extent applicable, the Tower Section By-Laws).

    2.16   <u>Standard of Care; Affiliate/Prohibited Transactions</u>.

    2.16.1   The Condominium Board shall have no fiduciary duty to the Unit Owners, but each Condominium Board Member shall perform his or her duties, and shall exercise his or her powers, in good faith and with a view to the interests of the Condominium. To the extent permitted by applicable Laws, no contract or other transaction between the Condominium Board and either: (i) any of its members; or (ii) any corporation, partnership, fiduciary, firm, limited liability company, association or other entity in which any of the members of the Condominium Board are officers, directors, shareholders, employees, partners, fiduciaries, beneficiaries, members or principals, or are otherwise interested, pecuniarily or otherwise, shall be deemed either void or voidable because either: (a) any such Condominium Board Member was present at the meeting or meetings of the Condominium Board during which such contract or transaction was discussed, authorized, approved or ratified, or (b) the vote of any such Board Member was counted for such purpose; provided, however, that either: (1) the fact thereof is disclosed to, or known by, the Condominium Board or a majority of the members thereof and noted in the minutes thereof, and the Condominium Board shall authorize, approve or ratify such contract or transaction in good faith by a vote of a majority of the entire Condominium Board, less the number of such members involved in such contract or transaction; or (2) the fact thereof is disclosed to, or known by, a majority of Unit Owners and a majority of Unit Owners, present at a duly constituted meeting, shall in good faith authorize, approve or ratify such contract or transaction less the number of such Unit Owners who are also such members involved in such contract or transaction; and (3) the compensation, price or fee and terms which would be chargeable therefor in a bona fide, arm's length transaction by or with an unaffiliated Person rendering comparable services or receiving comparable benefits under comparable circumstances. Any such members of the Condominium Board may be counted in

determining the presence of a quorum of any meeting of the Condominium Board or of the Unit Owners which authorizes, approves or ratifies any such contract or transaction, but no such member shall be entitled to vote thereat in order to authorize, approve or ratify such contract or transaction. Notwithstanding the foregoing, the Condominium Board shall be authorized to employ an affiliate of The Related Companies, L.P. as managing agent for the Condominium pursuant to Section 2.2.6 of the Condominium By-Laws initially, and then, subject to reasonable market rate increases, for subsequent renewal terms. Any contract entered into by the Condominium Board or its manager or managing agent in violation of this Section 2.16 shall be deemed void and of no force and effect.

       2.16.2    Notwithstanding the foregoing, the Unit Owners hereby acknowledge that the Condominium Board shall, and is authorized to, enter into and/or assume and from time to time, and renew, modify, amend, restate or supplement a management agreement (in the form agreed prior to the recording of the Declaration) with Related and/or Oxford, which are Affiliates of one or more of the Unit Owners, or another such Affiliate of Related and/or Oxford, to serve as the managing agent of the Condominium. Additionally, the Condominium Board or its manager or managing agent shall be authorized to enter into and/or assume, and renew, modify, amend, restate or supplement (a) one or more agreements with Affiliates of Related and/or Oxford for the provision of utilities and related utilities services, for use of and access to utility systems and for certain technology and thermal equipment and systems (including, without limitation, as provided in Section 6.4 hereof), and for other purposes provided for in the Condominium Documents and the Underlying Agreements, at commercially reasonable rates; (b) one or more agreements with respect to PEBL; and (c) lease(s) or license(s) pursuant to Section 7.6 of the Declaration. Further, following the recording of the Original Declaration, the Condominium Board entered into and is authorized to modify or amend an agreement with an Affiliate of Tower Sponsor (as the same may be amended, restated, replaced, supplemented and otherwise modified from time to time, the "Electric Service Supply Agreement") to (i) procure, arrange, maintain, repair the electricity supply and related utility services for all or a portion of the Building, and (ii) authorize Electric Service Supplier the powers to serve and act as agent for the Condominium Board in connection therewith, including, but not limited to, the power to read submeters, bill and collect payments from the Unit Owners directly for services described in Section 6.4.1(a) below, enforce collection against a defaulting Unit Owner for services described in Section 6.4.1(a) below, exercise all remedies under the Electric Service Supply Agreement, to pay, settle or compromise bills and claims with respect to the Unit Owners in connection with services described in Section 6.4.1(a) below, and to prosecute and defend all actions or proceedings in connection with any or all claims or obligations for services described in Section 6.4.1(a) below; provided, that if such entity is an Affiliate of Tower Sponsor the rates and other charges for such electric supply and related utility services shall be no greater than the rates and other charges that would have been payable to Con Ed if the Unit Owners and any lessee thereof, were purchasing direct meter service for the Building from such provider directly. Further also, following the recording of the Original Declaration, the Condominium Board entered into and is authorized to amend an agreement with an Affiliate of Tower Sponsor (as the same may be amended, restated, replaced, supplemented and otherwise modified from time to time, the "Thermal Energy Supply Agreement") to procure, arrange, maintain and repair the thermal energy supply (including heating and heated water) for all or a portion of the Building.

- 16 -

## ARTICLE 3

## UNIT OWNERS

3.1     Annual Meetings.  No annual meeting of all Unit Owners (a "Unit Owners Meeting") shall be required to be held unless required, in each case, by applicable Laws, in which event any such meeting so required to be held shall be held on the date specified by the Condominium Board.

3.2     Place of Meetings.  All Unit Owners Meetings required or permitted to be held, if any, shall be held at the principal office of the Condominium or at such other place in the Borough of Manhattan as may be designated from time to time by the Condominium Board.

3.3     Special Meetings.  The President or the Vice President of the Condominium shall call a special Unit Owners Meeting if so directed by resolution of the Condominium Board or upon a petition signed and presented to the Secretary of the Condominium by (i) the Base Unit Owner, (ii) the CS Unit Owner or (iii) Unit Owners owning Units representing not less than 50% of the aggregate Common Interest of all of the Units (but which, in all events, must include the CS Unit Owners).  Each such resolution or petition shall state, in reasonable detail, the purposes for calling such Unit Owners Meeting.

3.4     Notice of Meetings and Actions Taken.  Notice of annual or special Unit Owners Meetings (in each case, if any) shall be given by the Secretary of the Condominium to all Unit Owners of record and each Declarant Net Lessee at their address at the Condominium (or at such other address as any Unit Owner or Declarant Net Lessee has designated by notice given to the Secretary of the Condominium at least forty-five (45) days prior to the giving of notice of the applicable meeting).  Each such notice shall state the purpose(s) of the meeting and the date, time and place (in the Borough of Manhattan) where it is to be held, and no business shall be transacted at such meeting except as stated in the notice.  All notices hereunder shall be given at least ten (10) Business Days prior to the date fixed for the meeting.  However, if the business to be conducted at any Unit Owners Meeting shall include consideration of a proposed amendment to the Declaration or to these Condominium By-Laws which requires a vote of the Unit Owners at such a meeting, the notice of such meeting shall be given to all Unit Owners, Registered Mortgagees and Tower Mortgagee Representatives at least thirty (30) days prior to the date fixed for such meeting and such notice shall be accompanied by a copy of the text of such proposed amendment.  The Condominium Board shall have the exclusive right to vote on the matters and take the actions delegated to it by the Condominium Documents.

3.5     Quorum.

3.5.1     Except as otherwise provided in these Condominium By-Laws, the presence in person or by proxy of Unit Owners representing more than 50% (in Common Interest) of all Unit Owners shall constitute a quorum at all Unit Owners Meetings; provided that the Base Unit Owner shall have the absolute right (except in the case of an Emergency) to require an adjournment of any such Unit Owners Meeting (notwithstanding the presence of a quorum) for a period not longer than thirty (30) days.

- 17 -

3.5.2    Subject to Section 3.5.1, if at any Unit Owners Meeting a quorum does not exist, the Unit Owners who are present at such meeting, either in person or by proxy, may act by Majority Unit Owner Vote to adjourn the meeting and reconvene at a time (specified on at least ten (10) Business Days' notice to the absent Unit Owners). At any such adjourned and reconvened Unit Owners Meeting at which a quorum (determined as aforesaid) exists, any business which might have been transacted at the meeting originally called may be transacted without further notice.

3.6    <u>Order of Business</u>.  The order of business at all annual Unit Owners Meetings, if any, shall be as follows:

(a)    Call to order.

(b)    Proof of notice of meeting.

(c)    Reading of minutes of preceding meeting, if any.

(d)    Reports of officers, if any.

(e)    Reports of Board Members.

(f)    Reports of committees, if any.

(g)    Election of inspectors of election (when so required).

(h)    Unfinished business.

(i)    New business.

3.7    <u>Voting at Unit Owners Meetings</u>.

3.7.1    Each Unit Owner or Declarant Net Lessee, if any, or a Person designated by each such Person to act as proxy on its behalf and who need not be a Unit Owner, shall be entitled to cast the votes appurtenant to such Unit Owner's Unit (determined on a Common Interest basis), as set forth herein and in the Declaration, at all Unit Owners Meetings, if any. The designation of any such proxy shall be made in a signed and dated writing to the Secretary of the Condominium and shall be revocable at any time by notice actually delivered to such Secretary by the Unit Owner or Declarant Net Lessee which had made the designation; <u>provided, however</u>, that no designation to act as a proxy shall be effective for a period in excess of twelve (12) months. If a Registered Mortgagee is entitled to vote at a Unit Owners Meeting pursuant to clause (ii) of the first sentence of Section 13.4(f) hereof (which vote may be by proxy), such Registered Mortgagee shall continue to so vote until the Secretary of the Condominium shall have received written notice from such Registered Mortgagee of the first of the following events to occur: (i) the revocation of such designation by such Registered Mortgagee; (ii) the satisfaction or assignment of record of such mortgage; and (iii) the release of the encumbered Unit from the lien of such mortgage. A fiduciary shall be the voting member with respect to any Unit owned in a fiduciary capacity. Except as otherwise provided herein or in the Declaration or

- 18 -

as otherwise required by applicable Laws, a majority of votes duly cast at any Unit Owner's Meeting at which a quorum is present or is not required shall be binding.

3.7.2    If two (2) or more Persons own a Unit, they shall designate one (1) Person amongst them to vote the Common Interest appurtenant to their Unit in a writing given to the Secretary of the Condominium, and the vote of such designee shall be binding upon such Persons. Failing such a designation, all of such Persons shall mutually vote such Common Interest under one ballot, without division, and the concurrence of such Persons shall be conclusively presumed if any one of them purports to vote such Common Interest without protest being made contemporaneously to the party presiding over the meeting at which such vote is taken. From and after the day such protest is made until the dispute with respect thereto is resolved (which dispute shall be resolved in Arbitration), the Common Interest of such Unit shall not be voted; provided, however, that (i) such Unit shall be counted solely for determining whether a quorum is present for such voting and (ii) such protest shall not nullify any vote made by any such Person on behalf of such jointly-owned Unit prior to such protest being made.

3.7.3    At Unit Owners Meetings, the Condominium Board (or its designee) shall not be entitled to vote the Common Interest appurtenant to any Unit owned by the Condominium Board (or such designee) on behalf of all Unit Owners, but shall count for purposes of determining a quorum.

3.7.4    Except as otherwise set forth herein or in the Declaration, at all Unit Owners Meetings, if any, each Unit Owner (or its proxy) entitled to vote thereat shall be entitled to cast one vote for each .0001% (rounded off to the nearest .0001%) of Common Interest attributable to its Unit or Units. If a matter requires the consent of a Unit Owner prior to its being approved by the Condominium Board, then such action, if and when raised at a Unit Owners Meeting, shall require the consent of such Unit Owner. Notwithstanding any provision of these Condominium By-Laws or the Condominium Documents to the contrary, however, a Unit Owner (or his or her or its proxy) shall be entitled and authorized to vote at any Unit Owners Meeting or any other annual, regular or special meeting of any or all Unit Owners if, and only if, such Unit Owner shall be a Unit Owner in Good Standing at the time of such annual, regular or special meeting.

3.7.5    If any Unit is owned by Declarant but subject to a Declarant Net Lease, the Declarant Net Lessee, and not Declarant or a Declarant Net Lessor, shall have the right to vote the Common Interest of such Unit to request a meeting under Section 3.3 hereof, to constitute a quorum under Section 3.5 hereof, and to vote such Common Interest at any meeting of Unit Owners. Following notice by Declarant or Declarant Net Lessor to the Condominium Board that an Event of Default has occurred under a Declarant Net Lease, the Declarant Net Lessee under such Declarant Net Lease may not thereafter exercise such rights, until further written notice is provided from Declarant or the Declarant Net Lessor to the Board of Managers that such voting rights and rights under Sections 3.4 and 3.5 hereof have been reinstated.

3.8    <u>Voting By Certain Unit Owners or Groups of Unit Owners</u>.  Whenever a particular percentage of Common Interest must be reached for voting purposes and such required percentage is described in terms of a specified group of Unit Owners (e.g., "50% in Common Interest of all Tower Unit Owners") as opposed to all Unit Owners as a whole, such required

percentage shall mean a percentage in terms of the total Common Interests attributable to all Unit Owners within such specified group and not the percentage of Common Interests attributable to all Unit Owners.

## ARTICLE 4

## OFFICERS

4.1    Designation.  (a) The principal officers of the Condominium shall be a President, a Vice President, a Secretary and a Treasurer thereof, all of whom shall be elected by the Condominium Board.  The Condominium Board may elect one or more Assistant Vice Presidents, Assistant Treasurers and Assistant Secretaries and such other officers as in its judgment may be desirable.  Nothing herein shall preclude any officer of the Tower Board from also being an officer of the Condominium or any officer of the Condominium from also being an officer of the Tower Board, if otherwise qualified under the terms of these Condominium By-Laws and the Tower Section By-Laws; and any Condominium Board Member may also be an officer of the Condominium.

(b)    An officer of the Condominium need not be a Unit Owner or have any interest therein or be a member of the Condominium Board.

4.2    Election of Officers.  The officers of the Condominium shall each be elected annually by a majority vote of the Condominium Board (including at the first meeting thereof) and at any other meeting as may be required to fill a vacancy, and shall serve at the pleasure of the Condominium Board, provided that the President of the Condominium shall be elected solely by the Board Members designated by the Tower Board.

4.3    Resignation and Removal of Officers.  Any officer may resign at any time by notice given to the Condominium Board; such resignation shall take effect at the time specified in such notice and, unless specifically requested by the resigning officer, acceptance of such resignation shall not be necessary to make such resignation effective.  Upon a majority vote at a regular meeting of the Condominium Board, or at a special meeting of the Condominium Board called for such purpose, at which a quorum is present, any officer may be removed, either with or without cause, and his or her successor shall be elected.

4.4    President.  The President of the Condominium shall be the chief executive officer of the Condominium and shall preside at all Unit Owners Meetings and at all meetings of the Condominium Board.  The President shall have all of the general powers and duties which are incident to the office of president of a stock corporation organized under the Business Corporation Law of the State of New York, including, but not limited to, the power to appoint (subject to the provisions of Section 2.12) committees from among the Board Members and/or Unit Owners, from time to time as such President, in his or her discretion, may decide are appropriate to assist in the conduct of the affairs of the Condominium.

4.5    Vice President.  The Vice President of the Condominium shall take the place of the President under whom he or she serves and shall perform the duties of the President whenever the President shall be absent or unable to act.  If both the President and the Vice

President of the Condominium are unable to act, the Condominium Board shall appoint some other Condominium Board Member to act in the place of such President and Vice President on an interim basis. The Vice President shall also perform such other duties as, from time to time, shall be imposed by the Condominium Board or by the President.

4.6 Secretary. The Secretary of the Condominium shall keep the minutes of all Unit Owners Meetings, if any, and of all meetings of the Condominium Board. The Secretary shall have charge of such books and papers as the Condominium Board shall direct and, in general, shall perform all of the duties incident to the office of secretary of a stock corporation organized under the Business Corporation Law of the State of New York.

4.7 Treasurer. The Treasurer shall have the care and custody of the funds and securities of the Condominium, and shall be responsible for keeping full and accurate financial records and books of account thereof showing all receipts and disbursements necessary for the preparation of all required financial data. The Treasurer shall be responsible for the deposit of all funds and other securities in the name of the Condominium Board (or in the name of the managing agent or manager appointed by the Condominium Board) in such depositories as may from time to time be designated by the Condominium Board and shall, in general, perform all of the duties incident to the office of treasurer of a stock corporation organized under the Business Corporation Law of the State of New York.

4.8 Execution of Documents. All agreements, contracts, deeds, leases, checks and other instruments of the Condominium shall be executed by the President or Vice-President, acting alone, or by any other two officers thereof or by such other Person or Persons as may be designated by the Condominium Board. In addition to the foregoing, the Condominium Board may authorize the managing agent serving on its behalf to execute checks, provided that the expenditures, and the managing agent's paying for same, have been approved in advance pursuant to the applicable management agreements or by resolution of the Condominium Board or have been authorized by two officers of the Condominium, and are otherwise permitted under the Condominium Documents.

4.9 Compensation of Officers. Except as otherwise determined by a unanimous vote of the Condominium Board, no officer of the Condominium shall receive any compensation for acting as such.

4.10 Liability of Officers. To the extent permitted by applicable Laws, no officer of the Condominium shall have any personal liability with respect to any contract, act or omission of the Condominium, the Condominium Board or its members or officers, or of any managing agent or manager, building engineer, superintendent or employee in connection with the affairs or operation of the Condominium (except to the extent arising from such officer's bad faith, gross negligence or willful misconduct) including, without limitation: (i) any failure or interruption of any utility or other services to be obtained by, or on behalf of, any such officer or to be paid for as a General Common Expense; or (ii) any injury, loss or damage to any individual or property, occurring in or upon either a Unit or any Common Element, which is either: (a) caused by the elements, by any Unit Owner or by any other individual; (b) resulting from electricity, water, snow or ice that may leak or flow from a Unit or any portion of any Common Element; or (c) arising out of theft or otherwise. The Condominium shall indemnify each officer

of the Condominium against all Costs arising out of such officer's service in such capacity, except those matters arising out of such officer's bad faith, gross negligence or willful misconduct.

## ARTICLE 5

## NOTICES

5.1     Notices. Except as otherwise expressly provided in the Declaration or these Condominium By-Laws, all requests, notices, reports, demands, approvals and other communications required or desired to be given pursuant to the Declaration and/or the Condominium By-Laws shall be in writing and shall be delivered: (a) if to any of the Boards or any Unit Owner, other than a Tower Unit Owner or Declarant Net Lessee, in person or sent to the principal office of the applicable Board or such Unit Owner or Declarant Net Lessee, as the case may be (or to such other address as:  (i) the applicable Board may designate from time to time, by notice in writing to the other Boards and such other Unit Owners and Declarant Net Lessee; and (ii) each such Unit Owner or Declarant Net Lessee may designate from time to time, by notice in writing to each Board and to each other such Unit Owner or Declarant Net Lessee); and a duplicate shall be sent in like manner to the managing agent of the Condominium, of the Tower Section, of the Base Unit (if the Base Unit Owner retains a managing agent), and any other Unit having a managing agent; (b) if to a Tower Unit Owner, in person or sent to the address of such Unit Owner at the Building, or to such other address as may have been designated by such Unit Owner from time to time in writing to the Tower Board; and (if such notice is from a Person other than the Tower Board) a duplicate shall be sent in like manner to the Tower Board and managing agent for such Section, if any; (c) if to a Condominium Board Member, to the address of such Board Member as shall be specified in the written designation thereof by such individual's Designator (provided that, failing such specification, the address of such Designator shall be deemed to be the specified address for such Board Member), or to such other address as may have been designated by such Board Member from time to time in writing to the Secretary of the Condominium Board and to the other Condominium Board Members; and (d) if to the Registered Mortgagees or Tower Mortgagee Representatives, either delivered in person or sent to their respective addresses, as designated by them from time to time in writing to the Condominium Board or the Tower Board, as the case may be.  All notices delivered in person (to the extent permitted herein) shall be deemed to have been given when delivered in person.  Unless other means of giving certain notices are specifically required or permitted pursuant to the Condominium Documents, all notices which are "sent" shall be sent either (x) by hand delivery, (y) by registered or certified mail, return receipt requested, and shall be deemed to have been given three (3) days after deposit in a depository maintained by the U.S. Postal Service in a postage prepaid sealed wrapper or (z) by nationally recognized overnight courier service and shall be deemed to have been given the first Business Day (for domestic delivery) and the third Business Day (for international delivery), after deposit with an overnight courier service, provided that notices of change of address shall in all events be deemed to have been given when received.

5.2     Waiver of Service of Notice; Consent to Other Notices.  Whenever any notice is required to be given by applicable Laws or the Condominium Documents, a waiver thereof in writing, signed by the Person or Persons entitled to such notice, whether before or after the time

stated therein, shall be deemed effective as a waiver thereof and no such notice shall be required. Additionally, any Person may consent (with respect to notices given to it) to additional means of service including, without limitation, transmission by facsimile or electronic means. Such consent, if given, shall in all events be in writing and given and treated as if the same were a change of address (as described in Section 5.1 above). With respect to notices given by facsimile, the transmission shall be to a telephone number designated for such purpose. Notices sent by facsimile shall be deemed to have been given upon receipt by the sender of a signal from the equipment of the Person served confirming that the transmission was received. A Person may change or rescind a facsimile telephone number by giving notice thereof to the Condominium Board, the Tower Board and each Unit Owner other than Tower Unit Owners. With respect to notices given by electronic transmission (*e.g.*, e-mail), the transmission shall be in a manner authorized by the Person consenting to such transmission. The foregoing provisions of this Section 5.2 are intended to facilitate additional means of notification and shall not be construed to permit any Person to refuse receipt of any notices given in any of the manners specified in Section 5.1.

5.3     Notices by a Tower Unit Owner to the Tower Board. Notwithstanding anything contained in this Article 5, all notices required or desired to be given by a Tower Unit Owner to the Tower Board or to another Tower Unit Owner shall be given in the manner prescribed in the Tower Section By-Laws; however, any additional or duplicate notices required thereunder to be given to any Board and/or any other Unit Owner shall be given in any of the manners herein provided.

5.4     Record of Addresses.

5.4.1     The Condominium Board shall keep and maintain correct, current and complete records containing the names and addresses of all Condominium Board Members (and their proxies, if any), each Unit Owner, the Tower Board (and its members), Registered Mortgagees and Tower Mortgagee Representatives. The foregoing records shall be in written form or in any other form capable of being converted into written form within a reasonable time. A Condominium Board Member, a Unit Owner, Declarant Net Lessee, and any Registered Mortgagee or Tower Mortgagee Representative shall have the right to examine in person or by agent or attorney, during usual business hours on Business Days, such records and, at such Person's expense, to make extracts or copies therefrom (including electronic copies to the extent such records are in electronic form) for any purpose reasonably related to such Person's interest in the Condominium.

5.4.2     The Tower Board shall keep and maintain correct, current and complete records containing the names and addresses of all of its members, all Tower Unit Owners and Tower Mortgagee Representatives. The foregoing records shall be in written form or in any other form capable of being converted into written form within one Business Day. The Condominium Board shall have the right to examine in person or by agent or attorney, during usual business hours on Business Days, such records and, at the Condominium Board's expense, to make extracts or copies therefrom (including electronic copies to the extent such records are in electronic form) for any purpose reasonably related to the exercise and fulfillment of the Condominium Board's rights and obligations, respectively.

**ARTICLE 6**

**GENERAL COMMON EXPENSES AND CHARGES;**
**BUDGETS; MAINTENANCE OBLIGATIONS AND COSTS; UTILITIES**

6.1    Determination of General Common Expenses and Fixing of General Common Charges.

6.1.1    (a)    The Condominium Board shall determine and allocate all costs and expenses incurred by the Condominium Board in connection with the operation, care, upkeep and maintenance of, and the making of Alterations to, and Repairs of, the General Common Elements and the Residential Tower Limited Common Elements (all such costs and expenses, together with all other items which are provided for in these Condominium By-Laws and the Declaration to be General Common Expenses, the "General Common Expenses"). From time to time, but at least once per year to be endeavored by no later than sixty (60) days before the first date of the fiscal year, the Condominium Board will prepare a budget ("Budget") for the overall Condominium, setting forth its projection of General Common Expenses and will allocate the General Common Expenses among the General Common Charge Obligors and assess charges ("General Common Charges") accordingly to meet the General Common Expenses. General Common Charges shall also be deemed to include any Special Assessment imposed by the Condominium Board. Except as otherwise expressly set forth in the Declaration or the Condominium By-Laws, the allocation of General Common Expenses among the General Common Charge Obligors shall be made as shown in Exhibit 2 annexed hereto and made a part hereof (the "Expense Allocation Schedule"). The Condominium Board shall advise the General Common Charge Obligors promptly in writing of the amount of General Common Charges payable by each of them and shall furnish to such parties copies of each Budget on which such General Common Charges are based. If the total General Common Charges allocated under any Budget to any of the CS Group, Base Unit or Tower Section as a whole (not any individual Tower Unit Owner), as applicable, are increased by more than twenty percent (20%) of the total General Common Charges allocated thereto under the prior year's Budget, the consent of the member of the Condominium Board designated by the CS Unit Owner, Base Unit Owner or Tower Board, as the case may be, shall be required to approve any category of expenses within such Budget with an increase of greater than twenty percent (20%) over the same category in the prior year. Notwithstanding the foregoing, in the event that a Budget cannot be approved, either in its entirety or a single line item, the Budget (or the particular line item) of the previous year will be increased by ten percent (10%) (subject to any CPI Factor) plus anticipated expenditures for applicable Mandatory Costs and will serve as the Budget until a new Budget is approved.

(b)    The allocations methodology for the General Common Charges set forth on the Expense Allocation Schedule shall not change, except pursuant to a change in Common Interest under Section 11.12.13 hereof.

(c)    Pending the resolution in Arbitration of any dispute with respect to the allocation of General Common Expenses, the allocation to the affected General Common Charge Obligors of the disputed components of the General Common Expenses shall remain as determined by the Condominium Board, provided that upon such resolution, any resulting

- 24 -

change in the allocation of such General Common Expenses shall be effective retroactive to the effective date of the allocation or re-allocation that gave rise to the dispute but any such retroactive application shall not be subject to the imposition of interest and/or penalties for overpayments or underpayments so long as the dispute was made in good faith.

(d)     Initial Budget; Budget Increases.  The Condominium Board has agreed upon and adopted an initial Budget (the "Initial Budget") for the Condominium, which Initial Budget allocates General Common Expenses among the General Common Charge Obligors for the period covered by the Initial Budget.  In respect of all fiscal years following the period covered by the Initial Budget, the Condominium Board shall prepare and adopt Budgets as set forth in Section 6.1.1(a) above.

(e)     Interim Operating Statement; Payment of General Common Charges.

(i)     The Condominium Board shall furnish to each General Common Charge Obligor, by no later than the later to occur of:  (a) thirty (30) days prior to the commencement of each fiscal year (or, in the case of the fiscal year in which the Declaration is recorded, by the date of such recording) or (b) fifteen (15) days after the adoption of a Budget or amended Budget, a statement of the Condominium Board's reasonable estimate (subject to adjustment as provided in the Condominium Documents) of the amount of the General Common Charges payable by each such Person for such fiscal year (or partial year, if applicable) (each such statement, an "Interim Operating Statement") which statement shall contain such reasonable detail and/or annotation as may be appropriate.  (If the Condominium Board adopts a revised Budget during the course of a fiscal year, it shall issue an amended Interim Operating Statement to each such Person, as appropriate, without making any adjustments to take into account the time value of money).  Each General Common Charge Obligor shall pay to the Condominium Board (or as the Condominium Board directs), on the first day of each month, an amount equal to one-twelfth (1/12th) of the Condominium Board's estimate of the General Common Charges payable by each such General Common Charge Obligor, as shown on the Interim Operating Statement for such fiscal year (or an appropriate adjusted amount (without any adjustment to take into account the time value of money) if there is an amendment to the Budget for such fiscal year).

(ii)     If the Condominium Board shall not furnish an Interim Operating Statement for any fiscal year prior to the commencement thereof, then: (a) until such Interim Operating Statement is furnished, as appropriate, each General Common Charge Obligor shall pay to the Condominium Board by no later than the tenth (10th) day of each month, an amount equal to the monthly sum payable to the Condominium Board by each such Person for the last month of the preceding fiscal year or partial fiscal year (excluding any portion of such prior monthly payment that relates to a Special Assessment previously explicitly stated as not continuing beyond such prior period); (b) promptly after the Interim Operating Statement is furnished or together therewith, the Condominium Board shall notify each General Common Charge Obligor whether the installments previously made for the applicable fiscal year were greater or less than the installments required to be made by each such Person for such fiscal year in accordance with such Interim Operating Statement; and (y) if there shall be a deficiency, the General Common Charge Obligor shall pay the amount of such deficiency within thirty (30) days

- 25 -

after receipt of such notification; or (z) if there shall have been an overpayment, the Condominium Board shall credit such amount against the next payments to be made by the General Common Charge Obligor; provided, however, that if the amount of such credit exceeds the amount of the next installment due, the amount of such excess shall be paid by the Condominium Board to such General Common Charge Obligor within ten (10) days after the application of such credit; and (c) by no later than the tenth (10th) day of the month following the month in which the Interim Operating Statement is furnished to each General Common Charge Obligor, and monthly thereafter until a new Interim Operating Statement is furnished, each General Common Charge Obligor shall pay to the Condominium Board an amount equal to one-twelfth (1/12th) of such General Common Charge Obligor's allocable share of General Common Charges for such full fiscal year, as shown on the Interim Operating Statement (or an appropriate adjusted amount if there is an amendment to the Budget for such fiscal year).

      (f)    Final Operating Statement; Year-End Reconciliation.

      (i)    Not later than ninety (90) days after the end of each fiscal year, the Condominium Board shall furnish to each General Common Charge Obligor an operating statement for such fiscal year, which statement shall: (1) set forth the computation of the actual aggregate General Common Expenses, and reserves, allocable to each such General Common Charge Obligor for such fiscal year; (2) state the payments made by each such General Common Charge Obligor on account thereof; and (3) set forth, in comparative form, the corresponding figures for the previous fiscal year, if any (any such statement, a "Final Operating Statement") which statement shall include such other reasonable detail and/or annotation as may be appropriate. Each such Final Operating Statement shall be prepared in accordance with generally accepted accounting principles. In addition, such Final Operating Statement shall be accompanied by an audit, report and opinion of an independent firm of certified public accountants, which such audit, report and opinion shall be prepared in accordance with generally accepted auditing standards relating to reporting, subject to the general exceptions usually taken with respect to such audits, reports and opinions and shall include an audit, report and opinion with respect to the allocation of all General Common Expenses among the General Common Charge Obligors. At the request of a General Common Charge Obligor, the Condominium Board shall provide copies of invoices and such other information reasonably required to enable such Person to confirm any or all items included in the General Common Expenses allocated to it and to the other General Common Charge Obligors.

      (ii)    If a Final Operating Statement shall show a deficiency between the sums paid by a General Common Charge Obligor for the fiscal year in question and such General Common Charge Obligor's allocable share of General Common Expenses (together with any reserves) for such fiscal year, then the General Common Charge Obligor shall pay to the Condominium Board the amount of such deficiency within thirty (30) days after receipt of such Final Operating Statement; or if the Final Operating Statement shows that there has been an overpayment, the Condominium Board shall credit such amount against the next payment of General Common Charges to be made by the General Common Charge Obligor to the Condominium Board; provided, however, that if the amount of such credit exceeds the amount of the next installment due, the amount of such excess shall be paid by the Condominium Board to such General Common Charge Obligor within ten (10) days after the application of such credit. The obligations of the Condominium Board and each General

Common Charge Obligor with respect to any deficiency or overpayment hereinabove described shall survive the termination of the Condominium.

        (g)    <u>Failure to Deliver a Statement Not Prejudicial</u>. The Condominium Board's failure to render any statement hereunder with respect to any period shall not prejudice the Condominium Board's right to thereafter render any statement with respect thereto or the right of any General Common Charge Obligor to require and be furnished with same.

        6.1.2    The Condominium Board may, at its sole discretion but subject to Section 2.2.3 of these Condominium By-Laws, from time to time increase or decrease the amount of General Common Charges allocated to and payable by the General Common Charge Obligors, and may modify its prior determination of the General Common Expenses for any fiscal year so as to increase or decrease the amount of General Common Charges payable for such fiscal year or portion thereof; provided that no such revised determination of General Common Expenses shall have a retroactive effect on the amount of General Common Charges payable for any period prior to the date of such new determination. However, a prior period's deficit may be included in General Common Charges for a subsequent period or paid from a Special Assessment levied against all General Common Charge Obligors. Notwithstanding the foregoing, any General Common Charges specifically assessed by the Condominium Board with respect to the Base Unit must comport with the requirements of Section 339-m of the New York Real Property Law pursuant to the procedure set forth in the Tower Section By-Laws, with any resulting reduction in the Common Charges payable by the Base Unit Owner being allocated solely to the Tower Unit Owners according to their relative proportional Common Interest.

        6.1.3    The failure or delay of the Condominium Board to prepare or adopt a budget or to determine the General Common Expenses for any fiscal year or portion thereof shall not be deemed a waiver or modification in any respect of the covenants and provisions hereof or a release of any General Common Charge Obligor from the obligation to pay General Common Charges. In such event, the General Common Charges that were computed on the basis of the General Common Expenses last determined for any fiscal year or portion thereof shall continue thereafter to be the General Common Charges payable until a new determination of the General Common Expenses shall be made.

        6.1.4    In addition to the foregoing duty to determine the amount of and assess General Common Charges, the Condominium Board shall have the right to levy special assessments ("<u>Special Assessments</u>") to meet the General Common Expenses or a prior period's deficit. All Special Assessments shall be levied against all General Common Charge Obligors (a) in proportion to their respective Common Interests, or (b) in accordance with the Expense Allocation Schedule if such Special Assessment specifically relates to any particular category on the Expense Allocation Schedule; and all disputes as to whether the foregoing (a) or (b) shall apply, or in the event (b) applies, the allocation made by the Condominium Board with respect thereto, shall be resolved in Arbitration. The Condominium Board shall have all rights and remedies for the collection of Special Assessments as are provided herein for the collection of General Common Charges. Notwithstanding the foregoing, any Special Assessments specifically assessed by the Condominium Board with respect to the Base Unit must comport with the requirements of Section 339-m of the New York Real Property Law, with any resulting

reduction in the Special Assessment payable by the Base Unit Owner being allocated solely to the Tower Unit Owners according to their relative proportional Common Interest.

6.1.5     Except as otherwise set forth to the contrary herein or in the Declaration, the excess of all rents, profits and revenues derived from the rental or use of any space or facility forming part of or included in any General Common Element remaining after the deduction of any non-capital expenses paid or incurred in connection therewith shall be collected by the Condominium Board, as agent for and on behalf of the Unit Owners, and shall constitute income of the Unit Owners.  Notwithstanding any provision contained in these Condominium By-Laws or in the Declaration to the contrary, in no event shall any rent, profit or revenue derived from the rental or use of any space in the Building be deemed to be derived from the rental or use of any floor slabs, ceilings or walls delineating or enclosing such space or the incidental use of any portion of any Common Elements appurtenant to such space.

6.1.6     There shall be no right of a General Common Charge Obligor or a Unit Owner to reduce its General Common Charges by opting out of any services or waiving any benefits provided by the Condominium Board, provided that the foregoing shall not be deemed to prohibit applicability of Section 339-m of the New York Real Property Law to the Base Unit.

6.1.7     Except as otherwise provided herein, the Tower Common Expenses shall be determined and incurred, and the Tower Common Charges shall be paid, by the Tower Board, and borne by the Tower Unit Owners in the manner determined by the Tower Board, but in all events in accordance with the Tower Section By-Laws.  The Tower Common Charges shall include, without limitation, any Base Unit Operating Shortfall.  The Tower Board shall have a lien for unpaid General Common Charges, Residential Common Charges, Tower Common Charges or Special Assessments that may be allocated to and/or assessed individually against Tower Unit Owners.

6.1.8     The Tower Common Charges collected by the Tower Board shall, in all instances, (a) first be payable by the Tower Board to the Base Unit Owner as required by Section 6.2.3 hereof, and (b) next to the Condominium Board in payment of the Tower Section's allocated share of General Common Charges and before application for any other purpose.  If payment under clause (b) of this Section 6.1.8 fails to occur, the Condominium Board shall have the right, without limitation, and in addition to all other remedies available at Law, to avail itself of the remedy of specific performance with respect to the obligations of the Tower Board.

6.1.9     Except as otherwise provided herein, Residential Common Expenses (in connection with the Residential Limited Common Elements generally, but excluding any General Common Elements and Residential Tower Limited Common Elements) shall be determined by the Tower Board, as agent for the Condominium Board (with exclusive control, and decision-making authority, over and with respect to operation, management, insurance, maintenance, Alteration and Repair of the Residential Limited Common Elements), and the Residential Common Charges shall be an expense of and paid by the Tower Board, and borne by the Base Unit Owner and Tower Unit Owners in proportion to their respective Common Interests or as otherwise set forth on the Expense Allocation Schedule, although the Tower Board may allocate such expenses among the Tower Unit Owners in its discretion.  The Residential Common Charges shall include all costs and expenses in connection with the operation, care,

upkeep and maintenance of, and the making of Alterations to, and Repairs of, the Residential Limited Common Elements and the Sidewalk Obligations referred to in Section 6.3.2(f)(ii) hereof (including a reasonable fee for the Tower Board's administration of the Residential Limited Common Elements and any management fee paid by the Tower Board to a managing agent of or in respect of the Residential Limited Common Elements). The Condominium Board shall be the sole holder of any lien for unpaid Residential Common Charges that may be allocated to and/or assessed individually against any of the Base Unit Owner or Tower Unit Owners, but the Lien may be enforced by the Tower Board in the name of the Condominium Board.

6.1.10    Subject to Section 6.1.8 hereof, the Residential Common Charges collected by the Tower Board shall, in all instances, first be payable by the Tower Board to the Condominium Board in payment of the Base Unit's and Tower Section's allocated share of General Common Charges and before application for any other purpose. If such priority of payment fails to occur, the Condominium Board shall have the right, without limitation, and in addition to all other remedies available at Law, to avail itself of the remedy of specific performance with respect to the obligations of the Tower Board.

6.1.11    Except as otherwise provided herein or in the Declaration, the operation, care, upkeep and maintenance of, and the making of Alterations to, and Repairs of, and insuring, any Limited Common Elements shall be the responsibility of, and the costs and expenses thereof shall be by, the General Common Charge Obligor to whose Unit(s) (or Tower Section) such Limited Common Elements are appurtenant. The Condominium Board shall have all of the same rights and remedies with respect to collection of expenditures made by it on behalf of the applicable General Common Charge Obligors in connection with such Limited Common Elements as it has in respect of collection of General Common Charges.

6.1.12    In the event of a Base Operating Shortfall, with respect to the General Common Charges assessed against the Base Unit, such amount that creates the Base Operating Shortfall shall be deemed an additional assessment against the Tower Units. In no event shall this Section 6.1.12 be modified to impair the rights of the Base Unit hereunder without the prior written consent of the appropriate governmental authority which is a party to the HFA Regulatory Agreement so long as the HFA Regulatory Agreement remains in effect.

6.2    Payment of Common Charges.

6.2.1    All General Common Charge Obligors shall be obligated to pay General Common Charges assessed by the Condominium Board pursuant to the provisions of Section 6.1 at such time or times (but not more frequently than monthly) as the Condominium Board determines. Unless otherwise determined by the Condominium Board, General Common Charges shall be payable monthly, in advance, on the first day of each month.

6.2.2    The Tower Unit Owners and the Base Unit Owner shall be obligated to pay Residential Common Charges assessed by the Tower Board, as agent of the Condominium Board pursuant to the provisions of Section 6.1 at such time or times (but not more frequently than monthly) as the Tower Board determines, provided that any Residential Common Charges specifically assessed by the Tower Board with respect to the Base Unit shall be subject to

- 29 -

adjustment in accordance with the requirements of Section 339-m of the New York Real Property Law pursuant to the procedures set forth in the Tower Section By-Laws. Unless otherwise determined by the Tower Board, Residential Common Charges shall be payable monthly, in advance, on the first day of each month.

      6.2.3     The Tower Board on behalf of and as agent for each Tower Unit Owner shall, commencing upon notice from the Base Unit Owner to the Tower Board (but not earlier than the first day of the calendar month following the First Tower Closing; such commencement date, the "PEBL Commencement Date") and continuing through July 1, 2039 (such date, the "PEBL Expiration Date"), pay a project enhancement base loan ("PEBL") payment to the Base Unit Owner in an amount equal to (i) all costs attributable to $44,800,000 in respect of debt anticipated to encumber the Base Unit, in connection with financing or refinancing thereof (inclusive of interest, fees and expenses; all such interest, fees and expenses not to exceed 12% per annum in the aggregate), together with (ii) fully amortizing payments of principal attributable to $44,800,000 in respect of such debt (the amounts described in clauses (i) and (ii) together, "PEBL Payments"). In the event the Base Unit debt forming the basis of the PEBL Payments obligation is prepaid in full prior to the PEBL Expiration Date, the Tower Section's obligations in respect of making PEBL Payments shall continue nonetheless through the PEBL Expiration Date with the loan terms last in effect prior to such prepayment deemed to continue in existence through and including the PEBL Expiration Date for purposes of calculating the required PEBL Payments. Each Tower Unit Owner is severally obligated only for its pro rata portion (based on its proportionate Common Interest among all Tower Unit Owners) of the overall PEBL Payment. PEBL Payments shall be assessed against and payable by all Tower Unit Owners monthly as additional Tower Common Charges through and including the PEBL Expiration Date and, as necessary to ensure payment, will be collected by the Condominium Board for the benefit of the Base Unit Owner from the Tower Board as a General Common Expense allocated exclusively to the Tower Section as if the same were a General Common Charge of the Tower Section and then further allocated by the Tower Section to the applicable Tower Unit Owner. The Tower Board is obligated to take any and all commercially reasonable actions in order to enforce each Tower Unit Owner's obligation to pay its proportionate share of the PEBL Payment, including exercising its board lien right. In the event a Tower Unit Owner still fails to pay its proportionate PEBL Payment, the Base Unit Owner, following notice to the Tower Board and providing the Tower Board a ten (10) day opportunity to cure, shall have the right to exercise the Tower Board's statutory lien right in the name of the Tower Board against a defaulting Tower Unit Owner in the amount of such defaulting Tower Unit Owner's proportionate PEBL Payment. All monies collected by the Tower Board shall first be payable as set forth in Section 6.1.8 hereof.

      6.2.4     No Unit Owner shall be liable for the payment of any part of the Common Charges, any Special Assessment or other assessment assessed against such Unit Owner's Unit accruing subsequent to the effective date of a sale or other conveyance by such Unit Owner (made in accordance with these Condominium By-Laws) of such Unit together with its appurtenant Common Interest. In the event of a foreclosure sale of a Unit, a deed in lieu of foreclosure or other remedy elected by the mortgagee, the owner of such Unit prior to the foreclosure sale or deed in lieu of foreclosure shall remain liable for the payment of all unpaid Common Charges, Special Assessments and other assessments, which accrued prior to such sale.

6.2.5    A purchaser of a Unit shall be liable for the payment of Common Charges, any Special Assessments and any other assessments accrued and unpaid against such Unit prior to the acquisition by such purchaser of such Unit.

6.3    Maintenance Obligations; Costs of Same.

6.3.1    General.  Except as otherwise provided in the Declaration or these Condominium By-Laws (including, without limitation, Section 6.1.2 and Article 8 hereof), all operation, care, upkeep, maintenance, insurance, Repairs and Alterations, painting and decorating, whether structural or non-structural, ordinary or extraordinary, including, without limitation, with respect to the building systems and other plumbing, heating, ventilating, electrical (including emergency power systems), air-conditioning and telecommunications systems, fixtures, Equipment and appliances:

(a)    in or of the Tower Section (including any Residential Limited Common Elements and Tower Limited Common Elements, but excluding any General Common Elements or Residential Tower Limited Common Elements that may be located in the Tower Section or the Base Unit) shall be made or performed in the manner, and by and at the sole cost and expense of the Tower Unit Owners and, to the extent the same involve the Residential Limited Common Elements, allocated to the Base Unit Owner and the Tower Unit Owners in accordance with their respective Residential Common Interest.

(b)    in or of and exclusively relating to a Unit and/or its appurtenant Limited Common Elements (but excluding any General Common Elements, Residential Tower Limited Common Elements, or, in the case of the Base Unit and the Tower Units, any Residential Limited Common Elements that may be included therein), as shall be made or performed by the Unit Owner thereof at its sole cost and expense;

(c)    in or of the CS Building, the CS MS Unit or the CS LL Unit, shall be made and performed by the CS Unit Owner at its sole cost and expense; and

(d)    in or of the General Common Elements and the Residential Tower Limited Common Elements shall be made or performed by the Condominium Board and the cost and expense thereof shall be charged as a General Common Expense to the General Common Charge Obligors as and in the manner provided in these Condominium By-Laws.

6.3.2    Exceptions.  Notwithstanding the provisions of Section 6.3.1:

(a)    Negligence; Fault.  In the event and to the extent that any operation, care, upkeep, maintenance, Repair and Alteration, painting and decorating, whether structural or non-structural, ordinary or extraordinary (collectively, any "Necessary Work"), is required to be made or performed, or any increase in insurance premiums is required to be paid, the entire cost thereof (the "Resulting Cost") with respect to the General Common Elements as a result of the negligence, misuse, neglect or abuse of: (i) the Tower Board or its Occupants or Permittees (including, for the purposes of this Section, the Tower Unit Owners), the Resulting Cost shall be borne by the Tower Board as an obligation of the Tower Board (but the Tower Board may for its own purposes allocate such cost to one or more Tower Unit Owners if such cost is attributable to such Unit Owner(s), or as otherwise provided in the Tower Section By-

Laws); (ii) the Base Unit Owner or its Occupants or Permittees (including, for the purposes of this Section, the tenants of the Base Apartments), the Resulting Cost shall be borne by the Base Unit Owner as an obligation of the Base Unit Owner; or (iii) any other Unit Owner or its Occupants or Permittees, the Resulting Cost shall be borne entirely by such Unit Owner; except, with respect to all of the foregoing in each case, to the extent that the Resulting Cost is covered by the proceeds of any insurance actually maintained, or would have been so covered had the insurance that was required to be maintained pursuant to the provisions of these Condominium By-Laws or the Tower Section By-Laws, actually been maintained. The Resulting Cost shall not be deemed covered by insurance proceeds pursuant to the preceding sentence to the extent of any applicable deductibles. The foregoing shall not give rise to any claim on the part of any Person for consequential, special, exemplary or punitive damages.

(b)     Cleaning of Windows and Exterior Façade. The washing and cleaning of: (i) the interior glass surfaces of the Base Unit and each Tower Unit shall be the responsibility of each Unit Owner with respect to its own Unit, and the responsibility of the Tower Board with respect to any Residential Limited Common Elements or Tower Limited Common Elements having exterior glass surfaces. (ii) the exterior façade surfaces, windows and louver fins of the Residential Tower Building shall be the responsibility of the Condominium Board, with the cost of such washing and cleaning activities to be allocated to the respective Unit Owner(s) (or the Tower Board, as applicable) as to whose Unit(s) (or Limited Common Element(s), as applicable) such surfaces abut in accordance with their respective Façade Contact Areas, and (iii) the interior and exterior façade, glass and other surfaces and components of the CS Building and the CS LL Unit shall be the responsibility of the CS Unit Owner. The window exteriors of the CS Building and interiors of the CS LL Unit shall be cleaned as often as reasonably necessary, as determined by the CS Unit Owner or as may otherwise be required under the ERY FAPOA Declaration in accordance with standards appropriate for a first-class cultural, festival and exhibit facility. The Condominium Board may from time to time enforce the responsibility of Unit Owners (or the Tower Board) to wash and clean the surfaces of windows and other façade components as aforesaid.

(c)     Repair or Replacement of Windows and Façade Components. Any repair or replacement of exterior windows and other façade components in the Residential Tower Building because of breakage or otherwise, shall be made by the Condominium Board and charged to the General Common Charge Obligors as a General Common Expense allocated among the Unit Owners in the same manner as the expense for window and other façade component cleaning as set forth in subsection 6.3.2(b), unless such breakage is caused by or attributable to the negligence, misuse or abuse of a Board or a Unit Owner or its Occupants or Permittees, in which event such replacement of glass windows and other façade components shall be made by the Condominium Board and the cost thereof shall be allocated as described in subsection 6.3.2(a) above. Any repair or replacement of exterior glass windows and other façade components in the CS Building and the CS LL Unit because of breakage or otherwise, shall be made by the CS Unit Owner at its sole cost and expense, unless such breakage is caused by or attributable to the negligence, misuse or abuse of a Board or a Unit Owner or its Occupants or Permittees, in which event such replacement of glass windows and other façade components shall be made by the CS Unit Owner and the cost thereof shall be allocated as described in subsection 6.3.2(a) above.

(d)    Tower Terrace.  Subject to Article 8 of these Condominium By-Laws, all operations (including the cost of any utilities), care, upkeep, maintenance, Repairs and Alterations (subject to the next sentence), and painting and decorating, of the Tower Terrace, shall be made by the Tower Board at its sole cost and expense, and in each case subject to the applicable provisions of the Condominium Documents.  Any structural or extraordinary Repairs or Alterations of or to the Tower Terrace shall be made by the Condominium Board and, subject to Section 6.3.2(a) hereof, charged to the General Common Charge Obligors (other than the CS Unit Owner with respect to the CS Unit) as a General Common Expense and allocated as shown on the Expense Allocation Schedule.

(e)    Roofs; Roof Telecom Platforms.  Although maintenance and Repairs of the main roof of the Residential Tower Building, as a Residential Tower Limited Common Element, shall be made by the Condominium Board and chargeable to the General Common Charge Obligors as a General Common Expense as set forth on the Expense Allocation Schedule, if the Developer exercises its right under Section 15.12 of the Declaration to install and erect a roof telecom platform, antennae or similar equipment, which shall be the property of the Developer (or its lessees) then the maintenance and Repair of any such item, whether ordinary or extraordinary in nature, shall be the obligation of, and the expense thereof shall be borne by, the Developer (or its lessees).

(f)    Sidewalks.  The Tower Board shall be responsible, at its sole cost and expense but subject to reimbursement from the Base Unit Owner and the Tower Unit Owners as part of Residential Common Charges, for the maintenance, Repair, replacement and cleaning of sidewalks including, without limitation, the prompt removal of snow and ice (collectively, "Sidewalk Obligations") with respect to any sidewalk adjacent to any portion of the Residential Tower Building, and the CS Unit Owner shall be responsible, at its sole cost and expense, for Sidewalk Obligations with respect to any sidewalk adjacent to the CS LL Unit and any sidewalk adjacent to the CS Building (or adjacent to the portion of the Land on which they are constructed).  To the extent the Building has an obligation with respect to a public sidewalk, the respective Board or Unit Owner, as set forth above, shall have the same obligation as if such sidewalk were a Residential Limited Common Element (with respect to public sidewalks adjacent to the Residential Tower Building) or part of the CS Unit (with respect to public sidewalks adjacent to the CS Building or the CS LL Unit), respectively.  If any Unit Owner (or the Tower Board) shall fail to perform any Sidewalk Obligation, the Condominium Board may perform the same and bill the Unit Owner (or Tower Board) for the cost thereof as part of Common Charges.

(g)    [Intentionally omitted.]

(h)    Garbage Removal.  Each Unit Owner (or the Tower Board, on behalf of the Base Unit Owner and the Tower Unit Owners) shall make its own arrangements for removal of garbage from the Units.

(i)    Dumpsters.  Any dumpsters required during Alterations or other construction of any Unit (other than the Initial Construction Work) shall be placed in areas under the control of the applicable Unit (unless agreed otherwise by the Unit Owners).  Trash

removal and placement of dumpsters during the Initial Construction Work shall be governed by the Site Logistics Plan (as such term is defined in the DCA).

(j)     ENVAC System. The Condominium Board may elect, in its sole discretion, to install and maintain an ENVAC System for efficient waste disposal, and all (or certain, as applicable) Unit Owners will be required to use such ENVAC System. The CS Group, as a whole, shall have the one (1) time right to elect by written notice to the Condominium Board to opt out of the ENVAC System which election must be made within thirty (30) calendar days of receipt of notice of such election by the Condominium Board. The Condominium Board shall have the right to solely operate the ENVAC System or to jointly operate such ENVAC System pursuant to an agreement with the owners of the other ERY Parcels (which agreement shall include an allocation of the cost to operate and maintain the same as determined by the Condominium Board and the other parties thereto). The costs thereof shall be payable by the Unit Owners as Common Charges in accordance with their respective Common Interests, except as otherwise set forth on the Expense Allocation Schedule.

(k)     Site Specific Easements.

(i)     Each Unit Owner that has exclusive rights to a Site Specific Easement shall be responsible, at its sole cost and expense, for the Repair and maintenance of the same subject to the provisions of the Annex. Should any Unit Owner fail to so Repair and maintain the same, the Condominium Board may perform the same and bill the Unit Owner (or Tower Board) for the cost thereof as part of Common Charges.

(ii)     The Condominium Board shall be responsible for the Repair and maintenance of all Site Specific Easements as to which no Unit Owner has exclusive rights, and the cost thereof shall be allocated among such Unit Owners, as a General Common Expense, in the manner set forth in Section 15.6 of the Declaration or as otherwise set forth in the Expense Allocation Schedule.

(l)     ERY FAPOA Declaration. Costs incurred by the Condominium Board under the ERY FAPOA Declaration (including, without limitation, Association Charges and Association Special Assessments, as therein defined) shall be allocated and billed by the Condominium Board to and shall be payable by the Unit Owners as Common Charges in accordance with their respective Common Interests, except as otherwise specifically set forth in the Expense Allocation Schedule, provided that any costs payable by the Condominium Board to the Tower C Board of Managers or the owner of Parcel C, as applicable, incurred with respect to the Parcel C Loading Dock shall be allocated by the Tower C Condominium Board or owner of Parcel C, as applicable, in accordance with Section A-3(a) of the Annex.

(m)     Master Declaration. Costs incurred by the Condominium Board under the Master Declaration shall be allocated and billed by the Condominium Board to the Unit Owners in accordance with the Expense Allocation Schedule.

(n)     Generator: Costs for initial fuel and for repair of the generator shall be allocated and billed by the Condominium Board to the Unit Owners or Board, as

applicable, based on design load. The costs for replacement of fuel will be based on metered usage by each Unit Owner or Board, as applicable.

(o)     CS Unit Plaza Area: For the avoidance of doubt, the CS Unit Owner shall be responsible at its sole cost and expense for the repair and maintenance of the CS Unit Plaza Area, subject to Section 8.13 of the Declaration or such other standard required by the Master Declaration or ERY FAPOA Declaration.

(p)     High Line Restrictive Declaration: Costs incurred by the Condominium Board under the High Line Restrictive Declaration shall be charged to the Tower Board and allocated to the Base Unit Owner and Tower Unit Owners based on Residential Common Interest.

6.3.3     Manner of Performing Maintenance and Repairs. All maintenance and Repairs by any Unit Owner or Board shall be made in accordance with the applicable provisions of Article 8 hereof (and, with respect to Site Specific Easements, as required by the Annex) as if the references therein to Alterations were references to maintenance and Repairs.

6.3.4     Standard of Maintenance. Each Unit (and all portions thereof), the Limited Common Elements and the General Common Elements shall be kept and maintained in accordance with the Project Standards, and otherwise in good and proper manner, consistent with standards of maintenance and appearance as are commensurate with other similar properties in the vicinity of the Building, by whichever Person is responsible for the maintenance and Repair thereof under the Condominium Documents; and each such Unit Owner or Board shall promptly make or perform, or cause to be made or performed, all maintenance work, Repairs, Alterations, painting or decoration as are necessary in connection therewith and to ensure that such Unit, Limited Common Element and General Common Element meets or exceeds such standards.

6.4     Utility Services. Utilities are provided and supplied to the Property and are distributed within the Building to each Utility Service Area, and shall be paid for, as hereinafter set forth. For purposes of this Section 6.4, a "Utility Service Area" means any particular Unit, the Tower Section or Common Element (e.g., the Residential Common Elements) benefiting from a certain Utility. Costs of utility distribution and submetering, including equipment maintenance, replacement costs and amortization of the costs of the equipment (if applicable), but excluding usage (as described below) shall be allocated to the respective General Common Charge Obligors based on connected load, usage or Common Interest, depending on the nature of the utility service in question. Utility charges billed by or for the Condominium Board or the Tower Board to the Unit Owners shall be payable as, and the Condominium Board and/or Tower Board, as applicable, shall have all rights and remedies in the event of non-payment as apply to non-payment of, Common Charges. The cost of utilities if provided by the Condominium Board shall be charged to the Unit Owners without profit to the Condominium Board.

6.4.1     Electricity.

(a)     General. Electricity service for the Building will be provided by Consolidated Edison Company of New York, Inc. ("Con Ed") or other public or private utility company/ies or supplier(s) designated by the Condominium Board and will be measured

through one or more direct electric meter(s) which shall be a General Common Element and then submetered to the extent practicable for each Unit, the General Common Elements and Limited Common Elements (which submeters shall be the responsibility of the applicable non-Tower Unit Owner or Board), and if usage cannot reasonably be metered or submetered, the allocation of usage and expenses shall be determined by a survey performed by a qualified engineering consultant or other agreed upon method.  If submetered or allocated as provided above, the Tower Board and each Unit Owner shall be required to make payment for electricity usage in accordance with such submeters or survey allocation (as applicable) to the Condominium Board which shall be responsible for paying the utility company/ies or supplier(s) supplying such electricity or as otherwise directed by the Condominium Board. Furthermore, in cases where a submeter billed to the Condominium Board measures electricity supplying more than one Utility Service Area (and/or the General Common Elements), the cost of such electricity shall be apportioned among such Utility Service Areas (and/or the General Common Elements) by the Condominium Board based on the connected load or usage by each such Utility Service Area (and/or the General Common Elements).   Charges for usage in respect of the General Common Elements and the Limited Common Elements shall be allocated among Unit Owners by percentage Common Interest or as otherwise set forth on the Expense Allocation Schedule.  Notwithstanding the foregoing, the Condominium Board may elect to contract with an entity (including the Electric Service Supplier) to (i) procure, arrange, maintain, repair the electricity supply and related utility services for all or a portion of the Building, and (ii) authorize Electric Service Supplier the powers to serve and act as agent for the Condominium Board, including, but not limited to, the power to read submeters, bill and collect payments from the Unit Owners directly or through another entity for services described in this Section 6.4.1(a), enforce collection against a defaulting Unit Owner for services described in this Section 6.4.1(a), exercise all remedies under the Electric Service Supply Agreement, to pay, settle or compromise bills and claims with respect to the Unit Owners in connection with services described in this Section 6.4.1(a), and to prosecute and defend all actions or proceedings in connection with any or all claims or obligations for services described in this Section 6.4.1(a); provided, that if such entity is an Affiliate of Tower Sponsor the rates and other charges for such electric supply and related utility services shall be no greater than the rates and other charges that would have been payable to Con Ed if the Unit Owners or any lessee thereof were purchasing direct meter service for the Building from such provider directly.  The terms and conditions of any such agreement (including the Electric Service Supply Agreement) with respect to rates, supply terms, billing, enforcement and otherwise shall apply for all or such portion of the Building receiving such electricity supply and related utility services.  Unless contrary to applicable Law, the HPD Regulatory Agreement, the HFA Regulatory Agreement or any other agreement, the tenants of the Base Apartments pursuant to their applicable leases shall be required to obtain electricity supply and related services described in this Section 6.4.1(a) through the arrangement with Electric Service Supplier.

        (b)    CS Group. At its option, if the CS Group does not receive electricity as set forth in Section 6.4.1(a) above, electricity service for the CS Group will be provided by Con Ed or other public or private utility company/ies or supplier(s) designed by the CS Unit Owner and will be measured through one direct electric meter which shall be part of the CS Unit.

        6.4.2    Gas.

(a)   General. Gas for the Building (e.g., for heating, domestic heated water, and cooking) will be supplied by Con Edison or other utility company/ies or supplier(s) from time to time serving the Property. Each General Common Charge Obligor having or arranging to have gas service supplied and metered directly to all or any portion of its Utility Service Area shall pay the cost of such gas service directly to the applicable utility company or supplier and the Condominium Board shall not be obligated to pay any part of any cost required for such direct gas service. Costs of gas for the entire Residential Section (if applicable) shall be allocated to Tower Units and the Base Unit by Residential Common Interest.

6.4.3   Domestic Water; Sewer Rents.

(a)   CS Group. Domestic water will be supplied to the CS Group through one or more direct meters which shall be the responsibility of the CS Group, and the cost for water and sewer with respect to such meter shall be paid directly by the CS Group to The City of New York.

(b)   Balance of the Building. Domestic water supplied to all portions of the Building other than the CS Group for the benefit of the applicable Unit Owner or Board will be sub-metered or allocated by the Tower Board based upon the estimated usage by, or benefit to, each Utility Service Area; and each Unit Owner or Board, as applicable, shall be required to make payment therefor to the Tower Board, which shall be responsible for paying the domestic water and sewer charges to The City of New York (or other utility). Costs for water and sewer for the Tower Section shall be allocated to the Tower Units by Tower Common Interest.

(c)   Pavilion Parcel and Plaza Parcel. The Condominium Board shall have the right to provide domestic cold water to the Plaza Owner for use at the Plaza Parcel and to the Pavilion Owner for use at the Pavilion Parcel, pursuant to separate agreements. The domestic water will be provided through additional sub-meters served by the direct meters referred to in Section 6.4.3(b), which sub-meters shall be the responsibility of the Plaza Owner or the Pavilion Owner, as applicable, and the cost for water and sewer with respect to such sub-meters shall be paid by the Plaza Owner or the Pavilion Owner, as applicable, to the Condominium Board.

6.4.4   Condenser Water and Chilled Water.

(a)   The cooling tower and primary condenser water loop (the "Main Condenser Water Loop") (for air conditioning) is a General Common Element shared by all Units. The costs associated with operation, maintenance, repair shall be allocated to Utility Service Areas by usage determined by sub-metering condenser water use.

(b)   The Building includes a secondary condenser water loop (for air conditioning) exclusively servicing portions of the CS Group, which secondary condenser water loop is part of the CS Unit, CS LL Unit or CS MS Unit, as applicable, and the CS Unit Owner shall be responsible for all associated costs thereof, including the costs to the Condominium Board of providing primary condenser water as measured by a sub-meter.

- 37 -

(c)    The Building includes a secondary condenser water loop (for air conditioning) servicing the Tower Limited Common Elements, which secondary condenser water loop shall be a Tower Limited Common Element and the Tower Board shall be responsible for all associated costs thereof, including costs of providing chilled water.

(d)    The Building includes a secondary condenser water loop (for air conditioning) servicing the Base Unit and the Common Elements located below and on the Nineteenth Floor of the Residential Tower Building, which shall be a Residential Limited Common Element, and the Tower Board shall allocate the associated costs thereof among the Base Unit and the Tower Unit Owners on the basis of usage, design load, or other equitable arrangement.

(e)    The Building includes primary and secondary chilled water loops (for air conditioning) servicing the Tower Units, which primary and secondary chilled water loops shall be a Tower Limited Common Element and the Tower Board shall be responsible for all associated costs thereof.

6.4.5    Heat and Heated Water.

(a)    CS Group.  Heat and heated water shall be provided to the CS Building and the CS LL Unit and the CS MS Unit by the CS Unit Owner, pursuant to separate boiler, heating and heated water systems which shall be part of the CS Unit, the CS LL Unit or the CS MS Unit, as applicable, and the CS Unit Owner shall be responsible for all costs associated therewith.  If elected by the CS Unit Owner, heat and heated water for the CS Group may be provided by the Auxiliary System and usage shall be submetered and paid directly to the operator of the Auxiliary System.

(b)    Tower Section.  Heat and heated water to the Tower Section shall be provided by the Tower Board pursuant to separate boiler, heating and heated water system (the "Tower Hot Water Plant") (subject to Section 6.4.5(d)), which shall be a Tower Limited Common Element, and the Tower Board shall be responsible for all costs associated therewith.

(c)    Base Unit and Residential Limited Common Elements.  Heat and heated water for the Base Unit and the Common Elements located below and on the Nineteenth Floor of the Residential Tower Building (subject to Section 6.4.5(d)) will be provided exclusively by the Auxiliary System.  Usage of the Auxiliary System shall be submetered, and the Base Unit Owner or the Tower Board, as applicable, shall pay the cost thereof directly to the operator of the Auxiliary System pursuant to agreements entered into between them and the operator.  Amounts paid by the Tower Board will be allocated among the Unit Owners on the basis of Residential Common Interest.

(d)    Twentieth through Thirty Fifth Floor Option.  At the option of the Condominium Board, heated water for the portion of the Tower Section and Common Elements located on the Twentieth through the Thirty Fifth Floors of the Residential Tower Building may at any time be provided by the Auxiliary System rather than by the Tower Hot Water Plant.  In such event, such usage of the Auxiliary System for such floors shall be submetered, and the Tower Board shall pay the cost thereof directly to the operator of the Auxiliary System pursuant

- 38 -

to an agreement entered into between the Tower Board and the operator.  Amounts so paid by the Tower Board shall be allocated among the Unit Owners owning Tower Units on the Twentieth through the Thirty Fifth Floors.

(e)     Further, the Condominium Board may elect to contract with an entity (including through an agreement described in Section 2.16.2 above with an Affiliate of Tower Sponsor) to furnish, arrange, and/or bill (including billing the Unit Owners directly) for the utility services described in this Section 6.4.5.  Notwithstanding the foregoing, the Condominium Board may elect to contract with an entity (including the Thermal Energy Supply Agreement described in Section 2.16.2 above with an Affiliate of Tower Sponsor) to procure, arrange, maintain and repair the thermal energy supply for all or a portion of the Building.

6.4.6     Technology.  The Building will contain certain Dedicated Technology Equipment and Shared Technology Equipment, all of which shall constitute General Common Elements. The Dedicated Technology Equipment and the Shared Technology Equipment will be connected to the Technology System, which will be operated by the Plaza Owner or its licensee or designee, though easements provided for in the Annex. Unit Owners, the Condominium Board, and the Tower Board may enter into direct agreements with the operator of the Technology System for technology services from the Technology System, and shall pay the costs thereof directly to the operator.

6.4.7     Utilities for Common Elements.  The usage and consumption of electricity, gas, domestic water, sewer service, condenser water, heated water and any other utility by, for or in respect of the Common Elements will be separately metered, submetered or otherwise determined and the costs and charges therefor will be allocated among the General Common Charge Obligors as a Common Expense as set forth in the Expense Allocation Schedule or otherwise amongst the benefitting Unit Owners on the basis of Common Interest as appropriate.

6.4.8     Utility Costs Payable as Common Charges.  The Condominium Board may require each General Common Charge Obligor to pay monthly in advance to the Condominium Board the charges reasonably estimated or anticipated as being attributable to each such General Common Charge Obligor with respect to the aforementioned utilities.  All such estimated charges shall be subject to periodic adjustment based upon actual usage.

6.4.9     Meter Readings.

(a)     To the extent not provided for in the Electric Service Supply Agreement and Thermal Energy Supply Agreement, the Condominium Board shall, as necessary, engage the services of a reputable meter reading and/or billing company to act on its behalf in properly billing and accounting for each General Common Charge Obligor's share of utility costs reimbursable to the Condominium Board.

(b)     All such billings to General Common Charge Obligors by or on behalf of the Condominium Board with respect to metered or submetered utilities shall be at the Building's and/or Condominium Board's cost; except that the allocable cost of reading the

meters or submeters of each General Common Charge Obligor may be added to the charges payable to the Condominium Board by each such General Common Charge Obligor.

      6.4.10   Further Submetering.  Each General Common Charge Obligor shall have the right to sub-submeter or allocate, as applicable and as determined in its sole discretion, all or any portion of the utilities within its Utility Service Area and, to bill or otherwise collect amounts from its Occupants or Tower Unit Owners (as to the Tower Board), as the case may be, with respect thereto.  The individual Tower Unit Owners, and if applicable, the Base Unit Owner shall pay their share of their Tower Section's utility costs to the Tower Board in the manner provided in the Tower Section By-Laws.  No such sub-submetering or other allocations or arrangements made by a General Common Charge Obligor, however, shall affect or diminish the primary obligation of such General Common Charge Obligor to the Condominium Board with respect to any such charges, as applicable.

## ARTICLE 7

## REAL ESTATE TAXES AND PILOT; TAX CERTIORARI PROCEEDINGS

      7.1   Real Estate Taxes; Impositions.

      7.1.1   (a)   Until the Units are separately assessed and billed for real estate tax purposes or for Payments-in-Lieu of Real Property Taxes ("PILOT"), the Condominium Board will pay all real estate taxes and/or PILOT with respect to the Property to the Department of Finance of The City of New York (or directly to Declarant if and to the extent Declarant has paid such taxes) and allocate the cost thereof (and all refunds thereof) among all the Units as hereinafter set forth.  The Condominium Board will first allocate such taxes or PILOT to each General Common Charge Obligor in accordance with their respective proportionate Common Interests, provided that if the aggregate real estate tax or PILOT bill for the Property reflects a specific exemption of the CS Unit (and/or the CS LL Unit or CS MS Unit) from such taxation, then the allocation to the CS Unit (and/or the CS LL Unit or CS MS Unit), if any, shall reflect such exemption.  The General Common Charge Obligors shall be responsible and shall pay the Condominium Board for their respective allocated shares (determined as aforesaid), which payments shall be payable as if the same were General Common Charges and will be due at least ten (10) Business Days prior to the due date of such taxes or PILOT.  Such taxes or PILOT will be paid by the Condominium Board in a timely manner so that no lien will be placed on the Property or on any Unit.

      (b)   In addition, until the Base Unit and the Tower Units are separately assessed and billed for real estate tax or PILOT purposes, the Tower Board will pay all real estate taxes and PILOT with respect to the Base Unit and the Tower Units to the Department of Finance of the City of New York (or directly to the Initial Residential Unit Owner, or Declarant Net Lessee of the Initial Residential Unit if and to the extent it has paid such taxes or PILOT) and allocate the cost thereof (and all refunds thereof) among the Base Unit and the Tower Units in accordance with their respective Residential Common Interests, provided that if the aggregate real estate tax or PILOT bill for the Residential Section reflects an exemption of any Unit or Units from such taxation, then the allocation shall reflect such exemption.  The Base Unit Owner and the Tower Unit Owners shall be responsible and shall pay the Tower Board for

their respective allocated shares (determined as aforesaid), which payments shall be payable as if the same were Residential Common Charges and will be due at least ten (10) Business Days prior to the due date of such taxes. Such taxes or PILOT will be paid by the Tower Board in a timely manner so that no lien will be placed on the Residential Section or on the Base Unit or any Tower Unit.

(c)     A Unit Owner will not be responsible for the payment of, and will not be subject to any lien arising from, the non-payment of real estate taxes or PILOT assessed against or allocated to any other Unit(s). Each Unit Owner shall be responsible for the Impositions payable in respect of its Unit.

7.2     <u>Tax Certiorari Proceedings</u>. The Condominium Board, on behalf of and as agent for the Unit Owners, shall commence, pursue and settle certiorari proceedings to obtain reduced real estate tax assessments with respect to such Unit Owners' Units but only to the extent requested and authorized to do so, in writing, by the applicable Unit Owner, and provided such Unit Owner indemnifies the Condominium Board, the other Unit Owners and MTA in its capacity as Declarant from and against all Costs resulting from such proceedings. During the pendency of any such proceedings, the Unit Owner(s) making such request to the Condominium Board and joining therein shall share in the costs thereof in relative proportion to their respective Common Interest; and upon the conclusion of any such proceedings, such Persons shall, after retroactive adjustment for any overpayments or underpayments as a result of prior sharing on the basis of Common Interest, share in the costs thereof in relative proportion to the benefits derived by such Unit Owners therefrom. In the event any such Unit Owner individually seeks to have the assessed valuation of its Unit reduced by bringing a separate certiorari proceeding, the Condominium Board, if necessary or desirable for such proceeding, will execute any documents or other papers required for, and otherwise cooperate with such Unit Owner (at such Unit Owner's cost and expense) in pursuing, such reduction, provided that such Unit Owner indemnifies the Condominium Board and MTA in its capacity as Declarant from all Costs resulting from such proceedings. Certiorari proceedings to obtain reduced real estate tax assessments with respect to the Tower Units shall be commenced, pursued, compromised and settled as and to the extent set forth in the Tower Section By-Laws.

## ARTICLE 8

## ALTERATIONS

8.1     <u>Alterations to Units</u>.

8.1.1     Except as otherwise provided in the Declaration, no Unit Owner (other than Declarant or its designee, the Base Unit Owner or its designee or Tower Sponsor or its designee(s) as the owner of Unsold Tower Units) shall make any Alteration or Repair in or to its Unit if the same materially and adversely would affect the General Common Elements, including without limitation the structure and mechanical and utility systems of the Building, or any access thereto, or any Limited Common Elements or other Units, or access thereto without the prior written approval of the Condominium Board, which approval will not be unreasonably withheld, subject, however, in all cases, to compliance by the Unit Owner with the other requirements and provisions of the Condominium Documents, including, without limitation, this Article 8. Prior

- 41 -

to, and as a condition of, the granting of its consent to the making of any such Alteration or Repair in or to a Unit (to the extent such consent is required), the Condominium Board, at its option, may require the Unit Owner to execute an agreement, in form and substance satisfactory to the Condominium Board, setting forth the terms and conditions under which such Alteration may be made. The consent of the Condominium Board shall not be required for any Alteration or Repair made by a Unit Owner wholly within a Unit which does not materially adversely affect (i) the General Common Elements or Residential Tower Limited Common Elements (including, without limitation, the structure and mechanical and utility systems of the Building) or access thereto, or (ii) another Unit or the Tower Section, or their respective Limited Common Elements or access thereto, subject, however, in all cases, to compliance by the Unit Owner with the other requirements and provisions of the Condominium Documents, including, without limitation, this Article 8.

8.1.2    All Repairs which would affect the structure or systems of the Residential Tower Building and all Alterations to any Unit shall be made in accordance with plans and specifications, which plans and specifications (other than for the CS Unit) shall be subject to review and approval by the Condominium Board, and in the case of the CS MS Unit and CS LL Unit, such consent shall not be unreasonably withheld, conditioned or delayed. All Alterations shall be performed: (i) at the Unit Owner's sole cost and expense; (ii) in a manner which will not interfere with, or cause any labor disturbances or stoppages in, the work of Condominium employees or other contractors or subcontractors employed in the Units or the Building; (iii) during only such days and hours as may be specified by the Condominium Board in its reasonable judgment; (iv) only after obtaining such insurance, naming the Condominium Board and its managing agent, the Tower Board and its managing agent, as the Condominium Board may require; (v) employing such architects, engineers, contractors, subcontractors, suppliers and other laborers who are on the managing agent's then approved list, as such list may change from time to time, in the sole discretion of the Condominium Board; and (vi) in compliance with the Declaration, these Condominium By-Laws, the Tower Section By-Laws, if applicable (including the Rules and Regulations, if any, annexed thereto), and the General Rules and Regulations, if any, the overall Building standards and all applicable Laws.

8.1.3    The CS Unit Owner may make Repairs and Alterations to the CS Unit (as distinguished from the CS LL Unit and the CS MS Unit) without notice to or consent by the Condominium Board, Tower Board or any other Unit Owner, provided that all such Repairs and Alterations shall be performed: (i) at the CS Unit Owner's sole cost and expense; (ii) only after obtaining such insurance, naming the Condominium Board and its managing agent, the Tower Board and its managing agent, as the Condominium Board may require; and (iii) in compliance with the Declaration, these Condominium By-Laws, the Tower Section By-Laws, if applicable (including the Rules and Regulations, if any, annexed thereto), and the General Rules and Regulations, if any, the overall Building standards and all applicable Laws.

8.1.4    The Unit Owner performing or causing, permitting or suffering such Alterations to be performed shall, if required by the Condominium Board, pay the cost of (x) any necessary amendment of the Declaration and the floor plans of the Condominium, if appropriate, to reflect any such Alterations, (y) obtaining all necessary governmental permits, authorizations, certificates and licenses for the commencement and completion of any Alterations (and copies thereof shall be delivered to the Condominium Board promptly after the issuance thereof and

- 42 -

prior to the commencement of any Alterations or Repairs), and obtaining any amendment to the Certificate of Occupancy for such Unit, if necessary, and (z) any reasonable, out-of-pocket architectural, engineering and legal fees incurred by the Condominium Board in connection with such work. The Condominium Board, the Tower Board or the managing agent reserves the right to impose supervisory fees on a Tower Unit Owner in connection with any Alterations to such Tower Unit Owner's Tower Unit. Neither the Condominium Board nor any Unit Owner (other than the Unit Owner making or causing, permitting or suffering any Alterations to be made in or to its Unit) shall incur any liability, cost, or expense either: (a) in connection with the preparation, execution, or submission of the applications referred to above; (b) to any contractor, subcontractor, supplier, architect, engineer or laborer on account of any Alterations made or caused, permitted or suffered to be made by any Unit Owner; (c) to any Person or entity asserting any claim for personal injury or property damage arising therefrom; or (d) arising out of a Unit Owner's failure to obtain any permit, authorization, certificate or license, or to comply with the Declaration, these Condominium By-Laws, the Tower Section By-Laws, if applicable (including the Rules and Regulations annexed thereto) and the General Rules and Regulations, if any, and all applicable Laws insofar as the same relate to Alterations. A Unit Owner making or causing, permitting or suffering any tenant or occupant to make, any Alteration shall be deemed to have agreed to indemnify and hold the Condominium Board and its managing agent, the Tower Board and its managing agent, the Base Unit Owner and its managing agent (if any), MTA in its capacity as Declarant, and all other Unit Owners harmless from and against any liability, loss, cost, or expense arising therefrom, and from and against all Costs resulting from, arising out of, or in any way connected with, any of the foregoing.

8.1.5    Any application to any department of the City of New York or to any other Governmental Authority having jurisdiction thereof for a permit to make an Alteration in or to any Unit so approved by the Condominium Board, to the extent such is approval is required under the Declaration or these Condominium By-Laws, shall, if required by applicable Laws or such department or authority, be executed by the Condominium Board, provided that the Condominium Board shall not incur any liability, cost or expense in connection with such application or to any contractor, subcontractor, supplier, architect or engineer on account of such Alteration or to any person having any claim for injury to person or damage to property arising therefrom.

8.1.6    Notwithstanding anything to the contrary contained in this Section 8.1 (but subject to all applicable Laws), Tower Sponsor and its designees shall have the right pursuant (and subject) to the terms of the Declaration, without the approval of any Board, to: (i) make any Alterations and Repairs in or to any Unsold Units, whether structural or non-structural, interior or exterior, ordinary or extraordinary; and (ii) subdivide, combine and change the boundary walls of Unsold Units. Additionally, an initial purchaser of an Unsold Unit shall have the right, without the approval of the Board, to make any Alterations in or to its Unit, provided that the Tower Sponsor or their designee has consented to the same in writing at or prior to the initial closing of title to such Unit, and that such purchaser complies with all of the other requirements of this Article 8 and applicable requirements of Article 8 of the Declaration.

8.1.7    In addition to the requirements set forth above in this Section 8.1, until a permanent Certificate of Occupancy is obtained for the Residential Tower Building, no Unit Owner shall make any Alterations in or to its Unit without first notifying the Tower Board and

the Tower Sponsor of the same in writing and complying with the reasonable requirements of the Tower Board and the Tower Sponsor with respect to the same.  Such requirements may include, but need not be limited to, the requirements that:

        (a)    such work not include any change that would result in a delay in obtaining a temporary or permanent Certificate of Occupancy for the Residential Tower Building, or any amendment to, or extension of, the same if theretofore issued;

        (b)    the Unit Owner posts a bond or other similar security that is reasonably acceptable to the Tower Board and the Tower Sponsor in an amount sufficient (in their reasonable judgment) to insure the diligent completion of the work and the filing of any required notices or certificates with respect to such work and the completion of the same with all Governmental Authorities having jurisdiction;

        (c)    such work not be commenced until the Unit Owner causes all required plans, specifications, notices and/or certifications to be filed with all Governmental Authorities having jurisdiction, procures all required permits and licenses with respect to the same, and delivers copies of all such plans, specifications, notices, certifications, permits and licenses to the Tower Board and the Tower Sponsor;

        (d)    such work be diligently prosecuted to completion in compliance with all plans, specifications, notices and/or certifications and in conformity with all permits and licenses;

        (e)    the Tower Board and the Tower Sponsor and their representatives shall be given reasonable opportunity, from time to time, to inspect such work as it progresses;

        (f)    promptly after the completion of such work, all necessary inspections and approvals of the same shall be obtained, all necessary notices and/or certifications shall be filed with the appropriate Governmental Authorities and the Tower Board and the Tower Sponsor shall be given a copy of all such inspections, approvals, notices and certifications;

        (g)    the Unit Owner shall indemnify and hold the Tower Board, the Tower Sponsor and MTA in its capacity as Declarant, harmless from any cost, expense, claim, or liability arising, directly or indirectly, from such work, including, without limitation, any cost, expense, claim, or liability incurred or suffered by the Tower Board or the Tower Sponsor due to any violation of a Law or due to any delay in obtaining a temporary or permanent Certificate of Occupancy for the Residential Tower Building (or any amendment to, or extension of, the same if theretofore issued) as a result of such work or the failure to make all appropriate governmental filings in connection with the same; and

        (h)    all contractors shall be duly licensed to the extent required by applicable Laws and, if required under any contract with any union whose members are performing services at the Residential Tower Building (including, without limitation, services directly or indirectly at the behest, for the benefit, or for the account of the Tower Board or the Tower Sponsor, any other Unit Owner, or Board), such work shall be performed solely by union members.

(i)     For the avoidance of doubt, the foregoing provisions of this Section 8.1.7 do not apply to the initial construction of the CS Building, the construction of which shall be governed by the DCA.

8.1.8    If any Unit Owner commences any such Alterations in violation of the foregoing terms and conditions, or fails to comply with the reasonable requirements of the Tower Board or the Tower Sponsor in connection with the same, the Tower Board or the Tower Sponsor, as the case may be, after ten (10) days' prior written notice, shall be entitled to cause such work by the Unit Owner to be halted, including, without limitation, to cause the managing agent to deny access to the Residential Tower Building to the Unit Owner's workers and suppliers, until the Unit Owner complies with the same. During the period until such Unit Owner is permitted hereunder to resume its work, the Tower Board and the Tower Sponsor shall have the right to perform any and all work in and to such Unit Owner's Unit as shall be necessary, in the sole judgment of the Tower Board or the Tower Sponsor, in order to avoid any delay in obtaining a temporary or permanent Certificate of Occupancy for the Building (or any amendment to, or extension of, the same if theretofore issued), whether or not such work shall be in compliance with the plans and specifications for the work theretofore performed by, or on behalf of, such Unit Owner. The cost and expense of any such work performed by the Tower Board or the Tower Sponsor, as the case may be, shall be borne by such Unit Owner and shall be paid to the Tower Board or the Tower Sponsor, as applicable, within fifteen (15) days of written demand therefor.

8.2    Alterations to Tower Section; and Residential Limited Common Elements; Tower Units. Unless otherwise provided in the Tower Section By-Laws, the Tower Board shall have the exclusive right to make Alterations to the Tower Limited Common Elements and Residential Limited Common Elements, subject to Section 6.3.2(d) hereof. In addition, subject in all events to the provisions hereof regarding conflicting terms, Alterations to the Tower Units and the Tower Limited Common Elements (subject to Section 6.3.2(d) hereof) be further subject to such additional terms, conditions and requirements as may be contained in the Tower Section By-Laws from time to time or as shall be imposed by the Tower Board (including, without limitation, requiring that any approvals or consents required or permitted to be obtained by a Tower Unit Owner from the Condominium Board, a Unit Owner other than another Tower Unit Owner be obtained by the Tower Board on the Tower Unit Owner's behalf). Any of the foregoing requirements and authority of the Condominium Board set forth in Section 8.1 may be delegated by the Condominium Board to the Tower Board with the agreement of the Tower Board.

8.3    Alterations to CS Group. The CS Unit Owner shall have the exclusive right to make Alterations to the CS Group (such Alterations to be made in accordance with the applicable provisions of the Condominium Documents and subject to the DCA).

8.4    Alterations to Base Unit. Only the Base Unit Owner shall have the right to make Alterations to the Base Unit (such Alterations to be made in accordance with the applicable provisions of the Condominium Documents).

8.5     Alterations to General Common Elements.

8.5.1     Cost and Approval.  Alterations in or to any General Common Element may be made only by the Condominium Board, authorized in accordance with the provisions hereof and the cost thereof shall be charged to the General Common Charge Obligors in accordance with Article 6 hereof.

8.5.2     Without Consent of Affected Unit Owner(s) or Board(s). Notwithstanding any other provision of the Condominium Documents, to the extent that any Alteration (including Repair) of the General Common Elements and/or Residential Tower Limited Common Elements is necessary to comply with applicable Laws or Insurance Requirements, or for the health or safety (but not the general comfort or welfare) of the Unit Owners or their Occupants or Permittees or in the case of an Emergency, the Condominium Board may make and perform the same without the consent of any Unit Owner(s) or the Tower Board that would, or whose Unit(s) or Limited Common Elements would, be affected thereby; however, notice shall be provided to the CS Unit Owner as soon as reasonably practicable.

8.6     Security.  Notwithstanding anything to the contrary contained in this Article 8 or elsewhere in the Condominium Documents, if deemed appropriate by the Condominium Board, the Condominium Board may require the posting of security, as determined in the Condominium Board's reasonable discretion, for any Alterations to be performed by a Unit Owner or the Tower Board in its Unit or in the Tower Section which could reasonably be expected to affect another Unit or the Tower Section or the Residential Section or such Unit's or Section's Limited Common Elements or the General Common Elements and/or Residential Tower Limited Common Elements, or would be expected to cost in excess of an amount as reasonably determined by the Condominium Board.

## ARTICLE 9

## MECHANIC'S LIENS, VIOLATIONS; COMPLIANCE WITH LAWS AND INSURANCE REQUIREMENTS; HAZARDOUS MATERIALS

9.1     Mechanic's Liens.  In the event that any mechanic's lien is filed against any Unit or other portion of the Property as a result of services provided or materials furnished to, or Alterations or Repairs or other work performed for:  (a) (i) the Base Unit Owner or any Tower Unit Owner, or such Unit Owner's Occupants or Permittees) with respect to all or any portion of its Unit, or any Limited Common Elements over which it exercises exclusive control pursuant to the Declaration or the Tower Section By-Laws, as applicable,  or (ii) the CS Unit Owner, the CS LL Unit Owner or the CS MS Unit Owner (or such Unit Owner's Occupants or Permittees) with respect to all or any portion of its Unit, or any Limited Common Elements over which it exercises exclusive control pursuant to the Declaration (each such Unit Owner, for purposes of this Section 9.1, being referred to as the "Lien-Causing Unit Owner"); (b) the Tower Board (or its managing agent or such Board's Occupant's or Permittees) with respect to the Tower Limited Common Elements (other than those over which one or more Tower Unit Owners exercises exclusive control pursuant to the Declaration or the Tower Section By-Laws) or any Tower Unit owned by the Tower Board or its designee; or (c) the Condominium Board (or its managing agent or such Board's Occupants or Permittees) with respect to the General Common Elements

or any Unit owned by the Condominium Board or its designee (in each such case (b) or (c), for purposes of this Section 9.1, such Board being referred to as the "Lien-Causing Board"), or alleged to have been provided or furnished to, or performed for, any such Lien-Causing Unit Owner or Lien-Causing Board, as the case may be, then such Lien-Causing Unit Owner or Lien-Causing Board shall promptly notify the Condominium's managing agent (or, if there is no managing agent, the Condominium Board) of same, and shall cause such lien to be released and discharged of record, either by paying the indebtedness which gave rise to such lien or by posting a bond or other security as shall be required by law to obtain such release and discharge, in each case within sixty (60) days after receiving from the Board or Unit Owner whose Unit (and/or Limited Common Element, as applicable) has been adversely affected by such mechanic's lien, or from the Condominium Board if any General Common Elements have been adversely affected by such mechanic's lien, a notice (a "Lien Notice") identifying the lien and requesting that the same be released, bonded or discharged, failing which: (y) the Condominium Board (in the case of a Lien-Causing Unit Owner or the Lien-Causing Board of the same in the Tower Board), or (z) each of the Unit Owners and the Tower Board (if the Condominium Board is the Lien-Causing Board), shall have the rights set forth in Article 12 of these Condominium By-Laws. For purposes of this Section 9.1, the applicable Board or Unit Owner shall be deemed to be "adversely affected" by a mechanic's lien (which is the responsibility of a Lien-Causing Unit Owner or Lien-Causing Board to remove, as aforesaid) if: (i) in the case of the Tower Board, any of the Tower Units or Limited Common Elements within the Tower Section, or (ii) in the case of a Unit Owner that is affected, such Unit Owner's Unit and/or any Limited Common Elements over which such Unit Owner exercises exclusive control pursuant to the Condominium Documents, as applicable, is/are reasonably purportedly (whether or not actually) encumbered by or subjected to the mechanic's lien (provided such mechanic's lien arises from services provided or materials furnished to, or Alterations or Repairs or other work performed for or alleged to have been provided or furnished to, or performed for, the Lien-Causing Unit Owner or the Lien-Causing Board, and not by, to or for the putatively 'adversely affected' Unit Owner or Board or its/their Occupants or Permittees). In all events, the Lien-Causing Unit Owner or Board shall defend, protect, indemnify and hold harmless all other Unit Owners, Boards (and their Occupants) and MTA in its capacity as Declarant from and against any and all Costs arising out of or resulting from the applicable mechanic's lien. Copies of all Lien Notices sent by the Tower Board or Unit Owner shall be simultaneously sent to the Condominium Board.

9.2     Violations. In the event that any violation shall be noted or noticed against any Unit or other portion of the Property as a result of any condition at the Property created or suffered by or existing with respect to: (a) (i) the Base Unit Owner or any Tower Unit Owner, or such Unit Owner's Occupants or Permittees with respect to all or any portion of its Unit, or any Limited Common Elements over which it exercises exclusive control pursuant to the Declaration or the Tower Section By-Laws as applicable, or (ii) the CS Unit Owner, the CS LL Unit Owner or the CS MS Unit Owner (or such Unit Owner's Occupants or Permittees); with respect to all or any portion of its Unit, or any Limited Common Elements over which it exercises exclusive control pursuant to the Declaration (each such Unit Owner, for purposes of this Section 9.2, being referred to as the "Violation-Causing Unit Owner"); (b) the Tower Board (or its managing agent or such Board's Occupant's or Permittees) with respect to the Tower Limited Common Elements (other than those over which one or more Tower Unit Owners exercises exclusive control pursuant to the Declaration or the Tower Section By-Laws) or any Tower Unit owned by the Tower Board or its designee; or (c) the Condominium Board (or its managing agent or such

- 47 -

Board's Occupants or Permittees) with respect to the General Common Elements or any Unit owned by the Condominium Board or its designee (in each such case (b) or (c), for purposes of this Section, such Board being referred to as the "Violation-Causing Board"), the Violation-Causing Unit Owner or the Violation-Causing Board, as the case may be, shall promptly notify the Condominium's managing agent (or, if there is no managing agent, the Condominium Board) of same, and shall cause the violation to be removed and the condition giving rise to the violation to be cured, in each case within sixty (60) days after receiving, from the applicable Sub-Board or Unit Owner whose Unit or Limited Common Element, as applicable, has been adversely affected by such violation, or from the Condominium Board if any General Common Elements have been adversely affected by such violation, a notice (a "Violations Notice") identifying the violation and requesting that the same be removed and/or bonded and the condition giving rise to it be cured (provided that if such violation cannot, notwithstanding diligent efforts, be removed and/or such condition cured within such sixty (60) day period, the Violation-Causing Unit Owner or the Violation Causing Board, as the case may be, commences the removal of such violation and/or the curing of such condition as promptly as practicable within such sixty (60) day period and thereafter proceeds with diligence and continuity to complete such removal and/or cure); failing which: (y) the Condominium Board (in the case of a Violation-Causing Unit Owner or the Violation-Causing Board if the same is the Tower Board), or (z) each of the Unit Owners and the Tower Board (if the Condominium Board is the Violation-Causing Board), shall have the rights set forth in Article 12 of these Condominium By-Laws. For purposes of this Section 9.2, a Board or a Unit Owner shall be deemed to be "adversely affected" by a violation or condition giving rise to a violation (which is the responsibility of a Violation-Causing Unit Owner or Violation-Causing Board to remove or cure, as aforesaid) if: (i) in the case of the Tower Board being affected, any of the Tower Units or Limited Common Elements within the Tower Section, as applicable; or (ii) in the case of a Unit Owner that is affected, any of such Unit Owner's Unit or appurtenant Limited Common Elements over which such Unit Owner exercises exclusive control pursuant to the Condominium Documents as applicable, in each case, is/are reasonably purportedly (whether or not actually) subjected to the violation or the violation is noted against same (provided such violation arises from a condition at the Property created or suffered by the Violation-Causing Unit Owner or the Violation-Causing Board, and not by the putatively 'adversely affected' Unit Owner or Board or its/their Occupants or Permittees). In all events, the Violating-Causing Unit Owner or Board shall defend, protect, indemnify and hold harmless all other Unit Owners and Boards (and their Occupants) from and against any and all Costs arising out of or resulting from any contest proceeding undertaken pursuant to Section 9.3, or the underlying violation or non-compliance related thereto. Copies of all Violations Notices sent by the Tower Board or a Unit Owner shall be simultaneously sent to the Condominium Board.

     9.3    Compliance With Laws, Insurance Requirements. Each Unit Owner and each Board, without cost or expense to the other Unit Owner(s) and Boards (except that costs and expenses incurred by the Condominium Board pursuant to this sentence are General Common Expenses), shall promptly comply and/or cause its Occupants or Permittees to comply with all applicable Laws and Insurance Requirements applicable to such Unit Owner's or Board's Unit or Section, Limited Common Elements or General Common Elements, as applicable; provided, however, that each Unit Owner and each Board shall have the right to contest, by appropriate legal or administrative proceedings diligently conducted in good faith, the validity or applicability to it of any such applicable Law or Insurance Requirement and may delay compliance until a final decision has been rendered in such proceedings and appeal is no longer

possible, unless such delay is reasonably likely to (1) render the other Unit(s) or any portion of any of the Common Elements liable to forfeiture, involuntary sale or loss, (2) result in involuntary closing of any use of the other Unit(s) or any portion of any of the Common Elements or business conducted thereon or therein, (3) subject another Unit Owner or Board to potential or real civil or criminal liability, (4) impair or prohibit any insurance required to be maintained hereunder or under any of the other Condominium Documents, or (5) subject any other Unit or Common Element to any lien or encumbrance, in which case (with respect to any of the foregoing clauses (1)-(5)) the contesting Unit Owner or Board shall immediately take such steps as may be necessary to prevent any of the foregoing, including posting bonds or security for complying with such Law or Insurance Requirement. If such alternate measures shall not be effective to prevent any of the foregoing, then such contesting Person shall comply with the applicable requirements pending the resolution of any such contest. Each non-contesting Unit Owner and Board shall cooperate to the fullest extent necessary with any contesting Unit Owner or Board in any proceeding undertaken pursuant to this provision, including executing necessary documents or consents to such contest, provided all costs and expenses incurred with respect thereto are paid by the contesting Unit Owner or Board, as the case may be. In all events, the contesting Unit Owner or Board shall defend, protect, indemnify and hold harmless all other Unit Owners and Boards (and their Occupants) from and against any and all Costs arising out of or resulting from any proceeding undertaken pursuant to this Section 9.3 or the underlying violation or non-compliance related thereto.

     9.4    <u>Hazardous Materials</u>. No Unit Owner (or its Occupants or Permittees) or Board shall store, use or permit the storage or use of Hazardous Materials on, about, under or in its Unit, Limited Common Element or otherwise in or on the Property, except to the extent that such Hazardous Materials are necessarily and customarily used in the ordinary course of usual business operations conducted thereon or as it relates to the CS Building is used in connection with any arts, cultural and/or performance installations, and any such storage and/or use shall at all times be in compliance with all applicable Environmental Laws. Each Unit Owner and Board shall defend, protect, indemnify and hold harmless each other Board, each other Unit Owner (and the Occupants of each of the foregoing) and MTA in its capacity as Declarant from and against any and all claims or demands, including any action or proceeding brought thereon, and all costs, losses, expenses and liabilities of any kind relating thereto, including, but not limited to, costs of investigation, remedial response, and reasonable attorneys' fees and cost of suit, arising out of or resulting from any Hazardous Material stored, used, maintained, released, or otherwise introduced by such Unit Owner or Board (including its Occupants and Permittees) under or in its respective Unit, Section, Common Elements, Limited Common Elements and General Common Elements or otherwise in or on the Property.

## ARTICLE 10

## RECORDS AND AUDITS

     10.1    <u>The Condominium Board</u>. The Condominium Board (or its managing agent) shall keep detailed records of the actions of the Condominium Board, minutes of the meetings of the Condominium Board, minutes of the meetings of the Unit Owners, if any, and financial records and books of account with respect to the activities of the Condominium Board, including a listing

of all receipts and expenditures (collectively, the "Records"). In addition, the Condominium Board shall keep a separate account for each General Common Charge Obligor which, among other things, shall contain the amount of each assessment of General Common Charges and other amounts required by the Condominium Board to be paid by such Person, the date when due, the amounts paid thereon and the balance, if any, remaining unpaid (collectively, the "General Common Expenses Records").

        10.1.1   Within four months after the end of each fiscal year, an annual report of receipts and expenditures, prepared and certified by an independent certified public accountant or an independent certified public accounting firm, shall be submitted by the Condominium Board to all Unit Owners, Registered Mortgagees and Permitted Tower Mortgagees who have requested the same in writing. The cost of such report submitted by the Condominium Board shall be a General Common Expense.

        10.2   Availability of Documents. Copies of the Declaration, these Condominium By-Laws, the General Rules and Regulations, the Tower Section By-Laws and Tower Section Rules and Regulations, and the Floor Plans, as the same may be amended from time to time, shall be maintained at the office of the Condominium Board and shall be available for inspection by Unit Owners and their authorized agents during reasonable business hours and upon reasonable prior notice.

        10.3   Right to Audit. In order to confirm the correctness of any Final Operating Statement, and/or in the event of any dispute with respect to General Common Charges, each General Common Charge Obligor (and their respective authorized representatives) shall have the right, from time to time but not more frequently than three (3) times in any one calendar year or twice with respect to any fiscal year, and upon reasonable notice, to inspect or audit (any such inspection or audit, an "Audit") the applicable Records and General Common Expense Records and to make extracts or copies thereof (including electronic copies of any such Records or General Common Expense Records that are kept in electronic form). Such notice shall specifically designate the year(s) for which such General Common Charge Obligor intends to Audit applicable Records and General Common Expense Records, which year(s) shall be limited to the six (6) full fiscal years immediately preceding the date of such inspection and any then elapsed portion of the then current fiscal year. Any General Common Charge Obligor making or causing to be made any Audit hereunder shall provide the Condominium Board with a copy of any written report of the results of such Audit within forty-five (45) days after the preparation thereof. All costs of such Audit shall be borne by the party making or causing the Audit. In connection with any Audit covering a Final Operating Statement and/or General Common Charges relating to a particular fiscal year, the General Common Charge Obligor making or causing to be made such Audit, and its authorized representatives, shall have the right to inspect the Records and General Common Expense Records relating to all other fiscal years and to make extracts or copies thereof (including electronic copies of any such Records or General Common Expense Records that are kept in electronic form).

## ARTICLE 11

## INSURANCE; CASUALTY; CONDEMNATION

11.1    Condominium Board's Insurance Requirements. The Condominium Board shall exercise best efforts to obtain and maintain, to the extent obtainable and maintainable at commercially reasonable rates, the following insurance with respect to the General Common Elements and the Residential Tower Limited Common Elements, and, to the extent that the Condominium Board is responsible for Repair or restoration of the same, the Tower Terrace (the "Condominium Board Insured Property").

11.1.1    Insurance against loss customarily included in so-called Special Causes of Loss or the equivalent insurance written with replacement cost basis of the Condominium Board Insured Property, including building collapse and such other insurable hazards as from time to time are or would be reasonably and customarily insured against for other property and buildings similar to the Residential Tower Building in use, location, height, and type of construction. Such insurance policy shall also insure costs of demolition and increased cost of construction, including, without limitation, increased costs arising out of changes in applicable laws and codes regulating reconstruction following a loss (which insurance for demolition and increased cost of construction shall be in an amount not less than $25,000,000), insuring the Condominium Board Insured Property. Such insurance shall cover the interests of the Condominium, the Tower Board, all Unit Owners and Declarant Net Lessees thereof, all Permitted Tower Mortgagees (as a group) and all Registered Mortgagees, as their respective interests may appear. In addition, the Special Causes of Loss property insurance shall also provide coverage for (A) mold (which may be insured on a separate pollution legal liability policy), (B) terrorism (subject to its availability at commercially reasonable rates), (C) flood (including sewer backup), having a sublimit of the greater of (i) $25,000,000 per occurrence and in the annual aggregate and (ii) an amount equal to the 100-year probable maximum loss, and (D) earth movement, having a sublimit of the greater of (i) $25,000,000 per occurrence and in the annual aggregate and (ii) an amount equal to the 250-year probable maximum loss as determined by an acceptable PML (probable maximum loss study). The amount of such Special Causes of Loss or its equivalent insurance shall be not less than one hundred percent (100%) of the aggregate replacement cost value of the Condominium Board Insured Property (without deduction for depreciation), and such insurance shall include Extra Expense and Expediting Expense coverage in such amounts as the Condominium Board, from time to time, may determine, but in no event less than $50,000,000 for each coverage. Each such insurance policy shall contain a removal or waiver of the co-insurance provisions and a replacement cost endorsement. Such coverage shall be subject to deductibles not to exceed $250,000. Such coverage shall not include any Unit, or any fixtures, improvements, furnishings or personal property within any Unit. The parties insured under such Special Causes of Loss or its equivalent insurance required under this Section 11.1.1 hereby waive all rights against each other and any of their respective agents, consultants and employees, each of the other, as to claims and damages to the extent covered by such available insurance.

11.1.2    If not included in the coverage described in Section 11.1.1 hereof, Comprehensive Boiler & Machinery coverage on a replacement cost basis with a limit no less than twenty percent (20%) of the Building's Special Causes of Loss policy required under

Section 11.1.1 above, covering the Condominium Board Insured Property, and such insurance shall include Extra Expense and Expediting Expense coverage in such amounts as the Condominium Board, from time to time, may determine but in no event less than $10,000,000 each occurrence and in the aggregate separately from each coverage, and covering the interests of the Condominium, the Tower Board (when created) and all Unit Owners and Declarant Net Lessees thereof, and Registered Mortgagees, as their respective interests may appear. Each such insurance policy shall contain a removal or waiver of the co-insurance provisions and a replacement cost endorsement. Furthermore, if applicable, Business Income and or Rental Income insurance (A) covering all risks required to be covered by the insurance provided for in this section above covering a loss on an "actual loss sustained" basis; (B) in an amount equal to one hundred percent (100%) of the projected gross revenues from the operation of the Condominium Board Insured Property for a period of at least twenty-four (24) months after the date of the Casualty; and (C) containing an extended period of indemnity endorsement which provides that after the physical loss to the Improvements and Personal Property has been repaired, the continued loss of income will be insured for three hundred sixty (360) days if commercially available, if not one hundred eighty (180) days, or until such income either returns to the same level it was at prior to the loss, resumed, notwithstanding that the policy may expire prior to the end of such period. The parties insured under such Comprehensive Boiler and Machinery coverage required under this Section 11.1.2 hereby waive all rights against each other and any of their respective agents, consultants and employees, each of the other, as to claims and damages to the extent covered by such available insurance.

11.1.3    Workers' Compensation insurance and New York State Disability benefits insurance as required by applicable Laws and Employer's Liability coverage with limits of not less than $1,000,000, covering any employees of the Condominium (provided, however, that if the Condominium Board does not have any direct employees, such insurance shall be purchased on an "if any" basis and the respective Unit Owner or management company shall be responsible for purchasing Workers' Compensation insurance for its employees).

11.1.4    Crime insurance covering the Condominium Board and all officers, directors and employees of the Condominium and of any managing agent(s) of the Condominium with limits of not less than $1,000,000, and with such deductible as is commercially reasonable and maintained by owners of properties similar in type, location and quality as the Residential Tower Building.

11.1.5    Directors' and Officers' Liability insurance with respect to the Condominium Board with limits of no less than $1,000,000.

11.1.6    Commercial General Liability policy of insurance written on a current ISO CG 001 occurrence form or equivalent liability coverage, including, coverage for damages because of bodily injury, property damage, personal and advertising injury, and products-completed operations. This insurance shall have annual limits of not less than $1,000,000 per occurrence and $2,000,000 annual aggregate. This insurance shall further: (A) contain a "Notice and Knowledge of Occurrence, Unintentional Errors and Omissions" endorsement; (B) contain no exclusions or limitations for elevators or escalators if such terms are commercially available; (C) contain, if such terms are commercial available, no exclusions for suits amongst insureds (i.e., no "Cross Liability" exclusion); (D) contain a provision extending coverage to independent

contractors of the insured(s); and (E) contain no modification of the insured contract exception to the contractual liability exclusions, (thereby covering, to the maximum extent permitted by applicable Laws and in accordance with the policy terms and conditions, obligations to indemnify the holder of any mortgage covering the General Common Elements). The policy or policies described in this subsection shall cover the following entities as follows:

(a)      The Condominium, Condominium Board, the managing agent(s) of the Condominium, the members of the Condominium Board and each officer and employee of the Condominium shall be the named insured on such Commercial General Liability policy;

(b)      The Tower Board, together with its subsidiaries, affiliates, directors, officers, members, managers, partners, agents, employees, servants and assignees, managing agents and Permitted Tower Mortgagees, if any, and such other entities as shall reasonably be requested shall be included as additional insured(s) on a primary and non-contributory basis, except that such policy will not cover the liability or negligence of the Tower Board arising from occurrences within or about the Tower Section; and

(c)      Each of the Unit Owners and Declarant Net Lessees thereof, together with their subsidiaries, affiliates, directors, officers, members, managers, partners, agents, employees, servants and assignees, managing agents and Registered or Permitted Mortgagees, if any, and such other entities as shall reasonably be requested shall be included as additional insured(s) on a primary basis, except that such policy will not cover the liability or negligence of a Unit Owner or Declarant Net Lessee arising from occurrences within or about its own Unit or the Limited Common Elements appurtenant thereto.

11.1.7    Hired and Non Owned Automobile Liability insurance on a current ISO form or equivalent with limits of $1,000,000 Combined Single Limit for bodily injury and property damage.

11.1.8    Umbrella or Excess liability insurance following form to the Employer's Liability, Automobile Liability, and Commercial General Liability insurance, and providing coverage that will "drop down" for defense and indemnity in the event of exhaustion of the underlying insurance, with limits of not less than $100,000,000 per occurrence and annual aggregate per location, or in such higher limits as the Condominium Board, from time to time, may determine. All entities required to be added as additional insureds on the Commercial General Liability insurance policy shall also be added as additional insureds on the Umbrella or Excess liability policy on a primary and non-contributory basis.

11.1.9    At all times prior to completion of the Residential Tower Building and in accordance with the DCA:

(a)      In lieu of the insurance described in Section 11.1.1 hereof, the Condominium Board shall carry, or cause Developer to carry, Special Causes of Loss "Builder's Risk" insurance or an installation floater in such amount as any Construction Lender shall require but in no event less than the completed value of the foundation and then once vertical construction begins one hundred percent (100%) of the replacement cost value of the completed Residential Tower Building (including, without limitation, one hundred (100%) percent of the

replacement cost value of all tenant improvements and betterments (other than those that are owned by tenants and not required to be insured or replaced by the landlord under the applicable lease, but excluding foundations and any other improvements not subject to physical damage)). Such insurance shall cover the interests of the Condominium Board, the Tower Board, all Unit Owners and Declarant Net Lessees thereof, all Permitted Tower Mortgagees (as a group) and all Registered Mortgagees, as their respective interests may appear. Such policy shall be written on a Builder's Risk Completed Value Form (100% non-reporting) or its equivalent and shall include, without limitation, coverage for loss by testing, collapse, theft, flood, and earth movement. Such insurance policy shall also include coverage for:

(i)     Loss suffered with respect to materials, equipment, heating and air conditioning machinery, machinery, and supplies, in each case owned by the Condominium Board or the Developer or required to be insured by the Condominium Board or an Owner, whether on-site, in transit, or stored offsite and with respect to temporary structures, hoists, sidewalks, retaining walls, and underground property in each case owned by the Condominium Board or an Owner or required to by insured by the Condominium Board or an Owner;

(ii)     Soft costs that are recurring costs, which shall include, without limitation, delayed opening loss of income/revenue coverage for a period of recovery of not less than twelve (12) months commencing from the date the Residential Tower Building was to be completed as agreed to by the holder of the mortgage on the General Common Elements and/or Residential Tower Limited Common Elements, or such improvements and betterments, as the case may be, as well as costs to reproduce plans, specifications, blueprints and models in connection with any restoration following a casualty;

(iii)     Demolition, debris removal and increased cost of construction, including, without limitation, increased costs arising out of changes in applicable Laws and codes in an amount not less than $25,000,000; and

(iv)     Operation of building laws (which insurance under this clause (iv) may contain a sublimit of $5,000,000).

(b)     The Condominium Board (or the Developer) shall cause its construction manager responsible for the completion of the Residential Tower Building (the "Construction Manager") to obtain and maintain the following insurance:

(i)     Commercial General Liability coverage written on a current ISO CG 001 occurrence form or equivalent, including, without limitation, coverage for damages because of bodily injury, property damage, personal and advertising injury, and products and completed operations and containing no "X", "C", "U" exclusion if excavation and/or demolition is to be provided. Such insurance shall have annual limits of not less than $100,000,000 in limits per occurrence and in the aggregate per project through primary and umbrella liability coverages. Such insurance shall name the Condominium Board (and Developer) as the insured and the holder of any mortgage on the Building or portion thereof as additional insured. The Condominium Board (or Developer, as the case may be) shall also require that all trade contractors cause all of their respective subcontractors to maintain similar

- 54 -

coverage with limits of no less than $5,000,000 per occurrence and shall include the Condominium Board, Developer and the holder of any mortgage on the Residential Tower Building or portion thereof as additional insureds. In the event the Construction Manager, or any trade contractors (including their respective subcontractors of all tiers) maintain limits greater than set forth herein, the Condominium Board (or the Owner of the Building) and the then currently listed additional insureds shall be included therein as an additional insureds to the fullest extent of all such insurance in accordance with all terms and provisions herein.

(ii)    Workers' Compensation insurance and New York State Disability benefits insurance as required by applicable Laws and Employer's Liability coverage with limits of not less than $1,000,000 per bodily injury/disease, covering any employees of the Condominium (provided, however, that if the Condominium Board does not have any direct employees, such insurance shall be purchased on an "if any" basis and the respective Unit Owner or management company shall be responsible for purchasing Workers' Compensation insurance for its employees).

(iii)    Hired and Non Owned Automobile Liability insurance on a current ISO form or equivalent with limits of $1,000,000 Combined Single Limit for bodily injury and property damage.

(c)    In lieu of the insurance described in Sections 11.1.3, 11.1.6, 11.1.7, 11.1.8 and 11.1.9(b) hereof, the Condominium Board (or Developer) may provide such insurance through the purchase of a Wrap-up or Owner Controlled Insurance Program. This program shall provide coverage for all Persons engaged in construction operations at the Building. Such Wrap-up or Owner Controlled Insurance Program shall have liability limits of not less than $100,000,000.

(d)    The Condominium Board is responsible for insuring the core and shell of the CS LL Unit and such insurance requirement may be deemed satisfied to the extent the same is insured by the Builder's Risk Policy for Parcel C.

11.1.10    For so long as the Terrorism Risk Insurance program Reauthorization Act of 2015 or its equivalent is still in effect, the Condominium Board may obtain terrorism coverage written by a non-rated captive insurer.

11.1.11    Such other insurance as the Condominium Board may determine advisable or necessary from time to time (the insurance referred to in Sections 11.1.1 through 11.1.11, collectively, the "Condominium Board Insurance"). The Condominium Board Insurance shall have deductibles in such amounts as the Condominium Board, from time to time, may reasonably determine, taking into account market conditions, or as may be required by the holder of any mortgage covering the Condominium Board Insured Property, except as otherwise noted herein. The Condominium Board shall review the limits of Condominium Board Insurance at least once each year.

11.1.12    The Condominium Board shall also comply with any applicable insurance requirements contained in the Construction Loan Documents and the Construction Loan Mortgage, for so long as the Construction Loan Mortgage remains in effect as to any Unit.

- 55 -

11.2     CS Unit Owner's Insurance Requirements.  Each of the CS Unit Owner, the CS LL Unit Owner and the CS MS Unit Owner shall obtain and maintain the following insurance in such amounts and in such limits as described below:

11.2.1    Commercial General (Public) Liability insurance written on a current ISO CG 001 occurrence form or equivalent liability coverage, including coverage for damages because of bodily injury, property damage, personal and advertising injury, and products-completed operations.  This insurance shall have annual limits of not less than $1,000,000 per occurrence and $2,000,000 annual aggregate.  This insurance shall further: (A) contain a "Notice and Knowledge of Occurrence, Unintentional Errors and Omissions" endorsement; (B) contain no exclusions or limitations for elevators or escalators if such terms are commercially available; (C) contain, if such terms are commercial available, no exclusions for suits amongst insureds (i.e., no "Cross Liability" exclusion); (D) contain a provision extending coverage to independent contractors of the insured(s); and (E) contain no modification of the insured contract exception to the contractual liability exclusion.  The Unit Owner purchasing such Commercial General Liability policy shall be the named insured.  Each of the Boards and the other Unit Owners, together with its or their respective subsidiaries, affiliates, directors, officers, members, managers, partners, agents, employees, servants and assignees, managing agents and mortgagees, and such other entities as shall reasonably be requested by the Boards shall be included as additional insured(s).

11.2.2    Hired and Non Owned Automobile Liability insurance on a current ISO form or equivalent with limits of $1,000,000 Combined Single Limit for bodily injury and property damage.

11.2.3    Umbrella or Excess liability insurance following form to the Automobile Liability and Commercial General Liability insurance, and providing coverage that will "drop down" for defense and indemnity in the event of exhaustion of the underlying insurance, with limits of not less than $100,000,000 per occurrence and annual aggregate per location.  All entities required to be added as additional insureds on the Commercial General Liability insurance policy shall also be added as additional insureds on the Umbrella or Excess liability policy on a primary and non-contributory basis.

11.2.4    Insurance against loss customarily included in so-called Special Causes of Loss property insurance in an amount equal to the replacement cost of Unit Owner's property.  Such insurance shall include Comprehensive Boiler & Machinery coverage, on a replacement cost basis, except that the Unit Owner may procure separate coverage insuring the same.  Such insurance shall cover the interests of the Unit Owner or Declarant Net Lessee and its Registered Mortgagee in the applicable Unit (including the Limited Common Elements appurtenant thereto), as their respective interests may appear including the full replacement cost of any improvements and betterments made to the Unit, and otherwise provide coverage in amounts reasonably sufficient to undertake and complete any Unit Restoration Work and otherwise comply with Section 11.12.7 below.

11.2.5    Business Income and/or Rental Income on "Actual Loss Sustained" forms in amounts necessary to rebuild the applicable Unit using due diligence and containing an extended period of indemnity endorsement which provides that after the physical loss to

- 56 -

improvements and personal property has been repaired, the continued loss of income will be insured for one hundred eighty (180) days or until such income either returns to the same level it was at prior to the loss, resumed, notwithstanding that the policy may expire prior to the end of such period.

11.2.6    Such policy of Business Income and/or Rental Income shall have a maximum deductible of no more than six (6) months of the then annual General Common Charges payable by the applicable Unit Owner at the time of purchase or renewal of such policy.

11.2.7    If the applicable Unit Owner is engaged in the sale of alcoholic beverages, so-called "dramshop" or other Liquor Legal Liability insurance required in connection therewith.  Such coverage shall have limits of no less than $5,000,000 each occurrence and in the aggregate.

11.2.8    Each such Unit Owner shall also comply with any applicable insurance requirements contained in (i) if a Declarant Net Lease is in effect as to its Unit, the requirements of the Declarant Net Lease, and (ii) so long as the Construction Loan Mortgage remains in effect as to its Unit, the Construction Loan Documents and the Construction Loan Mortgage.

11.2.9    At all times prior to completion of the CS Group:

(a)    In lieu of the insurance described in Section 11.2 hereof, the CS Unit Owner (with respect to the CS Building), CS MS Unit Owner and/or CS LL Unit Owner (with respect to its respective fit outs), as applicable, shall carry, or cause Developer to carry, Special Causes of Loss "Builder's Risk" insurance or an installation floater in such amount as any Construction Lender shall require but in no event less than one hundred percent (100%) of the replacement cost value of the completed CS Building and/or completed fit outs of the CS MS Unit and CS LL Unit (including, without limitation, one hundred (100%) percent of the replacement cost value of all tenant improvements and betterments (other than those that are owned by tenants and not required to be insured or replaced by the landlord under the applicable lease, but excluding foundations and any other improvements not subject to physical damage)).  Such insurance shall cover the interests of the Condominium Board, all Unit Owners and Declarant Net Lessees thereof, as their respective interests may appear.  Such policy shall be written on a Builder's Risk Completed Value Form (100% non-reporting) or its equivalent and shall include, without limitation, coverage for loss by testing, collapse, theft, flood, and earth movement.  Such insurance policy shall also include coverage for:

(i)    Loss suffered with respect to materials, equipment, heating and air conditioning machinery, machinery, and supplies, in each case owned by the CS Unit Owner, CS MS Unit Owner or CS LL Unit Owner, or required to be insured by the CS Unit Owner, CS MS Unit Owner or CS LL Unit Owner, whether on-site, in transit, or stored offsite and with respect to temporary structures, hoists, sidewalks, retaining walls, and underground property in each case owned by the CS Unit Owner, CS MS Unit Owner, CS LL Unit Owner or required to by insured by the CS Unit Owner, CS MS Unit Owner or CS LL Unit Owner;

(ii)    Soft costs that are recurring costs, which shall include, without limitation, delayed opening loss of income/revenue coverage for a period of recovery of

not less than twelve (12) months commencing from the date the CS Building or the fit outs of the CS MS Unit and/or CS LL Unit were to be completed, or such improvements and betterments, as the case may be, as well as costs to reproduce plans, specifications, blueprints and models in connection with any restoration following a casualty;

(iii)    Demolition, debris removal and increased cost of construction, including, without limitation, increased costs arising out of changes in applicable Laws and codes in an amount not less than $25,000,000; and

(iv)    Operation of building laws (which insurance under this clause (iv) may contain a sublimit of $5,000,000).

(b)    The CS Unit Owner shall cause its construction manager responsible for the completion of the CS Building and the fit outs in the CS MS Unit and CS LL Unit (the "Construction Manager") to obtain and maintain the following insurance:

(i)    Commercial General Liability coverage written on a current ISO CG 001 occurrence form or equivalent, including, without limitation, coverage for damages because of bodily injury, property damage, personal and advertising injury, and products and completed operations and containing no "X", "C", "U" exclusion if excavation and/or demolition is to be provided. Such insurance shall have annual limits of not less than $100,000,000 in limits per occurrence and in the aggregate per project through primary and umbrella liability coverages. Such insurance shall name the CS Unit Owner as the insured and the holder of any mortgage on the Building or portion thereof as additional insured. The CS Unit Owner, CS MS Unit Owner and CS LL Unit Owner shall also require that all trade contractors cause all of their respective subcontractors to maintain similar coverage with limits of no less than $5,000,000 per occurrence and shall include the Condominium Board as additional insureds. In the event the Construction Manager, or any trade contractors (including their respective subcontractors of all tiers) maintain limits greater than set forth herein, the CS Unit Owner, CS MS Unit Owner, CS LL Unit Owner and the then currently listed additional insureds shall be included therein as an additional insureds to the fullest extent of all such insurance in accordance with all terms and provisions herein.

(ii)    Workers' Compensation insurance and New York State Disability benefits insurance as required by applicable Laws and Employer's Liability coverage with limits of not less than $1,000,000 per bodily injury/disease, covering any employees of the CS Group (provided, however, that if the CS Group does not have any direct employees, such insurance shall be purchased on an "if any" basis and the respective Unit Owner or management company shall be responsible for purchasing Workers' Compensation insurance for its employees).

(iii)    Hired and Non Owned Automobile Liability insurance on a current ISO form or equivalent with limits of $1,000,000 Combined Single Limit for bodily injury and property damage.

(c)    In lieu of the insurance described in Sections 11.2.2, 11.2.3, 11.2.9(b) hereof, the CS Unit Owner, CS MS Unit Owner or CS LL Unit Owner may provide such

- 58 -

insurance through the purchase of a Wrap-up or Contractor Controlled Insurance Program. This program shall provide coverage for all Persons engaged in construction operations at the Building. Such Wrap-up or Contractor Controlled Insurance Program shall have liability limits of not less than $100,000,000.

    11.3   <u>Tower Unit Owner's Insurance Requirements</u>. Each Tower Unit Owner shall obtain and maintain the following insurance in such amounts and in such limits as described below, or in such higher amounts and in such higher limits as the Tower Board, from time to time, may determine:

    11.3.1   Liability insurance, with a limit of not less than $300,000 per occurrence, and an Umbrella Liability Policy with limits of not less than $3,000,000 per occurrence and annual aggregate per location, and property insurance providing full replacement cost coverage for the Tower Unit Owner's Unit and any fixtures, improvements, furnishings or personal property within the Tower Unit, insuring the interests of the Tower Unit Owner and its Permitted Tower Mortgagee in the applicable Tower Unit as their respective interests may appear. Such insurance may, at the option of the Tower Unit Owner, be effected by a Homeowners HO-6 form (or its equivalent). The Tower Unit Owner purchasing such policy shall be the named insured.

    11.4   <u>Tower Board's Insurance Requirements</u>. The Tower Board shall obtain and maintain the following insurance with respect to the Tower Section, the Tower Limited Common Elements, and the Residential Limited Common Elements (the "<u>Tower Board Insured Property</u>") in such amounts and in such limits as described below, or in such higher amounts and in such higher limits as the Condominium Board, from time to time, may determine:

    11.4.1   Commercial General Liability policy of insurance written on a current ISO CG 001 occurrence form or equivalent liability including coverage for damages because of bodily injury, property damage, personal and advertising injury, and products-completed operations. This insurance shall have annual limits of not less than $1,000,000 per occurrence and $2,000,000 annual aggregate. This insurance shall further: (A) contain a "Notice and Knowledge of Occurrence, Unintentional Errors and Omissions" endorsement; (B) contain no exclusions or limitations for elevators or escalators if such terms are commercially available; (C) contain, if such terms are commercial available, no exclusions for suits amongst insureds (i.e., no "Cross Liability" exclusion); (D) contain a provision extending coverage to independent contractors of the insured(s); and (E) contain no modification of the insured contract exception to the contractual liability exclusion. The Tower Board purchasing such Commercial General Liability policy shall be the named insured. The Condominium Board and the other Unit Owners, together with its or their respective subsidiaries, affiliates, directors, officers, members, managers, partners, agents, employees, servants and assignees, managing agents and mortgagees, and such other entities as shall reasonably be requested shall be included as additional insured(s) on a primary and non-contributory basis.

    11.4.2   Hired and Non Owned Automobile Liability insurance on a current ISO form or equivalent with limits of $1,000,000 Combined Single Limit for bodily injury and property damage.

11.4.3    Workers' Compensation insurance and New York State Disability benefits insurance as required by applicable Laws, and Employer's Liability insurance with limits of not less than $1,000,000 per bodily injury/disease and annual aggregate, covering any employees of the Tower Board (provided, however, that if the Tower Board does not have any direct employees, such insurance shall be purchased on an "if any" basis).

11.4.4    Umbrella or Excess liability insurance following form to the Employer's Liability, Automobile Liability, and Commercial General Liability insurance, and providing coverage that will "drop down" for defense and indemnity in the event of exhaustion of the underlying insurance, with limits of not less than $100,000,000 per occurrence and annual aggregate per location, or in such higher limits as the Tower Board, from time to time, may determine. All entities required to be added as additional insureds on the Commercial General Liability insurance policy set forth in Section 11.4.1 above shall also be added as additional insureds on the Commercial General Liability insurance policy on a primary and non-contributory basis.

11.4.5    Insurance against loss customarily included in so-called Special Causes of Loss or its equivalent insurance (including Comprehensive Boiler & Machinery coverage), on a 100% replacement cost basis, and such insurance shall include Extra Expense and Expediting Expense coverage in such amounts as the Tower Board, from time to time, may determine. Furthermore, if applicable, such insurance shall also include Business Income and or Rental Income insurance (A) covering all risks required to be covered by the insurance provided for in this section above covering a loss on an "actual loss sustained" basis; (B) in an amount equal to one hundred percent (100%) of the projected gross revenues from the operation of the Residential Limited Common Elements and Tower Limited Common Elements for a period of at least twenty-four (24) months after the date of the Casualty; and (C) containing an extended period of indemnity endorsement which provides that after the physical loss to improvements and personal property has been repaired, the continued loss of income will be insured for one hundred eighty (180) days or until such income either returns to the same level it was at prior to the loss, resumed, notwithstanding that the policy may expire prior to the end of such period. Such insurance shall cover the interests of, as the case may be, the Tower Unit Owners and the Permitted Tower Mortgagees in the Tower Limited Common Elements, as their respective interests may appear, in amounts reasonably determined by the Condominium Board.

11.4.6    Directors' and Officers' Errors and Omissions insurance with respect to the Tower Board with limits of no less than $1,000,000.

11.4.7    Crime insurance covering the Tower Board and all officers, directors and employees of the Tower Section and of any separate managing agent(s) of the Tower Section with limits of not less than $1,000,000, and with such deductible as is commercially reasonable and maintained by owners of properties similar in type, location, and quality as the Residential Tower Building.

11.5    Base Unit Owner's Insurance Requirements. The Base Unit Owner shall obtain and maintain the following insurance in such amounts and in such limits as described below, or in such higher amounts and in such higher limits as the Condominium Board, from time to time, may determine:

11.5.1    Commercial General Liability policy of insurance written on a current ISO CG 001 occurrence form or equivalent liability, including coverage for damages because of bodily injury, property damage, personal and advertising injury, and products-completed operations. This insurance shall have annual limits of not less than $1,000,000 per occurrence and $2,000,000 annual aggregate per location. This insurance shall further: (A) contain a "Notice and Knowledge of Occurrence, Unintentional Errors and Omissions" endorsement; (B) contain no exclusions or limitations for elevators or escalators if such terms are commercially available; (C) contain, if such terms are commercial available, no exclusions for suits amongst insureds (i.e., no "Cross Liability" exclusion); (D) contain a provision extending coverage to independent contractors of the insured(s); and (E) contain no modification of the insured contract exception to the contractual liability exclusion. The Base Unit Owner purchasing such Commercial General Liability policy shall be the named insured. Each of the Boards and the other Unit Owners, together with its or their respective subsidiaries, affiliates, directors, officers, members, managers, partners, agents, employees, servants and assignees, managing agents and mortgagees, and such other entities as shall reasonably be requested shall be included as additional insured(s) on a primary and non-contributory basis.

11.5.2    Umbrella or Excess liability insurance following form to the Commercial General Liability insurance, and providing coverage that will "drop down" for defense and indemnity in the event of exhaustion of the underlying insurance, with limits of not less than $100,000,000 per occurrence and annual aggregate per location, or in such higher limits as the Condominium Board, from time to time, may determine. All entities required to be added as additional insureds on the Commercial General Liability insurance policy described in Section 11.5.1 above shall also be added as additional insureds on the Umbrella or Excess liability policy on a primary and non-contributory basis.

11.5.3    Insurance against loss customarily included in so-called Special Causes of Loss or Special Form Perils property insurance (including Comprehensive Boiler & Machinery coverage), on a 100% replacement cost basis, and such insurance shall include Extra Expense and Expediting Expense coverage in such amounts as the Condominium Board, from time to time, may determine, containing an extended period of indemnity endorsement which provides that after the physical loss to improvements and personal property has been repaired, the continued loss of income will be insured for one hundred eighty (180) days or until such income either returns to the same level it was at prior to the loss, resumed, notwithstanding that the policy may expire prior to the end of such period. Such insurance shall cover the interests of the Base Unit Owner and its Registered Mortgagee as their respective interests may appear including the full replacement cost of any improvements and betterments made to the Base Unit and otherwise in amounts reasonably sufficient to undertake and complete any Unit Restoration Work and otherwise comply with Section 11.12.7 below.

11.5.4    Business Income and/or Rental Income due to an occurrence or accident insured under the policies described in Section 11.5.4 hereof. The coverage shall be provided on "Actual Loss Sustained" forms in amounts of not less than twelve (12) months of the then annual gross revenue and such insurance shall include Extra Expense and Expediting Expense coverage in such amounts as the Condominium Board, from time to time, may determine, containing an extended period of indemnity endorsement which provides that after the physical loss to improvements and personal property has been repaired, the continued loss of income will be

insured for one hundred eighty (180) days or until such income either returns to the same level it was at prior to the loss, resumed, notwithstanding that the policy may expire prior to the end of such period. Such policy of Business Income and/or Rental Income shall have a maximum deductible of no more than six (6) months of the then annual General Common Charges payable by the Base Unit Owner at the time of purchase or renewal of such policy. The Base Unit Owner shall use commercially reasonable efforts to name the Condominium Board as "loss payee", as its interest may appear, under such policy.

11.5.5    Each such Unit Owner shall also comply with any applicable insurance requirements contained in (i) if a Declarant Net Lease is in effect as to its Unit, the requirements of the Declarant Net Lease, and (ii) so long as the Construction Loan Mortgage remains in effect as to its Unit, the Construction Loan Documents and the Construction Loan Mortgage.

11.6    [Intentionally omitted.]

11.7    Insurance Requirements During the Course of Alterations and/or Repairs. The Condominium Board shall promulgate, as part of the General Rules and Regulations, rules and regulations specifying, with respect to the performance of Alterations and/or Repairs by any Person, whether insurance is required to be carried with respect to such Alteration and/or Repair and if so, the type of insurance required, the amount thereof, the Person required to carry any such insurance and such other related matters as the Condominium Board shall deem appropriate, provided, however, that the same shall comply with the Condominium Documents and with the Master Declaration. Notwithstanding anything to the contrary contained in these Condominium By-Laws, provisions consistent with Section 11.7 hereof shall be part of such rules and regulations only to the extent, if any, deemed appropriate by the Condominium Board.

11.8    Insurance as a General Common Charge.

11.8.1    The premiums for all insurance referred to in Section 11.1 above shall be a General Common Expense and shall be borne by each of the General Common Charge Obligors as a General Common Charge as set forth on the Expense Allocation Schedule. Any General Common Charge Obligor may request the Condominium Board to obtain and maintain for its benefit any additional coverages and any changes or amendments to the terms and conditions of existing coverages as such requesting General Common Charge Obligor sees fit (collectively, the "Additional Insurance Coverage") and may require that all proceeds of any such Additional Insurance Coverage (to the extent that it can be determined with reasonable certainty that such proceeds relate to such Additional Insurance Coverage and not to insurance purchased by the Condominium Board on its own behalf) be payable to such General Common Charge Obligor (and if, notwithstanding such requirement, proceeds are paid to the Condominium Board or the Insurance Trustee, then notwithstanding any other provision of these Condominium By-Laws to the contrary, such proceeds shall be turned over to such General Common Charge Obligor); provided, however, that (A) the cost of such Additional Insurance Coverage shall be borne entirely by the Person requesting it and such Person shall indemnify the Condominium Board from any loss, cost and expense (including reasonable attorney's fees) in connection therewith and (B) the Additional Insurance Coverage shall not (i) preclude the Condominium Board from purchasing, for itself, insurance coverage similar to such Additional Insurance Coverage, (ii) preclude the Condominium Board from receiving proceeds from any

Condominium Board Insurance, (iii) cause the Condominium Board Insurance to be less protective or (iv) adversely affect the interests of the Unit Owners or Boards.

11.8.2    If the use of all or any portion of any portion of the Residential Tower Building or the CS Building in violation of these Condominium By-Laws or the Declaration causes an increase in the premium for the insurance which the Condominium Board or any Unit Owner is required to obtain and maintain as set forth herein or otherwise, then the General Common Charge Obligor responsible for such portion of the Residential Tower Building or CS Building shall be obligated to pay to the Condominium Board, as an additional General Common Charge, or to pay to such Unit Owner, as the case may be, a sum equal to the amount of such increase attributable to such use; provided, however, that the foregoing shall not apply even if such increase occurs as long as the use of the Residential Tower Building and CS Building is the use as contemplated as of the creation of the Condominium.  If the use of any Tower Unit in violation of these Condominium By-Laws or the Declaration causes an increase in General Common Charges payable by the Tower Board, in accordance with the preceding sentence of this subsection, then the owner of such Tower Unit shall be obligated to pay to the Tower Board, as a Residential Common Charge, a sum equal to the amount of such increase attributable to such use.

11.9    General Insurance Matters.

11.9.1    If any coverage in these Condominium By-Laws is to be self-insured, such self-insurance must be approved by the Condominium Board and is subject to financial review. The insurance coverage required of any Person under this Article 11, at the option of such Person, may be offered under a blanket policy or policies, provided that any such blanket policy shall otherwise comply with the provisions of these Condominium By-Laws.  With respect to blanket property polices covering the applicable property to be insured pursuant to these Condominium By-Laws (the "Insured Property") and other properties and assets not constituting a part of such Insured Property, such blanket policies shall be without possibility of co-insurance or reduction below the limits required by this Article 11 by reason of, or damage to, any other property (real or personal) named therein.  If the insurance required by these Condominium By-Laws shall be effected by any such blanket policy, such Person shall furnish to the Person or Persons specified in Section 11.9.4 hereof (when and as such deliveries would be required for the insurance regularly required by these Condominium By-Laws not constituting blanket coverage) valid certificates of insurance evidencing such policy, with schedules thereto attached (with respect to property or building insurance) showing the amount of insurance afforded by such policies applicable to the Insured Property.

11.9.2    Policy Requirements.  (a)  All policies required to be obtained pursuant to these Condominium By-Laws shall:

(b)    be purchased from and maintained with financially sound and responsible insurance companies duly authorized, and authorized to do business in the State of New York, which are rated at the time of purchase or renewal of such policy in (x) the then most current A.M. Best Key Rating Guide with a claims paying ability rating of A-VIII or better (or the equivalent of such rating if there is a change in the basis of the rating, or any successor publication of comparable standing) or (y) are rated "A" or better (and the equivalent thereof) by

at least two (2) of the rating agencies rating any mortgage covering the General Common Elements (one of which shall be Standard & Poor's if they are rating such mortgage and one of which will be Moody's if they are rating such mortgage), or if only one (1) rating agency is rating such mortgage, then only by such rating agency, with respect to policies required to be obtained by the Condominium Board, the Unit Owners or the Tower Board pursuant to Sections 11.1, 11.2, 11.4 and 11.5 of these Condominium By-Laws, respectively. The foregoing shall not apply to the Tower Unit Owners and the insurance companies furnishing the policies required to be obtained by the Tower Unit Owners pursuant to these Condominium By-Laws shall be rated pursuant to and in accordance with applicable standards, if any, to be determined by the Tower Board.

(c)  with respect to Special Causes of Loss or other property coverage, contain, to the fullest extent permitted by applicable Laws, a waiver of the insurer's right of subrogation or otherwise, because of deductible clauses, inadequacy of limits of any insurance policy, limitations or exclusions of coverage against the Unit Owners, the Boards, any Registered Mortgagee, any Declarant Net Lessee, any Declarant Net Lessor and all Occupants.

(d)  provide that before any lapse, cancellation, non-renewal, or material modification of a policy for which an additional insured or loss payee is required to be named pursuant to this Article 11, at least thirty (30) days' advance written notice (or ten (10) days' advance written notice, in the event of a lapse, cancellation, non-renewal, or material modification due to non-payment of premium) shall be given in the case of insurance required to be maintained (w) if by the Condominium Board, to the Unit Owners, the Tower Board and each Permitted Tower Mortgagee (and any Permitted Guarantor of such Permitted Mortgage), (x) if by any Unit Owner (other than a Tower Unit Owner), to the Condominium Board, (y) if by the Tower Board, to the Condominium Board and each Registered Mortgagee (and any Permitted Guarantor of such Permitted Mortgage), and (z) if by a Tower Unit Owner, to the Tower Board.

(e)  be primary as to the named insured and not be entitled to contribution from any other insurance that may be maintained by any other party.

(f)  contain an endorsement or agreement by the insurer that any loss shall be payable in accordance with the terms of such policy notwithstanding any act or negligence of the policy holder.

(g)  All policies of Special Causes of Loss and Comprehensive Boiler & Machinery property coverage required to be obtained by any Person pursuant to these Condominium By-Laws shall name its Registered Mortgagee, if any, as a "mortgagee" under a standard New York State mortgagee clause or its equivalent which shall provide that the loss, if any, thereunder shall be payable to such Registered Mortgagee, as its interest may appear, subject, however, to the provisions of Sections 11.1.1 and 11.1.2 with respect to insurance maintained by the Condominium Board and subject to the provisions of Sections 11.2.4, 11.4.5 or 11.5.3, as applicable, with respect to insurance required to be maintained by the Unit Owners and the Tower Board.

(h)  All policies of Special Causes of Loss and Comprehensive Boiler & Machinery property coverage required to be obtained by the Condominium Board and any

insurance required to be obtained by the Unit Owners (other than the CS Unit Owner), subject to Section 17.1(d) hereof, shall (A) provide that adjustment of loss shall be made by the Condominium Board on behalf of all Unit Owners, Declarant Net Lessees and Registered Mortgagees, if applicable, and (B) name the Insurance Trustee (as hereinafter defined) as "loss payee" as agent for the insured in the event the proceeds payable are in excess of $2,000,000.

(i)     Prior to the Condominium Board obtaining any policy of property insurance, and at three (3) year intervals thereafter (or more often, if deemed appropriate by the Condominium Board), the Condominium Board shall obtain an appraisal of the full replacement value of the General Common Elements (including the General Common Elements which are underground), without deduction for depreciation, for the purpose of determining the amount of property insurance to be obtained pursuant to Section 11.1. The cost of any such appraisal shall be borne by the General Common Charge Obligors as a General Common Charge in the same proportion as each such party bears under the Budget with respect to insurance.

(j)     Unless otherwise required of the Tower Unit Owners by the Tower Section By-Laws, the Tower Board and the Unit Owners shall not be required to obtain or maintain any insurance with respect to any personal property contained in the respective General Common Elements, Limited Common Elements or Unit, except as is mandated under any Special Causes of Loss or Comprehensive Boiler & Machinery property coverage required under these Condominium By-Laws. The Unit Owners and the Boards shall not be prohibited from carrying other insurance for their own benefit in addition to the insurance required to be carried by such Unit Owners and Board(s) under these Condominium By-Laws.

11.9.3    Condominium as Additional Insured. All policies required to be obtained by a Unit Owner (other than a Tower Unit Owner if the same is not available), the Tower Board or any Sub-Board pursuant to these Condominium By-Laws and/or the Tower Section By-Laws shall name the Condominium as an additional insured.

11.9.4    Evidence of Insurance. (a) Condominium Board Insurance. The Condominium Board shall deliver to the Unit Owners, Declarant Net Lessees and Declarant Net Lessors (if applicable), the Tower Board, and all Registered Mortgagees, a certificate of insurance evidencing the insurance required to be maintained by the Condominium Board under Section 11.1 above and all renewals thereof, evidencing same, and promptly after issuance of any renewal or replacement policy, together with proof of payment of premiums. Renewals shall be obtained at least five (5) Business Days prior to the expiration of the then current policies.

(b)     CS Unit Owner, CS LL Unit Owner and CS MS Unit Owner Insurance. The CS Unit Owner, the CS LL Unit Owner and the CS MS Unit Owner shall deliver to the Condominium Board a certificate of insurance evidencing the insurance required to be maintained by such Unit Owner under Section 11.2 above, and all renewals thereof, evidencing same, and promptly after issuance of any renewal or replacement policy, together with proof of payment of premiums. Renewals shall be obtained at least five (5) Business Days prior to the expiration of the then current policies.

(c)     Tower Unit Owner Insurance. Each Tower Unit Owner shall deliver to the Tower Board a certificate of insurance evidencing the insurance required to be

maintained by such Tower Unit Owner under Section 11.3 above and all renewals thereof, evidencing same, and promptly after issuance of any renewal or replacement policy, together with proof of payment of premiums. Renewals shall be obtained at least five (5) days prior to the expiration of the then current policies.

(d) <u>Tower Board Insurance</u>. The Tower Board shall deliver to the Condominium Board, a certificate of insurance evidencing the insurance required to be maintained by the Tower Board under Section 11.4 above and all renewals thereof, evidencing same, and promptly after issuance of any renewal or replacement policy, together with proof of payment of premiums. Renewals shall be obtained at least five (5) days prior to the expiration of the then current policies.

(e) <u>Tower Board Monitoring of Tower Unit Owner Insurance</u>. The Tower Board shall take commercially reasonable steps to enforce the obligations of its Tower Unit Owners under Section 11.4 and Article 12 of these Condominium By-Laws, and shall, on a semi-annual basis upon request, provide to the Condominium Board a report detailing those Tower Unit Owners that have not so complied, but the Tower Board shall have no liability for the failure of such Tower Unit Owners to so comply. Nothing contained in this Section 11.9.4(e) shall be deemed to limit the obligations of Tower Unit Owners under Section 11.4 and Article 12 of these Condominium By-Laws.

(f) <u>Base Unit Owner Insurance</u>. The Base Unit Owner shall deliver to the Condominium Board a certificate of insurance evidencing the insurance required to be maintained by such Unit Owner under Section 11.5 above and all renewals thereof, evidencing same, and promptly after issuance of any renewal or replacement policy, together with proof of payment of premiums. Renewals shall be obtained at least five (5) days prior to the expiration of the then current policies.

(g) <u>Certificates of Insurance; Policies</u>. The certificates of insurance required to be obtained by any Person pursuant to this Section 11.9.4 shall be kept at the offices of such Person at the Property or at such other reasonably proximate location(s) in The City of New York and electronic file(s) of the same shall also be available. In the event that any certificate of insurance shall fail to contain detail reasonably sufficient enough to enable the Person(s) who are entitled to a copy of such certificate to reasonably determine if the insurance covered by such certificate complies with the provisions of this Article 11, then such Person or Persons shall have the right, upon reasonable notice to the Person maintaining such insurance, to inspect the policy or policies underlying such certificate.

11.10 <u>Waiver of Subrogation</u>. To the fullest extent permitted by applicable Laws each of the Boards and the Unit Owners (and their Occupants) (the "<u>Releasing Party</u>") hereby releases and waives for itself, and each Person claiming by, through or under it, each other Unit Owner and all Boards and their respective Occupants (the "<u>Released Party</u>") from any liability for any loss or damage to all property of such Releasing Party located upon any portion of the Property, which loss or damage is of the type covered by Special Causes of Loss or Comprehensive Boiler & Machinery property insurance policies required to be carried under these Condominium By-Laws, irrespective either of any negligence on the part of the Released Party which may have contributed to or caused such loss, or of the amount of such insurance required or actually

- 66 -

carried, including any deductible, inadequacy of limits of any insurance policy, limitations or exclusions of coverage. The Releasing Party agrees to obtain, if needed, appropriate language in its policies of insurance, and to the policies of insurance carried by its Occupants, with respect to the foregoing release.

11.11   Indemnification.

11.11.1   Indemnification by Unit Owners.  Subject to the waiver of claims and waiver of subrogation set forth in this Article 11, and to the fullest extent permitted by applicable Laws each Unit Owner covenants to indemnify, defend and hold each other Unit Owner (and such other Unit Owner's Occupants), each Board and MTA in its capacity as Declarant harmless (except for loss or damage resulting from the gross negligence, willful misconduct or bad faith of any such other Unit Owners or Boards, or their respective Occupants, directors, officers, agents, tenants, contractors, employees, servants, licensees (collectively, the "Related Parties")) from and against any and all claims, actions, suits, judgments, damages, liabilities and expenses (including, without limitation, reasonable attorneys' fees) in connection with loss of life, personal injury and/or damage to property arising from or out of any occurrence in or upon the Unit (or any Limited Common Element appurtenant to such Unit) owned by such Unit Owner, or occasioned wholly, or in part, by any gross negligence, willful misconduct or bad faith of such Unit Owner, or its respective Related Parties.

11.11.2   Indemnification by Boards.  Subject to the waiver of claims and waiver of subrogation set forth in this Article 11, and to the fullest extent permitted by applicable Laws, each of the Boards covenants to indemnify, defend and hold each Unit Owner (and each Unit Owner's Occupants), each other Board and MTA in its capacity as Declarant harmless (except for loss or damage resulting from the gross negligence, willful misconduct or bad faith of such Unit Owner or any such other Board, or their respective Related Parties) from and against any and all claims, actions, suits, judgments, damages, liabilities and expenses (including, without limitation, reasonable attorneys' fees) in connection with loss of life, personal injury and/or damage to property arising from or out of any occurrence in or upon (i) with respect to the Condominium Board, the General Common Elements and Residential Tower Limited Common Elements, (ii) with respect to the Tower Board, the Residential Limited Common Elements and the Tower Limited Common Elements, or occasioned wholly or in part by any gross negligence, willful misconduct or bad faith of the Boards, or their respective Related Parties.

11.12   Casualty and Condemnation.

11.12.1   General Common Element Restoration Funds.  All insurance proceeds under all policies required to be obtained by the Condominium Board with respect to any property loss (the "GCE Restoration Insurance Proceeds") and all condemnation awards, if any, with respect to the General Common Elements (such sums, together with any interest or income earned thereon, but net of the reasonable fees, compensation and expenses incurred by the Insurance Trustee hereunder, collectively, the "GCE Restoration Funds") shall be payable to the Condominium Board, except that if the GCE Restoration Funds shall exceed $2,000,000, all GCE Restoration Funds shall be payable to the Insurance Trustee.

11.12.2   Use of GCE Restoration Funds. The Condominium Board shall (i) hold in trust on behalf of all Unit Owners any GCE Restoration Funds it receives, (ii) subject to the provisions of Sections 11.12.3 and 11.12.9 of these Condominium By-Laws, use the GCE Restoration Funds only for GCE Restoration Work and (iii) not commingle the GCE Restoration Funds with other funds being held by the Condominium Board.

11.12.3   Casualty to or Condemnation of General Common Elements; Repair by Condominium Board; GCE Restoration Work.

(a)   GCE Restoration Work. Except as provided herein, in the event of (i) the casualty of all or any part of the General Common Elements, (ii) the taking in condemnation or by eminent domain of all or any part of the General Common Elements, or (iii) the taking in condemnation or by eminent domain of all or any part of a Unit, then, subject to the provisions set forth below, the Condominium Board will arrange for the prompt repair and restoration of the part of the General Common Elements affected by such casualty or impaired by such taking which, pursuant to the provisions of the Declaration or these Condominium By-Laws, are required to be maintained by the Condominium Board (the "GCE Restoration Work"). In the event of a casualty, such GCE Restoration Work shall restore the General Common Elements so that they are the same type and quality as existed immediately prior to such casualty; provided, however, that Alterations to such General Common Elements may be made in accordance with Article 8 of these Condominium By-Laws. In the event of a taking, such GCE Restoration Work shall take into account the physical constraints imposed by such taking, and accordingly the General Common Elements may be altered (in accordance with Article 8 of these Condominium By-Laws) to account for such physical constraints; provided, however, that in no event shall the Condominium Board have the right to utilize additional space in any Unit in connection with such restoration, unless such right has otherwise been granted under these Condominium By-Laws or the Declaration or in connection with such taking. Notwithstanding anything herein to the contrary, in no event shall the Condominium Board be obligated to restore any Unit Owner's fit-out or personal property contained within such Unit Owner's Unit, or any Common Elements (other than General Common Elements), other than as provided in Section 11.12.6(a) hereof. All GCE Restoration Work shall comply with the provisions of Exhibit D to the Master Declaration as if such GCE Restoration Work were the initial construction of the Building (it being understood that Section 2.11 of said Exhibit D shall not apply to the same).

(b)   Disbursement of GCE Restoration Funds; GCE Restoration Funds Request. In the event of any GCE Restoration Funds held by the Insurance Trustee, (a) the Condominium Board shall apply to the Insurance Trustee for disbursement of the GCE Restoration Funds and (b) the Insurance Trustee shall disburse the GCE Restoration Funds to the Condominium Board in installments as the GCE Restoration Work progresses and in accordance with the provisions hereof and the provisions of the Insurance Trustee Agreement. Each request for GCE Restoration Funds (each such request, together with all supporting documentation, herein called a "GCE Restoration Funds Request") shall also be sent to all Unit Owners (other than Tower Unit Owners), the Tower Board and all Registered Mortgagees. Advances by the Insurance Trustee shall be made not more than once a month, after the Insurance Trustee's receipt of a written request therefor from the Condominium Board, addressed to the Insurance Trustee, provided that:

- 68 -

(i)     such GCE Restoration Funds Request shall be accompanied by a certificate of a Certifying Professional (as defined below) in charge of the GCE Restoration Work (A) requesting payment of specified amounts of the GCE Restoration Funds equal to the amounts then due and owing to contractors or other parties (less any retainage amounts, if any, as determined by the Condominium Board) for performance of all or a portion of the GCE Restoration Work under specific contracts or agreements in respect of the GCE Restoration Work, or to the Condominium Board as reimbursement for a cost of the GCE Restoration Work paid by the Condominium Board, (B) describing in reasonable detail the GCE Restoration Work performed or materials provided under such contracts or agreements, for which GCE Restoration Funds are then being requested, (C) stating that such payment does not exceed the amount then due and owing (or reimbursable) in respect of the GCE Restoration Work completed to date and materials supplied under such contracts or agreements, (D) stating that all GCE Restoration Work has been performed substantially in accordance with the plans and specifications for such GCE Restoration Work, and that all such materials have theretofore been incorporated as General Common Elements into the Building (except for such materials specifically delineated as not yet being so incorporated into the Building, and with respect to such materials, stating the status of such materials (if such materials are being fabricated) or stating the location of such materials (if such materials are stored off-site)), (E) stating that the cost to complete the GCE Restoration Work does not exceed the amount of the remaining funds held by the Insurance Trustee and (F) stating that the cost of such GCE Restoration Work and materials has not been previously made the basis of any GCE Restoration Funds Request (such certificate being herein called the "Certificate"); and

(ii)     the Insurance Trustee receives waivers of all mechanic's and other similar liens (or title endorsements or other satisfactory evidence) with respect to all of the GCE Restoration Work for which a GCE Restoration Funds Request has previously been made and funded (if and only to the extent that such lien waivers have not been previously provided).

Upon compliance with subsections (i) and (ii) above, the amount requisitioned for such GCE Restoration Work shall be paid to the Condominium Board or the Persons designated in the Certificate.

(c)     GCE Restoration Funds Deficiency. If, as part of the Certificate accompanying the GCE Restoration Funds Request, or prior to the commencement of (and also at any time during the prosecution of) the GCE Restoration Work, the Certifying Professional or the Condominium Board reasonably estimates that the cost to complete the GCE Restoration Work exceeds the GCE Restoration Funds then being held by the Insurance Trustee or the Condominium Board, as the case may be, then the Condominium Board shall be required to notify each General Common Charge Obligor of the amount of such estimated deficiency and each General Common Charge Obligor's pro rata allocation thereof (which such allocation shall be determined consistent with the Common Interest of each General Common Charge Obligor), and shall be payable by each General Common Charge Obligor as a Special Assessment (hereinafter referred to as a "Special GCE Restoration Assessment"; all such Special GCE Restoration Assessments received by the Condominium Board, the "Special GCE Restoration Assessment Proceeds"). At the election of the Condominium Board, each General Common Charge Obligor shall then pay its respective Special GCE Restoration Assessment either: (i) in a

lump sum, to be paid as a Special Assessment pursuant to and in accordance with Section 6.1.4 of these Condominium By-Laws or (ii) in installments, as may be necessary, in the determination of the Condominium Board, to pay for the GCE Restoration Work. The Special GCE Restoration Assessment Proceeds shall be treated as if such monies were GCE Restoration Funds.

        (d)    Excess GCE Restoration Insurance Proceeds. To the extent not drawn upon and/or applied to the GCE Restoration Work, the Insurance Trustee and/or the Condominium Board, as the case may be, shall, after the completion of the GCE Restoration Work, return all excess GCE Restoration Insurance Proceeds to the General Common Charge Obligors according to the Common Interest of such General Common Charge Obligors (after deducting from the amount to be distributed to each General Common Charge Obligor the amount, if any, of any General Common Charges or Special Assessments (and other charges related thereto imposed under Article 12 of these Condominium By-Laws) then due and owing from such General Common Charge Obligor (such deducted amount, a "Delinquency Charge").

        (e)    Excess Special GCE Restoration Assessment Proceeds. To the extent not drawn upon and/or applied to the GCE Restoration Work, the Insurance Trustee and/or the Condominium Board, as the case may be, shall, after the completion of the GCE Restoration Work, return all excess Special GCE Restoration Assessment Proceeds it receives to each General Common Charge Obligor according to the pro rata share of such General Common Charge Obligor's contribution to such Special GCE Restoration Assessment Proceeds, after deducting any Delinquency Charge. If any General Common Charge Obligor fails to pay its Special GCE Restoration Assessment in accordance with the provisions of Section 11.12.3(c) of these Condominium By-Laws, then the Special GCE Restoration Assessment of such General Common Charge Obligor still due and payable (the "Delinquent Special GCE Restoration Assessment") shall be subject to late charges, interest, expenses and fees, all pursuant to and in accordance with Article 12 of these Condominium By-Laws (such charges, the "Special GCE Restoration Assessment Penalties"). Upon payment to the Condominium Board of the Delinquent Special GCE Restoration Assessment, and to the extent not drawn upon and/or applied to such completed GCE Restoration Work, then the Insurance Trustee and/or the Condominium Board, as the case may be, shall distribute the Delinquent Special GCE Restoration Assessment to each General Common Charge Obligor, after deducting any Delinquency Charge, according to the pro rata share of such General Common Charge Obligor's contribution to the Special GCE Restoration Assessment Proceeds. The Special GCE Restoration Assessment Penalties shall be distributed to each General Common Charge Obligor (excluding the General Common Charge Obligor paying such Special GCE Restoration Assessment Penalties) according to the pro rata share of such General Common Charge Obligor's contribution to the Special GCE Restoration Assessment Proceeds (taking into account any prior distribution of any excess Special GCE Restoration Assessment Proceeds and after deducting any Delinquency Charge) prior to the payment of the Delinquent Special GCE Restoration Assessment.

        11.12.4    Residential Tower Limited Common Element Restoration Funds. All insurance proceeds under all policies required to be obtained by the Condominium Board with respect to any property loss (the "RTLCE Restoration Insurance Proceeds") and all condemnation awards, if any, with respect to the Residential Tower Limited Common Elements

and, to the extent that the Condominium Board is responsible under the Condominium Documents for the Repair or restoration of the same, the Tower Terrace (such sums, together with any interest or income earned thereon, but net of the reasonable fees, compensation and expenses incurred by the Insurance Trustee hereunder, collectively, the "RTLCE Restoration Funds") shall be payable to the Condominium Board, except that if the RTLCE Restoration Funds shall exceed $2,000,000, all RTLCE Restoration Funds shall be payable to the Insurance Trustee.

       11.12.5   Use of RTLCE Restoration Funds.  The Condominium Board shall (i) hold in trust on behalf of all Unit Owners other than the CS Unit Owner any RTLCE Restoration Funds it receives, (ii) subject to the provisions of Sections 11.12.6 and 11.12.10 of these Condominium By-Laws, use the RTLCE Restoration Funds only for GCE Restoration Work and (iii) not commingle the RTLCE Restoration Funds with other funds being held by the Condominium Board.

       11.12.6   Casualty to or Condemnation of the Residential Tower Limited Common Elements; Repair by Condominium Board; RTLCE Restoration Work.

       (a)   RTLCE Restoration Work.  Except as provided herein, in the event of (i) the casualty of all or any part of the Residential Tower Limited Common Elements (or, if applicable, Tower Terrace), (ii) the taking in condemnation or by eminent domain of all or any part of the Residential Tower Limited Common Elements, or (iii) the taking in condemnation or by eminent domain of all or any part of a Unit, then, subject to the provisions set forth below, the Condominium Board will arrange for the prompt repair and restoration of the part of the Residential Tower Limited Common Elements  (and, if applicable, Tower Terrace) affected by such casualty or impaired by such taking which, pursuant to the provisions of the Declaration or these Condominium By-Laws, are required to be maintained by the Condominium Board (collectively, the "RTLCE Restoration Work").  In the event of a casualty, such RTLCE Restoration Work shall restore the Residential Tower Limited Common Elements, and if applicable, the Tower Terrace, so that they are the same type and quality as existed immediately prior to such casualty; provided, however, that Alterations to such Residential Tower Limited Common Elements (and, if applicable, the Tower Terrace) may be made in accordance with Article 8 of these Condominium By-Laws.  In the event of a taking, such RTLCE Restoration Work shall take into account the physical constraints imposed by such taking, and accordingly the Residential Tower Limited Common Elements (and, if applicable, the Tower Terrace) may be altered (in accordance with Article 8 of these Condominium By-Laws) to account for such physical constraints; provided, however, that in no event shall the Condominium Board have the right to utilize additional space in any Unit in connection with such restoration, unless such right has otherwise been granted under these Condominium By-Laws or the Declaration or in connection with such taking.  Notwithstanding anything herein to the contrary, in no event shall the Condominium Board be obligated to restore any Unit Owner's fit-out or personal property contained within such Unit Owner's Unit or any Common Elements (other than Residential Tower Limited  Common Elements and, if applicable, the Tower Terrace), other than as provided in Section 11.12.3(a) hereof.  All RTLCE Restoration Work shall comply with the provisions of Exhibit D to the Master Declaration as if such RTLCE Restoration Work were the initial construction of the Building (it being understood that Section 2.11 of said Exhibit D shall not apply to the same).

(b)     Disbursement of RTLCE Restoration Funds; RTLCE Restoration Funds Request.  In the event of any RTLCE Restoration Funds held by the Insurance Trustee, (a) the Condominium Board shall apply to the Insurance Trustee for disbursement of the RTLCE Restoration Funds and (b) the Insurance Trustee shall disburse the RTLCE Restoration Funds to the Condominium Board in installments as the RTLCE Restoration Work progresses and in accordance with the provisions hereof and the provisions of the Insurance Trustee Agreement.  Each request for RTLCE Restoration Funds (each such request, together with all supporting documentation, herein called a "RTLCE Restoration Funds Request") shall also be sent to the Unit Owners (other than the CS Unit Owner), the Tower Board, and all Registered Mortgagees.  Advances by the Insurance Trustee shall be made not more than once a month, after the Insurance Trustee's receipt of a written request therefor from the Condominium Board, addressed to the Insurance Trustee, provided that:

(i)     such RTLCE Restoration Funds Request shall be accompanied by a certificate of a Certifying Professional in charge of the RTLCE Restoration Work (A) requesting payment of specified amounts of the RTLCE Restoration Funds equal to the amounts then due and owing to contractors or other parties (less any retainage amounts, if any, as determined by the Condominium Board) for performance of all or a portion of the RTLCE Restoration Work under specific contracts or agreements in respect of the RTLCE Restoration Work, or to the Condominium Board as reimbursement for a cost of the RTLCE Restoration Work paid by the Condominium Board, (B) describing in reasonable detail the RTLCE Restoration Work performed or materials provided under such contracts or agreements, for which RTLCE Restoration Funds are then being requested, (C) stating that such payment does not exceed the amount then due and owing (or reimbursable) in respect of the RTLCE Restoration Work completed to date and materials supplied under such contracts or agreements, (D) stating that all RTLCE Restoration Work has been performed substantially in accordance with the plans and specifications for such RTLCE Restoration Work, and that all such materials have theretofore been incorporated as Residential Tower Limited Common Elements (or, if applicable, Tower Terrace) into the Residential Tower Building (except for such materials specifically delineated as not yet being so incorporated into the Residential Tower Building, and with respect to such materials, stating the status of such materials (if such materials are being fabricated) or stating the location of such materials (if such materials are stored off-site)), (E) stating that the cost to complete the RTLCE Restoration Work does not exceed the amount of the remaining funds held by the Insurance Trustee and (F) stating that the cost of such RTLCE Restoration Work and materials has not been previously made the basis of any RTLCE Restoration Funds Request (such certificate being herein called the "Certificate"); and

(ii)     the Insurance Trustee receives waivers of all mechanic's and other similar liens (or title endorsements or other satisfactory evidence) with respect to all of the RTLCE Restoration Work for which a RTLCE Restoration Funds Request has previously been made and funded (if and only to the extent that such lien waivers have not been previously provided).

Upon compliance with subsections (i) and (ii) above, the amount requisitioned for such RTLCE Restoration Work shall be paid to the Condominium Board or the Persons designated in the Certificate.

(c)     RTLCE Restoration Funds Deficiency.  If, as part of the Certificate accompanying the RTLCE Restoration Funds Request, or prior to the commencement of (and also at any time during the prosecution of) the RTLCE Restoration Work, the Certifying Professional or the Condominium Board reasonably estimates that the cost to complete the RTLCE Restoration Work exceeds the RTLCE Restoration Funds then being held by the Insurance Trustee or the Condominium Board, as the case may be, then the Condominium Board shall be required to notify each Residential Tower Common Charge Obligor of the amount of such estimated deficiency and each Residential Tower Common Charge Obligor's pro rata allocation thereof (which such allocation shall be determined consistent with the Residential Tower Common Interest of each Residential Tower Common Charge Obligor), and shall be payable by each Residential Tower Common Charge Obligor as a Special Assessment (hereinafter referred to as a "Special RTLCE Restoration Assessment"; all such Special RTLCE Restoration Assessments received by the Condominium Board, the "Special RTLCE Restoration Assessment Proceeds").  At the election of the Condominium Board, each Residential Tower Common Charge Obligor shall then pay its respective Special RTLCE Restoration Assessment either:  (i) in a lump sum, to be paid as a Special Assessment pursuant to and in accordance with Section 6.1.4 of these Condominium By-Laws or (ii) in installments, as may be necessary, in the determination of the Condominium Board, to pay for the RTLCE Restoration Work.  The Special RTLCE Restoration Assessment Proceeds shall be treated as if such monies were RTLCE Restoration Funds.

(d)     Excess RTLCE Restoration Insurance Proceeds.  To the extent not drawn upon and/or applied to the RTLCE Restoration Work, the Insurance Trustee and/or the Condominium Board, as the case may be, shall, after the completion of the RTLCE Restoration Work, return all excess RTLCE Restoration Insurance Proceeds to the Residential Tower Common Charge Obligors according to the Residential Tower Common Interest of such Residential Tower Common Charge Obligors (after deducting from the amount to be distributed to each Residential Tower Common Charge Obligor the amount, if any, of any General Common Charges or Special Assessments (and other charges related thereto imposed under Article 12 of these Condominium By-Laws)) then due and owing from such Residential Tower Common Charge Obligor (such deducted amount, a "RTLCE Delinquency Charge").

(e)     Excess Special RTLCE Restoration Assessment Proceeds.  To the extent not drawn upon and/or applied to the RTLCE Restoration Work, the Insurance Trustee and/or the Condominium Board, as the case may be, shall, after the completion of the RTLCE Restoration Work, return all excess Special RTLCE Restoration Assessment Proceeds it receives to each Residential Tower Common Charge Obligor according to the pro rata share of such Residential Tower Common Charge Obligor's contribution to such Special RTLCE Restoration Assessment Proceeds, after deducting any RTLCE Delinquency Charge.  If any Residential Tower Common Charge Obligor fails to pay its Special RTLCE Restoration Assessment in accordance with the provisions of Section 11.12.7(c) of these Condominium By-Laws, then the Special RTLCE Restoration Assessment of such Residential Tower Common Charge Obligor still due and payable (the "Delinquent Special RTLCE Restoration Assessment") shall be subject to late charges, interest, expenses and fees, all pursuant to and in accordance with Article 12 of these Condominium By-Laws (such charges, the "Special RTLCE Restoration Assessment Penalties").  Upon payment to the Condominium Board of the Delinquent Special RTLCE Restoration Assessment, and to the extent not drawn upon and/or

applied to such completed RTLCE Restoration Work, then the Insurance Trustee and/or the Condominium Board, as the case may be, shall distribute the Delinquent Special RTLCE Restoration Assessment to each Residential Tower Common Charge Obligor, after deducting any RTLCE Delinquency Charge, according to the pro rata share of such Residential Tower Common Charge Obligor's contribution to the Special RTLCE Restoration Assessment Proceeds. The Special RTLCE Restoration Assessment Penalties shall be distributed to each Residential Tower Common Charge Obligor (excluding the Residential Tower Common Charge Obligor paying such Special RTLCE Restoration Assessment Penalties) according to the pro rata share of such Residential Tower Common Charge Obligor's contribution to the Special RTLCE Restoration Assessment Proceeds (taking into account any prior distribution of any excess Special RTLCE Restoration Assessment Proceeds and after deducting any RTLCE Delinquency Charge) prior to the payment of the Delinquent Special RTLCE Restoration Assessment.

11.12.7   <u>Casualty to or Condemnation of Units; Repair by Unit Owners; Unit Restoration Work</u>. Except as provided herein, in the event a Unit is damaged or destroyed by casualty or impaired by a partial taking by condemnation or eminent domain, the affected Unit Owner(s) shall immediately remove any rubble and debris resulting from such event and, within a reasonable time thereafter, shall (at its election) either repair and restore the Unit so damaged or destroyed by casualty, or such of the Unit (and the appurtenant Limited Common Elements, if applicable) as shall remain following the taking: (i) to a complete, independent and self-contained architectural whole; and/or (ii) to a safe and secure "core and shell" condition, with complete and sightly demising walls, doors and exterior visible surfaces separating such Unit (or any appurtenant Limited Common Elements) from any other Unit (or any appurtenant Limited Common Elements) or General Common Element visible from outside of the applicable Unit, having no adverse effect on any other Unit or the Common Elements (either of the foregoing (i) or (ii), the "<u>Unit Restoration Work</u>"). Notwithstanding anything herein to the contrary, the Unit Restoration Work with respect to any Tower Unit shall be performed by the Tower Board (on behalf of the Tower Unit Owner).

11.12.8   <u>Casualty to or Condemnation of Tower Limited Common Elements or Residential Limited Common Elements; Repair by Tower Board; Tower LCE Restoration</u>. Except as provided herein, if any portion of the Tower Limited Common Elements or Residential Limited Common Elements are damaged or destroyed by casualty or impaired by a partial taking by condemnation or eminent domain, the Tower Board (on behalf of the affected Tower Unit Owner(s)) and the Base Unit Owner, shall immediately remove any rubble and debris resulting from such event and, within a reasonable time thereafter, shall (at its election) either repair and restore the Tower Limited Common Elements and/or Residential Limited Common Elements so damaged or destroyed by casualty, or such of the Tower Limited Common Elements and/or Residential Limited Common Elements as shall remain following the taking, (i) to a condition substantially similar to the condition of such Tower Limited Common Elements and/or Residential Limited Common Elements as existed immediately prior to such casualty or taking or (ii) to a safe and secure "core and shell" condition, with secure, complete and sightly demising walls, doors and exterior visible surfaces separating such Tower Limited Common Elements and/or Residential Limited Common Elements from any other Unit (or from any other Tower Limited Common Elements and/or Residential Limited Common Elements) or General Common Element or Residential Tower Limited Common Element visible from outside of the Tower

Limited Common Elements and/or Residential Limited Common Elements, having no adverse effect on any other Unit or the Common Elements (either of the foregoing (i) or (ii), with respect to a casualty or taking of the Tower Limited Common Elements and/or Residential Limited Common Elements, the "Tower LCE Restoration Work").

11.12.9   Casualty to Seventy Five Percent (75%) or More of the Residential Tower Building and CS Building.  Notwithstanding any provision of the Declaration or these Condominium By-Laws to the contrary, if seventy-five percent (75%) or more of the Residential Tower Building and the CS Building is destroyed or damaged by a single fire or casualty (a "Significant Casualty") and if, at any time prior to the execution and delivery of any construction contract relating to the GCE Restoration Work, Unit Restoration Work, Tower LCE Restoration Work or RTLCE Restoration Work (other than a construction contract relating solely to Safety Work (as defined below) or other minor construction work not constituting restoration work), more than seventy-five percent (75%) in Common Interest of Unit Owners (including in such percentage the affirmative vote by the Common Interest held by the CS Unit Owner) duly vote not to proceed to make the necessary GCE Restoration Work or require the necessary Unit Restoration , Tower LCE Restoration Work or RTLCE Restoration Work, as the case may be, then: (i) the Condominium Board shall secure and fence in the Property boundary, and shall raze the Residential Tower Building and the CS Building, if necessary, and put the Residential Tower Building and the CS Building and Property into compliance with applicable Laws, and otherwise make the Property and Building safe (all of the activities described in this clause (i), the "Safety Work"); and (ii) the GCE Restoration Insurance Proceeds, net of the costs and expenses of the Condominium Board hereunder and the cost of any Safety Work, shall be divided in the aggregate among each class of Unit (i.e., CS Unit, CS LL Unit, CS MS Unit, Tower Units and Base Unit) pursuant to an appraisal of fair market values to be performed by a panel of three independent appraisers (all of whom shall be selected by the Condominium Board), and then among the Unit Owners within each class of Unit in proportion to the respective Common Interests of such Units; provided, however, that no payment shall be made to a Unit Owner until there has first been paid out of his or her share of such funds, such amounts as may be necessary to discharge all unpaid liens on his or her Unit (other than mortgages which are not Permitted Mortgages) in the order of the priority of such liens.

11.12.10   Partial Condemnation.  Notwithstanding anything in the Declaration or these Condominium By-Laws to the contrary, if the Residential Tower Building and/or the CS Building is partially taken by condemnation or eminent domain (a "Partial Condemnation"), then (i) the Condominium Board shall be required to restore only those General Common Elements and the Residential Tower Limited Common Elements necessary for the Units remaining after such Partial Condemnation and (ii) any Unit Owner whose Unit has been partially taken and irrespective of any condemnation award therefor, shall contribute to the Condominium Board the cost for any applicable GCE Restoration Work and/or RTLCE Restoration Work relating to such Unit Owner's Unit, and such funds shall be deemed to be GCE Restoration Funds or RTLCE Restoration Funds, as the case may be; provided, however, that any excess GCE Restoration Funds or RTLCE Restoration Funds shall, after the completion of the applicable GCE Restoration Work or RTLCE Restoration Work, as the case may be, be returned to such Unit Owner (after deducting any Delinquency Charges).

11.12.11 <u>Total Condemnation</u>. Notwithstanding any provision of the Declaration or By-Laws to the contrary, if all or substantially all of the Residential Tower Building and CS Building is taken by condemnation or eminent domain (a "<u>Total Condemnation</u>") (a) the Condominium Board shall perform any Safety Work which it deems appropriate, (b) any award received by a Unit Owner with respect to the taking of its Unit as part of the Total Condemnation shall be payable to the applicable Unit Owner, after deducting any Delinquency Charges and (c) the Condominium Board shall have no obligation to restore the General Common Elements or the Residential Tower Limited Common Elements.

11.12.12 <u>Restoration Work; Plans</u>. All GCE Restoration Work, Unit Restoration Work, Tower LCE Restoration Work and RTLCE Restoration Work hereunder shall be performed in accordance with the applicable provisions of the Declaration and these Condominium By-Laws regarding the performance of Alterations and/or Repairs, including without limitation the approval provisions of Section 8.1.1 of these Condominium By-Laws.

11.12.13 <u>Reallocation of Percentage Interests</u>. (a) If, as a result of a taking or casualty, the gross square footage of any Unit changes, the Condominium Board shall promptly (x) adjust, as of the date of such taking or casualty, the Unit Owner's Common Interest percentage in a manner consistent with the allocation of the Common Interests in existence immediately preceding such casualty or taking and in accordance with the then applicable Real Property Law, (y) equitably adjust, as of the date of such taking or casualty, the then effective budget to take into account the casualty or taking, and (z) subject to the provisions of Article 17 of the Declaration and Article 16 of these Condominium By-Laws, prepare and record in the City Register's Office an amendment to the Declaration, confirming such reallocation. If the Condominium Board shall not agree on any of the matters referred to in the foregoing clauses (x), (y) and (z) within ninety (90) days following completion of the reconstruction, they shall submit such issue to Arbitration.

(b)     If a Unit Owner or Board does not (in the course of restoring its Unit or Section, including any Tower Unit Common Elements and Residential Limited Common Elements) restore the number of gross square feet existing immediately preceding the fire or other casualty, then, notwithstanding such reduction in the number of gross square feet, such Unit Owner's/s' Common Interest(s) and allocation(s) of General Common Charges shall not be diminished. Likewise, each Unit Owner's Common Interest and allocation of General Common Charges shall not be adjusted or diminished if a Unit Owner chooses to restore its Unit to a "core and shell" condition rather than to a fully operational condition (as each such condition is described in Section 11.12.7 above).

(c)     For the avoidance of doubt, in the event of damage resulting from a casualty, the Common Charges otherwise payable by the Owner(s) of any affected Unit(s) shall not be abated.

11.12.14 <u>Notification of Casualty or Condemnation to Mortgagees and Guarantors</u>. Each Permitted Mortgagee and Permitted Guarantor shall be entitled to timely written notice of any condemnation or casualty loss that affects either a material portion of the Property or the Unit securing its Permitted Mortgage, to the extent such notification has not been provided by the Tower Board.

11.13   Coordination of Insurance.   Notwithstanding anything to the contrary contained herein, for so long as Related Companies or Oxford Properties or any Affiliate thereof owns or has any interest in the Base Unit, such Base Unit Owner reserves the right to require the Condominium's Board(s) to use such insurance vendor(s), including without limitation, any captive insurer(s) and the like (if applicable) which has been set up for the FAS Parcel for all of the insurance required pursuant to 11.1 and 11.4 of the Condominium By-Laws, or to obtain such insurance through a blanket insurance program covering one or more buildings located at the FAS Parcel; provided that the cost of such insurance shall be reasonably competitive with the cost which would be charged to the applicable Board were such Board to purchase such comparable insurance separately for the Building (or applicable portion thereof) from a reputable, independent third-party insurance company generally in the business of providing such insurance to similarly situated properties.

## ARTICLE 12

## EVENTS OF DEFAULT; RIGHTS OF CURE; CONDOMINIUM BOARD'S LIEN; GRANTEES LIABLE FOR UNPAID GENERAL COMMON CHARGES

12.1   Failure to Pay General Common Charges.

12.1.1   The Condominium Board shall take prompt action to collect any General Common Charges or Special Assessments which remain unpaid following notice and the expiration of applicable grace periods, including, without limitation, the institution of such actions and the recovery of interest and expenses as are provided in this Article 12.

12.1.2   The Condominium Board shall have a lien (the "Condominium Board's Lien") for all unpaid General Common Charges, Special Assessments, other sums payable to it as if part of General Common Charges or amounts otherwise due to the Condominium Board (together with interest thereon as provided in this Article) from a delinquent General Common Charge Obligor, provided that such lien shall not apply to the portion of the General Common Charges which have been assessed against the Base Unit in violation of Section 339-m of the New York Real Property Law, which charges shall constitute Base Unit Operating Shortfalls and shall be payable by Tower Unit Owners and if unpaid shall constitute a lien against the Tower Units, proportionate to the relative proportional Common Interest of the Tower Unit Owners, as provided in Article 31 of the Declaration and Section 6.1.7 of these Condominium By-Laws. Such lien(s) shall be subordinate only to liens for real estate taxes and other assessments by taxing authorities and, to the extent required or permitted by applicable Laws, to prior recorded mortgages on the Unit(s) of such delinquent Unit Owner(s), which are first mortgages of record. With respect to individual Tower Units such lien shall be subordinate to the lien of the Tower Board in respect to such same amounts and obligations. Without limiting any of the foregoing, the Condominium Board may: (w) bring an action to foreclose the Condominium Board's Lien in accordance with Section 339-aa of the Real Property Law (provided that any successor owner of the Base Unit shall be bound by the terms of any Regulatory Agreement applicable to the Base Unit for so long as such agreement remains in effect); (x) purchase the interest of the owner of such Unit at a foreclosure sale resulting from any such action; (y) proceed by appropriate judicial proceedings to enforce the specific performance or observance by the defaulting General

- 77 -

Common Charge Obligor of the applicable provisions of the Declaration or these Condominium By-Laws from which default arose; or (z) exercise any other remedy available at Law or in equity; however, in the event the net proceeds received on a foreclosure sale are insufficient to satisfy the defaulting Unit Owner's obligations, there shall be no further cause of action against such Unit Owner with respect to such deficit. Each of the remedies herein described as well as any other remedy available at Law or in equity may be exercised concurrently or sequentially. Any Registered Mortgagee or Declarant Net Lessee may bid in a foreclosure sale of any Unit.

12.1.3    The Condominium Board shall not record any notice of any Condominium Board's Lien prior to the date on which all applicable notice and grace periods (including cure periods to which any Registered Mortgagee may be entitled) in respect of the default(s) giving rise to the Condominium Board's Lien have expired. Subject to the requirements with respect to notice, grace and cure periods set forth in the preceding sentence, the pendency of an Arbitration with respect to the obligations giving rise to any such lien shall not serve to prevent the Condominium Board from recording any Condominium Board's Lien; however, no proceedings or filings in furtherance thereof (other than as may be required in order to preserve the validity and priority of the lien so recorded) shall be had or made, as the case may be, until the resolution of the Arbitration with respect thereto, and to the extent it shall be determined in Arbitration that the Condominium Board was not entitled to record all or any portion of such Condominium Board's Lien, the Condominium Board shall, as promptly as practicable following such determination and at the Condominium Board's expense, cause its Condominium Board's Lien (or portion thereof) to be released and discharged. The Condominium Board's Lien shall be effective from and after the time of recording in the public records of New York County of a claim of lien stating the description of the Unit, the name, if any, and the address of the Unit, the City Register Office's File Number (or other identifying recording information) of record of the Declaration, the name of the record owner, the amount due and purpose of such amount and the date when due. Subject to the penultimate sentence of Section 12.1.4 hereof, such claim of lien shall include only sums which are due and payable when the claim of lien is recorded and shall be signed and verified by an officer or agent of the Condominium Board. Upon full payment of all sums evidenced by the lien including, without limitation, interest at the Default Rate, the party making payment shall be entitled to a recordable satisfaction of lien to be recorded at its expense. Liens for unpaid General Common Charges may also be reduced to a personal money judgment against the Unit Owner or may be foreclosed by suit brought in the name of the Condominium Board or the Unit Owner asserting the lien in the same manner as a contract or other action (and without waiving the lien securing the same); provided, however, that no Unit Owner shall be liable to the Condominium Board for any deficiency with respect to a Unit owned by such Unit Owner and upon which the Condominium Board has foreclosed its Condominium Board's Lien. In the event of the foreclosure of such lien, the Condominium Board shall have the power to bid on the Unit at foreclosure sale and to acquire, hold, lease, mortgage and convey such Unit.

12.1.4    The Condominium Board shall charge any delinquent General Common Charge Obligor: (i) a late charge of $.04 for each dollar of such amounts which remain unpaid for more than ten (10) days from their initial due date (although nothing herein shall be deemed to extend the period within which such amounts are to be paid); (ii) interest at the Default Rate on such unpaid amounts (exclusive of any "late charges" theretofore collected on such amounts) computed from the due date thereof to the date payment is actually received from the delinquent

General Common Charge Obligor; and (iii) if the Condominium Board institutes a suit or other proceeding to collect sums due hereunder, all expenses, including, without limitation, attorneys' fees and expenses paid or incurred by the Condominium Board or by any managing agent in any proceeding brought to collect such unpaid General Common Charges or in an action to foreclose a Condominium Board's Lien with respect to such delinquent Person's Unit(s). All such late charges, interest, expenses and fees shall be added to and shall constitute General Common Charges payable by such General Common Charge Obligor (and the Condominium Board's Lien, as applicable, shall also secure the payment of such additional sums). A suit to recover a money judgment for unpaid General Common Charges shall be maintainable without foreclosing or waiving the lien securing such charges.

   12.1.5 Each Permitted Mortgagee and Permitted Guarantor shall be entitled to timely written notice of any 60-day delinquency in any General Common Charges assessed directly against a Unit securing its Permitted Mortgage, to the extent such notification has not been provided by the Tower Board.

   12.2 <u>Other Defaults Under the Condominium Documents</u>.

   12.2.1 The violation of any of the General Rules and Regulations or the breach of any provision of these Condominium By-Laws, or the breach of any provision of the Declaration (including, without limitation, a failure to comply with the provisions of Articles 8 and 15 of the Declaration and Section 13.6 of these Condominium By-Laws), shall give the Condominium Board the right, in addition to any other rights set forth in these Condominium By-Laws or the Declaration, (i) after notice and a reasonable (under the circumstances) opportunity to cure, to enter any Unit, General Common Elements or Limited Common Elements in which, or as to which, such violation or breach exists and to summarily abate and remove, at the expense of the defaulting Unit Owner, any structure, thing or condition resulting in such violation or breach and the Condominium Board shall not thereby be deemed guilty or liable in any matter of trespass, and/or (ii) to enjoin, abate or remedy by appropriate legal proceedings, either at Law or in equity, the continuance of any such violation or breach, provided that the Condominium Board gives the Unit Owner or Declarant Net Lessee notice (which may be by telephone) that such violation exists, that repairs or replacements are necessary and that the Condominium Board will complete such repairs or replacements in the event the Unit Owner does not promptly act or complete the repairs or replacements, and/or (iii) to levy such fines and penalties as the Condominium Board may deem appropriate, and the Condominium Board shall have the same remedies for non-payment of such fines and penalties as for non-payment of General Common Charges.

   12.2.2 The violation or breach of any of the provisions of these Condominium By-Laws, any of the General Rules and Regulations or the Declaration with respect to any rights, easements, privileges or licenses granted to Declarant and the Tower Sponsor or their designees shall give to Declarant and the Tower Sponsor or their designees, as the case may be, the right, in addition to any other rights set forth in these Condominium By-Laws or the Declaration, to enjoin, abate or remedy by appropriate legal proceedings, either at Law or in equity, the continuance of any such violation or breach.

12.2.3    In the event that any Unit Owner, after receipt of written notice from the Condominium Board, fails or neglects in any way to perform any of its obligations with respect to the maintenance, repair or replacement of its Unit as provided in the Condominium Documents or of any Common Element for which such Unit Owner is responsible under the Declaration or these Condominium By-Laws, the Condominium Board may perform or cause to be performed such obligation unless such Unit Owner, within five (5) Business Days after receiving notice of such monetary default by the Condominium Board or thirty (30) days after receiving notice of such non-monetary default, cures such default, or in the case of a default not reasonably susceptible to cure within such period, commences and thereafter prosecutes to completion, with due diligence, the curing of such default. All reasonable, out-of-pocket sums expended and all reasonable, out-of-pocket costs and expenses incurred in connection with the making of any such painting, decorating, maintenance, repair or replacement in such Unit Owner's Unit or to any such Common Element for which such Unit Owner is responsible as aforesaid, together with interest thereon at the Default Rate, shall be immediately payable by such Unit Owner to the Board and shall, for all purposes hereunder, constitute General Common Charges payable by such Unit Owner.

12.2.4    Without limiting the preceding provisions of this Section 12.2:

(a)    in the event a Unit Owner or the Tower Board shall fail to obtain and maintain any insurance required to be obtained and maintained by it under such of the Condominium Documents as may be applicable, or fails to effect the renewal or substitution of any such policy at least fifteen (15) Business Days prior to the date set forth in any notice received by any such Person from its insurance company or the Condominium Board as the date (the "Insurance Termination Date") on or as of which any such policy is being terminated, is expiring or will otherwise not be renewed (unless such notice is received by such Person with fewer than fifteen (15) Business Days remaining prior to such Insurance Termination Date, in which case such renewal or substitution shall be required in all events prior to the Insurance Termination Date of the required coverage); and any such failure continues for a period of one (1) business day following receipt by the defaulting Unit Owner or Tower Board, from the Condominium Board (and/or, in the case of a Tower Unit Owner, the Tower Board), of a notice of default with respect thereto specifying the policy and coverage amount (as applicable) required to be obtained, maintained, or renewed (as the case may be) and stating in bold print: "THIS IS YOUR FINAL NOTICE THAT YOU ARE IN DEFAULT WITH RESPECT TO THE CONDOMINIUM'S INSURANCE REQUIREMENTS AS SPECIFIED HEREIN. FAILURE TO OBTAIN, MAINTAIN OR RENEW SUCH REQUIRED POLICY/IES OF INSURANCE WITHIN ONE (1) BUSINESS DAY AFTER THE DATE OF THIS NOTICE SHALL CONSTITUTE AN EVENT OF DEFAULT UNDER ARTICLE 12 OF THE CONDOMINIUM BY-LAWS AND THE PROVISIONS OF ANY OTHER APPLICABLE BY-LAWS."; or

(b)    in the event a Unit Owner or the Tower Board shall fail (whether due to its action or inaction, or the action or inaction of any Permittee or Occupant of any such Unit Owner or the Tower Board) to bond or obtain the release or discharge of any mechanic's lien, or to remove of record, and cure the condition resulting in, any violation required to be released, discharged, removed or cured, as the case may be, in accordance with the provisions of (and within the time periods set forth in) Sections 9.1 and 9.2 of these Condominium By-

- 80 -

Laws, and such failure continues after notice from the person "adversely affected" by such lien or violation (as such term is used in Section 9.1 or 9.2, as applicable), and beyond the expiration of the cure periods therein, provided that such notice shall specify and identify in reasonable detail the mechanic's lien or violation or condition in question and state in bold print: "THIS IS YOUR FIRST AND ONLY REQUIRED NOTICE THAT YOU ARE OBLIGATED TO [RELEASE OR DISCHARGE A MECHANIC'S LIEN and/or REMOVE A VIOLATION AND CURE THE CONDITION GIVING RISE THERETO] [the inapplicable phrase(s) to be deleted], AS REQUIRED BY ARTICLE 9 OF THE CONDOMINIUM BY-LAWS. FAILURE TO EFFECT SUCH [RELEASE, DISCHARGE, REMOVAL OR CURE] [the inapplicable phrase to be deleted] WITHIN [insert applicable cure period] AFTER RECEIPT OF THIS NOTICE SHALL CONSTITUTE AN EVENT OF DEFAULT UNDER ARTICLE 12 OF THE CONDOMINIUM BY-LAWS.";

either of such cases (each, a "Special Non-Monetary Event of Default"), then upon such occurrence and for so long as such Special Non-Monetary Event of Default continues, the Condominium Board may (without the consent of the defaulting Tower Board or defaulting Unit Owner (notwithstanding any other provision of the Condominium Documents which might otherwise require such consent and without notice other than as provided in this Article 12), subject to Section 12.5 below), but shall not be obligated to, pay the amount or perform or cause to be performed the obligation or otherwise cure or effect the cure of the default which is the basis for such Special Non-Monetary Event of Default (including, for example, by means of causing Repairs or Alterations, or curing violations or removing or bonding mechanic's liens or otherwise as the Condominium Board shall deem appropriate), if the defaulting Unit Owner or Tower Board, as the case may be, shall after receiving a further notice from the Condominium Board specifying the nature of the Special Non-Monetary Event of Default, and stating "YOU ARE HEREBY NOTIFIED THAT THE CONDOMINIUM BOARD SHALL BE ENTITLED TO EXERCISE ITS RIGHTS TO CURE THE EVENT OF DEFAULT DESCRIBED HEREIN IF YOU DO NOT CURE OR (AS APPLICABLE UNDER SECTION 9.2) COMMENCE THE CURE OF SAME, IN ACCORDANCE WITH ARTICLE 12 OF THE CONDOMINIUM BY-LAWS, WITHIN ___ DAYS [to be specified by the Condominium Board but which shall not be less than seven (7) Business Days] AFTER YOUR RECEIPT OF THIS NOTICE, WHICH MAY ENTAIL, WITHOUT LIMITATION, ENTRY BY THE CONDOMINIUM BOARD OR ITS AGENTS UPON YOUR UNIT AND/OR LIMITED COMMON ELEMENTS. AMONG OTHER THINGS, YOU WILL BE RESPONSIBLE FOR ALL COSTS INCURRED BY OR ON BEHALF OF THE CONDOMINIUM BOARD IN CONNECTION THEREWITH." fail to cure such circumstances giving rise to such Special Non-Monetary Event of Default, or, if the condition giving rise to a Special Non-Monetary Event of Default is of a nature such that it cannot reasonably be cured within the period specified in such further notice and after so notifying the Condominium Board within such period, fail, as promptly as practicable within such period, to commence such cure and thereafter proceed with diligence and continuity to complete such cure (unless, notwithstanding the foregoing requirements, such condition giving rise to the Special Non-Monetary Event of Default constitutes an Emergency, in which event only such prior notice as is practicable under the circumstances (which may be, but shall not be presumed to be, none) shall apply and if no prior notice is given, notice shall be given promptly thereafter). Such right on behalf of the Condominium Board to cure any such matters includes, without limitation, the right: (i) to enter the Unit, the Limited Common Elements of the defaulting Unit Owner or the Tower Board, as the case may be, in which, or as to which, such

violation or breach exists and to summarily abate and remove, at the expense of the defaulting Unit Owner or Tower Board, any structure, thing or condition resulting in such violation or breach and the Condominium Board shall not thereby be deemed guilty or liable in any matter of trespass; and/or (ii) to enjoin, abate or remedy by appropriate legal proceedings, either at law or in equity, the continuance of any such violation or breach.  Any reasonable, out-of-pocket amounts expended by the Condominium Board, together with interest at the Default Rate from the date of expenditure to the date of repayment, shall be reimbursed by the defaulting Unit Owner or Tower Board to the Condominium Board on demand and, as applicable, the same shall, for all purposes hereunder, constitute part of the General Common Charges payable by such Person.

(c)     Any Repairs or Alterations performed by the Condominium Board in accordance with the terms of this Section 12.2 shall be the sole responsibility of the Condominium Board with respect to the quality and the proper completion thereof, but the responsibility thereafter for maintenance and related obligations for such item or area shall remain with the Person who had that responsibility prior to such performance by the Condominium Board.

12.3    Default by Condominium Board; Performance by Unit Owners or Tower Board. In the event that the Condominium Board fails or neglects (other than to a de minimis extent) to perform any obligations (for which appropriate provision has been made in the then applicable Budget or for which an expenditure is otherwise specifically approved by the Condominium Board) with respect to the operation, maintenance, care, upkeep, Alteration or Repair of any part of the Residential Tower Building required to be operated, maintained, cared for, Altered or Repaired by the Condominium Board under the Condominium Documents, any Unit Owner (other than the CS Unit Owner) or the Tower Board, if adversely affected by such failure or neglect (in such case, a "Performing Party"), may, but shall not be obligated to, perform or cause to be performed, all such obligations (in accordance with any applicable provisions of the Condominium Documents with respect to consents and approvals, etc.), if the Condominium Board shall fail: (i) within a period of time not less than thirty (30) days after notice is given to the Secretary of the Condominium Board and to each Condominium Board Member specifying the precise nature and scope of such obligation and default, making demand for performance and/or cure thereof and stating in bold print:  "YOU ARE HEREBY NOTIFIED THAT THE CONDOMINIUM BOARD HAS FAILED TO FULFILL ITS OBLIGATIONS WITH RESPECT TO THE OPERATION, MAINTENANCE, CARE, UPKEEP, ALTERATION OR REPAIR OF THE BUILDING AS SET FORTH IN DETAIL IN THIS NOTICE.  THE CONDOMINIUM BOARD'S FAILURE TO: (a) CURE THIS DEFAULT OR (AS APPLICABLE) TO COMMENCE THE CURE OF SAME, IN ACCORDANCE WITH ARTICLE 12 OF THE CONDOMINIUM BY-LAWS, OR (b) COMMENCE AN ARBITRATION DISPUTING THE DEFAULT HEREIN DESCRIBED, IN EACH CASE WITHIN __ DAYS [to be specified by the Person giving notice but which shall not be less than thirty (30) days] AFTER YOUR RECEIPT OF THIS NOTICE, SHALL ENTITLE US TO PERFORM SUCH OBLIGATION IN THE NAME OF THE CONDOMINIUM BOARD" (unless, notwithstanding the foregoing requirements, such alleged default constitutes an Emergency, in which case only such prior notice as is practicable under the circumstances (which may, but shall not be presumed to be, none) shall apply and if no prior notice is given, notice shall be given promptly thereafter), to either: (x) cure (or if the default is of a nature such

- 82 -

that it cannot reasonably be cured within the stated period (except in the case of an Emergency), commence to cure and thereafter proceed with diligence and continuity to complete such cure of) the alleged default; or (y) dispute the existence of such alleged default and submit such dispute to Arbitration (and if the Condominium Board does not comply with either clause (x) or clause (y) of this sentence, it shall not have any further right to commence an Arbitration disputing the alleged default).  All reasonable sums expended and costs and expenses incurred by the Performing Party in connection with the making or performing of any such operation, maintenance, care, upkeep, Alteration or Repair (to the extent within the scope of nature and scope of the work described in the notices provided to the Condominium Board as set forth above), together with interest thereon (at the Prime Rate for the first twenty days after demand for payment, and at the Default Rate thereafter), shall be immediately payable upon demand by the Condominium Board to the Performing Party; and shall otherwise be allocated to the Unit Owners, as a General Common Expense in the manner set forth in these Condominium By-Laws. The Performing Party shall have a right of offset against sums due to the Condominium Board with respect to amounts due from the Condominium Board as described in the preceding sentence.

12.4    Emergencies Caused by Unit Owners or Board(s).

12.4.1    In the event that an Emergency exists as a result of: (i) the failure or neglect by a Unit Owner (or its Occupants or Permittees) or any Board to perform any obligation with respect to the operation, maintenance, care, upkeep or Repair of its Unit or Common Elements under its control and for which it is, under the Condominium Documents, responsible, as the case may be; (ii) a condition existing or an occurrence within a Unit or a Common Element, as the case may be; or (iii) the violation by a Unit Owner or a Board (or any Occupants or Permittees of a Unit Owner or a Board) of any of the Declaration, these Condominium By-Laws, the Tower Section By-Laws or any Rules and Regulations, all the other Unit Owners and the Boards that are, or that have (or that have Occupants or Permittees that are or that have) Units, Common Elements, property or operations that are threatened or affected by such Emergency, shall have the right, but not the obligation, to enter that portion of the Property in or from which, or as to which, such Emergency exists and to perform or cause to be performed any such operation, maintenance, care, upkeep or Repair or otherwise take any reasonable action under the circumstances to summarily abate and remove, at the expense of the defaulting Unit Owner or Board, as the case may be, such Emergency, but in all events only to the extent reasonably and immediately necessary to do so (i.e., until the Emergency no longer exists), and the party effecting such performance shall not thereby be deemed guilty or liable in any manner of trespass, provided that such party gives the defaulting Unit Owner or Board, as the case may be, such notice as is practicable under the circumstances (which may be, but shall not be presumed to be, none), which notice, to the fullest extent possible, shall describe the Emergency and the actions the party intending to effect performance intends to take, is taking, or has taken to abate such Emergency and further provided that such actions were taken only to the extent reasonably and immediately necessary to cause the Emergency no longer to exist.  The reasonable, out-of-pocket costs and expenses incurred in connection with the making of any such maintenance, repair or replacement or the taking of any such action for which such applicable Unit Owner or Board, as the case may be, is or would be otherwise responsible, together with interest thereon (at the Prime Rate for the first twenty days after demand for payment, and at the Default Rate thereafter), shall be immediately payable upon demand by such Unit Owner or

Board, as the case may be, to the Person effecting such performance (the "Curing Person"). The Condominium Board shall have a Condominium Board's Lien (hereinafter described) in respect of amounts owed pursuant to the preceding sentence as if the same were payable to the Condominium Board as part of the General Common Charges payable by such applicable Unit Owner or Board, but such lien shall be held (and enforced) by the Condominium Board for the benefit of the Curing Person.

12.4.2    Any operation, maintenance, Repair or other action taken to abate and remove any such Emergency in accordance with the terms of Section 12.4.1 shall be the sole responsibility of the Person taking such action with respect to the quality and the diligent and proper completion thereof (and such Person shall be liable for any and all damage caused thereby or in the course thereof and shall indemnify and hold the affected Board(s), managing agents, Unit Owner(s) and MTA in its capacity as Declarant harmless with respect to the same); except that the responsibility thereafter for maintenance and related obligations for the item or area repaired or replaced shall remain with the Person who had that responsibility prior to the Emergency.

12.5    Priority of Recourse Against Tower Unit Owners.

12.5.1    Notwithstanding anything to the contrary contained in this Article 12 and without limiting the rights of the Tower Board as set forth in the Tower Section By-Laws, the Tower Board shall in the first instance have the exclusive right of enforcement with respect to, and to exercise any remedy or recourse as against, any of the Tower Unit Owners as to whom or which any default under the Declaration, these Condominium By-Laws, the General Rules and Regulations, the Tower Section By-Laws and/or the Rules and Regulations thereof exists. The Tower Board shall, upon demand by the Condominium Board, use commercially reasonable efforts (and shall promptly, diligently and continuously attempt) to cause such defaulting Tower Unit Owner to cure such default (including, without limitation, through the exercise of all remedies available to the Tower Board under the Tower Section By-Laws). However, a default shall in no event be deemed to exist with respect to the Tower Board by reason of any action or inaction by, or a default existing with respect to, a Tower Unit Owner (or the Tower Board's action or inaction with respect to the enforcement or cure of the same).

12.5.2    In the event the Tower Board fails, within forty-five (45) days after demand is made by the Condominium Board to cause the Tower Unit Owner in question to cure its non-monetary default under the Declaration or these Condominium By-Laws (or, if such default is such that the Tower Board cannot reasonably cause the Tower Unit Owner in question to cure the same within such forty-five (45) day period, the Tower Board fails, as promptly as practicable within such forty-five (45) day period, to commence, and thereafter to proceed with diligence and continuity, to cause such Tower Unit Owner to cure its default), then the Condominium Board shall be entitled to exercise its right to cure any such default in accordance with the applicable provisions of the Declaration or these Condominium By-Laws.

12.6    Grantee Liable for Unpaid General Common Charges; Statement of Defaults.

(a)    To the extent applicable, upon any voluntary conveyance of any Unit, the grantee of such Unit shall (subject to the proviso clause of the penultimate sentence of

- 84 -

Section 12.1.3 above) be liable for all unpaid General Common Charges then pertaining to such Unit (which Unit shall continue to be subject to any Condominium Board's Lien existing as of the date of such conveyance), whether accrued and in respect of the period up to and including the date of such conveyance or in respect of the period following conveyance, but without prejudice to any right of the grantee to recover from the grantor any amounts paid by the grantee. To the extent permitted by applicable Laws, a Permitted Mortgagee acquiring title to a Unit at a foreclosure sale shall not be liable for, and such Unit shall not be subject to, a lien by the Condominium Board for the payment of General Common Charges assessed against such Unit (or the Section of which such Unit is a part) subsequent to the recording of such Permitted Mortgage and prior to the acquisition of title of such Unit by such Permitted Mortgagee.

(b)     Any General Common Charge Obligor may request from the Condominium Board for the benefit of a prospective purchaser, lender or Occupant, or otherwise, a statement: showing the amount of unpaid General Common Charges pertaining to such General Common Charge Obligor; stating whether there exists any known default under the Declaration or these Condominium By-Laws by the requesting Person, and if there are known defaults, specifying the nature thereof; stating the date and recording information of any amendments to the Declaration and these Condominium By-Laws, and stating whether the Declaration and these Condominium By-Laws are in full force and effect; and the Condominium Board shall provide such statement within ten (10) Business Days after request therefor. The Condominium Board shall be entitled to charge the requesting General Common Charge Obligor a reasonable fee for preparing and rendering said statement. Any Registered Mortgagee may request a similar statement with respect to a Unit upon which it holds a Registered Mortgage, with any reasonable charge therefor to be paid by the applicable Unit Owner. From time to time, the Condominium Board may request a statement from each General Common Charge Obligor that, except as may be otherwise specified, the Condominium Board is not in default under any of its obligations under the Declaration or these Condominium By-Laws, and such other reasonable information as may be reasonably requested. The addressee of any such statement shall be entitled to rely thereon; and each statement delivered pursuant to this Section 12.6 shall act as a waiver of any claim between the addressee and the Condominium Board or Person furnishing such statement to the extent such claim is based upon facts contrary to those asserted in the statement and to the extent the claim is asserted against a bona fide encumbrancer or purchaser for value without knowledge of facts to the contrary of those contained in the statement, and who has acted in reasonable reliance upon the statement provided, however, that: (i) the issuance of such statement shall in no event subject the Condominium Board to any liability for the negligent or inadvertent failure of the Condominium Board to disclose correct and/or relevant information and (ii) such issuance shall not be construed to waive any rights of the issuer with respect to any audit of or adjustments to General Common Charges as provided for in the Declaration and/or these Condominium By-Laws, or to challenge acts committed by a Unit Owner for which approval by or consent of the Condominium Board was required but not sought or obtained.

12.7     Title of Condominium Board on Foreclosure. Subject to Sections 13.5 and 13.6 of these Condominium By-Laws, in the event of the Condominium Board's purchase of any Unit at a foreclosure sale, or in the event that any Unit Owner (to the extent permitted in the Condominium Documents) shall convey its Unit to the Condominium Board in accordance with Section 339-x of the Real Property Law, title to such Unit shall be held by the Condominium

- 85 -

Board or its designee on behalf of all Unit Owners, and the Condominium Board shall have the power to hold, lease, mortgage, sell or otherwise deal with (but not vote the Common Interest appurtenant to) such Unit.

12.8    Tower Unit Owners. The provisions of the Tower Section By-Laws shall provide for the remedies of the Tower Board in the event of a failure by a Tower Unit Owner to pay Tower or Residential Common Charges assessed against its Unit (which Residential Common Charges include a portion of the General Common Charges allocated to the Tower Section or the Tower Board by the Condominium Board).

12.9    Defaults Under Master Declaration and ERY FAPOA Declaration.

(a)    As used herein:

(i)    "Association Charges" has the meaning set forth in the ERY FAPOA Declaration.

(ii)    "Association Special Assessments" has the meaning set forth in the ERY FAPOA Declaration.

(iii)    "Facility Airspace Improvements" has the meaning set forth in the Master Declaration.

(iv)    "Facility Airspace Parcel" has the meaning set forth in the Master Declaration.

(v)    "Individual Association Share" means, with respect to each Tower Unit Owner, its Tower Common Interest as applied to the total obligations of the Condominium Board with respect to its portion of the Facility Airspace Parcel or Facility Airspace Improvements. For the avoidance of doubt, no other Unit Owner shall have an Individual Association Share.

(vi)    "Yards Parcel Owner" has the meaning set forth in the Master Declaration.

(vii)    "YP Obligation Assessment" has the meaning set forth in the ERY FAPOA Declaration.

(b)    The Condominium Board shall assess and collect Association Charges and Association Special Assessments from the Tower Unit Owners only in proportion to its Tower Common Interest. No other Unit Owner shall have any obligation to pay any Association Charges and Association Special Assessments. Each Tower Unit Owner shall be responsible to fund in a timely manner its Individual Association Share of the total Association Charges and Association Special Assessments. If a Tower Unit Owner (a "Defaulting Unit Owner") fails to so fund its Individual Association Share, the Condominium Board may impose a Special Assessment on the other Tower Unit Owners ("Master Declaration Special Assessment") (pro-rated among the remaining Tower Unit Owners in accordance with their respective Tower Common Interests, such pro-rated amount, as to each remaining Tower Unit

- 86 -

Owner being referred to as the "Pro-Rata Master Declaration Special Assessment") in order to meet the obligation of the Condominium to pay Association Charges and Association Special Assessments, but such Special Assessment shall not relieve the Defaulting Unit Owner of its obligations. Such Special Assessment may be reimbursed to Tower Unit Owners upon receipt of payment from Defaulting Unit Owner.

        (c)    For the avoidance of doubt, nothing herein prevents the Association from collecting Association Charges (other than YP Obligation Assessments) or any other amounts or expenses incurred for Association services or other services rendered directly to the CS Group upon its request therefor, either directly from the CS Unit Owner or the Condominium, as elected by the Association, in accordance with Section 12.1 of the ERY FAPOA Declaration or any agreement(s) between the Association and the CS Unit Owner. In connection therewith, in the event the Association so elects (in accordance with Section 12.1 of the ERY FAPOA Declaration or any agreement(s) between the Association and the CS Unit Owner) to collect the same through the Condominium, the CS Unit Owner shall indemnify the other Unit Owners from any liability, expense or obligation to the Association or the Condominium in connection with services rendered directly to or for the benefit of the CS Group; provided that the Condominium timely provides the CS Unit Owner with the invoices pertaining to any such expense or liability.

        (d)    Each Unit shall be subject to levy or execution for the satisfaction of any monetary liability under the Master Declaration solely to the extent of the Individual Association Share of such Unit Owner of such Unit. In accordance with the Master Declaration and the ERY FAPOA Declaration, in the event of a default by the Condominium in payment of such Association Charges and/or Association Special Assessments to the Association, a lien shall exist upon the Tower Unit of each Tower Unit Owner who failed to remit its Individual Association Share in favor of the Association, solely to the extent of such Tower Unit Owner's unpaid Individual Association Share (including, for this purpose, such Unit Owner's Pro-Rata Master Declaration Special Assessment), which lien shall include such Tower Unit Owner's obligation for the costs of collection of such Tower Unit Owner's unpaid Individual Association Share. Such lien shall have the same priority as the lien of the Condominium Board for unpaid General Common Charges, and shall be superior to all other liens on the Unit, except to the extent provided in Section 339-z of the New York Real Property Law (or other applicable Laws), the lien of any real property taxes or mortgages, and subject to Section 6.2.3 hereof.

        (e)    The Condominium Board and the Unit Owners acknowledge that the ERY FAPOA Declaration provides that prior to enforcing its rights under the ERY FAPOA Declaration against a Unit Owner, the Association shall first use reasonable efforts to enforce its rights against the Condominium Board. In the event that the Condominium Board does not timely perform its obligations under the ERY FAPOA Declaration, the Association and the Yards Parcel Owner shall have the right at any time thereafter to obtain from the Condominium Board the names of any Unit Owners who have not paid their Individual Association Shares (including, for this purpose, such Unit Owner's Pro-Rata Master Declaration Special Assessment). In no event shall Yards Parcel Owner be obligated to bring suit against the Condominium Board or to exhaust remedies against the Condominium Board prior to making

demand on the Defaulting Unit Owners to fund their Individual Association Shares (including, for this purpose, such Unit Owner's Pro-Rata Master Declaration Special Assessment).

(f)     The Condominium Board shall give a copy of any notice of default received by it from the declarant under the Master Declaration or from the Association with respect to the ERY FAPOA Declaration to each Unit Owner, Board, Registered Mortgagee, and the Tower Mortgagee Representatives. Each Unit Owner or Board may cure such default if the Condominium Board fails to do so, and shall promptly notify the Condominium Board of its intent. If more than one Unit Owner or Board notifies the Condominium Board of such intent, Unit Owners or a Board shall have priority to cure such default in order of their Common Interests, with the Unit Owner or Board with the largest Common Interest having the highest priority. A Registered Mortgagee or Permitted Mortgagee shall also have the right to cure such default on behalf of its Unit Owner or Board.

(g)     In the event that the Condominium Board fails to perform its obligations hereunder with respect to any YP Obligation Assessment and the Association fails to cause the Condominium Board to remedy such failure within ten (10) Business Days of the occurrence thereof, the Yards Parcel Owner shall be entitled, at its election, to assess Master Declaration Special Assessments and/or to make demand on and/or exercise any remedies against the Defaulting Unit Owners directly to fund their respective Individual Association Shares of such YP Obligation Assessment (including, for this purpose, such Unit Owner's Pro-Rata Master Declaration Special Assessment). In no event shall the Yards Parcel Owner be obligated to bring suit against the Condominium Board or to exhaust remedies against the Condominium prior to assessing Master Declaration Special Assessments and/or making such demand on the Defaulting Unit Owners to fund their Individual Association Shares of such YP Obligation Assessment or exercising any other remedies of the Yards Parcel Owner hereunder against the Condominium. Any suit by the Yards Parcel Owner against the Condominium Board and/or each Defaulting Unit Owner to enforce the obligation to pay a Master Declaration Special Assessment and/or YP Obligation Assessment may, at the option of the Yards Parcel Owner, be brought in a single action or successive actions (subject to any applicable statute of limitations). No Unit Owner shall be liable for payment of more than its Individual Association Share of any YP Obligation Assessment and/or its Pro-Rata Master Declaration Assessment, and any Unit Owner that has duly paid its Pro-Rata Master Declaration Special Assessment and/or YP Obligation Assessment, as applicable, to the Condominium Board shall not be obligated to pay any duplicative amount to the Yards Parcel Owner. Yards Parcel Owner shall hold any funds received from the Unit Owners on account of a Master Declaration Special Assessment and/or YP Obligation Assessment in the name of and for the account of Yards Parcel Owner, and shall apply such funds to the Condominium's Association Share (as defined in the ERY FAPOA Declaration) of obligations under the Master Declaration.

(h)     The obligations of the Condominium Board and its rights (and the rights of the Yards Parcel Owner) against the Unit Owners pursuant to this Section 12.9 are essential elements permitting the development of the Property. Every deed conveying title to a Unit to a Unit Owner, and every lease of all or substantially all of a Unit, shall make reference to the provisions of this Section 12.9, and shall expressly state that the Condominium Declaration and/or the applicable conveyance is subject to the ERY FAPOA Declaration.

(i)     In no event may the provisions of this Section 12.9 be amended, modified, deleted or waived without the express written consent of Yards Parcel Owner.

## ARTICLE 13

## SALES, LEASES AND MORTGAGES OF UNITS

13.1    Sales, Leases and Mortgages of Tower Units. The provisions of the Tower Section By-Laws, to the extent not in conflict with the Declaration and these Condominium By-Laws, shall govern the sale, leasing and mortgaging of the Tower Units; except that, notwithstanding the foregoing, Declarant and/or Tower Sponsor, shall have the right, at any time, in its sole discretion and without the consent of any Person, to sell, assign or otherwise transfer, lease or encumber any Unsold Tower Unit(s), whether by merger, consolidation, sale, lease, mortgage, assignment or otherwise.

13.2    Sales, Leases and Mortgages of the Units Other Than Tower Units. Each Unit Owner (but as to the CS Unit Owner, CS LL Unit Owner, and CS MS Unit Owner, subject to the provisions of Section 13.6 of these Condominium By-Laws) with respect to its respective Unit may, without the prior consent of any Board, Unit Owner or any other Person but subject to compliance with all applicable Laws, the Condominium Documents, sell, assign or otherwise transfer, lease or encumber its Unit (whether by merger, consolidation, sale, lease, mortgage, assignment or otherwise, but subject to the restrictions on use and leasing provided herein or in the Declaration); provided, however, that: (i) no lien to secure repayment of any sum borrowed may be created on any other Unit without the prior written consent of the owner of such other Unit or on any of the Common Elements (as opposed to the applicable Unit Owner's undivided interest therein) without the prior written consent of all affected Boards and Unit Owners; and (ii) no Unit Owner (other than such borrowing Unit Owner), nor any Board, will be liable for repayment of any portion of any such loan, unless all such Unit Owner(s) and Boards, as applicable, otherwise so agree in writing.

13.3    Registered Mortgages; Rights of Registered Mortgagees.

(a)     The term "Registered Mortgage" as used herein shall mean any mortgage, as the same may be amended, modified or restated from time to time, given to secure the repayment of money or other obligation owed by a Unit Owner (other than the owner or Declarant Net Lessee of a Tower Unit that is not an Unsold Tower Unit, but as to a mortgage given by the CS Unit Owner, CS LL Unit Owner, or CS MS Unit Owner, subject to the provisions of Section 13.6 of these Condominium By-Laws): (i) which shall comply with the provisions of this Article 13; and (ii) a true and correct copy of such mortgage has been delivered to the Secretary of the Condominium Board, together with a certification by the indebted Unit Owner or the mortgagee confirming that such copy is a true and correct copy of the mortgage in question. Such defined term shall also include the mortgages encumbering the Base Unit, and/or the Unsold Tower Units as of the date of recording of the Declaration, as each mortgage may be increased, restated, amended, modified, split, severed and assigned from time to time (each, a "Construction Loan Mortgage"). In the event of any assignment of a Registered Mortgage or in the event of a change of address of a Registered Mortgagee or of an assignee of such Registered Mortgage, notice of the new or changed name and address shall be

provided to the Secretary of the Condominium Board. The term "Registered Mortgagee" as used herein shall mean (x) the record holder of a Registered Mortgage from time to time (subject to the preceding sentence); and/or (y) up to two (2) additional lenders, whose name and address shall be provided by the CS Unit Owner, who provides financing to the CS Unit Owner whether or not such financing is secured by an interest in the CS Unit. Holders of any Construction Loan Mortgage as of the date of recording of the Declaration shall automatically be deemed a Registered Mortgagee. Holders of any leasehold mortgages in connection with a Declarant Net Lease shall automatically be deemed a Registered Mortgagee. All Registered Mortgages, including, without limitation, any leasehold mortgages, shall be deemed to include (whether or not such mortgage in fact includes) an express provision acknowledging: (y) that the lien of such mortgage is and shall be subordinate to the Condominium Documents (and the provisions thereof and hereof) but superior to the Condominium Board's Lien to the extent set forth in Section 12.1.2 above; and (z) that the mortgagee (and its successors and assigns) will take title (whether by foreclosure, deed-in-lieu of foreclosure or otherwise) subject to the Condominium Documents.

(b)     If a Unit Owner (other than the owner or Declarant Net Lessee of a Tower Unit that is not an Unsold Tower Unit) or a Registered Mortgagee shall have served on the Secretary of the Condominium Board, as described in the preceding subparagraph, a notice ("RM Notice") specifying the name and address of such Registered Mortgagee, such Registered Mortgagee shall be given a copy of each and every notice of the occurrence of a default or an Event of Default (including, without limitation, all notices (including notices that the Condominium Board or another Person intends to cure an Event of Default) described in Sections 12.1, 12.2 and 12.3 hereof) required or permitted to be given to such Registered Mortgagee's mortgagor pursuant to the Declaration or these Condominium By-Laws at the same time as and whenever such notice shall thereafter be given thereunder or hereunder, at the address last furnished by the applicable Unit Owner (other than the owner or Declarant Net Lessee of a Tower Unit that is not an Unsold Tower Unit) or Registered Mortgagee. After receipt of an RM Notice from a Unit Owner (other than the owner or Declarant Net Lessee of a Tower Unit that is not an Unsold Tower Unit) or Registered Mortgagee, no notice of the occurrence of a default or an Event of Default thereafter given with respect to such Registered Mortgagee's mortgagor under the Declaration or these Condominium By-Laws by the Condominium Board or any other party entitled to give such notice shall be effective as to such Registered Mortgagee unless and until a copy thereof shall have been so given to the Registered Mortgagee(s). If a Registered Mortgage so provides or otherwise requires, then any insurance proceeds or condemnation award payable to a Unit Owner pursuant to the provisions hereof shall, upon notice from a Registered Mortgagee of such mortgagor, be delivered instead to such Person's Registered Mortgagee but applied as provided in the applicable provisions hereof (including, without limitation, Section 11.12) and of the Declaration. For purposes of this Section 13.3(b), the Construction Lender, as administrative agent for the benefit of certain lenders, shall be deemed to have given an RM Notice with respect to each Construction Loan Mortgage specifying the same addresses that are set forth in the documents governing such Construction Loan Mortgage, and shall be Registered Mortgagee with respect to any Residential Units owned by or on behalf of Tower Sponsor for so long as any such Construction Loan Mortgage remains in effect.

(c)     If more than one Registered Mortgagee having a lien on any specific Unit has exercised any of the rights afforded by this Section 13.3, only that Registered Mortgagee, to the exclusion of all other Registered Mortgagees having a lien on such Unit, whose Registered Mortgage is most senior in priority of lien with respect to such Unit (the "Senior RM"), shall be recognized by the other Unit Owner(s), the Tower Board and the Condominium Board as having exercised such right, for so long as such Registered Mortgagee shall be diligently exercising its rights hereunder with respect thereto; provided, however, that by written notice to the Condominium Board, such Registered Mortgagees of a specific Unit may designate one of them which is not most senior in priority to be deemed the Senior RM with respect to such Unit for purposes of this Section 13.3(c).

(d)     Each Registered Mortgagee shall have the right, but not the obligation, to cure any Event of Default by such Registered Mortgagee's mortgagor.  The Condominium Board, the Tower Board and all Unit Owners shall accept performance by a Registered Mortgagee (or its designee or nominee) of any covenant, condition or agreement on the part of a Unit Owner (other than the owner or Declarant Net Lessee of a Tower Unit that is not an Unsold Tower Unit) to be performed hereunder with the same force and effect as though performed by such Registered Mortgagee's mortgagor, even if such performance is after the applicable time period set forth in clause (e) below.

(e)     Notwithstanding any other provision of the Declaration or these Condominium By-Laws to the contrary, upon the occurrence of an Event of Default by a Unit Owner (other than the owner or Declarant Net Lessee of a Tower Unit that is not an Unsold Tower Unit), as applicable, no remedies contemplated under the Condominium Documents (other than (y) the remedies set forth in Section 12.4.1 hereof; and (z) unless clause (2) of this sentence applies and the applicable Non-Monetary Event of Default is not an Event of Default under Section 12.2.4(a) or Section 12.2.4(b) hereof, the remedies set forth in Section 12.2.4(a) hereof) shall be exercised by any Board or Unit Owner with respect thereto if a Registered Mortgagee of such Unit Owner shall (1) with respect to a Monetary Event of Default, within thirty (30) days following its receipt of any notice to the effect that a Monetary Event of Default has occurred with respect to its mortgagor, cure (or cause to be cured) such Monetary Event of Default, (2) with respect to any Non-Monetary Event of Default that is reasonably capable of being cured without owning or controlling the applicable Unit, within thirty (30) days following its receipt of any notice to the effect that such Non-Monetary Event of Default has occurred with respect to its mortgagor (a "Default Notice"), cure (or cause to be cured) such Non-Monetary Event of Default, or (3) with respect to any Non-Monetary Default in respect of which ownership or control of the applicable Unit is reasonably necessary to cure the Non-Monetary Event of Default in question, within ninety (90) days following its receipt of a Default Notice with respect thereto, commence to cure (or cause to be cured) the applicable Non-Monetary Event of Default, which cure may consist solely of exercising diligent efforts to obtain ownership or control of the applicable Units, and then diligently and continuously pursue such cure until completion.

(f)     In addition, notwithstanding any provision hereof to the contrary, if one or more Events of Default have occurred with respect to a Unit Owner (other than the owner or Declarant Net Lessee of a Tower Unit that is not an Unsold Tower Unit), but such defaulting Person's Registered Mortgagee is taking the actions described in the preceding

subparagraph (e) (as and when provided therein) with respect to, and/or has cured, each such Event of Default, then: (i) the Registered Mortgagee shall be entitled to replace and designate the Condominium Board Members that such defaulting Unit Owner would otherwise have been entitled to designate, as if such Registered Mortgagee were the Designator thereof; (ii) the Registered Mortgagee shall be entitled to vote at all Unit Owners Meetings the Common Interest that the Unit Owner would otherwise have been entitled to vote thereat and to give any consent or approval that its mortgagor could have given, which shall be granted or withheld under the same terms as are applicable to its mortgagor, as if such Registered Mortgagee were its mortgagor; and (iii) the Condominium Board shall rely (and be entitled to rely) on the votes of or actions taken by the Registered Mortgagee or the Condominium Board Member designated by it in determining the appropriateness of any action to be taken.  The rights of a Registered Mortgagee under the preceding sentence shall remain in effect until the Secretary of the Condominium receives the written notice described in the last sentence of Section 2.9.5 hereof and the third sentence of Section 3.7.1 hereof.  Payment or performance of any obligation of a Unit Owner (other than the owner or Declarant Net Lessee of a Tower Unit that is not an Unsold Tower Unit) by a Registered Mortgagee (prior to the date on which such Registered Mortgagee or its assignee or designee or nominee shall take title to the defaulting Unit Owner's Unit) shall not give rise to any obligation on the part of the Registered Mortgagee to continue to pay or perform in the future.

(g) Wherever the Condominium Documents would grant the Condominium Board a Condominium Board's Lien or other lien on account of the failure by a Declarant Net Lessee to pay any General Common Charges, Association Charges, Special Assessments or other amounts that such Declarant Net Lessee is obligated to pay the Condominium Board hereunder or another Unit Owner under the terms of the Condominium Documents or such Declarant Net Lease, such Condominium Board's Lien or other lien shall also encumber Declarant Net Lessee's leasehold interest under the applicable Declarant Net Lease (and be superior to the interest of any leasehold mortgagee of any such Declarant Net Lease) and the Condominium Board may exercise its remedies under Section 12.1.2 hereof with respect to such leasehold interest.

(h) The foregoing shall not be in limitation of any explicit rights otherwise granted to a Registered Mortgagee under the Condominium Documents.

13.4  No Severance of Ownership.  No Unit Owner shall execute any mortgage or other instrument conveying or mortgaging title to its Unit without including therein its entire Common Interest appurtenant to such Unit (and in the case of the CS Unit Owner, CS LL Unit Owner, or CS MS Unit Owner, compliance with the provisions of Section 13.6 of these Condominium By-Laws).  Any such mortgage or deed or other instrument purporting to affect one or more of such interests without including all such interests shall be deemed and taken to include the interest or interests so omitted even though the latter shall not be expressly mentioned or described therein.  Nothing in this Section 13.4 shall prohibit the lease of all or any portion of a Unit without the simultaneous lease of its appurtenant Common Interest (but subject, in the case of the CS Unit Owner, CS LL Unit Owner or CS MS Unit Owner to compliance with the provisions of Section 13.6 of these Condominium By-Laws).

13.5    Waiver of Right of Partition with Respect to Units Acquired on Behalf of Unit Owners as Tenants-in-Common; Waiver of Right of Surrender.  (a)  In the event that a Commercial Unit Owner or Base Unit Owner shall convey its Unit to the Condominium Board (to the extent permitted under the Condominium Documents) in accordance with Section 339-X of the Real Property Law, or any Commercial Unit or Base Unit shall be acquired by the Condominium Board or its designees (either at a foreclosure sale or otherwise) on behalf of all Unit Owners as tenants-in-common, all such Unit Owners shall be deemed to have waived all rights of partition with respect to such acquired Unit as herein provided.

(b)    To the extent permitted by applicable Laws, each of the Unit Owners (other than the Tower Unit Owners) shall be deemed to have waived any and all right to surrender its Unit, as applicable (in each case, together with its Appurtenant Interests), to the Condominium Board.

13.6    Common Ownership of and Operation of the CS Unit, CS LL Unit and CS MS Unit.  Notwithstanding anything to the contrary contained in the Condominium Documents, following Substantial Completion of the CS LL Unit and the CS MS Unit and conveyance of the same to the CS Unit Owner (or Declarant Net Lessee of the CS Unit), the CS Unit, the CS LL Unit and the CS MS Unit shall at all times remain in common ownership and shall be operated and maintained by the same entity, and the sale, conveyance, leasing or mortgaging of any such Unit without the simultaneous sale, conveyance, leasing or mortgaging  of all such Units to the same entity shall be null and void, and shall constitute an Event of Default.

13.7    Net Leases of Units by Declarant.

(a)    Declarant shall have the right to enter into a net lease (each, a "Declarant Net Lease") of each Unit owned by it with a third party without restriction, which Declarant Net Lease shall be subject, however, to the provisions of the Declaration and these Condominium By-Laws.  The lessee under a Declarant Net Lease is herein called a "Declarant Net Lessee", and the Lessor under a Declarant Net Lease is herein called a "Declarant Net Lessor".

(b)    Each Declarant Net Lessee shall provide the Condominium Board and each Unit Owner with its name and address and any changes thereto.

(c)    Each Declarant Net Lessee shall provide the Condominium Board with a redacted copy of its Declarant Net Lease.

(d)    The Condominium Board (and, if applicable, any Unit Owner) shall (i) accept payment of any sum or performance of any act by a Declarant Net Lessee required to be paid or performed by Declarant or a Declarant Net Lessor, as the owner of a Unit, pursuant to the provisions of the Condominium Documents, with the same force and effect as though paid or performed by Declarant or a Declarant Net Lessor, and (ii) deal with the Declarant Net Lessee in all respects as if it were the Unit Owner of the applicable Unit owned by Declarant or a Declarant Net Lessor, including, without limitation, the enforcement of all defaults and other remedies under the Declaration and these Condominium By-Laws, without first having to exercise any remedies against Declarant or a Declarant Net Lessor.

- 93 -

(e)     Each Declarant Net Lessee shall (to the exclusion of Declarant or a Declarant Net Lessor) have all of the rights and obligations of the Unit Owner of the applicable Unit under the Declaration, these Condominium By-Laws and, as applicable, the Tower Section By-Laws, including, without limitation, (i) the rights under Articles 14 and 16 of the Declaration; (ii) the rights to designate Board Members as set forth in Section 2.2.12 of these Condominium By-Laws and to call for and vote at meetings of Unit Owners as set forth in Section 3.7.5 of these Condominium By-Laws, subject, however, to the provisions of the penultimate sentence of Section 2.2.12 and last sentence of Section 3.7.5 of these Condominium By-Laws, respectively; and (iii) the rights of a Tower Unit Owner or owner of an Unsold Tower Unit, as applicable, under the Tower Section By-Laws.

(f)     The Condominium Board and each Unit Owner shall give to each Declarant Net Lessee and (so long as a Declarant Net Lease is in effect) to Declarant or a Declarant Net Lessor copies of all notices given to Unit Owners or the Condominium Board, as the case may be, pursuant to the provisions of the Declaration and these Condominium By-Laws.

(g)     The provisions of this Section 13.7, the next to last sentence of Section 2.1 hereof, and the last sentence of Section 3.8 hereof may not (so long as a Declarant Net Lease is in effect) be amended without the consent of Declarant or the Declarant Net Lessor.

## ARTICLE 14

## ARBITRATION

14.1    General Procedure.  Except as may otherwise be expressly provided in these Condominium By-Laws or the Declaration, any arbitration provided for in these Condominium By-Laws, Tower Section By-Laws or the Declaration ("Arbitration") shall be resolved by Arbitration conducted before one arbitrator (having 10 or more years' experience in the field of New York City real estate, if practicable, with Manhattan mixed use developments) selected by mutual agreement of the parties, or, failing such agreement within 15 days of receipt by a party of a written notice of an Arbitration, by the American Arbitration Association ("AAA").  The Arbitration shall be held in accordance with the AAA's Real Estate Industry Arbitration Rules then in effect.  The decision rendered in such Arbitration shall be binding upon the parties and may be entered in any court having jurisdiction.  In the event that the American Arbitration Association shall not then be in existence and has no successor, any Arbitration hereunder shall be conducted in New York City before one arbitrator appointed, on application of any party, by any justice of the highest court of appellate jurisdiction located in the County of New York.  The decision of the arbitrator so chosen shall be given within 10 days after his or her appointment. Subject to Section 14.3 below, in no event may the arbitrator modify any provision of the Declaration, the Condominium By-Laws or Tower Section By-Laws, including, without limitation any provision with respect to maintaining Project Standards.

14.2    Costs and Expenses.  The fees, costs and expenses of the arbitrator shall be borne by the losing party in the Arbitration or, if the position of neither party to a dispute shall be substantially upheld by the arbitrator, such fees, costs and expenses shall be borne equally by the

parties to the dispute. Each disputant shall also bear the fees and expenses of its counsel and expert witnesses. Subject to the foregoing, all costs and expenses paid or incurred by the Condominium Board in connection with any Arbitration held hereunder (including, without limitation, the fees and expenses of counsel and expert witnesses) shall constitute General Common Expenses; except to the extent such fees and expenses relate to a dispute which is exclusive to a particular Unit in which case the Condominium Board shall allocate such costs to such Unit.

14.3    Agreement by Parties.  The parties to any dispute required or permitted to be submitted to Arbitration hereunder may, by mutual agreement between them, vary any of the provisions of Section 14.1 with respect to the Arbitration of such dispute, or may agree to resolve their dispute in any other manner, including, without limitation, the manner set forth in Section 3031 of the New York Civil Practice Law and Rules and known as the "New York Simplified Procedure for Court Determination of Disputes."

## ARTICLE 15

## GENERAL RULES AND REGULATIONS

All General Rules and Regulations adopted from time to time by the Condominium Board shall be non-discriminatory and uniformly applied. None of the General Rules and Regulations shall be in conflict with these Condominium By-Laws or the Declaration. Each Unit Owner and the Tower Board may adopt and, from time to time, modify, amend or add to rules and regulations concerning the use of its Unit or the Tower and/or Residential Section, as applicable. Notice and a copy of any newly adopted General Rules and Regulations or any modifications, amendments or additions thereto shall be given by the Condominium Board to each Unit Owner and the Tower Board not less than thirty (30) days prior to the effective date thereof.

## ARTICLE 16

## AMENDMENTS TO DECLARATION AND/OR BY-LAWS

16.1    General.  Except as specifically provided herein and in the Declaration with respect to amendments, modifications, additions or deletions (each, an "Amendment") to the Declaration and/or these Condominium By-Laws:  (i) solely for the purpose of, and to the extent required for, effecting the permitted subdivision and/or combination of Units; and/or (ii) affecting Declarant or Tower Sponsor (or its designee(s) or other Unsold Tower Unit Owner(s)): (a) the Condominium Board may add to, amend, modify or delete ("Amend") any provision of the Declaration and/or these Condominium By-Laws by a 75% vote of the Condominium Board Members Present in Person and entitled to vote at a duly called meeting of such Board at which a quorum is present; provided, however, that the Common Interest appurtenant to each Unit as expressed in the Declaration shall not be altered without the written consent of the affected Unit Owner(s) (and their Registered Mortgagee(s) (in the case of any Unit or other than the Tower Units)) or Permitted Mortgagee(s) (in the case of any Tower Unit(s) directly affected); (b) any provision of the Declaration and/or these Condominium By-Laws benefiting, protecting or otherwise affecting only the Tower Section or the Tower Unit Owners may be Amended by the

affirmative vote of at least 66-2/3% in number and in Common Interest of all Tower Unit Owners taken in accordance with the provisions of these Condominium By-Laws and the Tower Section By-Laws; (c) any provision of the Declaration and/or these Condominium By-Laws benefiting, protecting or otherwise affecting only the Base Unit Owner may be Amended by the Base Unit Owner (or the Declarant Net Lessee of the Base Unit); and (d) any provision of the Declaration and/or these Condominium By-Laws benefiting, protecting or otherwise affecting only the CS Unit (or, following Substantial Completion of the CS LL Unit and the CS MS Unit and conveyance of the same to the CS Unit Owner, or the Declarant Net Lessee of the CS Unit, the CS LL Unit and the CS MS Unit) may be Amended by the affirmative vote of the CS Unit Owner.  Notwithstanding the foregoing, but subject to the provisions of the Declaration and/or these Condominium By-Laws with respect to Amendments to the Declaration and/or these Condominium By-Laws: (I) solely for the purpose of, and to the extent required for, effecting the permitted subdivision and/or combination of Units; and/or (II) affecting Declarant and/or Tower Sponsor (or its designee(s) or other Unsold Tower Unit Owner(s)): (1) no Amendment pursuant to the provisions of clause (a) above which would: (A) adversely affect the lien of any mortgagee under the Condominium Documents; (B) amend any enumerated rights, privileges, liabilities or obligations of a mortgagee of any Unit(s); or (C) subject to subsection 16.3 below, adversely affect any enumerated rights, privileges, liabilities or obligations of any Unit Owner; shall be effective without the written consent (which consent shall not be unreasonably withheld, conditioned or delayed) of the applicable Registered Mortgagee (in the case of any Unit other than the Tower Units) or Permitted Mortgagee (in the case of any individual Tower Unit(s)) or at least 51% of the applicable Mortgagee Representatives, if any (in the case of all Tower Units); (2) no Amendment pursuant to the provisions of clause (b) above shall be effective without the written consent (which consent shall not be unreasonably withheld or delayed) of at least 51% of the Tower Mortgagee Representatives, if any; and the provisions of this Section 16.1 may not be Amended unless 80% in Common Interest of all Unit Owners affected thereby duly approve such Amendment.

16.2    Amendments Affecting Declarant, Tower Sponsor and Particular Unit Owners. Notwithstanding any provision contained in the Declaration and/or these Condominium By-Laws to the contrary, no Amendment to the Condominium Documents shall be effective in any way: (a) without the prior written consent of the affected Unit Owner(s) (other than the Tower Unit Owners) with respect to any Amendment thereto modifying the permitted uses of its Unit or affecting the rights, privileges, easements, licenses or exemptions granted to its Unit; (b) without the prior written consent of Tower Sponsor or its designee or the owner of any Unsold Tower Unit with respect to any amendment, modification, addition or deletion of or to the Condominium Documents modifying the permitted uses of the Tower Section or affecting the rights, privileges, easements, licenses or exemptions granted to Tower Sponsor or its designee or the owner of any Unsold Tower Unit, or otherwise adversely affecting Tower Sponsor or its designee or the owner of any Unsold Tower Unit; (c) without the prior written consent of HPD, if applicable, or other applicable agency with respect to any Amendment thereto materially impairing any of the special rights specifically granted to or obligations of the Base Unit Owner (i.e., with respect to the protections afforded to the Base Unit Owner pursuant to Section 339-m of the New York Real Property Law or the requirements of any HPD Agreements); or (d) without the prior written consent of the holder of any present or future mortgage, pledge, or other lien or security interest covering any Unsold Unit with respect to any amendment, modification, addition or deletion of or to the Condominium Documents modifying the permitted uses of such

- 96 -

Unsold Unit or affecting the rights, privileges, easements, licenses or exemptions granted to the owner of such Unsold Unit.

16.3    Special Amendments.  Declarant, Tower Sponsor and the Unit Owners (other than the other Tower Unit Owners) shall have the right to amend the Declaration and these Condominium By-Laws, without the consent of any Board or any other Unit Owner, to effectuate the rights otherwise granted to such party under the terms of the Declaration and these Condominium By-Laws, provided that such amendment would not materially, adversely and disproportionately affect the rights of any particular Unit Owner, and further provided that no such amendment may materially impair any of the special rights specifically hereby granted to or the obligations of the Base Unit Owner whose Unit is subject at the time to a Regulatory Agreement (i.e., with respect to the protections afforded to the Base Unit Owner pursuant to Section 339-m of the New York Real Property Law or the requirements of any Regulatory Agreements) without the prior written consent of HPD, if applicable, or other applicable agency.

16.4    Declarant; Declarant Net Lessors.  The provisions of the last sentence of Section 2.1.1, the last sentence of Section 3.7.5, and Sections 11.12.9 and 13.7 of these Condominium By-Laws may not, so long as Declarant owns any Unit and a Declarant Net Lease is in effect, be amended without the consent of Declarant and  any Declarant Net Lessors.  In addition, the provisions of Section 12.9 of these Condominium By-Laws may not be amended, modified, deleted or waived without the express written consent of the Declarant named herein (and not a Declarant Net Lessee) and the Yards Parcel Owner.

16.5    Amendments in Connection with Certain Subdivisions.  In connection with the subdivision of the Tower Section, a Tower Unit or the Base Unit, the Tower Board or Base Unit Owner (as applicable) shall have the right, without the approval of any other Unit Owner or Board, to Amend the Declaration, these Condominium By-Laws and to implement and amend the Tower Section By-Laws to reflect such subdivision, the creation and subdivision of the Base Unit (including the creation of a Base Section, Limited Common Elements with respect to the Base Section, and/or a Base Section Sub-Board) the creation or modification of the Tower Units, and the creation or modification  of the Residential Limited Common Elements or Tower Limited Common Elements, including, without limitation, such additional Amendments to the Declaration, these Condominium By-Laws, and the Tower Section By-Laws as may be necessary to effectuate such subdivision, creation or modification, and to take such further actions as may be necessary or desirable to effectuate such subdivision.  The Condominium Board shall provide to all Unit Owners notice of any amendment consummated pursuant to this Section 16.5 together with copies of such amendments.

16.6    Approval of CS Unit Owner.  In addition to such other rights of the Condominium Board or any Unit Owner to Amend the Condominium Documents as set forth in the Condominium Documents (including, without limitation, Section 16.5 of these Condominium By-Laws), the Condominium Board shall have the unilateral right to Amend the Declaration and these Condominium By-Laws without the approval of the CS Unit Owner, the CS LL Unit Owner or the CS MS Unit Owner, unless such Amendment adversely affects to more than a de minimis extent the rights, privileges and obligations of the CS Unit Owner, the CS LL Unit Owner or the CS MS Unit Owner, as applicable, in which case it shall be subject to the review

and reasonable approval of the CS Unit Owner, CS LL Unit Owner or the CS MS Unit Owner, as applicable.

16.7    Amendments of Tower Section By-Laws.  Subject to the provisions hereof or thereof with respect to amendments affecting Declarant, Tower Sponsor and/or the owner of any Unsold Tower Unit(s), and subject to compliance with any other requirements of this Article 16, the Tower Board and/or Tower Unit Owners shall have the right to amend, modify, add or delete any provision of the Tower Section By-Laws in accordance with the terms and conditions of the Tower Section By-Laws.

16.8    Recording of Amendments.  No Amendment to the Declaration, Condominium By-Laws and/or Tower Section By-Laws shall be effective until approved in accordance with the applicable provisions of the Condominium Documents and recorded in the City Register's Office.

16.9    Execution and Delivery of Amendments.  Subject to the provisions contained herein or in the Declaration with respect to Amendments affecting Declarant, Tower Sponsor, their respective designees or the holder of any Unsold Units, any Amendment to the Declaration and/or Condominium By-Laws or the Tower Section By-Laws: (i) if on behalf of the applicable Board, by the President or Vice President and the Secretary or an Assistant Secretary of such Board; and (ii) if on behalf of a Unit Owner by any general partner, managing member, officer or other authorized Person of such owner.

16.10    Review and Approval by Mortgagees.  If the approval of a Unit Owner or the Tower Board is required in connection with any Amendment pursuant to the Condominium Documents, each Unit Owner and the Tower Board shall submit a draft of such proposed Amendment to the Declaration and/or Condominium By-Laws to its Registered Mortgagee (or, in the case of the Tower Board, to the Tower Mortgagee Representatives, if any), and each such Registered Mortgagee whose mortgage grants it such right, and each such Tower Mortgagee Representative, shall have the right to approve or disapprove such Amendment prior to the Board Member designated by its mortgagor (in the case of a Unit Owner) or the Tower Board, as the case may be, being entitled to vote for the adoption of such Amendment by the Condominium Board.  Any approval or disapproval of a proposed Amendment to the Declaration and/or Condominium By-Laws shall be given by each Registered Mortgagee entitled to give the same within fifteen (15) Business Days after such Registered Mortgagee's receipt of a written request therefor (or, with respect to a Tower Mortgagee Representative, within sixty (60) calendar days after such Tower Mortgagee's receipt of a written request therefor), and each such Registered Mortgagee's or Tower Mortgagee Representative's failure to timely respond to any such request (i.e., within such fifteen (15) Business Day period (for a Registered Mortgagee) or within such sixty (60) calendar day period (for a Tower Mortgagee Representative)) shall constitute (and be deemed to constitute) such Registered Mortgagee's or Tower Mortgagee Representative's approval of the proposed Amendment.  The approval of a Registered Mortgagee or Tower Mortgagee Representative, as the case may be, shall (if required pursuant to the foregoing provisions of this Section 16.10) continue to be required notwithstanding that an Event of Default exists and is continuing with respect to such mortgagee's mortgagor or such representative's Tower Board, as the case may be.

16.11   Amendments Affecting the Underlying Agreements.  Notwithstanding any provision herein to the contrary, for so long as any of the Underlying Agreements are in full force and effect, no Amendment to the Declaration and/or Condominium By-Laws may be effected which would contravene and/or would directly or indirectly constitute or give rise to a default under either such instruments or would act as a material impediment to the performance of the obligations thereunder.

16.12   Consent of HFA.        No amendment to the Declaration, these Condominium By-Laws or the Tower Section By-Laws adversely affecting the Base Unit shall be effected without the consent of HFA, which consent shall not be unreasonably withheld, conditioned or delayed.

## ARTICLE 17

## INSURANCE TRUSTEE

17.1   Insurance Trustee.

17.1.1   Insurance Trustee. (a) Appointment of Insurance Trustee; Voting. Initially, the servicer for the Construction Loans shall be the Insurance Trustee, unless such Person declines to do so or is no longer a Registered Mortgagee with respect to a Construction Loan Mortgage, and in such case, the Condominium Board shall appoint a Person to serve as the insurance trustee (in each case, the "Insurance Trustee") with a Majority Member Vote; provided, however, that if the Insurance Trustee is not chosen pursuant to the initial Majority Member Vote, then the Person who was nominated to be the Insurance Trustee and who received the lowest number of votes shall be eliminated as a candidate for Insurance Trustee, and the Condominium Board shall then choose an Insurance Trustee from the remaining candidates with a Majority Member Vote.  The aforedescribed voting procedure for eliminating the candidate with the lowest number of votes shall be repeated until an Insurance Trustee is chosen.

(b)   Qualifications.  The Insurance Trustee shall at all times be (i) a savings bank, (ii) a savings and loan association, (iii) a credit union, (iv) a commercial bank or trust company (whether acting individually or in a fiduciary capacity), (v) an insurance company organized and existing under the laws of the United States or any state thereof, (vi) a commercial credit corporation, (vii) an investment bank, a real estate investment trust or an opportunity fund, or (viii) any servicer for, or affiliate of, any of the foregoing ; provided, that each of the above entities shall qualify as an Insurance Trustee within the provisions of this subsection only if each such entity shall (a) be subject to (y) the jurisdiction of the courts of the United States of America or of the State of New York in any actions or (z) the supervision of (A) the Comptroller of the Currency or the Department of Labor of the United States or the Federal Home Loan Bank Board or the Insurance Department or the Banking Department or the Comptroller of the State of New York, or the Comptroller of New York City or any successor to any of the foregoing agencies or officials, or (B) any agency or official exercising comparable functions on behalf of any other state within the United States, or (C) any federal, state or municipal agency or public benefit corporation or public authority advancing or insuring mortgage loans or making payments that, in any manner, assist in the financing, development, operation and maintenance of improvements, or (D) in the case of a commercial credit corporation, the laws and regulations of the state of its incorporation, and (b) except in

the case of any servicer (as hereinabove provided, provided the party for which such servicer is acting) has/have individual or combined assets, as the case may be, of not less than One Billion and 00/100 Dollars ($1,000,000,000.00), and (c) not be an Affiliate of any Unit Owner or Board.

(c)    Insurance Trustee Obligations.    The Insurance Trustee shall be obligated to engage experts with knowledge of claims settlement and allocations such as either (i) a property insurance claims adjustment professional or (ii) an accounting firm that has claims accounting expertise.

(d)    Insurance Trustee Agreement.  Any GCE Restoration Funds or RTLCE Restoration Funds received by the Insurance Trustee shall be held by the Insurance Trustee for restoration of the General Common Elements or Residential Tower Limited Common Elements, as the case may be, or for distribution to the Unit Owners or Tower Board, as applicable, as provided in these Condominium By-Laws, and the Insurance Trustee shall act otherwise in accordance with the terms and provisions hereof.  In the event restoration of the CS Unit and at least one of the CS MS Unit and CS LL Unit is required, the Insurance Trustee shall have the right and obligation to engage such experts described in Section 17.1(c) hereof to determine the cost of restoration of the CS MS Unit and/or CS LL Unit and such allocated portion of the CS Group restoration funds shall be promptly remitted to the Insurance Trustee. If any GCE Restoration Funds or RTLCE Restoration Funds exceed $10,000,000, the Condominium Board shall remit to the Insurance Trustee, promptly upon receipt of same, all GCE Restoration Funds or RTLCE Restoration Funds.  The Insurance Trustee shall be entitled to receive from the Condominium Board the Insurance Trustee's reasonable fees, compensation and expenses (all as approved by the Condominium Board) for acting as Insurance Trustee and may retain said fees, compensation and expenses, free of trust, from monies held by it.  Each Unit Owner and the Tower Board (on behalf of the applicable Tower Unit Owners), shall contribute to the Condominium Board the same percentage share of such fees, compensation and expenses as each such Unit Owner and Board bears with respect to the cost of insurance under the Budget.

17.1.2    Liability of Insurance Trustee.  The Insurance Trustee shall not be liable or accountable for any action taken or disbursement made in good faith by the Insurance Trustee or any of its Related Parties, except that arising from the gross negligence, willful misconduct or bad faith of the Insurance Trustee or its Related Parties. The Insurance Trustee shall have no affirmative obligation to prosecute a determination of the amount of, or to effect the collection of, any insurance proceeds or award paid (or to be paid) in respect of the General Common Elements or the Residential Tower Limited Common Elements, as the case may be, unless the Insurance Trustee shall have been given an express written authorization from the Condominium Board.  In addition, the Insurance Trustee may rely conclusively on any Certificate furnished by a Certifying Professional to the Insurance Trustee which appears on its face to have been properly furnished in accordance with the provisions of Section 11.12.3 or 11.12.6 above and shall not be liable or accountable for any disbursement of funds made by it in reliance upon such certificate or authorization.

17.1.3    Indemnification of Insurance Trustee.  In consideration of the services rendered by the Insurance Trustee, the Condominium Board shall agree to indemnify and hold

- 100 -

harmless the Insurance Trustee and its Related Parties from any and all damage, liability or expense of any kind whatsoever (including, but not limited to, reasonable attorneys' fees and expenses) incurred in the course of Insurance Trustee's duties hereunder or in the defense of any claim or claims made against Insurance Trustee or any of its Related Parties by reason of its appointment hereunder, except where due to the gross negligence, willful misconduct or bad faith of the Insurance Trustee or its Related Parties.

17.1.4    Interest on Deposited Funds. (a) The Insurance Trustee shall hold any GCE Restoration Funds or RTLCE Restoration Funds in trust for the uses and purposes herein provided, and shall not commingle such monies with the Insurance Trustee's own funds or any other funds. The Insurance Trustee shall hold such monies in an account or accounts maintained in the City of New York in an Approved Bank(s) (as hereinafter defined) which is a member of the New York Clearing House Association. Unless otherwise approved in writing by the Condominium Board, such proceeds shall be invested in reasonably prudent investments, including without limitation certificates of deposit, recognizing preservation of capital as the primary investment obligation, and which shall at all times provide sufficient liquidity necessary in order to have sufficient funds available for the disbursement of funds which may be required under these Condominium By-Laws. As used herein, the term "Approved Bank" shall mean a bank or financial institution that has a minimum long-term unsecured debt rating of at least "A" by at least two of the following rating agencies: Standard & Poor's Rating Services, a Division of the McGraw-Hill Companies, Inc., Duff & Phelps Credit Rating Co., Moody's Investors Service, Inc. and Fitch ICBA, Inc.

(b)    GCE Restoration Funds or RTLCE Restoration Funds shall be applied to the payment of the costs of GCE Restoration Work or RTLCE Restoration Work, as the case may be, before using any portion of such funds for any other purpose (other than the Insurance Trustee's fees or expenses), and then in accordance with the terms and provisions of these Condominium By-Laws. Any interest paid or received by the Insurance Trustee on monies or securities held in trust, and any gain on the redemption or sale of any securities, shall be added to the monies or securities so held in trust by the Insurance Trustee. Each deposit of insurance proceeds and/or condemnation award shall be held and accounted for separately by the Insurance Trustee. Notwithstanding anything in the Declaration or these Condominium By-Laws to the contrary, if, pursuant to and in accordance with Section 11.12.7 of these Condominium By-Laws, the Condominium Board votes not to rebuild the Building after a Significant Casualty, then the Insurance Trustee shall remit all GCE Restoration Funds to the Condominium Board.

17.1.5    Resignation and Removal of Insurance Trustee; Successor Insurance Trustee. (a) The Insurance Trustee may resign by serving not less than sixty (60) days' prior notice to the Condominium Board. Within such sixty (60) day period, the Condominium Board shall appoint a substitute Insurance Trustee pursuant to and in accordance with Section 17.1.1(a), and the resigning Insurance Trustee shall transfer all funds, together with copies of all records, held by it as Insurance Trustee to such substitute, at which time its duties as Insurance Trustee shall cease. If an Insurance Trustee is not appointed within the sixty (60) day period, the resigning Insurance Trustee shall continue to hold, receive and invest any funds payable to the Insurance Trustee hereunder but shall have no other duties or obligations as Insurance Trustee other than to invest the funds as herein provided and to transfer all funds and records to the new

Insurance Trustee when selected; provided, however, that the Insurance Trustee may, after not less than twenty (20) days' prior written notice to the Condominium Board (given no sooner than forty (40) days after the resignation notice referred to above), deposit such funds with either a court of competent jurisdiction or with a bank or trust company in New York, New York who qualifies as an Insurance Trustee.

(b)     If the Insurance Trustee is a Registered Mortgagee and such Insurance Trustee ceases to be a Registered Mortgagee, the Condominium Board may select a successor Insurance Trustee in accordance with the provisions hereof.

(c)     The Condominium Board may replace the Insurance Trustee for any reason; provided, however, that if the initial Insurance Trustee is a Registered Mortgagee (or a servicer thereof) with respect to a Construction Loan Mortgage, such trustee may be removed by the Condominium Board as Insurance Trustee only if it fails to materially comply with its obligations as Insurance Trustee or is otherwise removed for cause (including, without limitation, for the gross negligence, willful misconduct or bad faith of the Insurance Trustee or its Related Parties).

17.1.6   Insurance Trustee's Compliance with Law.  The Insurance Trustee shall hold all proceeds and discharge its obligations in accordance with all applicable Laws, including, without limitation, Section 254(4) of the Real Property Law of the State of New York.

## ARTICLE 18

## MISCELLANEOUS

18.1   Approvals and Consents.

18.1.1     Wherever the consent or approval of Declarant (or the Declarant Net Lessee of a Tower Unit) or Tower Sponsor is required under these Condominium By-Laws or the Declaration, such consent or approval shall not be required when such Person (either directly or through its affiliates) no longer owns (or is no longer the Declarant Net Lessee of) any Units.

18.1.2     Any approval or consent of a Board, Declarant (or the Declarant Net Lessee of a Tower Unit), Tower Sponsor or any Unit Owner (or Declarant Net Lessee thereof) or Board Member required under the Declaration or these Condominium By-Laws may, except to the extent expressly provided to the contrary in the Declaration or these Condominium By-Laws, be granted or withheld in such Person's sole discretion.  Whenever the approval or consent of a Board, Tower Sponsor, or any Unit Owner (or the Declarant Net Lessee of such Unit) or Board Member is required under the Declaration or these Condominium By-Laws not to be unreasonably withheld, such approval shall also not be unreasonably conditioned or delayed.

18.1.3     Notwithstanding that the consent and/or approval of any Board or Unit Owner may be required for or with respect to any particular matter, there shall be no separate or further requirement to obtain the consent or approval of the managing agent for any of the foregoing Persons.

18.1.4    Notwithstanding any other provision of the Declaration and these Condominium By-Laws, with respect to any right of approval or consent granted to any Person by virtue of any "effect" or "impact" on it or any portion of the Property owned or controlled by it, in each instance the "effect" alleged must relate to the unique circumstances of such Person and the portion(s) of the Property owned or controlled by it; and no specific right of approval or consent shall apply with respect to any such matter which affects or impacts all Unit Owners, all General Common Charge Obligors and the Tower Board, as the case may be, simply by virtue of their status as Unit Owners, General Common Charge Obligors or Board, as the case may be.

18.2    Waiver.  No provision contained in the Declaration, these Condominium By-Laws or the General Rules and Regulations shall be deemed to have been abrogated or waived by reason of any failure to enforce the same, regardless of the number of violations or breaches thereof which may occur.

18.3    Captions.  The index hereof and captions herein are inserted only as a matter of convenience and for reference, and in no way define, limit or describe the scope of these Condominium By-Laws or the intent of any provision hereof.

18.4    Conflicts.  In the event of a conflict between: (i) the terms of the Declaration and those of any of the Condominium By-Laws or the Tower Section By-Laws, the terms of the Declaration shall in all events govern; (ii) the terms of the Condominium By-Laws and those of the Tower Section By-Laws, the terms of these Condominium By-Laws shall in all events govern; (iii) the terms of any General Rules and Regulations, on the one hand, and the terms of the Declaration and Condominium By-Laws, on the other hand, the terms of these Condominium By-Laws or Declaration, as applicable, shall in all events govern; and (iv) the terms of any General Rules and Regulations and those of the Tower Section Rules and Regulations or any rules and regulations regarding the Base Unit adopted by the Base Unit Owner, the terms of any General Rules and Regulations shall in all events govern.

18.5    Certain References.

18.5.1    A reference in these Condominium By-Laws to any one gender, masculine, feminine or neuter, includes the other two, and the singular includes the plural, and vice versa, unless the context otherwise requires.

18.5.2    The terms "herein," "hereof" or "hereunder" or similar terms used in these Condominium By-Laws refer to these entire Condominium By-Laws and not to the particular provision in which the terms are used.

18.5.3    Unless otherwise stated, all references herein to Articles, Sections, subsections, paragraphs, subparagraphs or other provisions are references to Articles, Sections or other provisions of these Condominium By-Laws.

18.6    Severability.  Subject to the provisions of the Declaration, if any provision of these Condominium By-Laws is invalid or unenforceable as against any Person or under certain circumstances, the remainder of these Condominium By-Laws and the applicability of such provision to other Persons or circumstances shall not be affected thereby.  Each provision of

these Condominium By-Laws shall, except as otherwise herein provided, be valid and enforced to the fullest extent permitted by applicable Laws.

18.7   CPI Increases. All specific dollar amounts set forth in these Condominium By-Laws or the Declaration shall be adjusted yearly, not more than once in any calendar year, by the CPI Increase Factor except to the extent otherwise provided. For such purposes, the "CPI Increase Factor" means an increase proportionate to any increase in the cost of living from the date of the initial recording of the Declaration, as reflected by the change in the Consumer Price Index (CPI-U; All Items; 1982-84 = 100 standard reference base period) for New York, New York (or the smallest measured area including New York, New York), as published by the Bureau of Labor Statistics, United States Department of Labor or, if the same ceases to be published, a commonly used substitute therefor reasonably selected by the Condominium Board (such index or substitute, the "Consumer Price Index").

18.8   Covenant of Further Assurances.

18.8.1   Any party which is subject to the terms of these Condominium By-Laws, whether such party is a Unit Owner, a lessee or sublessee of a Unit Owner (including Declarant Net Lessee), an Occupant of a Unit, a Declarant Net Lessee, a member or an officer of any Board, a Registered Mortgagee, Tower Mortgagee Representative or otherwise, shall, at the expense of any such other party requesting the same, execute, acknowledge and deliver to such other party such instruments, in addition to those specifically provided for herein, and take such other action, as such other party may reasonably request, as shall be reasonably necessary to effectuate the provisions of these Condominium By-Laws or any transaction contemplated herein or to confirm or perfect any right to be created or transferred hereunder or pursuant to any such transaction (but without expanding the scope of any liability or obligation on the part of the cooperating party beyond that set forth in the Condominium Documents).

18.8.2   If any Unit Owner or any other party which is subject to the terms of these Condominium By-Laws fails to execute, acknowledge or deliver any instrument, or fails or refuses to take any action which such Unit Owner or other party is required to perform pursuant to one or more specific provision of these Condominium By-Laws, in each case (unless a specific provision with respect thereto is provided for elsewhere in the Condominium Documents) within fifteen (15) Business Days after request therefor and within five (5) Business Days after receipt of a second request therefor (which second request shall be accompanied by a copy of the initial request (and any supporting materials)) and stating in bold print: "THIS IS A SECOND AND FINAL REQUEST FOR YOU TO EXECUTE, ACKNOWLEDGE AND/OR DELIVER THE DOCUMENTS, OR TO TAKE THE ACTIONS, DESCRIBED IN THE ENCLOSED PRIOR REQUEST THEREFOR, WHICH IS REQUIRED UNDER THE TERMS OF THE CONDOMINIUM DECLARATION AND/OR BY-LAWS. YOUR FAILURE TO EXECUTE, ACKNOWLEDGE AND/OR DELIVER THE DOCUMENTS, OR TO TAKE THE ACTIONS, AS THE CASE MAY BE, WITHIN FIVE BUSINESS DAYS FROM THE DATE HEREOF SHALL ENTITLE THE CONDOMINIUM BOARD TO DO SO ON YOUR BEHALF.", then the Condominium Board is hereby authorized, as attorney-in-fact, coupled with an interest, for such Unit Owner or other party, to execute, acknowledge and deliver such instrument, or to take such action, in the name of such Unit Owner or other party, and such instrument or action shall be binding on such Unit Owner or other party, as the case may be.

- 104 -

Any dispute with respect to the foregoing shall be subject to Arbitration; provided, the Person refusing to execute, acknowledge or deliver any such instrument, or refusing to take any such action, expressly renders such refusal in writing (together with its rationale for such refusal) within the time period(s) provided in this Section 18.8.2.

18.8.3   If the Condominium Board or Tower Board, as applicable, fails to execute, acknowledge or deliver any instrument, or fails or refuses to take any action which is required of it to perform, then Declarant, Tower Sponsor and/or their respective designees are authorized, as attorney-in-fact, coupled with an interest, for the Boards, and the Unit Owners, to execute, acknowledge and deliver any instrument, or to take action, in the name of the Boards and the Unit Owners in furtherance thereof, and such instrument or action shall be binding on the applicable Board(s) and the Unit Owners, as the case may be.

18.9   Estoppel Letters.  The Condominium Board will, on request of a Unit Owner or Board, provide an estoppel letter to any Unit Owner or Board, to any potential transferee of a Unit, and to any Registered Mortgagee (or potential Registered Mortgagee ) or Permitted Mortgagee (or potential Permitted Mortgagee) of a Unit, setting forth the status of payment of Common Charges and Special Assessments with respect to the applicable such Unit and, as to its knowledge, whether the Unit Owner of the applicable Unit is in default under the Condominium Documents, and setting forth such other matters reasonably and customarily included in such estoppel letters.

[NO FURTHER TEXT THIS PAGE]

**EXHIBIT 1**
**TO CONDOMINIUM BY-LAWS**

**TABLE OF DEFINITIONS**

AAA:  As defined in Section 14.1 of the Condominium By-Laws.

Additional Insurance Coverage:  As defined in Section 11.9.1 of the Condominium By-Laws.

Affiliate: As defined in Section 8.1(a) of the Declaration.

Alterations:  As defined in Section 2.2.2(a) of the Condominium By-Laws; and "Altering" shall mean performing an Alteration.

Amend:  As defined in Section 16.1 of the Condominium By-Laws.

Amendment:  As defined in Section 16.1 of the Condominium By-Laws.

Annex:  As defined in Section 15.6 of the Declaration.

Approved Bank: As defined in Section 17.1.4 of the Condominium By-Laws.

Appurtenant Interests:  As defined in Section 17.3 of the Declaration.

Arbitration:  As defined in Section 14.1 of the Condominium By-Laws.

Association: As defined in Section 8.1(b) of the Declaration.

Association Charges: As defined in Section 12.9(a)(i) of the Condominium By-Laws.

Association Special Assessments:  As defined in Section 12.9(a)(ii) of the Condominium By-Laws.

Audit:  As defined in Section 10.3 of the Condominium By-Laws.

Auxiliary System: means a campus wide system providing heated water and other utilities to portions of the Eastern Rail Yards located in the Tower A/B Retail Unit which will be owned by the Tower A/B Retail Unit Owner and operated by the Tower A/B Retail Unit Owner or its licensee or designee.

Base Apartments:  As defined in Section 3.1.1(d) of the Declaration.

Base Common Element:  As defined in Section 9.3 of the Declaration.

Base Operating Shortfall:  As defined in Section 6.4.7(c) of the Tower Section By-Laws.

A-1

Base Section:  means a Section comprising the Base Unit if the same is subdivided by the Base Unit Owner.

Base Section Sub-Board:  means a Sub-Board for the Base Section if one is created by the Base Unit Owner.

Base Unit:  As defined in Section 3.1.1(d) of the Declaration.

Base Unit Budget:  As defined in Section 6.4.7(a) of the Tower Section By-Laws.

Base Unit Common Charge Allocation:     As defined in Section 6.4.1 of the Tower Section By-Laws.

Base Unit Estimated CC Amount:  As defined in Section 6.4.2 of the Tower Section By-Laws.

Base Unit Operating Costs:  As defined in Section 6.4.7(b) of the Tower Section By-Laws.

Base Unit Owner:  As defined in Section 3.4 of the Declaration.

Base Unit Revenues:  As defined in Section 6.4.7(d) of the Tower Section By-Laws.

Base Unit Revised Estimated CC Amount:  As defined in Section 6.4.5 of the Tower Section By-Laws.

Board Member:  As defined in Section 2.1.1 of the Condominium By-Laws.

Board:  the Tower Board or the Condominium Board (and if created pursuant to Section 16.5 of these Condominium By-Laws, the Base Section Sub-Board), as the context may require; and such boards are collectively referred to as the "Boards".

Budget:  As defined in Section 6.1.1(a) of the Condominium By-Laws.

Building:  As defined in Section 3.1 of the Declaration.

Building Digital Antenna System: means a digital antenna system which may be installed by or on behalf of the Condominium Board.

Business Days:  means Monday to Friday, except holidays observed by the federal, state or local governments.

Carrying Cost Differential:  As defined in Section 6.4.10 of the Tower Section By-Laws.

Certificate:  As defined in Section 11.12.3(b)(i) or Section 11.12.6(b)(i) of the Condominium By-Laws.

Certifying Professional: means an architect or a licensed professional engineer or engineering or construction consulting firm retained by the Condominium Board in connection with the GCE Restoration Work or RTLCE Restoration Work, as the case may be, which is experienced in the design and operation in the City of New York of structures similar to the Residential Tower Building and has provided services comparable to those being requested hereunder within not less than three (3) of the immediately preceding ten (10) years, and which is selected by the Condominium Board.

City Register's Office:  As defined in Section 5.1 of the Declaration.

Coach: As defined in Section 8.1(c) of the Declaration.

Coach Affiliate: As defined in Section 8.1(d) of the Declaration.

Coach Competitors: As defined in Section 8.1(e) of the Declaration.

Coach Competitors List: As defined in Section 8.1(e) of the Declaration.

Common Charges:  means General Common Charges (in respect of a General Common Charge Obligor), Tower Common Charges (in respect of a Tower Unit Owner) and Residential Common Charges (in respect of the Residential Limited Common Elements).

Common Elements:  means the General Common Elements and the Limited Common Elements, each as defined in Article 7 of the Declaration.

Common Interest:  means, at any given time, the proportionate, undivided interest in fee simple absolute appurtenant to each Unit, as expressed in percentage terms and set forth in Schedule B to the Declaration, as such Schedule may be amended from time to time in accordance with and subject to the provisions of the Condominium Documents.  References in the Declaration, the Condominium By-Laws and the Tower Section By-Laws to the Common Interest(s) of the Tower Section or the Tower Board shall mean, in each case, the aggregate of the Common Interests appurtenant to all the Tower Units.

Con-Ed:  As defined in Section 6.4.1(a) of the Condominium By-Laws.

Condominium:  As defined in Section 1.1 of the Declaration.

Condominium Board:  As defined in Section 2.1.1 of the Condominium By-Laws.

Condominium Board Insurance:  As defined in Section 11.1.11 of the Condominium By-Laws.

Condominium Board Insured Property: As defined in Section 11.1 of the Condominium By-Laws.

Condominium Board Member:  As defined in Section 2.1.1 of the Condominium By-Laws.

A-3

Condominium Board's Lien:  As defined in Section 12.1.2 of the Condominium By-Laws.

Condominium By-Laws or By-Laws:  As defined in Section 1.2 of the Declaration.

Condominium Documents:  the Declaration, the Condominium By-Laws (including the General Rules and Regulations, to the extent then adopted and in effect) and the Tower Section By-Laws (including the Tower Section Rules and Regulations), as any of the foregoing may be amended from time to time.

Condominium Managing Agent: means the managing agent of the Condominium Board.

Construction Lender:  means any holder of a Construction Loan Mortgage.

Construction Loan Documents:  means all documents evidencing or governing a Construction Loan Mortgage.

Construction Loan Mortgage:  As defined in Section 13.3(a) of the Condominium By-Laws.

Construction Loans:  means the mortgage loans secured by the Construction Loan Mortgage.

Construction Manager:  As defined in Section 11.1.9(b) of the Condominium By-Laws.

Consumer Price Index:  As defined in Section 18.7 of the Condominium By-Laws.

Costs:  claims, liabilities, losses, damages, costs and expenses (including, without limitation, reasonable attorneys' fees and disbursements).

CPI Increase Factor:  As defined in Section 18.7 of the Condominium By-Laws.

CS Building:  As defined in Section 3.1 of the Declaration.

CS Group:  means, collectively, the CS Unit, the CS LL Unit, and the CS MS Unit.

CS Group Owner: means, collectively, the CS Unit Owner, the CS LL Unit Owner, and the CS MS Unit Owner.

CS LL Unit:  As defined in Section 3.1.1(b) of the Declaration.

CS LL Unit Owner:  As defined in Section 3.4 of the Declaration.

CS MS Exclusive Elevator:  As defined in Section 6.3 of the Declaration.

A-4

CS MS Unit:  As defined in Section 3.1.1(c) of the Declaration.

CS MS Unit Owner:  As defined in Section 3.4 of the Declaration.

CS Unit:  As defined in Section 3.1.1(a) of the Declaration.

CS Unit Owner:  As defined in Section 3.4 of the Declaration.

CS Unit Plaza Area:  As defined in Section 3.1.1(a) of the Declaration.

Curing Person:  As defined in Section 12.4.1 of the Condominium By-Laws.

DCA:  As defined in Section 8.1(f) of the Declaration.  All references in these Condominium Documents to DCA shall mean DCA, to the extent still applicable at the time in question pursuant to its terms.

Declarant:  As defined in the preamble to the Declaration.

Declarant Net Lease:  As defined in Section 13.7(a) of the Condominium By-Laws.

Declarant Net Lessee:  As defined in Section 13.7(a) of the Condominium By-Laws.

Declarant Net Lessor:  As defined in Section 13.7(a) of the Condominium By-Laws.

Declaration:  means that certain Declaration Establishing a Plan for Condominium Ownership of the Premises known as 15 Hudson Yards Condominium, to which the initial form of the Condominium By-Laws are attached, as such Declaration may be amended from time to time.

Dedicated Technology Equipment: As defined in Section 7.2(j) of the Declaration.

Default Notice:  As defined in Section 13.3(c) of the Condominium By-Laws.

Default Rate:  means a rate per annum equal to the lesser of: (i) five (5) percentage points above the Prime Rate; and (ii) the maximum rate of interest permissible under applicable Laws, if any, with respect to the applicable amount payable hereunder.

Defaulting Unit Owner:  As defined in Section 12.9(b) of the Condominium By-Laws.

Delinquency Charge:  As defined in Section 11.12.3(d) of the Condominium By-Laws.

Delinquent Special GCE Restoration Assessment:  As defined in Section 11.12.3(e) of the Condominium By-Laws.

Delinquent Special RTLCE Restoration Assessment:  As defined in Section 11.12.6(e) of the Condominium By-Laws.

Designated Signage:  As defined in Section 8.1(g) of the Declaration.

Designator:  means, with respect to a Condominium Board Member, the Person (*i.e.*, the Tower Board, the Unit Owner, or the Declarant Net Lessee) entitled to designate such Board Member to the Condominium Board.

Designator in Good Standing:  as of any given date, a Designator with respect to which no Event of Default has occurred and is continuing at the time in question.

Developer:  As defined in Section 8.1(h) of the Declaration.

Development Rights:  As defined in Section 1.5(a) of the Declaration.

Development Rights Owner:  As defined in Section 1.5(b) of the Declaration.

Development Rights Purchaser:  As defined in Section 1.5(b) of the Declaration.

Discretionary Approval Items:  As defined in the DCA.

Eastern Rail Yard:  As defined in Section 8.1(i) of the Declaration.

Electric Service Supplier:  The utility service supplier as set forth in the Electric Service Supply Agreement.

Electric Service Supply Agreement:  As defined in Section 2.16.2 of the Condominium By-Laws.

Emergency:  means a condition, event or occurrence (including, without limitation, leaks or cracks, structural problems or defects) requiring Repair, Alteration or abatement immediately and specifically necessary for the preservation or safety of the Building or any part thereof, or for the health or safety (but not the general comfort or welfare) of Occupants of the Building or other persons, or required to avoid the suspension of any necessary services in the Building.

ENVAC System:  means a system, including pipes, conduits and receptacles, for the efficient disposal of waste, which may be installed by or on behalf of the Condominium Board.

Environmental Law(s):  all federal, state and local laws, rules, regulations, ordinances, requirements and orders whether now existing or hereafter enacted, promulgated or issued, regulating, relating to or imposing liability or standards of conduct concerning any hazardous, toxic or dangerous waste, substance or material and/or the protection of human health and the environment.

Equipment:  means equipment, facilities, parts, fixtures, apparatus, appurtenances, installations and other similar items and personalty as may be located or contained in a Unit, Limited Common Element or General Common Element, but not necessarily forming a part of such Unit, Limited Common Element or General Common Element, as the case may be, unless otherwise specifically set forth in the Condominium Documents.

ERY Culture, Festival and Exhibit Facility:  shall have the meaning set forth in Section 93-01 of the Zoning Resolution.

ERY FAPOA Declaration:  As defined in Section 8.1(j) of the Declaration.

ERY Parcels:  means collectively the FAS Parcels, as such term is used in the ERY FAPOA Declaration.

Event of Default:  A Monetary Event of Default or Non-Monetary Event of Default, as the case may be.

Exclusive Easement:  As defined in Section 15.22.2 of the Declaration.

Expense Allocation Schedule:  As defined in Section 6.1.1(a) of the Condominium By-Laws.

Façade Contact Area: means, at any given time, the respective square footage of exterior glass located adjacent to the CS MS Unit, the Base Unit and the Tower Units, the Residential Limited Common Elements and the Tower Limited Common Elements.

Facility Airspace Improvements:  As defined in Section 12.9(a)(iii) of the Condominium By-Laws.

Facility Airspace Parcel:  As defined in Section 12.9(a)(iv) of the Condominium By-Laws.

Family Members:  As defined in Section 8.7 of the Tower Section By-Laws.

FAS Parcel: As defined in Section 8.1(l) of the Declaration.

Fashion Week: As defined in Section 8.1(k) of the Declaration.

Final Operating Statement:  As defined in Section 6.1.1(f)(i) of the Condominium By-Laws.

Fire Service Elements: As defined in Section 7.2(l) of the Declaration.

First Annual Tower Section Meeting:  As defined in Section 3.1 of the Tower Section By-Laws.

First Tower Board:  As defined in Section 2.3.1(a) of the Tower Section By-Laws.

First Tower Unit Closing:  As defined in Section 1.3 of the Declaration.

Floor Plans:  As defined in Section 5.1 of the Declaration.

Foundations:  As defined in Section 7.2(d) of the Declaration.

GCE Restoration Funds:  As defined in Section 11.12.1 of the Condominium By-Laws.

GCE Restoration Funds Request:  As defined in Section 11.12.3(b) of the Condominium By-Laws.

GCE Restoration Insurance Proceeds:  As defined in Section 11.12.1 of the Condominium By-Laws.

GCE Restoration Work:  As defined in Section 11.12.3(a) of the Condominium By-Laws.

General Common Charges:  As defined in Section 6.1.1(a) of the Condominium By-Laws.

General Common Charge Obligors:  means (i) the Base Unit Owner as the Unit Owner of the Base Unit; (ii) the CS Unit Owner as the Unit Owner of the CS Unit; (iii) the CS LL Unit Owner as the Unit Owner of the CS LL Unit; (iv) the CS MS Unit Owner as the Unit Owner of the CS MS Unit; (v) the Tower Board on behalf of and as agent for the owners of the Tower Units; and (vi) any Declarant Net Lessee of any such Units.

General Common Elements:  As defined in Section 7.1 of the Declaration.

General Common Expenses Records:  As defined in section 10.1 of the Condominium By-Laws.

General Common Expenses:  As defined in Section 6.1.1(a) of the Condominium By-Laws.

General Rules and Regulations:  such non-discriminatory rules and regulations as may be promulgated (and amended) by the Condominium Board from time to time with respect to various matters relating to the use of all or any portion of the Property, which either supplement or elaborate upon the provisions of the Declaration or the Condominium By-Laws, and which shall be uniformly enforced.

Generator:  As defined in Section 7.2(f)(i) of the Declaration.

Governmental Authority(ies):  means the United States of America, the State of New York, The City of New York and any agency, department, commission, board, bureau, instrumentality, public authority or agency (whether governmental or quasi-governmental) or political subdivision of any of the foregoing, now existing or hereafter created (including, without limitation, the New York City Department of Buildings, the City Planning Commission and the boards of fire underwriters) having jurisdiction over the Property or any portion thereof.

Hazardous Materials:  petroleum products, asbestos, polychlorinated biphenyls, radioactive materials and all other dangerous, toxic or hazardous pollutants, contaminants, chemicals, materials or substances listed or identified in, or regulated by, any Environmental Law.

HFA Regulatory Agreement:  means the regulatory agreement(s) entered or to be entered into by the New York State Housing Finance Agency and Initial Residential Unit Owner with regard to the Building, and recorded in the City Register's Office, as may be amended from time to time.

High Line Restrictive Declaration: means that certain Declaration dated April 16, 2015 and recorded in the City Register's Office at CRFN 2015000180722, made by ERY Tenant LLC as owner, as may be amended, supplemented and modified from time to time.

High Rise Passenger Elevators:  As defined in Section 6.4 of the Declaration.

HPD:  The New York City Department of Housing Preservation and Development, and any successor to its jurisdiction.

HPD Regulatory Agreement:  means the regulatory agreement(s) entered or to be entered into by the New York City Department of Housing Preservation and Development and Initial Residential Unit Owner with regard to the Building, and recorded in the City Register's Office, as may be amended from time to time, if applicable.

HY Easements:        As defined in Section 15.21 of the Declaration.

Impositions:  each of the following imposed by any Governmental Authority: (i) real property general and Special Assessments (including, without limitation, any Special Assessments:  (A) for business improvements; or (B) imposed by any Special Assessment district); (ii) personal property taxes; (iii) commercial rent or occupancy taxes; (iv) license and permit fees, if and to the extent such fees are not paid by the Condominium Board and charged to the Unit Owners as part of General Common Charges; (v) any fines, penalties and other similar governmental charges applicable to any of the foregoing, together with any interest or costs with respect to the foregoing; and (vi) any other governmental levies, fees, rents, assessments or taxes and charges, general and special, ordinary and extraordinary, foreseen and unforeseen, of any kind whatsoever, together with any fines and penalties and any interest or costs with respect thereto.

Inclusionary Rights:  As defined in Section 1.6(a) of the Declaration.

Inclusionary Rights Owner:  As defined in Section 1.6(a) of the Declaration.

Inclusionary Rights Purchaser:  As defined in Section 1.6(a) of the Declaration.

Individual Association Share:  As defined in Section 12.9(a)(v) of the Condominium By-Laws.

Initial Budget:  As defined in Section 6.1.1(d) of the Condominium By-Laws.

A-9

Initial Construction Work:  As defined in Section 27.1 of the Declaration.

Initial Residential Unit:  means the Initial Residential Unit, as defined in the Original Declaration.

Initial Residential Unit Owner:  means ERY South Residential Tower LLC and its successors and assigns, as the owner or Declarant Net Lessee of the Initial Residential Unit.

Initial Tower Control Period: As defined in Section 2.2.3 of the Tower Section By-Laws.

Institutional Mortgage:  means a mortgage loan made by and of the following Persons: (i) any bank, savings bank, investment bank, real estate investment trust, trust company, savings and loan association, commercial credit corporation, credit union or similar banking institution whether organized under the laws of the State of New York, the United States or any other state; (ii) any foreign banking corporation licensed by the Superintendent of Banks of New York or the Comptroller of the Currency to transact business in the State of New York; (iii) any insurance company, pension company, or annuity company duly organized or licensed to do business in New York State; and (iv) any instrumentality created by the United States or any state with the power to make mortgage loans.

Insurance Requirements:  means all requirements of any insurance policy required to be carried pursuant to the Declaration and/or Condominium By-Laws and covering or applicable to all or any part of the Property or the use thereof, all requirements of the issuer of any such policy and all orders, rules, regulations, reasonable recommendations and other requirements of the New York Board of Fire Underwriters or any other body exercising the same or similar functions and having jurisdiction over all or any portion of the Property.

Insurance Termination Date:  As defined in Section 12.2.4(a) of the Condominium By-Laws.

Insurance Trustee:  As defined in Section 17.1.1(a) of the Condominium By-Laws.

Insured Property:  As defined in Section 11.9.1 of the Condominium By-Laws.

Intellectual Property:  As defined in Article 28 of the Declaration.

Interim Operating Statement:  As defined in Section 6.1.1(e)(i) of the Condominium By-Laws.

Land:  As defined in Article 2 of the Declaration.

Laws (or, if used individually, Law):  all laws, statutes and ordinances (including, without limitation, Environmental laws, and all building codes, zoning ordinances and all requirements and limitations with respect to certificate(s) of occupancy for the Property), case law, and the written orders, rules, regulations, directives, binding resolutions and requirements of

all Governmental Authorities, whether in force as of the date hereof or hereafter, which are or become, or purport to be, applicable to the Property or any part thereof.

Lien-Causing Board:  As defined in Section 9.1 of the Condominium By-Laws.

Lien-Causing Unit Owner:  As defined in Section 9.1 of the Condominium By-Laws.

Lien Notice:  As defined in Section 9.1 of the Condominium By-Laws.

Limited Common Elements:  As defined in Section 7.1 of the Declaration.

LL Structure:  As defined in Section 3.1 of the Declaration.

Lobby Elevator:  As defined in Section 6.4 of the Declaration.

Low Rise Passenger Elevators:  As defined in Section 6.4 of the Declaration.

Major Decisions:  As defined in Section 2.2.3 of the Condominium By-Laws.

Main Condenser Water Loop:  As defined in Section 6.4.4(a) of the Condominium By-Laws.

Majority Member Vote:  means the affirmative vote of a majority of those Board Members in Good Standing who are Present in Person or by proxy and authorized to vote and voting at a duly constituted meeting of the Condominium Board at which a quorum is present, subject to Section 2.9.3 of the Condominium By-Laws.

Majority Unit Owner Vote:  means the affirmative vote of those Unit Owners having more than 50% of the total votes of all Unit Owners (determined in accordance with the provisions of Section 3.7 of the Condominium By-Laws), who are Present in Person or by proxy, authorized to vote and voting at a duly constituted meeting at which a quorum is present or is not required.

Mandatory Costs: means all costs attributable to (1) insurance coverage the Board is required to obtain and maintain under Article 11 hereof, as such requirements may be duly amended from time to time by the Condominium Board or under any Construction Loan; (2) costs under previously executed multi-year contracts with third-parties; (3) taxes and other governmental charges; (4) utilities (assuming no increase in level of service); (5) "variable" costs within the "Mechanical" line item; (6) compliance with applicable Laws and Insurance Requirements; (7) amounts payable to the Condominium's managing agent under the terms of its management agreement; (8) actions that the Condominium Board is required to take under these Condominium By-Laws or the Declaration (excluding actions required solely in connection with obligations imposed on the Condominium Board hereunder and under the Declaration to comply with or maintain Project Standards); (9) Association Charges and Association Special Assessments (as applicable); (10) cost associated with any Underlying Agreement; (11) PEBL Payments (as applicable); and (12) all existing contractual requirements.

A-11

Master Declaration:  As defined in Section 8.1(m) of the Declaration.

Master Declaration Special Assessment:  As defined in Section 12.9(b) of the Condominium By-Laws.

Member in Good Standing or Board Member in Good Standing:  means, as of any given date, a Condominium Board Member whose Designator is a Designator in Good Standing.

Merger:  As defined in Section 1.5(d) of the Declaration.

Monetary Event of Default:  The failure of any Unit Owner or Board, after all required notices and beyond the expiration of all applicable grace and cure periods, to pay any General Common Charges, Special Assessments and/or other sums payable by it directly to the Condominium Board.

Moveable Shed:  As defined in Section 3.1 of the Declaration.

Necessary Work:  As defined in Section 6.3.2(a) of the Condominium By-Laws.

New York City Noise Control Code:  As set forth at Title 24, Chapter 2, Section 24-201, et. seq. of the New York City Administrative Code.

New York Condominium Act:  As defined in Section 1.1 of the Declaration.

Non-Monetary Event of Default:  A default by any Unit Owner or the Tower Board (whether due to its action or inaction, or the action or inaction of any Permittee or Occupant of any such Unit Owner or Board), in the performance of any non-monetary obligation set forth in the Declaration or the Condominium By-Laws, other than a Monetary Event of Default (but including a Special Non-Monetary Event of Default), if such default continues for a period of thirty (30) days following receipt by the defaulting Unit Owner (in the case of any default by a Unit Owner or such Unit Owner's Occupants or Permittees; with a copy to the Tower Board if such defaulting Unit Owner is a Tower Unit Owner) or the defaulting Board (in the case of any default by the Tower Board or the Occupants or Permittees of any Units owned by it) of a notice of default from the Condominium Board, or, if the default is of a nature that it cannot reasonably be cured within such thirty (30) day period, if the defaulting Unit Owner (or its Occupant or Permittee) or Board (or its Occupant or Permittee) fails to: (i) commence such cure as promptly as practicable within such thirty (30) day period; and (ii) thereafter proceed with diligence to complete such cure (however if a Unit Owner's or Board's Occupant shall be the cause of or otherwise give rise to the default as to which such notice has been given, no Event of Default shall exist if the Unit Owner or Board, as the case may be, uses commercially reasonable efforts (and promptly and diligently attempts) to cause such defaulting Occupant to cure such default (including, without limitation, the commencement and prosecution of an action to evict such Occupant or seeking an order to compel such Occupant to comply)).

Occupant:  means any Person from time to time entitled to the use and occupancy of all or any portion of: (i) in the case of any Unit Owner, such Unit and the applicable Limited Common Elements pertaining thereto; and (ii) in the case of the Tower Board, the Tower Limited Common Elements and any Units owned by such Board or its designee; in each case

under an ownership right or any lease, sublease, license, concession, or other similar agreement (but an Occupant of a Tower Unit not owned by the Tower Board shall not, unless otherwise provided herein, be deemed an Occupant of such Board).

Offeree Unit Owner:  As defined in Section 8.1.1(a) of the Tower Section By-Laws.

Offering Plan: As defined in Section 2.2.3 of the Tower Section By-Laws.

Original Declaration:  As defined in the Preamble of the Declaration.

Original Floor Plans:  As defined in the Preamble of the Declaration.

Other Easement: As defined in Section 15.22.2 of the Declaration.

Outside Offeror: As defined in Section 8.1.1(a) of the Tower Section By-Laws.

Parcel A/B: As defined in Section 8.1(n) of the Declaration.

Parcel C: As defined in Section 8.1(o) of the Declaration.

Parcel C Condominium: As defined in Section 8.1(p) of the Declaration.

Parcel C Loading Dock: As defined in Section 8.1(q) of the Declaration.

Parcel C Parking Garage: As defined in Section 8.1(r) of the Declaration.

Parcel D: As defined in Section 8.1(s) of the Declaration.

Parcel E: means the FAS Parcel E, as such term is defined in the ERY FAPOA Declaration.

Partial Condemnation:  As defined in Section 11.12.10 of the Condominium By-Laws.

Party in Interest: As defined in Section 8.1(t) of the Declaration.

Pavilion Parcel: means the FAS Parcel Pavilion, as such term is defined in the ERY FAPOA Declaration.

Pavilion Owner:  means the owner of the Pavilion Parcel.

Payments:      As defined in Section 6.3.5(b) of the Tower Section By-Laws.

PEBL:  As defined in Section 6.2.3 of the Condominium By-Laws.

PEBL Commencement Date:  As defined in Section 6.2.3 of the Condominium By-Laws.

PEBL Expiration Date:  As defined in Section 6.2.3 of the Condominium By-Laws.

PEBL Payments:  As defined in Section 6.2.3 of the Condominium By-Laws.

Performing Party:  As defined in Section 12.3 of the Condominium By-Laws.

Permanent Structure:  As defined in Section 3.1 of the Declaration.

Permitted Guarantor:  with respect to a Tower Unit, shall (with respect to such Tower Unit), in each case, have the meaning given to such term, if any, in the Tower Section By-Laws.

Permitted Mortgagee or Permitted Tower Mortgagee:  with respect to a Tower Unit, shall (with respect to such Tower Unit), in each case, have the meaning given to such term, if any, in the Tower Section By-Laws.

Permitted Tower Mortgage:    As defined in Section 2.1.2 of the Tower Section By-Laws.

Permittee(s):  the Persons (including the officers, directors, employees, agents, contractors, subcontractors, customers, vendors, suppliers, visitors, invitees, licensees, tenants, subtenants, and concessionaires of any Unit Owner or Board, or of any Occupant) who are, at any given time, in a Unit Owner's Unit or the Limited Common Elements pertaining thereto, Tower Section or Tower Limited Common Elements Unit, in each case as the context requires.

Person:  means any individual, corporation, partnership, limited liability company, trust, unincorporated association, Governmental Authority or other legal entity, including, without limitation, each of the Boards.

Pet Facility Area:  As defined in Section 7.5(h) of the Declaration.

PILOT:  As defined in Section 7.1.1(a) of the Condominium By-Laws.

Plaza Parcel: means the FAS Open Space Parcel, as such term is defined in the ERY FAPOA Declaration, which shall in no event include the CS Unit Plaza Area or Public Access Area.

Plaza Owner:  means the FAS Open Space Parcel Owner, as such term is defined in the ERY FAPOA Declaration.

Present in Person or Presence in Person:  As defined in 2.9.3 of the Condominium By-Laws.

Prime Rate:  means a rate per annum equal to the lesser of:  (i) the rate publicly announced from time to time by Citibank N.A. (or its successor) in New York, New York as its "prime rate"; and (ii) the maximum rate of interest permissible under applicable Laws, if any, with respect to the applicable amount payable hereunder.

A-14

Private Elevators:      As defined in Section 6.7.2(e) of the Tower Section By-Laws.

Pro-Rata Master Declaration Special Assessment:  As defined in Section 12.9(b) of the Condominium By-Laws.

Project Standards:  means the applicable standards set forth in Section 8.13 of the Declaration.

Property:  As defined in Section 1.1 of the Declaration.

Public Access Area:  means the portion of the General Common Elements so designated on the Floor Plans.

Records:  As defined in Section 10.1 of the Condominium By-Laws.

Registered Mortgage:  As defined in Section 13.3(a) of the Condominium By-Laws.

Registered Mortgagee:  As defined in Section 13.3(a) of the Condominium By-Laws.

Regulatory Agreement:  means an HFA Regulatory Agreement or an HPD Regulatory Agreement, or other agreement with a Governmental Authority regulating rents of Base Apartments.

Related Party(ies):  As defined in Section 11.11.1 of the Condominium By-Laws.

Released Party:  As defined in Section 11.10 of the Condominium By-Laws.

Releasing Party:  As defined in Section 11.10 of the Condominium By-Laws.

Repairs:  As defined in Section 2.2.2(a) of the Condominium By-Laws; and "Repairing" shall mean performing a Repair.

Residential Common Charges:  As defined in Section 6.1.2(b) of the Tower Section By-Laws.

Residential Common Expenses:  As defined in Section 6.1.2(b) of the Tower Section By-Laws.

Residential Common Interest:  means the proportion that the Common Interest appurtenant to each Residential Unit bears to the aggregate Common Interests appurtenant to all of the Residential Units, as expressed in percentage terms and set forth in Schedule B to the Declaration, as such Schedule may be amended from time to time in accordance with and subject to the provisions of the Condominium Documents.

Residential Limited Common Elements:  As defined in Section 7.1 of the Declaration.

A-15

Residential Loading Dock: means the loading dock located within the LL Structure, as shown on the Floor Plans.

Residential Section: means collectively the Base Unit, the Tower Units, Tower Limited Common Elements and the Residential Limited Common Elements.

Residential Tower Building: As defined in Section 3.1 of the Declaration.

Residential Tower Common Charge Obligor: means all Unit Owners other than the Unit Owner of the CS Unit.

Residential Tower Common Interest: means the proportion that the Common Interest appurtenant to the CS LL Unit, CS MS Unit, Base Unit and each Tower Unit bears to the aggregate Common Interests appurtenant to all of the Tower Units, Base Unit, CS LL Unit and CS MS Unit, as expressed in percentage terms and set forth in Schedule B to the Declaration, as such Schedule may be amended from time to time in accordance with and subject to the provisions of the Condominium Documents.

Residential Tower Limited Common Elements: As defined in Section 7.1 of the Declaration.

Residential Units: As defined in Section 3.1.1(e) of the Declaration.

Residential Unit Owner: means the owner of a Residential Unit.

Resulting Cost: As defined in Section 6.3.2(a) of the Condominium By-Laws.

RM Notice: As defined in Section 13.3(b) of the Condominium By-Laws.

Roof: means each of the roofs of the Residential Tower Building (including any rooftop machine room levels or rooftop bulkhead levels thereof or thereon), including, without limitation, those roofs, if any, which are the subject of easements for terraces and otherwise as specified in Article 15 of the Declaration.

RTLCE Delinquency Charge: As defined in Section 11.12.6(d) of the Condominium By-Laws.

RTLCE Restoration Funds: As defined in Section 11.12.4 of the Condominium By-Laws.

RTLCE Restoration Funds Request: As defined in Section 11.12.6(b) of the Condominium By-Laws.

RTLCE Restoration Insurance Proceeds: As defined in Section 11.12.4 of the Condominium By-Laws.

RTLCE Restoration Work: As defined in Section 11.12.6(a) of the Condominium By-Laws.

Rules and Regulations:  means, collectively, the General Rules and Regulations and the Tower Section Rules and Regulations (if any); and in all events, together with all amendments, additions and modifications thereto.

Safety Work: As defined in Section 11.12.9 of the Condominium By-Laws.

Sale Agreement or Lease:     As defined in Section 8.1.1(a) of the Tower Section By-Laws.

Sale, Sell or like terms, including the term conveyance (in each case, whether or not capitalized): means the sale or conveyance or transfer by a Unit Owner of its fee title interest in its Unit and its undivided common ownership interest in the Common Elements appurtenant thereto.

Section:  Any of the Tower Section of the Residential Section, individually or collectively, as the context may require.

Senior RM: As defined in Section 13.3(c) of the Condominium By-Laws.

Service Elevator:  As defined in Section 6.4 of the Declaration.

Shared Technology Equipment: As defined in Section 7.2(k) of the Declaration.

Sidewalk Obligations:  As defined in Section 6.3.2(f) of the Condominium By-Laws.

Signage: means exterior signs, flags, posters, banners, canopies, awnings, blade signs and/or similar fixtures.

Significant Casualty:  As defined in Section 11.12.9 of the Condominium By-Laws.

Site Specific Easements:  As defined in Section 15.6(a) of the Declaration.

Special Assessments:  As defined in Section 6.1.4 of the Condominium By-Laws.

Special GCE Restoration Assessment:  As defined in Section 11.12.3(c) of the Condominium By-Laws.

Special GCE Restoration Assessment Penalties:  As defined in Section 11.12.3(e) of the Condominium By-Laws.

Special GCE Restoration Assessment Proceeds:  As defined in Section 11.12.3(c) of the Condominium By-Laws.

Special Non-Monetary Event of Default: As defined in Section 12.2.4(b) of the Condominium By-Laws.

A-17

Special RTLCE Restoration Assessment:  As defined in Section 11.12.6(c) of the Condominium By-Laws.

Special RTLCE Restoration Assessment Penalties:  As defined in Section 11.12.6(c) of the Condominium By-Laws.

Special RTLCE Restoration Assessment Proceeds:  As defined in Section 11.12.6(c) of the Condominium By-Laws.

Storage Area:  As defined in Section 6.11.6 of the Tower Section By-Laws.

Storage License:  As defined in Section 6.11.1(a) of the Tower Section By-Laws.

Storage Licensee:  As defined in Section 6.11.1(a) of the Tower Section By-Laws.

Storage Locker:  As defined in Section 6.11.1(a) of the Tower Section By-Laws.

Storage Locker License Agreement:  As defined in Section 6.11.1(a) of the Tower Section By-Laws.

Substantial Completion:  As defined in the DCA.

Technology System: means a campus wide system providing technology services to portions of the Eastern Rail Yards.

Thermal Energy Supplier: The utility service supplier as set forth in the Thermal Energy Supply Agreement.

Thermal Energy Supply Agreement:  As defined in Section 2.16.2 of the Condominium By-Laws.

Tower A/B Condominium: As defined in Section 8.1(u) of the Declaration.

Tower Board:  As defined in Section 2.1.1(a) of the Tower Section By-Laws.

Tower Board Insured Property: As defined in Section 11.4 of the Condominium By-Laws.

Tower C: As defined in Section 8.1(w) of the Declaration.

Total Condemnation:  As defined in Section 11.12.11 of the Condominium By-Laws.

Tower Common Charges:  As defined in Section 6.1.2(a) of the Tower Section By-Laws.

Tower Common Expenses:  As defined in Section 6.1.2(a) of the Tower Section By-Laws.

Tower Common Interest:  means the proportion that the Common Interest appurtenant to a Tower Unit bears to the aggregate Common Interests appurtenant to all of the Tower Units, as expressed in percentage terms and set forth in Schedule B to the Declaration, as such Schedule may be amended from time to time in accordance with and subject to the provisions of the Condominium Documents.

Tower Hot Water Plant: As defined in Section 6.4.5(b) of the Condominium By-Laws.

Tower LCE Restoration Work:  As defined in Section 11.12.8 of the Condominium By-Laws.

Tower Limited Common Elements:  As defined in Section 7.1 of the Declaration.

Tower Managing Agent: means the managing agent of the Tower Board.

Tower Mortgagee Representatives:  As defined in Section 7.5.1 of the Tower Section By-Laws.

Tower Offering Plan:  means an offering plan, when submitted to and initially accepted for filing by the Office of the Attorney General of the State of New York, in connection with the offering of the Tower Units, together will all amendments to such plan made from time to time.

Tower Section:  As defined in Section 3.1.1(e) of the Declaration.

Tower Section By-Laws:  As defined in Section 1.3 of the Declaration.

Tower Section Rules and Regulations:      As defined in Section 6.15 of the Tower Section By-Laws.

Tower Sponsor:  means, collectively, the entity or entities or any affiliate or designee thereof to which the Unsold Tower Units are initially conveyed in bulk following the recording of the Declaration for purposes of effecting the offering of Tower Units as set forth the Tower Offering Plan and/or which is the offeror and/or Sponsor under such Tower Offering Plan.

Tower Terrace:  As defined in Section 7.5(a) of the Declaration.

Tower Unit Owner:  As defined in Section 3.4 of the Declaration.

Tower Units:  As defined in Section 3.1.1(e) of the Declaration.

Unanimous or "unanimous", "unanimously" and words of similar import (whether or not capitalized): used in the Condominium Documents, when referring to the Condominium

Board shall mean the affirmative vote of all Condominium Board Members in Good Standing; and when referring to a group of some or all Unit Owners, shall mean the affirmative vote of all Unit Owners in Good Standing within the identified group.

Underlying Agreements: As defined in Section 8.1(x) of the Declaration.

Unit: As defined in Section 3.4 of the Declaration.

Unit Owner: the record owner, whether one or more Persons, of a Unit in fee simple absolute, from time to time, including, without limitation, Declarant and/or Tower Sponsor as the record owner of any Unit or any Registered Mortgagee or Permitted Mortgagee (or its designee or nominee) succeeding to such owner's interest in a Unit by foreclosure or by deed-in-lieu of foreclosure. All references to a Unit Owner shall be deemed to include such Unit Owner's successors and assigns. Every Unit Owner shall be treated for all purposes as a single owner, irrespective of whether such ownership is joint, in common, or by a tenancy by the entirety. Notwithstanding the foregoing, if the rights of Declarant as a Unit Owner shall be deemed to have been assigned to a Declarant Net Lessee pursuant to Section 2.2.12 of the Condominium By-Laws, then the term "Unit Owner" shall be deemed to refer to the Declarant Net Lessee.

Unit Owner in Good Standing: as of any given date, a Unit Owner with respect to which no Event of Default has occurred and is continuing at the time in question.

Unit Owners Meeting: As defined in Section 3.1 of the Condominium By-Laws.

Unit Restoration Work: As defined in Section 11.12.7 of the Condominium By-Laws.

Unsold Tower Unit: As defined in Section 8.5 of the Declaration.

Unsold Unit(s): Unsold Tower Unit(s).

Utility Service Area: As defined in Section 6.4 of the Condominium By-Laws.

Violation-Causing Unit Owner: As defined in Section 9.2 of the Condominium By-Laws.

Violation-Causing Board: As defined in Section 9.2 of the Condominium By-Laws.

Violations Notice: As defined in Section 9.2 of the Condominium By-Laws.

Wine Cellar: As defined in Section 6.11.1(b) of the Tower Section By-Laws.

Wine Locker: As defined in Section 6.11.1(b) of the Tower Section By-Laws.

Wine Storage License: As defined in Section 6.11.1(b) of the Tower Section By-Laws.

A-20

**Wine Storage License Agreement:**  As defined in Section 6.11.1(b) of the Tower Section By-Laws.

**Wine Storage Licensee:**  As defined in Section 6.11.1(b) of the Tower Section By-Laws.

**Wine Room:**   As defined in Section 6.11.7 of the Tower Section By-Laws.

**Yards Parcel Owner:**  As defined in Section 12.9(a)(vi) of the Condominium By-Laws.

**YP Obligation Assessment:**  As defined in Section 12.9(a)(vii) of the Condominium By-Laws.

**ZLDA:**  As defined in Section 1.5(b) of the Declaration.

**Zoning Lot Declaration:**  As defined in Section 1.5(b) of the Declaration.

**Zoning Resolution:**  As defined in Section 8.1(y) of the Declaration.

**SCHEDULE 2 TO CONDOMINIUM BY-LAWS**
**EXPENSE ALLOCATION SCHEDULE**

**16 Hudson Yards**
**EAS Schedule**

| Description | Notes | Allocation Method |
|---|---|---|
| | 1 | |
| **Management Fee** | | |
| Tower Section | | TLCI |
| Base Unit | | BLCI |
| General Common | | GCI |
| Residential Common | | RLCI |
| Subtotal | | |
| | | |
| **Common Area Services** | | |
| Decorations | 2 | USG / RLCI |
| Tower Section Amenity Operations | 3 | TLCI |
| Subtotal | | |
| | | |
| **Administrative** | | |
| Office Equipment and Supplies | | RLCI |
| General Administrative Expenses | 4 | RLCI |
| Postage | | RLCI |
| Express Mail Service | | RLCI |
| Printing | | RLCI |
| Messenger Service | | RLCI |
| Resident Manager's Unit Expense | 5 | TLCI |
| Hiring | | RLCI |
| Legal | | USG |
| Audit | | USG |
| Telephone | | RLCI |
| Uniforms | | RLCI |
| Training | | RLCI |
| Miscellaneous Administrative Expenses | 6 | RLCI |
| Personnel Expense Reimbursement | | RLCI |
| Membership Dues | | RLCI |
| Resident Relations | | USG |
| Computer Expense | 7 | USG/RLCI |
| Security | | TBD |
| Subtotal | | |
| | | |
| **UTILITIES EXPENSE** | 8 | |
| | | |
| **Electricity** | | |
| Tower Section Common | 9 | TLCI |
| Base Unit | 9 | BLCI |
| BOH and Amenities and all other | 9,10 | Usage |
| | | |
| **Water and Sewer** | 8 | Usage/Load |
| | | |
| **Hot Water (Auxiliary System)** | | |
| Tower Common (Base Building) | 11 | Usage/Load |
| Hot Water (Base Unit Heating & Domestic) | 11 | Usage/Load |
| Hot Water (Common BOH & Domestic below Floor 19) | 11 | Usage/Load |
| | | |
| **Gas (Natural)** | 8 | |
| Cooking | 12 | Usage |
| Hot Water | 12 | Usage |
| Common Heating | 12 | Usage |
| Apartment Heating | 12 | Usage |
| BOH and Amenity Heating | 12 | Usage/Load |
| | | |
| **Fuel** | | |
| Backup generator | 12a | GCI |
| Subtotal | | |
| | | |
| **ENVAC** | | TBD |
| | | |
| **Operating and Maintenance** | | |
| Janitorial Supplies | 13 | USG |
| Exterminating - General Building | 13 | USG |
| Exterminating - Special | 13 | USG |
| Plastic Bags | | RLCI |

A-23

15 Hudson Yards
EAS Schedule

| Description | Notes | Allocation Method |
|---|---|---|
| | 1 | |
| Rubbish Removal | 13 | RLCI |
| Fire/Alarm Systems | 13 | GCI |
| Access/Alarms | | RLCI |
| Professional Fees | | RLCI |
| Ground Supplies and Equipment | | RLCI |
| Grounds Maintenance - Tower Terrace | 13 | TLCI |
| Grounds Maintenance - Building (excluding sidewalk) | 13 | RLCI |
| Snow Removal and other sidewalk maintenance | 13 | RLCI |
| Appliance Repairs | | BLCI |
| Boiler Maintenance | | TLCI |
| Roof Maintenance (including structural elements of Tower Terrace) | 13 | RTLCI |
| Carpentry Maintenance | 13 | USG |
| Electrical Maintenance | 13a | GCI/USG |
| Hardware/Lock Repairs | 13 | USG |
| Plumbing Maintenance | 13 | USG |
| Sewer Maintenance | | RLCI |
| Window/Glass Maintenance | 14 | Special |
| Health and Safety Repairs | | RLCI |
| Elevator Maintenance | 15 | USG/RLCI |
| HVAC Contract | | RLCI |
| HVAC - Heating and Air Conditioning Supplies | 13 | USG |
| P/D - Common | 16 | USG |
| P/D - Exterior | | RLCI |
| Turn Paints | | BLCI |
| Miscellaneous Maintenance Repairs | | USG |
| Meter Reading Fees | | USG |
| Loading Dock | | USG |
| Subtotal | | |
| | | |
| **Salary Expenses** | | |
| Property Manager | | RLCI |
| Administrative | | RLCI |
| Superintendent | | RLCI |
| Janitorial | | RLCI |
| Janitorial - Special Projects (common corridors) | | RTLCI |
| Doormen/Concierge | 17 | USG |
| Maintenance | | RLCI |
| Payroll Taxes, Benefits, Workmen's Comp | 17 | USG |
| Subtotal | | |
| | | |
| **Taxes & Insurance** | | |
| Real Estate Taxes | | Direct |
| Insurance | 18 | Special |
| Subtotal | | |
| | | |
| **Hudson Yards POA Assessment & Master Declaration** | 19 | Special |
| Subtotal | | |
| | | |
| **Site Specific Easements** | 20 | Special |
| Subtotal | | |
| | | |
| **Tax Abatement Maintenance Payment** | | TLCI |
| Subtotal | | |
| | | |
| **Subtotals** | | |
| | | |
| **Capital Reserves** | | Special |
| | | |
| **TOTALS** | | |

A-24

**15 Hudson Yards**
**Notes to EAS**

1) Allocations are based on GSF and are detailed below:
   - TLCI (Tower Limited Common Interest): 100% Tower Section
   - BLCI (Base Limited Common Interest): 100% Base Unit.
   - RLCI (Residential Limited Common Interest): 86.02% Tower Section, 13.98% Base Unit
   - RTLCI (Residential Tower Limited Common Interest): 75.70% Tower Section, 12.30% Base Unit, 6.92% CS MS Unit 5.08% CS LL Unit
   - GCI (General Common Interest): 69.98% Tower Section, 11.39% Base Unit, 18.63% CS Group
   - Usage / Load: Metered usage where possible, design load otherwise
   - USG (Unit/Section/Group): Allocated to Unit(s), Sections, or Building as appropriate given nature of each cost
   - CS Unit GSF excludes CS Unit Plaza Area for purposes of common interest percentage calculation
   - 31st Street Lobby decorations allocated 100% to Tower Section, (remainder to be allocated by RLCI

2) Includes expenses directly attributed to the Tower Section Amenities including pool operations and maintance and concierge service.

3) Certain operations may be centralized for a larger operating portfolio and these costs may be allocated by common interest or other appropriate method.

4) Inclusive of common charges, cable, electricity and telephone.

5) Required certifications, fire department filings, etc.

6) Centralized technology support and maintenance costs allocated by usage where possible, otherwise by RLCI

7) Utility usage for common area and equipment will be sub metered where possible/practical otherwise allocations will be based on engineer's calculation.

8) Electric usage primarily measured by electric sub-meters.
   Utility Costs associated with Cooling Tower shall be allocated based on usage. Maintenance and repair costs shall be allocated based on connected load.
   Meter reading costs allocated by number and types of meters as billed by meter reading vendor (not by usage of utilities).

9) Residential Limited Common Elements may be aggregated and billed to Tower Units and Base Unit by RLCI and to Tower Limited Common Elements to Tower Unit Owners by TLCI.
   Electricity utilized by the chiller will be metered and billed to the Tower Section

10) Metered when available, otherwise by design load or allocation as appropriate.
   Electricity utilized by the Tower Boiler will be metered and billed to the Tower Section as TLCI

11) Hot water usage from the Auxiliary System will be sub-metered where possible, otherwise allocations made by design load.

12) Metered when available, otherwise by design load or allocation as appropriate.

12a) Based on design load, replacement of fuel based on usage.

13) Costs associated with common elements to be allocated to Unit or Sections appropriately (i.e. costs to Residential Common areas to be billed RLCI, Residential Tower areas by RTLCI, etc.)
   Units may also have costs associated with their Units that they will pay directly

13a) Repair, replacement and maintenance of Switchgear or other main components such as meters allocated by GCI. Submeters maintenance allocated by USG.

14) Allocation of window cleaning to be by specific cost to clean each Unit, if cost is not allocated by provider, default to be by window surface area allocation.

15) Elevators shall be maintained by direct users or by sections. Service car portion of the elevator maintenance contract to be allocated by USG/RLCI.

16) Interior Painting/Decorating initially budgeted only for residential lobbies, and residential common areas.

17) The 31st St Lobby Staff is allocated 100% to the Tower Section, with the remainder of the doormen/concierge staff allocated by RLCI.

18) Unit including without limitation the CS Unit with respect to the CS Building, shall pay their own insurance costs where applicable as set forth in Section 11.2 of the Condominium By-Laws
   (which describes the applicable types and scope of insurance required). Lease building/general building insurance costs will be allocated as follows: Initial Residential Unit - 91.0%, CS MS Unit - 6.70%, CS LL Unit - 2.30%

19) As set forth in the charges received from the POA, Base Unit and CS Group shall receive no POA assessment

20) If exclusive use, allocated 100% to the user. If non-exclusive allocated by GCI, except:
   - Parcel D Westerly Loading Dock Access Easement, allocated pursuant to Section A-3 of the Annex.

**SCHEDULE 2- PAGE 25**

K13|S713?9.3

**EXHIBIT B**

TOWER SECTION BY-LAWS

Exhibit B

**BY-LAWS**

**OF THE TOWER SECTION**

**OF**

**15 HUDSON YARDS CONDOMINIUM**

# TABLE OF CONTENTS

**Page**

ARTICLE 1 GENERAL ................................................................................ 1
1.1      Purpose............................................................................................1
1.2      Applicability of By-Laws. .............................................................1
1.3      Principal Office of the Tower Section. ..........................................1
ARTICLE 2 THE TOWER BOARD ............................................................ 1
2.1      General Description of the Tower Board.........................................1
2.2      Powers and Duties of Tower Board. ...............................................2
2.3      Number and Terms of Office of Members of Tower Board. ...........8
2.4      Election of Tower Board Members; Rights of Tower Sponsor. .......8
2.5      Resignation and Removal. .............................................................10
2.6      Vacancies on Tower Board. ...........................................................10
2.7      Organizational Meeting of Tower Board. ......................................10
2.8      Regular Meetings of Tower Board.. ...............................................10
2.9      Special Meetings of Tower Board.. ................................................11
2.10     Resolutions of Tower Board. ..........................................................11
2.11     Waiver of Notice. ...........................................................................11
2.12     Determinations by Tower Board; Quorums....................................11
2.13     Compensation. ...............................................................................11
2.14     Liability of Tower Board and Unit Owners. ..................................11
2.15     Fidelity Bonds. ..............................................................................12
2.16     Committees.....................................................................................13
2.17     Status of Board...............................................................................13
2.18     Incorporation and Organization of Tower Board............................13
2.19     Tower Board as Agent of Tower Unit Owners...............................13
2.20     Prohibited Transactions.. ...............................................................13
2.21     Affiliate Transactions.....................................................................14
2.22     Principal Office of Tower Board.. ..................................................14
ARTICLE 3 TOWER UNIT OWNERS ........................................................ 14
3.1      Annual Meetings.............................................................................14
3.2      Place of Meetings. ..........................................................................14
3.3      Special Meetings. ...........................................................................15
3.4      Notice of Meetings and Actions Taken. .........................................15
3.5      Lack of Quorum..............................................................................15
3.6      Order of Business............................................................................15
3.7      Title to Tower Units. ......................................................................16
3.8      Voting. ............................................................................................16
3.9      Majority of Tower Unit Owners. ...................................................17
3.10     Quorum............................................................................................17
3.11     Majority Vote..................................................................................17
3.12     Representation on Condominium Board...........................................17
ARTICLE 4 OFFICERS ............................................................................... 17
4.1      Designation.. ...................................................................................17

| 4.2 | Election of Officers. | 17 |
|---|---|---|
| 4.3 | Resignation and Removal of Officers. | 18 |
| 4.4 | President. | 18 |
| 4.5 | Vice President. | 18 |
| 4.6 | Secretary. | 18 |
| 4.7 | Treasurer. | 18 |
| 4.8 | Execution of Documents. | 18 |
| 4.9 | Compensation of Officers. | 19 |
| 4.10 | Liability of Officers. | 19 |

**ARTICLE 5 NOTICES** ............................................................................. 19

| 5.1 | Notices. | 19 |
|---|---|---|
| 5.2 | Waiver of Service of Notice. | 19 |

**ARTICLE 6 OPERATION OF THE TOWER SECTION** ...................... 20

| 6.1 | Determination of Tower Common Expenses, Residential Common Expenses and Fixing of Tower Common Charges and Residential Common Charges. | 20 |
|---|---|---|
| 6.2 | Payment of Tower Common Charges and Residential Common Charges. | 23 |
| 6.3 | Default in Payment of Tower Common Charges or Residential Common Charges; Lien for Unpaid Tower Common Charges or Residential Common Charges; Other Remedies. | 25 |
| 6.4 | Base Operating Shortfall. | 27 |
| 6.5 | Insurance. | 30 |
| 6.6 | Repair or Reconstruction after Fire or Other Casualty. | 31 |
| 6.7 | Maintenance and Repairs. | 32 |
| 6.8 | Alterations of Tower Units. | 34 |
| 6.9 | Alterations to Tower Limited Common Elements. | 38 |
| 6.10 | Use of Tower Units. | 39 |
| 6.11 | Licensing, Assignment and Use of Storage Lockers, Wine Lockers and Wine Cellars. | 39 |
| 6.12 | Use of Residential Limited Common Elements and Tower Limited Common Elements. | 43 |
| 6.13 | General Provisions as to Use. | 45 |
| 6.14 | Right of Access. | 46 |
| 6.15 | Rules and Regulations. | 46 |
| 6.16 | Real Estate Taxes, Water Charges and Sewer Rents. | 47 |
| 6.17 | Utilities. | 47 |
| 6.18 | Remedies for Violations of By-Laws or Rules and Regulations. | 48 |
| 6.19 | Utility Costs Payable as Tower Common Charges. | 48 |

**ARTICLE 7 MORTGAGES** .......................................................................... 49

| 7.1 | Notice to Tower Board. | 49 |
|---|---|---|
| 7.2 | Notices to Mortgages. | 49 |
| 7.3 | Performance by Permitted Tower Mortgagees. | 50 |
| 7.4 | Examination of Books. | 50 |
| 7.5 | Representatives of Tower Mortgagees. | 50 |
| 7.6 | Consent of Mortgagees. | 50 |

ARTICLE 8 SELLING, LEASING AND MORTGAGING OF TOWER UNITS ....... 50
8.1     Sales and Leases of Tower Units. .................................................................50
8.2     Consent of Tower Unit Owners to Purchase or Lease of Units by
        Tower Board. .......................................................................................53
8.3     No Severance of Ownership. ......................................................................54
8.4     Release by Tower Board of Right of First Refusal. ..................................54
8.5     Certificate of Termination of Right of First Refusal. ..............................54
8.6     Financing of Purchase, or Refinancing, of Tower Units by Tower
        Board. .................................................................................................55
8.7     Exceptions. ..................................................................................................55
8.8     Gifts and Devises, etc. ...............................................................................55
8.9     Payment of Assessments. ...........................................................................55
8.10    Waiver of Right of Partition with Respect to Tower Units
        Acquired on Behalf of Tower Unit Owners as
        Tenants-in-Common. ...........................................................................56
8.11    Mortgages of Tower Units. ........................................................................56
ARTICLE 9 CONDEMNATION ...................................................................................56
ARTICLE 10 RECORDS AND AUDITS .......................................................................57
10.1    Records. .......................................................................................................57
10.2    Audits. .........................................................................................................57
10.3    Availability of Documents. ........................................................................57
ARTICLE 11 ARBITRATION .......................................................................................57
11.1    General Procedure. ......................................................................................57
11.2    Costs and Expenses. ...................................................................................58
11.3    Agreement by Parties. ................................................................................58
ARTICLE 12 MISCELLANEOUS .................................................................................58
12.1    Consents. .....................................................................................................58
12.2    Waiver. ........................................................................................................58
12.3    Captions. .....................................................................................................58
12.4    Conflict. ......................................................................................................58
12.5    Certain References. .....................................................................................58
12.6    Severability. ................................................................................................59
12.7    Insurance Trustee. ......................................................................................59
12.8    Successors and Assigns. .............................................................................59
12.9    Covenant of Further Assurances. ...............................................................60
ARTICLE 13 AMENDMENTS TO TOWER SECTION BY-LAWS ..........................60
13.1    Amendments by Tower Unit Owners. ........................................................60
13.2    Amendments Affecting Tower Sponsor. ....................................................61
13.3    Amendments Affecting Permitted Tower Mortgagees. .............................61
13.4    Consent of Tower Sponsor. ........................................................................61

EXHIBIT A:   TOWER SECTION RULES AND REGULATIONS

# TOWER SECTION BY-LAWS

## OF

## 15 HUDSON YARDS CONDOMINIUM

## ARTICLE 1

## GENERAL

1.1 <u>Purpose</u>. The purpose of these Tower Section By-Laws (the "<u>Tower Section By-Laws</u>") is to set forth the rules and procedures concerning the conduct of the affairs of the Tower Section (as used herein, the "<u>Section</u>") and Residential Limited Common Elements at the Condominium; the Condominium By-Laws detail the rules and procedures concerning the conduct of the affairs of the Condominium. The Tower Section and these Tower Section By-Laws shall be subject to the provisions of the Declaration and the Condominium By-Laws; and, as provided therein, the rights of the Tower Unit Owners with respect to the Condominium, the Condominium Board, the Base Unit Owner, the CS Unit Owner, the CS MS Unit Owner and the CS LL Unit Owner shall generally only be enforced by the Tower Board on behalf of the Tower Unit Owners. The Tower Section is initially comprised of 285 Tower Units and the Tower Limited Common Elements. All terms used herein (including, without limitation, those in the previous sentence) which are not separately defined herein, shall have the meanings given to those terms in the Condominium By-Laws or the Declaration. Annexed to the Condominium By-Laws as <u>Exhibit 1</u> is a Table of Definitions used in the Declaration and Condominium By-Laws and such Table is incorporated herein by reference and made a part hereof.

1.2 <u>Applicability of By-Laws</u>. These Tower Section By-Laws are applicable to the Tower Section, Residential Limited Common Elements and to the use and occupancy thereof. All present and future Tower Unit Owners, mortgagees, lessees, sublessees and occupants of Tower Units and their respective employees, invitees and guests, as well as all other persons who may use the facilities located on, or forming a part of, the Tower Section, are and shall be subject to these Tower Section By-Laws, the Tower Section Rules and Regulations, the Declaration, the Condominium By-Laws, and the General Rules and Regulations (if any). The acceptance of a deed or conveyance, or the succeeding to title to, or the execution of a lease, sublease or license for, or the act of occupancy of, all or any portion of a Tower Unit shall constitute an agreement that the provisions of these Tower Section By-Laws, the Tower Section Rules and Regulations, the Declaration, the Condominium By-Laws and the General Rules and Regulations (if any), as any of the same may be amended from time to time, are accepted, ratified and will be complied with.

1.3 <u>Principal Office of the Tower Section</u>. The principal office of the Tower Section shall be located either within the Tower Section or at such other place in the Borough of Manhattan as may be designated from time to time by the Tower Board.

## ARTICLE 2

## THE TOWER BOARD

2.1 <u>General Description of the Tower Board</u>.

2.1.1    (a)    As more particularly set forth in Section 2.2, the affairs of the Tower Section and Residential Limited Common Elements shall be governed by a board of managers of the Tower Section (the "Tower Board" and, sometimes herein, the "Board").

(b)    In addition, subject to the rights of Tower Sponsor under Section 2.4 hereof, the Tower Board shall also elect or designate three (3) of its members to act as the representative of the Tower Section on the Condominium Board.  As described in the Condominium By-Laws, the representatives of the Tower Section on the Condominium Board shall vote thereat on behalf of all Tower Unit Owners and the Tower Section.  For so long as Tower Sponsor has the right to designate any members to the Tower Board, at Tower Sponsor's option, all of Tower Sponsor's designee Tower Board member(s) shall also serve as the Tower Section designee(s) to the Condominium Board.

2.1.2    Except for Tower Board members elected or designated by the Tower Sponsor, all members of the Tower Board shall be: (i) individual Tower Unit Owners or Permitted Tower Mortgagees of Tower Units; (ii) partners of a partnership owning, or holding a mortgage encumbering, a Tower Unit; (iii) officers, directors or shareholders of corporate owners or corporate Permitted Tower Mortgagees of Tower Units; (iv) members of a limited liability company owning, or holding a Permitted Tower Mortgage encumbering, a Tower Unit; (v) fiduciaries or their beneficiaries who are owners or Permitted Tower Mortgagees of Tower Units (or officers, directors or shareholders of corporate fiduciaries or partners or employees of partnership fiduciaries); (vi) adult family members or spouses of any of the foregoing individuals; or (vii) individuals designated by a sovereign government, consulate or other similar entity that is a Tower Unit Owner or a mortgagee of a Tower Unit.  Other than Tower Board members elected or designated by the Tower Sponsor, no Tower Board member shall continue to serve after he or she ceases to be qualified as set forth above.  Notwithstanding anything otherwise contained herein or in the Condominium By-Laws, any member of the Tower Board may also be a member of the Condominium Board and any member of the Condominium Board may also be a member of the Tower Board, if otherwise qualified.  As used herein, the term "Permitted Tower Mortgagee" means the holder of any Institutional Mortgage ("Permitted Tower Mortgage") of a Unit or Units which is permitted to be placed thereon in accordance with these Tower Section By-Laws.  Holders of any Construction Loan Mortgage as of the date of recording of the Declaration shall automatically be deemed a Permitted Tower Mortgage.

2.1.3    In no event shall any Tower Unit Owner (or its proxy) be eligible for election to the Tower Board if such Tower Unit Owner is then in default, beyond any applicable grace period, in the payment of Tower Common Charges or any other amounts required by the Tower Board to be paid.  In addition, no member of the Tower Board may continue to participate as a member thereof after the Tower Board has perfected a lien against its Unit, for so long as such lien remains unsatisfied.

2.2    Powers and Duties of Tower Board.

2.2.1    General.  The Tower Board shall have the powers and duties necessary for or incidental to the administration of the affairs of the Tower Section and Residential Limited Common Elements (except such powers and duties which by Law, the Declaration, the Condominium By-Laws or these Tower Section By-Laws may not be delegated to the Tower Board by the Tower Unit Owners).  Subject to the terms of the Declaration, the Condominium By-Laws and these Tower Section By-Laws, all determinations, however, which affect only the Tower Section and/or Residential Limited Common Elements, and do not affect (to more than a

de minimis extent) the Base Unit, the General Common Elements, the Residential Tower Limited Common Elements, or the CS Group, for their permitted purposes, shall be made by the Tower Board. The Tower Board is authorized to maintain the Residential Limited Common Elements. The Tower Board shall have all the rights and obligations for the Residential Limited Common Elements as for the Tower Limited Common Elements, except that the Tower Board shall have the right to charge the Base Unit Owner its pro rata portion of expenses attributable to the Residential Limited Common Elements. Except to the extent by Law or in the Declaration, the Condominium By-Laws or these Tower Section By-Laws provided, all other determinations with respect to the administration of the affairs of the Condominium shall be made by the Condominium Board.

2.2.2   <u>Tower Board</u>. Subject to, and in accordance with, the provisions of subsection 2.2.1 and without limiting the generality thereof, the Tower Board shall be entitled to make determinations with respect to all matters relating to the operation and the affairs of the Tower Section and Residential Limited Common Elements, including, without limitation, the following:

(a)   Operation, care, upkeep, maintenance, repair, restoration, addition and improvement to, and alteration and replacement of, the Tower Section and Residential Limited Common Elements, in the condition and otherwise in such manner of quality, service and appearance which are appropriate for a luxury condominium.

(b)   The amount of Tower Common Charges.

(c)   The amount of Residential Common Charges.

(d)   Collection of Tower Common Charges from Tower Unit Owners and of Residential Common Charges from the Base Unit Owner.

(e)   Employment and dismissal of the personnel necessary for the maintenance and operation of the Tower Section and the Residential Limited Common Elements and the provision of the services offered.

(f)   Adoption of, and amendments and additions to, the Tower Section Rules and Regulations.

(g)   Purchasing, leasing and otherwise acquiring in the name of the Tower Board (or, if required by Law, in the name of the Condominium Board as nominee for the Tower Board), or its designee, corporate or otherwise, on behalf of all Tower Unit Owners, those Tower Units offered for sale or lease by, or Tower Units surrendered by, the owners of such Units to the Tower Board, or those Tower Units with respect to which liens for real estate taxes are being sold by the City of New York, or a Tower Unit or other residence for use by a resident manager exclusively serving the Tower Section (if any).

(h)   Purchasing Tower Units at foreclosure or other similar sales (including, without limitation, in connection with the enforcement of the Tower Board's lien for unpaid Tower Common Charges), in the name of the Tower Board (or, if required by Law, in the name of the Condominium Board as nominee for the Tower Board), or its designee, on behalf of all Tower Unit Owners.

- 3 -

(i)   Selling, leasing, mortgaging and otherwise dealing with (but not voting the interests appurtenant to) Tower Units acquired by, and subleasing Tower Units leased by, the Tower Board or its designee, on behalf of all Tower Unit Owners; and subject to the rights of Tower Sponsor with respect to same, preparing, executing and administering Storage Licenses and Wine Storage Licenses and assignments and assumptions thereof.

(j)   Making repairs, restorations, additions and improvements to, and alterations and replacements of, the Tower Limited Common Elements and Residential Limited Common Elements.

(k)   Making repairs, restorations, additions and improvements to, and alterations and replacements of, the Tower Section, the Residential Limited Common Elements or parts thereof damaged or destroyed by fire or other casualty or necessitated as a result of condemnation or eminent domain proceedings, all in accordance with the terms of these Tower Section By-Laws and the Condominium By-Laws.

(l)   Enforcing obligations of Tower Unit Owners, including, without limitation, commencing, prosecuting and settling litigation in connection therewith.

(m)   Levying fines against Tower Unit Owners for violations of the Tower Section Rules and Regulations and the General Rules and Regulations (if any) (any such fines shall constitute Tower Common Charges payable by the Tower Unit Owner against whom they are levied).

(n)   Maintaining bank accounts on behalf of the Tower Section (with respect to matters within its jurisdiction as provided in these Tower Section By-Laws) and designating the signatories required therefor.

(o)   Adjusting and settling insurance claims (and executing and delivering releases in connection therewith) if the loss involves only the Tower Section, in accordance with Article 6 hereof.

(p)   Borrowing money on behalf of the Tower Section when required in connection with:  (x) the operation, care, upkeep and maintenance of, or the making of repairs, restorations, additions or improvements to, or alterations or replacements of, the Residential Limited Common Elements and the Tower Limited Common Elements, or (y) any permitted action or activity of the Tower Board, provided, however, that:  (i) except as provided in Section 8.6 of these Tower Section By-Laws, in the case of borrowings which are in excess of the aggregate amount of $1,000,000, but less than or equal to $2,000,000 (excluding the pro-rata share of the Tower Section with respect to any borrowing made by the Condominium Board pursuant to the Condominium By-Laws) in any one fiscal year (regardless of the balance of any loans outstanding from previous years), the consent of at least 60% of the members of the Tower Board shall be required for any borrowings for such purposes; (ii) except as provided in Section 8.6 of these Tower Section By-Laws, in the case of borrowings which are in excess of the aggregate amount of $2,000,000 (excluding the pro-rata share of the Tower Section with respect to any borrowing made by the Condominium Board pursuant to the Condominium By-Laws) in any one fiscal year (regardless of the balance of any loans outstanding from previous years), the consent of at least 60% of the total authorized votes of all Tower Unit Owners (determined in accordance with the provisions of Section 3.8) who are present, in person or by proxy, and voting at a duly constituted meeting at which a quorum is present or is not required, shall be required for any borrowings for such purposes;

- 4 -

(iii) no lien to secure repayment of any sum borrowed may be created on any Unit or its appurtenant interest in the Common Elements (except to the extent permitted by Laws) without the prior written consent of the owner of such Unit; and (iv) no CS Unit Owner, CS MS Unit Owner, CS LL Unit Owner or Base Unit Owner (except the Base Unit Owner with respect to the Residential Limited Common Elements) will be liable for repayment of any portion of any such borrowing and all loan documentation entered into by or on behalf of the Tower Board shall specifically so provide. Nothing herein in this subsection 2.2.2(o) contained shall limit or modify the right of the Condominium Board to borrow money pursuant to the provisions of the Condominium By-Laws. If any sum borrowed by the Tower Board pursuant to the authority contained in this subsection 2.2.2(n) is not repaid by the Tower Board, a Tower Unit Owner who pays to the creditor such proportion thereof as its interest in the Common Elements bears to the interest of all Tower Unit Owners in the Common Elements shall be entitled to obtain from the creditor a release of any judgment or other lien which said creditor has filed or has the right to file against such Tower Unit Owner's Unit, and all loan documentation entered into by or on behalf of the Tower Board shall specifically so provide. The dollar amounts set forth in clauses (i) and (ii) of this subsection 2.2.2(n) shall be adjusted to reflect any increase in the cost of living, as reflected by an increase in the CPI Increase Factor.

(q)    Organizing corporations, limited liability companies and/or other entities to act as designees of the Tower Board with respect to such matters as the Tower Board may determine, including, without limitation, in connection with the acquisition of title to, or the leasing or subleasing of, Tower Units acquired or leased by the Tower Board on behalf of the Tower Unit Owners.

(r)    Execution, acknowledgment and delivery of, without limitation:  (i) any consent, agreement, document, covenant, restriction, easement, declaration or other instrument, or any amendment thereto, affecting the Tower Section which the Tower Board deems necessary or appropriate to comply with the Laws applicable to the maintenance, demolition, construction, alteration, repair or restoration of the Tower Section; or (ii) any consent, agreement, document, covenant, restriction, easement, declaration or other instrument, or any amendment thereto, affecting (x) the Tower Section or Residential Limited Common Elements, which the Tower Board deems necessary or appropriate, or (y) a Tower Unit, if the owner of such Tower Unit requests, or under the Declaration, the Condominium By-Laws or these Tower Section By-Laws is required to request, that the Tower Board take such action, and (except as otherwise provided in the Declaration, the Condominium By-Laws or these Tower Section By-Laws) the Tower Board determines that taking such action is appropriate.

(s)    Execution, acknowledgement and delivery of any documents or other instruments necessary to commence, pursue, compromise or settle certiorari proceedings to obtain reduced real estate tax assessments, or in connection with any real estate tax exemption or abatement, with respect to any or all of the Tower Units on behalf of and as agent for the respective Tower Unit Owners thereof; but only with respect to such Tower Units as to which the respective Unit Owners thereof have, in writing requested and authorized the Tower Board to do so, and indemnified the Tower Board from and against all claims, costs and expenses (including, without limitation, attorneys' fees) resulting from such proceedings.

(t)    Commencing, prosecuting and settling litigation.

(u)   Operating, maintaining and supervising the Residential Limited Common Elements and Tower Limited Common Elements in accordance with the terms of these Tower Section By-Laws and the Condominium By-Laws.

(v)   Imposition of move-in fees and charges, and transfer fees, in connection with the sale or lease of a Tower Unit, provided that no such fees or charges or any other conditions of transfer or lease may be imposed upon Tower Sponsor.

(w)   Establishing, changing and otherwise making determinations with respect to reserves, including, without limitation, a general operating reserve or a reserve for working capital or for replacements with respect to the Tower Limited Common Elements and/or Residential Limited Common Elements.

(x)   Leasing or purchasing an apartment for use as the residence of the shared or exclusive superintendent of the Tower Section or its/their resident managers, if any, either in the Building or elsewhere (in compliance with applicable Laws) and amending, modifying, extending, renewing and otherwise dealing in any way with the documentation regarding any such apartment; provided that, (i) in no event shall any of the CS Unit Owner, CS MS Unit Owner, CS LL Unit Owner or the Condominium Board incur any expense or liability in respect of the foregoing without their prior written consent, and (ii) that the Base Unit Owner shall not incur any expense or liability in respect of the foregoing, other than with respect to the Residential Limited Common Elements, without its prior written consent.

(y)   Leasing or licensing the Residential Limited Common Elements or the Tower Limited Common Elements.

2.2.3   <u>Limitations on Tower Board</u>.  Notwithstanding anything to the contrary contained in these Tower Section By-Laws (including, without limitation in subsection 2.2.2 above), for a period (the "<u>Initial Tower Control Period</u>") which shall end upon the later to occur of: (a) the fifth anniversary of the First Tower Unit Closing by or at the direction of the Tower Sponsor, pursuant to an Option Agreement (as the term "Option Agreement" is defined in that certain Offering Plan, dated as of June 2, 2016 for the sale of Tower Units at the Condominium (as amended from time to time, the "<u>Offering Plan</u>")), or (b) the closing of title to Tower Units representing at least 90%, both in number and in aggregate Common Interests, of all Tower Units, the Tower Board may not, without the prior written consent of the Tower Sponsor: (i) make any addition, alteration or improvement to the Tower Limited Common Elements or any Tower Unit (unless required by any applicable Laws); (ii) assess any Tower Common Charges for the creation of, addition to or replacement of, all or any reserve, contingency or surplus fund; (iii) increase or decrease the number of, or change the kind of, employees initially hired for the Tower Section, as provided for in Schedule B-1 "Projected Budget for First Year of Tower Section Operation" set forth in the Offering Plan; (iv) enter into any service or maintenance contract for work for the Tower Section not covered in said Schedule B-1, or otherwise provide services for the Tower Section in excess of those contemplated by such Schedule or the Offering Plan (however, in no event shall the foregoing cause the services reflected in Schedule B-1 to be materially reduced except with the consent of a majority in interest of all Tower Unit Owners other than the Tower Sponsor); (v) borrow money on behalf of the Tower Section (unless such borrowing is approved by the owners of Tower Units representing greater than 50% of the aggregate Common Interests of all Tower Units); or (vi) exercise a right of first refusal to lease or purchase a Tower Unit.  However, the Tower Board may take any of the actions enumerated in subsections (i) through (v) above without the consent

- 6 -

of the Tower Sponsor if, and only if, such action is required either to comply with any Laws applicable to the Tower Section, or to remedy any notice of violation entered against the Tower Section or to comply with any proper work order by an insurer of the Tower Section (as part of the Building).

      2.2.4   (a)     Subject to Section 2.2.7 of these Tower Section By-Laws, any action required or permitted to be taken pursuant to the provisions of these Tower Section By-Laws or the Condominium By-Laws or the Declaration by the Tower Board shall be done or performed by the Tower Board, or shall be done on behalf of the Tower Board and at its direction by the agents, employees or designees of the Tower Board, and the Tower Board may employ one or more managing agents and/or managers, at a compensation established by the Tower Board, to perform such duties and services as the Tower Board shall authorize, including, but not limited to, the duties listed in 2.2.2(a), (d), (e), (j), (k), (l), (m), (u) and (v). The Tower Board may delegate to such managing agent or manager other powers granted to the Tower Board by these Tower Section By-Laws, except the powers set forth in subparagraphs 2.2.2(b), (c), (f), (g), (h), (i), (l), (n), (p) through (t), (w), (x) and (y).

      (b) Subject to the limitations set forth in this subsection 2.2.4, the Tower Board may, together with the Base Unit Owner and the Condominium Board employ the same Managing Agent and/or Resident Manager to act on behalf of each.

      2.2.5   For convenience of operation of the Condominium, the Tower Board, the Base Unit Owner and the Condominium Board may each designate one of the other entities enumerated, to act as its agent with respect to any matter the determination of which is entitled to be made by such designating party and, in connection with such designation, may execute, acknowledge and deliver any application, instrument or document, including, without limitation, any power of attorney or indemnification from liability that such designated party may request.

      2.2.6   Any action required or permitted to be taken pursuant to the provisions of these Tower Section By-Laws, the Condominium By-Laws or the Declaration by the Tower Board may, if required by any applicable Laws, be taken by the Tower Board (upon prior written notice to the Condominium Board in accordance with the Condominium By-Laws) in the name of the Condominium Board which shall, upon request, execute, acknowledge and deliver any and all instruments, documents or applications in connection therewith; provided, however, that the Tower Board shall, subject to the provisions of Section 2.14, indemnify and hold harmless the Condominium Board, the Base Unit Owner, the CS Unit Owner, the CS MS Unit Owner, the CS LL Unit Owner and the MTA in its capacity as Declarant from any expense or liability thereof or therefrom.

      2.2.7   Except as otherwise expressly set forth in the Declaration, the Condominium By-Laws or these Tower Section By-Laws, no Unit Owner, acting alone, shall have any authority to act for, or to create, undertake or assume any liabilities, obligations or responsibilities on behalf of any other Unit Owner. Notwithstanding the immediately preceding sentence, the Tower Board shall have the exclusive control, and decision-making authority, over and with respect to operation, management, maintenance, repair and restoration of the Residential Limited Common Elements. The Tower Board will assess the Tower Unit Owners and Base Unit Owner for Residential Common Charges, and shall be entitled to include in such Residential Common Charges a reasonable compensation for its administration of such responsibilities, and such Residential Common Charges will be payable by such members in the same manner and subject to the same requirements as General Common Charges.

Notwithstanding the foregoing, any Residential Common Charges specifically assessed by the Tower Board with respect to the Base Unit must comport with the requirements of Section 339-m of the New York Real Property Law pursuant to the procedure set forth in Section 6.4 of these Tower Section By-Laws, with any resulting reduction in the Residential Common Charges payable by the Base Unit Owner being allocated solely to the Tower Unit Owners according to their relative proportional Tower Common Interest.

    2.3    <u>Number and Terms of Office of Members of Tower Board</u>.

    2.3.1   (a)    Until the First Annual Tower Section Meeting held by the Tower Unit Owners pursuant to the terms of Section 3.1 hereof, the Tower Board (the "<u>First Tower Board</u>") shall consist of three (3) persons designated by the Tower Sponsor from time to time. Prior to the First Annual Tower Section Meeting, the terms of each such member of the First Tower Board shall expire annually and, subject to the other provisions of this Section, the Tower Sponsor shall have the right to designate the replacement for each such member, even though such replacement may be the same person. In accordance with, and within the time periods set forth in, the provisions of Section 3.1, the First Tower Board shall cause the President of the Tower Section to call the First Annual Tower Section Meeting. The term of office of the three (3) members of the First Tower Board so designated by the Tower Sponsor prior to the First Annual Tower Section Meeting shall expire when the three (3) persons to be elected at the First Annual Tower Section Meeting are so elected and qualified.

    (b)    From and after the holding of the First Annual Tower Section Meeting, the Tower Board shall consist of three (3) persons. For so long as the Tower Sponsor is entitled to designate one (1) member of the Tower Board, as provided for in subsection 2.4.3 hereof, the Tower Board may not be expanded beyond three (3) members without the prior consent thereto of the Tower Sponsor; notwithstanding anything otherwise herein contained, this provision may not be amended or modified without the consent thereto of the Tower Sponsor.

    (c)    The term of office of each of the three (3) members comprising the Tower Board elected at the First Annual Tower Section Meeting pursuant to Section 3.1 shall be fixed at such meeting as follows: (a) two (2) of such members will serve for a term of approximately two (2) years; and (b) one (1) of such members will serve for a term of approximately one (1) year. Those members of the first three (3)-member Tower Board who receive the highest number of votes will serve for the longest terms of office but, except as set forth in subsection 2.4.4 hereof, any members elected or designated by the Tower Sponsor pursuant to the terms of subsection 2.4.3 hereof, as the owner of Unsold Tower Units, shall serve for the shortest terms of office. At each annual meeting of Tower Unit Owners subsequent to the First Annual Tower Section Meeting, the Tower Unit Owners shall elect, pursuant to the terms of Section 2.4 hereof, Tower Board members to replace the Tower Board members whose terms of office are then expiring, each to serve a term of office fixed at two years. Notwithstanding the expiration of the term of office of a member of the Tower Board or anything contained herein to the contrary, such member of the Tower Board (including any member of such Board designated by the Tower Sponsor) shall serve until his or her successor shall be elected and qualified. There shall be no limit on the number of terms of office, successive or otherwise, that a Tower Board member (including any member of the Tower Board designated by the Tower Sponsor) may serve.

    2.4    <u>Election of Tower Board Members; Rights of Tower Sponsor</u>.

2.4.1   Subject to the terms of subsections 2.4.3 and 2.4.4, all members of the Tower Board to be elected by the Tower Unit Owners shall be determined by plurality of the votes cast by those Tower Unit Owners (including the Tower Sponsor, and subject in all events to the rights of the Tower Sponsor under subsection 2.4.3 for so long as the Tower Sponsor shall own at least two (2) Tower Units) entitled to vote for such board member(s) who are present (in person or by proxy) and voting at a meeting at which a quorum of all Tower Unit Owners is present or not required.

2.4.2   When voting for members of the Tower Board, the voting shall be by ballot and each ballot shall state the name of the Tower Unit Owner voting, the Tower Unit owned by such Tower Unit Owner and the percentage of Tower Common Interest attributable to each Tower Unit owned by such Tower Unit Owner and, in addition, the name of the proxy if such ballot is cast by a proxy. Nothing contained in these Tower Section By-Laws shall be deemed to permit cumulative voting.

2.4.3   Notwithstanding any other provision of this Section 2.4 or of these Tower Section By-Laws or otherwise, to the contrary, at the First Annual Tower Section Meeting and at all times before and thereafter, the Tower Sponsor shall be able to vote in accordance with its ownership of Tower Units and thus may be able to elect members of the Tower Board by virtue of its ownership of Tower Units. In addition: (a) at elections of members to the Tower Board held before the expiration of the Initial Tower Control Period (and until such later time as the events described in clause (b) below occurs), (i) the Tower Sponsor will have the right to designate not more than two (2) of the three (3) members of the Tower Board, and (ii) the Tower Sponsor, its designee, and all other Tower Unit Owners shall have the right to elect the remaining member of the Tower Board; (b) after the expiration of the Initial Tower Control Period but during the period in which the Tower Sponsor owns at least one (1) Tower Unit, (i) Tower Sponsor shall have the right to designate one (1) of the three (3) members of the Tower Board; and (ii) Tower Sponsor, its designee and all other Tower Unit Owners shall have the right to elect the remaining members of the Tower Board. Accordingly, from and after the expiration of the Initial Tower Control Period, at least two (2) of the members of the Tower Board shall not be designated by the Tower Sponsor or its designee. There is no restriction on the right of the Unsold Tower Unit Owners (including the Tower Sponsor) to vote for members of the Tower Board who are not related to or affiliated with the Tower Sponsor or other Unsold Tower Unit Owners; however, after the expiration of the Initial Tower Control Period, the Tower Sponsor will not appoint a majority of members to the Tower Board at the annual meeting of Tower Unit Owners (but shall still be entitled to exercise the voting interest appurtenant to any Tower Units then owned by the Tower Sponsor).

2.4.4   In the event that after notice of an annual meeting of Tower Unit Owners is given to Tower Unit Owners in the manner prescribed by Section 3.4 of these Tower Section By-Laws, the Tower Unit Owners present in person or by proxy at such annual meeting constitute less than a quorum, and consequently new members of the Tower Board to replace those whose terms expire as of such annual meeting cannot be elected, the remaining members of the Tower Board shall fill any resulting vacancies at a special meeting of the Tower Board held for that purpose promptly thereafter, even though the members of the Tower Board present at such meeting may themselves constitute less than a quorum. The Tower Board shall request the Tower Unit Owners present (in person or by proxy) at the annual meeting to express their preferences for the Tower Board members to have been elected at such annual meeting, but such expression of preferences shall be non-binding on the Tower Board. Any person so elected by

- 9 -

the Tower Board shall be a member of the Tower Board until the next annual meeting of Tower Unit Owners, when a successor shall be elected for the remainder of the term.

2.5   Resignation and Removal.

2.5.1   Any member of the Tower Board may resign at any time by written notice given in accordance with the terms of Section 5.1 of these Tower Section By-Laws to the President or Secretary of the Tower Section and, with respect to members of the Tower Board designated as such or elected by the Tower Sponsor, by also giving such written notice to such party. Any such resignation shall take effect at the time specified in such notice and, unless specifically requested by the resigning member, acceptance of such resignation shall not be necessary for the effectiveness thereof.

2.5.2   Subject to the provisions of Sections 2.3 and 2.4, and except as provided in the following sentence, any Tower Board member elected thereto by the Tower Unit Owners or by the Tower Board pursuant to the terms of Sections 2.4 or 2.6 hereof, respectively, may be removed from office, with or without cause, by a Majority of Tower Unit Owners. Any Tower Board member who was designated or elected as such by the Tower Sponsor may be removed from office: (i) for cause, by a Majority of Tower Unit Owners; and (ii) without cause, only by the Tower Sponsor. In the event of any removal described in the previous sentence, whether with or without cause, the Tower Sponsor shall have the sole right to designate the replacement of such member. Any Tower Board member whose removal for cause has been proposed shall be given an opportunity to be heard at the meeting of Tower Unit Owners at which such removal is to be considered.

2.6   Vacancies on Tower Board.   Subject to the provisions of Sections 2.3 and 2.4, any vacancy on the Tower Board for whatever reason shall be filled by the members of the Tower Board then in office, at a special meeting of the Tower Board held for that purpose promptly after the occurrence of any such vacancy even though the members present at such meeting may constitute less than a quorum, and any person so elected shall be a member of the Tower Board until the next annual meeting of Tower Unit Owners, when a successor shall be elected for the remainder of the term of the member creating such vacancy. However, any vacancy on the Tower Board created by the resignation, removal or any other reason of any Tower Board member designated or elected as such by the Tower Sponsor shall be filled only by the Tower Sponsor.

2.7   Organizational Meeting of Tower Board.   The first meeting of the Tower Board following each annual meeting of Tower Unit Owners shall be held within twenty (20) days after such annual meeting at such time and place in the Borough of Manhattan as shall be fixed by a majority of the members thereof, and no notice shall be necessary to the Tower Board members in order to legally constitute such meeting, provided that a majority of the members of the Tower Board shall be present thereat.

2.8   Regular Meetings of Tower Board.   Regular meetings of the Tower Board may be held at such time and place in the Borough of Manhattan as shall be determined from time to time by a majority of the members thereof, provided that at least four (4) such meetings shall be held during each fiscal year of the Tower Section. Notice of regular meetings shall be given to each member thereof, by personal delivery, nationally recognized overnight courier or telecopy, at least five (5) business days prior to the day named for such meeting.

- 10 -

2.9   Special Meetings of Tower Board.  Special meetings of the Tower Board may be called by the President or Vice President of the Tower Section by giving at least five (5) business days' prior notice to each member of the Tower Board, by personal delivery, nationally recognized overnight courier or telecopy, which notice shall state the time, place (in the Borough of Manhattan) and purpose of the meeting.  In addition, the President shall call a special meeting upon the written request of two (2) or more members of the Tower Board.

2.10   Resolutions of Tower Board.  The Tower Board shall cause to be delivered promptly to the Condominium Board copies of all resolutions adopted by it, except to the extent: (a) of matters privileged under Laws (b) relating to the terms of the sale, lease or subleasing of any Tower Unit, other than the nature of the use thereof and such materials as are necessary to evidence that such sale, lease or sublease complies with these Tower Section By-Laws; and (c) relating to matters not related to the Property.

2.11   Waiver of Notice.  Any member of the Tower Board may at any time waive notice of any Tower Board meeting in writing and such waiver shall be deemed equivalent to the giving of such notice.  Attendance by a member of the Tower Board at any meeting thereof shall constitute a waiver by such member of notice of the time and place thereof.  If all the members are present at any meeting of the Tower Board, no notice shall be required and any business may be transacted at such meeting.

2.12   Determinations by Tower Board; Quorums.

2.12.1   Except as otherwise set forth in subsections 2.4.4, 2.6 and 2.12.3, all determinations of the Tower Board shall be made at a meeting of the Tower Board at which a quorum thereof is present.  At any Tower Board meeting, a majority of the members thereof shall constitute a quorum, except as may otherwise be provided herein, and the votes of a majority of such members present shall constitute the decision of the Tower Board.

2.12.2   If at any Tower Board meeting there is less than a quorum present, a majority of those present may adjourn the meeting from time to time until a quorum exists or may reconvene the meeting to a time (specified on at least three (3) business days' notice, by personal delivery, nationally recognized overnight courier or telecopy, to the absent members) when no quorum requirement shall apply.  At any such adjourned meeting at which a quorum is present or is not required, any business which might have been transacted at the meeting originally called may be transacted without further notice.

2.12.3   Members of the Tower Board may participate in a meeting thereof by means of a conference telephone call or similar communications equipment by means of which all persons participating in such meeting can hear each other, and such participation shall constitute presence at such meeting.  Notwithstanding anything to the contrary contained herein, action permitted or required to be taken at a meeting of the Tower Board may be taken without a meeting if all members of the Tower Board consent thereto in writing.

2.13   Compensation.  No member the Tower Board shall receive any compensation for acting as such.

2.14   Liability of Tower Board and Unit Owners.

2.14.1   To the extent permitted by Laws, no member of the Tower Board shall have any personal liability with respect to any contract, act or omission of the Tower Board or of

- 11 -

any managing agent or manager, building engineer or superintendent in connection with the affairs or operation of the Condominium or the Tower Section (except in its or their capacities as Unit Owners) and the liability of any Tower Unit Owner with respect thereto shall be limited as hereinafter set forth. Every contract made by the Tower Board or by any managing agent or manager thereof shall state that it is made by the Tower Board or the managing agent or manager only as agent for all Tower Unit Owners, and that the Tower Board members or managing agent or manager shall have no personal liability thereon (except in its or their capacities as Unit Owners) and may also state the applicable limitations of liability of the Tower Unit Owners provided for in the next sentence; the absence of such statement or statements in any such contract shall not be deemed to imply any personal liability on the part of the Tower Board, the managing agent or manager or any greater liability on the part of any Tower Unit Owner than as provided in the next sentence. The liability of any Tower Unit Owner for any contract, act or omission with respect to the Condominium shall be limited to such Unit Owner's share of the total liability of the Tower Section with respect thereto (determined in accordance with the Condominium By-Laws) in such proportion as the Common Interest of such Tower Unit Owner bears to the aggregate Common Interests of all Tower Unit Owners; and the liability of any Tower Unit Owner for any contract, act or omission with respect to the Tower Section shall be limited to such proportionate share of the total liability as the Common Interest of such Tower Unit Owner bears to the aggregate Common Interests of all Tower Unit Owners; and in each case, to the extent permitted by Laws, shall be limited to such Tower Unit Owner's interest in its Unit and its appurtenant Common Interest, so that such Tower Unit Owner shall have no personal liability for any such contract, act or omission.

2.14.2  Nothing in Section 2.14.1 of these Tower Section By-Laws shall limit a Tower Unit Owner's liability for the payment of Tower Common Charges. To the extent permitted by Laws, Tower Board members shall have no liability to Tower Unit Owners except that a Board member shall be liable for its or his or her own bad faith or willful misconduct. All Tower Unit Owners shall, to the extent of their respective interests in their Units and their appurtenant Common Interests, indemnify each Tower Board member against any liability or claim except those arising out of such Tower Board member's own bad faith or willful misconduct. The Tower Board may contract or effect any other transaction with any member of the Tower Board, any member of the Condominium Board, any Unit Owner and/or the Tower Sponsor, and/or their respective designees, or the CS Unit Owner, CS MS Unit Owner and CS LL Unit Owner, and/or its/their designee, or any affiliate of any of them without incurring any liability for self-dealing, except in cases of bad faith or willful misconduct.

2.14.3  Neither the Tower Board nor any member thereof shall be liable for either: (i) any failure or interruption of any utility or other services to be provided or obtained by, or on behalf of, the Tower Board or Condominium Board or to be paid for as either a Tower Common Expense, Residential Common Expense or General Common Expense, except when any such failure or interruption is caused by the acts of bad faith or willful misconduct of the Tower Board or such member thereof, as the case may be; or (ii) any injury, loss or damage to any individual or property, occurring in or upon either a Unit or any Common Element, which is either: (a) caused by the elements, by any Unit Owner or by any other individual, (b) resulting from electricity, water, snow or ice that may leak or flow from a Unit or any portion of any Common Element, or (c) arising out of theft or otherwise; except in each case when caused by the acts of bad faith or willful misconduct of the Tower Board or such member thereof.

2.15  <u>Fidelity Bonds</u>. The Tower Board, to the extent commercially practicable, shall obtain crime insurance or fidelity bonds (or similar bonds or insurance), in amounts deemed

- 12 -

appropriate by it, for all of its members, officers and employees and for the managing agent or manager, if any, employed by it and the premiums on such bonds (or insurance) shall constitute Tower Common Expenses.

2.16   Committees.  The Tower Board may, subject to such limitations and exceptions as the Tower Board may prescribe, appoint an executive committee and such other committees as the Tower Board may deem appropriate, each to consist of two or more members of the Board. Each such committee, to the extent provided in the resolution which creates it, shall have and may exercise all the powers of the Tower Board during the intervals between the meetings of the Board, insofar as may be permitted by Law.  For so long as the Tower Sponsor is entitled to designate members to the Tower Board, any committee appointed by the Tower Board shall have as at least one of its members a member appointed by the Tower Sponsor.

2.17   Status of Board.  In addition to the status conferred upon the Tower Board under or pursuant to the provisions of the New York Condominium Act, the Tower Board shall, to the extent permitted by Laws, be deemed to constitute a separate unincorporated association for all purposes under and pursuant to the provisions of the General Associations Law of the State of New York.  In the event of the incorporation or organization of the Tower Board pursuant to the provisions of Section 2.18, the provisions of this Section 2.17 shall no longer be applicable to the Tower Board.

2.18   Incorporation and Organization of Tower Board.  To the extent and in the manner provided in the New York Condominium Act, the Tower Board may, by action of the Board as provided in this Article 2, be organized as a limited liability company or incorporated under the applicable statutes of the State of New York.  In the event that the Tower Board so incorporates or organizes, it shall have, to the extent permitted by Laws, the status conferred upon it under such statutes in addition to the status conferred upon the Tower Board under or pursuant to the provisions of the New York Condominium Act.  The certificate of incorporation and by-laws of any such resulting corporation or the articles of organization and operating agreement of such resulting limited liability company, as the case may be, shall conform as closely as practicable to the provisions of the Declaration, these Tower Section By-Laws and, to the extent applicable, the Condominium By-Laws, and the provisions of the Declaration, these Tower Section By-Laws and, to the extent applicable, the Condominium By-Laws, shall control in the event of any inconsistency or conflict between the provisions thereof and the provisions of such certificate of incorporation and by-laws or articles of organization and operating agreement.

2.19   Tower Board as Agent of Tower Unit Owners.  In exercising its powers and performing its duties under the Declaration, these Tower Section By-Laws and, to the extent applicable, the Condominium By-Laws, the Tower Board shall act as, and shall be, the agent of the Tower Unit Owners, subject to and in accordance with the provisions of the Declaration, these Tower Section By-Laws and, to the extent applicable, the Condominium By-Laws.

2.20   Prohibited Transactions.  Each member of the Tower Board shall perform his or her duties, and shall exercise his or her powers, in good faith and with a view to the interests of the Tower Section.  To the extent permitted by Laws, no contract or other transaction between the Tower Board and either: (i) any of its members, or (ii) any corporation, partnership, fiduciary, firm, limited liability company, association or other entity in which any of the members of the Tower Board are officers, directors, shareholders, employees, partners, fiduciaries, beneficiaries, members or principals, or are otherwise interested, pecuniarily or otherwise, shall be deemed either void or voidable because either:  (a) any such member of the

- 13 -

Tower Board was present at the meeting or meetings of the Tower Board during which such contract or transaction was discussed, authorized, approved or ratified, or (b) the vote of any such member was counted for such purpose; provided, however, that either: (1) the fact thereof is disclosed to, or known by, the Tower Board or a majority of the members thereof and noted in the minutes thereof, and the Tower Board shall authorize, approve or ratify such contract or transaction in good faith by a vote of a majority of the entire Tower Board, less the number of such members involved in such contract or transaction; or (2) the fact thereof is disclosed to, or known by, a majority of Tower Unit Owners and a majority of Tower Unit Owners, present at a duly constituted meeting, shall in good faith authorize, approve or ratify such contract or transaction; and (3) the contract or transaction is commercially reasonable to the Tower Board at the time the same is authorized, approved, ratified, executed or otherwise consummated. Any such members of the Tower Board may be counted in determining the presence of a quorum of any meeting of the Tower Board which authorizes, approves or ratifies any such contract or transaction, but no such member shall be entitled to vote thereat in order to authorize, approve or ratify such contract or transaction.

2.21   Affiliate Transactions.  The restrictions set forth in Section 2.20 above shall not prevent an affiliate of Tower Sponsor from serving as managing agent, nor shall such restrictions apply to any agreement entered into with or assumed by Affiliates of Related and/or Oxford (i) for the provision of management services, utilities, for use of and access to utility systems and for certain technology equipment and systems, and for other purposes provided for in the Condominium Documents and the Underlying Agreements, at commercially reasonable rates; (ii) with respect to PEBL, or (iii) with respect to lease(s) or license(s) pursuant to Sections 7.6 and 8.16 of the Declaration and Section 6.12.4 hereof.

2.22   Principal Office of Tower Board.  The principal office of the Tower Board shall be located either within the Tower Section or at such other place in the Borough of Manhattan, as may be designated from time to time by the Tower Board.

## ARTICLE 3

## TOWER UNIT OWNERS

3.1   Annual Meetings.  The first annual meeting of Tower Unit Owners (the "First Annual Tower Section Meeting") shall be held on a date not earlier than ten (10) nor later than thirty (30) days after the later to occur of: (i) the second anniversary of the First Tower Unit Closing; or (ii) the closing of title by or on behalf of Tower Sponsor, as seller, to Tower Units representing at least 50%, both in number and in aggregate Common Interests, of all Tower Units to Purchasers (as defined in the Offering Plan).  At such meeting a new Tower Board shall be elected and/or designated (as provided in Sections 2.3 and 2.4) consisting of three (3) persons and the incumbent Tower Board shall resign.  Thereafter, annual meetings of Tower Unit Owners shall be held within four weeks after the anniversary of such first meeting in each succeeding year on a date to be set by the Tower Board.  At such meetings, the Tower Unit Owners shall elect successors to the members of the Tower Board whose terms of office are due to expire on or about the day of such meeting and there shall also be transacted such other business as may properly come before such meeting.

3.2   Place of Meetings.  Meetings of Tower Unit Owners shall be held at the principal office of the Tower Section or at such other place in the Borough of Manhattan as may be designated from time to time by the Tower Board.

3.3 <u>Special Meetings</u>. The President or the Vice President of the Tower Section shall call a special meeting of Tower Unit Owners if so directed by resolution of the Tower Board or upon a petition signed and presented to the Secretary of the Tower Section by Tower Unit Owners owning Tower Units representing not less than 15% of the Common Interests of all of the Tower Units. Each such resolution or petition shall state, in reasonable detail, the purposes for calling such meeting.

3.4 <u>Notice of Meetings and Actions Taken</u>. Notice of each annual or special meeting of Tower Unit Owners shall be given by the Secretary of the Tower Section to all Tower Unit Owners of record entitled to vote thereat, at their address at the Tower Section (or at such other address as any Tower Unit Owner has designated by notice in writing to the Secretary of the Tower Section at least fifteen (15) business days prior to the giving of notice of the applicable meeting). Each such notice shall state the purposes of the meeting and the time and place where it is to be held, and no business shall be transacted at such meeting except as stated in the notice. All notices hereunder shall be given by personal delivery, mail, nationally recognized overnight courier or telecopy, at least ten (10) business days prior to the date fixed for the meeting. However, if the business to be conducted at any meeting of the Tower Unit Owners shall include consideration of a proposed amendment to the Declaration, these Tower Section By-Laws or the Condominium By-Laws, the notice of such meeting shall be given to all Tower Unit Owners, in the manner provided above, at least thirty (30) days prior to the date fixed for such meeting and such notice shall be accompanied by a copy of the text of such proposed amendment.

3.5 <u>Lack of Quorum</u>. Subject to the terms and provisions of subsection 2.4.4, if any meeting of Tower Unit Owners cannot be held because a quorum is not present, the Tower Unit Owners who are present at such meeting, either in person or by proxy, may act by majority vote to either: (a) adjourn the meeting from time to time until a quorum exists; or (b) reconvene the meeting to a time (specified on not less than three (3) business days' notice, by personal delivery, nationally recognized overnight courier or telecopy, to the absent Tower Unit Owners) when no quorum requirement shall apply.

3.6 <u>Order of Business</u>. The order of business at all regular meetings of Tower Unit Owners shall be as follows:

(a) Call to order.

(b) Roll call.

(c) Proof of notice of meeting.

(d) Reading of minutes of preceding meeting.

(e) Reports of officers.

(f) Reports of members of the Tower Board.

(g) Reports of committees.

(h) Election of inspectors of election (when so required).

(i) Election of members of the Tower Board.

(j)    Unfinished business.

(k)    New business.

3.7    <u>Title to Tower Units</u>. Title to Tower Units may be taken by any individual, corporation, partnership, limited liability company, association, trust or other entity, or any two or more of such owners as joint tenants, tenants in common or tenants by the entirety, as may be appropriate.

3.8    <u>Voting</u>.

3.8.1    Each Tower Unit Owner, or a person designated by such Tower Unit Owner to act as proxy on its behalf and who need not be a Unit Owner, shall be entitled to cast the votes appurtenant to such Tower Unit as set forth herein, in the Condominium By-Laws (to the extent applicable) and in the Declaration at all meetings of Tower Unit Owners and at all joint meetings of Unit Owners. The designation of any such proxy shall be made in a signed and dated writing to the Secretary of the Tower Section and shall be revocable at any time by written notice actually delivered to such Secretary by the Tower Unit Owner which had made the designation; provided, however, that no designation to act as a proxy shall be effective for a period in excess of six (6) months (except that the designation of a Permitted Tower Mortgagee to act as the proxy of its mortgagor shall be effective until duly revoked).

3.8.2    A fiduciary shall be the voting member with respect to any Unit owned in a fiduciary capacity.

3.8.3    If two (2) or more persons or entities own a Tower Unit, they shall designate one (1) person or entity amongst them to vote the entire Common Interest appurtenant to their Unit in a writing given to the Secretary of the Tower Section, and the vote of such designee shall be binding upon such designors. Failing such a designation, all of such persons or entities shall mutually vote such Common Interest under one ballot, without division, and the concurrence of such persons or entities shall be conclusively presumed if any one of them purports to vote such Common Interest without protest being made contemporaneously to the party presiding over the meeting at which such vote is taken. If protest is made, the Common Interest appurtenant to such Tower Unit shall be counted solely for determining whether a quorum is present for such voting.

3.8.4    Neither the Tower Board nor its designee shall be entitled to vote the interest appurtenant to any Tower Unit owned by the Tower Board or such designee, and the Common Interest of such Unit shall be excluded from the total Common Interests when computing the interests of Tower Unit Owners for quorum and voting purposes.

3.8.5    Except as otherwise set forth herein, in the Condominium By-Laws (to the extent applicable) or in the Declaration, at all meetings of Tower Unit Owners, each Tower Unit Owner (or its proxy) entitled to vote thereat (including, without limitation, the Tower Sponsor) shall be entitled to cast one vote for each .0001% (rounded off to the nearest .0001%) of Common Interest attributable to its Tower Unit or Units (including, without limitation, for each Board member to be elected).

3.8.6    Whenever a particular percentage of Common Interest must be reached for voting purposes and such required percentage is described in terms of the Tower Unit Owners, as a group, as opposed to all Unit Owners as a whole, such required percentage shall mean a

- 16 -

percentage in terms of the total Common Interests attributable to all Tower Unit Owners and not the percentage of Common Interests attributable to all Unit Owners.

3.9    Majority of Tower Unit Owners. Except as may otherwise be provided by Law, as used in these Tower Section By-Laws, the Condominium By-Laws (to the extent applicable) and the Declaration, the term "Majority of Tower Unit Owners" means those Tower Unit Owners having more than 50% of the total authorized votes of all Tower Unit Owners (determined in accordance with the provisions of Section 3.8), who are present in person or by proxy and voting at a duly constituted meeting at which a quorum is present or is not required.

3.10    Quorum. Except as otherwise provided in these Tower Section By-Laws, the presence in person or by proxy of Tower Unit Owners owning Tower Units to which appertain more than 35% of the aggregate Common Interests attributable to all Tower Units shall constitute a quorum at all meetings of Tower Unit Owners.

3.11    Majority Vote. Except where otherwise provided by Law, the Declaration or these Tower Section By-Laws, at all meetings solely of Tower Unit Owners, the affirmative vote of a Majority of Tower Unit Owners shall be binding upon all Tower Unit Owners for all purposes.

3.12    Representation on Condominium Board. Tower Unit Owners shall not be entitled to vote in their individual capacities as Unit Owners at any meeting of the Condominium Board. The entire Common Interest of the Tower Unit Owners shall be voted at any such meeting(s) only by the designees of the Tower Board thereto in accordance with the terms of Section 2.1 above and the provisions of the Condominium By-Laws.

## ARTICLE 4

## OFFICERS

4.1    Designation. (a) The principal officers of the Tower Section shall be a President, Vice President, Secretary and Treasurer thereof, all of whom shall be elected by the Tower Board. The Tower Board may elect more than one Vice President, or an Assistant Treasurer or Assistant Secretary and such other officers as in its judgment may be desirable. Nothing herein shall preclude any officer of the Tower Section from also being an officer of the Condominium or any officer of the Condominium from also being an officer of the Tower Section, if otherwise qualified under the terms of these Tower Section By-Laws and the Condominium By-Laws, as applicable. Unless prohibited by Law, any two or more offices of the Tower Section may be held by the same person.

(b) None of the officers of the Tower Section need be Tower Unit Owners or have any interest therein or be members of the Tower Board; except that, from and after the first organizational meeting of the Tower Board after the First Annual Tower Section Meeting, the President and Vice President of the Tower Section must be members of the Tower Board.

4.2    Election of Officers. The officers of the Tower Section shall each be elected annually by the Tower Board at the organizational meetings thereof and at any other meeting as may be required to fill a vacancy, and shall serve at the pleasure of the Tower Board; except that the initial officers of the Tower Section shall be elected by the First Tower Board and shall hold office at the pleasure of such First Tower Board and until their successors are elected.

- 17 -

4.3     Resignation and Removal of Officers.  Any officer may resign at any time by written notice given in accordance with the terms of Section 5.1 of these Tower Section By-Laws to the Tower Board; such resignation shall take effect at the time specified and, unless specifically requested by the resigning officer, acceptance of such resignation shall not be necessary to make it effective.  Upon the affirmative vote of a majority of the members of the Tower Board, present in person or by proxy at a regular meeting of the Tower Board, or at a special meeting of the Tower Board called for such purpose, at which a quorum is present or is not required pursuant to Section 2.12.2, any officer may be removed, either with or without cause, and his or her successor shall be elected.

4.4     President.  The President of the Tower Section shall be the chief executive officer of the Tower Section and shall preside at all meetings of Tower Unit Owners and of the Tower Board.  The President shall have all of the general powers and duties which are incident to the office of president of a stock corporation organized under the Business Corporation Law of the State of New York, including, but not limited to, the power to appoint committees from among Tower Unit Owners from time to time as such President, in his or her discretion, may decide are appropriate to assist in the conduct of the affairs of the Tower Section.

4.5     Vice President.  The Vice President of the Tower Section shall take the place of the President under whom he or she serves and shall perform the duties of the President whenever the President shall be absent or unable to act.  If both the President and the Vice President of the Tower Section are unable to act, the Tower Board shall appoint some other member of the Tower Board to act in the place of such President and Vice President on an interim basis.  The Vice President shall also perform such other duties as, from time to time, shall be imposed by the Tower Board or by the President.

4.6     Secretary.  The Secretary of the Tower Section shall keep the minutes of the meetings of the Tower Unit Owners and of the Tower Board.  The Secretary shall have charge of such books and papers as the Tower Board shall direct and, in general, shall perform all of the duties incident to the office of secretary of a stock corporation organized under the Business Corporation Law of the State of New York.

4.7     Treasurer.  The Treasurer shall have the care and custody of the funds and securities of the Tower Section and shall be responsible for keeping full and accurate financial records and books of account thereof showing all receipts and disbursements necessary for the preparation of all required financial data.  The Treasurer shall be responsible for the deposit of all funds and other securities in the name of the Tower Board (or in the name of the managing agent or manager appointed by the Tower Board) in such depositories as may from time to time be designated by such Tower Board and shall, in general, perform all of the duties incident to the office of treasurer of a stock corporation organized under the Business Corporation Law of the State of New York.

4.8     Execution of Documents.  All agreements, contracts, deeds, leases, checks and other instruments of the Tower Section shall be executed by the President or Vice-President, acting alone, or by any other two officers thereof or by such other person or persons as may be designated by the Tower Board. In addition to the foregoing, the Tower Board may authorize the managing agent serving on its behalf to execute checks, provided that the expenditures, and the managing agent's paying for same, have been approved in advance by resolution of the Tower Board or have been authorized by two officers of the Tower Section.

4.9     Compensation of Officers. Except as otherwise provided by the Tower Board, no officer shall receive any compensation for acting as such.

4.10    Liability of Officers.

4.10.1  To the extent permitted by Laws, no officer of the Tower Section shall have any personal liability with respect to any contract, act or omission of the officers in connection with the affairs or operation of the Tower Section (except in their capacities as Tower Unit Owners). To the extent permitted by Laws, officers shall have no liability to Tower Unit Owners, except that an officer shall be liable for his or her own bad faith or willful misconduct. All Tower Unit Owners shall severally, to the extent of their respective interests in their Tower Units and their appurtenant Common Interests, indemnify each officer of the Tower Section against any liability or claim except those arising out of such officer's own bad faith or willful misconduct.

4.10.2  None of the officers of the Tower Section shall be liable for either: (i) any failure or interruption of any utility or other services to be obtained by, or on behalf of, any such officer or to be paid for as either a Tower Common Expense, Residential Common Expense or General Common Expense, except when any such failure or interruption is caused by the acts of bad faith or willful misconduct of such officer; or (ii) any injury, loss or damage to any individual or property, occurring in or upon either a Unit or any Common Element, which is either: (a) caused by the elements, by any Unit Owner or by any other individual, (b) resulting from electricity, water, snow or ice that may leak or flow from a Unit or any portion of any Common Element, or (c) arising out of theft or otherwise; except in each case when caused by the acts of bad faith or willful misconduct of such officer.

## ARTICLE 5

## NOTICES

5.1     Notices. Except as otherwise provided in these Tower Section By-Laws, all requests, notices, reports, demands, approvals and other communications required or desired to be given shall be in writing and shall be delivered: (a) if to the Tower Board, in person or sent to the principal office of the Tower Board (or to such other address as the Tower Board may designate from time to time); and a duplicate shall be sent in like manner to the managing agent of the Tower Section, if any; (b) if to a Tower Unit Owner, in person or sent to the address of such Tower Unit Owner at the Building, or to such other address as may have been designated by such Tower Unit Owner from time to time in writing to the Tower Board; (c) if to any other Person, in the manner provided in Article 5 of the Condominium By-Laws. All notices delivered in person (to the extent permitted herein) shall be deemed to have been given when delivered in person. Unless other means of giving certain notices are specifically required or permitted pursuant to the Condominium Documents, all notices which are "sent" shall be sent either: (x) by registered or certified mail, return receipt requested, and shall be deemed to have been given three (3) days after deposit in a depository maintained by the U.S. Postal Service in a postage prepaid sealed wrapper; or (y) by nationally recognized overnight courier service and shall be deemed to have been given the first Business Day (for domestic delivery) and the third Business Day (for international delivery), after deposit with an overnight courier service, provided that notices of change of address shall in all events be deemed to have been given when received.

5.2     Waiver of Service of Notice. Whenever any notice is required to be given by Law, the Declaration or these Tower Section By-Laws, a waiver thereof in writing, signed by the

person or persons entitled to such notice, whether before or after the time stated therein, shall be deemed the equivalent thereof.

## ARTICLE 6

## OPERATION OF THE TOWER SECTION

6.1    Determination of Tower Common Expenses, Residential Common Expenses and Fixing of Tower Common Charges and Residential Common Charges.

6.1.1    (a)    As described in the Condominium By-Laws, the Condominium Board shall from time to time, but at least annually, prepare a budget setting forth the projection of General Common Expenses and will allocate to the Tower Section, in the manner described in the Condominium By-Laws, the Common Charges necessary to meet the Tower Section's allocated share of General Common Expenses. The Tower Board will allocate and assess to each Tower Unit Owner, in such proportion as the Common Interest of each such Unit Owner's Tower Unit bears to the total aggregate Common Interests of all Tower Units, a portion of the General Common Charges allocated to the Tower Section, to be assessed against and paid by each Tower Unit Owner as part of the Tower Common Charges payable by such Tower Unit Owner, as provided in subsection 6.1.2.

(b)    The Tower Board shall comply with the obligation set forth in Section 6.1.8 of the Condominium By-Laws with respect to granting a first priority security interest to the Base Unit Owner in the funds collected as Tower Common Charges (hereinafter defined) and next to the Condominium Board in payment of the Tower Section's allocated share of General Common Charges.

(c)    The Tower Board shall comply with the obligations set forth in Section 6.1.10 of the Condominium By-Laws with respect to granting a first priority security interest to the Condominium Board in the funds collected as Residential Common Charges (hereinafter defined) and  executing and performing the obligations set forth in the Condominium By-Laws with respect thereto.

6.1.2    (a)    Except as otherwise provided herein, all costs and expenses in connection with the repair, maintenance, replacement, restoration, care, upkeep and operation of, and any alteration, addition or improvement to, the Tower Limited Common Elements and the business and affairs of the Tower Section (the "Tower Common Expenses") shall be determined by the Tower Board and shall be borne solely by the Tower Unit Owners. Tower Common Expenses shall include, without limitation: (i) such amounts as the Tower Board may deem proper for the establishment of and/or changes to reserves, including, without limitation, a general operating reserve or a reserve for working capital or for replacements with respect to the Tower Limited Common Elements; (ii) such amounts, determined by the Tower Board, as may be required for the purchase, lease or sublease by the Tower Board or its designee, on behalf of all Tower Unit Owners, of an apartment to be used as the residence of the superintendent or resident manager of the Tower Section (which may be shared by the Tower Board and the Base Unit Owner), if any, or of any Tower Unit whose owner has elected to sell, lease, transfer or convey such Tower Unit or which is to be sold at a foreclosure or other similar sale; and (iii) all such other items as are provided for in the Declaration, the Condominium By-Laws or these Tower Section By-Laws to be Tower Common Expenses. The Tower Board shall from time to time, but at least annually, prepare a budget setting forth the projection of Tower Common Expenses and shall allocate and assess to the Tower Unit Owners pro rata, in accordance with

- 20 -

their respective Common Interests (except as otherwise provided in the Declaration, the Condominium By-Laws or these Tower Section By-Laws), charges to meet (x) the Tower Common Expenses, (y) each Tower Unit Owner's share of General Common Charges, (z) each Tower Unit Owner's share of Residential Common Charges (such charges together with all such other amounts denominated or payable as Tower Common Charges in or under the Declaration, the Condominium By-Laws or these Tower Section By-Laws being, collectively, the "Tower Common Charges"). In addition to basing the portion of Tower Common Charges attributable to Tower Common Expenses on Common Interests, the Tower Board may also assess the same in accordance with submetering, contract allocations and usage (both projected and actual) so long as such allocations are reasonable, as determined by the Tower Board. The Tower Board shall advise all Tower Unit Owners promptly in writing of the amount of Tower Common Charges payable by each of them and shall furnish copies of each annual budget on which such Tower Common Charges are based to all Tower Unit Owners and, upon written request therefor, to Permitted Tower Mortgagees thereof.

(b) Except as otherwise provided herein, all costs and expenses in connection with the repair, maintenance, replacement, restoration, care, upkeep and operation of, and any alteration, addition or improvement to, the Residential Limited Common Elements and the business and affairs of the Residential Limited Common Elements (the "Residential Common Expenses") shall be determined by the Tower Board and shall be borne by the Base Unit Owner and the Tower Unit Owners. Residential Common Expenses shall include, without limitation: (i) such amounts as the Tower Board may deem proper for the establishment of and/or changes to reserves, including, without limitation, a general operating reserve or a reserve for working capital or for replacements with respect to the Residential Limited Common Elements; and (ii) all such other items as are provided for in the Declaration, the Condominium By-Laws or these Tower Section By-Laws to be Residential Common Expenses. The Tower Board shall from time to time, but at least annually, prepare a budget setting forth the projection of Residential Common Expenses and shall allocate and assess to the Tower Unit Owners and the Base Unit pro rata, in accordance with their respective Common Interests (except as otherwise provided in the Declaration, the Condominium By-Laws or these Tower Section By-Laws), charges to meet the Residential Common Expenses the "Residential Common Charges"). In addition to basing the portion of Residential Common Charges attributable to Residential Common Expenses on Residential Common Interest, the Tower Board may also assess against the Residential Unit Owners. The Tower Board has the right to allocate insurance costs with respect to the Residential Limited Common Elements, the Tower Section Management Agreement with respect to the Tower Section and Residential Limited Common Elements and the Resident Manager solely against the Tower Unit Owners and not based on Residential Common Interest with a portion payable by the Base Unit Owner. The Tower Board shall advise the Base Unit Owner and Tower Unit Owners promptly in writing of the amount of Residential Common Charges payable by each of them and shall furnish copies of each annual budget on which such Residential Common Charges are based. Notwithstanding the foregoing, any Residential Common Charges specifically assessed by the Tower Board with respect to the Base Unit must comport with the requirements of Section 339-m of the New York Real Property Law pursuant to the procedure set forth in Section 6.4 of these Tower Section By-Laws, with any resulting reduction in the Residential Common Charges payable by the Base Unit Owner being allocated solely to the Tower Unit Owners according to their relative proportional Tower Common Interest.

(c) Notwithstanding anything to the contrary contained in this subsection 6.1.2, the costs of repair, maintenance, replacement, restoration, care, upkeep and operation of,

and any alteration, addition or improvement to, the Tower Limited Common Elements described in subsection 6.7.2(c) shall be paid for in the manner described therein.

6.1.3

(a)    The Tower Board may, at its sole discretion, from time to time increase or decrease the amount of Tower Common Charges, and may modify its prior determination of the Tower Common Expenses or, based on a determination of the Condominium Board, of the share of General Common Charges payable by each Tower Unit Owner for any fiscal year so as to increase or decrease the amount of Tower Common Charges payable for such fiscal year or portion thereof; however, no such revised determination shall have a retroactive effect on the amount of Tower Common Charges payable by Tower Unit Owners for any period prior to the date of such new determination. However, a prior period's deficit may be included in Tower Common Charges for a subsequent period or levied from a special assessment levied against all Tower Unit Owners in accordance with subsection 6.1.5.

(b)    The Tower Board may, at its sole discretion, from time to time increase or decrease the amount of Residential Common Charges, and may modify its prior determination of the Residential Common Expenses payable by the Base Unit Owner and Tower Unit Owners any fiscal year so as to increase or decrease the amount of Residential Common Charges payable for such fiscal year or portion thereof; however, no such revised determination shall have a retroactive effect on the amount of Residential Common Charges payable by Residential Unit Owners for any period prior to the date of such new determination. However, a prior period's deficit may be included in Residential Common Charges for a subsequent period or levied from a special assessment levied against the Base Unit Owner and Tower Unit Owners in accordance with subsection 6.1.5. Notwithstanding the foregoing, any Residential Common Charges specifically assessed by the Tower Board with respect to the Base Unit must comport with the requirements of Section 339-m of the New York Real Property Law pursuant to the procedure set forth in Section 6.4 of these Tower Section By-Laws, with any resulting reduction in the Residential Common Charges payable by the Base Unit Owner being allocated solely to the Tower Unit Owners according to their relative proportional Tower Common Interest.

6.1.4    The failure or delay of the Condominium Board or of the Tower Board, as the case may be, to prepare or adopt a budget or to determine the General Common Expenses, the Residential Common Expenses or the Tower Common Expenses, as the case may be, for any fiscal year or portion thereof shall not be deemed a waiver or modification in any respect of the covenants and provisions hereof or a release of any Tower Unit Owner from the obligation to pay Tower Common Charges. In the event of such failure by the Condominium Board, the General Common Charges thereafter allocable to the Tower Section until a new determination of General Common Expenses is made shall be computed as set forth in the Condominium By-Laws. In the event of such failure by the Tower Board, the Tower Common Charges that were computed on the basis of the Residential Common Expenses and/or Tower Common Expenses last determined for any fiscal year or portion thereof, together with the Tower Section's current allocated share of General Common Charges and Residential Common Charges, shall continue thereafter to be the Tower Common Charges payable by the Tower Unit Owners until a new determination of the Tower Common Charges can be made. In the event of such failure by the Tower Board, the Residential Common Charges that were computed on the basis of the Residential Common Expenses last determined for any fiscal year or portion thereof shall

continue thereafter to be the Residential Common Charges payable by the Base Unit Owner and Tower Unit Owners until a new determination of the Residential Common Charges can be made.

6.1.5    (a)    In addition to the foregoing duty to determine the amount of and to assess Tower Common Charges, the Tower Board shall have the right to levy special assessments to meet the Tower Common Expenses (or a prior period's deficit, in accordance with subsection 6.1.3) and the Tower Section's allocated share of General Common Charges and Residential Common Charges, or any special assessment levied by the Condominium Board. The Tower Board shall have all rights and remedies for the collection of special assessments as are provided herein for the collection of Tower Common Charges (including, without limitation, perfecting a lien against the defaulting Tower Unit).

(a)    In the event the Condominium Board levies a special assessment, a portion of which is allocated to the Tower Section, the Tower Board shall levy a special assessment (or increase Tower Common Charges) to meet the Tower Section's allocated share of any such special assessment levied by the Condominium Board.

(b)    The Tower Board shall have the right to levy special assessments to meet the Residential Common Expenses apportioned to the Base Unit.  The Tower Board shall have all rights and remedies for the collection of special assessments as are provided herein for the collection of Residential Common Charges (including, without limitation, perfecting a lien against the defaulting Base Unit).  Notwithstanding the foregoing, any Residential Common Charges specifically assessed by the Tower Board with respect to the Base Unit must comport with the requirements of Section 339-m of the New York Real Property Law pursuant to the procedure set forth in Section 6.4 of these Tower Section By-Laws, with any resulting reduction in the Residential Common Charges payable by the Base Unit Owner being allocated solely to the Tower Unit Owners according to their relative proportional Tower Common Interest.

6.1.6    The excess of all rents, profits and revenues derived from the rental or use of any space or facility forming part of or included in any Tower Limited Common Elements (other than the Pet Facility Area) or Residential Limited Common Elements shall be collected by the Tower Board, as agent for and on behalf of the Tower Unit Owners, and shall constitute income of the Tower Unit Owners, to be applied against Tower Common Expenses next arising. Notwithstanding any provision contained in these Tower Section By-Laws to the contrary, in no event shall any rent, profit or revenue derived from the rental, licensing or use of any space in the Tower Section or Residential Limited Common Elements be deemed to be derived from the rental, licensing or use of any floor slabs, ceilings or walls delineating or enclosing such space or the incidental use of any portion of any Tower Limited Common Elements or Residential Limited Common Elements appurtenant to such space.

6.2    Payment of Tower Common Charges and Residential Common Charges.

6.2.1    All Tower Unit Owners shall be obligated to pay to the Tower Board the Tower Common Charges assessed by the Tower Board pursuant to the provision of Section 6.1, at such time or times as the Tower Board determines.  Unless otherwise determined by the Tower Board, Tower Common Charges shall be payable monthly, in advance, on the first day of each month.

6.2.2    The Base Unit Owner shall be obligated to pay to the Tower Board its portion of the Residential Common Charges assessed by the Tower Board pursuant to the

- 23 -

provision of Section 6.1, at such time or times as the Tower Board determines. Unless otherwise determined by the Tower Board, Residential Common Charges shall be payable monthly, in advance, on the first day of each month. Notwithstanding the foregoing, any Residential Common Charges specifically assessed by the Tower Board with respect to the Base Unit must comport with the requirements of Section 339-m of the New York Real Property Law pursuant to the procedure set forth in Section 6.4 of these Tower Section By-Laws, with any resulting reduction in the Residential Common Charges payable by the Base Unit Owner being allocated solely to the Tower Unit Owners according to their relative proportional Tower Common Interest.

6.2.3   No Tower Unit Owner shall be liable for the payment of any part of the Tower Common Charges assessed against such Tower Unit Owner's Unit subsequent to a sale, transfer or other conveyance by it (made in accordance with these Tower Section By-Laws) of such Unit, together with its appurtenant Common Interest. Any Tower Unit Owner may, subject to the terms and conditions of these Tower Section By-Laws, convey its Unit, together with its appurtenant Common Interest, without consideration, to the Tower Board or its designee, on behalf of all Tower Unit Owners, and in such event (except as hereinafter set forth) be exempt from Tower Common Charges thereafter accruing, provided that such Tower Unit is free and clear of liens and encumbrances other than the statutory lien for unpaid Tower Common Charges (provided that no amounts are owing under any such lien). However, in no event may a Tower Unit Owner exempt itself from liability for Tower Common Charges by waiving use of any of the Common Elements or by abandonment of its Tower Unit. A purchaser of a Tower Unit shall be liable for the payment of Tower Common Charges accrued and unpaid against such Unit prior to its acquisition thereof, except that, to the extent permitted by Law, a Permitted Tower Mortgagee acquiring title to a Tower Unit at a foreclosure sale shall not be liable for, and such Tower Unit shall not be subject to, a lien for the payment of Tower Common Charges assessed against such Tower Unit subsequent to the recording of such Permitted Tower Mortgage and prior to the acquisition of title of such Tower Unit by such mortgagee; the foregoing is subject to the provisions of the last sentence of subsection 6.3.2(i) hereof. However, in the event of a foreclosure of a Tower Unit by a Permitted Tower Mortgagee (whether by sale, deed in lieu of foreclosure or otherwise) or by the Tower Board of its lien on any Tower Unit for unpaid Tower Common Charges, if the net proceeds of the foreclosure sale actually received (after deduction of all legal fees, advertising costs, brokerage commissions and other costs and expenses incurred by such Permitted Tower Mortgagee in connection therewith) are insufficient to satisfy the defaulting Tower Unit Owner's obligations, such Tower Unit Owner shall remain liable for the deficit of all unpaid Tower Common Charges, as provided in these Tower Section By-Laws.

6.2.4   (a)   Prior to any permissible sale, transfer or other conveyance of a Tower Unit, any seller or purchaser of a Tower Unit shall be entitled, upon request for same, to a statement from the Tower Board, dated as of the date of the closing of title in connection with any such sale, transfer or other conveyance, setting forth the amount of unpaid Tower Common Charges accrued against the Unit.

(b)   The Tower Board shall promptly provide any Tower Unit Owner who so requests with a written statement of all unpaid Tower Common Charges due to it from such Tower Unit Owner.

6.2.5   Notwithstanding the provisions of subsection 6.2.1, any Tower Unit Owner that is a foreign government, a resident representative of a foreign government or such other person or entity otherwise entitled to the immunities from suit enjoyed by a foreign

- 24 -

government (i.e., diplomatic or sovereign immunity) shall deposit with the Tower Board an amount equal to two (2) times the then current annual Tower Common Charges for such Unit, subject to increase from time to time as such Common Charges increase, together with the full amount of any special assessment levied against, or allocable to, such Unit, as security for the faithful observance by such Tower Unit Owner of the terms, provisions and conditions of these Tower Section By-Laws.  In the event that such Tower Unit Owner defaults in respect of the terms, provisions and conditions of these Tower Section By-Laws, the Tower Board may use, apply or retain the whole or any part of the security so deposited, to the extent required for the payment of any Tower Common Charges or any other sum as to which such Tower Unit Owner is in default.  If the Tower Board applies or retains any part of said security, the Tower Unit Owner in questions, within ten (10) days after notice from the Tower Board, shall deposit with the Tower Board the amount so applied or retained so that such Board has the full amount of said security on hand at all times.

     6.3    Default in Payment of Tower Common Charges or Residential Common Charges; Lien for Unpaid Tower Common Charges or Residential Common Charges; Other Remedies.

     6.3.1  The Tower Board shall take prompt action to collect any Tower Common Charges or Residential Common Charges which remain unpaid for more than thirty (30) days after the due date for payment thereof, including, without limitation, the institution of such actions and the recovery of interest and expenses as provided in this Article 6.  Subject to the applicable terms of the Condominium By-Laws, in the event the Tower Board, after notice from the Condominium Board, fails to take such action against a Tower Unit Owner, then the Condominium Board may do so, in its own name or, if necessary, in the name of the Tower Board.

     6.3.2  (i)    Except to the extent prohibited by Law, the Tower Board, on behalf of all Tower Unit Owners, shall have a lien for Tower Common Charges unpaid by any Tower Unit Owner, together with interest thereon, on all Tower Units owned by such Tower Unit Owner, in proportion to their respective Common Interests.  Such lien for Tower Common Charges shall be subordinate only to liens for real estate taxes and, to the extent required or permitted by Laws, to prior recorded Permitted Tower Mortgages on such Tower Units, which are first mortgages of record.

          (ii)    Notwithstanding the foregoing provisions of this Article 6, in respect of any Unsold Tower Units, the Tower Sponsor shall pay directly to the Condominium Board (and not to the Tower Board), on behalf of the Tower Board, that portion of the Tower Common Charges assessed against such Units which consist of the General Common Charges included therein; and, as provided in Article 12 of the Condominium By-Laws, except to the extent prohibited by Law, the Condominium Board shall have a Condominium Board's Lien on the Unsold Tower Units for the amount of any such General Common Charges (together with interest thereon) unpaid by the Tower Sponsor.

     6.3.3  In the event any Tower Unit Owner fails to make payment of Tower Common Charges when due, such Unit Owner shall be obligated to pay: (a) a "late charge" of $.04 for each dollar of such amounts which remain unpaid for more than ten (10) days from their due date (although nothing herein shall be deemed to extend the period within which such amounts are to be paid); and (b) interest at the rate of 1.5% per month (but in no event in excess of the maximum rate permitted by Law) on such unpaid amounts (exclusive of any "late charges" theretofore collected on such amounts) computed from the due date thereof, together

- 25 -

with all expenses, including, without limitation, attorneys' fees and expenses paid or incurred by the Tower Board or by any managing agent in any proceeding brought to collect such unpaid Tower Common Charges or in an action to foreclose the lien on such Unit arising from said unpaid Tower Common Charges, whether as provided in Section 339-z of the New York Condominium Act, in the manner provided in Section 339-aa thereof, or in any other manner permitted by Law. In addition, if the Tower Board shall bring an action to foreclose such lien because of unpaid Tower Common Charges, the defaulting Tower Unit Owner shall be required to pay a reasonable fee for the use and occupancy of its Unit and the plaintiff in such foreclosure action shall be entitled to the appointment, without notice, of a receiver to collect the same. All such "late charges," interest, expenses and fees shall be added to and shall constitute Tower Common Charges payable by such Tower Unit Owner; and the lien for unpaid Tower Common Charges shall also secure the payment of such additional sums. A suit to recover a money judgment for unpaid Tower Common Charges shall be maintainable without foreclosing or waiving the lien securing such charges.

6.3.4   In any action brought by the Tower Board to foreclose a lien on a Tower Unit because of unpaid Tower Common Charges, the Tower Board, acting on behalf of all Tower Unit Owners, shall have the power (but shall not be obligated) to purchase any such Tower Unit at the foreclosure sale thereof and to acquire, hold, lease, mortgage, convey or otherwise deal with such Unit (but not to vote the interests appurtenant thereto). In the event the net proceeds received on a foreclosure sale (after deduction of all legal fees, advertising costs, brokerage commissions and other costs and expenses incurred in connection therewith) are insufficient to satisfy the defaulting Tower Unit Owner's obligations, such Tower Unit Owner shall remain liable for the deficit, as provided in these Tower Section By-Laws.

6.3.5   (a)      For the purposes of this subsection 6.3.5, "non-occupying owner" shall mean a Tower Unit Owner who or which does not occupy its Tower Unit.

(b)   If a non-occupying owner rents any Tower Unit to a rental tenant and then fails to make payments due for Tower Common Charges or any other amounts payable by such Tower Unit Owner to the Tower Board, including, without limitation, assessments and/or late fees (all of the foregoing, collectively, "Payments") for such Tower Unit within sixty days of the expiration of any grace period after the same are due, upon notice in accordance with subdivision (c) of this subsection, all rental payments from the tenant shall be directly payable to the Tower Board.

(c)   If the Payments for any Tower Unit have not been paid in full, within sixty days after the expiration of any grace period of the earliest due date, the Tower Board shall provide written notice to the tenant and the non-occupying owner providing that, commencing immediately and until such time as all Payments are made current, all rental payments due subsequent to the issuance of such notice are to be made payable to the Tower Board at the address listed on the notice. Where a majority of the Tower Board has been elected by and from among the Tower Unit Owners who are in occupancy, the Tower Board may elect not to require that rental payments be made payable to the Tower Board. At such time as Payments from the non-occupying owner are once again current, notice of such fact shall be given within three business days to the rental tenant and non-occupying owner. Thereafter all rental payments shall be made payable to the non-occupying owner or a designated agent. A non-occupying owner who disputes the Tower Board's claim to rental payments pursuant to this subsection shall be entitled to present facts supporting such Tower Unit Owner's position at

the next scheduled meeting of the Tower Board, which must be held within thirty days of the date that such Board receives notice that such owner seeks to dispute such claim.

(d)   Nothing in this subsection shall limit any rights of any Tower Unit Owner or the Tower Board existing under any other Law or agreement.

(e)   Payment by a rental tenant to the Tower Board made in connection with this subsection shall relieve that rental tenant from the obligation to pay such rent to the non-occupying owner and shall be an absolute defense in any non-payment proceeding commenced by such non-occupying owner against such tenant for such rent.

6.4    Base Operating Shortfall.  Notwithstanding the foregoing:

6.4.1   In accordance with Section 339-m of the New York Real Property Law, the allocation and apportionment of Common Charges to the Base Unit (the "Base Unit Common Charge Allocation") may be less than its proportionate share of General Common Charges and/or Residential Common Charges, as applicable, where such lesser General Common Charges and/or Residential Common Charges are necessary to ensure that the General Common Charges and/or Residential Common Charges paid by the Base Unit do not cause a Base Operating Shortfall (as defined below).  The Base Unit Common Charge Allocation shall be implemented by either: (i) imposing Common Charges for the Base Unit that are not proportional to the General Common Charges for the other Units and/or to the Residential Common Charges for the other Residential Units, or (ii) limiting the amount of General Common Charges and/or Residential Common Charges imposed on the Base Unit.  In the event a Base Unit Common Charge Allocation is implemented, the General Common Charges payable by the Tower Board shall be increased by the amount of such reduction in the General Common Charges and/or the Tower Common Charges payable by the Tower Unit Owners shall be increased by the amount of such reduction in the Common Charges otherwise payable by the Base Unit Owner.

6.4.2   The Base Unit Owner, after receiving the proposed Condominium Budget and Tower Budget for the next fiscal year (or an amended Condominium Budget and Tower Budget for any fiscal year) setting forth the General Common Charges and Residential Common Charges, respectively, for the Base Unit, shall determine and notify the Condominium Board (with respect to the General Common Charges) or the Tower Board (with respect to the Residential Common Charges) and each Permitted Mortgagee whether, based upon such Condominium Budget, Tower Budget, General Common Charges and Residential Common Charges, there will be a Base Operating Shortfall in such fiscal year, supported by reasonably detailed projections and documentation, including, without limitation, the Base Unit Budget (as defined below).  In the event the Base Unit Owner determines that there will be a Base Operating Shortfall, then, no later than ten (10) days prior to the commencement of such fiscal year or twenty (20) days after receipt of such Budget and estimated Common Charges, whichever is later, the Base Unit Owner shall advise the Condominium Board and/or Tower Board and each Permitted Mortgagee of the same and the Base Unit Owner's estimate of the Common Charges, supported by reasonably detailed projections and documentation, including, without limitation, the Base Unit Budget, which would be required to be set for Base Unit to prevent the Base Operating Shortfall (the "Base Unit Estimated CC Amount").  Prior to the commencement of such upcoming fiscal year (i) the Condominium Board shall set the General Common Charges for the Base Unit at the Base Unit Estimated CC Amount, and shall apportion any shortfall to the Tower Board; and (ii) the Tower Board shall set the Residential Common Charges for the Base Unit at the Base Unit Estimated CC Amount, and shall apportion any shortfall to the Tower Unit

- 27 -

Owners in accordance with their relative proportional Tower Common Interest.  Notwithstanding the foregoing, in the event that the Condominium Board fails to set the General Common Charges for the Base Unit and/or the Tower Board fails to set the Residential Common Charges for the Base Unit as provided above, the General Common Charges and/or Residential Common Charges due from the Base Unit Owner shall be equal to the Base Unit Estimated CC Amount.

6.4.3   If, during any fiscal year in which there is a Base Operating Shortfall, the General Common Charges and/or Residential Common Charges for the Base Unit are increased, such increase shall be borne solely by the Tower Unit Owners.

6.4.4   The following remedies are available to the Condominium Board, Tower Board and/or Tower Unit Owners to avoid a Base Operating Shortfall.  For the avoidance of doubt, in the event such remedies are unsuccessful and there is a Base Unit Shortfall, an advance will be made by the Tower Unit Owners as set forth in this Section 6.4.

(a)   If Base Unit Owner fails to annually submit the Base Unit Budget to the Condominium Board and Tower Board in accordance with Section 6.4.8 below, the Condominium Board and Tower Board shall have the right to use (and to assume to be the Base Unit Budget) the Base Unit Budget from the previous year subject to the CPI Increase Factor.

(b)   If a Base Operating Shortfall results from the Base Unit Owner's failure to use commercially reasonable efforts (e.g., sending warning and default notices, commencing judicial proceedings against non-paying tenants and diligently and continuously pursuing such judicial proceedings and related collection efforts through completion) to collect Base Unit Revenues (as defined below), the Tower Board shall have the right, and any powers necessary, to collect, or attempt to collect, Base Unit Revenues.

6.4.5   If, during any fiscal year, the Base Unit Owner experiences a significant unanticipated Base Operating Shortfall, the Base Unit Owner may present a revised Base Unit Estimated CC Amount (the "Base Unit Revised Estimated CC Amount") for the balance of such fiscal year along with its reasonably detailed projections and documentation, including, without limitation, the Base Unit Budget, used to calculate such Base Unit Revised Estimated CC Amount including a revised estimate of the Base Unit Operating Costs.  Within ten (10) days of receipt of the Base Unit Revised Estimated CC Amount, the Condominium Board shall reset the General Common Charges for the Base Unit and/or the Tower Board shall reset the Residential Common Charges for the Base Unit at an amount that, after taking into account the revised estimate of the Base Unit Operating Costs, will eliminate the revised Base Operating Shortfall.  Such Base Unit Revised Estimated CC Amount will be subject to the annual reconciliation procedures described below.  Notwithstanding the foregoing, in the event that the Condominium Board fails to set the General Common Charges for the Base Unit and/or the Tower Board fails to set the Residential Common Charges for the Base Unit on the basis of the unanticipated Base Operating Shortfall, the General Common Charges and/or the Residential Common Charges due from the Base Unit Owner shall be equal to the Base Unit Revised Estimated CC Amount.

6.4.6   Within ninety (90) days after the close of any fiscal year in which there is a Base Operating Shortfall and Common Charges for Base Unit are reduced pursuant to this Section as a result, the Condominium Board, Tower Board and the Base Unit Owner will conduct a reconciliation with regard to the actual Base Operating Shortfall.  The Base Unit Owner will provide the Condominium Board, Tower Board  and each Permitted Mortgagee (upon request) with records pertaining to the actual Base Unit Revenues and the actual Base Unit

- 28 -

Operating Costs for such fiscal year. In the event the actual Base Operating Shortfall is less than the Base Unit Estimated CC Amount or the Base Unit Revised Estimated CC Amount, as applicable, the Base Unit Owner shall pay the difference to the Tower Board and such amount shall be distributed to or applied as a credit for the benefit of the Tower Unit Owners in the same manner. In the event the actual Base Operating Shortfall is greater than the anticipated Base Operating Shortfall, the difference shall either be paid by the Tower Unit Owners or, in the event the Base Unit Owner was required to offset such projected Base Operating Shortfall, applied as a credit against the Common Charges next due from the Base Unit Owner (in either case with such amount to be assessed to the Tower Unit Owners). Notwithstanding the foregoing, in no event shall the Base Unit Owner be obligated to pay proportionally more Common Charges than a Unit Owner other than the Base Unit Owner would have paid under the provisions of the Condominium By-Laws or these Tower Section By-Laws, and under no circumstances whatsoever shall the effect of this Section ever result in any payment, reduction, adjustment, credit or other obligation from the Condominium Board, the Tower Board or other Unit Owners to or in favor of the Base Unit Owner in excess of the gross amount of Common Charges that would otherwise be allocable to Base Unit or Base Unit Owner for any particular period before giving effect to this Section.

6.4.7   Definitions. As used herein, the following terms shall have the following meanings:

(a)   "Base Unit Budget" means the budget to be prepared by or on behalf of the Base Unit Owner, which takes into account all Base Unit Operating Costs and Base Unit Revenues.

(b)   "Base Unit Operating Costs" means the annual operating expenses of Base Unit, including, without limitation, real estate taxes levied on Base Unit, utilities, maintenance, repair, annual capital expenditures, legal fees, professional fees, management fees, etc. which expenses shall be set forth in the Base Unit Budget.

(c)   "Base Operating Shortfall" means a deficiency of funds occurring when Base Unit Revenues are insufficient to pay the full General Common Charges, Residential Common Charges and any special assessments attributable to Base Unit plus Base Unit Operating Costs.

(d)   "Base Unit Revenues" means the aggregate of (A) the annual rents paid by the apartments within Base Unit to the Base Unit Owner, and (B) any other revenues obtained from Base Unit by the Base Unit Owner.

6.4.8   From time to time, but at least once per year, the Base Unit Owner will prepare the Base Unit Budget. At least thirty (30) days prior to the adoption of any Base Unit Budget, the Base Unit Owner will be required to present such budget to the Condominium Board and Tower Board for approval, which approval will not be unreasonably withheld.

6.4.9   Notwithstanding anything to the contrary contained herein or in the Declaration or the Condominium By-Laws, the Condominium Board shall have the right to enter into service contracts on behalf of the Unit Owners and Tower Board for services to be performed with respect to the Condominium and the Tower Board shall have the right to enter into service contracts on behalf of the Tower Unit Owners and the Base Unit Owner for services to be performed with respect to the Residential Section, including, without limitation, security, extermination and elevator maintenance. Generally, the Unit Owners shall be responsible for all

- 29 -

costs incurred in connection with the provision of any such services rendered with respect to the Condominium, and the Tower Unit Owners and Base Unit Owner shall be responsible for all costs incurred in connection with the provision of any such services rendered with respect to the Residential Section.  To the extent the Condominium Board enters into any such agreement and/or contract on behalf of the General Common Charge Obligors, the cost of any such agreement and/or contract shall be paid by the Condominium Board and assessed as a special assessment against the General Common Charge Obligors; provided, however, that if such special assessment results in a Base Operating Shortfall, the portion of such cost that creates the Base Operating Shortfall shall be treated as an assessment against the Tower Units and paid by the Tower Board on behalf of the Tower Unit Owners in the same manner as the payment of Common Charges in Section 6.4.1 above.  To the extent the Tower Board enters into any such agreement and/or contract on behalf of the Tower Unit Owners and/or Base Unit Owner, the cost of any such agreement and/or contract shall be paid by the Tower Board and assessed as a special assessment against the Tower Unit Owners and Base Unit Owner; provided, however, that if such special assessment results in a Base Operating Shortfall, the portion of such cost that creates the Base Operating Shortfall shall be treated as a Tower Common Expense and paid by the Tower Unit Owners in the same manner as the payment of Common Charges in Section 6.4.1 above.

6.4.10  [INTENTIONALLY DELETED].

6.4.11  In no event shall the provisions of these Tower Section By-Laws be modified to impair the rights of the Base Unit hereunder without the prior written consent of HFA so long as the HFA Regulatory Agreement remains in effect.

6.5     Insurance.

6.5.1   The Condominium By-Laws describe those types of insurance which each of the Condominium Board and the Tower Board is required to obtain and maintain. Neither the Condominium Board nor the Tower Board is required to obtain or maintain any insurance with respect to any personal property contained in a Tower Unit or any liability with respect to occurrences within or about a Tower Unit or the Limited Common Elements, if any, appurtenant thereto.  Consequently, as specified in Section 11.3 of the Condominium By-Laws, all Tower Unit Owners are required to obtain and maintain liability insurance against claims for personal injury, death or property damage occurring in, on or about such Tower Unit Owner's Unit or the Common Elements, if any, exclusive to his or her Unit, affording protection of at least $300,000 per occurrence, and an Umbrella Liability Policy with limits of not less than $3,000,000 per occurrence and annual aggregate per location, or in such higher amounts or limits as the Tower Board, from time to time, may determine, and property insurance providing full replacement cost coverage for the Tower Unit Owner's Unit and any fixtures, improvements, furnishings or personal property within the Tower Unit, insuring the interests of the Tower Unit Owner and its Permitted Tower Mortgagee in the applicable Tower Unit as their respective interests may appear.  Such insurance may, at the option of the Tower Unit Owner, be effected by a Homeowners HO-6 form (or its equivalent).  The Tower Unit Owner purchasing such policy shall be the named insured.  Subject to the requirements hereinafter and in subsection 6.5.2 set forth, Tower Unit Owners shall not be prohibited from carrying other insurance for their own benefit, and the Tower Board shall not be prohibited from requesting or seeking to cause the Condominium Board to carry other insurance, or from carrying insurance itself, for the benefit of the Residential Limited Common Elements, Tower Section or Tower Unit Owners.  To the

extent any party is insured, or is required hereunder to be insured, for loss or damage to property, each party will look to its own insurance policies for recovery.

6.5.2    All policies obtained by any Tower Unit Owner, or by the Tower Board on behalf of the Tower Section or the Tower Unit Owners, shall provide that the liability of the carriers issuing insurance obtained by the Condominium Board shall not be affected or diminished by reason of any additional insurance carried by the Tower Board or any other Unit Owner and shall contain a waiver of the insurer's right of subrogation against the Condominium Board, the Tower Board and any Unit Owner.

6.5.3    If the use of any Tower Unit causes an increase in the premium for the insurance which the Condominium Board or the Tower Board is required to obtain and maintain as set forth herein or otherwise, then the owner of such Tower Unit shall be obligated to pay to the Tower Board (which, to the extent appropriate, shall in turn pay any necessary sums to the Condominium Board), as additional Tower Common Charges, a sum equal to the amount of such increase attributable to such use.

6.5.4    All insurance policies carried by or on behalf of the Tower Board shall provide that adjustment of loss shall be made exclusively by the Tower Board if the loss involves only the Tower Section; in all other instances, the provisions of the Condominium By-Laws shall control as to adjustment of loss. The By-Laws of the Condominium shall also control as to those instances in which proceeds shall be payable to an Insurance Trustee.

6.6    Repair or Reconstruction after Fire or Other Casualty.

6.6.1    (a)    If any portion of the Property other than solely the Residential Section is damaged or destroyed by fire or other casualty, or if any portion of the Residential Section is damaged or destroyed together with any other portion of the Property, the provisions of the Condominium By-Laws shall control as to control over repair and restoration. In the event that solely the Tower Section (i.e., the Tower Units and Tower Limited Common Elements) or any part thereof is damaged or destroyed by fire or other casualty (unless, in accordance with the Condominium By-Laws, the Building is not to be repaired), the Tower Board will arrange for the prompt repair and restoration of the Tower Section (including each Tower Unit, but excluding improvements, betterments, equipment, furniture, furnishings or other personal property in any such Unit) and the Tower Board, or Insurance Trustee, as provided in the Condominium By-Laws, shall disburse the proceeds of all applicable insurance policies to the contractors engaged in such repair and restoration in appropriate progress payments.

(b)    If only the Tower Section is damaged or destroyed by fire or other casualty and the insurance proceeds are less than sufficient to cover, or exceed, the cost of repairs and restoration, the deficit or surplus, as the case may be, will be borne as a Tower Common Expense or profit, respectively, and shared by all Tower Unit Owners in proportion to their respective Common Interests. Any surplus allocable to any Tower Unit pursuant to this subsection 6.6.1 shall first be lessened by such amounts as may be required to discharge unpaid liens (other than mortgages which are not Permitted Tower Mortgages) on any such Unit in the order of priority of such liens, and the remaining surplus, if any, shall then be paid to the owner of such Unit. If any portion of the Property other than solely the Tower Section is damaged or destroyed by fire or other casualty, or if any portion of the Tower Section is damaged or destroyed together with any other portion of the Property, the provisions of the Condominium By-Laws shall control as to any deficit or surplus in insurance proceeds.

- 31 -

6.6.2    (a)    In the event that solely the Residential Limited Common Elements or any part thereof are damaged or destroyed by fire or other casualty (unless, in accordance with the Condominium By-Laws, the Building is not to be repaired), the Tower Board will arrange for the prompt repair and restoration of the Residential Limited Common Elements and the Tower Board, or Insurance Trustee, as provided in the Condominium By-Laws, shall disburse the proceeds of all applicable insurance policies to the contractors engaged in such repair and restoration in appropriate progress payments.

(b)    If only the Residential Limited Common Elements are damaged or destroyed by fire or other casualty and the insurance proceeds are less than sufficient to cover, or exceed, the cost of repairs and restoration, the deficit or surplus, as the case may be, will be borne as a Residential Common Expense or profit, respectively, and shared by the Base Unit Owner and all Tower Unit Owners in proportion to their respective Common Interests. Any surplus allocable to the Base Unit Owner and any Tower Unit pursuant to this subsection 6.6.2 shall first be lessened by such amounts as may be required to discharge unpaid liens (other than mortgages which are not Permitted Tower Mortgages) on any such Unit in the order of priority of such liens, and the remaining surplus, if any, shall then be paid to the owner of such Unit. If any portion of the Property other than solely the Residential Limited Common Elements damaged or destroyed by fire or other casualty, or if any portion of the Residential Limited Common Elements damaged or destroyed together with any other portion of the Property, the provisions of the Condominium By-Laws shall control as to any deficit or surplus in insurance proceeds.

6.7    <u>Maintenance and Repairs</u>.

6.7.1    Except as otherwise provided in the Declaration, the Condominium By-Laws or these Tower Section By-Laws, all painting, decorating, maintenance, repairs and replacements, whether structural or non-structural, ordinary or extraordinary, and all maintenance, repairs and replacements of all plumbing, heating and lighting fixtures, heating and air-conditioning units and appliances:  (i) in or to any Tower Unit (excluding General Common Elements, Residential Tower Limited Common Elements, Residential Limited Common Elements, Tower Limited Common Elements and any Private Elevators, except as otherwise provided in these Tower Section By-Laws) and the interior side of entrance doors thereto, shall be made by the owner of such Tower Unit at its sole cost and expense; provided that, except in the case of work to be done in Unsold Tower Units, the Owner of a Tower Unit utilizes only such contractors, workers or suppliers as are on the then approved list of the then managing agent of the Tower Section, which list may change from time to time in the sole discretion of such managing agent or the Tower Board and, to the extent applicable, complies with the provisions of Section 6.7 hereof and does not cause the Building to no longer be in compliance with the requirements of Section 11-245 of the New York City Administrative Code and the 421-a Restrictive Declaration during the 421-a benefit period; (ii) in or to the Tower Limited Common Elements shall be made by the Tower Board and the cost and expense thereof shall be shared by all Tower Unit Owners as a Tower Common Expense, in proportion to their respective Common Interests; and (iii) in or to the Residential Limited Common Elements shall be made by the Tower Board and the cost and expense thereof shall be shared by the Base Unit Owner and the Tower Section as a Residential Common Expense, in proportion to their respective Common Interests.

6.7.2    Notwithstanding the provisions of subsection 6.7.1:

- 32 -

(a)   In the event that any painting, decorating, maintenance, repairs or replacements to the Property or any part thereof (including, without limitation, any Unit) is necessitated by or attributable to the negligence, misuse, neglect or abuse of:  (i) any one or more Tower Unit Owner(s) or its or their tenants, agents, invitees, licensees or guests, the entire cost thereof shall be borne entirely by such Tower Unit Owner(s); or (ii) the Tower Board or its tenants, agents, invitees, licensees or guests, the entire cost thereof shall be charged to all Tower Unit Owners as a Tower Common Expense, except to the extent in any case that such cost is covered by the proceeds of any insurance maintained pursuant to the provisions hereof.

(b)   The interior and exterior glass surfaces of all windows located in any Tower Unit shall not be altered, colored or painted.  The exterior glass surfaces of all windows in the Residential Tower Building shall be washed and cleaned at the direction of the Condominium Board and the cost and expense thereof shall be charged to the Unit Owners as a Residential Tower Common Expense, on an allocated basis (as set forth in the Condominium By-Laws).  Similarly, any replacement of glass windows in any Unit, because of breakage or otherwise, shall be made by the Condominium Board, and charged to the Unit Owners as a Residential Tower Common Expense, on an allocated basis (as set forth in the Condominium By-Laws) (unless such breakage is caused by or attributable to the negligence, misuse, neglect or abuse of one or more Unit Owner(s) or its or their tenants, agents, invitees, licensees or guests, in which event such replacement of glass windows shall be made by the Condominium Board, at the expense of such Unit Owner(s).

(c)   All normal maintenance and repairs of any Tower Limited Common Element appurtenant to a Tower Unit shall be made by the Tower Unit Owner having access thereto, at its own cost and expense; any structural or extraordinary repairs or replacements thereto (including leaks) shall be made by the Tower Board and the cost and expense thereof shall be charged to all Tower Unit Owners as a Tower Common Expense, unless due to the negligence, misuse, neglect or abuse of such Tower Unit Owner or its tenant, agent, invitee, licensee or guest, in which event such Tower Unit Owner shall bear the entire cost thereof, and the same shall, for all purposes hereunder, constitute part of the Tower Common Charges payable by such Unit Owner.

(d)   No Tower Unit Owner (other than Tower Sponsor) may install, inscribe or expose any Signage on or at any window or any other part of the Common Elements.

(e)   Although the private elevators exclusively serving Tower Units PH-88A, PH-88B, PH-88C and PH-88D (the "Private Elevators") shall be deemed to be a part of the Units exclusively served by such Private Elevator,  the service provider and any service and maintenance agreements for such elevators shall be selected and entered into by the Tower Board, and the aggregate cost of such elevator maintenance agreements for the Private Elevators shall be paid equally by the Unit Owners of Tower Units containing Private Elevators as part of such Tower Unit Owner's Tower Common Charges.  However, the cost of any extraordinary maintenance and/or repairs for such Private Elevators (i.e., any maintenance and/or repairs not included in the cost of such elevator maintenance agreement or not otherwise covered by such agreement) shall be paid by the Tower Board and assessed as a special assessment against the Owner of the Tower Unit exclusively served by the Private Elevator requiring such repair and/or maintenance.

- 33 -

6.7.3   The Tower Limited Common Elements shall be kept in the condition and otherwise in a manner of quality and appearance consistent with standards appropriate for a first-class mixed use property of the size, location and composition of the Residential Tower Building by the Tower Unit Owner or the Tower Board, whichever is responsible for the maintenance thereof, under the Declaration, these Tower Section By-Laws or the Condominium By-Laws; and such Tower Unit Owner or the Tower Board shall promptly make or perform, or cause to be made or performed, all maintenance work, repairs and replacements necessary in connection therewith.  In addition, the public areas of the Tower Section and those areas which are exposed to public view shall be kept in good appearance, in conformity with the dignity and character of the Building, by:  (a) the Tower Board, with respect to such parts of the Building it is required to maintain under the Declaration, these Tower Section By-Laws or the Condominium By-Laws; and; (b) each Tower Unit Owner, with respect to the windows and shades, venetian or other blinds, drapes, curtains or other window decorations in or appurtenant to its Tower Unit, as well as those other areas of such Unit and its appurtenant Tower Limited Common Elements which are exposed to public view.  To promote a consistent appearance of the Residential Tower Building from outside, each Tower Unit Owner will be required to install and maintain window treatments having a white colored backing on the sides facing the windows in its Tower Unit.

6.7.4   In the event of an Emergency affecting the Condominium, Tower Section employees and employees of the Residential Section may assist the Condominium employees.

6.7.5   In the event that any Tower Unit Owner, within a reasonable time after receipt of written notice from the Tower Board, fails or neglects in any way to perform any of its obligations with respect to maintenance, repair or replacement in or to its Tower Unit as provided in this Article 6 or of any Common Element for which such Tower Unit Owner is responsible under the Declaration, the Condominium By-Laws or these Tower Section By-Laws, the Tower Board may perform or cause to be performed such maintenance, repair or replacement, unless such Tower Unit Owner, within ten (10) days after receiving notice of such default by the Tower Board (except in the event of an Emergency, in which case no notice is required), cures such default, or in the case of a default not reasonably susceptible to cure within such period, commences (within such ten (10) day period) and thereafter prosecutes to completion, with due diligence, the curing of such default.  All sums expended and all costs and expenses incurred in connection with the making of any such maintenance, repair or replacement in or to such Tower Unit Owner's Unit or to any such Common Element for which such Tower Unit Owner is responsible as aforesaid, together with interest thereon at the rate of 1.5% per month (but in no event in excess of the maximum rate permitted by Law), shall be immediately payable by such Tower Unit Owner to the Tower Board and shall, for all purposes hereunder, constitute part of the Tower Common Charges payable by such Tower Unit Owner.

6.8   Alterations of Tower Units.

6.8.1   Except as otherwise provided in the Declaration, the Condominium By-Laws or these Tower Section By-Laws:

(a)   (i) No Tower Unit Owner (other than Tower Sponsor) shall make any alteration, addition, improvement or repair in or to its Tower Unit which affects the structure or systems of the Building (including, without limitation, the mechanical, electrical, plumbing, heating, ventilating and/or air-conditioning systems thereof), without obtaining the prior written consent of the Tower Board thereto.  Prior to, and as a condition of, the granting of its consent to the making of any such alteration, addition, improvement or repair in or to a

- 34 -

Tower Unit, the Tower Board, at its option, may require the Tower Unit Owner to execute an agreement, in form and substance satisfactory to the Tower Board, setting forth the terms and conditions under which such alteration, addition, improvement or repair may be made; such agreement must be reviewed and approved by the Tower Board as a condition to performing such alteration work even if Tower Sponsor consented to such work.

(ii)     Notwithstanding anything otherwise herein contained to the contrary (whether in clause (i) above or otherwise), no Tower Unit Owner shall make, and the Tower Board shall not have the authority to consent to, any alteration, addition, improvement or repair to a Tower Unit which affects the structural elements or the systems (including, without limitation, the mechanical, electrical, plumbing, heating, ventilating and/or air-conditioning systems) of:  (x) the Building (including the General Common Elements and Residential Tower Limited Common Elements) without the Tower Board's obtaining the prior written consent thereto of the Condominium Board; (y) any portion of the CS Group without the Tower Board's obtaining the prior written consent thereto of the owner of such Unit; and/or (z) the Base Unit without the Tower Board's obtaining the prior written consent thereto of the owner of the Base Unit Owner.  In each of the foregoing cases, the Tower Unit Owner seeking to perform such work requiring such consent(s) shall be liable for all costs and expenses incurred by the Tower Board in obtaining such consent(s).

(b)     All repairs which would affect the structure or the systems of the Building (including, without limitation, the mechanical, electrical, plumbing, heating, ventilating and/or air-conditioning systems thereof) and all Alterations to any Tower Unit shall be made in accordance with plans and specifications, which plans and specifications shall be:  (1) subject to review and approval by the Tower Board, in the case of Alterations to which the consent of the Tower Board is otherwise required under subsection 6.8.1(a); (2) subject to review and approval by the Condominium Board, in the case of Alterations to which the consent of the Condominium Board is otherwise required under Article 8 of the Condominium By-Laws; (3) subject to the approval of the CS Unit Owner, CS LL Unit Owner and CS MS Unit Owner, as applicable, in the case of Alterations to which the consent of such Unit Owner(s) is otherwise required under Article 8 of the Condominium By-Laws; and/or (4) subject to the approval of the appropriate Base Unit Owner in the case of Alterations to which the consent of the Base Unit Owner is otherwise required under Article 8 of the Condominium By-Laws.

6.8.2    All Alterations by a Tower Unit Owner shall be performed:

(a)     at the Tower Unit Owner's sole cost and expense (including, without limitation, the reasonable costs of the Base Unit Owner, the Tower Board and/or the Condominium Board, as the case may be, incurred in reviewing and approving such Tower Unit Owner's submission for approval and in monitoring such Tower Unit Owner's compliance with the provisions of this Section 6.8);

(b)     only after obtaining such insurance, naming the Condominium Board, the Base Unit Owner and the Tower Board, and the managing agent(s) thereof, and any affected Unit Owner(s) as additional insureds, as such Boards or such managing agent(s) or such Unit Owner(s) may reasonably require;

(c)     in compliance with the Declaration, these Tower Section By-Laws, the Condominium By-Laws, the General Rules and Regulations (if any), the Tower Section Rules and Regulations, and all Laws (including, without limitation, those regarding licensing

- 35 -

of contractors, obtaining of all necessary governmental permits, authorizations, certificates and licenses for the commencement and completion of any Alterations and obtaining of any amendment to the certificate of occupancy for such Tower Unit, if necessary);

(d)   in a manner which will not interfere with, or cause any labor disturbances or stoppages in, the work of Condominium, Base Unit or CS Group's employees or other contractors or subcontractors employed in the Units or the Building; and

(e)       (i) only during such days and hours as may be specified by the Tower Board in its reasonable judgment; and (ii) employing such architects, engineers, contractors, subcontractors, suppliers and other laborers who are on the then approved list of the then managing agent of the Tower Section, as such list may change from time to time, in the sole discretion of the Tower Board or its managing agent.

The Tower Unit Owner performing, permitting, suffering or causing such Alterations to be performed shall, if required either by the Condominium Board and/or the Tower Board, pay the cost of: (x) any necessary amendment of the Declaration and the Floor Plans of the Condominium, if appropriate, to reflect any such Alterations; (y) obtaining all necessary governmental permits, authorizations, certificates and licenses for the commencement and completion of any Alterations (copies of which shall be delivered to the Tower Board (which shall, as appropriate, also cause copies to be delivered to the Condominium Board) promptly after the issuance thereof and prior to the commencement of any Alterations), and obtaining any amendment to the certificate of occupancy for such Tower Unit, if necessary; and (z) any reasonable architectural, engineering and legal fees incurred by the Condominium Board or the Tower Board, as appropriate, in connection with such work.  Neither the Condominium Board, the Base Unit Owner, the Tower Board nor any Unit Owner (other than the Tower Unit Owner making, permitting, suffering or causing any Alterations to be made in or to its Unit) shall incur any liability, cost or expense either: (1) in connection with the preparation, execution or submission of the applications referred to above; (2) to any contractor, subcontractor, supplier, architect, engineer or laborer on account of any Alterations made, or permitted or caused to be made, by any Tower Unit Owner; (3) to any person or entity asserting any claim for personal injury or property damage arising therefrom; or (4) arising out of a Tower Unit Owner's failure to obtain any permit, authorization, certificate or license, or to comply with the Declaration, the Condominium By-Laws, these Tower Section By-Laws, the General Rules and Regulations (if any), the Tower Section Rules and Regulations, and the provisions of any Laws insofar as the same relates to Alterations.  A Tower Unit Owner making, or causing, permitting or suffering any tenant or occupant to make, any Alteration shall be deemed to have agreed to indemnify and hold MTA, in its capacity as Declarant, the Condominium Board, the Base Unit Owner and the Tower Board, the managing agents thereof and all other Unit Owners harmless from and against any liability, loss, cost, or expense arising therefrom, and from and against any and all loss, cost, expense (including, but not limited to, attorneys' fees and disbursements), damage, injury or liability, whether direct, indirect or consequential, resulting from, arising out of, or in any way connected with, any of the foregoing.

6.8.3   Any application to any department of The City of New York or to any other governmental authority having jurisdiction thereof for a permit to make an Alteration in or to any Tower Unit shall, if and to the extent required by Law or such department or authority, be executed by the Condominium Board, the Tower Board and/or, if affected, the Base Unit Owner, in the case of an Alteration which such party has approved (or for which its approval is not required), provided that the Condominium Board, the Tower Board and the Base Unit Owner

shall not incur any liability, cost or expense in connection with or by reason of executing such application.

6.8.4   Notwithstanding anything to the contrary contained in this Section 6.8 (but subject to all Laws), the Tower Sponsor shall have the right pursuant (and subject) to the terms of the Declaration, without the approval of the Tower Board, the Condominium Board or any other Unit Owner:  (i) to make any alterations, additions, improvements and repairs in or to any Unsold Tower Units, whether structural or non-structural, interior or exterior, ordinary or extraordinary (including, without limitation, those required under the Offering Plan and any Option Agreement or otherwise); and (ii) to subdivide, combine and change the boundary walls of Unsold Tower Units.  Additionally, an initial purchaser of any Unsold Tower Unit shall have the right, without approval of the Tower Board, to make any Alterations in or to its Tower Unit, provided that the Tower Sponsor shall have consented to the same in writing at or prior to the closing of title to such Tower Unit (which consent may be withheld or conditioned in the Tower Sponsor's sole discretion) and that such purchaser complies with all of the other requirements of this Section 6.8, including, without limitation, the alteration agreement set forth in Section 6.8.1(a) hereof.

6.8.5   In addition to the requirements set forth above in this Section 6.8, until a permanent certificate of occupancy is obtained for the Building, no Tower Unit Owner shall make any Alterations in or to its Tower Unit without first notifying the Tower Sponsor of the same in writing and complying with the requirements of the Tower Sponsor with respect to the same.  Such requirements may include, but need not be limited to, the following:

(a)      such work not include any change that would result in a delay in obtaining a temporary or permanent certificate of occupancy for the Tower Section and/or the Building, or any amendment to, or extension of, the same if theretofore issued;

(b)      such Tower Unit Owner post a bond or other similar security that is reasonably acceptable to the Tower Sponsor in an amount sufficient (in the Tower Sponsor's reasonable judgment) to insure the diligent completion of the work and the filing of any required notices or certificates with respect to such work and the completion of the same with all governmental authorities having jurisdiction;

(c)      such work not be commenced until such Tower Unit Owner causes all required plans, specifications, notices and/or certifications to be filed with all governmental authorities having jurisdiction, procures all required permits and licenses with respect to the same, and delivers copies of all such plans, specifications, notices, certifications, permits and licenses to the Tower Sponsor;

(d)      such work be diligently prosecuted to completion in compliance with all plans, specifications, notices and/or certifications and in conformity with all permits and licenses;

(e)      Tower Sponsor and its representatives be given reasonable opportunity, from time to time, to inspect such work as it progresses;

(f)      promptly after the completion of such work, all necessary inspections and approvals of the same be obtained, all necessary notices and/or certifications be filed with the appropriate governmental authorities and the Tower Sponsor each be given a copy of all such inspections, approvals, notices and certifications;

- 37 -

(g)      such Tower Unit Owner indemnify and hold MTA, in its capacity as Declarant, and Tower Sponsor harmless from any cost, expense, claim, or liability arising, directly or indirectly, from such work, including, without limitation, any cost, expense, claim or liability incurred or suffered by any of them due to any delay in obtaining a temporary or permanent certificate of occupancy for the Building (or any amendment to, or extension of, the same if theretofore issued) as a result of such work or the failure to timely make all appropriate governmental filings in connection with the same; and

(h)      all contractors shall be duly licensed to the extent required by applicable Laws and, if required under any contract with any union whose members are performing services at the Building (including, without limitation, services directly or indirectly at the behest, for the benefit, or for the account of the Tower Sponsor, any other Unit Owner or the Condominium Board or the Tower Board), such work shall be performed solely by union members.

If any Tower Unit Owner commences any such Alterations in violation of the foregoing terms and conditions of this subsection 6.8.5, or fails to comply with the requirements of the Tower Sponsor in connection with the same, the Tower Sponsor shall be entitled to cause such work by such Tower Unit Owner to be halted, including, without limitation, causing the managing agent to deny access to the Building to such Tower Unit Owner's workers and suppliers, until such Tower Unit Owner so complies. During the period until such Tower Unit Owner is permitted hereunder to resume its work, the Tower Sponsor shall have the right to cause to be performed (whether by the Tower Sponsor or otherwise) any and all work in and to such Tower Unit Owner's Unit as shall be necessary, in such party's sole judgment, in order to avoid any delay in obtaining a temporary or permanent certificate of occupancy for the Building (or any amendment to, or extension of, the same if theretofore issued), whether or not such work shall be in compliance with the plans and specifications for the work theretofore performed by, or on behalf of, such Tower Unit Owner. The cost and expense of any such work so performed shall be borne by such Tower Unit Owner and shall be paid to the Tower Sponsor, as designated by such parties, within fifteen (15) days following written demand therefor.

6.8.6   In the event that a dispute arises between any Tower Unit Owner and the Condominium Board, the Tower Board or the Base Unit Owner, as the case may be, regarding any Alteration subject to the approval of either such Board or the Base Unit Owner (including, without limitation, the determination of whether any work constitutes an Alteration subject to the approval of either such Board or the Base Unit Owner), or if a dispute arises between a Tower Unit Owner and the Tower Sponsor in respect of subsection 6.8.5, such dispute shall be submitted to Arbitration, provided that the parties shall cause such Arbitration to proceed in an expedited manner.

6.9      Alterations to Tower Limited Common Elements. Except as otherwise provided in the Declaration, the Condominium By-Laws or these Tower Section By-Laws, all alterations, additions or improvements in or to any Tower Limited Common Elements shall be made by the Tower Board or by the Tower Unit Owner(s) required to maintain and repair such Common Element and the cost thereof shall be charged either to all Tower Unit Owners as a Tower Common Expense, or to the Tower Unit Owner(s) responsible therefor, as the case may be. Whenever the cost of any such alterations, additions or improvements chargeable to the Tower Board is capital in nature and would, in the judgment of the Board, exceed $1,000,000 in the aggregate in any calendar year or $3,000,000 in the aggregate (subject to increase by the CPI Increase Factor), then such proposed alteration, addition or improvement shall not be made

unless first approved by a Majority in Interest of the Tower Unit Owners required to bear the cost and expense thereof in accordance with the foregoing and by a majority of the Tower Mortgagee Representatives; provided that if the aforesaid is in the nature of a non-capital repair or is necessary to comply with Laws or a proper work order of an insurer of the Property, or for the health or safety (but not the general comfort or welfare) of the residents or occupants of the Property, such consent shall not be required.  In any such event, the Tower Board may, in its direction, assess each Tower Unit Owner liable therefor for its pro-rata share of the cost of such alterations, additions and improvements, according to its respective Common Interest, as part of the Tower Common Charges.  Any additions, alterations, or improvements costing the amounts set forth above or less, in the aggregate, in any calendar year may be made by the Tower Board without the approval of the Tower Unit Owners or the Tower Mortgage Representatives.  The amounts set forth in this Section 6.9 shall be adjusted to reflect any increase in the CPI Increase Factor.

6.10    Use of Tower Units.  A Tower Unit may be used only as a residence and, subject to compliance with these Tower Section By-Laws, for a lawful home occupation, as defined in the Zoning Resolution of the City of New York; provided, however, Unsold Tower Units may be used for any legally permitted purpose, subject to Section 8.5 of the Condominium Declaration, the certificate of occupancy and any applicable Zoning Lots Development Agreement.  A Tower Unit may only be occupied by: (i) any individual who is a Tower Unit Owner or permitted lessee; (ii) any officer, director or shareholder of any corporation which is a Tower Unit Owner or permitted lessee; (iii) any partner of any partnership which is a Tower Unit Owner or permitted lessee; (iv) any member of any limited liability company which is a Tower Unit Owner or permitted lessee; (v) the fiduciary or beneficiary of any fiduciary which is a Tower Unit Owner or permitted lessee; (vi) any principal or employee of any other entity (including, but not limited to, embassies and consulates of foreign governments) which is a Tower Unit Owner or permitted lessee; provided that in each instance in clauses (ii) through (vi) above: (A) the designated officer, director, shareholder, partner, member, fiduciary, beneficiary, principal or employee is designated as the primary occupant of the Tower Unit and is not being designated to use the Tower Unit on a transient basis or as other than the primary occupant; and (B) such use is not, in fact or in effect, part of or in furtherance of a program, plan, entity, agreement or other arrangement providing for short-term, fractional or shared use and/or ownership of such Unit; and (vii) family members, domestic employees and/or non-paying guests of any of the foregoing.

6.11    Licensing, Assignment and Use of Storage Lockers, Wine Lockers and Wine Cellars.

6.11.1  Permitted Licensees.

(a)  Any Tower Unit Owner assigned a storage locker (each a "Storage Locker") in the Building will be required to execute a license agreement to use such space (a "Storage Locker License Agreement") governing the use of the space.  To protect the security of the Building, the holder (a "Storage Licensee") of a license to use such space (a "Storage License") must at all times be the owner of a Tower Unit, provided, however, that the foregoing restriction shall not apply: (i) to Tower Sponsor or its designee (and Tower Sponsor may permit the use of an unlicensed Storage Locker by any party); or (ii) to the Tower Board or their designees.  If at any time a Storage Licensee sells its Tower Unit and no longer owns any Tower Units in the Building, it shall simultaneously assign its Storage License to another owner of a Tower Unit, and if it fails to do so, the Storage License shall automatically terminate without any action or notice required by the Tower Board at such time as a Storage

Licensee no longer owns a Tower Unit. If a Storage License is terminated pursuant to the immediately preceding sentence or otherwise by the Tower Board pursuant to the Storage License Agreement, or if a Tower Unit Owner surrenders a Storage License without assigning such Storage License to another Tower Unit Owner, the Tower Board shall have the right to take possession of the same and/or issue a new Storage License for such space upon terms and conditions determined in its sole discretion and without compensation to the Storage Licensee.

(b) Any Tower Unit Owner assigned a wine locker (each a "Wine Locker") or wine cellar (each a "Wine Cellar") in the Building will be required to execute a license agreement to use such space (a "Wine Storage License Agreement") governing the use of the space. To protect the security of the Building, the holder (a "Wine Storage Licensee") of a license to use such space (a "Wine Storage License") must at all times be the owner of a Tower Unit, provided, however, that the foregoing restriction shall not apply: (i) to Tower Sponsor or its designee (and Tower Sponsor may permit the use of an unlicensed Wine Locker or unlicensed Wine Cellar by any party); or (ii) to the Tower Board or their designees. If at any time a Wine Storage Licensee sells its Tower Unit and no longer owns any Tower Units in the Building, it shall simultaneously assign its Wine Storage License to another owner of a Tower Unit, and if it fails to do so, the Wine Storage License shall automatically terminate without any action or notice required by the Tower Board at such time as a Wine Storage Licensee no longer owns a Tower Unit. If a Wine Storage License is terminated pursuant to the immediately preceding sentence or otherwise by the Tower Board pursuant to the Wine License Agreement, or if a Tower Unit Owner surrenders a Wine Storage License without assigning such Wine Storage License to another Tower Unit Owner, the Tower Board shall have the right to take possession of the same and/or issue a new Wine Storage License for such space upon terms and conditions determined in its sole discretion and without compensation to the Wine Storage Licensee.

6.11.2 Assignment.

(a) Upon the issuance of a Storage License or Wine Storage License, as the case may be, to a Tower Unit Owner, such Tower Unit Owner may assign such Storage License or Wine Storage License, as the case may be, provided (i) the assignee is a Tower Unit Owner and assumes the obligations under the Storage License Agreement or Wine Storage License Agreement, as the case may, pursuant to the assignment and assumption agreement in the form annexed to such Storage Locker License Agreement or Wine Storage License Agreement, as applicable; (ii) notification of the assignment is delivered in writing to the Tower Board in compliance with the requirements of such Storage Locker License Agreement or Wine Storage License Agreement (which assignment shall require and be effective only upon the consent of the Tower Board, which consent shall be granted provided the terms of such Storage Locker License Agreement or Wine Storage License Agreement, as applicable, regarding such assignment have been otherwise complied with); and (iii) no outstanding monies are owed to the Tower Board or Condominium Board by the holder of such license and/or the assignee. Neither Tower Sponsor, the Tower Board nor the Condominium Board shall have any liability or obligation with respect to a private assignment of a Storage License or Wine Storage License.

(b) With regard to a Storage Locker, Wine Cellar or Wine Locker held by Tower Sponsor or its designees or the Tower Board, the foregoing provisions with regard to assignment thereof do not apply to Tower Sponsor or its designee or the Tower Board.

(c) The Tower Board has the authority to promulgate additional rules regarding the use of and access to the Storage Lockers, Wine Cellars and Wine Lockers and the procedures for assigning such Storage Licenses or Wine Storage License, as the case may be, which rules shall not be applicable to Tower Sponsor or its designee.

### 6.11.3 Use and Maintenance.

(a) Subject to the certificate of occupancy for the Building, a Storage Locker may only be used for storage purposes. In no event may any Storage Locker be used as a dwelling space or for storing property which (a) constitutes an inflammable, combustible, explosive or other dangerous item; (b) has an objectionable odor; or (c) is deemed by Tower Sponsor or the Tower Board, in its sole and absolute discretion, not to be in conformity with the general welfare of the Building or which interferes with the peaceful possession and proper use of the Condominium by its occupants. The Rules and Regulations which are applicable to a Tower Unit and/or the Tower Unit Owner shall also be applicable to a Storage Locker and/or a licensee thereof. Notwithstanding the foregoing, Tower Sponsor or its designee shall have the right to use any unlicensed Storage Lockers for any lawful purpose or to change the permitted use of any unlicensed Storage Lockers subject, however, to the provisions of the Declaration and this Article 6 of the Tower Section By-Laws. A Storage Licensee shall, at all times, use his or her assigned Storage Locker only in a manner which is in full compliance with all present and future laws, orders, rules and regulations of all state, federal, municipal and local governments, departments, commissions and boards (including the New York Board of Fire Underwriters or any similar body) asserting jurisdiction therefor, or any direction of any public officer pursuant to law, including, without limitation, the police and fire departments of the City of New York, which may require the removal or destruction of items stored in a Storage Locker.

(b) Subject to the certificate of occupancy for the Building, a Wine Cellar or Wine Locker may only be used for the storage of wine and other beverages. In no event may any Wine Cellar or Wine Locker be used as a dwelling space or for storing property which (a) constitutes an inflammable, combustible, explosive or other dangerous item; (b) has an objectionable odor; or (c) is deemed by Tower Sponsor or the Tower Board, in its sole and absolute discretion, not to be in conformity with the general welfare of the Building or which interferes with the peaceful possession and proper use of the Condominium by its occupants. The Rules and Regulations which are applicable to a Tower Unit and/or the Tower Unit Owner shall also be applicable to a Wine Cellar, Wine Locker and/or a licensee thereof. Notwithstanding the foregoing, Tower Sponsor or its designee shall have the right to use any unlicensed Wine Cellars and/or Wine Lockers for any lawful purpose or to change the permitted use of any unlicensed Wine Cellars and/or Wine Lockers subject, however, to the provisions of the Declaration and this Article 6 of the Tower Section By-Laws. A Wine Storage Licensee shall, at all times, use his or her assigned Wine Cellar or Wine Locker only in a manner which is in full compliance with all present and future laws, orders, rules and regulations of all state, federal, municipal and local governments, departments, commissions and boards (including the New York Board of Fire Underwriters or any similar body) asserting jurisdiction therefor, or any direction of any public officer pursuant to law, including, without limitation, the police and fire departments of the City of New York, which may require the removal or destruction of items stored in a Wine Cellar or Wine Locker.

6.11.4 A Storage Licensee or Wine Storage Licensee, as the case may be, shall not (a) interfere with another Storage Licensee or Wine Storage Licensee, as the case may be, in

connection with the access to or use of its licensed space; (b) store all or any portion of its possessions outside the licensed space; (c) allow any other person to use his or her assigned licensed space except in accordance with the terms hereof; or (d) deface, damage or alter his or her assigned licensed space, the Building, the Common Elements or any equipment of the Condominium Board, Tower Board or Tower Sponsor.

6.11.5 Since the Storage Lockers are located at the Cellar Floor, a below grade area, neither the Condominium Board, Tower Board nor Tower Sponsor can make any representation that the Storage Lockers will remain dry or will not experience any water infiltration and neither the Condominium Board, Tower Board nor Tower Sponsor will be responsible for any damage to items stored within the Storage Lockers. Tower Unit Owners who store items in the Storage Lockers, Wine Cellars and/or Wine Lockers do so at their own risk and Tower Unit Owners are advised to consult with their insurance brokers regarding appropriate coverage for such stored items. Tower Unit Owners must comply with applicable Laws regarding the Storage Lockers, Wine Cellars and Wine Lockers, which may be subject to periodic inspection by the police and fire departments of the City of New York and other governmental agencies having jurisdiction thereover.

6.11.6 Holders of Storage Licenses for the Storage Lockers in the storage area (the "Storage Area") will be required to pay a license fee to the Tower Section which shall, for the projected First Year of Tower Section Operation initially be in an amount equal to the amount shown on Schedule A to the Offering Plan, which amount shall, following the fifth anniversary of the First Closing, be subject to annual increases based upon the CPI Increase Factor. Tower Sponsor or the Tower Board shall not be responsible for paying the aforementioned monthly license fee for unlicensed Storage Lockers. The Tower Board shall have, without limitation, the same rights and remedies with respect to the collection of such license fees as it does with respect to Common Charges.

6.11.7 Holders of Wine Storage Licenses will be required to pay a license fee to the Tower Section which shall, for the projected First Year of Tower Section Operation initially be in an amount equal to the amount shown on Schedule A, which amount shall, following the fifth anniversary of the First Closing, be subject to annual increases based upon the CPI Increase Factor. Additionally, the aggregate cost for the electricity serving each Wine Cellar or Wine Locker in the wine storage area (the "Wine Room") shall be metered along with the other Tower Limited Common Elements and costs for such electricity shall be borne by all Tower Unit Owners as part of all Tower Unit Owner's Tower Common Charges. Tower Sponsor or the Tower Board shall not be responsible for paying the aforementioned monthly license fee for unlicensed Wine Cellars or Wine Lockers. The Tower Board shall have, without limitation, the same rights and remedies with respect to the collection of such license fees as it does with respect to Common Charges.

6.11.8 Storage Licensees shall, at all times, keep in full force and effect, insurance covering any items stored in the Storage Locker and any property contained therein as well as coverage for liability with minimum limits of liability of as set forth in the Storage Licensee's Storage Locker License Agreement, and shall waive its insurer's right of subrogation against Tower Sponsor, the Tower Board and/or the Condominium Board.

6.11.9 Wine Storage Licensees shall, at all times, keep in full force and effect, insurance covering any items stored in the Wine Cellar and/or Wine Locker and any property contained therein as well as coverage for liability with minimum limits of liability of as set forth

in the Wine Storage Licensee's Wine Storage License Agreement, and shall waive its insurer's right of subrogation against Tower Sponsor, the Tower Board and/or the Condominium Board.

6.11.10    Upon the issuance of a Storage License or Wine Storage License, as the case may be, to a Tower Unit Owner or the transfer of a Storage License or Wine Storage License, as the case may be, to an assignee, such Tower Unit Owner or assignee, as the case may be, shall provide the Tower Managing Agent with a copy of such Storage License or Wine Storage License.

6.11.11    Tower Sponsor reserves the right to reconfigure, change, combine, relocate and/or modify the Storage Area, Wine Room or any portion thereof, and the number and size of the Storage Lockers, Wine Cellars and/or Wine Lockers by, among other things, reconfiguring the Storage Area and/or Wine Room, in connection therewith, re-designating in an amendment to the Declaration a portion of any Tower Limited Common Element space (other than such Tower Limited Common Element spaces which are used for ingress or egress to the Residential Tower Building or otherwise similarly used at the time for Building operations), as part of the Storage Area or Wine Room. Tower Sponsor expressly reserves the right to effect such changes and to amend the Offering Plan so as to reflect the same. Tower Sponsor will maintain necessary permits and approvals required by the New York City Department of Buildings in connection with the foregoing work.

6.11.12    Tower Sponsor (or its designee), in its own name or in the name of the Tower Board, shall have the exclusive right to offer for sale and initially issue Storage Licenses for Storage Lockers and Wine Storage Licenses for Wine Cellars and Wine Lockers and to retain the proceeds thereof. Tower Sponsor's rights hereunder shall include the right, hereby reserved, of Tower Sponsor to increase the number of Storage Lockers, Wine Cellars and/or Wine Lockers, as permitted by applicable law, and offer for sale and initially issue Storage Licenses and/or Wine Storage Licenses therefor.

6.12    Use of Residential Limited Common Elements and Tower Limited Common Elements.

6.12.1 Except as otherwise provided herein, in the Condominium By-Laws or in the Declaration, Residential Limited Common Elements and Tower Limited Common Elements may be used only for the furnishing of the services and facilities and for the other uses for which they are reasonably suited.

6.12.2

(a)    In no event shall any Tower Unit Owner impair, restrict or impede the use of the Residential Limited Common Elements by any other Tower Unit Owner(s) or anyone claiming by, through or under any other Unit Owner(s), including, but not limited to, the tenants and occupants of the Base Unit and their respective licensees or invitees.

(b)    In no event shall any Tower Unit Owner impair, restrict or impede the use of the Tower Limited Common Elements by any other Tower Unit Owner(s) or anyone claiming by, through or under any other Unit Owner(s), including, but not limited to, the tenants and occupants of the Base Unit and their respective licensees or invitees.

6.12.3 Notwithstanding the foregoing subsections of this Section:

- 43 -

(a)   The owner or owners of any one or more Tower Units, which Tower Unit or Units are the only Tower Unit or Units serviced or benefited by any Tower Limited Common Element adjacent or appurtenant thereto (for example, that portion at the end of any hallway which is directly adjacent to any such Tower Units located on opposite sides of such hallway) and not affecting access or service (including, without limitation, heating, ventilating and air-conditioning) to any other Unit or to any other portion of the Common Elements shall, to the extent permitted by Laws and subject to the consent of the Tower Board (which consent shall not be unreasonably withheld and shall not be required if such Tower Unit Owner or Owners shall be the Tower Sponsor or such Units shall be Unsold Tower Units), have the exclusive right to use that portion of the Tower Limited Common Elements, as applicable, as if it were a part of such Tower Units (including the right, in the above example of a portion of a hallway, to enclose such portion) and no amendment to the Declaration nor reallocation of Common Interests shall be made by reason thereof; provided, however, that notwithstanding the provisions of subsection 6.7.1 hereof, such Tower Unit Owner or Owners, at their sole cost and expense: (a) shall be responsible for the operation, maintenance and repair of that portion of the Tower Limited Common Elements for so long as such Tower Unit Owner or Owners exercise such exclusive right of use; and (b) shall restore that portion of the Tower Limited Common Elements to its original condition, reasonable wear and tear excepted, after such Tower Unit Owner or Owners cease to exercise such exclusive right of use.

(b)   Elevator landings which serve fewer than three (3) Tower Units may be decorated and/or furnished by the adjoining Tower Unit Owners as they desire, but subject to the provisions of these Tower Section By-Laws (including, without limitation, subsection 6.7.3 and Section 6.8), at their expense, provided that each such Tower Unit Owner consents in writing thereto, and the Tower Board gives its written consent to such decoration and/or furnishing, which consent of the Tower Board may be granted or withheld in such board's sole discretion. After an elevator landing is decorated and/or furnished by the Tower Unit Owners serviced by the same, then, notwithstanding the provisions of subsection 6.7.1 hereof, the owners of such Tower Units, and not the Tower Board, will be responsible for keeping the decor and furnishings in a first class condition and state of repair and for performing, at their joint expense, all repairs and maintenance necessary or desirable in order to accomplish the same.

(c)   The Tower Sponsor or any owner of Unsold Tower Units shall have the right, until the tenth anniversary of the First Tower Unit Closing, to use portions of the Tower Section or Residential Limited Common Elements, without charge, for exhibitions or other promotional functions with respect to a sales program in respect of such Unsold Units or otherwise.

6.12.4  <u>Pet Facility Area.</u>

(a)   The Pet Facility Area, located on the Lower Level Lobby, is a Tower Limited Common Element. Tower Sponsor has and shall retain the ongoing right to use such Tower Limited Common Elements pursuant to license agreement(s) with the Tower Board, for an annual fee of $1, and the Tower Board shall be obligated to enter into such license agreement(s) with Tower Sponsor or Tower Sponsor's designee (including an affiliate of Tower Sponsor) at Tower Sponsor's request, as more particularly set forth in Section 8.16 of the Declaration.

(b)   Tower Sponsor and Tower Sponsor's designee (including an affiliate of Tower Sponsor) shall have the right to use and/or sublicense any such space so licensed for a pet services, pet amenities and uses ancillary thereto or otherwise, even when Tower Sponsor no longer owns any Units the Condominium.

(c)   Tower Sponsor or Tower Sponsor's designee (including an affiliate of Tower Sponsor) has and shall retain the right to collect a fee for any such sublicenses or other use fees it collects in connection with the use of such space.

(d)   The Tower Board shall not be entitled to any rent or fees in connection with the licensing of such space.  Tower Sponsor or Tower Sponsor's designee has and shall retain the right to charge customers, including Unit Owners, for services and use of the Pet Facility Area.

6.12.5  <u>Tower Section Amenities.</u>  Sponsor and the Tower Board reserve the right to charge a fee for the reservation and use of the amenity areas in the Tower Section, including, but not limited to, the Aquatics Center with swimming pool, whirlpool, men's and women's spa facilities including lockers, showers, sauna and steam rooms, Private Spa with treatment rooms, beauty bar, fitness club, Private Movement Studio for yoga and stretching, and children's Imagination Center; lounges, atelier, club room, screening and performance room, business center with dual conference rooms, Private Dining Suite with chef's kitchen and dining area, pre-function bar area and catering kitchen, and Golf Club Lounge, dining room, and outdoor amenity rooftop terrace.

6.13   <u>General Provisions as to Use.</u>

6.13.1  No nuisance shall be allowed in the Tower Section or Residential Limited Common Elements nor shall any use or practices be allowed in the Tower Section or Residential Limited Common Elements which interfere with the peaceful possession or proper use thereof by its occupants.  No unlawful use shall be made of the Tower Section or Residential Limited Common Elements or any portion thereof.  All Laws relating to any portion of the Tower Section or Residential Limited Common Elements shall be complied with at the sole expense of whichever of the Unit Owners or the Tower Board or the Condominium Board shall have the obligation to maintain or repair such portion.  In no event may all or any portion of the Tower Section or Residential Limited Common Elements be used for any pornographic purpose or as an adult book, video or paraphernalia store, peep show or adult entertainment facility.

6.13.2  The Tower Board may, in its discretion, grant permission for the use of a Tower Unit for a use other than its original intended use, provided such use is permitted by Law, does not violate the then existing certificate of occupancy for such Unit, the Declaration, these Tower Section By-Laws or the Condominium By-Laws, and the Tower Unit Owner thereof complies with all applicable Laws.

6.13.3  The Tower Sponsor, without the permission of the Tower Board, may: (a) use or grant permission for the use of any Unsold Tower Unit for any purpose, provided such use is permitted by Law, does not violate the then existing certificate of occupancy for such Tower Unit and the user of such Tower Unit complies with all applicable Laws; (b) use any one or more Unsold Tower Units as sales and/or leasing offices in connection with the sale or rental of the Tower Units or for any other purpose, subject only to compliance with applicable Laws; and (c) lease Unsold Tower Units to any party(ies).

- 45 -

6.14    Right of Access.

6.14.1  Each Tower Unit Owner grants a right of access to its Tower Unit to the Tower Board and the Condominium Board, Electric Service Supplier, the managing agents, superintendents and/or any other person authorized by any of the foregoing, for the purposes, among others, of: making inspections of, or removing violations noted or issued by any governmental authority against, the Common Elements or any other part of the Property; curing defaults hereunder or under the Declaration, the Condominium By-Laws, the Tower Section Rules and Regulations or the General Rules and Regulations (if any) by such Tower Unit Owner or correcting any conditions originating in its Tower Unit and having a reasonably likelihood of causing damage to another Unit or all or any part of the Common Elements; performing maintenance, installations, alterations, repairs or replacements to the mechanical or electrical services or other portions of the Common Elements within its Tower Unit or elsewhere in the Building; reading, maintaining or replacing utility meters relating to the Common Elements, its Tower Unit or any other Unit in the Building; or correcting any condition which violates the provisions of any Permitted Tower Mortgage covering another Unit; provided that (a) requests for entry to any Tower Unit are made not less than one (1) day in advance, and (b) any such right shall be exercised in such a manner as will not unreasonably interfere with the use of the Tower Units for their permitted purposes.  In case of an Emergency, such right of entry shall be immediate (and, in addition to the Tower Board and the Condominium Board, shall also, only in such case, run in favor of the Base Unit Owner), without advance notice, whether or not the Tower Unit Owner or tenant is present.

6.14.2  Each Tower Unit Owner grants a right of access to its Tower Unit and any Tower Limited Common Elements appurtenant thereto, and the Tower Board grant rights of access to the Residential Limited Common Elements and Tower Limited Common Elements to: (a) The Tower Sponsor, Developer and their respective contractors, subcontractors, agents and employees, for the purpose of complying with and fulfilling each such party's obligations as set forth in the Offering Plan and other documents relating to the construction, development and operation of the Property, provided that access thereto shall be exercised by such party, with respect to any Tower Unit or appurtenant Tower Limited Common Element, in such a manner as will not unreasonably interfere with the use of such Tower Unit and/or Tower Limited Common Element for its or their permitted purposes; and (b) the CS MS Unit Owner and the Base Unit Owner and its respective contractors, subcontractors, agents and employees, for the purpose of complying with and fulfilling each such party's obligations under their respective Development Agreements and other documents relating to the construction, development and operation of the Property, provided that access thereto shall be exercised by each such party, with respect to any Tower Unit or appurtenant Tower Limited Common Element, in such a manner as will not unreasonably interfere with the use of such Tower Unit and/or Tower Limited Common Element for its or their permitted purposes.

6.15    Rules and Regulations.  Annexed hereto as Exhibit A and made a part hereof is rules and regulations (the "Tower Section Rules and Regulations") concerning the use of the Tower Units, the Residential Limited Common Elements and the Tower Limited Common Elements.  The Tower Board may from time to time modify, amend or add to such Tower Section Rules and Regulations, except that: (x) a Majority of Tower Unit Owners may overrule the Tower Board with respect to any such modifications, amendments or additions; and (y) no adoption, modification, amendment or addition affecting the Tower Sponsor or the Unsold Tower Units may be made unless agreed to, in writing, by the Tower Sponsor, or by all the owners of such Unsold Tower Units who are affected by such adoption, modification,

- 46 -

amendment or addition, as the case may be. Copies of any newly adopted Tower Section Rules and Regulations, or any modifications, amendments or additions thereto shall be furnished by the Tower Board to each Tower Unit Owner not less than thirty (30) days prior to the effective date thereof.

     6.16    Real Estate Taxes, Water Charges and Sewer Rents.

     6.16.1  The Tower Board (on behalf of all Tower Unit Owners) shall be required to make payment to the Condominium Board in respect of the costs and charges therefor allocated to the Tower Unit Owners for domestic water and sewer services.

     6.16.2  Until the Units are separately assessed and billed for real estate tax purposes, the Tower Board will pay all real estate taxes with respect to the Residential Section to the Department of Finance of The City of New York (or directly to Tower Sponsor if Tower Sponsor has paid such taxes) and allocate the cost thereof among the Base Unit Owner and Tower Unit Owners by Residential Common Interest. Each Tower Unit Owner will then, no later than the later to occur of (i) 15 days after receipt of notice of such pro-rated amount from the Tower Board or (ii) 15 days prior to the date such taxes are due to The City of New York, pay to the Tower Board its pro-rated share, which amount shall for all purposes constitute part of the Tower Common Charges payable by such Unit Owner, and the Tower Board will pay all such amounts to The City of New York; and in the event that the Tower Section's actual taxes and assessments for such period differ from the amount upon which such allocation to the Residential Section by the Tower Board was made, any refund to, or further assessment against, the Tower Board shall be refunded to, or assessed against, as the case may be, the individual Tower Unit Owners pro rated in accordance with their Common Interest. A Tower Unit Owner will not be responsible for the payment of, and will not be subject to any lien arising from, the non-payment of real estate taxes assessed against any other Units.

     6.16.3  The Tower Board shall commence, pursue, compromise and settle certiorari proceedings to obtain reduced real estate tax assessments with respect to any or all of the Tower Units on behalf of and as agent for the respective Tower Unit Owners thereof; but only with respect to such Tower Units as to which the respective Unit Owners thereof have, in writing requested and authorized the Tower Board to do so, and indemnified the Tower Board from and against all claims, costs and expenses (including, without limitation, attorneys' fees) resulting from such proceedings. All Tower Unit Owners making such request to the Tower Board will share the costs in connection therewith in proportion to the benefits derived therefrom by such Tower Unit Owners. In the event any Tower Unit Owner individually seeks to have the assessed valuation of its Unit reduced by bringing a separate certiorari proceeding, the Tower Board, if necessary for such proceeding, will execute any documents or other papers required for, and otherwise cooperate with such Tower Unit Owner in pursuing, such reduction, provided that such Tower Unit Owner indemnifies the Tower Board from all claims, costs and expenses (including, without limitation, attorneys' fees and expenses) resulting from such proceedings.

     6.17    Utilities.

     6.17.1  Utilities shall be provided to the Tower Units and billed to the Tower Unit Owners as set forth in Section 6.4 of the Condominium By-Laws.

     6.17.2  Tower Unit Owners, upon closing of title to its Tower Unit, shall be obligated to contact Electric Service Supplier for the provision of electric service to its Unit. Pursuant to the Electric Service Supply Agreement referenced in Section 2.16.2 of the

Condominium By-Laws, Electric Service Supplier shall have the right to enforce the obligation for Tower Units Owners to pay for utility service to its Tower Unit, provided, however, that such enforcement shall only be against the defaulting Tower Unit Owner and not against the Boards or any other Unit Owner.

6.18    Remedies for Violations of By-Laws or Rules and Regulations.

6.18.1  The violation by any Tower Unit Owner of any of the Tower Section Rules and Regulations (or the General Rules and Regulations, if any) or the breach of any of these Tower Section By-Laws or the Condominium By-Laws, or the breach of any provision of the Declaration, shall give: (a) the Condominium Board with respect to matters affecting the Condominium By-Laws or the General Common Elements or the Residential Tower Limited Common Elements, (b) the Tower Board with respect to matters affecting these Tower Section By-Laws or the Tower Section or the Residential Limited Common Elements and (c) the Base Unit Owner, with respect to matters affecting the Base Unit or the Common Elements affecting the use of its Residential Section, the right, in addition to any other rights set forth in these Tower Section By-Laws, the Condominium By-Laws or the Declaration: (i) to enter any Tower Unit or Common Elements in which, or as to which, such violation or breach exists and to summarily abate and remove, at the expense of the defaulting Tower Unit Owner, any structure, thing or condition resulting in such violation or breach, provided that the appropriate Board or the Base Unit Owner gives the Tower Unit Owner notice (which may be by telephone or telecopier) that such violation or breach exists and, as the case may be, that abatement, removal, repairs, replacements or alterations are necessary, and the appropriate Board or Base Unit Owner shall not as a result of such entry and cure be deemed guilty or liable in any matter of trespass, and/or (ii) to enjoin, abate or remedy by appropriate legal proceedings, either at Law or in equity, the continuance of any such violation or breach, provided that the appropriate Board or the Base Unit Owner gives the Tower Unit Owner notice (which may be by telephone or telecopier) that such violation exists and that repairs, replacements or alterations are necessary, and/or (iii) to have its costs and expenses by reason of such breach or violation repaid to it, and/or (iv) if the party seeking to remedy a breach is the Condominium Board or the Tower Board, to levy such fines and penalties as such Board may deem appropriate, and such Board shall have the same remedies for non-payment of such fines and penalties as for non-payment of Common Charges.

6.18.2  The violation or breach of any of the provisions of these Tower Section By-Laws, the Condominium By-Laws, the Tower Section Rules and Regulations, the General Rules and Regulations (if any) or the Declaration with respect to any rights, easements, privileges or licenses granted to the Initial Residential Unit Owner and/or the Tower Sponsor shall give to such parties the right, in addition to any other rights set forth in these Tower Section By-Laws, the Condominium By-Laws or the Declaration, to enjoin, abate or remedy by appropriate legal proceedings, either at Law or in equity, the continuance of any such violation or breach.

6.19    Utility Costs Payable as Tower Common Charges.  All amounts payable to the Tower Board by the Tower Unit Owners in respect of utilities as set forth above shall be considered and payable as Tower Common Charges and subject to, among other things, the Tower Board's lien for unpaid Tower Common Charges.  As set forth in the Condominium By-Laws, the usage and consumption of electricity, gas, domestic water, sewer service, condenser water, heated water and any other utility by, for or in respect of the Common Elements will be separately metered, submetered or otherwise determined and the costs and charges therefor will be allocated among the General Common Charge Obligors as a Common Expense on the basis of

Common Interest as appropriate. Costs associated with the Residential Limited Common Elements, or otherwise with respect to the Residential Section (including, without limitation, Residential Common Charges), shall be allocated to Tower Section and Base Unit by Residential Common Interest and subject to, among other things, the Tower Board's lien for unpaid Residential Common Charges.

## ARTICLE 7

## MORTGAGES

7.1 <u>Notice to Tower Board</u>. A Tower Unit Owner which mortgages its Unit shall notify the Tower Board of the name and address of the mortgagee, file a conformed copy of the note and mortgage with the Tower Board and, prior to making such mortgage, satisfy all unpaid liens against its Unit other than Permitted Tower Mortgages. A Tower Unit Owner who satisfies a mortgage covering its Unit shall so notify the Tower Board and shall file a conformed copy of the satisfaction of mortgage with the Board.

7.2 <u>Notices to Mortgagees</u>

7.2.1 <u>Unpaid Tower Common Charges</u>. The Tower Board shall promptly report to such Permitted Tower Mortgagee any sixty (60) day default in the payment of Tower Common Charges by the Unit Owner of such Tower Unit. In addition, whenever so requested in writing by a Permitted Tower Mortgagee, the Tower Board shall also promptly report to such Permitted Tower Mortgagee any other default by the Unit Owner of such Tower Unit of which the Tower Board has given notice to such Unit Owner. The Tower Board, when giving notice to a Tower Unit Owner of any such default, shall also send a copy of such notice to any Permitted Tower Mortgagee thereof, if so requested in writing by such Permitted Tower Mortgagee; however, the Tower Board shall have no liability for any failure, through oversight or negligence, in notifying a Permitted Tower Mortgagee of any default by its mortgagor described above, provided that the Tower Board shall advise such Permitted Tower Mortgagee of the default promptly after discovering such failure.

7.2.2 <u>Material Casualty or Condemnation</u>. Whenever so requested in writing by a Permitted Tower Mortgagee of a Tower Unit, the Tower Board shall promptly report to such Permitted Tower Mortgagee any condemnation or casualty loss that affects (a) a material portion of the Tower Section or (b) the Tower Unit encumbered by such Permitted Tower Mortgagee's mortgage; however, the Tower Board shall have no liability for any failure, through oversight or negligence, in notifying a Permitted Tower Mortgagee of such casualty or condemnation, provided that the Tower Board shall advise such Permitted Tower Mortgagee of such casualty or condemnation promptly after discovering such failure.

7.2.3 <u>Cancellation or Material Modification of Insurance Policy</u>. Whenever so requested in writing by a Permitted Tower Mortgagee of a Tower Unit, the Tower Board shall promptly report to such Permitted Tower Mortgagee any lapse, cancellation, or material modification of any insurance policy required to be held by the Tower Board under these Tower Section By-Laws or the Condominium By-Laws; however, the Tower Board shall have no liability for any failure, through oversight or negligence, in notifying a Permitted Tower Mortgagee of such cancellation or material modification, provided that the Tower Board shall advise such Permitted Tower Mortgagee of such cancellation or material modification promptly after discovering such failure.

7.2.4 <u>Actions Requiring Consent of Tower Mortgagee Representatives</u>. Whenever so requested in writing by a Permitted Tower Mortgagee of a Tower Unit, the Tower Board shall promptly report to such Permitted Tower Mortgagee any proposed action which requires the consent of any Tower Mortgagee Representative; however, the Tower Board shall have no liability for any failure, through oversight or negligence, in notifying a Permitted Tower Mortgagee of such proposed action, provided that the Tower Board shall advise such Permitted Tower Mortgagee of such proposed action promptly after discovering such failure.

7.3 <u>Performance by Permitted Tower Mortgagees.</u> The Tower Board shall accept payment of any sum of money or performance of any act by any Permitted Tower Mortgagee of a Tower Unit Owner required to be paid or performed by such Tower Unit Owner pursuant to the provisions of the Declaration, these Tower Section By-Laws, the Condominium By-Laws, the Tower Section Rules and Regulations or the General Rules and Regulations (if any), with the same force and effect as though paid or performed by such Tower Unit Owner.

7.4 <u>Examination of Books</u>. Each Tower Unit Owner and Permitted Tower Mortgagee shall be permitted to examine the books of account of the Tower Section upon reasonable prior notice, at reasonable times on business days, but not more frequently than once a month.

7.5 <u>Representatives of Tower Mortgagees</u>.

7.5.1 The holders of Permitted Tower Mortgages constituting a majority of the outstanding principal amount of all Permitted Tower Mortgages encumbering the Tower Units may, at their election, designate in writing to the Tower Board one or more (but not more than three) representatives ("<u>Tower Mortgagee Representatives</u>"), which Tower Mortgagee Representatives shall be empowered to act on behalf of all holders of Permitted Tower Mortgages encumbering the Tower Units with respect to any matter requiring their consent or approval under the Declaration, these Tower Section By-Laws or the Condominium By-Laws. If any of the Tower Mortgagee Representatives are so designated and notice thereof is given to the Tower Board, the act of any such Representative (or a majority of such Representatives, if more than one is so designated) shall be deemed binding upon the holders of all Permitted Tower Mortgages encumbering the Tower Units.

7.5.2 Any designation of a Tower Mortgagee Representative shall remain effective until a subsequent designation is made pursuant to the provisions hereof and notice of such subsequent designation is given to the Tower Board.

7.6 <u>Consent of Mortgagees</u>. Except as otherwise expressly provided for herein, in the Condominium By-Laws or in the Declaration, no consent or approval by any mortgagee shall be required with respect to any determination or act of the Tower Board or any Tower Unit Owner, provided, however, that nothing contained herein shall be deemed to limit or affect the rights of any mortgagee against its mortgagor.

**ARTICLE 8**

**SELLING, LEASING AND MORTGAGING OF TOWER UNITS**

8.1 <u>Sales and Leases of Tower Units</u>. Subject to the terms of Section 8.7 hereof, each Tower Unit Owner may sell its Unit, or lease its Unit for periods of one (1) year or more only (or for such other period of time as may be determined by the Tower Unit Owners pursuant to an

- 50 -

amendment of this provision in accordance with Section 13.1), provided that no Tower Unit Owner (other than the Tower Sponsor) may sell or lease its Tower Unit except by complying with the provisions of this Article 8 and, specifically, this Section 8.1.

8.1.1   (a)   Subject to the terms of Section 8.8, any contract to sell a Tower Unit, together with its appurtenant Common Interest, or any lease of a Tower Unit (collectively, the "Sale Agreement or Lease") shall contain the following provision: "This Agreement, and the rights and obligations of the parties hereunder, are hereby expressly subject to the right of first refusal of the Tower Board of Managers of 15 Hudson Yards Condominium in respect of the transaction described herein, pursuant to the terms of Article 8 of the By-Laws of the Tower Section of 15 Hudson Yards Condominium."  (The Tower Unit Owner who has entered into a Sale Agreement or Lease is herein referred to as the "Offeree Unit Owner" and the prospective purchaser or tenant is herein referred to as the "Outside Offeror.")

(b)          Promptly after a Sale Agreement or Lease has been fully executed, the Offeree Unit Owner shall send written notice thereof to the Tower Board, by certified or registered mail, return receipt requested, or by reputable courier providing overnight delivery; such notice shall be accompanied by a fully completed application package, which the Offeree Unit Owner shall obtain from the managing agent of the Tower Section, together with a fully executed duplicate original of the Sale Agreement or Lease and any and all related agreements, containing all of the terms offered in good faith by the Outside Offeror.  The giving of such notice to the Tower Board shall constitute an offer by the Offeree Unit Owner to sell its Tower Unit, together with its appurtenant Common Interest, or to lease its Tower Unit, as the case may be, to the Tower Board, or its designee (corporate or otherwise), on behalf of all Tower Owners, upon the same terms and conditions as contained in such Sale Agreement or Lease, and shall also constitute a representation and warranty by the Offeree Unit Owner to the Tower Board, on behalf of all Tower Owners, that such Sale Agreement or Lease is bona fide in all respects and contains the complete terms of the transaction.  The Offeree Unit Owner shall promptly submit in writing such further information with respect thereto as the Tower Board may reasonably request.  The Tower Board may, by sending written notice, by certified or registered mail, return receipt requested, or by reputable courier providing overnight delivery, to such Offeree Unit Owner not later than twenty (20) days after receipt of such notice, or if further information has been requested, then not later than twenty (20) days after receipt thereof, elect to purchase such Tower Unit, together with its appurtenant Common Interest, or elect to lease such Tower Unit, as the case may be (or to cause the same to be purchased or leased by its designee), on behalf of all Tower Owners, upon the same terms and conditions as contained in the Sale Agreement or Lease and as stated in the Offeree Unit Owner's response(s) to requests by the Tower Board for further information, as provided for above.

8.1.2   If the Tower Board shall timely elect to purchase such Tower Unit, together with its appurtenant Common Interest, or to lease such Tower Unit, as the case may be, or to cause the same to be purchased or leased by its designee, title shall close or a lease shall be executed at the office of the attorneys for the Tower Board, in accordance with the terms of the Sale Agreement or Lease, within sixty (60) days after the giving of notice by the Tower Board of its election to accept such offer. However, if the closing date of the purchase or the commencement date of the term of the lease, as the case may be, set forth in the Sale or Lease Agreement shall be later than sixty (60) days after the giving of notice by the Tower Board of its election to accept the aforesaid offer, the Tower Board shall be required to perform or cause to be performed all of the terms of the Sale Agreement or Lease to be performed by the Outside

Offeror (except as otherwise expressly set forth in this Article 8), including, but not limited to, payment of a downpayment or advance rentals and security deposits, or closing of title or acceptance of occupancy, as the case may be, and such closing of title or the commencement of the term of the Lease shall be on the date set forth in the Sale Agreement or Lease as the intended closing date or commencement date, as the case may be. If, pursuant to such Sale Agreement or Lease, the Outside Offeror was to assume or take title to the Unit subject to the Offeree Unit Owner's existing mortgage or mortgages, in the case of a sale, the Tower Board may purchase the Tower Unit and assume or take title to the Tower Unit subject to said existing mortgage or mortgages, as the case may be. At the closing, the Offeree Unit Owner, if such Tower Unit (together with its appurtenant Common Interest) is to be sold, shall convey the same to the Tower Board, or its designee, on behalf of all Tower Unit Owners, by deed in the form required by Section 339-o of the Real Property Law of the State of New York. Real estate taxes (including water charges and sewer rents, if separately assessed), mortgage interest, if applicable, Tower Common Charges and rent, if applicable, shall be apportioned between the Offeree Unit Owner and the Tower Board, or its designee, as of the closing date. In the event such Tower Unit is to be leased, the Offeree Unit Owner shall execute and deliver to the Tower Board, or its designee, a lease between the Offeree Unit Owner, as landlord, and the Tower Board, or its designee, as tenant, covering such Tower Unit, for the rental and term contained in the Lease.

8.1.3    In the event the Tower Board or its designee shall fail to accept such offer within twenty (20) days after receipt of notice and all other documents and information to be provided under this Article 8, or waives such election in writing within such twenty (20)-day period, the Offeree Unit Owner shall have an additional sixty (60) days after the earlier of the expiration of such twenty (20)-day period or waiver in writing by the Tower Board, as the case may be, to consummate the transaction set forth in the Sale Agreement or Lease (or such later date for closing or occupancy provided in the Sale Agreement or Lease, as applicable). In the event the Offeree Unit Owner shall not, within such sixty (60)-day period (or such later date for closing or occupancy provided in the Sale Agreement or Lease, as applicable), so consummate the transaction, or should the terms of the Sale Agreement or Lease be amended or modified in any way (whether orally, in writing or by a side agreement) to be on terms less favorable to the Offeree Unit Owner, then the Offeree Unit Owner shall be required to again comply with all the terms and provisions of this Section 8.1.

8.1.4    Any deed to an Outside Offeror shall expressly provide that the acceptance thereof by the grantee shall constitute an assumption of all of the provisions of the Declaration, the Condominium By-Laws, these Tower Section By-Laws, the Tower Section Rules and Regulations and the General Rules and Regulations (if any), in each case as the same may be amended from time to time, and, in the absence of such express language, the same shall be conclusively deemed to have been included therein.

8.1.5    Any Lease to an Outside Offeror shall be consistent with these Tower Section By-Laws and shall provide that it may not be modified, amended, extended or assigned without the prior consent in writing of the Tower Board, that the tenant shall not assign its interest in such Lease or sublet the demised premises or any part thereof without the prior consent in writing of the Tower Board and that the Tower Board shall have power to terminate such Lease and/or to bring summary proceedings to evict the tenant in the name of the landlord thereunder, in the event of: (i) a default by the tenant in the performance of its obligations under such Lease or a default by or caused by such tenant under any of the provisions of these Tower Section By-Laws or the Condominium By-Laws; or (ii) a foreclosure of the lien granted by Section 339-z of the Real Property Law of the State of New York, the Declaration, these Tower

Section By-Laws, the Condominium By-Laws or otherwise. Such Lease shall also provide that it is and shall be subject and subordinate to the Declaration, these Tower Section By-Laws, the Condominium By-Laws, the Tower Section Rules and Regulations and the General Rules and Regulations (if any).

8.1.6   Except as hereinbefore set forth, the form and substance of any such Lease executed by the Tower Board or an Outside Offeror shall be the then current form of lease approved by the Tower Board (as the same may be changed from time to time). Any Lease executed by the Tower Board as tenant shall provide that the Board may enter into a sublease of the demised premises without the consent of the landlord and without paying to the landlord any portion of the rent received from the subtenant.

8.1.7   If a Tower Unit Owner is a corporation, any sale, assignment, transfer or other disposition of any of its stock, or if a Tower Unit Owner is a partnership, limited liability company or other entity, any sale, assignment, transfer or other disposition of any interest in such partnership, company or other entity, in each case, other than through any recognized national securities exchange or "over-the-counter" market, which results in a change in the majority beneficial or legal ownership of such entity, shall also subject the Tower Unit owned by such entity to the requirement that the Tower Unit first be offered to the Tower Board, as described in this Section 8.1.

8.1.8   Any purported sale or lease of a Tower Unit in violation of this Section 8.1 shall be voidable at the election of the Tower Board and if the Tower Board shall so elect, the Tower Unit Owner shall be deemed to have authorized and empowered the Tower Board to institute legal proceedings to eject or evict the purported purchaser or tenant, as the case may be, in the name of said Tower Unit Owner as the purported seller or landlord, as the case may be. Said Tower Unit Owner shall reimburse the Tower Board for all expenses (including attorneys' fees and expenses) incurred in connection with such proceedings, promptly upon demand therefor. In no event shall any purported sale or lease of a Tower Unit in violation of this Section 8.1 release the Tower Unit Owner which is the purported seller or lessor, as the case may be, from any of its obligations under the Declaration, the Condominium By-Laws, these Tower Section By-Laws, whether or not such sale or lease is voided by the Tower Board.

8.1.9   The Tower Board shall have the right to impose a fee in connection with any waiver of its right of first refusal pursuant to this Section 8.1, either with respect to a sale or a lease of a Tower Unit; provided, however, that no fee shall assessed in connection with a renewal of a lease of a Tower Unit, which lease the Tower Board previously waived its right of first refusal pursuant to this Section 8.1.

8.2   Consent of Tower Unit Owners to Purchase or Lease of Units by Tower Board.

8.2.1   Subject to the remaining provisions of these Tower Section By-Laws, the Condominium By-Laws and the Declaration, the Tower Board may not exercise any option hereinabove set forth to purchase or lease any Tower Unit without the prior approval of a majority in interest of the Tower Unit Owners. Any such lease shall be in the form and substance then approved by the Tower Board (as the same may be changed from time to time), including provisions such as a prohibition on assignment or subletting. The Tower Board shall have the right to release or waive such option without the prior approval or a vote of the Tower Unit Owners.

8.2.2   The Tower Board, in its sole discretion and without the approval of the Tower Unit Owners, may obtain and close on mortgage loan financing in such amount as it determines, subject to limitations hereafter set forth, to finance the purchase of any Tower Unit as to which the Tower Board exercises its right of first refusal pursuant to Section 8.1, provided that: (i) such mortgage is secured by a first lien on the Tower Unit being purchased, and (ii) the principal amount of such mortgage does not exceed the purchase price for the Tower Unit plus the amount of closing costs incurred by the Tower Board in connection with such purchase and related mortgage financing.

8.2.3   As to any purchase of a Tower Unit by the Tower Board, and related mortgage loan financing, pursuant to the exercise by the Tower Board of its right of first refusal under Section 8.1: (i) the Tower Board shall be required to comply with all terms related to financing of purchase of such Tower Unit as are contained in the Agreement for such Tower Unit as negotiated by the Tower Unit Owner and as presented to the Tower Board pursuant to Section 8.1, and (ii) the Tower Board shall be required to close on its purchase of such Tower Unit within sixty (60) days of the date set for closing in such Agreement or sixty (60) days of date of notification of exercise of right of first refusal, whichever is later.

8.3   No Severance of Ownership.  No Tower Unit Owner shall execute any deed, mortgage or other instrument conveying or mortgaging title to its Tower Unit without including therein its appurtenant Common Interest, it being the intention to prevent any severance of such combined ownership. Any such deed, mortgage or other instrument purporting to affect one or more of such interests without including all such interests shall be deemed and taken to include the interest or interests so omitted even though the latter shall not be expressly mentioned or described therein. No part of the appurtenant Common Interest of any Tower Unit may be sold, conveyed or otherwise disposed of, except as part of a sale, conveyance or other disposition of the Unit to which such interests are appurtenant, or as part of a sale, conveyance or other disposition of such part of the appurtenant Common Interests of all Tower Units. Nothing in this Section 8.3 shall prohibit the lease of any Tower Unit without the simultaneous lease of its appurtenant Common Interest.

8.4   Release by Tower Board of Right of First Refusal.  The right of first refusal contained in Section 8.1 may be released or waived by the Tower Board only in the manner provided in Section 8.5.  In the event the Tower Board shall release or waive its right of first refusal as to any Tower Unit, such Tower Unit, together with its appurtenant Common Interest, may be sold, conveyed or leased in accordance with the Sale Agreement or Lease and the other information supplied by the Offeree Unit Owner to the Tower Board pursuant to Section 8.1 hereof, subject to the provisions of subsection 8.1.3.  The Tower Board may establish reasonable fees for the consideration of any right of first refusal, which fees shall be payable by the selling or leasing Tower Unit Owner (but not the Tower Sponsor), as the case may be.

8.5   Certificate of Termination of Right of First Refusal.  A certificate executed and acknowledged by the Secretary or any other officer of the Tower Section stating that the provisions of 8.1 have been satisfied by a Tower Unit Owner or stating that the right of first refusal contained therein has been duly released or waived by the Tower Board and that, as a result thereof, the rights of the Tower Board thereunder have terminated, shall be conclusive upon the Tower Board and the Tower Unit Owners in favor of all persons who rely on such certificate in good faith.

8.6     Financing of Purchase, or Refinancing, of Tower Units by Tower Board. The purchase of any Tower Unit, together with its appurtenant Common Interest, by the Tower Board or its designee, on behalf of all Tower Unit Owners, may, at the option of the Tower Board, be made from the funds deposited in the capital and/or expense accounts of the Tower Board by or on behalf of Tower Unit Owners. The Tower Board may levy an assessment against each Tower Unit Owner, in proportion to its respective Tower Common Interest, as an additional Tower Common Charge, and/or the Tower Board, in its discretion, may finance the acquisition of such Tower Unit and subsequently refinance such Tower Unit (on such terms and in such amount(s) as the Tower Board determines); provided, however, that no such financing may be secured by an encumbrance or hypothecation of any portion of the Tower Section (except to the extent permitted by Law) other than the Tower Unit to be purchased or refinanced, as the case may be, together with its appurtenant Common Interest.

8.7     Exceptions. In addition to any other exceptions herein before set forth, the provisions of Section 8.1 shall not apply to the lease, sale or conveyance of any Tower Unit, together with its appurtenant Common Interest, by: (a) the Tower Unit Owner thereof to his or her spouse, adult children, parents, adult siblings or to any combination of them, or to a trust for the benefit of any one or more of them and/or any one or more minor children of any of them (collectively, "family members"), or to any affiliate (as defined below) of the Tower Unit Owner thereof or the owner of any controlling interest in a Tower Unit Owner which is a corporation, partnership, limited liability company or other entity; (b) the Tower Sponsor with respect to Unsold Tower Units; (c) the Tower Board; (d) any proper officer conducting the sale of a Tower Unit in connection with the foreclosure of a mortgage or other lien covering such Unit or delivering a deed in lieu of such foreclosure; or (e) a Permitted Tower Mortgagee or its nominee or assignee, who has acquired title to any Tower Unit at any foreclosure sale of its Permitted Tower Mortgage or by deed in lieu of such foreclosure delivered in a bona fide transaction; provided, however, that each succeeding Tower Unit Owner shall be bound by, and its Tower Unit shall be subject to, all of the provisions of this Article 8. In addition, the provisions of Section 8.1 shall not apply to any lease, sale or conveyance of a Tower Unit to a Permitted Tower Mortgagee or a purchaser at a foreclosure sale of a Permitted Tower Mortgage in connection with a foreclosure, or to the acceptance of a deed or assignment in lieu of foreclosure, in the event of a default by the mortgagor under such Permitted Tower Mortgage. The term "affiliate" shall be deemed to be any individual or entity that owns 50% or more of the legal and beneficial interest of such Tower Unit Owner or owner of an interest in a Unit Owner, as the case may be (with respect to a Tower Unit Owner which is not an individual), or any entity with respect to which such Tower Unit Owner or owner of an interest in a Tower Unit Owner, as the case may be (individual or otherwise), owns 50% or more of the legal and beneficial interest.

8.8     Gifts and Devises, etc. Any Tower Unit Owner shall be free to convey or transfer his or her Tower Unit by gift, or may devise his or her Tower Unit by will, or have his or her Tower Unit pass by intestacy, without complying with the provisions of 8.1, provided, however, that each succeeding Tower Unit Owner shall be bound by, and his or her Tower Unit shall be subject to, the provisions of this Article 8.

8.9     Payment of Assessments. Tower Unit Owners shall not be permitted to sell, convey, mortgage, pledge, hypothecate or lease their Tower Units unless and until they shall have paid in full to the Tower Board all unpaid Tower Common Charges (including, without limitation, the allocated General Common Charges and Residential Common Charges included therein) and other amounts required by the Tower Board to be paid and theretofore assessed against such Tower Units and until such Tower Unit Owners shall have satisfied all unpaid liens

against their Units, other than Permitted Tower Mortgages. Tower Unit Owners shall notify the Managing Agent at least five (5) business days prior to the closing of any of the aforementioned transactions for confirmation of any unpaid amounts.

      8.10   <u>Waiver of Right of Partition with Respect to Tower Units Acquired on Behalf of Tower Unit Owners as Tenants-in-Common</u>. In the event that any Tower Unit shall be acquired by the Tower Board or its designee, corporate or otherwise, on behalf of all Tower Unit Owners, as tenants-in-common, all such Unit Owners shall be deemed to have waived all rights of partition with respect to such acquired Unit and the entire Property as herein provided.

      8.11   <u>Mortgages of Tower Units</u>. Subject to Article 7 and Section 8.9, each Tower Unit Owner shall have the right to mortgage its Unit without restriction.

**ARTICLE 9**

**CONDEMNATION**

      Without modifying Section 11.12.8 of the Condominium By-Laws, in the event of the taking in condemnation or by eminent domain of all or any part of the Tower Limited Common Elements, then, subject to the provisions set forth below, the Tower Board will arrange for the prompt repair and restoration of the part of such Tower Limited Common Elements affected by such taking. The award made for any such taking shall be payable to the Tower Board; provided, however, that if any such award exceeds $5,000,000, such award shall be payable to the Insurance Trustee (as defined in Section 12.7 hereof) and shall be disbursed to the contractors engaged in such repair and restoration, if any, in appropriate progress payments. (The dollar amount set forth in the preceding sentence shall be adjusted to reflect any increase in the CPI Increase Factor). If the net proceeds of any such award are insufficient to cover, or if such net proceeds exceed, the cost of any repairs and restorations, the deficit or surplus, as the case may be, will be borne by the Tower Unit Owner's pro rata in accordance with their Common Interests; provided, that the amount of any surplus payable to any Unit Owner shall be lessened by such amounts as may be necessary to reduce unpaid liens (other than mortgages which are not Permitted Tower Mortgages) on any such Unit in the order of the priority of such liens. Notwithstanding any provisions contained herein to the contrary, if seventy-five (75%) percent or more of the Tower Limited Common Elements in the aggregate are so taken, such repairs or restorations shall not be made unless seventy-five (75%) percent or more of all Tower Unit Owners (and Tower Sponsor or its designees, if they shall then own any Units), both in number and in aggregate Common Interests, shall promptly resolve to proceed with the same. In the event that a sufficient number of Unit Owners shall so resolve, the repairs and restoration shall be performed as set forth above. Conversely, in the event that a sufficient number of Unit Owners shall either fail or refuse to so resolve, the repairs and restoration shall not be performed and the Tower Section shall be subject to an action for partition by any Tower Unit Owner or lienor, as if owned in common, in which event the net proceeds of the sale, and net proceeds of any applicable condemnation awards shall be divided among all Tower Unit Owners by apportioning the amount apportioned to the Tower Unit Owners among such Tower Unit Owners in proportion to the fair market values of the respective Tower Units, provided, however, that no payment shall be made to a Unit Owner until there has first been paid out of its share of such funds, such amounts as may be necessary to discharge all unpaid liens on its Unit (other than mortgages which are not Permitted Tower Mortgages) in the order of the priority of such liens. As used in this Article 9, the words "promptly resolve" shall mean not more than 60 days after

- 56 -

the date notice is given of such taking. Any dispute between the Tower Board and a Tower Unit Owner under this Article 9 shall be settled by Arbitration.

## ARTICLE 10

## RECORDS AND AUDITS

10.1    Records.  The Tower Board, or the managing agent therefor, shall keep detailed records of the actions of the Tower Board, minutes of the meetings of the Board, minutes of the meetings of the Tower Unit Owners, and financial records and books of account with respect to the activities of the Board, including a listing of all receipts and expenditures. In addition, the Tower Board shall keep a separate account for each Tower Unit which, among other things, shall contain the amount of each assessment of Tower Common Charges and other amounts required by the Tower Board to be paid in respect of each such Unit, the date when due, the amounts paid thereon and the balance, if any, remaining unpaid.

10.2    Audits.  Within four months after the end of each fiscal year, an annual report of receipts and expenditures, prepared and certified by an independent certified public accountant or an independent certified public accounting firm, shall be submitted by the Tower Board to all Tower Unit Owners and to all Permitted Tower Mortgagees of Tower Units, who have requested the same in writing. The cost of such report submitted by the Tower Board shall be paid by the Tower Unit Owners as a Tower Common Expense.

10.3    Availability of Documents.  Copies of the Declaration, these Tower Section By-Laws, the Condominium By-Laws, the Tower Section Rules and Regulations, the General Rules and Regulations (if any) and the Floor Plans, as the same may be amended from time to time, shall be maintained at the office of the Tower Board and shall be available for inspection by Tower Unit Owners and their authorized agents during reasonable business hours and upon reasonable prior notice.

## ARTICLE 11

## ARBITRATION

11.1    General Procedure.  Except as may otherwise be expressly provided in these Tower Section By-Laws, the Condominium By-Laws or the Declaration, any Arbitration provided for in these Tower Section By-Laws shall be conducted before one arbitrator in New York City by the American Arbitration Association or any successor organization thereto, in accordance with its rules then in effect; the decision rendered in such arbitration shall be binding upon the parties and may be entered in any court having jurisdiction; provided that, in the case of Arbitration of issues arising under Sections 6.5 and 6.6, any arbitrator shall be a real estate professional, having ten (10) or more years' experience in the field of Manhattan commercial real property. Notwithstanding the foregoing, any arbitration held pursuant to the Declaration or these Tower Section By-Laws with respect to a dispute which arose prior to the first annual meeting of Tower Unit Owners shall be non-binding. In the event that the American Arbitration Association shall not then be in existence and has no successor, any arbitration hereunder shall be conducted in New York City before one arbitrator appointed, on application of any party, by any justice of the highest court of appellate jurisdiction located in the County of New York. The decision of the arbitrator so chosen shall be given within ten (10) days after his or her appointment.

- 57 -

11.2   Costs and Expenses. The fees, costs and expenses of the arbitrator shall be borne by the losing party in the arbitration or, if the position of neither party to a dispute shall be substantially upheld by the arbitrator, such fees, costs and expenses shall be borne equally by the parties to the dispute. Each disputant shall also bear the fees and expenses of its counsel and expert witnesses. Subject to the foregoing, all costs and expenses paid or incurred by the Tower Board in connection with any arbitration held hereunder (including, without limitation, the fees and expenses of counsel and expert witnesses) shall constitute Tower Common Expenses.

11.3   Agreement by Parties. The parties to any dispute required or permitted to be submitted to arbitration hereunder may, by mutual agreement between them, vary any of the provisions of Section 11.1 with respect to the arbitration of such dispute, or may agree to resolve their dispute in any other manner, including, without limitation, the manner set forth in Section 3031 of the New York Civil Practice Law and Rules and known as the "New York Simplified Procedure for Court Determination of Disputes."

## ARTICLE 12

## MISCELLANEOUS

12.1   Consents. Wherever the consent, approval or satisfaction of the Tower Sponsor is required under these Tower Section By-Laws, such consent, approval or satisfaction shall not be required when there are no remaining Unsold Tower Units, the Building has been fully completed, a permanent certificate of occupancy therefor has been issued and the Tower Sponsor has any remaining obligations under the Offering Plan or otherwise.

12.2   Waiver. No provision contained in these Tower Section By-Laws or the Tower Section Rules and Regulations shall be deemed to have been abrogated or waived by reason of any failure to enforce the same, regardless of the number of violations or breaches thereof which may occur.

12.3   Captions. The index hereof and captions herein are inserted only as a matter of convenience and for reference, and in no way define, limit or describe the scope of these Tower Section By-Laws nor the intent of any provision hereof.

12.4   Conflict. In the event of any conflict between: (a) the provisions of these Tower Section By-Laws and those of the Condominium By-Laws, the provisions of the Condominium By-Laws shall control; and (b) the provisions of the Tower Section Rules and Regulations and those of the General Rules and Regulations, the provisions of the General Rules and Regulations shall control. In the event any provision of these Tower Section By-Laws or the Tower Section Rules and Regulations conflicts with the provisions of the Declaration, the provisions of the Declaration shall control.

12.5   Certain References.

12.5.1 A reference in these Tower Section By-Laws to any one gender, masculine, feminine or neuter, includes the other two, and the singular includes the plural, and vice versa, unless the context otherwise requires.

12.5.2 The terms "herein," "hereof" or "hereunder" or similar terms used in these Tower Section By-Laws refer to these Tower Section By-Laws in their entirety and not to the particular provision in which the terms are used.

12.5.3 Unless otherwise stated, all references herein to Articles, Sections, subsections, subparagraphs or other provisions are references to Articles, Sections or other provisions of these Tower Section By-Laws.

12.6 <u>Severability</u>. Subject to the provisions of the Declaration, if any provision of these Tower Section By-Laws is invalid or unenforceable as against any person, party or under certain circumstances, the remainder of these Tower Section By-Laws and the applicability of such provision to other persons, parties or circumstances shall not be affected thereby. Each provision of these Tower Section By-Laws shall, except as otherwise herein provided, be valid and enforced to the fullest extent permitted by Law.

12.7 <u>Insurance Trustee</u>. The Insurance Trustee shall at all times be (i) a savings bank, (ii) a savings and loan association, (iii) a credit union, (iv) a commercial bank or trust company (whether acting individually or in a fiduciary capacity), (v) an insurance company organized and existing under the laws of the United States or any state thereof, (vi) a commercial credit corporation, (vii) an investment bank, a real estate investment trust or an opportunity fund, or (viii) any servicer for, or affiliate of, any of the foregoing; provided, that each of the above entities shall qualify as an Insurance Trustee within the provisions of this subsection only if each such entity shall (a) be subject to (y) the jurisdiction of the courts of the United States of America or of the State of New York in any actions or (z) the supervision of (A) the Comptroller of the Currency or the Department of Labor of the United States or the Federal Home Loan Bank Board or the Insurance Department or the Banking Department or the Comptroller of the State of New York, or the Comptroller of New York City or any successor to any of the foregoing agencies or officials, or (B) any agency or official exercising comparable functions on behalf of any other state within the United States, or (C) any federal, state or municipal agency or public benefit corporation or public authority advancing or insuring mortgage loans or making payments that, in any manner, assist in the financing, development, operation and maintenance of improvements, or (D) in the case of a commercial credit corporation, the laws and regulations of the state of its incorporation, and (b) except in the case of any servicer (as hereinabove provided, provided the party for which such servicer is acting) has/have individual or combined assets, as the case may be, of not less than One Billion and 00/100 Dollars ($1,000,000,000.00), and (c) not be an Affiliate of any Tower Unit Owner or Tower Board. The Insurance Trustee shall be obligated to engage experts with knowledge of claims settlement and allocations such as either (i) a property insurance claims adjustment professional or (ii) an accounting firm that has claims accounting expertise. The Tower Board shall pay the fees and disbursements of any Insurance Trustee and such fees and disbursements shall constitute a Tower Common Expense. The Insurance Trustee shall hold all such proceeds in accordance with Section 254(4) of the Real Property Law of the State of New York.

12.8 <u>Successors and Assigns</u>. The rights and obligations of the Tower Sponsor with respect to the Unsold Tower Units as set forth herein shall inure to the benefit of, and be binding upon, any successor or assign of the Tower Sponsor or, with the consent of the Tower Sponsor, any transferee of all of the then Unsold Tower Units. The rights and obligations of the Base Unit Owner as set forth herein shall inure to the benefit of, and be binding upon, any successor or assign of such Base Unit Owner with respect to the Base Unit. The rights and obligations of the CS Unit Owner, CS MS Unit Owner and CS LL Unit Owner as set forth herein shall inure to the benefit of, and be binding upon, any successor or assign of such CS Unit Owner, CS MS Unit Owner and CS LL Unit Owner with respect to its Unit. Subject to the foregoing, the Tower Sponsor, the Base Unit Owner, CS Unit Owner, CS MS Unit Owner and CS LL Unit Owner

shall each have the right, at any time, in its sole discretion, to assign or otherwise transfer its interests in the Condominium, whether by merger, consolidation, lease, assignment or otherwise.

     12.9     <u>Covenant of Further Assurances</u>.

          12.9.1  Any party which is subject to the terms of these Tower Section By-Laws, whether such party is a Tower Unit Owner, a lessee or sublessee of a Tower Unit Owner, an occupant of a Unit, a member or officer of the Tower Board, or otherwise, shall, at the expense of any such other party requesting the same, execute, acknowledge and deliver to such other party such instruments, in addition to those specifically provided for herein, and take such other action, as such other party may reasonably request, to effectuate the provisions of these Tower Section By-Laws or any transaction contemplated herein or to confirm or perfect any right to be created or transferred hereunder or pursuant to any such transaction.

          12.9.2  If any Tower Unit Owner or any other party which is subject to the terms of these Tower Section By-Laws fails to execute, acknowledge or deliver any instrument, or fails or refuses, within ten (10) days after request therefor, to take any action which such Tower Unit Owner or other party is required to perform pursuant to these Tower Section By-Laws, then the Tower Board which represents such Unit Owner or other party is hereby authorized, as attorney-in-fact, coupled with an interest, for such Tower Unit Owner or other party, to execute, acknowledge and deliver such instrument, or to take such action, in the name of such Tower Unit Owner or other party, and such instrument or action shall be binding on such Tower Unit Owner or other party, as the case may be.

          12.9.3  If any Tower Unit Owner or other party which is subject to the terms of these Tower Section By-Laws fails to execute, acknowledge or deliver any instrument, or fails or refuses, within ten (10) days after request therefor, to take any action which such Tower Unit Owner or party is required to perform pursuant to these Tower Section By-Laws at the request of the Tower Sponsor, then the Tower Sponsor is hereby authorized, as attorney-in-fact, coupled with an interest, for such Tower Unit Owner or other party, to execute, acknowledge and deliver such instrument, or to take such action, in the name of such Tower Unit Owner or other party, and such document or action shall be binding on such Tower Unit Owner or other party.

          12.9.4  If the Tower Board fails to execute, acknowledge or deliver any instrument, or fails or refuses, within ten (10) days after request therefor, to take any action which the Tower Board is required to perform pursuant to these Tower Section By-Laws or the Condominium By-Laws at the request of the Tower Sponsor or the Condominium Board, then the Tower Sponsor or the Condominium Board, as the case may be, is hereby authorized, as attorney-in-fact, coupled with an interest, for the Board, to execute, acknowledge and deliver such instrument, or to take such action, in the name of the Board, and such document or action shall be binding on the Board.

## ARTICLE 13

## AMENDMENTS TO TOWER SECTION BY-LAWS

     13.1     <u>Amendments by Tower Unit Owners</u>.  Subject to the provisions contained herein, in the Declaration or in the Condominium By-Laws with respect to amendments, modifications, additions or deletions affecting the Tower Sponsor, any Unsold Tower Units, the Base Unit, the Base Unit Owner, the CS Group, the CS Unit Owner, the CS MS Unit Owner or the CS LL Unit Owner, any provision of these Tower Section By-Laws or the Tower Section Rules and

Regulations may be amended, modified, added to or deleted by the affirmative vote of at least 66-2/3% in number and in Tower Common Interest of all Tower Unit Owners; provided, however, that the Tower Common Interest appurtenant to each Tower Unit shall not be altered without the written consent of all Tower Unit Owners affected thereby. Subject to the provisions contained herein, in the Declaration or in the Condominium By-Laws with respect to amendments, modifications, additions or deletions affecting the Tower Sponsor, any Unsold Tower Units, the CS Group, the CS Unit Owner, the CS MS Unit Owner or the CS LL Unit Owner, the Base Unit or the Base Unit Owner, any such amendment, modification, addition or deletion shall be executed by the Tower Board, as attorney-in-fact, coupled with an interest, for the Tower Unit Owners, for the purpose of approving and executing any instrument effecting such amendment, modification, addition or deletion, which Tower Board is hereby authorized by such Tower Unit Owners so to act as their attorney-in-fact. Notwithstanding the foregoing and subject to the provisions contained herein, in the Declaration or in the Condominium By-Laws with respect to amendments, modifications, additions or deletions affecting the Tower Sponsor, any Unsold Tower Units, the Base Unit, the Base Unit Owner, the CS Group, the CS Unit Owner, the CS MS Unit Owner or the CS LL Unit Owner: (i) no such amendment, modification, addition or deletion shall be effective without the written consent (which consent shall not be unreasonably withheld or delayed) of the Tower Mortgagee Representatives, if any (and, in the case of amendments having a material adverse effect on Tower Mortgagees, without the written consent of the Permitted Tower Mortgagees of at least 51% of the affected Tower Units which are encumbered by Permitted Tower Mortgages); and (ii) the provisions of Sections 6.9 and 6.10 may not be amended, modified, added to or deleted unless 80% in Common Interest of all Tower Unit Owners affected thereby approve such amendment, modification, addition or deletion in the manner set forth above. Each duly adopted amendment, modification, addition or deletion to these Tower Section By-Laws shall be effectuated by an instrument recorded in the City Register's Office.

    13.2   <u>Amendments Affecting Tower Sponsor</u>. Notwithstanding any provision contained herein to the contrary, no amendment, modification, addition to or deletion of these Tower Section By-Laws, the Declaration, the Condominium By-Laws, the General Rules and Regulations, if any, or the Tower Section Rules and Regulations shall be effective in any way against: (a) the Tower Sponsor or its designee, for so long as any of the foregoing is the owner of one or more Tower Units, or any Unsold Tower Unit, unless the Tower Sponsor or its designee, as applicable, has given prior written consent thereto; or (b) the holder of any present or future mortgage, pledge or other lien or security interest encumbering any Unsold Tower Unit unless such holder has given its prior written consent thereto.

    13.3   <u>Amendments Affecting Permitted Tower Mortgagees</u>. Notwithstanding any provision contained herein to the contrary, no amendment, modification, addition to or deletion of Sections 6.2.2 or 6.4, Article 7, or clauses (d) and (e) and the second sentence of Section 8.7, shall be effective as against the holder of any Permitted Tower Mortgage theretofore made unless such holder has given its prior written consent thereto.

    13.4   <u>Consent of Tower Sponsor</u>. The provisions of this Article 13 may not be modified, amended, added to or deleted, in whole or in part, without the consent of Tower Sponsor or its designee.

EXHIBIT A

TOWER RULES AND REGULATIONS
TOWER SECTION
OF 15 HUDSON YARDS CONDOMINIUM

These Tower Section Rules and Regulations shall apply only to the Tower Section and to the Tower Units included therein, and not to any other Units or portions of the Condominium; and neither the Tower Board nor any Tower Unit Owner shall have any right to make, amend or enforce any of the Tower Section Rules and Regulations as may be applicable to other sections of the Condominium.

1. The sidewalks, entrances, passages, public halls, elevators, vestibules, corridors and stairways of or appurtenant to the Tower Section shall not be obstructed or used for any purpose by Tower Unit Owners and their invitees other than the respective purposes for which they were intended.

2. No article (including, but not limited to, garbage cans, bottles or mats) shall be placed in any of the passages, public halls, vestibules, corridors, stairways or fire landings of the Tower Section nor shall any fire exit thereof be obstructed in any manner. Nothing shall be hung or shaken from any doors, windows or roofs or placed upon the window sills of the Tower Section.

3. Neither occupants nor their guests shall play in the entrances, passages, public halls, lobbies, elevators, vestibules, corridors, stairways or fire landings of or serving the Tower Section.

4. No public hall or public elevator vestibule of the Tower Section (other than on those floors containing full-floor Tower Units) shall be decorated or furnished by any Tower Unit Owner in any manner, except as otherwise expressly provided in the Tower Section By-Laws.

5. Each Tower Unit Owner shall keep his or her Unit (and any Limited Common Element appurtenant thereto) in a good state of preservation and cleanliness, and shall not sweep or throw or permit to be swept or thrown therefrom, or from the doors or windows thereof, any dirt or other substance.

6. No window guards, except if installed by Tower Sponsor, or other window decorations shall be used in or about any Tower Unit, unless otherwise required by Law and as approved by the Tower Board. However, each Tower Unit Owner shall notify the Managing Agent in writing when a child or children under the age of eleven years lives or resides (even temporarily) in the Tower Unit. Each such Tower Unit Owner shall install, at such Unit Owner's expense, the required window guards in all windows of the Tower Unit. The Tower Unit Owner shall maintain all window guards and window limit stops installed in the Tower Unit and shall not remove the same until permitted by applicable Laws and in any event, without full knowledge of the Managing Agent. In order to promote a consistent appearance of the Building from the outside, Tower Unit Owners may install and maintain window treatment materials, where appropriate, provided that such materials have a white-colored

backing and otherwise conform to any specifications (including a new color) established from time to time by the Tower Board. Any low-voltage electric shades shall be provided and installed in the empty conduit of the Tower Unit at each Tower Unit Owner's sole cost and expense. The Tower Board has the right to change or add to the specifications for the window treatments and backings.

7. No radio, television or other aerial, satellite dish, disk or similar device shall be attached to or hung from the exterior of the Tower Section and no sign, notice, advertisement or illumination shall be inscribed or exposed on or at any window or other part of the Tower Section except such as are permitted pursuant to the Declaration, the Condominium By-Laws, the General Rules and Regulations (if any) or the Tower Section By-Laws or shall have been approved in writing by the Condominium Board and the Tower Board; nor shall anything be projected from any window of the Tower Section without similar approval.

8. No heat, ventilator or air conditioning device shall be installed in any Tower Unit without the prior written approval of the Tower Board; and no "window" air-conditioners of any kind shall be permitted.

9. All radio, television or other electrical or electronic equipment of any kind installed or used in any Tower Unit shall comply with all rules, regulations, requirements and recommendations of the New York Board of Fire Underwriters and governmental or public authorities having jurisdiction, and the Tower Unit Owner alone shall be liable for any damage or injury (or interference with Building systems) caused by any radio, television or other electrical or electronic equipment in such Unit Owner's Tower Unit.

10. No mopeds, motorcycles, bicycles, scooters or similar vehicles shall be taken into or from the Tower Section through the main Tower Section entrances or be allowed in any of the elevators other than the elevators designated by the Tower Board or the Managing Agent for that purpose, and no baby carriages or any of the above-mentioned vehicles shall be allowed to stand in the passages, public halls, vestibules, corridors or other public areas of the Tower Section. The service entrances are the only means by which bicycles should be transported in and out of the Tower Section. Tower Unit Owners or Occupants of a Tower Unit (including children) will be subject to a fine of $50 per person each time they or their guest are found in the lobby with a bicycle, scooter or tricycle or wearing rollerblades.

11. No Tower Unit Owner shall make or permit any disturbing or objectionable noises, odors or activity in the Tower Section, or do or permit anything to be done therein, which will interfere with the rights, comforts or conveniences of other Unit Owners or their tenants or occupants. No Tower Unit Owner shall play upon or suffer to be played upon any musical instrument, or operate or permit to be operated a stereo system, radio or television set or other loudspeaker in such Tower Unit Owner's Unit between midnight and the following 7:00 A.M., if the same shall disturb or annoy other occupants of the Building, and in no event shall practice or suffer to be practiced either vocal or instrumental music between the hours of 10:00 P.M. and the following 9:00 A.M. No construction or repair work or other installation involving noise shall be conducted in any Tower Unit except on weekdays (not including legal holidays) and only between the hours of 8:00 A.M. and 4:00 P.M., unless

such construction or repair work is necessitated by an emergency or is being performed by or on behalf of the owner of any Unsold Tower Units, by Tower Sponsor; or is work by or on behalf of any Non-Tower Unit Owner to repair or complete construction of any portion of the Building.

12. No pets other than dogs, caged birds, cats and fish (which do not cause a nuisance, health hazard or unsanitary condition), shall be permitted, kept or harbored in a Tower Unit without the same in each instance having been expressly permitted in writing by the Tower Board or the Managing Agents and such consent, if given, shall be revocable by the Tower Board or such Managing Agent in their sole discretion, at any time. Any pet constituting a nuisance shall be permanently removed from the Tower Section within one week after notice from the Managing Agent. In no event shall there be maintained in any Tower Unit more than two (2) pets without the prior written consent of the Tower Board (which may be granted or denied in the sole discretion of the Tower Board) nor shall any bird, reptile, or animal be permitted in any public elevator in the Tower Section for that purpose, other than the elevators designated by the Tower Board or the Managing Agents for that purpose, or in any of the public portions of the Building, unless carried or on a leash. Any Tower Unit Owner in the public portions of the Tower Section with an animal that is unleashed and not carried shall be fined $50. No pigeons or other birds or animals shall be fed from the window sills or other public portions of the Tower Section or on the sidewalk or street adjacent to the Tower Section. Each Tower Unit Owner who keeps (or permits to be kept) any type of pet in such Unit Owner's Tower Unit may be required to enter into an agreement with the Tower Board setting forth such other rules regarding pets as the Tower Board shall deem suitable and indemnifying and holding harmless the Tower Section, the Tower Board, all Tower Unit Owners and the Managing Agents from all claims and expenses resulting from acts of such pet. The Tower Board reserves the right to create and implement rules in its sole and absolute discretion against any and all pets; any such rules do not need to apply to all pets in the Tower Section equally.

13. Service personnel, messengers and tradespeople visiting or residing in the Tower Section may be required to use the elevators designated by the Tower Board or the Managing Agent for that purpose, for ingress and egress, and shall not use any of the other elevators for any purpose, except that nurses in the employ of Tower Unit Owners or their guests or tenants may use any of the other elevators when accompanying said Tower Unit owner, guest or tenant. However, a guest or visitor of a Tower Unit Owner may use any of the available elevators freely, if authorized by such Unit Owner.

14. All service and delivery persons will be required to use the service entrances to the Tower Section as may be designated by the Tower Board. All packages, including, without limitation, those containing perishable items, delivered by outside personnel must be delivered to the area therefor designated by the Tower Board or the Managing Agent (with respect to the Tower Section or Residential Limited Common Elements) or the Condominium Board. Deliveries will be made from such area to individual Tower Units only by Tower Section personnel or Residential Section personnel, or as otherwise directed by such Residential Section personnel or Tower Section personnel. Such deliveries will be made only at such times as a Tower Unit is occupied by the resident thereof or an authorized

person and said resident or authorized person is willing to accept delivery. If the Tower Unit in question is not occupied or delivery is declined, the package will be held in the designated area until the resident or authorized person returns or requests delivery, except in the case of perishable items which will be held in the designated area for no longer than 24 hours. After said 24-hour period, the perishable item shall be disposed of by Tower Section or Residential Section personnel. A Tower Unit Owner may consent in writing to the Managing Agent or the management company for deliveries when such Tower Unit Owner is not home. Tower Section or Residential Section personnel will not be responsible for packages held in the package room for more than 72 hours. No large deliveries will be accepted for a Tower Unit Owner (or Occupant of a Tower Unit) unless such Tower Unit Owner (or Occupant) has made prior arrangements with the Tower Section or Residential Section staff.

15. Trunks and heavy baggage shall be taken in or out of the Tower Section by the elevators designated by the Tower Board or the Tower Managing Agent for that purpose, and through a designated entrance only.

16. No refuse from the Tower Units, Tower Limited Common Elements or Residential Limited Common Elements shall be sent to the below grade levels or to the street except at such times and in such manner as the Tower Board or the Managing Agents may direct.

17. Water-closets and other water apparatus in the Residential Section shall not be used for any purpose other than those for which they were designed, nor shall any sweepings, rubbish, rags or any other article be thrown into the same. Any damage resulting from misuse of any water-closets or other apparatus in a Tower Unit shall be repaired and paid for by the Owner of such Tower Unit.

18. No occupant of the Tower Section shall send any employee of the Tower Section or of the Managing Agents thereof out of the Tower Section on any private business.

19. The agents of the Tower Board, the Condominium Board, or the Managing Agents, and any contractor or worker authorized and accompanied by an agent of any of the foregoing, may enter any room or Tower Unit at any reasonable hour of the day, on at least one day's prior notice to the Tower Unit Owner, for the purpose of inspecting such Tower Unit for the presence of any vermin, insects or other pests and for the purpose of taking such measures as may be necessary to control or exterminate any such vermin, insects or other pests; however, such entry, inspection and extermination shall be done in a reasonable manner so as not to unreasonably interfere with the use of such Tower Unit for its permitted purposes.

20. Corridor doors shall be kept closed at all times except when in actual use for ingress or egress to and from public corridors.

21. The Tower Board, the Condominium Board or the Tower Managing Agent shall retain a pass-key to each Tower Unit. If any lock is altered or a new lock is installed, the Tower Board or the Tower Managing Agent shall be provided with a key thereto immediately upon such alteration or installation. If the Tower Unit Owner is not personally present to open and permit an entry to his or her Tower Unit at any time when an entry therein is necessary or

permissible under these Tower Section Rules and Regulations, the Tower Section By-Laws, the Condominium By-Laws or the Declaration, and the Tower Unit Owner has not furnished a key to the Tower Board or the Tower Managing Agent, then the Tower Board or the Tower Managing Agent or their agents (but, except in an emergency, only when specifically authorized by an officer of the Tower Board or an officer of the Tower Managing Agent) may forcibly enter such Tower Unit without liability for damages or trespass by reason thereof (provided that during such entry reasonable care is given to the Tower Unit Owner's property).

22. Complaints regarding Tower Section services shall be made in writing to the Tower Board or to the Tower Managing Agent.

23. Tower Unit Owners shall not cause or permit any unusual or objectionable noise or odors to be produced upon or to emanate from their Tower Units or any public portions of the Tower Section.

24. No Tower Unit Owner or any of his or her agents, service personnel, employees, licensees or visitors shall at any time bring into or keep in such Tower Unit Owner's Tower Unit any inflammable, combustible or explosive fluid, material, chemical or substance except as shall be necessary or appropriate for the permitted uses thereof.

25. If any key or keys are entrusted by a Tower Unit Owner or by any member of his or her family or by his or her agent, servant, employee, licensee or visitor to an employee of the Tower Section or of the Managing Agents, whether for such Tower Unit Owner's Tower Unit, automobile, trunk or other item of personal property, the use of the key shall be at the sole risk of such Tower Unit Owner, and neither the Tower Board nor the Managing Agents shall be liable for injury, loss or damage of any nature whatsoever, directly or indirectly resulting therefrom or connected therewith.

26. Nothing shall be done or kept in any Tower Unit which would increase the rate of insurance of the Condominium, the Building, the Tower Section or any contents of any of the foregoing, without the prior written consent of the Tower Board. No Tower Unit Owner shall permit anything to be done or kept in his or her Tower Unit which will result in the cancellation of insurance on the Condominium, the Building or the Tower Section, or which would be in violation of any Law. No waste shall be committed in the Common Elements.

27. Tower Unit Owners will comply with the Laws, ordinances, rules and regulations of the City of New York or any other applicable governmental authority with respect to recycling of waste and refuse, including, without limitation, the separation of trash into "recyclable" and "non-recyclable" materials and/or categories of each of same. The Tower Board may designate from time to time the types of materials which must be separated for recycling, the types of containers or binding to be used by the Tower Unit Owners for the disposal of designated recyclable materials and the locations where designated recyclable materials shall be deposited. The Tower Board may also establish other rules and regulations regarding the recycling of trash. Any costs incurred by the Tower Board to enforce the Tower Section Rules and Regulations or the requirements of Laws regarding the recycling of trash against a

Tower Unit Owner, including, without limitation, legal fees, fines and penalties imposed by any government agency, shall be payable by the Tower Unit Owner as additional Common Charges. Tower Unit Owners will comply with the following procedures with respect to the use of the refuse chutes: (a) wrap dust, flour and powdered waste before depositing the same; (b) thoroughly drain and wrap in paper all garbage before depositing the same; (c) refrain from forcing large bundles into the chute; (d) crush into tight bundles all loose papers before placing the same in the hopper door; (e) deposit all bundles of waste into the hopper; and (f) refrain from depositing waste of an explosive or otherwise hazardous nature therein. Any refuse not disposable by depositing same in the refuse chute must be picked up directly from the Tower Unit by Tower Section personnel at such times and in such manner as the Tower Board or the Managing Agent shall determine.

28. Tower Unit Owners will comply with the Laws, ordinances, rules and regulations of the City of New York or any other applicable governmental authority, including without limitation, those with respect to window guards and notices of emergency access and egress.

29. Tower Unit Owners, their families, guests, service personnel, employees, agents, visitors or licensees shall not at any time or for any reason whatsoever enter upon or attempt to enter upon the roof of the Building, other than the amenity roof terrace for its intended purpose, in accordance with guidelines adopted by the Tower Board from time to time for such use.

30. The Tower Board shall have the right from time to time to relocate any portion of the Common Elements located in the Tower Section or Residential Limited Common Elements devoted to storage or service purposes of the Residential Section.

31. Unless expressly authorized by the Tower Board in each case, at least 80% of the floor area of each Tower Unit (excepting only kitchens, pantries, bathrooms, closets and foyers) must be covered with rugs, carpeting or equally effective noise-reducing material.

32. No Tower Unit Owner, tenant or occupant of a Tower Unit (other than the owner of any Unsold Tower Unit) shall conduct any group tour or exhibition of any Tower Unit or its contents or any auction sale in any Tower Unit, without the prior consent of the Tower Board or a Managing Agent.

33. In the event that any Tower Unit is used for home occupation purposes which are permitted by Law, in no event shall any patients, clients or other invitees be permitted to wait in any lobby, public hallway or vestibule.

34. All firearms are banned from the Building, except as approved by the Tower Board. No Tower Unit Owners, their families, guests, service personnel, employees, agents, visitors or licensees shall at any time have or harbor firearms while in the Building, except as approved by the Tower Board.

35. Any consent or approval given under these Tower Section Rules and Regulations may be granted, refused, added to, amended or repealed, in the sole discretion of the Tower Board, at

any time by resolution of the Tower Board.  Further, any such consent or approval may, in the discretion of the Tower Board or the Managing Agents, be conditional in nature.

36. The Tower Board reserves the right to rescind, alter, waive or add, as to one or more or all occupants, any rule or regulation at any time prescribed for the Tower Section when, in the judgment of the Tower Board, the Tower Board deems it necessary or desirable for the reputation, safety, character, security, care, appearance or interests of the Condominium, the Building or the Tower Section, or the preservation of good order therein, or the operation or maintenance of the Condominium, the Building or the Tower Section, or the equipment thereof, or the comfort of Unit Owners, occupants or others in the Building.  No rescission, alteration, waiver or addition of any rule or regulation in respect of one Tower Unit Owner or other occupant shall operate as a rescission, alteration, waiver or addition in respect of any other Tower Unit Owner or other occupant.

37. Notwithstanding any references to "Tower Unit Owner" in these Tower Section Rules and Regulations, these Tower Section Rules and Regulations shall be binding upon all Tower Unit Owners and all tenants, guests and other occupants of the Tower Unit(s) of such Tower Unit Owner(s).  Tower Unit Owners shall be responsible for enforcing compliance with, and liable for any violation of, the Tower Section Rules and Regulations by members of their families, guests, invitees, tenants, employees, agents, visitors and any other occupants of their Tower Units.

38. The Tower Board may establish such other rules and regulations it deems necessary to protect the Residential  Limited Common Elements, the Tower Limited Common Elements and the Tower Units and to ensure the integrity of the Residential Tower Building and the health and safety of the occupants.

39. With respect to any lease (and lease renewal) which, pursuant to the Tower Section By-Laws, is subject to the Tower Board's review and right of first refusal, a fee for any such lease (or renewal of a lease) as determined by the Tower Board from time to time, shall be payable. Any such Tower Unit Owner that has entered into or renewed a lease with a tenant and has not submitted the lease (or lease renewal) to the Managing Agent will have 30 days from the date notified by the Managing Agent to submit the lease or the renewal.  In the event that any such Tower Unit Owner does not submit such lease or lease renewal to the Tower Board within such thirty (30) day period, such Tower Unit Owner shall be subject to a fine as determined by the Tower Board from time to time, and further action by the Tower Board.

40.    No horseplay, ball playing, running or objectionable behavior (such as the use of loud boisterous, obscene or offensive language) in any of the amenity areas.

41.    The Unit Owners of Tower Units containing service halls, if any, shall be required to provide access to Residential Section or Tower Section personnel for purposes of retrieving recyclables and maintaining the trash chute and trash chute door and to keep such areas free of obstructions as may be required by applicable Law.

42.     Violations of these Tower Rules and Regulations will result in a fine in an amount to be determined by the Tower Board from time to time levied against the offending Tower Unit Owner (or Tower Unit Owner responsible for the offending party) for each violation. Continued violations may result in a suspension or revoking of a Tower Unit Owner's privilege to use the various Tower Section amenities by the Tower Board.

43.     For purposes of these Tower Rules and Regulations, "Tower Unit Owner" is deemed to include a spouse of a Tower Unit Owner, or children's caregiver who is over the age of eighteen (18), as well as any resident living in the Tower Section pursuant to a lease.

44. **The following Rules and Regulations are applicable only to the gym:**

(a)     Use of the gym is restricted to individuals of at least sixteen (16) years of age.

(b)     Personal trainers must submit proof of certification and insurance to management before using the gym and must at all times while using the gym be accompanied by the Tower Unit Owner being trained.  Personal trainers may not work out in the gym at any time.

45. Any additional rules and regulations as the Tower Board may adopt from time to time related to the use of the various Tower Section amenity spaces, which may include per use fees for private usage or clean up.

46. **The following provisions are applicable only to submetered electricity in Tower Units:**

(a)     Consolidated Edison Company of New York, Inc. ("Con Edison") or another local utility, energy services company, and/or on-site distributed energy resource(s) (individually or collectively, the "Distribution Utility") provides electricity to the building located at 15 Hudson Yards, New York, New York 10001 (the "Condominium"), the consumption of which will be measured through the use of a submeter for each Tower Unit.

(b)     On February 28, 2018, in Case 17-E-0301: Notice of Intent of ERY Retail Podium LLC to Submeter Electricity at 15 Hudson Yards, New York, New York 10001, Located within the Territory of Consolidated Edison Company of New York, Inc., the New York State Public Service Commission (the "PSC") approved submetering of the Tower Units within the Condominium. The Electric Service Supplier administers submetering at the Tower Units, which is performed by a third-party billing company under contract with the Electric Service Supplier to invoice residents for their monthly utility usage.

(c)     Electric consumption for each Tower Unit is recorded through separate electric submeters. The Tower Unit Owner will be required to pay the Electric Service Supplier for the use of electricity at the Tower Unit on the basis of a separate submetered charge that will be billed to the Tower Unit Owner by the Electric Service Supplier or its third-party billing company on a monthly basis. The Electric Service Supplier shall afford the Tower Unit Owners all notices and protections available pursuant to Home Energy Fair Practices Act ("HEFPA") before any action(s) based on such non-payment is commenced, including, but not limited to, termination of service.

(d)    The rate calculation to be used to determine each Tower Unit's submetered electric bill is the Con Edison Service Classification SC-1 for direct metered service. Specifically, the Tower Unit Owner's kilowatt hour ("kWh") usage will be multiplied by the Con Edison Service Classification SC-1 tariffed rate for a billing period, plus applicable taxes.

The Con Edison Service Classification SC-1 rate is a combination of various items, including, but not limited to:

> Basic Customer Charge: This is a charge for basic system infrastructure and customer-related services, including customer accounting, meter reading, and meter maintenance.

> kWh Cost: This energy charge is broken down into separate components, including market supply, monthly adjustment, and delivery (transmission and distribution).

> Systems Benefit Charge ("SBC")/Renewable Portfolio Standard ("RPS"): This is an additional charge per kWh.

> Fuel Adjustment: The sum of Market Supply Charge ("MSC") and Monthly Adjustment Charge ("MAC") adjustment factors.

The following is an example of the formula that will be used to derive the Tower Unit Owner's electricity charges based on the current Con Edison Service Classification SC-1 rate and a monthly use of 250 kWh:

| Type of Charge | Calculation | Total |
|---|---|---|
| Basic Charge | | $YY.YY |
| kWh | .XXXXX times 250 kWh | $YY.YY |
| Systems Benefit Charge | .XXXXX times 250 kWh | $ Y.YY |
| Fuel Adjustment Charge | .XXXXX times 250 kWh | $ Y.YY |
| **Subtotal** | | **$YY.YY** |
| Utility Tax | .XXXXX times Subtotal YY.YY | $ Y.YY |
| **New Subtotal** | | **$YY.YY** |
| Sales Tax | New Subtotal YY.YY times .045000 | $ T.TT |
| | New Subtotal YY.YY plus T.TT | $ZZ.ZZ |
| **Total Tower Unit Owner Cost** | | **$ZZ.ZZ** |

All Con Edison rates by classification are available on its website (www.coned.com) by clicking on "Rates and Tariffs." The applicable electric rates and tariffs are listed under the heading "P.S.C. No. 10 – Electricity."

In no event will the total rate for a billing period (including any monthly administrative charge but excluding sales tax) exceed Con Edison's rates and charges for delivery and commodity in that billing period to similarly-situated, direct-metered residential customers (*see* 16 NYCRR § 96.1 [i]).

The Electric Service Supplier or its third-party billing company will read the meters monthly and process a bill based on the Tower Unit Owner's actual consumption. The meter reading data and billing calculations will be documented and maintained for a 6-year period for each unit.

If a Tower Unit Owner has a question about the submetered electricity bill or believes it is inaccurate, he or she may contact the Electric Service Supplier through its Assistant General Manager by telephone at (212) 519-1182, or by mail at Management Office, Attn: Assistant General Manager, 60 Columbus Circle, 19th Floor, c/o ERY Retail Podium LLC, New York, New York 10023. In the event of a complaint about the submetered electricity bill, the Tower Unit Owner shall submit such complaint in writing to the Electric Service Supplier by mail to the address in the previous sentence. In turn, the Electric Service Supplier and/or its third-party billing company shall investigate the Tower Unit Owner's complaint within fifteen (15) days of the receipt of the complaint and will report the results to the complainant thereafter. As part of this response, the Tower Unit Owner shall be advised of the disposition of the complaint and the reason therefor. If the Tower Unit Owner and the Electric Service Supplier cannot reach an agreement and the Tower Unit Owner continues to believe the complaint has not been adequately addressed, then the Tower Unit Owner may file a complaint with the PSC through the Department of Public Service. Alternatively, the Tower Unit Owner may contact the PSC at any time concerning submetered service in writing at New York State Department of Public Service, 3 Empire State Plaza, Albany, New York 12223, by telephone at (800) 342-3377, by facsimile at (212) 417-2223, in person at the nearest office at 90 Church Street, New York, New York 10007, or via the Internet at www.dps.ny.gov.

(e)     As a residential customer for submetered electricity, each Tower Unit Owner is afforded rights and protections available to residential energy consumers in New York State under HEFPA, including the ability to file a complaint with the PSC. The nearest office of the PSC is located at: New York State Public Service Commission, 90 Church Street, New York, NY 10007, and can be reached by telephone at (800) 342-3377, by facsimile at (212) 417-2234, or via the Internet at www.dps.ny.gov. The Tower Unit Owner may contact the Department of Public Service at any time if dissatisfied with the Electric Service Supplier's response to a complaint or at any time regarding submetered service.

(f)     The Tower Unit Owner irrevocably consents to the Electric Service Supplier's entry, upon reasonable notice of no less than forty-eight (48) hours, into their Tower Unit in order to inspect, repair, test, replace, or access the electrical installations, including the submeter, serving the Tower Unit. Such access may include, and is not limited to, taking such action(s) as may be necessary to terminate service to the Tower Unit for nonpayment of electric charges. In the event the Tower Unit Owner is not present to permit the Electric Service Supplier or Electric Service Supplier's representative to enter the Tower Unit and entry is necessary or allowed by Law or under the Condominium's governing documents, the Electric Service Supplier or its representatives may nevertheless enter the Tower Unit.

(g)     A Tower Unit Owner may request budget billing for the Tower Unit's submetered electricity charges. Budget billing divides the electricity costs into equal monthly payments. Periodically, the Electric Service Supplier or its third-party billing company will review the budget billing for conformity with actual billings and may adjust that monthly amount as necessary. After those reviews, you may be responsible to pay for any electricity costs in excess

of the budget billing amount(s) you previously paid. You may contact the Electric Service Supplier to discuss the details of a budget billing plan, if you are interested.

(h)     If the Tower Unit Owner has difficulty paying the submetered electricity bill, the Tower Unit Owner may contact the Electric Service Supplier in order to request a deferred payment agreement, whereby the Tower Unit Owner may be granted the ability to pay the balance owed over a period of time. If the Tower Unit Owner can show financial need, the Electric Service Supplier can work with the Tower Unit Owner to negotiate the length of the agreement and the amount of each monthly payment.

(i)     Regardless of the Tower Unit Owner's payment history relating to the Tower Unit Owner's submetered electricity bills, the Tower Unit Owner's submetered electricity service will be continued if the Tower Unit Owner's health or safety or the health or safety of someone living in the Tower Unit is threatened. When the Electric Service Supplier becomes aware of such hardship, the Electric Service Supplier can refer the Tower Unit Owner to the Department of Social Services. The Tower Unit Owner shall notify the Electric Service Supplier if either of the following conditions exist: (i) the Tower Unit Owner and/or another resident of the Tower Unit is suffering from a medical emergency, substantiated by a medical certificate from a doctor or local board of health; or (ii) the Tower Unit Owner and/or another resident of the Tower Unit suffer from a medical condition requiring electricity service to operate a life-sustaining device, where a medical certificate from a doctor or local board of health demonstrates this necessity.

(j)     Special protections may be available to the Tower Unit Owner. Such protections may be available if the Tower Unit Owner and those living with the Tower Unit Owner are age eighteen (18) or younger or sixty-two (62) or older, blind, or disabled. If the Tower Unit Owner is age sixty-two (62) or older, the Tower Unit Owner may be eligible for quarterly billing for the Tower Unit Owner's submetered electric charges.

(k)     The Tower Unit Owner may designate a third party as an additional contact to receive notices of past due balances for the Tower Unit Owner's electric charges.

(l)     Any submetering refunds will be credited to a submetered Tower Unit Owner affected by the Electric Service Supplier's actions that led to such refunds provided that the Electric Service Supplier has such contact information for such Tower Unit Owner.

(m)     The Tower Unit Owner agrees that at all times the use of electricity in the Tower Unit shall never exceed the capacity of existing feeders to the Condominium or the risers, wiring, or electrical installations serving the Tower Unit. Except to the extent permitted by the Condominium Documents, the Tower Unit Owner shall not make any alterations, modifications, or additions to the electrical installations serving the Tower Unit.

(n)     The Electric Service Supplier shall have the right to suspend submetered electricity service to a/the Tower Unit(s) when necessary by reason of accident or for repairs, alterations, replacements, or improvements necessary or desirable in the Electric Service Supplier's judgment for as long as may be reasonably required by reason thereof, and the Electric Service Supplier shall not incur any liability for any damage or loss sustained by the

Tower Unit Owner or any other resident of the Tower Unit as a result of such suspension. The Electric Service Supplier shall not in any way be liable or responsible to the Tower Unit Owner or any other occupant for any loss, damage, cost, or expense that the Tower Unit Owner or any occupant of the Tower Unit may incur if either the quantity or character of electricity service is changed or is no longer available or suitable for the Tower Unit Owner's requirements or if the supply or availability of electricity is limited, reduced, interrupted, or suspended by the Distribution Utility serving the Condominium or for any reason or circumstances beyond the Electric Service Supplier's control. Except as may be provided by applicable Law, the Tower Unit Owner shall not be entitled to any credit or refund because of a stoppage, modification, interruption, suspension, limitation, or reduction of electricity service to the Tower Unit.

(o)     If the Electric Service Supplier or its third-party billing company fails to deliver a bill to the Tower Unit Owner for the use of submetered electricity at the Tower Unit for any given billing period, then such failure shall not prejudice or impair the Electric Service Supplier's right to subsequently deliver or cause its third-party billing company to deliver such a bill to the Tower Unit Owner, nor shall any such failure relieve or excuse the Tower Unit Owner from having to pay to such bill, except as may otherwise be provided by applicable Law.

47.     Smoking is permitted in individual Tower Units. However, Tower Unit Owners and their guests shall not permit cigarette, e-cigarette, cigar or pipe smoke to escape from a Tower Unit or enter any other Unit or the Common Elements. Tower Unit Owners, their guests and tenants shall not smoke in their Tower Units if they are unable to prevent the smoke from entering the Common Elements or another Unit.  Smoking is prohibited in all interior and exterior common areas. The Tower Board shall have the right to seek and obtain a court order enjoining the occupant of a Tower Unit from smoking in the Tower Unit if the smoke escapes the Tower Unit, and the Tower Board shall have the right to seek the eviction of a tenant who violates the foregoing.  In addition to all other remedies available to the Boards, violation of this policy by any occupant of a Tower Unit shall subject the Tower Unit Owner to (i) a fine in an amount to be determined from time to time by the Tower Board, and (ii) reimbursement of any fees or expenses incurred by the Tower Board to cause the smoke infiltration into the Common Elements or another Unit to cease (including legal fees) in enforcing this provision.