UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X

CHANEL MOODY, AYANDA CARMICHAEL,
AND RONNIE CLARK,                                   CIVIL ACTION

                          Plaintiffs,               No.: 21-cv-06238-VEC

        -against-

THE RELATED COMPANIES, L.P., AND
ERY SOUTH RESIDENTIAL TOWER LLC,

                          Defendants.

-----------------------------------------------------------X

### PLAINTIFFS' OPPOSITION TO DEFENDANTS THE RELATED COMPANIES, L.P., AND ERY SOUTH RESIDENTIAL TOWER LLC'S MOTION TO DISMISS

Dated: December 1, 2021
        New York, New York

MARK DAVID SHIRIAN P.C.
Mark D. Shirian, Esq.
228 East 45th Street, Suite 1700-B
New York, New York 10017
Tel: (212) 931-6530
Email: mshirian@shirianpc.com
*Attorneys for Plaintiffs*
CHANEL MOODY, AYANDA
CARMICHAEL, AND RONNIE CLARK

**<u>Table of Contents</u>**

Table of Authorities…………………………………………………………...……………iii-v

I. Introduction……………………………………………………………………………..1

II. Factual Background…………………………………………………………………….3

III. Legal Argument…………………………...………………………………...…..……..9

    A. Standards of review …………………………...………………………….....…..9

    B. Plaintiffs Have Adequately Pleaded Claims For Which Relief Can Be Granted …...…….10

      1. Plaintiffs Have Sufficiently Alleged Their FHA Claims…………………………...10
        (i) Plaintiffs Have Adequately Pled a Claim for Intentional Discrimination…………12
        (ii) Plaintiffs Sufficiently States a Claim of Disparate Impact under the FHA……….18

      2. Plaintiffs Have Adequately Pleaded Their State- and Local-Law Claims…………....24

IV. Conclusion…………………………………………...……………………………….25

## Table of Authorities

**Cases**

*ACORN v. Cty. of Nassau*, No. 05-CV-2301 (JFB) (WDW), 2006 U.S. Dist. LEXIS 50217 (E.D.N.Y. July 21, 2006)…………………………….…………………………………..…16

*Arista Records, LLC v. Doe 3.* 604 F. 3d 110, 120 (2d Cir. 2010)...……………………………..10

*Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U. S. 252, 264-265, 97 S. Ct. 555, 50 L. Ed. 2d 450 (1977) ……………………..………………………………..13, 14

*Ashcroft v. Iqbal* 556 U.S. 662 (2009) ……………………………..………………...….…9, 10

*Ave. 6E Invs., LLC v. City of Yuma*, 818 F.3d 493, 503 (9th Cir. 2016) ………..………..………18

*Bank of Am. Corp. v. City of Miami, Fla.*, 137 S. Ct. 1296, 1303, 197 L. Ed. 2d 678 (2017)..…..21

*Bell Atlantic Corp. v. Twombley*, 550 U.S. 554, 555 (2007) …………………………………..9

*Boykin v. KeyCorp*, 521 F.3d 202, 213 (2d Cir. 2008) …………………………………………16

*Branum v. Clark*, 927 F.2d 698, 705 (2d Cir. 1991) …………………………..…………….…9

*Candlehouse, Inc. v. Town of Vestal, N.Y.,* 2013 U.S. Dist. LEXIS 63353, 2013 WL 1867114, at *13 (N.D.N.Y. May 3, 2013) …………………………..………………………………..20

*Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U. S. 520, 541-542, 113 S. Ct. 2217, 124 L. Ed. 2d 472 (1993) …………………………..……………………………..………….…………15

*Conley v. Gibson*, 355 U.S. 41, 45-46 (1957) ……………………………..……………….....9

*Crossroads Residents Organized for Stable & Secure ResiDencieS (CROSSRDS) v. MSP Crossroads Apartments LLC*, No. 16-233 ADM/KMM, 2016 U.S. Dist. LEXIS 86965, (D. Minn. July 5, 2016) …………………………..………………………………..……………18, 19, 21, 22

*Dews v. Sunnyvale*, 109 F. Supp. 2d 526 (N.D. Tex. 2000) ……………………..…...14-15

*EEOC v. Port Auth. of N.Y. & N.J.*, 768 F.3d 247, 254 (2d Cir. 2014) …………………………..9

*Fair Hous. in Huntington Comm. v. Town of Huntington*, No. 02-CV-2787 (DRH) (WDW), 2005 WL 3184273, at * 3 (E.D.N.Y. Nov. 29, 2005) …………………………..……………9, 12, 22

*Francis v. Kings Park Manor, Inc.*, 992 F.3d 67, 73 (2d Cir. 2021) …………………..…..10

*Gashi v. Grubb & Ellis Property Management Services, Inc.*, No. 3:09-CV-1037 (JCH), 2010 U.S. Dist. LEXIS 73926, at *15 (D. Conn. July 20, 2010) …………………….………………..21

*Gorokhovsky v. N.Y. City Hous. Auth.,* 552 Fed.Appx. 100, 102 (2d Cir. 2014) …………..…….25

*Griggs v. Duke Power Co.*, 401 U.S. 424, 431, 91 S. Ct. 849, 28 L. Ed. 2d 158 (1971) …….....18

*Hack v. President & Fellows of Yale Coll.*, 237 F.3d 81, 91 (2d Cir. 2000) …………….....20-21

*Hamad v. Woodcrest Condo Ass'n*, 328 F.3d 224, 232 (6th Cir. 2003) …………………………22

*Hunter v. Underwood*, 471 U. S. 222, 233, 105 S. Ct. 1916, 85 L. Ed. 2d 222 (1985). …....…….15

*Huntington Branch, NAACP v. Huntington,* 844 F.2d 926 (2d Cir. 1988) …………12, 13, 15, 16

*LeBlanc-Sternberg v. Fletcher,* 67 F.3d 412, 425 (2d Cir. 1995) …………………………..…….13

*Lotes Co. v. Hon Hai Precision Indus. Co.,* 753 F. 3d 395, 403 (2d Cir. 2014). …………..…….10

*Meyer v. Bear Road Assocs.,* 124 F. App'x 686, 688 (2d Cir. 2005) ……………………..……..20

*Paige v. N.Y.C. Hous. Auth.,* No. 17cv7481, 2018 U.S. Dist. LEXIS 137238, (S.D.N.Y. Aug. 14, 2018)…………………….…..…………………………………..……………………………...……19-23

*Ricci v. DeStefano*, 557 U. S. 557, 577, 129 S. Ct. 2658, 174 L. Ed. 2d 490, (2009) …………..13

*Saunders v. Farmers Ins. Exch.,* 537 F.3d 961, 964 (8th Cir. 2008) …………………………....18

*Smith v. Anchor Bldg. Corp.,* 536 F.2d 231, 233 (8th Cir. 1976) ………………………………18

*Smith v. Johnson*, 14 Civ. 3975 (KBF), 2014 WL 5410054, at *4 (S.D.N.Y. Oct. 24, 2014) …..25

*Swierkiewicz v. Sorema N.A.*, 534 U.S. 506. (2002) ………………………..……..9, 13, 16, 20

*Teamsters v. United States*, 431 U. S. 324, 97 S. Ct. 1843, 52 L. Ed. 2d 396 (1977)…………...13

*Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, 135 S. Ct. 2507, 2513 (2015) …………………………..…….…………………….…....……………..11, 13, 15, 18

*Trafficante v. Metro. Life Ins. Co.,* 409 U.S. 205, 209, 93 S. Ct. 364, 34 L. Ed. 2d 415 (1972)………………………………………………………………..…..3, 11, 19, 22

*Tsombanidis v. West Haven Fire Dept.,* 352 F.3d 565, 574-75 (2d Cir. 2003) …..…….20, 21, 23

*U.S. v. City of Yonkers*, 96 F.3d 600, 612 (2d Cir. 1996) …………………………………………14

*United States v. Yonkers Board of Education*, 837 F.2d 1181 (2d Cir. 1988) …..……...11, 13, 16

**Statutes**

42 U.S.C. §3604…..……………………..…………...…………..………………*passim*

**Other Authorities**

Audrey McFarlane, The Properties of Integration: Mixed-Income Housing as Discrimination
Management, 66 U.C.L.A. Law Review 1140 (2019)…………………………...………2, 24

Audrey G. McFarlane, Operatively White?: Exploring the Significance of Race and
Class Through the Paradox of Black Middle-Classness, L. & CONTEMP. PROBS., 163, 184–85
(2009)………………………………………………………………………………..2

Justin Wm. Moyer, NYC Bans 'Poor Doors' – Separate Entrances for Low-Income Tenants,
WASH. POST (June 30, 2015) (describing the poor door controversy and the statutory changes
that followed outrage over the practice's perceived unfairness and cruelty)…………………..4

THE LEGAL GUIDE TO AFFORDABLE HOUSING DEVELOPMENT 65 (Tim Iglesias &
Rochelle E. Lento eds., 2006) …………………………..……………………………………11

Plaintiffs Chanel Moody, Ayanda Carmichael, and Ronnie Clark, (collectively, "Plaintiffs") hereby respectfully submit this memorandum of law in opposition to Defendants, The Related Companies, L.P., and ERY South Residential Tower LLC's (collectively, "Defendants") motion to dismiss Plaintiffs' Amended Complaint, dated October 15, 2021 ("Amended Complaint").

## I.      INTRODUCTION

Contrary to the Defendants' assertion, this is a certainly a case that should have been brought, as "poor doors" and racial disparities in housing have been a cause for concern in many areas of New York City and across our nation. In their motion to dismiss this housing discrimination action, Defendants misapply the relevant legal principles, and misconstrue facts alleged in the Amended Complaint. Contrary to Defendant's arguments, Plaintiffs' allegations are sufficient to withstand the current motion to dismiss.

As the Amended Complaint alleges, this action is not just about economic disparities regarding wealth, but rather the configuration of a housing complex that intentionally perpetuates racial discrimination by isolating minority low-income tenants and robbing them of important benefits from interracial associations and their right to live in an integrated community. *See* Amended Complaint, ¶ 87.[1] The isolation and segregation of low-income tenants, majority of whom are minorities, within a housing complex, is just as much as a racial issue as it is an economic issue, as it is clear that race and class were taken into account when designing 15 Hudson Yards. Incredibly, the Defendants, in their tone-deaf approach, have somehow convinced themselves that that this an "apples to oranges" comparison, which is certainly not the case.

---

[1] Plaintiffs' First Amended Complaint is annexed hereto as Exhibit A.

The racial animus of the Defendants can easily be inferred by critics of the "poor door".
As explained in Audrey McFarlane's *The Properties of Integration: Mixed-Income Housing as Discrimination Management,* 66 U.C.L.A. Law Review 1140 (2019):

> "Class is a racialized concept in the United States, and questions of economic justice are intertwined with racial justice…Thus, even in supposedly race neutral housing schemes, race and class differences are interacting in an overlapping, unspoken ways that result in perplexing controversies like the poor door…While mixed-income housing is appealingly and expediently framed in race-neutral, market-based terms that emphasize price point and housing tenure, the focus on income fails to acknowledge the racial dynamics within mixed-income communities. Studies indicate that micro-segregation takes place when there are visible markers of status differences, such as race, use of public housing, and tenure. More cross-class contact takes place when there is homogeneity of status… In other words, when class tracks race, assumptions, stigmatization, and segregation result. Thus, instead of integration and inclusion, mixed-income housing schemes promise to render the poor socially isolated because they ignore the potential for micro-segregation. This deprives the low-income resident of status and a voice in their own community"). [2]

The Defendants here cannot dispute that they have intentionally placed low-income tenants to specific lower floors of this housing complex, with a separate address, amenities and elevators that only stop on these specific floors. Moreover, the Defendants cannot dispute that they have purposely prevented any or otherwise limited interaction between these low-income tenants, many of whom are minorities, and the market-rate tenants *by design,* which has disparately impacted minorities who are in need of low-cost housing. This is not a case about economic disparities, but rather a case about decisions by developers who intentionally perpetuate racial discrimination by

---

[2] *See*, Audrey McFarlane, *The Properties of Integration: Mixed-Income Housing as Discrimination Management,* 66 U.C.L.A. Law Review 1140 (2019),  pg. 1157-1158, 1204. "Several scholars have discussed the intersection between racial justice and economic justice: The literature has long acknowledged an intersection between race and class, but there has been little actual exploration of the meaning of this interaction and its significance for antidiscrimination theory . . . . [R]ace, as the central barrier to a black person's opportunities, may change as class changes. Class is something that can be deployed in certain circumstances to deflect racial stigma and disadvantage suggests that race is inaccurately conceptualized as fixed or absolute. It might instead be only nearly fixed and nearly absolute, a slight albeit noteworthy shift signaling issues that might have to be faced fully if and when improvement in economic conditions for Blacks continues. Class is conceptualized or mythologized as fluid because it can be manipulated by acquisition of material things. But there might likewise be changes in the perception of one's race as one travels through different strata of class." Audrey G. McFarlane, Operatively White?: Exploring the Significance of Race and Class Through the Paradox of Black Middle-Classness, L. & CONTEMP. PROBS., 163, 184–85 (2009).

isolating low-income tenants and causing injury to prospective and current tenants by the exclusion

of minority persons from the apartment complex [through] the loss of important benefits from

interracial associations." See Amended Complaint, ¶ 78-80, *Trafficante v. Metro. Life Ins. Co.,*

409 U.S. 205, 209, 93 S. Ct. 364, 34 L. Ed. 2d 415 (1972);

     As will be demonstrated below, the Defendants are not entitled to a dismissal of Plaintiffs'

claims. For the reasons set forth below, Plaintiffs respectfully request that Defendants' motion to

dismiss Plaintiffs' First Amended Complaint be denied in its entirety.

## II.    FACTUAL BACKGROUND

     Plaintiffs bring this action as prospective low-income tenants of 553 West 30th Street,

based on their collective rejection of Defendants' offer of affordable units, in light of

Defendants' discriminatory housing practices and disparate impact of instituting a "poor

building address" and isolating low-income tenants to specific lower floors, separate from the

market-rate tenants and units located on higher floors of 15 Hudson Yards, New York, New

York 10001. *See Amended Complaint,* ¶ 15, 21-23. Plaintiff, Chanel Moody, in an African

American female and resides in New York County, City and State of New York. *Id.* ¶ 18.

Plaintiff, Ayanda Carmichael, is a disabled African American female and resides in New York

County, City and State of New York. *Id.* ¶ 19. Plaintiff, Ronnie Clark, is an African American

male and resides in New York County, City and State of New York. *Id.* ¶ 20.

     At all relevant times, Defendants have developed a mixed-use project such as 553 West

30th Street, a/k/a 15 Hudson Yards, above a 26-acre rail yard off 10th Avenue, between 30th and

33rd Streets, owned by the Metropolitan Transportation Authority. The Hudson Yards

Redevelopment Project comprises 28 acres (0.11 km2) in Manhattan's Chelsea and Hell's

Kitchen neighborhoods. *Id.* ¶ 31. Section 421-a of the New York State Real Property Tax Law,

("Section 421-a of the New York State Real Property Tax Law") (hereafter "421-a") entitled "Affordable New York Housing Program," is a real estate tax exemption program for owners of certain newly-constructed [*4]   multiple dwellings. *Id.* ¶ 4 The 421-a tax abatement was extended to developers who agreed to provide affordable housing among luxury high-end apartments. *Id.* ¶ 6.  Many developers managed to benefit from the millions of dollars in tax breaks along with added construction privileges. However, to maximize profits and marketability, developers vowed to segregate affordable units from their luxury ones. *Id.* ¶ 7.

The term "poor door" is attributed to separate building entrances and, in reality, income-segregated properties often have separate amenities, as well, which can only be accessed by apartment owners or tenants with a higher income. [3] *Id.* ¶ 8. In or around 2015, New York City Mayor De Blasio attempted to take action and added language to the legislative loophole of §421-a, which was signed by Governor Andrew Cuomo, to supposedly outlaw "poor doors," and likewise, "poor buildings," stating that affordable units "must share the same common entrances and common areas as the market-rate units":

> (ii) affordable units shall share the same common entrances and common areas as market rate units, and **shall not be isolated to a specific floor or area of a building**. Common entrances shall mean any area regularly used by any resident for ingress and egress from a multiple dwelling.

*See* N.Y. Real Prop. Tax Law § 421-a (Consol., Lexis Advance through 2021 released Chapters 1-156). *Id.* ¶ 9.

Upon information and belief, and at all relevant times herein, 553 West 30th (a/k/a 15 Hudson Yards) is a residential housing development that received and continues to receive the "Low Income Housing Tax Credit" under the 421-a partial tax exemption program. *Id.* ¶ 52. *Id.*

---

[3] See, e.g., Justin Wm. Moyer, NYC Bans 'Poor Doors' – Separate Entrances for Low-Income Tenants, WASH. POST (June 30, 2015) (describing the poor door controversy and the statutory changes that followed outrage over the practice's perceived unfairness and cruelty).

¶ 54.

In or around July 2019, Plaintiffs were selected from a housing lottery and later approved through "NYC Housing Connect" for low-income housing tenancy that Plaintiffs initially thought were located at "15 Hudson Yards" but in actuality were located at 553 West 30th. *Id.* ¶ 57, 59. Although Plaintiffs were interested in residing at 15 Hudson Yards as low-income tenants, they later became aware that the units offered by Defendants were located at 553 West 30th Street, New York, NY 10001, which sits on the same grounds as 15 Hudson Yards, but in an entirely separate part of the building and with a different address. *Id.* ¶ 58.

In or around November 18, 2019, and November 25, 2019, Plaintiffs were interviewed for the low-income units at 553 West 30th Street.  *Id.* ¶ 60. However, in or around November 2019 when Plaintiffs interviewed and inquired into the units that they were offered at 553 West 30th, Plaintiffs noticed that the building located at 553 West 30th Street was located at a separate building address from 15 Hudson Yards, specifically for the low-income units located on lower floors, that was adjacent to 15 Hudson Yards, the building with the market-rate units for sale and/or rent on higher floors. *Id.* ¶ 61.

At the time the low-income units became available in or around 2019, and at all relevant times herein, Defendants illegally segregated and discriminated against Plaintiffs and other prospective and current tenants of 553 West 30th Street by segregating the low-income units from market-rate units by placing low-income units on lower floors, and, at one point, excluding the low-income tenants from the same entrance and exit, amenities, rules and regulations, and limiting access to the overall building structure and address of 15 Hudson Yards, among other violations. *Id.* ¶ 62. Specifically, Plaintiffs noticed that 15 Hudson Yards was a separate address with its own separate entrance that featured numerous amenities, including a fitness center,

rooftop deck, screening room, pool, and a 24-hour doorman, which Plaintiffs would not have access to at 15 Hudson Yards as prospective low-income tenants of 553 West 30th Street. *Id.* ¶ 63. In or around August 2019 and March 2020, Elvira Quintero Barroso of Related, interviewed Plaintiff Chanel Moody and informed her of the different rules and regulations and what was prohibited as a prospective tenant of 553 West 30th Street.  While at the interview, Plaintiff Moody asked Elvira Quintero Barroso whether she would be able to enter the 15 Hudson Yards entrance in order to access the 553 West 30th Street side of the premises. However, Elvira Quintero Barroso told Plaintiff Moody that she was prohibited from entering the 15 Hudson Yards entrance and from utilizing the pool and playroom located at 15 Hudson Yards. *Id.* ¶ 64.

Pursuant to the Regulatory Agreement between the New York State Housing Finance Agency and the Defendants, there are affordable rental units on the lower floors (with the address of 553 West 30th Street) and luxury condominiums on the upper floors (with the address of 15 Hudson Yards). *Id.* ¶ 66.  Further, 15 Hudson Yards has separate elevators from 553 West 30th Street and a 24-hour doorman. However, in comparison, the doorman assigned to 553 West 30th Street regularly leaves at 10 PM and the tenants of 553 West 30th Street have limited access to certain upper floors and are prohibited from entering certain upper floors within 15 Hudson Yards, including the pool area on the 50th Floor of 15 Hudson Yards. *Id.* ¶ 67. Additionally, the lobby of 553 West 30th Street is smaller in comparison to the lobby of 15 Hudson Yards, and at one point was sealed off from 15 Hudson Yards and has its own separate mailboxes and elevators from 15 Hudson Yards. *Id.* ¶ 68. Upon information and belief, the elevators within 553 West 30th Street only allow tenants to travel to floors 16-23, which is limited to lottery recipient floors, and do not have access to floors with market-rate units at 15 Hudson Yards. *Id.* ¶ 69. Upon information and belief, the units within 553 West 30th Street are affordable housing units, and do not have a washer and dryer within the unit, as compared to the market-rate units at 15

Hudson Yards. However, tenants of 553 West 30th do have access to a laundry room on the 16th Floor because they do not have in-unit washer and dryers. *Id.* ¶ 70. Such accommodations are necessary to afford Plaintiffs as prospective low-income tenants an equal opportunity to use and enjoy the dwelling and its amenities. *Id.* ¶ 71.

Upon realizing the discriminatory segregation and glaring "financial apartheid" among these two differing addresses within the 15 Hudson Yards premises, the Plaintiffs collectively declined the Defendants' offer of low-income units at 553 West 30th Street (a/k/a 15 Hudson Yards) in or around March 2020. *Id.* ¶ 72. The Defendants RELATED and ERY SOUTH's policy for segregating and isolating the low-income tenants to specific lower floors within a different building address has discriminatory effects, and by exclusively placing the low-income tenants to specific floors within a separate and different address (553 West 30th), away from the market-rate units at 15 Hudson Yards, Defendants RELATED and ERY South are perpetuating racial segregation, which amounts to a form of illegal housing discrimination. *Id.* ¶ 73.

That the physical separation of the floors and building addresses between 553 West 30th and 15 Hudson Yards, specifically the separation of the low-income units from the market-rate units, respectively, disproportionately occupied by racial minorities, violates the Fair Housing Act, New York City and State Human Rights Laws, by impeding integration by restricting low-income housing needed by minorities exclusively to an area of a building mostly inhabited by minorities. *Id.* ¶ 74. The discriminatory effects of Defendants separating the building addresses between 553 West 30th and 15 Hudson Yards are racial segregation and impermissibly depriving their low-income tenants of 553 West 30th of the social and economic benefits of integration while also compromising the dignity of the population being segregated. *Id.* ¶ 75- 76. Specifically, the separate building addresses, and likewise entries, rules and regulations and the prohibition of low-income tenants from utilizing the same amenities as the adjacent 15 Hudson

Yards building with the market-rate units, have a disproportionately adverse impact on minorities because they significantly perpetuate segregation and deprives a protected class of individuals from enjoying the benefits of integration, and deprives the Plaintiffs, and prospective and current minority occupants of low-income units of the potential opportunity to socialize with people from more economically advantaged backgrounds and implies that they are undesirable neighbors. *Id.* ¶ 77, 78, 79. Defendants' discriminatory practice as described above endorses a practice that imputes inferiority upon the occupants of the affordable units on a symbolic and actual basis. *Id.* ¶ 80.  Further, facially neutral housing practices that have a disparate impact on the basis of race or color are prohibited by the Fair Housing Act. *Id.* ¶ 81.

Defendants' decisions to segregate the affordable units from the market-rate units into two separate building addresses and isolated to lower floors and to prevent low-income tenants from using the same amenities as the high-income tenants are unlawful under this standard. Such separation has a severe disparate impact on minorities, and any legitimate business and/or uniformity concerns can be satisfied through the less discriminatory alternative of creating the same address, entrances and shared amenities, including playrooms, for low-income tenants and high-income tenants, including placing low-income units on the same floor as market-rate units. *Id.* ¶ 82. Moreover, the disparate impact of Defendants' facially neutral housing practice may be so evident and foreseeable that it demonstrates an unlawful intent to discriminate. *Id.* ¶ 83. While Defendants provide a predominantly minority community with a form of social assistance through the 421-a program, it still deprives them of racial integration benefits, which simultaneously violates the Fair Housing Act and New York State and City Human Rights Laws. *Id.* ¶ 86. Plaintiffs have been directly and substantially harmed by Defendants' separation policy of offering units to an isolated area of lower floors with a different address, which deprives a protected class of individuals from enjoying the benefits of integration, including Plaintiffs. *Id.*

¶ 87. Because Defendants' policy has a large discriminatory impact on the basis of race and is not necessary to achieve a legitimate business purpose, it is unlawfully discriminatory. *Id.* ¶ 88. Defendants' housing separations do not support its core mission and does not help sustain demand and value for market-rate homes for sale and/or rent. *Id.* ¶ 89.

### III.    LEGAL ARGUMENT

### A.  Standards of review

A complaint may only be dismissed for failure to state a claim under Rule 12(b)(6) if it is "beyond doubt that the plaintiff[s] can prove no set of facts in support of [their] claim which would entitle [them] to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); see *Fair Hous. in Huntington Comm. v. Town of Huntington*, No. 02-CV-2787 (DRH) (WDW), 2005 WL 3184273, at * 3 (E.D.N.Y. Nov. 29, 2005) (FHA claims sustained "at this early stage in the litigation"). This rule "is to be applied with particular strictness when the plaintiff complains of a civil rights violation." *Branum v. Clark*, 927 F.2d 698, 705 (2d Cir. 1991).

Rule (8)a of the Federal Rules of Civil Procedure requires "a short and plain statement of the claim showing that the pleader is entitled to relief," a standard that merely requires that a complaint "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1947); *see also Bell Atlantic Corp. v. Twombley*, 550 U.S. 554, 555 (2007). A plaintiff need only plead "enough facts to state a claim to relief that is plausible on its face to nudge [ ] [his or her] claims across the line from conceivable to plausible." *Id.* at 570. In the Title VII context, a plaintiff need not plead all the elements of a prima facie case in order to withstand a 12 (b) (6) motion.  *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506. (2002). *Swierkiewicz's* holding remains good law after *Ashcroft v. Iqbal* 556 U.S. 662 (2009) and *Twombly*. *EEOC v. Port Auth. of N.Y. & N.J.*, 768 F.3d 247, 254 (2d Cir. 2014). Plaintiffs have

specific, "reduced" pleading burdens in cases subject to the *McDonnell Douglas* analysis. For a plaintiff's claim to survive a motion to dismiss in a *McDonnell Douglas* case, he or she must plausibly allege that he "[1] is a member of a protected class, . . . [2] suffered an adverse . . . action, and [3] has at least minimal support for the proposition that the [housing provider] was motivated by discriminatory intent." *Francis v. Kings Park Manor, Inc.*, 992 F.3d 67, 73 (2d Cir. 2021).

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, (2007). A claim will only have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). A complaint is properly dismissed where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly,* 550 U.S. at 558.

In considering a motion to dismiss, a district court must "accept all factual claims in the complaint as true, and draw all reasonable inferences in the plaintiff's favor." *Lotes Co. v. Hon Hai Precision Indus. Co.,* 753 F. 3d 395, 403 (2d Cir. 2014). However, "the tenant that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal,* 556 U.S. at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* "Rather, the complaint's factual allegations must be enough to raise a right to relief above the speculative level, i.e. enough to make the claim plausible." *Arista Records, LLC v. Doe 3.* 604 F. 3d 110, 120 (2d Cir. 2010).

**B.    Plaintiffs Have Sufficiently Alleged Claims For Which Relief Can Be Granted**

      **1.    Plaintiffs Have Sufficiently Alleged Their FHA Claims**

Congress enacted the FHA, or Title VIII of the Civil Rights Act of 1968, to "provide, within constitutional limits, for fair housing throughout the United States." 42 U.S.C. § 3601. The law provides that it shall be unlawful "[t]o refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin." *Id.* § 3604 (a). Given this statutory language, the FHA provides potential plaintiffs wide latitude to bring a housing discrimination claim. *Id.* § 3604(b) ("To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin."); see *Trafficante v. Metropolitan Life Ins. Co.,* 409 US 205, 209 (1972) (describing the FHA's statutory language pertaining to prohibiting housing discrimination as "broad and inclusive").

In *United States v. Yonkers Board of Education*, 837 F.2d 1181 (2d Cir. 1988), the municipality's regulations regarding the geographic placement of subsidized housing amounted to a form of race–based housing discrimination. *Id.* (finding a § 3604 violation due to the practice of constructing subsidized housing in predominantly minority neighborhoods). By almost exclusively placing low–income housing in heavily minority neighborhoods, the local government's zoning decisions had the effect of perpetuating racial segregation, which amounted to a form of illegal housing discrimination. See *id.* at 1226 ("[T]he City may properly be held liable for the segregative effects of a decision to cater to this 'will of the people.'"). Additionally, courts permit the use of the disparate impact doctrine and the disparate treatment doctrine as alternative methods of pursuing housing discrimination claims under the FHA. *Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, 135 S. Ct. 2507, 2513 (2015); see also THE LEGAL GUIDE TO AFFORDABLE HOUSING DEVELOPMENT 65 (Tim Iglesias & Rochelle E. Lento eds., 2006)

("There are three principal theories by which a local land–use ordinance can be found to have violated the FHA: (1) intentional discrimination, (2) disparate impact, or . . . (3) failure to provide reasonable accommodation.").

The FHA forbids, inter alia, racial discrimination in connection with the sale or rental of housing, see *Fair Hous. in Huntington Comm. v. Town of Huntington,* No. 02-CV-2787 (DRH) (WDW), 2005 U.S. Dist. LEXIS 31355 (E.D.N.Y. Nov. 29, 2005), as well as actions which "otherwise make unavailable or deny" housing on the basis of race. 42 U.S.C. § 3604(a). FHA claims may be brought under either a disparate treatment theory, which requires a showing of intentional discrimination, and/or a disparate impact theory, which does not. See *Huntington Branch, NAACP v. Town of Huntington*, 844 F.2d 926, 933-34 (2d Cir. 1988) ("Huntington Branch II"); *Fair Hous. in Huntington Comm.*, 2005 WL 3184273, at * 2.

In the instant case, the Plaintiffs advance their FHA claim against the Defendants under both disparate treatment and disparate impact theories of liability. Defendants argue that Plaintiffs failed to properly assert violations of the FHA. Contrary to Defendants' arguments, the Amended Complaint properly alleges violations of the FHA under both theories.

**(i)        Plaintiffs Have Adequately Pled a Claim for Intentional Discrimination**

Defendants submit that Plaintiffs' disparate treatment claim must dismissed "for two independent reasons: (1) they fail to identify any similarly-situated persons of other races, who were treated differently from plaintiffs, and (2) they fail to allege plausibly that they were treated differently because of their race." See Def. Memorandum of Law, at 13.

However, the Defendants inaccurately apply the applicable standard for a disparate treatment claim. At the outset, a fair reading of the Amended Complaint demonstrates that the Plaintiffs, as prospective low-income tenants, have alleged facts that could plausibly support a

conclusion that they would be intentionally isolated from the market-rate tenants due to race and likely attributable to racially discriminatory motives. "Everyone agrees that the FHA punishes intentional discrimination. Treating someone "less favorably than others because of a protected trait" is "'the most easily understood type of discrimination.'" *Ricci v. DeStefano*, 557 U. S. 557, 577, 129 S. Ct. 2658, 174 L. Ed. 2d 490  [*559]  (2009) (quoting *Teamsters v. United States*, 431 U. S. 324, 335, n. 15, 97 S. Ct. 1843, 52 L. Ed. 2d 396 (1977). Indeed, this classic form of discrimination—called disparate treatment—is the only one prohibited by the Constitution itself." See, e.g., *Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U. S. 252, 264-265, 97 S. Ct. 555, 50 L. Ed. 2d 450 (1977). *Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.,* 576 U.S. 519, 558-59, 135 S. Ct. 2507, 2533 (2015).

To plead a prima facie case under a disparate treatment theory, plaintiffs must show that "animus against the protected group was a significant factor in the position taken by the municipal decision-makers themselves or by those to whom the decision-makers were knowingly responsive." *LeBlanc-Sternberg v. Fletcher,* 67 F.3d 412, 425 (2d Cir. 1995) (internal quotations and citation omitted). Once plaintiffs establish a prima facie case, defendants bear the burden of demonstrating that their action was taken to further "a legitimate, bona fide governmental interest and that no alternative would serve the interest with less discriminatory intent." *Huntington Branch II*, 844 F.2d at 936. "The prima facie case under McDonnell Douglas, however, is an evidentiary standard, not a pleading requirement." *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 510, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002).

Intent to discriminate may be inferred from the totality of relevant facts, including the fact that a regulation bears more heavily on one race than another. See *U.S. v. Yonkers Bd. of Ed.*, 837 F.2d 1181, 1221 (2d Cir. 1987) (internal quotations omitted). The Second Circuit has held that

13

among the factors from which intent may be inferred are: the "historical background of the decision
. . ., particularly if it reveals a series of official actions taken for invidious purposes"; "[t]he
specific sequence of events leading up to the challenged decision," such as zoning changes for a
given site enacted upon the decisionmaker's learning of plans for the construction there included
integrated housing opportunities; "contemporary statements by members of the decisionmaking
body, minutes of its meetings, or reports"; "[d]epartures from the normal procedural sequence";
and "[s]ubstantive departures . . ., particularly if the factors usually considered important by the
decisionmaker strongly favor a decision contrary to the one reached." *Id., quoting Arlington
Heights*, 429 U.S. at 267-68. In addition, "[t]he foreseeability of a segregative effect, or adherence
to a particular policy or practice, with full knowledge of thepredictable effects of such adherence
upon racial imbalance" is a factor to consider in determining intent. *See U.S. v. City of Yonkers*,
96 F.3d 600, 612 (2d Cir. 1996) (citation omitted).

In *Dews v. Sunnyvale*, 109 F. Supp. 2d 526 (N.D. Tex. 2000), the court utilized both a
disparate impact and disparate treatment analysis. In that case, the claim brought against a
municipality centered on the discriminatory impact of its low–density zoning restrictions. *Id.* at
529. The Court found that there was a discriminatory effect where the zoning restrictions excluded
racial minorities by prohibiting the construction of multi–family housing that would have been
disproportionally occupied by African Americans. See *Id.* at 526. The court then held that under
the disparate treatment doctrine, there is a discriminatory intent where (1) the defendant's stated
reasons for its decision are pretextual and (2) there is a reasonable inference that race was a
significant factor in the refusal. *Id.* at 532. To determine whether there is a discriminatory intent,
courts consider: "(1) discriminatory impact; (2) the historical background of the challenged
decision; (3) the specific sequence of events leading up to the decision; (4) any procedural and

substantive departures from the norm; and (5) the legislative or administrative history of the decision." *Id.* at 533. Disparate impact can be evidence of disparate treatment. E.g., *Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U. S. 520, 541-542, 113 S. Ct. 2217, 124 L. Ed. 2d 472 (1993) (opinion of Kennedy, J.); *Hunter v. Underwood*, 471 U. S. 222, 233, 105 S. Ct. 1916, 85 L. Ed. 2d 222 (1985). *Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.,* 576 U.S. 519, 588, 135 S. Ct. 2507, 2550 (2015).

In *Huntington Branch, NAACP v. Huntington,* 844 F.2d 926 (2d Cir. 1988), the Town of Huntington had enacted a zoning ordinance which restricted private construction of multi-family housing to a narrow urban renewal area and had also refused a non-profit developer's request to rezone a parcel of land located outside the urban renewal area, on which they wished to develop an integrated, multi-family, subsidized apartment complex. The Second Circuit found that the Town's zoning ordinance had both a "segregative effect" and an adverse impact on African Americans. See *Huntington,* 844 F.2d at 937-38. In concluding that the zoning ordinance tended to perpetuate segregation, the Court pointed out that "Huntington's zoning ordinance, which restricts private construction of multi-family housing to the largely minority urban renewal area, impedes integration by restricting low-income housing needed by minorities to an area already 52% minority." *Id.* ("the fact that a large majority of Mitchell's black tenants were clustered in a defined area is highly probative of a § 3604(a) violation. Statistics, although not dispositive, 'have critical, if not decisive significance.' … The district court's decision, based on statistical evidence and evidence of actions that effectively confined blacks to a section of the complex, is therefore consistent with the requirements of § 3604(a).") (internal citations omitted). *Dews v. Town of Sunnyvale*, 109 F. Supp. 2d 526, 531-32 (N.D. Tex. 2000)

In *Boykin v. KeyCorp*, 521 F.3d 202, 213 (2d Cir. 2008), the Second Circuit applied *Swierkiewicz* to an FHA claim, one of disparate treatment, and deemed a complaint sufficient. The Second Circuit held that the plaintiff did "not need to allege discriminatory animus for her disparate treatment claim to be sufficiently pleaded." Id. at 215. It was sufficient that the plaintiff stated her protected status, set forth the circumstances under which she was treated differently, and included an allegation that this differential treatment was on the basis of her protected status. See *Id.* Plaintiffs have adequately pled their disparate treatment claims under at least two of the three FHA provisions. 42 U.S.C. §§ 3604(d), 3604(f)(1).

In *ACORN v. Cty. of Nassau*, No. 05-CV-2301 (JFB) (WDW), 2006 U.S. Dist. LEXIS 50217, at *36-37 (E.D.N.Y. July 21, 2006), the Court rejected defendants' argument that plaintiffs failed to plead intentional discrimination. The Court held that:

> "Plaintiffs need only allege that animus against them was a significant factor in the position taken by the defendants in developing the Special Zoning. See *Huntington Branch, NAACP*, 844 F.2d at 936. There can be no dispute that the amended complaint has alleged discriminatory animus by defendants. (See Am. Compl. PP 22-24, 27-32). See *U.S. v. Yonkers Bd. of Ed.*, 837 F.2d 1181, 1221 (2d Cir. 1987) (holding that discriminatory animus may be inferred based on the historical background, the sequence of events, statements, and departures from the normal procedures by the government entity). Thus, as Huntington Branch, NAACP explains, the burden then shifts to defendants to demonstrate that the zoning decision was taken to further a "legitimate, bona fide governmental interest and that no alternative would serve the interest with less discriminatory intent." *Huntington Branch, NAACP*, 844 F.2d at 936. As the amended complaint has sufficiently alleged discriminatory animus by defendants, and assuming the facts as alleged are true, the burden will shift after discovery, to defendants to show a legitimate government interest. Thus, on a motion to dismiss, the Court finds plaintiffs have sufficiently pled intentional discrimination."

See *Id. at* 36-37.

In this action, Defendants argue that Plaintiffs' claims fail under an intentional discrimination theory because the Amended Complaint (1) fails to identify any similarly-situated persons of other races, who were treated differently from plaintiffs, and (2) fails to allege plausibly

that they were treated differently because of their race." However, these baseless arguments do not taken into account the factual allegations of the Amended Complaint and applicable law.

In the case at bar, the Plaintiffs allege that they are African-Americans and members of a protected class. (See Amended Complaint ¶18-20), and that by segregating and isolating the low-income tenants to specific lower floors within a different building address has discriminatory effects, and by exclusively placing the low-income tenants to specific floors within a separate and different address (553 West 30th), away from the market-rate units at 15 Hudson Yards, Defendants are perpetuating racial segregation, which amounts to a form of illegal housing discrimination. *Id.* ¶ 73. Plaintiffs allege that the Defendants sought and continue to seek to exclude minority tenants of 553 West 30th by intentionally placing low-income tenants to subpar units that are isolated to lower floors within a separate building address, separate and apart from market-rate tenants and units for sale and/or rent within the other floors of 15 Hudson Yards, and thus are intentionally discriminating against low-income tenants on the basis of race and color by violating the relevant portions of the Fair Housing Act and New York State and City Human Rights Laws. *Id.* ¶ 56, 97.

By segregating prospective minority low-income tenants to the lower floors of a separate building address, Defendants have intentionally discriminated against African-Americans on the basis of race, and in doing so unlawfully deprived Plaintiffs the social and professional benefits of living in a racially integrated society and implies that they are undesirable neighbors. *Id.* ¶ 80, 96.

Additionally, the 2015 amendments to N.Y. Real Prop. Tax Law § 421-a are telling, as the apparent loophole developers use to construct affordable units to an isolated specific floor or area of a building was outlawed. In other words, if the Defendants were approved of 421-a in 2016 or thereafter, the current configuration of the low-income units would not be approved. It is apparent that these amendments were made to 421-a in order to curb the discriminatory

intent of developers who vowed to isolate the placement of the low-income tenants of these mixed-use buildings as a way to maximize 'profits and marketability.' *Id.* ¶ 7-10, 77-79.

It is without question that Plaintiffs have alleged numerous facts from which the Defendants' intent to discriminate the Plaintiffs on the basis of race can be inferred in light of the applicable pleading standard. Here, the Defendants intentionally isolated the low-income tenants and otherwise limited socializing with  the tenants of the market-rate units because of race. *Id.* ¶ 77-79. Accordingly, Plaintiff's Amended Complaint satisfies the burden necessary to allege intentional discrimination claims under the FHA and this claim should proceed.

### (ii) Plaintiffs Sufficiently States a Claim of Disparate Impact under the FHA

The Supreme Court confirmed that disparate impact claims are cognizable under the FHA. *Inclusive Cmtys.,* at 2525. A disparate impact theory of liability challenges practices that are "fair in form, but discriminatory in operation." *Saunders v. Farmers Ins. Exch.,* 537 F.3d 961, 964 (8th Cir. 2008) (quoting *Griggs v. Duke Power Co.*, 401 U.S. 424, 431, 91 S. Ct. 849, 28 L. Ed. 2d 158 (1971)). As the Ninth Circuit has explained, Disparate impact provides a remedy in two situations that disparate treatment may not reach. First, "[i]t permits plaintiffs to counteract unconscious prejudices and disguised animus that escape easy classification." Second, disparate  impact . . . also targets "artificial, arbitrary, and unnecessary barriers" to minority housing and integration that can occur through unthinking, even if not malignant, policies of developers and governmental entities. *Ave. 6E Invs., LLC v. City of Yuma*, 818 F.3d 493, 503 (9th Cir. 2016) (quoting *Inclusive Cmtys.,* 135 S. Ct. at 2522); see also *Smith v. Anchor Bldg. Corp.,* 536 F.2d 231, 233 (8th Cir. 1976) ("Effect, not motivation, is the touchstone because a thoughtless housing practice can be as unfair to minority rights as a willful scheme."). *Crossroads Residents Organized for Stable &*

*Secure ResiDencieS (CROSSRDS) v. MSP Crossroads Apartments LLC*, No. 16-233 ADM/KMM, 2016 U.S. Dist. LEXIS 86965, at *16-17 (D. Minn. July 5, 2016).

Defendants once again conflate and mischaracterize Plaintiffs' allegations in the Amended Complaint and applicable law. Defendants also seek dismissal of Plaintiffs' disparate impact claim under the FHA on the grounds that "Plaintiffs fail to meet their pleading burden for at least two independent reasons: (1) they fail to allege facts demonstrating the existence of a disproportionate impact on a protected group; and (2) they fail to allege facts demonstrating the existence of a causal connection between the facially neutral policy and the alleged discriminatory effect." See Defendants' Memorandum of Law.

Defendants also submit that, absent a comparison of similarly situated groups and statistics, plaintiffs cannot state disparate impact claim. At the outset, it is well-settled that statistical evidence is not always necessary in pleading a disparate impact claim. ("[T]here may be cases where statistics are not necessary," as long as "there [is] some evidence that a significant number of people [of the protected class] needs [the housing in question] and that [the practice] restricts a substantial portion of [people in the class] from doing so."). *Paige v. N.Y.C. Hous. Auth.,* No. 17cv7481, 2018 U.S. Dist. LEXIS 137238, at *13 (S.D.N.Y. Aug. 14, 2018). Moreover, this is not a case of "mere differential treatment of different economic groups," but rather goes further than that. Contrary to Defendants' position, the crux of this matter is how the Defendants' housing decisions perpetuate racial discrimination by the "exclusion of minority persons from the apartment complex [through] the loss of important benefits from interracial associations," which is a recognizable injury and is alleged here. *Trafficante v. Metro. Life Ins. Co.,* 409 U.S. 205, 209, 93 S. Ct. 364, 34 L. Ed. 2d 415 (1972).

19

For disparate impact cases, to establish a prima facie case of discrimination under the FHA, "the plaintiff must show: (1) the occurrence of certain outwardly neutral practices, and (2) a significantly adverse or disproportionate impact on persons of a particular type produced by the defendant's facially neutral acts or practices." *Tsombanidis v. West Haven Fire Dept.,* 352 F.3d 565, 574-75 (2d Cir. 2003) (emphasis and citation omitted). "Furthermore, the plaintiff must show a causal connection between the facially neutral policy and the alleged discriminatory effect." Id. at 575. "The prima facie case under *McDonnell Douglas*, however, is an evidentiary standard, not a pleading requirement." *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 510, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002). As such, Defendants' arguments are wholly inaccurate and baseless.

"Disparate impact liability requires a showing that the challenged policy "resulted in or predictably will result in under-representation" of the protected class in the relevant population. *Hack v. President & Fellows of Yale Coll.*, 237 F.3d 81, 91 (2d Cir. 2000), abrogated on other grounds by *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002); see also *Tsombanidis*, 352 F.3d at 575-76; *Meyer v. Bear Road Assocs.,* 124 F. App'x 686, 688 (2d Cir. 2005) (affirming that a plaintiff "must demonstrate that a facially neutral policy actually or predictably leads to under-representation of families with children in the housing relative to the general population").. See also *Candlehouse, Inc. v. Town of Vestal, N.Y.,* 2013 U.S. Dist. LEXIS 63353, 2013 WL 1867114, at *13 (N.D.N.Y. May 3, 2013) (holding that the plaintiff "must do more than merely show that the Town's . . . provisions adversely affected its students. It must also establish . . . that [its] neutral policy actually or predictably created a shortage of housing. . ."). *Paige v. N.Y.C. Hous. Auth.,* No. 17cv7481, 2018 U.S. Dist. LEXIS 137238, at *10-11 (S.D.N.Y. Aug. 14, 2018). It is sufficient that they pled it "predictably will result in under-representation." See *Tsombanidis v. West Haven Fire Dept.,* 352 F.3d 565, 576 (2d Cir. 2003)

In *Gashi v. Grubb & Ellis Property Management Services, Inc.*, No. 3:09-CV-1037 (JCH), 2010 U.S. Dist. LEXIS 73926, at *15 (D. Conn. July 20, 2010), a married couple alleged that their condominium association's policy of not allowing more than two people per bedroom predictably created "a disparate impact on families with children because families with children are more likely to have three or more members." *Id*, at *1 (D. Conn. July 21, 2010). Relying on *Tsombanidis* and *Hack*, the district court held that the couple "alleged facts sufficient to make a plausible claim that the policy [was] 'outwardly neutral' [but] has had a 'disproportionate impact' . . . in light of . . . familial status." *Gashi* at 5.

 In *Crossroads Residents Organized for Stable and Secure ResiDencieS (CROSSRDS) v. MSP Crossroads Apartments LLC*, 2016 U.S. Dist. LEXIS 86965, 2016 WL 3661146, at *1-2 (D. Minn. July 5, 2016), tenants sued an apartment complex based on an increase in rent and upgraded background checks that they alleged caused a disparate impact. *Id.* The court held that "[a]lthough the Complaint d[id] not contain all the data necessary [to calculate a disparate impact], it d[id] contain enough factual allegations to support an inference that [p]laintiffs will ultimate be able to show a disparate impact through statistical analysis." *Crossroads Residents*, 2016 U.S. Dist. LEXIS 86965, 2016 WL 3661146, at *7. Also see, *Paige v. N.Y.C. Hous. Auth.,* No. 17cv7481, 2018 U.S. Dist. LEXIS 137238, at *13-14 (S.D.N.Y. Aug. 14, 2018)

Further, the Supreme Court has interpreted the FHA's definition [*16]  of "aggrieved person" as reflecting "a congressional intent to confer standing . . . as broadly as is permitted by Article III of the Constitution." See *Bank of Am. Corp. v. City of Miami, Fla*., 137 S. Ct. 1296, 1303, 197 L. Ed. 2d 678 (2017) (citations and quotation marks omitted).

This includes "the alleged injury to existing tenants by exclusion of minority persons from the apartment complex [through] the loss of important benefits from interracial associations."

*Trafficante v. Metro. Life Ins. Co.,* 409 U.S. 205, 209, 93 S. Ct. 364, 34 L. Ed. 2d 415 (1972); *Fair*

*Hous. in Huntington Comm. Inc. v. Town of Huntington, N.Y.,* 316 F.3d 357, 362 (2d Cir. 2003)

("[A] plaintiff sufficiently establishes standing to bring suit under the FHA by alleging that a

defendant's acts impinge on the plaintiff's right to live in an integrated community."); *Hamad v.*

*Woodcrest Condo Ass'n*, 328 F.3d 224, 232 (6th Cir. 2003) (allowing plaintiffs to sue because

"they were members of a community whose familial-status composition was being manipulated").

*Paige v. N.Y.C. Hous. Auth.*, No. 17cv7481, 2018 U.S. Dist. LEXIS 137238, at *15-16 (S.D.N.Y.

Aug. 14, 2018). *Trafficante v. Metropolitan Life Ins. Co.*, 409 US 205, 221 (1972) (finding that

losing the social and economic benefits associated with living in a racially integrated environment

is a valid injury for a plaintiff to allege).

In the case at bar and similarly in *Crossroads,* as an alternative showing of disparate

impact, the Plaintiffs allege that the low-income tenants that are harmed by Defendants' actions

are disproportionately protected class members and has an effect on housing by dissuading

Plaintiffs from renting. *Amended Complaint,*  ¶ 75, 107; *Crossroads Residents Organized for*

*Stable & Secure ResiDencieS (CROSSRDS) v. MSP Crossroads Apartments LLC*, No. 16-233

ADM/KMM, 2016 U.S. Dist. LEXIS 86965, at *19 (D. Minn. July 5, 2016).

Specifically, Plaintiffs allege that the physical separation of the floors and building

addresses between 553 West 30th and 15 Hudson Yards, specifically the separation of the low-

income units from the market rate units, respectively, disproportionately occupied by racial

minorities, violates the Fair Housing Act, New York City and State Human Rights Laws, by

impeding integration by restricting low income housing needed by minorities exclusively to an

area of a building mostly inhabited by minorities. *Amended Complaint,* ¶ 75, 107.  Plaintiffs also

allege that "the discriminatory effects of Defendants isolating the low-income tenants to lower

floors of a different address located at 553 West 30th, away from market-rate tenants at 15 Hudson Yards, respectively, are racial segregation and impermissibly depriving their low-income tenants of the social and economic benefits of integration while also compromising the dignity of the population being segregated." *Id.* ¶ 108. Defendants' discriminatory customs, practices and actions deprive the Plaintiffs of their right of equal access to housing and/or otherwise make housing unavailable to Plaintiffs, both by intent and impact, in violation of the FHA. *Id.* ¶ 109. Defendants' acts, policies, and practices have an adverse and disproportionate impact on African Americans and Hispanics in New York City as compared to similarly situated whites. This adverse and disproportionate impact is the direct result of Defendants' segregation policies of limiting the minority tenants into one specific building address and lower floors away from the high-income tenants and not allowing them to share the same amenities, and rules and regulations, with no consideration of their individual characteristics and circumstances. This policy is not necessary to serve any substantial legitimate, nondiscriminatory interest, and any such interest can be satisfied by another practice – providing individualized consideration – that would have a less discriminatory effect. *Id.* ¶ 110*,* 111.

The court in *Paige v. N.Y.C. Hous. Auth.*, No. 17cv7481, 2018 U.S. Dist. LEXIS 137238, at *13 (S.D.N.Y. Aug. 14, 2018) held that: "Discovery will ascertain whether the disparate harm to families that Plaintiffs allege caused them to move out or dissuaded others from renting. Therefore, Plaintiffs may be able to establish that NYCHA's acts caused "significantly adverse or disproportionate impact on persons of a particular type"—families with young children. See *Tsombanidis*, 352 F.3d at 575." *Id.*

In the case at bar, the Plaintiffs' allege that: "Defendants' policy or practice has a disproportionately adverse effect on tenants and/or potential tenants who are African-American,

and in doing so unlawfully deprived Plaintiffs the social and professional benefits of living in an integrated society. *See* Amended Complaint, ¶ 113. Defendants' policy or practice is the direct cause of the disproportionately adverse effects on tenants and/or potential tenants who are African-American. *Id.* ¶¶ 73, 114."Additionally, upon realizing the discriminatory segregation… among these two differing addresses within the 15 Hudson Yards premises, the Plaintiffs collectively declined the Defendants' offer of low-income units at 553 West 30th Street (a/k/a 15 Hudson Yards) in or around March 2020. *Id.* ¶ 72.

It is well documented that segregating tenants negatively impacts housing availability, as alleged here. In Audrey McFarlane's *The Properties of Integration: Mixed-Income Housing as Discrimination Management,* 66 U.C.L.A. Law Review 1140 (2019),  pg. 1185, it was discussed that:

> "New York City and London poor doors were crude, stigmatizing efforts to overtly cater to discriminatory impulses. The doors were not mere matters of convenience but a way of signaling preferred or high status to some users and lack of status to others. Accordingly, the poor doors demonstrate that the overall project of mixed-income housing has managed discrimination in a manner that is not self-aware nor self-critical. Mixed-income housing uncritically accepts discriminatory preferences as justified because they mirror policymakers' own biases and what they consider to be desirable living arrangements. Moreover, low-income persons are stereotyped and cut off from receiving the valuable resource of housing because they are defined as only eligible for a limited share. Managing discrimination in this way leads to a housing scarcity that perpetuates, if not exacerbates, the problem it intended to solve."[4]

In the case at bar, a fair reading of Plaintiffs' Amended Complaint demonstrates that the Plaintiffs have sufficiently alleged a disparate impact claim in that the segregation and isolation of low-income tenants rob them of important social benefits, which ultimately dissuaded them from renting the units offered. Accordingly, Defendants' motion should be denied.

### 2. Plaintiffs' State and Local-Law Claims Should Not Be Dismissed

---

[4] See, Audrey McFarlane, *The Properties of Integration: Mixed-Income Housing as Discrimination Management,* 66 U.C.L.A. Law Review 1140 (2019),  pg. 1185.

Defendants move to dismiss Plaintiffs' state and local-law claims. However, for the same reasons set forth above, these claims should not be dismissed. "The NYCHRL embodies a broader conception of actionable discrimination than Title VII and the NYSHRL." See *Smith v. Johnson*, 14 Civ. 3975 (KBF), 2014 WL 5410054, at *4 (S.D.N.Y. Oct. 24, 2014). "To state a claim for discrimination under the NYCHRL, a plaintiff must only show differential treatment of any degree based on a discriminatory motive." *Gorokhovsky v. N.Y. City Hous. Auth.,* 552 Fed.Appx. 100, 102 (2d Cir. 2014) (summary order).

## IV. CONCLUSION

Plaintiff has sufficiently pled cognizable claims. As a result of the foregoing, Plaintiffs respectfully requests this Court to deny Defendant's motion to dismiss the Amended Complaint.

Dated: December 1, 2021
     New York, New York

Respectfully submitted,

MARK DAVID SHIRIAN P.C.

By: __/s/ Mark D. Shirian, Esq.
228 East 45th Street, Suite 1700B
New York, NY 10017
Telephone: (212) 931-6530
Email: mshirian@shirianpc.com
COUNSEL FOR PLAINTIFF